IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON AMERICAN ACADEMY OF PEDIATRICS, et al. | Misc. Case No. _____ |
| AUGUST DEKKER et al., <br><br> Plaintiffs, <br><br> v. <br><br> SIMONE MARSTILLER et al., <br><br> Defendants. | Northern District of Florida <br><br> Case No. 4:22-cv-325-RH-MAF |

**REDACTED DECLARATION OF AMERICAN ACADEMY OF PEDIATRICS IN SUPPORT OF JOINT MOTION OF NONPARTY GROUPS TO QUASH RULE 45 SUBPOENAS AND FOR FEES**

I, ▮▮▮▮▮▮▮▮, declare as follows:

1. I am the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at the American Academy of Pediatrics ("AAP"). If called upon to testify as to the facts set forth herein, I could and would testify competently thereto.

2. Before becoming AAP's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on ▮▮▮▮▮, I was a member of AAP's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ team since ▮▮▮▮▮. In that role, my responsibilities included legislative research and analysis on pediatric health care issues; strategic consultation and technical assistance to AAP chapters, AAP committees, AAP councils, AAP sections, and other AAP entities on pediatric health care issues; developing and disseminating state advocacy resources; providing advocacy education and training; and partner engagement.

3. I have spent nearly 15 years working with hundreds of AAP physician-members and hundreds of our partner organizations in the medical community to advance the cause of children's health and wellbeing. Through this work, I have developed extensive knowledge of pediatric health care issues and AAP's internal operations and procedures.

Background

4. AAP is a 501(c)(3) organization founded in 1930 by a group of 35 pediatricians who wanted to address pediatric healthcare standards. AAP's mission is to attain optimal physical, mental, and social health and well-being for all infants, children, adolescents and young adults. To accomplish this mission, AAP supports the professional needs of our more than 67,000 pediatrician members.

1

5.      AAP engages in a number of charitable activities, including our large pediatric publishing program, with more than 300 titles for consumers and over 500 titles for physicians and other healthcare professionals. AAP also publishes hundreds of policy statements, clinical reports, and technical reports, ranging from advocacy issues to practice recommendations, all of which are available on AAP's website.

6.      AAP does not conduct clinical studies. We work with experts in the field to review and analyze publicly available evidence. We then publish those analyses freely online, citing all of the evidence we reviewed, the methodology we used to evaluate the evidence, the basis of our conclusions, and all potential conflicts of interest.

7.      We have published numerous policy statements examining pediatric health care issues and providing recommendations. Most recently, AAP published policy statements on the prevention and control of influenza, patient safety in emergency care settings, ATV injuries and deaths, and immunization information systems.

8.      Related specifically to gender-affirming care, we published a Policy Statement that examined the medical literature and provided recommendations for the care of transgender and gender-diverse youth. AAP does not generate or publish clinical guidelines regarding gender-affirming care. Our Policy Statement recommends that "TGD (transgender and gender-diverse) youth have access to comprehensive, gender-affirming, and developmentally appropriate health care that is provided in a safe and inclusive clinical space," among other recommendations. The Policy Statement is not clinical guidance for the care of transgender and gender-diverse youth.

The Subpoena

9. I have reviewed the nonparty subpoena issued to AAP by Secretary Marstiller and the Florida Agency for Health Care Administration. The subpoena contains multiple requests that relate to many different aspects of AAP's work. In my judgment, responding to the requests as drafted would require AAP to identify and speak with multiple potential document custodians from across the organization, including at least the following teams within AAP: Advocacy Communications; Chapter, District, & Member Engagement; News, Media, and Public Relations; Information Technology; Medical & Surgical Subspecialties; State Advocacy; and Systems of Services for Children with Special Health Care Needs. We would then need to collect potentially responsive documents from those individuals. Given the breadth of the requests as drafted, it is possible AAP would need to collect Electronically Stored Information ("ESI"), such as custodial email files, from some or all of those individuals.

10. AAP does not have an in-house e-discovery team. To the extent AAP needed to collect more than a *de minimus* number of documents, and certainly if any ESI collections were required, we would likely need to retain a third-party vendor to collect and process those documents. Any collected documents would also need to be reviewed by attorneys for responsiveness to the subpoena requests and for privilege, among other issues. Our pro bono counsel would be involved in that work, but I understand that depending on the volume of documents, AAP could need to retain additional contract attorneys to review the materials.

11. AAP has only one in-house counsel, who currently has a full plate with wide ranging legal matters to attend to and hundreds of contracts to review in a short timeframe. Moreover, my team would need to closely review the responsiveness and privilege determinations, especially because many of our organizational and internal documents are highly

context-specific.  For example, we extensively use acronyms or medical terminology.  Further, many of our internal documents may involve third parties who have their own privacy rights, or sensitive patient or health data.  Screening for this information would require additional time from my team.  Finally, I understand that we would likely need a vendor to process the responsive documents for production.

