**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON AMERICAN ACADEMY OF PEDIATRICS, et al., | Misc. Case No. _____ |
| AUGUST DEKKER, et al.,<br><br>               Plaintiffs,<br>v.<br><br>JASON WEIDA, et al.,<br><br>               Defendants. | Northern District of Florida<br>Case No. 4:22-cv-325-RH-MAF |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
JOINT MOTION OF NONPARTY GROUPS TO
QUASH RULE 45 SUBPOENAS AND FOR FEES**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................................................... 1

II.   BACKGROUND ................................................................................................... 4

    A.    The Nonparty Groups ............................................................................... 4

    B.    The Subpoenas ......................................................................................... 5

    C.    Scope of Discovery in the Underlying Litigation ................................... 7

    D.    Meet-and-Confer Efforts .......................................................................... 8

III.  ARGUMENT ...................................................................................................... 10

    A.    The Subpoenas Seek Discovery Irrelevant to the Issue in Dispute in This
           Litigation. ............................................................................................... 10

    B.    Complying With the Subpoenas Would Impose Undue Burdens on the
           Nonparty Groups. ................................................................................... 13

    C.    The Subpoenas Infringe on Free Speech and Associational Rights. ................... 16

    D.    The State Should be Required to Pay the Nonparty Groups' Fees. ...................... 19

IV.   CONCLUSION ................................................................................................... 21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL-CIO v. FEC*,
   333 F.3d 168 (D.C. Cir. 2003) ................................................................17

*Apple Inc. v. Match Grp., Inc.*,
   2021 WL 3727067 (N.D. Cal. Aug. 19, 2021) ........................................17

*Black Panther Party v. Smith*,
   661 F.2d 1243 (D.C. Cir. 1981) ...............................................................17

*Boe v. Marshall*,
   2022 WL 14049505 (M.D. Ala. Oct. 24, 2022).................................13, 14

*Builders Ass'n of Greater Chicago v. City of Chicago*,
   2002 WL 1008455 (N.D. Ill. May 13, 2002) ...........................................20

*Coleman v. District of Columbia*,
   275 F.R.D. 33 (D.D.C. 2011)...........................................................10, 13

*Dekker v. Weida*,
   No. 4:22-cv-325-RH-MAF (N.D. Fla. filed Sept. 7, 2022) ........... *passim*

*Int'l Action Ctr. v. United States*,
   207 F.R.D. 1 (D.D.C. 2002)....................................................................17

*N.C. Right to Life v. Leake*,
   231 F.R.D. 49 (D.D.C. 2005)............................................................12, 14

*NAACP v. Ala. ex rel. Patterson*,
   357 U.S. 449 (1958)..........................................................................16, 19

*Night Hawk Ltd. v. Briarpatch Ltd., L.P.*,
   2003 WL 23018833 (S.D.N.Y. Dec. 23, 2003) .......................................21

*In re Schaefer*,
   331 F.R.D. 603 (W.D. Pa. 2019) ............................................................12

*Ted Cruz for Senate v. FEC*,
   451 F. Supp. 3d 92, 99 (D.D.C. 2020)....................................................17

*United States v. Kellogg Brown & Root Servs., Inc.*,
   284 F.R.D. 22 (D.D.C. 2012)..................................................................10

*United States v. Miller*,
  799 F.3d 1097 (D.C. Cir. 2015) ..................................................................................10

*Updateme Inc. v. Axel Springer SE*,
  2018 WL 5734670 (N.D. Cal. Oct. 31, 2018) ..........................................................14

*Watts v. S.E.C.*,
  482 F.3d 501 (D.C. Cir. 2007) ..................................................................................14

*Whole Woman's Health v. Texas Catholic Conference*,
  896 F.3d 362 (5th Cir. 2018) ....................................................................................18

*Wyoming v. U.S. Dep't of Agriculture*,
  208 F.R.D. 449 (D.D.C. 2002) ..................................................................................14

**Statutes**

Fla. Stat. § 409.905(9) ..................................................................................................7

**Other Authorities**

Fed. R. Civ. P. 25(d) ......................................................................................................1

Fed. R. Civ. P. 26 .....................................................................................................1, 10

Fed. R. Civ. P. 45 ................................................................................................ *passim*

Fla. Admin. Code R. 59G-1.050(7) ...............................................................................4

Dylan Housman, *EXCLUSIVE: Florida Subpoenas Organizations Pushing
  Transgender Care on Children in Lawsuit*, Daily Caller (Dec. 14, 2022),
  https://dailycaller.com/2022/12/14/florida-transgender-care-lawsuit-medicaid-
  subpoena/ ..............................................................................................................19

## I.    INTRODUCTION

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, nonparties

American Academy of Pediatrics ("AAP"), Endocrine Society, World Professional Association

for Transgender Health ("WPATH"), American Academy of Child & Adolescent Psychiatry,

American Academy of Family Physicians, American Academy of Nursing, American College of

Obstetricians and Gynecologists, American College of Physicians, American Medical

Association, American Pediatric Society, American Psychiatric Association, Association of

American Medical Colleges, National Association of Pediatric Nurse Practitioners, North Central

Florida Council of Child & Adolescent Psychiatry, Societies for Pediatric Urology, Society for

Adolescent Health and Medicine, Society for Pediatric Research, and Society of Pediatric Nurses

(collectively, the "Nonparty Groups") jointly and respectfully move to quash the subpoenas

served on each of them by Defendants Jason Weida and the Florida Agency for Health Care

Administration ("Defendants" or the "State") in the case styled *Dekker v. Weida*, No. 4:22-cv-

325-RH-MAF (N.D. Fla. filed Sept. 7, 2022) ("*Dekker*" or the "Underlying Litigation").[1]

Nonparty Groups also seek reimbursement of their attorneys' fees incurred in responding to the

subpoenas, including their fees incurred in bringing this motion.

