# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

AUGUST DEKKER, legally known as KORI DEKKER; BRIT ROTHSTEIN; SUSAN DOE, a minor, by and through her parents and next friends, JANE DOE and JOHN DOE; and K.F., a minor, by and through his parent and next friend, JADE LADUE,

*Plaintiffs*,

v.

SIMONE MARSTILLER, in her official capacity as Secretary of the Florida Agency for Health Care Administration; and FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION,

*Defendants*.

Civil Action No.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**

---

Plaintiffs AUGUST DEKKER, legally known as KORI DEKKER;[1] BRIT

ROTHSTEIN; SUSAN DOE, a minor, by and through her parents and next friends,

JANE DOE and JOHN DOE;[2] and K.F., a minor, by and through his parent and next

---

[1] Although Plaintiff's legal name is Kori Dekker, he is known by and uses the name August Dekker in accordance with his male gender identity. Accordingly, this Complaint refers to Plaintiff as August and uses male pronouns to refer to him.

[2] As set forth in the motion to proceed pseudonymously, Plaintiff Susan Doe, and her parents and next friends, Jane Doe and John Doe, seek to proceed pseudonymously in order to protect Susan Doe's right to privacy given that she is a

friend JADE LADUE,[3] by and through the undersigned counsel, bring this lawsuit against Defendants SIMONE MARSTILLER, in her official capacity as Secretary of the Florida Agency for Health Care Administration, and the FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION ("AHCA") to challenge the adoption of a rule, Florida Administrative Code 59G-1.050(7), prohibiting Medicaid coverage of services for the treatment of gender dysphoria and to seek declaratory and injunctive relief.

## **INTRODUCTION**

1.     A person's access to health care should not be contingent on their sex, gender identity, or whether they are transgender.  Yet, that is exactly the situation in Florida.  AHCA has made access to medically necessary health care for Medicaid beneficiaries contingent on whether they are transgender.

2.     Empirical evidence and decades of clinical experience demonstrate that medical care for the treatment of gender dysphoria, also known as gender-affirming care, is medically necessary, safe, and effective for both transgender adolescents and adults with gender dysphoria.  Gender-affirming care is neither experimental nor

---

minor and the disclosure of her identity "would reveal matters of a highly sensitive and personal nature, specifically [Susan Doe]'s transgender status and [her] diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019).

[3] Because he is a minor, Plaintiff K.F. is proceeding under his initials pursuant to Federal Rule of Civil Procedure 5.2(a).

2

investigational; it is the prevailing standard of care, accepted and supported by every major medical organization in the United States.

3.     Under newly adopted Rule 59G-1.050(7) of the Florida Administrative Code (the "Challenged Exclusion"), transgender Medicaid beneficiaries are denied coverage for gender-affirming care to treat gender dysphoria, without regard to the actual generally accepted professional medical standards that govern such care or the particular medical needs of any Medicaid beneficiary. Specifically, any health care service that "alter[s] primary or secondary sexual characteristics" is ineligible for Medicaid coverage, though only when that service is being used to treat gender dysphoria. These same health care services, however, are routinely covered by Medicaid when they are for medically necessary purposes other than the treatment of gender dysphoria.

4.     The Challenged Exclusion represents dangerous governmental action that threatens the health and wellbeing of transgender Medicaid beneficiaries.

5.     The purpose of Medicaid is to provide health care coverage to individuals who have low income and cannot otherwise afford the costs of necessary medical care.   By denying coverage for gender-affirming care, Defendants effectively *categorically* deny access to medically necessary care to thousands of Floridians who lack other means to pay for such care.

6.      Defendants' actions not only come within the context of a series of measures the State has adopted targeting transgender people for discrimination, but they stand in sharp contrast not just to the well-established evidence and widely accepted view of the medical and scientific community in the United States, but also to the policies of the vast majority of states, which provide Medicaid coverage for gender-affirming care.

7.      If allowed to remain in effect, the Challenged Exclusion will have immediate dire physical, emotional, and psychological consequences for transgender Medicaid beneficiaries.

8.      These consequences need not occur, however, as the Challenged Exclusion is unlawful in multiple respects and therefore should be preliminarily and permanently enjoined.[4]

9.      First, the Challenged Exclusion, which Defendant Marstiller enforces, violates the United States Constitution's guarantee of equal protection of the laws. Under the Fourteenth Amendment's Equal Protection Clause, Defendants are prohibited from discriminating against persons based on sex and transgender status.

---

[4] Blanket bans like the Challenged Exclusion have been repeatedly found to be unlawful and unconstitutional forms of discrimination. *See, e.g.*, *Fain v. Crouch*, 3:20-cv-00740, Dkt. #271 (S.D.W.V. Aug. 2, 2022) (granting summary judgment in favor of plaintiffs on causes of action also brought in this Complaint); *Flack v. Wis. Dep't. of Health Services*, 3:18-cv-00309-wmc, Dkt. #217 (W.D. Wis. Aug. 16, 2019) (same).

10.     Second, the Challenged Exclusion violates Section 1557 of the Patient Protection and Affordable Care Act (the "ACA"), 42 U.S.C. § 18116, which prohibits discrimination on the basis of sex by health programs or activities, any part of which receives federal funding, such as Medicaid.

11.     Third, the Challenged Exclusion violates the Medicaid Act's Early and Periodic Screening, Diagnostic, and Treatment provisions, which require Defendants to affirmatively arrange for services that are necessary to "correct or ameliorate" a health condition for Medicaid beneficiaries under 21 years of age, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r) ("EPSDT Requirements"), as well as the Medicaid Act's requirement for Defendants to ensure comparable coverage to every Medicaid beneficiary, 42 U.S.C. § 1396a(a)(10)(B)(i) ("Comparability Requirements").

12.     Accordingly, Plaintiffs seek relief related to Defendants' adoption and enforcement of the Challenged Exclusion, including declaratory and preliminary and permanent injunctive relief, as well as compensatory damages, attorney's fees, and costs.

# PARTIES

## A.    Plaintiffs

### *Plaintiff August Dekker*

13.    Plaintiff August Dekker is a 28-year-old transgender man.  August, who has been diagnosed with gender dysphoria, is enrolled in and receives his health care coverage through Florida's Medicaid program.  At the recommendation of his health care providers, August receives medically necessary hormone therapy to treat his gender dysphoria, which Florida's Medicaid program has covered until now.  August has been enrolled in Medicaid at all times relevant to this complaint.  August lives in Hernando County, Florida.

### *Plaintiff Brit Rothstein*

14.    Plaintiff Brit Rothstein is a 20-year-old transgender man.  Brit, who has been diagnosed with gender dysphoria, is enrolled in and receives his health care coverage through Florida's Medicaid program.  At the recommendation of his health care providers, Brit receives medically necessary hormone therapy to treat his gender dysphoria, which Florida's Medicaid program has covered until now, and is scheduled to obtain chest surgery as treatment for his gender dysphoria in December 2022, which Medicaid had pre-authorized.  Brit has been enrolled in Medicaid at all times relevant to this complaint.  As he is college student, Brit lives in Orange

6

County, Florida while he is in school, and lives in Broward County, Florida, along with his family, when he is out of school.

***Plaintiff Susan Doe***

15. Plaintiff Susan Doe is a 12-year-old transgender adolescent girl. Susan Doe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her next friends and parents, Jane Doe and John Doe. Susan, who has been diagnosed with gender dysphoria, is enrolled in and receives her health care coverage through Florida's Medicaid program. At the recommendation of her health care providers, Susan receives medically necessary puberty delaying medication to treat her gender dysphoria, which Florida's Medicaid program has covered until now. Susan has been enrolled in Medicaid at all times relevant to this complaint. Susan, Jane, and John live in Brevard County, Florida.

***Plaintiff K.F.***

16. Plaintiff K.F. is a 12-year-old transgender adolescent boy. K.F. sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friend and parent, Jade Ladue. K.F., who has been diagnosed with gender dysphoria, is enrolled in and receives his health care coverage through Florida's Medicaid program. At the recommendation of his health care providers, K.F. receives medically necessary puberty delaying medication to treat his gender dysphoria, which Florida's Medicaid

7

program has covered until now. K.F. has been enrolled in Medicaid at all times relevant to this complaint. Jade and K.F. live in Sarasota County, Florida.

**B.  Defendants**

17.  Defendant Simone Marstiller is sued in her official capacity as Secretary of AHCA, the "single state agency authorized to manage, operate, and make payments for medical assistance and related services under Title XIX of the Social Security Act [Medicaid]." Fla. Stat. §§ 409.902, 409.963 (2022); *see also* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10. Defendant Marstiller is responsible for the enforcement of the Challenged Exclusion. Defendant Marstiller is responsible for ensuring that the operation of Florida's Medicaid program complies with the United States Constitution and the Medicaid Act and its implementing regulations. Defendant Marstiller's official place of business is located in Tallahassee, Leon County, Florida.

18.  Defendant AHCA is the "single state agency authorized to manage, operate, and make payments for medical assistance and related services under Title XIX of the Social Security Act [Medicaid]." Fla. Stat. §§ 409.902, 409.963 (2022). As such, AHCA receives federal funding to support the Florida Medicaid Program. AHCA uses the funds it receives from the federal government in part to cover health care services for persons enrolled in the Florida Medicaid Program. Moreover, AHCA oversees the promulgation of all Medicaid rules, fee schedules, and coverage

policies into the Florida Administrative Code. Fla. Stat. § 409.919 (2022). Defendant AHCA is based and headquartered in Tallahassee, Leon County, Florida.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

20.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202, 42 U.S.C. § 1983, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

21.     Under 28 U.S.C. § 1391(b), venue is proper in the U.S. District Court for the Northern District of Florida because all Defendants reside within this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. Venue is proper in the Tallahassee Division of the Northern District of Florida under N.D. Fla. Loc. R. 3.1(B) because it is where the Defendants reside and where a substantial portion of the acts or omissions complained of herein occurred.

22.     This Court has personal jurisdiction over Defendants because they are domiciled in Florida and/or have otherwise made and established contacts with Florida sufficient to permit the exercise of personal jurisdiction over them.

# FACTUAL BACKGROUND

## A.    Gender Identity and Gender Dysphoria

23.    A person's sex is multifaceted, and comprised of a number of characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and most importantly, gender identity.

24.    Gender identity is a person's internal sense of their sex.  It is an essential element of human identity that everyone possesses, and a well-established concept in medicine.  Gender identity is innate; immutable; has significant biological underpinnings, such as the sex differentiation of the brain that takes place during prenatal development; and cannot be altered.

25.    Gender identity is the most important determinant of a person's sex. Everyone has a gender identity.

26.    A person's sex is generally assigned at birth based solely on a visual assessment of external genitalia.  External genitalia, however, are only one of several sex-related characteristics that comprise a person's sex, and as a result, are not always indicative of a person's sex.

27.    For most people, their sex-related characteristics are aligned, and the visual assessment performed at birth serves as an accurate proxy for that person's sex.

10

28.     The term "sex assigned at birth" is the most precise terms to use because not all of the physiological aspects of a person's sex are always in alignment with each other as typically male or typically female.