12. While we have not obtained quotes from discovery vendors for the work I described above, I understand that discovery costs of this type can often run into the tens of thousands of dollars.  AAP is a non-profit organization with limited resources, and this effort would quickly supplant and exceed AAP's existing legal budget.

13. In my view, the work I have described that would be required to respond to the subpoena as drafted would also distract our team from the critically important, time-sensitive work we do advancing children's health and wellbeing.

14. The subpoena also requests that AAP put forward one or more witnesses to speak on behalf of our organization in a deposition.  Given the scope of the topics identified in the subpoena, I believe it would require a substantial investment of time and resources to prepare such individuals to testify.  At a minimum, we would need to locate and review supporting documents (which would impose much of the same burden described above), identify and speak with knowledgeable individuals from across the organization, and spend many hours educating our witness(es).

15. We also view this subpoena—which is broad, and which requests our private, confidential internal communications—as highly invasive.  As drafted, the subpoena requests production of various internal communications with our members and partners, internal chats, notes, drafts, social media posts, and private email.  Our members use all of these channels to

communicate with each other and engage in robust, frank, and healthy discussion of AAP's work product.

16. Based on my nearly 15 years of experience working with AAP members, I believe that our staff and members will communicate less, and less freely, if the subpoena were enforced. Already, just the service of this subpoena, and the prospect that we may be required to produce internal messages and communications, has chilled our internal communications. My previous work in AAP State Advocacy required the ability to have honest, open discussions about policy issues and then strategize with colleagues and partners on how best to approach issues and provide guidance to AAP chapters, AAP committee, AAP councils, AAP sections, and other AAP entities. The subpoena has greatly hampered our ability to engage in those discussions. I am anxious of updating my colleagues on the current state of affairs around gender-affirming care in Florida for concern of those open discussions being pulled into court. I am reluctant to seek guidance from colleagues or my previous supervisor on this issue for concern of bringing them under the umbrella of the subpoena. The answer has been to not update colleagues out of trepidation and not to seek guidance.

17. During discussions on the State of Florida's efforts regarding gender-affirming care, we were required to be very cautious about communications between us and the Florida Chapter of the AAP out of concern that those discussions could be pulled into court as well. We have since had to take a more cautious approach in other states as well on this issue, thereby greatly diminishing our ability to engage in open discussions with state AAP chapters on how best to advocate against efforts to ban gender-affirming care. State AAP chapters are small, with very limited budgets and staff. They rely on us to be able to provide guidance and have open

discussions on advocacy strategies. Since the subpoena was issued, that ability has greatly diminished.

18. The subpoena is not just an issue for myself and other AAP staff; it also directly effects the ability of our physician-member experts to volunteer and provide their expertise. The AAP is an evidence-based, policy-driven organization and we rely on our physician-member experts to develop our policy statements, clinical reports, and technical reports. Physician members with expertise in gender-affirming care have to be very cautious in the political environment surrounding gender-affirming care and the subpoena has added to that burden. The subpoena has made it extremely difficult to seek out our physician-member expertise on gender-affirming care because we risk putting those physician-members under the umbrella of the subpoena. Our physician-members have been harassed and threatened for providing this care and many are unwilling to engage in public support or serve as spokespersons on the issue for the AAP.

19. I am also concerned that our staff and members will avoid communicating with each other, and that new members will fear joining, if they know their private emails and comments shared with us will become public fodder in contentious policy debates and potentially subject them to harassment.

20. This subpoena has also created a notable chill on our educational efforts, which aim to benefit all pediatricians and their patients. As a result of this subpoena, whenever AAP prepares to submit a new amicus filing, send a letter to the government, or issue a new policy statement, our board now considers whether this will open us up to a similarly invasive subpoena from those who oppose our policy positions.

21. Open, honest dialogue is also essential to the accuracy of our work product and practice recommendations, which pediatricians use every day to inform their medical decision-making. We work with dozens of pediatric care experts every year to understand the latest science, and to review and edit our publications materials. These experts are volunteers, and do this work out of a desire to help improve pediatric care. Having personally worked with many of them for years, I know that many would think twice before volunteering their expertise if their confidential feedback could be shared with the world. Our ability to receive candid feedback depends on the confidence that peer reviews and communications with AAP will not be publicly disclosed. Based on my experience, I believe enforcement of this subpoena will reduce the quality and accuracy of our work product, which in turn will worsen the care that our pediatrician members provide to their patients across all health domains.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Itasca, IL, on January 10, 2023.



American Academy of Pediatrics

8