In the Underlying Litigation, several individual plaintiffs have asserted Constitutional

and statutory challenges to the adoption by the Florida Agency for Healthcare Administration of

an administrative rule prohibiting Medicaid coverage for medical treatments that are indicated

for the clinical condition known as gender dysphoria.  Lannin Decl., Ex. 1 (*Dekker*, Complaint,

Doc. 1).  Gender dysphoria is a clinical condition that is marked by distress due to an

---

[1] The subpoenas at issue, which are noticed for compliance in this judicial district, are attached
hereto as Exhibits A-R.  On January 12, 2023, pursuant to Federal Rule of Civil Procedure 25(d),
Jason Weida was substituted for Simone Marstiller as a defendant.

incongruence between a patient's gender identity (*i.e.*, the innate sense of oneself as being a particular gender) and sex assigned at birth.

The Nonparty Groups are 18 professional medical and mental health organizations. They are not, and have never been, parties to the Underlying Litigation. Rather, they moved to submit an *amicus* brief in support of the *Dekker* Plaintiffs' motion for a preliminary injunction. Lannin Decl., Ex. 2 (*Dekker*, Motion for Leave to File Amicus Brief, Doc. 34). The proposed *amicus* brief described the widely accepted view of the medical community that "gender-affirming care," which includes the treatments prohibited by the Florida rule, is the appropriate treatment for gender dysphoria, as reflected in publicly-available clinical guidelines published by two of the 18 groups that bring this motion: WPATH and Endocrine Society. Pursuant to those clinical guidelines, the medical treatments at issue in *Dekker* may be indicated to treat gender dysphoria in adolescents and adults who meet specified eligibility criteria. The remaining 16 groups do not publish clinical guidelines.

The State opposed the submission of the Nonparty Groups' *amicus* brief, arguing it lacked adequate time to respond, that "counsel for the parties are more than able to present arguments and scientific information," and that " [o]utside assistance is not necessary." Lannin Decl., Ex. 4 (*Dekker*, Opp. to. Mot. for Leave to File Amicus Brief ("Opp. to Mot. for Leave"), Doc. 35 at 2). The *Dekker* court subsequently denied the Nonparty Groups leave to file their proposed *amicus* brief and denied plaintiffs' motion for a preliminary injunction. Lannin Decl., Ex. 5 (*Dekker*, Order Denying Leave to File Amicus Br., Doc. 43).

Although it succeeded in excluding the Nonparty Groups' *amicus* brief, the State proceeded to serve substantively identical subpoenas on all of the Nonparty Groups. Those subpoenas seek documents from every organization and, from three of the organizations (AAP,

Endocrine Society, and WPATH), deposition testimony.  The State has identified two principal areas of inquiry: (i) any "policy positions" each organization has regarding gender-affirming care; and (ii) any "guidelines" (or "standards" and "best-practices") each organization publishes for gender-affirming care.  As to both categories, the State is seeking voluminous internal information, including how such materials were created, who voted for them and why, and communications between and among members about them.  All of this material is irrelevant to the Underlying Litigation.

The *Dekker* court has observed that the "controlling" question in that litigation is "whether, based on current medical knowledge, the state's determination that these treatments are experimental is reasonable."  Lannin Decl., Ex. 6 (*Dekker*, Order Denying a Prelim. Injunct. ("PI Order"), Doc. 64 at 4-5).  There is no plausible argument that statements pertaining to policy matters, much less internal documents about them, are relevant to the state of "current medical knowledge."  *Id.*  Furthermore, even assuming that the clinical guidelines published by exactly *two* of the subpoenaed organizations are relevant to "current medical knowledge," those guidelines speak for themselves.  The State presumably will challenge those guidelines with whatever contrary scientific evidence it credited when it first determined the treatments described in those guidelines is "experimental."  But the State does not need WPATH's and Endocrine Society's sensitive internal communications to mount that challenge to the scientific basis of the guidelines they publish.  Rather, the State has sought these internal materials for a very different reason: to hunt for evidence of supposed internal dissent and biased procedures in service of an attack on the guidelines (and the credibility of the other 16 organizations that merely support them) from the inside-out.  This Court should not countenance this inappropriate and highly invasive discovery.