29.     For these reasons, the Endocrine Society, an international medical organization of over 18,000 endocrinology researchers and clinicians, warns practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.[5]

30.     When a person's gender identity does not match that person's sex assigned at birth, gender identity is the critical determinant of that person's sex.

31.     Individuals whose sex assigned at birth aligns with their gender identity are referred to as cisgender. Transgender people, on the other hand, have a gender identity that differs from the sex assigned to them at birth. A transgender boy or man is someone who was assigned a female sex at birth but has a male gender identity. A transgender girl or woman is someone who was assigned a male sex at birth but has a female gender identity.

---

[5] *See* Wylie C. Hembree, *et al.*, *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society\* Clinical Practice Guideline*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869, 3875 (2017), https://perma.cc/FM96-L228 (hereinafter "Endocrine Society Guidelines").

32.     The health and wellbeing of all people, including those who are transgender, depends on their ability to live in a manner consistent with their gender identity.

33.     Scientific and medical consensus recognizes that attempts to change an individual's gender identity to bring their gender identity into alignment with their sex assigned at birth are ineffective and harmful.  Attempts to force transgender people to live in accordance with their sex assigned at birth, a practice often described as "conversion," or "reparative" therapy, is universally known to cause profound harm and is widely considered unethical and, in some places, unlawful.

34.     For transgender people, the incongruence between their gender identity and sex assigned at birth can result in clinically significant stress and discomfort known as gender dysphoria.

35.     Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. The World Health Organization's International Classification of Diseases, which is the diagnostic and coding compendia used by medical professionals, refers to the condition as "gender incongruence."  Gender dysphoria is also recognized by the leading medical and mental health professional groups in the United States, including the American Academy of Pediatrics,

American Medical Association, the American Psychological Association, American Psychiatric Association, and the Endocrine Society, among others.

36.     If left untreated, gender dysphoria can result in debilitating anxiety, severe depression, self-harm, and even suicidality. Untreated gender dysphoria often intensifies with time.  The longer an individual goes without or is denied adequate treatment for gender dysphoria, the greater the risk of severe harms to the person's health.

37.     The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published widely accepted guidelines for treating gender dysphoria.[6]  The goal of medical treatment for gender dysphoria is to eliminate clinically significant distress by helping a transgender person live in accordance with their gender identity.  This treatment is sometimes referred to as "gender transition," "transition related care," or "gender-affirming care."

38.     WPATH is an international and multidisciplinary association whose mission is to promote evidence-based health care protocols for transgender people. WPATH publishes the Standards of Care based on the best available science and expert professional consensus.

_____

[6] Endocrine Society Guidelines; World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (7th Version, 2012), https://perma.cc/62K5-N5SX (hereinafter, "WPATH Standards of Care").

39.    The WPATH Standards of Care and Endocrine Society Guidelines are widely accepted as best practices guidelines for the treatment of adolescents and adults diagnosed with gender dysphoria and have been recognized as authoritative by the leading medical organizations.

40.    The WPATH Standards of Care and Endocrine Society Guidelines recognize that puberty delaying medication, hormone therapy, and surgery to align a person's primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring) with their gender identity are medically necessary services for many people with gender dysphoria.

41.    The precise treatment of gender dysphoria for any individual depends on that person's individualized needs.  The guidelines for medical treatment of gender dysphoria differ depending on whether the treatment is for an adolescent (minors who have entered puberty) or an adult.  No pharmaceutical or surgical intervention is recommended or necessary prior to the onset of puberty, however. The individualized steps that many transgender people take to live in a manner consistent with their gender identity are known as "a transition" or "transitioning." The precise steps involved in transitioning are particular to the individual but may include social, medical, and legal transition.  Determinations regarding medically necessary care are made on an individualized basis between by the medical professional and the patient.

14

42.     Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life.  Social transition can include wearing attire, following grooming practices, and using pronouns consistent with that person's gender identity.  The steps a transgender person can take as part of their social transition help align their gender identity with all aspects of everyday life.

43.     Many transgender individuals also pursue legal transition, which involves taking steps to formally amend their legal identification documents to align with their gender identity, such as changing one's name through a court ordered legal name change and updating the name and gender marker on their driver's license, birth certificate, and other identification documents.

44.     Medical transition, a critical part of transitioning for many transgender people, includes gender-affirming care that brings the sex-specific characteristics of a transgender person's body into alignment with their identity.

45.     Gender-affirming care can involve counseling, hormone therapy, surgery, or other medically necessary treatments for gender dysphoria.

46.     The most effective treatment for transgender adolescents and adults with gender dysphoria, in terms of both their mental and medical health, contemplates an individualized approach.  Medical and surgical treatment interventions are determined by the health care team (usually involving medical and

mental health professionals) in collaboration with the patient, and the patient's parents/guardians, if the patient is an adolescent.

47.     Under the WPATH Standards of Care, medical interventions may become medically necessary and appropriate after transgender youth reach puberty. In providing medical treatments to adolescents, pediatric physicians and endocrinologists work in close consultation with qualified mental health professionals experienced in diagnosing and treating gender dysphoria.

48.     For many transgender adolescents, going through puberty as the sex assigned to them at birth can cause extreme distress. Puberty delaying medication allows transgender adolescents to pause puberty, thus minimizing and potentially preventing the heightened gender dysphoria and permanent physical changes that puberty would cause.

49.     Puberty delaying treatment is reversible. When the adolescent discontinues treatment, puberty will resume.  Puberty delaying treatment does not cause infertility.

50.     For some transgender adolescents and adults, it is necessary to undergo hormone therapy, which involves taking hormones for the purpose of bringing their secondary sex characteristics into alignment with their gender identity (testosterone for transgender males, and estrogen and testosterone suppression for transgender females). Secondary sex characteristics are bodily features not associated with

external and internal reproductive genitalia (primary sex characteristics). Secondary sex characteristics include, for example, hair growth patterns, body fat distribution, and muscle mass development. Hormone therapy can have significant masculinizing or feminizing effects and can assist in bringing transgender people's secondary sex characteristics into alignment with their gender identity, and therefore is medically necessary care for transgender people who need it to treat their gender dysphoria.

51.    Gender-affirming surgery might be sought by transgender people after puberty to treat symptoms of gender dysphoria by better aligning their primary or secondary sex characteristics with their gender identity. Though not all transgender people require or seek gender-affirming surgical care, such care can be medically necessary when determined to be in the best interests of the patient and supported by empirical evidence.

52.    Gender-affirming medical care can be lifesaving treatment and has been shown to positively impact the short and long-term health outcomes for transgender people of all ages.

53.    All of the treatments used to treat gender dysphoria are also used to treat other diagnoses or conditions. These treatments are not excluded from Medicaid coverage under the Challenged Exclusion when used to treat any diagnosis or condition other than gender dysphoria, yet they carry comparable risks and side

effects to those that can be present when treating gender dysphoria. Thus, the use of these treatments for gender dysphoria are not any more risky than for other conditions and diagnoses for which the same treatments are regularly used.

54. The consequences of untreated, or inadequately treated, gender dysphoria, however, are dire, as untreated gender dysphoria is associated with both clinically significant anxiety, depression, self-harm, and suicidality and higher levels of stigmatization, discrimination, and victimization, contributing to negative self-image and the inability to function effectively in daily life.

55. When transgender people are provided with access to appropriate and individualized gender-affirming care in connection with treatment of gender dysphoria, its symptoms can be alleviated and even prevented.

56. As such, the American Medical Association, American Psychological Association, American Psychiatric Association, Endocrine Society, American College of Obstetricians and Gynecologists, American Academy of Pediatrics, American Academy of Family Physicians, and other major medical organizations have recognized that gender-affirming care is medically necessary, safe, and effective treatment for gender dysphoria, and that access to such treatment improves the health and well-being of transgender people. These groups and others have explicitly advocated against blanket bans on gender-affirming care like the Challenged Exclusion.

18

57.     The medical procedures for the treatment of gender dysphoria are not "cosmetic" or "elective" or for the mere convenience of the patient, but instead are medically necessary for the treatment of the diagnosed medical condition. They are not experimental or investigational, because decades of both clinical experience and medical research show that they are essential to achieving well-being for transgender patients with gender dysphoria.

**B.      The Medicaid Act and Florida's Medicaid Program**

**i.      Medicaid Coverage**

58.     The Medicaid Act, Title XIX of the Social Security Act of 1965, 42 U.S.C. §§ 1396-1396w-6, creates a joint federal-state program that provides health care services to specified categories of low-income individuals.

59.     Medicaid is designed to "enabl[e] each State, as far as practicable...to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence and self-care...." 42 U.S.C. § 1396-1.

60.     States are not required to participate in the Medicaid program—but all states do.  States that choose to participate must comply with the Medicaid Act and its implementing regulations.  In return, the federal government reimburses each

participating state for a substantial portion of the cost of providing medical assistance. *See id.* §§ 1396b(a), 1396d(b), 1396(c).

61.     The Medicaid Act requires each participating state to designate a single state agency charged with administering or supervising the state's Medicaid program. *Id*. § 1396a(a)(5).  While a state may delegate certain responsibilities to other entities, such as local agencies or Medicaid managed care plans, the single state agency is ultimately responsible for ensuring compliance with all aspects of the Medicaid Act.  *See, e.g.*, 42 C.F.R. §§ 438.100(a)(2), 438.100(d).

62.     Each participating state must maintain a comprehensive state plan for medical assistance, approved by the Secretary of the U.S. Department of Health and Human Services.  42 U.S.C. § 1396a.

63.     The state plan must describe how the state will administer its Medicaid program and affirm the state's commitment to comply with the Medicaid Act and its implementing regulations.  *Id.*

64.     Under the Medicaid Act, a participating state must provide medical assistance to certain eligibility groups. *Id*. § 1396a(a)(10)(A)(i). One such group is children and adolescents under age 18 whose household income is below 133% of the federal poverty level. *Id*. §§ 1396a(a)(10)(A)(i)(VI)-(VII), 1396a(l). Another mandatory eligibility category is individuals with a disability who receive Supplemental Security Income or meet separate disability and financial eligibility

standards established by the state. *Id*. §§ 1396a(a)(10)(A)(i)(II), 1396a(f). States have the option to cover additional eligibility groups. *Id*. §§ 1396a(a)(10)(A)(ii).

65.     States must administer Medicaid in "the best interests of recipients." 42 U.S.C. § 1396a(a)(19).

### ii.     The Medicaid EPSDT Requirements

66.     The Medicaid Act requires each participating state to cover certain health care services, including inpatient and out-patient hospital services and physician services, when medically necessary. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d.  States have the option to cover additional services, including prescription drugs, when medically necessary. *Id*.

67.     One mandatory benefit under Medicaid is Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) services for beneficiaries under age 21. *Id*. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r).

68.     The fundamental purpose of the EPSDT Requirements is to "[a]ssure that health problems are diagnosed and treated early, before they become more complex and their treatment more costly."  Ctrs. for Medicare & Medicaid Servs., State Medicaid Manual § 5010.B.

69.     Pursuant to the EPSDT requirements, states must cover four specific, separate categories of screening services: medical, vision, dental, and hearing. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396d(r)(1)-(4).

70.     States also must cover "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in [1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." *Id.* § 1396d(r)(5).  In other words, states participating in Medicaid must cover all medically necessary services for beneficiaries under age 21, even when those services are not covered for adults.