3

For the reasons described more fully below, the State's subpoenas to the Nonparty Groups should be quashed in their entirety. The subpoenas seek information that is irrelevant to the issue in dispute in the Underlying Litigation, and complying with them would impose significant, undue burdens and expenses on these nonparty, non-profit organizations. The subpoenas also infringe upon the Nonparty Groups' associational rights under the First Amendment by discouraging membership and candid, uninhibited dialogue within the organizations, which is integral to the scientific process and the organizations' missions. Indeed, permitting invasive internal discovery of organizations that merely sought (unsuccessfully) to file an *amicus* brief would have far-reaching and chilling implications for friends of the court everywhere. Finally, given the charged nature of the Underlying Litigation and the publicity it has attracted, permitting this discovery could subject the Nonparty Groups and their employees and members—many of whom are identified with specificity in the materials sought by the State—to harassment, threats, and even the risk of physical violence, which would further chill membership.[2]

## II.   BACKGROUND

### A.   The Nonparty Groups

On August 21, 2022, Defendant Florida Agency for Healthcare Administration adopted Florida Administrative Code Rule 59G-1.050(7), which prohibits Medicaid coverage for certain treatments for gender dysphoria. Plaintiffs in the Underlying Litigation thereafter filed a complaint for declaratory, injunctive, and other relief and a motion for a preliminary injunction barring enforcement of the rule. Lannin Decl., Ex. 1 (*Dekker*, Complaint, Doc. 1).

---

[2] The Nonparty Groups also request an order requiring the State to reimburse them and their *pro bono* counsel for the fees incurred responding to these subpoenas, including their fees incurred in bringing this Motion.

The 18 Nonparty Groups bringing this motion are among the 22 national and state professional medical and mental health organizations that sought leave to file an *amicus* brief in support of Plaintiffs' motion.[3]  Lannin Decl., Ex. 2 (*Dekker*, Mot. for Leave., Doc. 34).  The proposed *amicus* brief explained that gender-affirming care, as described in publicly-available clinical guidelines issued by WPATH and Endocrine Society, is the widely-accepted standard of care for gender dysphoria.[4]  Lannin Decl., Ex. 3 (*Dekker*, Proposed *Amicus* Brief, Doc. 34-1 at 8–27).  The State opposed the submission of Nonparty Groups' proposed *amicus* brief, arguing "counsel for the parties are more than able to present arguments and scientific information" and that "[o]utside assistance is not necessary."  Lannin Decl., Ex. 4 (*Dekker*, Opp. to Mot. for Leave, Doc. 35 at 2).  On October 3, 2022, the *Dekker* court denied the Nonparty Groups leave to file the *amicus* brief and, a few weeks later, denied Plaintiffs' motion for preliminary injunction.  Lannin Decl., Exs. 5, 6.  In short, the Nonparty Groups' proposed *amicus* brief is *not* in the record in the Underlying Litigation.

### B.      The Subpoenas

On November 8, 2022, the State issued to AAP, Endocrine Society, and WPATH subpoenas seeking depositions from each of these organizations and also the production of documents, as specified in seven requests for production.[5]  *See* Ex. A  at 11-12 (AAP Subpoena);

---

[3] Four of the 22 proposed *amici* are not parties to this Motion because the subpoenas that they received from the State, which are otherwise identical to those at issue in this motion, were noticed for compliance in other jurisdictions.

[4] None of the other proposed *amici curiae*, aside from WPATH and Endocrine Society, have published clinical guidelines related to gender-affirming care.

[5] AAP, founded in 1930, is a 501(c)(3) non-profit organization of 67,000 pediatricians whose mission is to attain the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults.  *See* Declaration of AAP (January 10, 2023) ("AAP Decl."), filed under seal, ¶ 4.  WPATH, founded in 1979, is a 501(c)(3) non-profit

Ex. B  at 11-12 (Endocrine Soc'y Subpoena);  Ex. C  at 11-12 (WPATH Subpoena)).  The subpoenas seek information about each organization's policies and guidelines, internal communications, and associational activities related to gender-affirming care.  Specifically, the subpoenas specify the following deposition topics: "(1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended by through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case."  *See, e.g.*, Exs. A-C at 2.

The document requests are similar and call for:

> Request No. 1:  Any documents that state the total number of your membership.
>
> Request No. 2: Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.
>
> Request No. 3: Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.  Any documents and communications showing the individuals or committees that

---

interdisciplinary professional and educational organization whose mission is to promote evidence-based care, education, research, public policy, and respect in transgender health.  *See* Declaration of WPATH (January 10, 2023) ("WPATH Decl."), filed under seal, ¶ 4.  Endocrine Society, founded in 1916, is a 501(c)(3) non-profit organization of physicians and scientists whose mission includes uniting, leading, and growing the endocrine community to accelerate scientific breakthroughs and improve health worldwide.  *See* Declaration of Endocrine Society (January 10, 2023) ("Endocrine Society Decl."), filed under seal, ¶ 3. Public versions of the foregoing declarations, which have been lightly redacted to protect the privacy of the individual declarants, have also been filed concurrently with this Motion.

proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:  Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:  Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:   Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 7:  Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

*See* Exs. A, B, C at 11-12 (subpoenas to AAP, Endocrine Society, and WPATH).  On November 15, 2022, the State issued subpoenas to the remaining 15 Nonparty Groups containing identical requests for production, but without deposition requests.  Exs. D-R.