71.     Services that fall under 42 U.S.C. § 1396d(a) include inpatient and outpatient hospital services, physician services, and prescription drugs.  *Id.* § 1396d(a)(1), (2), (5)(A), (12).

72.     Gender-affirming medical treatments, including puberty delaying medication, hormone therapy, and surgery come within the services described in section § 1396d(a) and, thus, are EPSDT services when they are necessary to correct or ameliorate gender dysphoria.  *Id.* § 1396d(r)(5) (incorporating services listed in § 1396d(a)).

73.     States must "arrang[e] for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by" screening services.  *Id.* § 1396a(a)(43)(C).

74.    States must initiate EPSDT services in a timely manner, as appropriate to the individual needs of the beneficiary, and absolutely no later than 6 months from the date of the request.  42 C.F.R. § 441.56(e).

### iii.    The Medicaid Comparability Requirements

75.    Under the Medicaid Act, "the medical assistance made available to any individual ... shall not be less in amount, duration or scope than the medical assistance made available to any other such individual."    42 U.S.C. § 1396a(a)(10)(B)(i).

76.    "Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose."  42 C.F.R. § 440.230(b).

77.    A state "Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service ... to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition."    42 C.F.R. § 440.230(c).

### iv.    Florida's Medicaid Program

78.    The State of Florida participates in the federal Medicaid program. Fla. Stat. §§ 409.901-409.9205.  AHCA is the single state agency in Florida that is responsible for administering and implementing Florida's Medicaid program consistent with the requirements of federal law.  *See* Fla. Stat. § 409.902; 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.

23

79. AHCA contracts with private managed care plans to provide health care services to most Medicaid beneficiaries. Fla. Stat. § 409.964.

80. The federal government reimburses Florida for approximately 60% of the cost of providing medical assistance through its Medicaid program. *See* U.S. Dep't of Health & Hum. Servs., Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2022 Through September 30, 2023, 86 Fed. Reg. 67479, 67481 (Nov. 26, 2021).

81. Florida regulations require AHCA to cover health care services that are medically necessary within the scope of Fla. Admin. Code R. 59G-1.035(6), 59G-1.010. To qualify as medically necessary, a service must meet several conditions. *See* Fla. Admin. Code R. 59G-1.010, incorporating by reference AHCA, Definitions Policy at 2.83 (2017) (defining medically necessary care).

82. For one, the service must be consistent with generally accepted professional medical standards and not experimental or investigational. *Id*.; Fla. Admin. Code R. 59G-1.035. To determine whether a particular service is consistent with generally accepted professional medical standards, AHCA must consider: "(a) Evidence-based clinical practice guidelines. (b) Published reports and articles in the authoritative medical and scientific literature related to the health service (published in peer-reviewed scientific literature generally recognized by the relevant medical

24

—

community or practitioner specialty associations). (c) Effectiveness of the health service in improving the individual's prognosis or health outcomes. (d) Utilization trends. (e) Coverage policies by other creditable insurance payor sources. (f) Recommendations or assessments by clinical or technical experts on the subject or field." *Id*. § 59G-1.035(4).

83.    After considering those factors, AHCA must submit a report with recommendations to the Deputy Secretary for Medicaid for review, and the Deputy Secretary makes a final determination as to whether the health service is consistent with generally accepted professional medical standards and not experimental or investigational. *Id*. § 59G-1.035(5).

84.    Until August 21, 2022, Florida Medicaid covered the full range of gender-affirming treatments, including puberty delaying medication, hormone therapy, and surgical care.

85.    Effective August 21, 2022, Florida excluded the coverage without any intervening change in federal Medicaid laws or the standard of care for gender dysphoria, as recognized by the medical community.

### C.    Defendants Adopt the Challenged Exclusion and Target Transgender Medicaid Beneficiaries for Discrimination.

86.    On April 20, 2022, Florida's Department of Health ("FDOH") issued a misleading and factually inaccurate set of guidelines titled "Treatment of Gender

Dysphoria for Children and Adults" (hereinafter "FDOH Guidelines").[7]  FDOH issued the FDOH Guidelines in direct response to the fact sheet from the U.S. Department of Health & Human Services regarding "Gender-Affirming Care and Young People."[8]

87.    The FDOH Guidelines, which are non-binding in nature, directly contradicted the guidance from HHS, as well as the established medical guidelines supported by the country's largest and leading medical organizations.

88.    The FDOH Guidelines stated that:

- Social gender transition should not be a treatment option for children or adolescents.

- Anyone under 18 should not be prescribed puberty delaying medication or hormone therapy.

- Gender reassignment surgery should not be a treatment option for children or adolescents.

89.    Under the WPATH Standards of Care and Endocrine Society Guidelines, no one is provided pharmaceutical treatment for gender dysphoria until *after* the onset of puberty.  No surgical interventions are recommended for

---

[7] *See Treatment of Gender Dysphoria for Children and Adults*, FLORIDA DEP'T OF HEALTH (April 20, 2022), https://perma.cc/W33H-6P5Q.

[8] *See Gender-Affirming Care and Young People*, U.S. Dep't of Health & Human Servs. (March 2022), https://perma.cc/399W-T6AC.

transgender adolescents prior to the age of 18, *except* for limited reconstructive surgery for adolescents who have reached Tanner Stage 5 and for whom it is deemed medically necessary by qualified mental and medical health care professionals.

90.    The FDOH Guidelines were criticized by, among others, a group of more than 300 Florida health care professionals who care for transgender and gender diverse youth.  This group denounced the FDOH Guidelines for citing "a selective and non-representative sample of small studies and reviews, editorials, opinion pieces and commentary to support several of their substantial claims" and misrepresenting "high-quality studies" by making "conclusions that are not supported by the authors of the articles."[9]

91.    The 300 Florida health care professionals further stated that the FDOH Guidelines "contradict[] existing guidelines from the American Academy of Pediatrics, the Endocrine Society, the American Academy of Child and Adolescent Psychiatry and the World Professional Association for Transgender Health," and that "[t]hese national and international guidelines are the result of careful deliberation and examination of the evidence by experts including pediatricians, endocrinologists, psychologists and psychiatrists."

---

[9] Brittany S. Bruggeman, *et al.*, *Opinion: We 300 Florida health care professionals say the state gets transgender guidance wrong | Open letter*, TAMPA BAY TIMES (Apr. 27, 2022), https://perma.cc/5UWE-LURH.

27

92.     On April 20, 2022, based on the publication of the FDOH Guidelines, Secretary Marstiller sent a letter to Tom Wallace, AHCA's Deputy Secretary for Medicaid, requesting that AHCA determine if the treatments addressed in the FDOH Guidelines "are consistent with generally accepted professional medical standards and not experimental or investigational."[10]

93.     The request from Secretary Marstiller to Deputy Secretary Wallace was highly unusual, as AHCA does not generally draft a GAPMS report for services that it is already covering.

94.     While AHCA purported to go through its required rule-making process, it was clear the outcome was predetermined: to restrict access to medically necessary gender-affirming care for transgender people in Florida.

95.     On June 2, 2022, Defendants published their report, "Florida Medicaid: Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria" (hereinafter "GAPMS Memo").[11]  The publication of the GAPMS Memo was accompanied by the publication of a political webpage within AHCA's website titled "Let Kids Be Kids"

---

[10] *Letter from AHCA Secretary Marstiller to Deputy Secretary Wallace* (April 20, 2022), https://perma.cc/YS7S-DFAX.

[11] AHCA, *Florida Medicaid: Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria* (June 2, 2022), https://perma.cc/SUB9-V7DW.

(https://ahca.myflorida.com/letkidsbekids/) that included graphics, misleading "fact-checking" of HHS's guidance, and false assertions about social media's alleged influence on experiences of gender dysphoria.

96. The GAPMS Memo wrongly concluded that gender-affirming medical treatments, including puberty blockers, hormone therapy, and surgery, "do not conform to GAPMS [("generally accepted professional medical standards")] and are experimental and investigational." Deputy Secretary Wallace signed the GAPMS Memo and noted his concurrence.

97. To support this conclusion, the GAPMS Memo cited to, and relied upon, five non-peer-reviewed, unpublished "assessments" that Defendants commissioned. The "assessments" are the following:

- Romina Brignardello-Petersen, DDS, MSc, PhD and Wojtek Wiercioch, MSc, PhD: Effects of Gender Affirming Therapies in People with Gender Dysphoria: Evaluation of the Best Available Evidence. 16 May 2022.

- James Cantor, PhD: Science of Gender Dysphoria and Transsexualism. 17 May 2022.

- Quentin Van Meter, MD: Concerns about Affirmation of an Incongruent Gender in a Child or Adolescent. 17 May 2022.

- Patrick Lappert, MD: Surgical Procedures and Gender Dysphoria. 17 May 2022.

- Kevin Donovan, MD: Medical Experimentation without Informed Consent: An Ethicist's View of Transgender Treatment for Children. 16 May 2022.

98.    These "assessments" illustrate how the GAPMS Memo is the product of bias and was engineered to achieve a particular result.

99.    For example, although the GAPMS Memo presents Dr. Quentin van Meter as an expert in medical treatment for gender dysphoria, at least one court in Texas barred him from providing expert testimony on the on the "question of whether an adolescent transgender child should be administered puberty blockers and whether affirmation of an incongruent gender in a child is harmful or not."[12] Dr. Van Meter is the president of the American College of Pediatricians (not to be confused with the American Academy of Pediatrics). The American College of Pediatricians is not a professional association but instead a political group that, among other things, opposes marriage equality for same-sex couples, supports the

---

[12] Stephen Caruso, *A Texas judge ruled this doctor was not an expert. A Pennsylvania Republican invited him to testify on trans health care*, PENNSYLVANIA CAPITOL-STAR (Sept. 15, 2020), https://perma.cc/P8AU-3RFC.

provision of conversion therapy, and describes childhood gender dysphoria as "confusion."

100.  The GAPMS Memo also cites to Dr. James Cantor as an expert on gender dysphoria.  However, Dr. Cantor admitted in court to having no clinical experience in treating gender dysphoria in minors and no experience monitoring patients receiving medical or surgical treatments for gender dysphoria.[13]

101.  AHCA's GAPMS Memo also cites to an "assessment" authored by Dr. Romina Brignardello-Petersen and a post-doctoral fellow purporting to review the scientific literature regarding gender dysphoria and its treatment. Dr. Brignardello-Petersen has no particular expertise regarding gender dysphoria and is a member of the Society for Evidence Based Gender Medicine ("SEGM"), a group that opposes standard medical care for gender dysphoria, has no publications or conferences, and, upon information and belief, consists solely of a website created by a small group of people.