### C.    Scope of Discovery in the Underlying Litigation

According to the State, it adopted the challenged rule prohibiting coverage for certain treatments consistent with gender-affirming care "because [it] found those treatments to not be 'consistent with generally accepted professional medical standards,' and to otherwise be 'experimental or investigational.'"  Lannin Decl., Ex. 12 (*Dekker,* Opp. to PI Mot., Doc. 49 at 2; *see also* Fla. Stat. § 409.905(9) (barring Florida Medicaid coverage for services that are "clinically unproven [or] experimental."))  Consequently, the *Dekker* court has determined that "[t]he fundamental issue that eventually will determine the outcome in the case is whether the State has reasonably determined that the treatments at issue are experimental."  Lannin Decl., Ex.

7 (*Dekker*, 10/12/2022 Hr'g on Prelim. Inj. Tr., at 111:25-112:3).  The *Dekker* court explained

that whether the treatments are experimental is a "factual question," *id.* at 68:23-25, and found

that the reasonableness of the State's determination depends on whether it comports with

"current medical knowledge."  Lannin Decl., Ex. 6 (*Dekker*, PI Order, Doc. 64 at 4-5 (emphasis

added)).  In light of the purely scientific nature of the "fundamental issue" in dispute, the *Dekker*

court set an accelerated fact discovery schedule and noted that "nobody is trying to figure out

some complicated factual issue other than the complicated factual issue that's the core of the

case *and that you've already looked at in detail*."  *See* Lannin Decl., Ex. 7 (*Dekker*, 10/12/2022

Hr'g on Prelim. Inj. Tr. at 117:13-16 (emphasis added)).

      The State echoed the district court's view of the "fundamental issue" in dispute when it

opposed the Nonparty Groups' motion for leave to file their *amicus* brief.  Specifically, the State

observed that "counsel for the parties are more than able to present arguments *and scientific*

*information* to this Court," and as such "[o]utside assistance is not necessary."  Lannin Decl., Ex.

4 (*Dekker*, Opp. to Mot. for Leave, Doc. 35 at 2 (emphasis added)).

      **D.**    **Meet-and-Confer Efforts**

      Following service of the subpoenas, the Nonparty Groups served the State with timely

written responses and objections.  *See*  Exs. S–V.  Counsel for the Nonparty Groups thereafter

conferred with the State's counsel on December 12, 2022 and December 22, 2022 in an attempt

to narrow the requests, lessen the burden on the Nonparty Groups, and address First Amendment

concerns.  *See* Lannin Decl., ¶¶ 11–19.  As a result of those discussions, the State offered to

accept the identification of publicly-available information in response to Request No. 1; to

withdraw Request No. 5; and to narrow Request No. 6 to communications with federal and

Florida officials.  *See id.* ¶ 16, Ex. 9 (Dec. 13 email).  As to the remaining requests, the State has

stated that it is looking for "more substantive" documents.  *See id.* ¶ 17, Ex. 10 (Dec. 23 email).

During the December 22 teleconference, the State "floated" a "proposal" to withdraw the

deposition (but *not* document requests) as to AAP, Endocrine Society, and WPATH, and to

withdraw the document requests as to the remaining Nonparty Groups, if each organization

submitted a sworn declaration answering the following questions identified by the State:

> 1. How many members are in their organizations;
>
> 2. What subset of the membership sets their policies, guidelines, and standards of care and how;
>
> 3. What subset of the membership set their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria;
>
> 4. Of the individuals responsible for setting their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria, how many of those individuals dissented from the policies, guidelines, and standards of care on gender-affirming care for gender dysphoria and why;
>
> 5. How many members in the organizations as a whole dissented from the organizations' policies, guidelines, and standards of care on gender-affirming care for gender dysphoria and did these members suggest any alternatives (and if so what were they); and
>
> 6. What side effects of gender-affirming care for gender dysphoria were these organizations aware of when they developed their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria.

*See* Lannin Decl., ¶ 17, Ex. 10 (Dec. 23 email).

During the parties' final meet-and-confer on January 10, 2023, counsel for the Nonparty

Groups explained that the document requests as narrowed, as well as the declaration topics

proposed by the State, were still problematic to the extent they sought irrelevant discovery into

the internal processes and communications of each organization.  *See id.* ¶ 18.  In an effort to

avoid motion practice, the Nonparty Groups offered to produce the sources cited in the

Endocrine Society and WPATH clinical guidelines, which are analogous to materials that a district court in Alabama recently concluded were appropriate subjects of third-party discovery in a case similar to this one.  *Id.*; *see also infra* III.A (discussing Alabama case).  The State rejected that compromise and, with the parties at impasse, this motion followed.  *Id.*.

**III.    ARGUMENT**

This Court should quash the subpoenas directed at the Nonparty Groups because the subpoenas seek discovery irrelevant to the issue in dispute in the Underlying Litigation, would impose significant and undue burdens on these nonparties, and infringe upon associational rights under the First Amendment.