102.  AHCA cites to an "assessment" by Dr. Patrick Lappert, a non-board-certified plastic surgeon. A federal court recently noted that there is evidence that calls Dr. Lappert's "bias and reliability [to testify regarding gender dysphoria] into

---

[13] In *Eknes-Tucker v. Marshall*, No. 2:22-CV-184-LCB, 2022 WL 1521889, at *5 (M.D. Ala. May 13, 2022), based on Dr. Cantor's lack of experience in providing this type of care, "the Court gave his testimony regarding the treatment of gender dysphoria in minors very little weight."

serious question" and that Dr. Lappert "is not qualified to render opinions about the diagnosis of gender dysphoria, its possible causes, … the efficacy of puberty blocking medication or hormone treatments, the appropriate standard of informed consent for mental health professionals or endocrinologists, or any opinion on [] non-surgical treatments," and that his views "do not justify the exclusion" of gender-affirming medical care.[14]

103.    On June 17, 2022, AHCA issued a Notice of Proposed Rule seeking to amend Florida Administrative Code 59G-1.050 to prohibit Florida Medicaid from covering "services for the treatment of gender dysphoria," including: "1. Puberty blockers; 2. Hormones and hormone antagonists; 3. Sex reassignment surgeries; and 4. Any other procedures that alter primary or secondary sexual characteristics."  The Proposed Rule also stated that, "For the purpose of determining medical necessity, including Early and Periodic Screening, Diagnosis, and Treatment (EPSDT)," the aforementioned services "do not meet the definition of medical necessity in accordance with Rule 59G-1.010, F.A.C."[15]

---

[14] *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 3226731, at *12-13, 32 (M.D.N.C. Aug. 10, 2022).

[15] https://www.flrules.org/gateway/View_Notice.asp?id=25979915.

104. The Proposed Rule sought to prohibit Medicaid coverage of medical treatment for gender dysphoria for both transgender adolescents and adults, going beyond the FDOH Guidance.

105. During the 21 days following the issuance of the Proposed Rule, from June 17, 2022 to July 8, 2022, thousands of comments were submitted by individuals, organizations, and medical professionals across Florida in opposition to the rule.

106. On July 8, 2022, AHCA held a public hearing on the proposed rule.

107. The hearing, which was set for 3:00pm on a Friday afternoon, featured a "panel of doctors," none of whom had any clinical experience treating gender dysphoria, to respond to any substantive comments from the audience. The panel of doctors included: Dr. Andre Van Mol; Dr. Quentin Van Meter; and Dr. Miriam Grossman.

108. The panel highlighted AHCA's singular focus on prohibiting coverage of and access to medically necessary gender-affirming care.

109. Dr. Andre Van Mol is a board member of Moral Revolution (https://www.moralrevolution.com/), an organization that believes that "[t]he multitude of possible gender identities and the normalization of same-sex sexual behavior points to a society that has abandoned the desire to accurately define and socialize humanity as a reflection of God's image," and that "[s]ome people

experience same-sex attraction and gender dysphoria … not because they were 'born that way,' but because they were born human into a fallen world, and because society has disrupted and confused how we teach children who they are."

110.   In reference to transgender youth, Dr. Miriam Grossman has stated that "conditioning children into believing that a lifetime of impersonating someone of the opposite sex, achievable only through chemical and surgical interventions, is harmful to youths."

111.   The public hearing was also characterized by participants who were flown in from out of state, who did not profess to be Florida Medicaid participants, or who were opponents of transgender rights bussed in to testify in support of the rule.  Many of them were carrying signs and shirts reflecting the "Let Kids Be Kids" slogan that appears on AHCA's webpage regarding the GAPMS Memo.  AHCA allowed stickers containing their slogan to be passed out at the front door and at the sign-in table as attendees entered.

112.   Notwithstanding the seemingly biased nature of the proceedings, thousands of commenters submitted written comments and many testified at the hearing in opposition to the Proposed Rule.  The range of comments highlighted, among other things: the significant and immediate harms that transgender Medicaid beneficiaries in Florida would suffer; the flaws of the GAPMS Memo; the well-documented evidence base for gender-affirming care, including that it is safe and

effective for the treatment of gender dysphoria; and that the Proposed Rule was unlawful.

113.  Among the comments submitted to Defendants in opposition to the Proposed Rule was a comment by a team of legal and medical experts from Yale Law School, the Yale School of Medicine's Child Study Center and Departments of Psychiatry and Pediatrics, University of Texas Southwestern, and University of Alabama at Birmingham that identifies and refutes the many unscientific claims behind the GAPMS Memo.[16]

114.  The comment by the team of experts indicated that:

- **The GAPMS Memo falsely claims that the scientific evidence does not support medical treatment for gender dysphoria.** In fact, medical care for gender dysphoria is supported by a robust scientific consensus. The specific medical services at issue have been used worldwide for decades, meet generally accepted medical standards, and are not experimental.

- **The GAPMS Memo urges a discriminatory policy that violates the federal and state constitutions and federal and state law.** AHCA offered the report to justify the denial of Medicaid coverage for medical

---

[16] *Letter from Anne L. Alstott et al. to AHCA Secretary Marstiller* (July 8, 2022), https://perma.cc/E432-YUQ7.

care for gender dysphoria. But this discriminatory policy illegally targets transgender people. Neither the June 2 GAPMS Memo nor the AHCA proposal would apply to similar treatments routinely offered to cisgender people.

- **The GAPMS Memo repeatedly and erroneously dismisses solid medical research studies as "low quality," demonstrating a faulty understanding of statistics, medical regulation, and scientific research.** The GAPMS Memo makes unfounded criticisms of robust and well-regarded clinical research, while disregarding other relevant studies altogether. If Florida's Medicaid program applied the June 2 GAPMS Memo's approach to all medical procedures equally, it would have to deny coverage for widely used medications like statins (cholesterol-lowering drugs taken by millions of older Americans) and common medical procedures like mammograms and routine surgeries.

- **The GAPMS Memo cites sources that have no scientific merit.** The GAPMS Memo relies on pseudo-science, particularly purported expert "assessments" that are biased and full of errors. The "assessments" are written by authors whose testimony has been disqualified in court and who have known ties to anti-LGBTQ advocacy groups. The GAPMS

36

Memo's unfounded claims come from unqualified sources, which include a blog entry, letters to the editor, and opinion pieces.

115. The comment by the team of experts was accompanied by the publication of a report, "A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria," that represents the first comprehensive examination of Florida's GAPMS Memo. The authors of this report contend that the GAPMS Memo is a misleading document intended to justify denying Florida Medicaid coverage for gender dysphoria treatment.[17]

116. In its comment, the American Academy of Pediatrics noted: "[T]he mental and physical health and well-being of transgender children and adolescents often rely on their abilities to access much needed mental and physical health care— care that is in keeping with the widely recognized evidence-based standards of care for gender dysphoria. In proposing this rule, Florida ignores broad consensus among the medical community as to what those evidence-based standards of care are, and instead seeks, for its own discriminatory reasons, to impose alternate standards and

---

[17] *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria* (July 8, 2022), https://perma.cc/XZV3-PBEA.

an outright ban of specific treatments for transgender adolescents in the state's Medicaid program."[18]

117.    Similarly, the Endocrine Society submitted a comment stating: "The proposed rule would deny Medicaid beneficiaries with gender dysphoria access to medical interventions that alleviate suffering, are grounded in science, and are endorsed by the medical community. The medical treatments prohibited by the proposed rule can be a crucial part of treatment for people with gender dysphoria and necessary to preserve their health. … [R]esearch shows that people with gender dysphoria who receive puberty blockers and/or hormone therapy experience less depression, anxiety, and suicidal ideation. Several studies have found that hormone therapy is associated with reductions in the rate of suicide attempts and significant improvement in quality of life. In light of this evidence supporting the connection between lack of access to gender-affirming care and lifetime suicide risk, banning such care can put patients' lives at risk."[19]

118.    In addition, interviews with researchers whose studies were cited within the FDOH Guidelines and GAPMS Memo have expressed alarm at how Defendants

---

[18] *Letter from the American Academy of Pediatrics and the Florida Chapter of the AAP to AHCA Deputy Secretary Tom Wallace* (July 7, 2022), https://perma.cc/ND5M-TGYJ.

[19] *Letter from the Endocrine Society to AHCA* (July 8, 2022), https://perma.cc/F5TX-J3JY.

have misinterpreted and misrepresented their studies to justify the Challenged Exclusion.[20]

119.   Notwithstanding the thousands of comments submitted to AHCA in opposition to the Proposed Rule, as well as the substantive evidence and extensive commentary submitted by leading medical and legal experts and organizations, Defendants filed the Challenged Exclusion as a final rule for adoption on August 1, 2022, a mere three weeks after the close of the public comment period and without having responded in writing to material or timely written comments, as required by Fla. Stat. § 120.54(3)(e)(4).

120.   Notice of the Final Adopted Version of the Challenged Exclusion was published on FLRules.com on August 10, 2022 and stated that the Challenged Exclusion would become effective on August 21, 2022.[21]

121.   The Challenged Exclusion, in its final adopted form within Florida Administrative Code 59G-1.050, states as follows:

(7) Gender Dysphoria.

(a) Florida Medicaid does not cover the following services for the treatment of gender dysphoria:

---

[20] Sam Greenspan, *How Florida Twisted Science to Deny Healthcare to Trans Kids*, VICE NEWS (Aug. 3, 2022), https://perma.cc/GZ6P-W2WN.

[21] https://www.flrules.org/gateway/View_Notice.asp?id=26157328.

1. Puberty blockers;

2. Hormones and hormone antagonists;

3. Sex reassignment surgeries; and

4. Any other procedures that alter primary or secondary sexual characteristics.

(b) For the purpose of determining medical necessity, including Early and Periodic Screening, Diagnosis, and Treatment (EPSDT), the services listed in subparagraph (7)(a) do not meet the definition of medical necessity in accordance with Rule 59G-1.010, F.A.C.

122.   Coverage for the four services listed within the Challenged Exclusion is still available when those services are medically necessary for the treatment of conditions other than gender dysphoria.

123.   The Challenged Exclusion ignores the established scientific and medical consensus that the four specified services are frequently medically necessary, safe, and effective for treating gender dysphoria.

124.   The Challenged Exclusion results in AHCA refusing to cover medically necessary treatments for gender dysphoria.

125.   In addition, the Challenged Exclusion is one of a series of measures the State has taken targeting transgender people, and LGBTQ people more broadly, for discrimination.

126. For example, surrounding the GAPMS Memo's release and the adoption of the Challenged Exclusion:

    a. The FDOH issued its factually inaccurate April 2022 guidelines titled "Treatment of Gender Dysphoria for Children and Adults";[22]

    b. Florida enacted its infamous "Don't Say Gay" law, Fla. Stat. § 1001.42(8)(c) (2022);[23]

    c. Governor DeSantis removed a state attorney from office for, in part, saying he would refuse to enforce any laws criminalizing gender-affirming care;[24]

    d. The FDOH sent the Florida Board of Medicine ("FBOM") a "Petition to Initiate Rulemaking," asking it to, among other things, adopt a categorical ban on the provision of gender-affirming medical care to people under 18 years of age and, with respect to adults, to adopt a 24-hour waiting period;[25]

---

[22] *Treatment of Gender Dysphoria for Children and Adults*, FLORIDA DEP'T OF HEALTH (April 20, 2022), https://perma.cc/W33H-6P5Q.

[23] Enacted July 1, 2022, the law seeks to erase LGBTQ people and related content from Florida public schools. The widely used "Don't Say Gay" moniker fails to recognize the harms this law intentionally inflicts upon transgender people and others who identify as members of the LGBTQ community.

[24] Florida Executive Order No. 22-176 (Aug. 4, 2022), https://perma.cc/VSG9-2SUJ.