**A.    The Subpoenas Seek Discovery Irrelevant to the Issue in Dispute in This Litigation.**

Subpoenas issued pursuant to Federal Rule of Civil Procedure 45 must satisfy the relevance requirements of Rule 26.  *See Coleman v. District of Columbia*, 275 F.R.D. 33, 36 (D.D.C. 2011) ("[I]t is settled that a subpoena is limited in scope by Rule 26(b)(1) of the Federal Rules of Civil Procedure.").  "Courts test relevance by looking at the law and facts of the case, not simply the expressed desires of a party to see certain information."  *United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 36 (D.D.C. 2012).  "Evidence is relevant if it 'has any tendency to make a fact more or less probable than it would be without the evidence' and if the 'fact is of consequence in determining the action.'"  *United States v. Miller*, 799 F.3d 1097, 1105 (D.C. Cir. 2015) (quoting Fed. R. Evid. 401).

In this case, the *Dekker* court has already offered guidance on the scope of relevant discovery: evidence bearing on whether, based on current medical knowledge, the State reasonably determined that the treatments excluded from Medicaid coverage are "experimental." The discovery sought by the State fails that standard.

10

These subpoenas seek information about two general topics.  The first is any "policy positions" each organization maintains regarding gender-affirming care.  But positions on questions of policy, to the extent they even exist, are irrelevant to whether "current medical knowledge" supports the State's conclusion that the prohibited treatments are experimental.  For example, the Nonparty Groups typically oppose legislative and administrative efforts to criminalize or ban gender-affirming care, and often issue position statements to that effect when such efforts are underway.  Such statements of organizational policy are not relevant to the fundamental scientific question identified by the *Dekker* court.  Compounding this problem, the State is seeking *internal information* about those irrelevant policy positions, including how they were developed and who supported them, all of which is even further afield from the scientific issue in dispute.

The second category relates to any "guidelines" (or "standards" and "best-practices") published by each organization for gender-affirming care—again, not copies of such guidelines, but rather information internal to each organization about how they were created, who supported them, and why.  In fact, only two of the Nonparty Groups even publish clinical guidelines for gender-affirming care.[6]  Even assuming that the guidelines published by WPATH and Endocrine Society are relevant to "current medical knowledge," they are publicly available, cite every study and piece of evidence on which they rely, and reflect the consensus view of the organizations that publish them.[7]  Those guidelines speak for themselves.  Presumably the State will present its

---

[6] As noted above, none of the other 16 Nonparty Groups that are party to this motion publish clinical guidelines for gender-affirming care.

[7] *See* https://www.wpath.org/soc8 (information about and link to WPATH's Standards of Care Version 8); https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence (information about and link to Endocrine Society's Gender Dysphoria/Gender Incongruence Guideline).

own scientific evidence and studies that allegedly are contrary to those guidelines—indeed, evidence the State must have *already had* when it determined in the first place that the treatments described in the WPATH and Endocrine Society guidelines are "experimental." But information about, *inter alia*, the WPATH and Endocrine Society committees and members that developed those guidelines, and disclosure of their internal communications with each other, is not relevant to that exercise. *See In re Schaefer*, 331 F.R.D. 603, 612 (W.D. Pa. 2019) (quashing subpoena seeking the deposition of the lead author of a publicly available report on transgender persons in the military, because the respondent had access to the report and "the same studies and data that [the petitioner] did in formulating her opinions and conclusions in the [] Report[,]" which "foreclose[d] any argument that the [respondent] ha[d] a 'substantial need" (or anything close to it) for [the petitioner's] testimony").

To the contrary, the face of the subpoena requests and the declaration topics the State proposed as a "compromise" leave no real doubt about the purpose of this discovery. It is not about the science. Rather, it is a fishing expedition for evidence of supposed dissent within each organization and an attempt to seed doubts about the internal processes, credibility, and purported bias of each organization. This discovery is irrelevant. As this court has recognized, "[t]he mere filing of an *amicus* brief … does not open oneself to broad discovery demands, nor does it make one's bias, if any, relevant to the underlying action." *N.C. Right to Life v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005). Instead, "[c]redibility of *amici* is a determination to be made by the trial judge, not a question that the parties should pursue in discovery." *Id.* "[W]ere the bias or credibility of *amici* presumptively relevant in every case, litigation and discovery of the issue would threaten the efficacy of the federal courts." *Id.*

12

In an ongoing case challenging an Alabama law barring certain gender-affirming care, the district court quashed nonparty subpoenas similar to those at issue here. There, the United States (as an intervener plaintiff) sought nonparty discovery from two organizations that had helped draft the Alabama law. There, as here, the requested discovery included internal communications evidencing the organizations' decision-making processes and supposed motivations. The district court quashed those subpoenas, concluding the discovery had "little—if any—relevance" and was "unlikely to reveal or lead to any information that would help resolve the fundamental issue in this case"—whether the Alabama law was constitutional. *Boe v. Marshall*, 2022 WL 14049505, at *2 (M.D. Ala. Oct. 24, 2022). The court concluded that the only documents in the nonparties' possession that were potentially relevant and not unduly burdensome to produce were "medical studies [and] literature" referenced in the challenged Alabama statute, "such as they exist." Lannin Decl., Ex. 8 (*Eknes-Tucker*, Hr'g on Mot. to Quash Tr. at 40:13, 20-21). Relying on that principle, the Nonparty Groups offered the same compromise to the State here—the production of materials cited in the WPATH and Endocrine Society clinical guidelines—which it rejected. *See id.* ¶ 18.