[25] *Petition to Initiate Rulemaking Setting the Standard of Care for Treatment of Gender Dysphoria* (July 28, 2022), https://perma.cc/3PP7-N6WW.

e.  The FBOM initiated a rulemaking process for a proposed rule to, among other things, ban gender-affirming care for people under the age of 18;[26]

f.  The Florida Department of Business and Professional Regulation lodged a public nuisance complaint against a bar catering to transgender people when that bar had a drag queen reading event;[27] and

g.  Florida officials and their spokespersons made a litany of statements denigrating transgender people.[28]

127.  The discriminatory animus by Defendants toward transgender people is clearly evident by their actions, as the adoption of the Challenged Exclusion deliberately targets transgender people for discrimination in Florida.

---

[26]  *Meeting Minutes*, FLORIDA BOARD OF MED. (Aug. 5, 2022), https://perma.cc/52A3-2E5V.

[27]  *Fla. Dep't of Bus. and Prof. Reg., Div. of Alcoholic Beverages and Tobacco v. R House, Inc.*, Case No. 2022-035976, Admin. Complaint (July 26, 2022), https://perma.cc/8DRL-KVWY.

[28]  Jeremy Redfern (@JeremyRedfernFL), Twitter (Aug. 14, 2022), https://tinyurl.com/2p8vajvw; Governor Ron DeSantis (@GovRonDeSantis), Twitter (Aug. 16, 2022), https://tinyurl.com/yckkuh32; Christina Pushaw (@ChristinaPushaw), Twitter (Aug. 19, 2022), https://tinyurl.com/2p8r5r6c.

42

D.     **The Plaintiffs**

*Plaintiff August Dekker*

128.   August Dekker is a 28-year-old transgender man.

129.   August is unemployed and receives Supplemental Security Income due to disability, as he lives with debilitating rheumatoid arthritis.  He has been a Medicaid beneficiary in Florida since 2014.

130.   August experiences and has been diagnosed with gender dysphoria.

131.   As a child, even as early as 5 years of age, August felt uncomfortable being perceived as a girl.  For example, he would always choose to play a male character when he was roleplaying with his brothers and would also play male characters when he would play "house."

132.   Around the age of 13, August was extremely distraught when he got his first period.  He ran to his mom crying and wondering what was happening because he did not feel that he was a girl.

133.   However, because of his family's religious beliefs, August felt forced to suppress his gender identity as a child and adolescent, which caused him great distress and anxiety.

134.   Once he graduated high school, August felt freer to explore his gender expression and come to terms with his gender identity as a man.  By 2015, August began to socially transition and live openly as the man that he is.

135.   Not long after, August decided to seek out medical care. It took him a while to find a provider who would be qualified and with whom he felt comfortable. Once he found a provider at Metro Inclusive Health in Tampa, August began working with a therapist before starting hormone therapy.  The therapist diagnosed August with gender dysphoria in 2017.

136.   Following the diagnosis of gender dysphoria and working with and under the care of his medical and mental health providers, August began undergoing hormone therapy as medically necessary treatment for his gender dysphoria in 2017.

137.   August has since worked with different medical and mental health providers, who continue to recommend hormone therapy as medically necessary treatment for his gender dysphoria.  He now sees a therapist at Solace Behavioral Health in Tampa and receives his hormone therapy through Planned Parenthood in Tampa.

138.   At present, at the recommendation of his medical and mental health providers, August is being prescribed testosterone hormone therapy as treatment for his gender dysphoria.  The prescription must be written every month.  Up until now, Medicaid has covered August's testosterone hormone therapy.

139.   In addition, in consultation with and under the care of his medical and mental health providers, August obtained chest surgery as treatment for his gender dysphoria in April 2022.  This surgical treatment, which was covered by Medicaid,

was recommended by his providers as medically necessary treatment for August's gender dysphoria.  And it was covered by Medicaid.

140.   Medicaid has always covered August's medically necessary gender-affirming medical care as recommended by his medical and mental health providers to treat his gender dysphoria.

141.   Being able to receive hormone therapy in the form of testosterone injections and to have chest surgery has allowed August to bring his body into alignment with who he is, provided a great deal of relief to August, and relieved some of the clinically significant distress underlying his gender dysphoria.  It has given August the ability to not hate himself or his body and has brought great comfort to his life.

142.   Having access to this medically necessary care has allowed August to be the version of himself that he pictured growing up. For August, it feels natural and normal to be able to live as the man that he is.

143.   Following his chest surgery, August was able to celebrate his birthday with some friends outdoors in a state park.  Having a more masculine chest that conformed with his identity allowed August to be shirtless in public for the first time ever, just like any other man.  It was an afternoon full of joy and laughter for August, and he had never felt more euphoric about his body than he did in that moment.

144.   AHCA's adoption of the Challenged Exclusion has caused August a great deal of distress and anxiety.  When August first learned of the new regulation, he felt a great sense of dread.  August is now fearful of the future.

145.   August's only source of income is his monthly Supplemental Security Income payments of $841.  He uses this limited income to pay for rent, food, and necessities, and simply cannot afford his medically necessary hormone therapy without Medicaid, which would cost $60-65 per month.

146.   While August could ask some family and friends for money in order to afford his medically necessary care, that is neither guaranteed nor sustainable.  It also feels dehumanizing and shameful to August to have to ask for help all the time, especially when his hormone therapy is medically necessary health care recommended by his doctors and which Medicaid has covered until now.

147.   August also has experienced the physical effects of having to stop hormone therapy for a period of time.  That experience caused him to lose muscle mass, have a higher pitched voice, and lose some of his body and facial hair such that it caused him distress and to a degree that people started perceiving him as a woman instead of the man that he is.  It caused August great discomfort and anguish to be perceived as such, and he does not want to ever have to experience that again.

148.   The adoption of the Challenged Exclusion, along with other actions taken by Florida's current administration targeting transgender people, have shaken

46

August and caused him to lose hope. August no longer feels safe to be an out transgender person in Florida. Because of the discrimination he sees stoked by Florida's policy decisions to target transgender people, August often worries that someone will perceive him as transgender and decide they want to hurt him. He is frightened about the possibility that losing access to his medically necessary gender-affirming care will cause physical changes that will make it more likely for someone to perceive him as transgender or more feminine. If someone perceives him as transgender or more feminine, August is afraid that they will verbally or physically assault him.

149. It is incredibly stressful and debilitating for August to have to worry about whether he will be able to get the medical care that he needs, or whether in its absence, he will be incorrectly perceived as female.

150. The Challenged Exclusion threatens the health and wellbeing of transgender Medicaid beneficiaries like August.

***Plaintiff Brit Rothstein***

151. Brit Rothstein is a 20-year-old transgender man.

152. Brit is a junior in at the University of Central Florida (UCF), where he is studying digital media and minoring in information technology. Brit has a full scholarship to attend UCF, which is the only way that he is able to go to college as his family is low-income and could not otherwise afford tuition and living expenses.

Brit worked hard to obtain a Florida Bright Futures scholarship so that he would be able to attend college.  He also received a Top Ten Knights Scholarship from the UCF.  In addition, Brit participates in a federal work study program, which provides part-time jobs for students with financial need, while taking 15 credits this semester.

153.   Given his and his family's very limited income, as well as his age, Brit receives his health care coverage through Florida's Medicaid program, as administered through Sunshine Health.

154.   A transgender man, Brit was incorrectly assigned the sex female at birth, but his gender identity is male.

155.   Brit experiences gender dysphoria in relation to the disconnect between his sex assigned at birth and his gender identity.

156.   Since the third grade, Brit has been aware of his male gender identity. When he was younger, Brit's mom would try to force him to wear dresses to church but he hated dresses and would only want to wear slacks.  He also did not understand why he could not have short hair.  Even as a child, stereotypical assumptions and expectations regarding his sex assigned at birth did not make sense to him.

157.   In the sixth grade, as he approached puberty, Brit's anxiety and depression surrounding his sex assigned at birth was exacerbated, and he would become physically ill when he had to go into the girls' locker room for P.E. Fortunately, there was a guidance counselor who understood the discomfort that Brit

experienced in the locker room and the manifesting anxiety and distress it caused him, so she helped him transfer out of P.E.

158.   While he was in the seventh grade, Brit was seeing a therapist due to unrelated issues.  His therapist saw how much Brit was struggling with not being able to live his life as a boy and, through his sessions with his therapist, Brit became more comfortable with how he was feeling and came to understand that he was a boy.  Brit's therapist also helped Brit navigate how to talk to others about his gender identity.

159.   After a lot of research about how to explain to his family how he felt and that he was transgender, Brit came out to his dad in 2015, at age 13, and asked that he be treated in accordance with his male gender identity.  Brit's parents are divorced, and he came out only to his dad at first.  Brit's dad was very supportive and allowed Brit to wear a binder (a garment that helps to give the appearance of a flatter chest) at his house and live as his true authentic self when he was there.

160.   Unfortunately, Brit was not able to do the same at his mother's house because she disapproved of him.  For example, when Brit came out to his mother as transgender in 2016, she called him an "abomination" and disowned him.  Brit has not had any contact with his mother or her side of the family since then.

161.   Around July 2015, when Brit was 14 years old, Brit began seeing a psychologist, and continued therapy with her until he went to college.  Brit's

49

psychologist diagnosed him with gender dysphoria and, after a couple of years of counseling, the psychologist referred Brit to Joe DiMaggio Children's Hospital to meet with a pediatric endocrinologist.

162. Because Brit's mother objected to the medical care for Brit's gender dysphoria recommended by Brit's mental health and medical providers, Brit's dad had to go to court, where he was granted by the court sole decision-making authority as it related to issues involving Brit's gender identity.

163. Thereafter, when Brit was 17 years old, he began to see a pediatric endocrinologist at Joe DiMaggio. By then, Brit had been diagnosed with gender dysphoria approximately four years prior and had been in consistent and regular counseling since that time. Brit was also living in accordance with his male gender identity to the maximum extent possible, given his family situation.

164. Brit's pediatric endocrinologist determined that it was medically necessary for Brit to begin hormone blockers, which she prescribed for him, and oversaw his treatment. Months later, Brit also began testosterone hormone therapy as medically necessary treatment for his gender dysphoria at his pediatric endocrinologist's recommendation. Medicaid has covered Brit's gender-affirming health care needs, including therapy, blood tests, office visits, and his prescriptions for hormone blockers and testosterone.

165.   Hormone therapy, in the form of testosterone, has impacted Brit's life in many positive ways, including the changes to his physical body, his mental and emotional health, and even the self-confidence he has gained through existing in a body that feels more like his own.

166.   When he was 18, Brit was able to obtain a court order for legal name change, changing his legal name to Brit Andrew Rothstein, which aligned with his gender identity and who he knows himself to be.  Brit also amended his legal government-issued identification documents to reflect his new legal name and correct gender marker as male.

167.   Still, however, Brit continues to experience significant dysphoria related to his chest.  Ever since his chest developed, Brit has hated the way it looks and feels, and has long known that he needs to have chest surgery to bring his body into alignment with who he is.