Because the State cannot articulate any plausible theory of relevance that would justify the expansive discovery sought, the subpoenas should be quashed.

### B.    Complying With the Subpoenas Would Impose Undue Burdens on the Nonparty Groups.

Under Rule 45, the Court must also quash a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). An undue burden exists when complying with the subpoena would result in time, expense, or collection efforts that outweigh any relevance the requested documents may have. *See Coleman*, 275 F.R.D. at 36–37 ("[C]ourts generally employ a balancing test, weighing the burdensomeness to the [party on which the subpoena was served]

13

against the [need of the party which served the subpoena] for, and the relevance of, the information being sought.") (modifications in original).  Additionally, courts consider the recipient's nonparty status "in weighing the burden of imposing discovery."  *Wyoming v. U.S. Dep't of Agriculture*, 208 F.R.D. 449, 452, 454 (D.D.C. 2002) ("[T]he discovery is 'unduly burdensome' considering the non-party status of the witnesses."); *Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2007) ("The Rule 45 'undue burden' standard requires district courts . . . to be generally sensitive to the costs imposed on third parties."); *see also Updateme Inc. v. Axel Springer SE*, 2018 WL 5734670, at *3 (N.D. Cal. Oct. 31, 2018) (observing that "[n]on-parties" that are unrelated to the litigants "should not be burdened in discovery to the same extent as litigants") (collecting cases).  Courts therefore quash subpoenas when compliance would require organizations like the Nonparty Groups to "sacrifice . . . a large proportion of [their] staff" and parse through voluminous records to identify responsive documents.  *See, e.g.*, *N.C. Right to Life*, 231 F.R.D. at 52 (quashing a subpoena that would require amici recipients to dedicate their limited staff to the weeks' long task of identifying and producing a "vast array" of documents). In accord, the *Marshall* court's quashing of similar nonparty subpoenas in Alabama was based in part on the undue burden of compliance, which would have required volunteer staff and *pro bono* counsel to sort through "thousands of documents" spanning multiple years.  *Marshall*, 2022 WL 14049505, at *2.

Complying with these expansive and scattershot subpoenas would require substantial efforts by each of the Nonparty Groups and their *pro bono* counsel.  The attached declarations of AAP, WPATH, and Endocrine Society detail the extent to which those organizations would be

unduly burdened by the subpoenas.[8]  These organizations do not have in-house e-discovery teams and could be forced to hire contract attorneys to review the requested documents, itself an undue burden and significant expense for a non-profit with limited resources.  *See* AAP Decl. ¶ 10; WPATH Decl. ¶ 9; Endocrine Society Decl. ¶ 9.  These organizations would need to dedicate staff members to this review, as their internal documents are highly contextual and contain esoteric medical terminology that staff will need to explain to hired counsel.  *See* AAP Decl. ¶ 11; WPATH Decl. ¶ 9; Endocrine Society Decl. ¶ 9.  These organizations would also need to identify and speak with a significant number of potential custodians across their organizations and membership, many of whom utilize the external e-mail accounts of their employers, including hospitals, medical groups, and educational institutions.  *See* AAP Decl. ¶ 9; WPATH Decl. ¶¶ 7-8; Endocrine Society Decl. ¶¶ 8, 11.  Endocrine Society, a 501(c)(3) organization with a limited legal budget, has already started identifying which programs, products, and services would need to be suspended to devote staff time to complying with the subpoena.  *See* Endocrine Society Decl. ¶¶ 8-11.

The State's offer to withdraw certain discovery requests in exchange for sworn declarations does not cure the defects in its subpoenas.  Under the State's proposal, it would withdraw its deposition requests (but not its requests for production) to AAP, WPATH, and Endocrine Society and its requests for production to the other Nonparty Groups.  In exchange, each Nonparty Group would need to provide a sworn declaration answering certain questions identified by the State.  *See* Lannin Decl., Ex. 10 at 1 (questions); Section II.D *supra* (listing questions).  However, the proposed declaration topics are substantively identical to the

---

[8] Movants have submitted representative declarations from AAP, WPATH, and Endocrine Society given the State's heightened focus on them, including through requests for deposition testimony that were not directed at the other 15 Nonparty Groups.

deposition topics and requests for production that the State has offered to withdraw.  *Compare* Lannin Decl., Ex. 10 at 1 (questions) *with, e.g.*, Exs. A-C at 2 (deposition topics) *and* Attachment to Exs. D-R at 10-11 (requests for production).[9]  Because the State's proposed questions seek essentially the same information as the discovery requests they would replace, developing answers to them would require each organization to identify, review, and then memorialize the same information requested now.  In short, the State's proposal would change the form of the discovery but not its substance, and would remediate neither the undue burden required to provide the discovery nor its lack of relevance.