168.   Brit wears a binder almost every day, usually for 10-12 hours per day, depending on his schedule. His binder causes him discomfort, leaves skin indentations, and sometimes causes bruising on his ribcage.  In 2018, Brit had to go to the emergency room for chest contusions caused by wearing his binder for too long.  Having top surgery would allow Brit to no longer wear a restrictive binder just to navigate his daily life.  Unfortunately, there are very few medical providers in

Florida who are both competent in performing gender-affirming chest surgery, and even fewer who also take Medicaid.

169.   Brit finally found a surgeon at the University of Miami who accepts Medicaid for chest surgeries in January 2022.  Brit had his consultation with the surgeon in May and the surgeon recommended that Brit undergo gender-affirming chest surgery, which was pre-authorized by Medicaid.  When Brit received his pre-authorization on August 11, 2022, he felt blessed to finally have the chance to obtain the gender-affirming care he needed.

170.   Brit was elated to learn that he would finally be getting the surgery that he needed and had long awaited, and he even had a date scheduled: December 22, 2022.  For Brit, it would be an understatement to say that he was looking forward to the surgery.  The surgery would allow Brit to bring his body into alignment with who he is.  It would also eliminate the need for Brit to wear a restrictive and painful binder to hide that part of his body.

171.   However, the very next day after Brit learned his surgery had been pre-authorized, Brit learned that AHCA adopted a rule that prohibited Medicaid coverage for Brit's medically necessary gender-affirming chest surgery.  To Brit, it was a punch to the gut to learn that the state of Florida had decided to strip coverage for medically necessary medical care from him and other transgender Floridians on Medicaid.  It was the highest of highs followed by the lowest of lows.

172.   What is worse, without Medicaid, Brit cannot afford to pay for his testosterone prescription or for his surgery, which is still scheduled for December 22, 2022.   Because of the Challenged Exclusion, Brit is unable to access to the medical care for his gender dysphoria that his medical providers have determined is medically necessary for his health and wellbeing.

173.   Brit's family is also of very limited income, and he does not have family members who can pay for his care.   Brit's dad is a single parent, who has arranged his entire life around being the sole-caretaker for Brit's twin sister, who lives with cerebral palsy and other disabilities.   Brit's dad needs to have the same schedule as his sister because she requires around the clock care and attention.   As such, Brit's has worked as a teachers' assistant for students with special education needs in the Broward County School District, a job which pays approximately $21,000 per year. Brit's dad is thus barely able to make ends meet and cannot afford to financially help Brit access the medical care he needs.

174.   Brit has spent a long time fighting to become the man that he knows himself to be.   He has overcome obstacles and worked hard to get an education and have access to the medical care his providers have deemed medically necessary to treat his gender dysphoria, yet Defendants have created an unnecessary additional barrier blocking Brit from the medical care that he needs, and which would allow him to feel like his body is in alignment with who he truly is.

175.   Even though Brit is legally male in the eyes of the state and federal government, has testosterone circulating through his body, and has grown facial hair, Brit still lives in fear every day that he will be misperceived as female or perceived as transgender due to his chest.

176.   In high school, Brit recognized how fortunate he was to have a supportive parent who loved him for who he is.  Not everyone has that.  There were multiple students at Brit's high school who attempted or died by suicide, so Brit decided that he needed to advocate for those who did not have the support that he had from his dad.  As a result, Brit was invited to join the Broward County Superintendent's LGBTQ+ Advisory Council, and Brit was the President of his school's Gay/Straight Alliance (GSA) Club.  Brit supported his fellow transgender classmates the best that he could, because Brit believes that everyone deserves to feel accepted for who they are.

177.   For Brit, the State's decision to deny transgender people, like himself, of access to medically necessary health care and being treated differently than others solely for being transgender is unthinkable and wrong.

### Plaintiff Susan Doe

178.   Susan Doe is the daughter of Jane and John Doe.

179.   Jane Doe is a full-time mom and homemaker.  John Doe works for the federal government.  He has worked there for 19 years.

180.   Along with their two children, Jane and John live in Brevard County, Florida.

181.   Jane and John adopted Susan, their 12-year-old daughter, out of medical foster care in Florida when she was 2 years old.

182.   Susan is transgender.

183.   When Jane and John adopted Susan out of foster care, Susan had several medical issues.  She was originally placed in regular foster care and was then moved into the medical foster care program after an incident where she stopped breathing as an infant.  At the time she came into the Does' care, she had severe acid reflux that needed treatment and was barely meeting developmental milestones.

184.   Because Jane and John adopted Susan out of foster care, she is eligible for Medicaid coverage until she turns 18.  Susan has thus been eligible for and enrolled in Florida's Medicaid program since she entered Florida's foster care system as an infant.  Jane and John have kept Susan on Medicaid in order to ensure continuity of care with her existing providers and to ensure that her medical needs are properly met.

185.   Although Susan was assigned male at birth, she has known that she is a girl from a very young age.  When she was 3 years old, Susan first told her parents that she was a girl.  Jane and John allowed Susan to explore her gender expression in deliberate and gradual steps.  For example, Susan liked to wear ribbons in her hair

and pink bracelets to school, even when she still wore typical boy clothes and had

not yet grown out her hair. Jane and John kept princess dresses for Susan at home,

and she would often change into a dress as soon as she came home from school.

186.   When Susan was in first grade, she became extremely unhappy with her

assigned gender. Before that time, she had mostly been a very happy-go-lucky child,

but starting in first grade she began getting angry and frustrated easily, and then

would become incredibly sad, often crying for 20 minutes or more.

187.   Jane and John consulted resources online and researched gender

dysphoria in children, and as Susan's parents, had to acknowledge that the

discrepancy between Susan's sex assigned at birth and how she felt inside was

causing her to suffer.

188.   The Does looked for a therapist for Susan. Ultimately, Susan and Jane

were able to go to one session with a therapist when Susan was 6, and the therapist

advised Jane on how to best support Susan. The therapist told Jane to keep listening

to Susan and to allow her to express herself, as Jane and John had been doing. The

therapist also suggested buying clothes from the girls' department that were gender

neutral so Susan could wear them to school without attracting attention about her

gender presentation.

189.   Susan had her last short haircut when she was 6 years old, and when she saw how it looked, she started crying because she felt like the short haircut did not reflect her identity.  After that, she started growing out her hair.

190.   Around the same time, Jane found out that Susan had started to introduce herself to people with her chosen name, which has since become her legal name, and is more typically feminine.

191.   During the summer of 2017, which was the summer before Susan started second grade, Susan told Jane and John unequivocally: "I need to be a girl." To ensure that they were properly supporting Susan, Jane and John took Susan to see a therapist as a family.  The therapist diagnosed Susan with gender dysphoria. The therapist also made clear to the Does that Susan knows exactly who she is and that any problems stemmed from when people question Susan's identity.   The therapist thus recommended Jane and John continue to support Susan in her social transition.

192.   Following the therapist's advice, Jane and John followed Susan's lead and bought her more traditionally feminine clothes, including dresses and skirts to wear to school.  Jane and John also worked with the principal and teachers at Susan's school to try to make sure that they used the appropriate name and pronouns for Susan.  In addition, the therapist shared with Jane and John, and the Does in turn

shared with Susan's school, the latest research on helping children with gender dysphoria adjust well at school, in addition to in the home.

193.   After Susan was able to socially transition and live in accordance with her firmly asserted female gender identity, Jane and John observed Susan feeling a sense of joy.  Susan was happy and comfortable in her own skin.

194.   In addition, the therapist further recommended that Susan see a pediatric endocrinologist, who could monitor her hormone levels for the onset of puberty and assist with any future medical needs.

195.   Jane and John looked for a pediatric endocrinologist that was close to them, but ultimately began working with a pediatric endocrinologist at Joe DiMaggio Children's Hospital in south Florida.  Susan has been seeing her pediatric endocrinologist since 2019.  The Does drive three hours there and three hours back for every appointment.  Initially, the pediatric endocrinologist closely monitored Susan's hormone levels to determine the onset of puberty.  Susan had visits approximately every three months.

196.   Jane and John have been very deliberate in their approach to supporting Susan.  Their goal has always been to support their daughter while following the advice and recommendations of medical and health professionals experienced in dealing with gender identity and gender dysphoria.

197.   In July 2020, after Susan began the onset of puberty, the pediatric endocrinologist started Susan on a puberty delaying medication called Lupron as medically necessary treatment for Susan's gender dysphoria.  The medication, which Medicaid has been covering, prevents Susan from developing secondary sex characteristics consistent with male puberty.   According to the pediatric endocrinologist, it is medically necessary for Susan to receive a Lupron injection every three months in order for her to live authentically in a manner consistent with her gender identity and to treat her gender dysphoria.  By preventing the physical manifestations that accompany male puberty, Susan is also able to avoid negative social and emotional consequences associated with her being forced to develop the characteristics aligned with a gender with which she does not identify.

198.   When Susan learned that the puberty delaying medication was necessary to suppress male puberty, she was happy at the prospect.  There is nothing worse in Susan's mind than male puberty; she describes it as a "nightmare."

199.   Susan's pediatric endocrinologist is currently monitoring Susan to determine when it would be medically appropriate for her to begin hormone therapy.  Susan is very eager to go through female puberty.  At this point, the pediatric endocrinologist thinks that Susan could be ready to start hormone therapy in a year or two.

200.   In August 2021, the Does' therapist retired from her practice.   In November 2021, Susan began seeing another therapist, who is a Licensed Clinical Social Worker.   Like the first therapist, the second therapist diagnosed Susan with gender dysphoria.   The second therapist has further supported Susan in managing the symptoms of her dysphoria.

201.   In light of Defendants' adoption of the Challenged Exclusion, the Does understand that Florida's Medicaid program will no longer cover Lupron for Susan as treatment for her gender dysphoria.   The Challenged Exclusion will also prohibit Medicaid from covering hormone therapy as treatment for Susan's gender dysphoria when Susan is ready to begin the treatment, per the medical guidance of her pediatric endocrinologist.

202.   Susan is due to have her next Lupron injection on October 3, 2022.   Due to the Challenged Exclusion, Medicaid will refuse to pay for the medically necessary Lupron injection when it is needed.

203.   Jane and John worry about the potential physical and mental health consequences of depriving Susan of the medically necessary treatment recommended by her doctors.   Not providing such treatment is not an option for them.   For Jane and John, providing Susan with the medical treatment for gender dysphoria that she requires is necessary to ensure her health and well-being.

204. If Susan had to stop taking Lupron and go through male puberty as a result of the Challenged Exclusion, she would be devastated. Susan has been living as a girl in every aspect of her life since 2017. Her legal name was changed to her current affirmed name in 2018, and in 2020, her birth certificate was amended to reflect that she is female.

205. If Susan were no longer able to access the medical care that she needs to align her body with her gender identity, Susan's mental health would suffer tremendously. Susan would not want to leave the house, and Jane and John fear that she might engage in self-harm. Going through male puberty would be torture for Susan. It would also be agony for Jane and John to watch Susan suffer needlessly when this could be easily eliminated with what they understand to be effective medical care for treating their daughter's gender dysphoria.

206. Through their experience with Susan's medical treatment and extensive conversations with her medical providers over the past five years, Jane and John understand that gender-affirming treatment is medically necessary, safe, and effective treatment for Susan's gender dysphoria.