### C.  The Subpoenas Infringe on Free Speech and Associational Rights.

The subpoenas should also be quashed because they would infringe on the Nonparty Groups' associational rights guaranteed by the First Amendment.  Complying with the subpoenas would discourage members from joining or participating in the organizations, and chill the robust and uninhibited internal exchange of ideas that these organizations rely on to do their work.  As discussed below, courts routinely quash subpoenas that would infringe upon these types of protected interests.

Under the First Amendment's associational privilege, organizations are protected from compelled disclosure that would "induce members to withdraw . . . and dissuade others from joining it because of fear of exposure."  *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 463 (1958).  In assessing a claim of privilege, courts in this Circuit balance the claimant's First Amendment interests against the requester's need for the information—"if the former outweighs

---

[9] The requests for production that the State served on all of the Nonparty Groups, and the deposition topics that it served on AAP, WPATH, and Endocrine Society, are also listed above in Sections II.B, and the State's proposed questions are also listed above in Section II.D (listing questions).

the latter, then the claim of privilege should be upheld." *Int'l Action Ctr. v. United States*, 207

F.R.D. 1, 4 (D.D.C. 2002) (quoting *Black Panther Party v. Smith*, 661 F.2d 1243, 1266 (D.C.

Cir. 1981) (citation and quotations omitted)).  In assessing First Amendment interests, this Court

has recognized that materials bearing on an organization's internal discussions and operations

may qualify for protection from disclosure.  *See Ted Cruz for Senate v. FEC*, 451 F. Supp. 3d 92,

99 (D.D.C. 2020); *see also AFL-CIO v. FEC*, 333 F.3d 168, 176–78 (D.C. Cir. 2003) (applying

First Amendment privilege where compelled disclosure of "detailed descriptions of training

programs, member mobilization campaigns . . . and state-by-state strategies" would "seriously

interfere[] with internal group operations and effectiveness").  As to need, the D.C. Circuit has

recognized that "[t]he interest in disclosure will be relatively weak unless the information goes to

'the heart of the matter'" and that "[m]ere speculation that information might be useful will not

suffice."  *See also Black Panther Party,* 661 F.2d at 1268 (citation omitted)*.*

Here, the representative declarations attached to this motion explain in detail how

disclosure of the information sought by the State would chill the organizations' associational

rights, regardless of whether they publish clinical guidelines (WPATH and Endocrine Society) or

not (AAP).  The mere issuance of the subpoenas (let alone enforcement of them) has already had

a chilling effect on member participation due to fears of being embroiled in litigation and

exposure of their private communications.  *See* AAP Decl. ¶¶ 15-20; WPATH Decl. ¶¶ 12-16;

Endocrine Society Decl. ¶¶ 13-16; *see, e.g.*, *Apple Inc. v. Match Grp., Inc.*, 2021 WL 3727067,

at *8 (N.D. Cal. Aug. 19, 2021) (refusing to enforce request for advocacy group's internal

documents on First Amendment grounds and observing "[w]ho in their right mind would want to

participate in a public advocacy organization, knowing that all their internal communications

17

about strategy, lobbying, planning, and so on, would be turned over to their principal

opponent?").

Additionally, the declarations detail how the subpoenas have already discouraged

dialogue in a field that requires robust scientific debate and candid exchanges. *See id.*  For

example, the quality of the clinical guidelines published by WPATH and Endocrine Society will

suffer if their members and contributors, with the prospect of public disclosure looming over

them, feel inhibited in the views they may express or reluctant to voice critical opinions.  Indeed,

as the Fifth Circuit recognized, the chilling effect of a subpoena that seeks internal

communications of a nonparty is "self-evident" because it would discourage "frank internal

dialogue and deliberations." *Whole Woman's Health v. Texas Catholic Conference*, 896 F.3d

362, 372-373 (5th Cir. 2018) (quashing subpoena that sought a nonparty religious organization's

internal communications about a Texas abortion regulation, and explaining that

"communications within such a group must be permitted to be broad, uninhibited, and fearless").

The Nonparty Groups are entitled to the same type of vigorous, "uninhibited, and fearless"

debate under the First Amendment.  *See id.*

Moreover, the declarations detail the alarming threats of violence and intimidation that

these organizations have already received due to their work on issues related to gender-affirming

care.  *See, e.g.*, AAP Decl. ¶ 19; WPATH Decl. ¶¶ 12-15; Endocrine Society Decl. ¶ 15.  This

includes, for example, the receipt of emails characterizing individuals who provide gender-

affirming care as "child molesters" and warning that "[y]our attempt to hide the child molesters

will get you killed.  If I see you or anyone who supports you.  I will kill them."  WPATH Decl.

¶ 15.  Complying with these subpoenas—which would require, among other things, the

production of personally identifying information about the organizations, their employees, and

their members—risks amplifying these threats and jeopardizes the safety of the Nonparty

Groups' employees and members.  In turn, members of these organizations would be motivated

to end their participation and potential members would waver in their decisions to join out of

unease regarding their safety.  *See NAACP*, 357 U.S. at 463.