207. Unlike Susan, Jane and John receive their health coverage through John's employer-provided health plan.

208. While the Does can add Susan to John's health plan, they cannot do so until the open enrollment period near the end of the year, and Susan's coverage

would not start before January 1, 2023. Thus, given her need for her next Lupron shot in early October 2022, this is not a feasible solution.

209.   In any event, as a child adopted out of foster care, Susan is entitled to have her medical needs covered by Medicaid and Jane and John should not have to move Susan to John's employer-provided health plan in order for her to continue receiving medically necessary care.

210.   With Medicaid no longer covering Susan's Lupron treatment, Jane and John will have no choice but to try to pay for her upcoming three-month Lupron injection out of pocket.  Based on their research, the retail price for a single Lupron shot is roughly $11,000.  As the parents of two children with only one income, Jane and John do not have sufficient resources to provide this care without sacrifice.  Jane and John would have to take on debt to pay for Susan's puberty delaying medication and it would be a hardship for them.

211.   Even if the Does are able to add Susan to John's health plan, Susan's health care would be more expensive for them, as they would have a $300 annual deductible for Susan and higher cost-sharing for Susan's gender-affirming care. These are costs they did not have prior to the Challenged Exclusion due to Medicaid's coverage of the medical treatment for Susan's gender dysphoria.

212.  Jane and John not only worry about the multitude of harms that would be imposed on their family by the Challenged Exclusion, but also about the effect that Defendants' actions will have on other transgender people and their families.

213.  The Does have begun considering moving out of state in order to protect their daughter from state-sponsored discrimination.  Jane and John do not wish to move if it can be avoided, as, among other things, it could mean John having to switch jobs and separating Susan and their son from their long-term health care providers, friends, and family.  That said, the health and wellbeing of their adolescent children are paramount to them.

214.  The Does consider Defendants' decision to stop covering medically necessary gender-affirming medical care through Medicaid to be tragic and dehumanizing.  They are concerned about the message the State of Florida is sending by excluding transgender people from Medicaid coverage to which they otherwise would be entitled simply because they are transgender.

215.  Jane and John keep in touch with other families in the LGBTQ+ affirming foster care community and are concerned for the ability of some children to find foster and adoptive families because of the state's hostility toward LGBTQ+ people and concerns about being able to meet the health care needs of those children through Medicaid.

*Plaintiff K.F.*

216.   K.F. is the 12-year-old son of Jade Ladue and stepson of Joshua Ladue.

217.   Joshua has raised K.F. since he was three years old and K.F. considers and calls Joshua "dad."

218.   Jade is a patient coordinator at a dental office, while Joshua receives Social Security Disability Insurance because he is diagnosed with venous malformation, a type of vascular condition that results from the veins in his leg having developed abnormally.

219.   K.F., Jade, and Joshua all live in Sarasota County along with K.F.'s four siblings, ranging in age from five to sixteen years old.  They moved to Florida from Massachusetts as a family in August 2020.

220.   K.F. is transgender.

221.   Because of K.F.'s age and the Ladue family's income, he is eligible for Medicaid.  He has been eligible for and enrolled in the program since he and his family moved to Florida.  Prior to the Ladue family's move, K.F. was enrolled in Massachusetts's Medicaid program.

222.   Although K.F. was assigned female at birth, he has known he was a boy from a very young age.  When he was 7 years old, he came out to his grandparents during a camping trip, telling them that he has known since he was four years old that he is a boy and was born in the wrong body.  In looking back on K.F.'s

childhood, both Jade and Joshua see that K.F. was showing them that he was a boy well before that conversation K.F. had with his grandparents. K.F. always wanted to wear traditional boy clothes (no dresses or skirts), insisted on his hair being kept short, and loved to play shirtless with other boys in their neighborhood.

223. K.F. has never wavered about his gender identity.

224. As with all of their children before their pre-teen years, Joshua and Jade established strict limitations on K.F.'s consumption of television, movies, videos, and video games. At the age of seven, when K.F. came out as transgender, he had never heard of the concept of gender dysphoria, or transgender people, beyond his own experience, which he described first to his grandparents, and then to Jade and Joshua, as simply "being a boy."

225. After K.F. confided in his parents, Jade decided the next best step would be to locate a therapist who specializes in gender dysphoria. Soon after, K.F. had his first appointment with a Licensed Mental Health Counselor. After thorough evaluation, the therapist was the first to diagnose K.F. with gender dysphoria and made sure that Jade and Joshua understood K.F.'s diagnosis and walked them carefully through what they should expect as K.F. got older.

226. After K.F. began therapy, Jade joined a local PFLAG group, an organization which is dedicated to supporting, educating, and advocating for

LGBTQ+ people and their families. She joined the group because it was important to her and Joshua that they demonstrate to K.F. their commitment to supporting him.

227. K.F. was living fully in accordance with his male gender identity in every aspect of his home life and he wanted to be treated accordingly at school. Thus, when K.F. entered the second grade, K.F.'s therapist helped facilitate a meeting between Jade and his school administrators and teachers to talk about K.F.'s gender identity and what actions the school should take to ensure he was fully affirmed and supported as a boy with his classmates in the school environment.

228. Once K.F.'s licensed mental health provider gave her professional recommendation that it was appropriate for K.F. to begin seeing a pediatric endocrinologist, she referred K.F. to the Gender Multispecialty Service (GeMS) Program at Boston Children's Hospital, the first pediatric and adolescent transgender health program in the United States. K.F. had his first appointment with the GeMS Program on September 13, 2015. That first appointment was incredibly thorough, lasting over two hours, and was overall a very happy occasion. It was clear to Jade that K.F. would be receiving the best possible care and the team of providers confirmed everything that K.F.'s therapist had told them: that K.F. is a transgender boy and that his parents and extended family supporting him in his affirmation of his male gender identity was the best decision for his health and well-being.

229.   GeMS continued K.F.'s therapy and started him with pediatric nurse practitioner.  The nurse practitioner's role was to monitor K.F.'s hormone levels for the onset of puberty and assist with any future gender-affirming health care needs. K.F.'s care with GeMS continued until the family moved to Florida in August 2020.

230.   Before the Ladue family moved, in the summer of 2020, K.F.'s medical providers determined that based on the onset of K.F.'s puberty, it was medically necessary for K.F. to receive his first puberty delaying medication.   At the recommendation of K.F.'s medical providers, K.F. received a Supprelin implant, a form of puberty delaying medication which would prevent the onset of secondary sex characteristics typical of girls and women.  K.F. received the implant on August 8, 2020, and it was fully covered by Massachusetts' Medicaid program.

231.   According to K.F.'s former and current medical providers, it is medically necessary for K.F. to receive puberty delaying medication so that K.F. can live authentically in a manner consistent with his gender identity and to treat his gender dysphoria.  By preventing the physical manifestations that would accompany the puberty of his sex assigned at birth, K.F. is also able to avoid negative social and emotional consequences associated with his being forced to develop secondary sex characteristics that do not align with his male gender identity.

232.   As his parent, it is also important to Jade and Joshua that K.F. be able to choose with whom to disclose this deeply personal, private information about

67

himself. Because of the puberty delaying medication, K.F. has that option, and the inherent protection and privacy that it provides.

233. When Jade and Joshua decided to move their family to Florida, Jade researched programs in the state that offered the same or similar level of care afforded by GeMS. Finding a program that offers high quality gender-affirming care and that accepts Medicaid can be challenging. Fortunately, through that research, Jade found the Emerge Gender & Sexuality Clinic for Children, Adolescents and Young Adults based at Johns Hopkins All Children's Hospital (Johns Hopkins Gender Clinic) located in St. Petersburg, Florida.

234. Once they moved, K.F. initiated care with a doctoral-level pediatric nurse practitioner specializing in endocrinology at the Johns Hopkins Gender Clinic. In April 2022, K.F. received his second Supprelin implant which was fully covered by his Florida Medicaid plan.

235. K.F. typically visits the Johns Hopkins Gender Clinic every six months. Recently, however, K.F. has had more frequent visits because his medical provider is monitoring whether K.F.'s second implant is adequately suppressing puberty and there is a possibility that K.F. may need a different type of puberty delaying medication to suppress puberty and successfully continue his medical transition. K.F. has another appointment scheduled at the end of October 2022 to check in with K.F.'s medical provider.

68

236.    K.F. is adamant that he does not want breasts and would eventually like to have facial hair and muscles.  The idea of developing typically female secondary sex characteristics makes K.F. extremely anxious; he prays every night that his puberty delaying medication will be successful.  Since K.F. came to understand and express the dysphoria he experienced resulting from his sex assigned at birth at an early age, Jade and Joshua were able to get him the mental health and medical treatment that was necessary, and as a result K.F. is perceived as and accepted by other people as male and very few people know he is transgender.  Developing secondary sex characteristics typically associated with girls and women, instead of those aligned with his male gender identity, would be tremendously emotionally and physically painful for K.F.

237.    In the event K.F.'s current implant is not effective, and because Florida Medicaid now excludes coverage of puberty delaying medication when used to treat gender dysphoria, the Ladues would have to pay out of pocket for Lupron Depot shots, the treatment K.F.'s medical provider has indicated would be the next step for K.F.  Those monthly shots would cost between $1,000 to $2,000 per shot out of pocket.  The Ladue family has limited income, and they are very worried because they would not be able to afford these treatments without Medicaid coverage.

238.    K.F.'s medical providers have also told the Ladues that likely within the next year, when K.F. is fourteen years old, that it will be medically indicated for

69

him to begin hormone therapy (testosterone) at a dose appropriate to his age and body composition. K.F. is very excited about starting testosterone therapy. K.F. usually hates receiving shots but he told Jade he would be happy to take a monthly shot if it meant that he would experience the male puberty that is aligned with his gender identity, such as his voice deepening and growing facial hair.

239. Jade and Joshua are so grateful that K.F. was confident enough and felt safe to come out to them at such a young age. His identifying his gender dysphoria at a young age combined with a loving and supportive immediate and extended family means that they were able to ensure that K.F. received the health care appropriate for him as soon as possible. As a result, his gender dysphoria has been well managed.

240. While K.F. has always dealt with anxiety, before he came out, it was much worse. He experienced what Jade would describe as "night terrors" and had a persistent stomachache. The Ladues would get calls from K.F.'s school that he was not doing well and was often in the nurse's office. The Ladues went to doctors to determine the source of K.F.'s distress, but no one could identify what was causing the problem. After he had firmly established gender-affirming care with GeMS, K.F. became a completely different child; it was like night and day. He had a smile on his face, a light in his eye, and even a glow about him. His performance and

attendance in school improved, as did his peer relationships. Like any parent, Jade and Joshua were relieved to see their child happy and thriving.

241.   K.F. has also begun the process of legal transition. He has legally changed his name and the family is currently in the process of having his gender marker changed on his birth certificate and records with the Social Security Administration.

242.   Under the Challenged Exclusion, Medicaid will no longer cover puberty delaying medications for K.F. as treatment for his gender dysphoria. The Challenged Exclusion will also prohibit Medicaid from covering hormone therapy as a medically necessary treatment for K.F.'s gender dysphoria when K.F., pursuant to the medical expertise and recommendations of his physicians, is ready to begin that treatment.

243.   Jade and Joshua are incredibly worried about the potential physical and mental health consequences of depriving K.F. the medically necessary treatment recommended by his health care providers. K.F. has been living as a boy in every aspect of his life--medically, legally, and socially--since 2016.