It is no answer that such information could be produced subject to a protective order,

given the possibility such information could nonetheless become public.  Indeed, detailed

information about *these very subpoenas* was recently leaked by unknown entities to an online

website that has previously characterized gender-affirming care as the "mutilation of children."[10]

In light of the heightened First Amendment interests at stake and the State's failure to

demonstrate any need for the irrelevant information it seeks, the instant subpoenas should be

quashed.

**D.      The State Should be Required to Pay the Nonparty Groups' Fees.**

The State should be required to reimburse Nonparty Groups for the fees they were forced

to incur in responding to the State's subpoenas, including their fees incurred in bringing this

Motion.  Rule 45 provides:

> ***Avoiding Undue Burden or Expense; Sanctions.*** A party or
> attorney responsible for issuing and serving a subpoena must take
> reasonable steps to avoid imposing undue burden or expense on a
> person subject to the subpoena. The court for the district where
> compliance is required must enforce this duty and impose an
> appropriate sanction--which may include lost earnings and
> reasonable attorney's fees--on a party or attorney who fails to
> comply.

---

[10] *See* Dylan Housman, *EXCLUSIVE: Florida Subpoenas Organizations Pushing Transgender Care on Children in Lawsuit*, Daily Caller (Dec. 14, 2022), https://dailycaller.com/2022/12/14/florida-transgender-care-lawsuit-medicaid-subpoena/.

19

Fed. R. Civ. P. 45(d)(1).  Even if a party acted in good faith in issuing the subpoena, they may be subject to such sanctions.  *See Builders Ass'n of Greater Chicago v. City of Chicago*, 2002 WL 1008455, at *3 (N.D. Ill. May 13, 2002) ("[G]ood faith in issuing a subpoena is not sufficient to avoid sanctions . . . if a party has issued the subpoena in violation of [its] duty [to avoid imposing undue burden or expense on a subpoena recipient].").

Here, the fee request should be granted for at least two independent reasons.  *First*, the State served subpoenas containing the same boilerplate requests for production on 18 separate organizations that differ substantially in many material respects.  For example, and as discussed above, only two of the 18 groups even publish clinical guidelines.  The State made no effort to "tailor its subpoenas in any way to the nature of the recipients, the types of documents they would be likely to produce, or their resources to respond," in violation of its duty under Rule 45 to "take reasonable steps to avoid imposing undue burden or expense."  Fed. R. Civ. P. 45(d)(1); *Builders Ass'n of Greater Chicago*, 2002 WL 1008455, at *4 (granting fee request under Rule 45 where the party had served "subpoenas with identical 49–category boilerplate Riders" on numerous nonparties and failed to "tailor its subpoenas in any way to the nature of the recipients, the types of documents they would be likely to produce, or their resources to respond." (emphasis omitted)).  Nor did the State investigate which of the materials it sought through subpoena might be publicly available, as evidenced by its request for "documents that state the total number of your membership"—information that is readily available online for many of the organizations.  *See* Ex. S (AAP Objs. & Resps. to Subpoena) at 15; Ex. T at 15 (Endocrine Soc'y Objs. & Resps. to Subpoena); Ex. U at 16 (WPATH Objs. & Resps. to Subpoena).

*Second*, and as set forth above, the subpoenas seek facially irrelevant discovery.  Further, the State declined to withdraw the improper subpoenas even after the Nonparty Groups identified

this issue, forcing them bring the instant motion to quash.  This also constitutes a breach of the State's duty imposed by Rule 45(d)(2).  *See Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, 2003 WL 23018833, at *9 (S.D.N.Y. Dec. 23, 2003) ("Sanctions are properly imposed and attorney's fees are awarded where . . . the party improperly issuing the subpoena refused to withdraw it, requiring the non-party to institute a motion to quash.").  For each of the foregoing reasons, the State should be required to reimburse Nonparty Groups for the fees they were forced to incur in responding to its improper subpoenas.[11]

## IV.    CONCLUSION

For the reasons set forth above, the Nonparty Groups respectfully request that the Court quash the State's subpoenas in their entirety.

---

[11] If the Court grants Nonparty Groups' request for fees, counsel for Nonparty Groups is prepared to submit to the Court a declaration stating and describing the fees incurred within 14 days of the Court's order or as otherwise directed by the Court.

Dated: January 13, 2023

Respectfully submitted,

*/s D. Jean Veta*
D. Jean Veta

Cortlin H. Lannin (CA Bar No. 266488)
(*pro hac vice* motion to be submitted)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

D. Jean Veta (D.C. Bar No. 358980)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com

Michael J. Lanosa (CA Bar No. 30124)
(*pro hac vice* motion to be submitted)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (424) 332-4800
mlanosa@cov.com

*Counsel for Nonparty Groups*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2023, I electronically filed the foregoing document and its attachments with the Clerk of the Court via email, and that I also caused copies of the documents to be sent to the Clerk via FedEx.  I also certify that on that same day, with their consent I caused the foregoing documents to be served on counsel for Defendants Jason Weida and the Agency for Health Care Administration via email at the following addresses:

Mohammad O. Jazil (via email only)
Gary V. Perko (via email only)
Michael Beato (via email only)
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
Phone:  (850) 270-5938
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com

*/s Michael J. Lanosa*
Michael J. Lanosa