244.   If he were no longer able to access the medication that aligns his body with his gender identity, K.F.'s mental health would suffer tremendously, and he would be devastated. Jade and Joshua fear that K.F., and the whole family with him, would go down a dark and scary road fast. For example, they fear that K.F. would

not leave his bedroom and he would refuse to go to school, or that he would cut off his communications with his friends, teammates, and teachers. Given how much his gender-affirming care has improved his life and mental health, Jade and Joshua can only assume that reversing that course of treatment would result in the unthinkable happening.

245. Because of these concerns, K.F. going without treatment is simply not an option for the Ladue family. They believe providing K.F. with the medical treatment for gender dysphoria that he requires is necessary to ensure his health and well-being.

246. The Ladue family is under 138% of the federal poverty limit; that is why their children, including K.F., qualify for Florida's Medicaid program. Whether it be paying for a different puberty delaying medication if K.F.'s provider determines the current implant is not working or beginning K.F.'s course of hormone therapy in the next year, the Ladue family simply does not have sufficient resources to provide K.F. the gender-affirming care he requires. They simply could not pay out of pocket for the cost of K.F.'s care.

247. Joshua receives his health insurance through Medicare. He cannot add K.F. to his health insurance. Jade has access to health care coverage for family members because of her job, but the cost of adding K.F. is unaffordable for their family.

248.     While Florida is their home, ultimately, the Ladue family will be forced to move if necessary to protect their son's access to medication that is necessary for his health and well-being.  Doing so would mean Jade would have to find a new job, Joshua would have to establish his Social Security payment through a new field office, and the kids would be uprooted and forced to start at new schools and make new friends.

249.     In addition, the Ladues are Christian and just joined a church that they attend every Sunday.  So far, they have felt very welcome and would be sad to break a tie with this faith community and the other communities and relationships they have established in South Florida.

250.     For K.F., this would be a particularly difficult and painful transition. K.F. is doing well academically, socially, and athletically.  He is on the golf team at his school and he is looking forward to upcoming tryouts out for the basketball team in their town.  It is awful for Jade and Joshua to even think that K.F. would have to end this participation and leave his teammates because Florida refuses to provide him with coverage for the medical treatment that he needs to live and thrive, medical treatment that is available to many other cisgender young people, simply because K.F. is transgender.

## CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Equal Protection in Violation
### of the Fourteenth Amendment of the U.S. Constitution

### (All Plaintiffs Against Defendant Simone Marstiller)

251. Plaintiffs reallege and incorporate by reference paragraphs 1 to 250 of this Complaint as though fully set forth herein.

252. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

253. Plaintiffs state this cause of action against Defendant Marstiller, in her official capacity, for purposes of seeking declaratory and injunctive relief, and to challenge her adoption and enforcement of the discriminatory Exclusion both facially and as applied to Plaintiffs.

254. Defendant Marstiller is a person acting under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs equal protection of the law.

255. Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

256.   Discrimination on the basis of nonconformity with sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics are all forms of discrimination on the basis of sex.

257.   A person is defined as transgender precisely because of the perception that they contradict gender stereotypes associated with the sex they were assigned at birth. When a transgender person affirms their authentic gender, it inherently contradicts standard gender stereotypes expected of the individual based on their sex assigned at birth.

258.   In addition, under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to strict, or at least heightened, scrutiny.  Indeed, transgender people have suffered a long history of discrimination in Florida and across the country and continue to suffer such discrimination to this day; they are a discrete and insular group and lack the political power to protect their rights through the legislative process; they have largely been unable to secure explicit state and federal protections to protect them against discrimination; their transgender status bears no relation to their ability to contribute to society; and gender identity is a core, defining trait so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

259.   By adopting and enforcing the Challenged Exclusion categorically excluding "services for the treatment of *gender* dysphoria," including "*[s]ex* reassignment surgeries" and any "procedures that alter primary or secondary *sexual* characteristics," Defendant Marstiller is engaging in constitutionally impermissible discrimination based on sex, including, *inter alia*, discrimination based on nonconformity with sex stereotypes and transgender status.

260.   Through her duties and actions to design, administer, and implement the Challenged Exclusion, Defendant Marstiller has unlawfully discriminated—and continues to unlawfully discriminate—against Plaintiffs based on sex-related considerations.

261.   The Challenged Exclusion treats Plaintiffs differently from other persons who are similarly situated.

262.   Under the Challenged Exclusion, transgender Medicaid beneficiaries who require gender-affirming care are denied coverage for that medically necessary care, while other Medicaid participants can access the same care as long as it is not required for the treatment of gender dysphoria, i.e., gender transition.

263.   The Challenged Exclusion on its face and as applied to Plaintiffs deprives transgender Medicaid beneficiaries of their right to equal protection of the laws and stigmatizes them as second-class citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment.

264. Defendants' promulgation and continued enforcement of the Challenged Exclusion did not, and does not, serve any rational, legitimate, important, or compelling state interest. Rather, the Challenged Exclusion serves only to prevent Plaintiffs and other transgender Medicaid beneficiaries from obtaining medically necessary medical care and services to treat their gender dysphoria, complete their gender transition, and live as their authentic selves.

265. As a direct and proximate result of the discrimination described above, Plaintiffs have suffered injury and damages, including mental pain and suffering and emotional distress. Without injunctive relief from Defendants' discriminatory Challenged Exclusion of coverage for gender-affirming care, Plaintiffs will continue to suffer irreparable harm in the future.

## COUNT II
### Discrimination on the Basis of Sex in Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116
### (All Plaintiffs Against AHCA)

266. Plaintiffs reallege and incorporate by reference paragraphs 1 to 250 of this Complaint as though fully set forth herein.

267. Section 1557 of the ACA, 42 U.S.C. § 18116, provides, in relevant part that, "an individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681, et seq.)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

268.   Discrimination on the basis of nonconformity with sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics are all forms of discrimination encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

269.   Defendant AHCA receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA.   The Centers for Medicare & Medicaid Services ("CMS"), operating within HHS, provide federal financial assistance to AHCA for the state's participation in the Medicaid program. Indeed, Defendant AHCA has a published Notice of Nondiscrimination Policy on its website, stating that the "This Notice is provided as required by … Section 1557 of the Affordable Care Act and implementing regulations."

270.   A covered entity, such as Defendant AHCA, cannot provide or administer health care coverage which contains a categorical exclusion of coverage for gender-affirming health care, or otherwise impose limitations or restrictions on coverage for specific health services related to gender transition if such limitation or restriction results in discrimination on the basis of sex.

271.  Plaintiffs have a right under Section 1557 to receive Medicaid coverage through AHCA free from discrimination on the basis of sex, sex characteristics, gender, nonconformity with sex stereotypes, transgender status, or gender transition.

272.  By categorically excluding "services for the treatment of *gender* dysphoria," including "*[s]ex* reassignment surgeries" and any "procedures that alter primary or secondary *sexual* characteristics," Defendant AHCA has discriminated against Plaintiffs on the basis of sex in violation of Section 1557 and has thereby denied Plaintiffs the full and equal participation in, benefits of, and right to be free from discrimination in a health program or activity.

273.  As a result of the Challenged Exclusion, Plaintiffs have and will continue to suffer harm.  By knowingly and intentionally offering coverage to Plaintiffs that discriminates on the basis of sex, Defendant AHCA has intentionally violated the ACA, for which Plaintiffs are entitled to injunctive relief, compensatory and consequential damages, and other relief.

274.  Without injunctive relief from Defendants' discriminatory Challenged Exclusion of coverage for gender-affirming care, Plaintiffs will continue to suffer irreparable harm in the future.

## COUNT III
### Violation of the Medicaid Act's EPSDT Requirements,
### 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5)
### (Plaintiffs Brit Rothstein, Susan Doe, and K.F. Against Defendant Marstiller)

275. Plaintiffs reallege and incorporate by reference paragraphs 1 to 250 of this Complaint as though fully set forth herein.

276. The Medicaid Act mandates that states provide Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") services, which include all services necessary to "correct or ameliorate" a physical or mental health condition, to Medicaid beneficiaries under age 21. 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), 1396d(r)(5).

277. The Challenged Exclusion, and Defendants' refusal, based on the Challenged Exclusion, to provide coverage for services for the treatment of gender dysphoria to Plaintiffs Brit Rothstein, Susan Doe, and K.F., and transgender Medicaid beneficiaries under age 21, violates the Medicaid Act's EPSDT requirements, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5), which are enforceable by Plaintiffs under 42 U.S.C. § 1983.

## COUNT IV
### Violation of the Medicaid Act's Comparability Requirements,
### 42 U.S.C. § 1396a(a)(10)(B)(i)
### (All Plaintiffs Against Defendant Marstiller)

278. Plaintiffs reallege and incorporate by reference paragraphs 1 to 250 of this Complaint as though fully set forth herein.

80

279. The Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B)(i), require that the "medical assistance made available to [eligible individuals] shall not be less in amount, duration, or scope than the medical assistance made available to" other eligible individuals.

280. The Challenged Exclusion, and Defendants' refusal, based on the Challenged Exclusion, to provide coverage for services for the treatment of gender dysphoria to Plaintiffs and other transgender Medicaid beneficiaries, while covering the same services for other Florida Medicaid beneficiaries with different diagnoses, violate the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B)(i), which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants on all claims, as follows:

A. Issue preliminary and permanent injunctions prohibiting Defendants from any further enforcement or application of the Challenged Exclusion and directing Defendants and their agents to provide Medicaid coverage for the medically necessary care for the treatment of gender dysphoria without regard to the Challenged Exclusion;

81

B.    Enter a declaratory judgment that the Challenged Exclusion, which categorically excludes coverage for medically necessary care for the treatment of gender dysphoria, both on its face and as applied to Plaintiffs:

i.    Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex, including transgender status, nonconformity with sex stereotypes, sex characteristics, gender, gender identity, sex assigned at birth, and gender transition;

ii.    Violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including transgender status, nonconformity with sex stereotypes, sex characteristics, gender, gender identity, sex assigned at birth, and gender transition);

iii.    Violates the Medicaid Act's EPSDT Requirements, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5); and

iv.    Violates the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B)(i);

C.    Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

82

D.   Award the declaratory and injunctive relief requested in this action against Defendants' officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with them;

E.   Award compensatory and consequential damages to Plaintiffs in an amount that would fully compensate each of them for: (1) the harms to their short- and long-term health and well-being from being denied access to medically necessary health care as a result of the Challenged Exclusion and its application to them; (2) their economic losses; and (3) all other injuries that have been caused by Defendants' acts and omissions alleged in this Complaint;

F.   Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 or other applicable statutes; and

G.   Award such other and further relief as the Court may deem just and proper.

*     *     *     *     *

Respectfully submitted this 7th day of September 2022.

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

By: */s/ Jennifer Altman*
**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux**\*\* (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

By: */s/ Abigail Coursolle*
**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

By: */s/ Omar Gonzalez-Pagan*
**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

By: */s/ Simone Chriss*
**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

By: */s/ Katy DeBriere*
**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Application for admission pro hac vice forthcoming.*
\*\* *Application for admission to the Northern District Court forthcoming.*

84