# EXHIBIT 8

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
2                NORTHERN DIVISION

3

4    REV. PAUL A. EKNES-TUCKER,  *
    et al.,                *
5                       *
         Plaintiffs,     *  2:22-cv-00184-LCB
6                      *  October 14, 2022
    vs.                *  Montgomery, Alabama
7                      *  10:00 a.m.
    KAY IVEY, in her official  *
8    capacity as Governor of the *
    State of Alabama, et al.,  *
9         Defendant.      *
    ****************************
10

11

12               TRANSCRIPT OF HEARING
       BEFORE THE HONORABLE LILES C. BURKE
13         UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
23   pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
      and Procedures Vol. VI, Chapter III, D.2.  Transcript
24            produced by computerized stenotype.

25

<u>APPEARANCES</u>

<u>FOR THE PLAINTIFFS</u>:
Jeff Doss, Esq.
Asaf Orr, Esq.


<u>FOR THE INTERVENOR PLAINTIFFS</u>:
Jason R. Cheek, Esq.
Lane Woodke, Esq.
Margaret Marshall, Esq.
Cooper Pickren, Esq.


<u>FOR THE DEFENDANTS</u>:
James W. Davis, Esq.
Edmund LaCour, Esq.


<u>FOR THE NON-PARTY EAGLE FORUM OF ALABAMA</u>:
John Graham, Esq.


Also Present:  Steve Marshall,
               Alabama State Attorney General


<u>COURTROOM DEPUTY</u>:   Kelli Fuller


<u>COURT REPORTER</u>:  Christina K. Decker, RMR, CRR

1                    **P R O C E E D I N G S**

2                   (In open court.)

3         THE COURT:  Good morning, everybody.

4      I assume that SLI and Eagle Forum and the Department of

5  Justice want to be heard today.  But is there anybody else who

6  is going to want to be heard today on this?

7      All right.  Well, obviously, I have read all the motions

8  and supporting briefs that have been filed on this issue.  Let

9  me just state a few things that I think are pretty obvious.

10        Discovery of a matter not reasonably calculated to lead to

11  the discovery of admissible evidence is not within the scope of

12  Rule 26(b)(1).  Parties may obtain discovery regarding any

13  non-privileged matter that is relevant to any party's claim or

14  defense and proportional to the needs of the case, considering

15  the importance of the issues at stake in the action, the amount

16  in controversy, the parties' relative access to relevant

17  information, the parties' resources, the importance of the

18  discovery in resolving the issues, and whether the burden or

19  expense of the proposed discovery outweighs its likely benefit.

20        And that's directly from the rule.

21        It's clear to me that relevant discovery, among other

22  things, would be things that bear on whether or not this

23  statute is constitutional or not.

24      I am going to read this subpoena that the Department of

25  Justice wants from Eagle Forum.

1      Any draft legislation, proposed legislation, model

2   legislation, relating to the Vulnerable Child Compassion and

3   Protection Act, Senate Bill 184, House Bill 266, or their

4   predecessor bills that Eagle Forum of Alabama wrote, assisted

5   in writing, provided feedback on, or reviewed.

6      Any materials considered by Eagle Forum of Alabama in

7   preparing regulation, draft legislation, proposed legislation,

8   model legislation relating to VCAP, Senate Bill 184, House Bill

9   266, or their predecessor bills, including any model or sample

10  legislation from other third-party organizations or

11  jurisdictions; and medical studies, opinions, or evidence.

12     Any documents concerning Eagle Forum of Alabama's

13  legislative or policy goals, initiatives and/or strategies

14  relating to medical care or treatment of transgender minors or

15  minors with gender dysphoria.

16     Any documents provided to the Alabama State Legislature or

17  any employee or member thereof in support of VCAP, Senate Bill

18  184, House Bill 266, or any predecessor bills, including

19  written testimony, letters, e-mails, draft legislation, model

20  legislation, or proposed legislation, reports, summaries,

21  analyses, fact sheets, and/or talking points.

22     Any communications between Eagle Forum of Alabama and any

23  employee, agent, assign, or member of the Alabama State

24  Legislature, Alabama Governor's office, Alabama Lieutenant

25  Governor's Office, Alabama Attorney General's Office, or any

1  employee, agent, or assign of a District Attorney's office

2  within Alabama concerning VCAP, Senate Bill 184, House Bill

3  266, and/or any predecessor bills.

4      Any communications between Eagle Forum of Alabama and any

5  other nongovernmental organization, consultant, or lobbyist

6  concerning the legislation and those bills.

7      Any records or minutes of meetings concerning those bills

8  or predecessor bills.

9      Any polling or public opinion data related to or

10  concerning those bills, predecessor bills, and/or legislation

11  relating to medical care or treatment to transgender minors or

12  youth.

13      Any records or documents relating to presentations,

14  videos, interviews, and/or speeches Eagle Forum of Alabama

15  representatives have given or participated in regarding medical

16  care or treatment related to gender identity, transgender

17  minors or youth, trans-identifying minors or youth, or minors

18  or youth with gender dysphoria.

19      Any mass letters, newsletters, or e-mails that the Eagle

20  Forum of Alabama sent to members of a mailing or e-mail list

21  related to or concerning those bills, or predecessor bills.

22      And, lastly, any social media postings that Eagle Forum of

23  Alabama issued concerning those bills, or any predecessor

24  bills.

25      Now I have filed with this Court an e-mail from the

1   Department of Justice saying, well, it's going to be our intent
2   just to withdraw all these subpoenas.
3       Then I now have a notice from the Department of Justice
4   that says, oh, actually, all we need is only any medical
5   studies or literature referenced in Section 2 of the Act.
6       So I am going to have some questions, Mr. Cheek.  I
7   mean --
8           MR. CHEEK:  Yes, sir.
9           THE COURT:  -- when you filed this subpoena and you
10  signed it, I assume you did so as an officer of the Court and
11  in good faith.
12          MR. CHEEK:  Yes, Your Honor.  That's correct.
13          THE COURT:  And yet now I have all these that filings
14  say, look, this is an undue burden, this does not meet the
15  standard of discovery.  I got an e-mail from you saying we
16  don't need any of it.  I've got a notice then filed saying,
17  well, we just actually need one thing.
18      So enlighten me why we're here today.
19          MR. CHEEK:  Sure.
20          THE COURT:  What changed between this absolutely
21  asking for everything we can think of subpoena down to we just
22  really actually only need one thing?
23          MR. CHEEK:  It's obviously a fair question, Your
24  Honor, and I appreciate --
25          THE COURT:  Is your microphone on?

1          MR. CHEEK:  Testing.

2          THE COURT:  I think it is.  Maybe just step a little

3   closer to it.

4          MR. CHEEK:  What I was saying, Your Honor, is it's

5   obviously a fair question.  And I appreciate the opportunity to

6   respond and provide some context.

7       So as Your Honor has probably noticed, this thing has

8   grown some legs.  And there were certainly some internal

9   conversations within the Department to evaluate what has

10  happened and whether we can lower the temperature here.

11      I mean, we've got amicus briefs filed by numerous

12  organizations.  We have heard or considered their arguments.

13  We've reached out to try to understand the burden, the other

14  issues that have been raised.  So this all did not occur in a

15  vacuum is my point.

16      And with respect to the e-mail that Your Honor asked

17  about, that's all on me.  I misunderstood something.  There's

18  nothing more to it.  There's nothing less to it.  It was just a

19  miscommunication.

20      I'm sorry.  I regret, obviously, that I made that mistake.

21  It probably won't be the last time I make such a mistake.  But

22  I will say that it was corrected in very short order, that

23  miscommunication.

24          THE COURT:  So, you know, one of the things I noticed

25  was that, you know, the subpoena asked for these documents in

1  native format.

2          MR. CHEEK:  Yes, sir.

3          THE COURT:  And what would be the purpose of that?

4          MR. CHEEK:  So Your Honor probably doesn't know this

5  about me, but prior to becoming a lawyer, I worked in the tech

6  industry for a number of years.

7          THE COURT:  So did you personally write this original

8  subpoena?

9          MR. CHEEK:  I was involved.  This was a team subpoena.

10 This was not just one person that wrote it.

11         THE COURT:  All right.

12         MR. CHEEK:  But native format is helpful for a number

13 of reasons.

14    Metadata can tell you who the author of a certain document

15 is, when it was written.  If you are dealing with spreadsheets,

16 metadata -- I'm sorry -- native format is very critical, in

17 terms of organizing, sorting, things of that nature.

18    So it's routinely what we request when we're issuing a

19 subpoena.  And oftentimes --

20         THE COURT:  So my question is:  What changed?  What

21 changed between this subpoena that you filed in good faith and

22 today, when it appears you are asking for 1 percent of what you

23 were originally asking?

24         MR. CHEEK:  I think that's a fair, fair assessment,

25 Your Honor.

1      And so a couple of things changed.  One, we heard the

2  arguments.

3      When we issue a subpoena, as Your Honor noted, we're

4  looking at Rule 26, the scope of the subpoena.  So you start

5  with that premise in mind.  And we're seeking relevant

6  information.

7      We can't --

8          THE COURT:  I know I am interrupting you again.  But I

9  read the standard of discovery for a reason.

10         MR. CHEEK:  Sure.

11         THE COURT:  And I will confess that as I prepared for

12  this hearing, before I even read the amicus briefs, or the

13  motions to quash, I read your subpoena.

14         MR. CHEEK:  Okay.

15         THE COURT:  And my initial reaction was this is vastly

16  overbroad and unduly burdensome.  I mean, that was -- I looked

17  at it, and I was like, how in the world could what the

18  Department of Justice is asking for possibly be relevant to

19  this case and its outcome?

20      So I'm just being straight honest with you so you know

21  where I'm coming from.

22         MR. CHEEK:  Yeah.  And I greatly appreciate that.  And

23  I want to return the favor, Your Honor, and be straightforward

24  with you, as well.

25      We're looking first and foremost to pin down who wrote the

1 statute.  We had some suspicions or some information about who

2 wrote the statutes, but we didn't know that for certain until

3 we got the declarations that were attached to the motions to

4 quash.

5 And so those things had an impact on whether we needed to

6 really push forward aggressively and insist that the other

7 materials be produced.

8 I'll also mention that -- and I have referenced it

9 before -- this thing has really grown legs.  It's -- it --

10 distraction is not the proper term, Your Honor.  But it --

11 THE COURT:  Well, look, who has filed these amicus

12 briefs don't matter to me.

13 MR. CHEEK:  Okay.

14 THE COURT:  The only thing that matters to me is

15 what's in them -- whether or not your subpoena, you know, meets

16 the standard of discovery.

17 It doesn't matter how many articles there are in the paper

18 or any of that.  The only thing that matters is are we

19 following the law.  So that's my consideration in this case.

20 MR. CHEEK:  Sure.

21 So a couple of things I will note.  Proportionality,

22 oftentimes when subpoenas are issued, a conversation occurs

23 between the subpoenaed party about that very issue.  Relevance

24 is something that occasionally comes up.  But there's typically

25 a conversation, an engagement that occurs.

1     Now, please don't misunderstand what I'm saying.  I'm not

2   faulting them for filing a motion to quash.  That was within

3   their right.  It's certainly within their right.  But I'm just

4   saying this did not follow sort of a typical course of the way

5   subpoenas work typically in practice in this district.

6     I hope that my actions have demonstrated -- that our

7   actions have demonstrated that we're willing to work in good

8   faith to not increase any burden, to not provide any undue

9   burden.  But we do believe that the issues in the case are

10  important.

11    And it's a balancing act.  It's a balancing test there.

12        THE COURT:  So I hear you saying -- I think, reading

13  between the lines -- that the parties filing a motion to quash

14  have done something that in your mind is outside the normal

15  range of practice in the Middle District.  So tell me what

16  you're talking about.

17        MR. CHEEK:  I don't mean to suggest that, Your Honor.

18    I'm just saying typically when a subpoena is issued, there

19  is a dialogue that goes on about, hey, you know, why are you

20  seeking this in native form?  You know, do you need -- do we

21  really need to produce that?  Things of that nature.

22    But I do not mean to suggest that they weren't within

23  their rights to file a motion to quash.  I do not mean to

24  suggest that at all.  I'm just saying that's my perspective.

25  That's sort of -- that's where I'm coming from.

```
 1          THE COURT:  So as we sit here today, I see you saying
 2   you only really need one thing from Eagle Forum.  But I don't
 3   really see that the SLI issue is squarely addressed.
 4      Is it DOJ's position you don't need anything from SLI as
 5   we stand here today?
 6          MR. CHEEK:  Based on Mr. Johnson's declaration from, I
 7   think it was from Wednesday of this week, where he indicated
 8   that he did not have any involvement in identifying those
 9   medical studies, those medical issues.  I don't mean to quote
10   him directly.  I'm paraphrasing.  But I think that's correct.
11      He's made that statement on behalf of SLI, if I am reading
12   it correctly, that he had no involvement with that piece.  And
13   so I think that's correct.
14          THE COURT:  Okay.  Another question.  Do we have any
15   attorneys here from any of the pertinent organizations that
16   have filed this action -- ACLU?  Southern Poverty?  Do we have
17   any attorneys from any other organizations?
18          MR. DOSS:  Yes, Your Honor.  For the private
19   plaintiffs.
20          THE COURT:  All right.
21          MR. DOSS:  For Lightfoot.
22          MR. ORR:  The National Center For Lesbian Rights, Asaf
23   Orr.
24          THE COURT:  Anyone else?
25          MR. DOSS:  We are the only ones here today.
```

1          THE COURT:  No, I understand.

2     Well, Mr. Doss, I am going to aim this question at you.

3 And I am just asking for an honest answer here, just what you

4 honestly think.

5     Certainly ALCU and many other organizations have been

6 involved in legislation all over this country and even Alabama,

7 in front of the Legislature and in front of departmental

8 practice.

9     What is your impression about whether, if you were their

10 attorney, you might recommend that they fully respond to this

11 kind of subpoena if it got issued to them if the shoe were on

12 the other foot?

13          MR. DOSS:  A couple of points on that, Your Honor.

14     I think, one, as to the issue of communications with

15 legislators, public officials, I think my advice would be you

16 may have a right to petition your government.  You don't have a

17 right to do so secretly.  So if you've shared information with

18 your government, it may be subject to disclosure.  That would

19 be kind of Category 1.

20     Category 2, in terms of the breadth, the volume of

21 discovery, that sort of thing, I would walk those clients

22 through the same process I go through with any subpoena, which

23 shows here's what they're asking for, do you have it, number

24 one.  Number two, what kind of time are you looking at.  Get a

25 sense of quantifying that amount of time.

1        And if it looked like it was going to be a steep burden,

2   then reach out to the other side and try to negotiate some

3   compromise to it.  And if those compromise negotiations were

4   not fruitful, we would file a motion to quash.

5        But that would be generally the process that we would walk

6   through, whether it was Eagle Forum, whether it was ALCU,

7   whether it was private business, any entity, Your Honor.

8            THE COURT:  All right.  Anything else you want to tell

9   me, Mr. Cheek?

10           MR. CHEEK:  There's so much.

11       At the heart of the matter, why we're here today, we

12  are -- we are here in good faith, Your Honor.  I know that is a

13  statement.  Actions speak louder than words.

14       But this was a team decision that was considered by a

15  number of people within the Department of Justice who believed

16  that this information was sufficiently important in this case.

17  And that's why the subpoena was issued.  There's nothing more

18  to it.  There's nothing less to it.

19       What I will say -- what I will add is that if you're

20  presented with a scenario where you're seeking a number of

21  things, and you can't have everything -- and we know that's

22  certainly what seems to be happening here in this instance --

23  you focus in on the things that matter the most.

24       And that's what we've tried to do, is focus in on those

25  medical studies that are so important that they were

1    specifically referenced in the statute itself.

2        Now, one of the things I will add is we've tried to get

3    that information through requests for production.  At this

4    point, those efforts have not been fruitful.  We are in the

5    conferral process.  But at the end of the day, these things are

6    so important to us that that's why we're here, Your Honor.

7        I believe that -- and our expert deadline is coming up

8    soon.  I believe that those experts have a right to see what

9    those specific studies are in forming their opinions and

10   presenting them to this Court.

11           THE COURT:  Are there unknown studies out there?  I

12   mean, it seems to me that everybody would know what studies

13   exist out there.  Are there studies out there that are unknown

14   to DOJ or anybody else in this area?

15           MR. CHEEK:  No, Your Honor.  You know, the National

16   Institutes of Health, I think, have a PubMed site that

17   effectively aggregates to my knowledge most medical studies

18   from around the country --

19           THE COURT:  I guess I'm saying, I mean, do you think

20   that Eagle Forum has got some secret internal study they've

21   conducted over the last year and this is going to change the

22   course of your case?

23           MR. CHEEK:  No, Your Honor.  That's not what I'm

24   suggesting at all.

25           THE COURT:  So tell me what you are looking for.

1    MR. CHEEK:  I am just wanting identification of what
2    those studies were so we can evaluate them as part of our case.

3    THE COURT:  But these are -- but I hear you saying
4    these are studies that probably are already known to you?

5    MR. CHEEK:  That's not what I'm saying, Your Honor.
6    And I apologize for my lack of clarity.

7    What I'm saying is I suspect these studies are publicly
8    available, but I just don't know which ones they are.  And
9    that's what I'm trying to get at.

10   If they could identify what those studies are -- don't
11   even have to produce them in and of themselves.  But if they
12   can just point me in the direction and say, here's a study
13   from, you know, 2000 whatever in this journal, there you go.

14   THE COURT:  Well, look, so, obviously, I have issued a
15   preliminary injunction that just freezes things the way they
16   are until we can get to a final hearing.  And then, you know, I
17   think you know what you are going to have to prove.  I am
18   pretty sure the State knows what they have to prove.

19   So let's get back to your original subpoena again.  Tell
20   me -- I want to know how the Department of Justice thought that
21   those were relevant and how were you going to use that
22   information if you got it.

23   You know, we're talking about whether this statute is
24   constitutional or not, really.  That's really just all we're
25   talking about.

1       So where were you really headed with this?

2            MR. CHEEK:  So the State has to show there's an

3    important government interest involved here.  And so part of

4    that analysis, that inquiry, is what does the science say?  And

5    if the science is flawed, or it's, you know, older, not

6    generally recognized -- I don't know.  I'm just hypothesizing

7    here.  That's important for us to know.  And we can have that

8    debate in this Court about those issues.  But not allowing us

9    to see or identify what those studies are, we can't engage in

10   that debate to begin with.

11           THE COURT:  I hear you.  I know you have limited it to

12   just the studies.  But I'm really talking about the other

13   99 percent that you now say that you don't need.

14           MR. CHEEK:  Okay.

15           THE COURT:  How are you going to use all that

16   information?

17           MR. CHEEK:  So a big piece of it was to identify the

18   origins of the statute.  And I think we've determined what the

19   origin was.

20       But, generally speaking, the evidence can be used to --

21   for a number of ways.  Stepping outside of the medical context,

22   the medical studies context.  It could provide circumstantial

23   evidence of the Legislature's intent.

24       You have situations where if someone is making statements

25   and a legislator adopts those statements, it could help color

1  why the statute was enacted or needed in the first place.

2      And then secondly -- I'm sorry -- thirdly, it can lead to

3  different areas for us to explore.

4      So there are a number of ways that we can get at it and

5  use this evidence.

6          THE COURT:  So let's just talk for a minute about what

7  where this naturally would lead.

8          MR. CHEEK:  Okay.

9          THE COURT:  You know, administrations change every

10  four years, or at least, you know, every eight.

11      So, you know, is the new standard going to be that these

12  kind of subpoenas, you know, go out in legislation to any

13  advocacy organization, and they want e-mails to their members,

14  they want social media posts, they want things that the group

15  just considered in their advocacy.  And that's all the things

16  you're asking for.

17      Is that where you think the Department of Justice thinks

18  we need to go in this country?  Because I promise this, you

19  know, at some point this will be aimed at Southern Poverty Law,

20  and ALCU, and their efforts, as well.  Is this where we need to

21  go?

22          MR. CHEEK:  That is not a consideration that any of us

23  on this team made.  We are career employees.  Many of us have

24  served through a number of administrations.  I have served in

25  four administrations under numerous attorneys general, numerous

1    U.S. attorneys.

2         And so --

3         THE COURT:  And let me say, I don't believe you're

4    partisan at all, Mr. Cheek.  I think you're just doing your

5    job.

6         I may not agree with this subpoena.  But I'm just saying

7    as a career employee, then you above anybody should recognize

8    where this would go, as with a change of administrations.

9         MR. CHEEK:  Sure.

10        THE COURT:  I imagine you are here today because the

11   Attorney General made a decision for the U.S. Attorney to get

12   involved; am I correct?

13        MR. CHEEK:  Oh, gosh.  I don't -- I don't know.  I

14   don't know that level of information.  I'm not trying to be

15   cute or anything.  I just -- I don't know.

16        THE COURT:  Well, they were issuing press releases

17   from the Attorney General's Office about coming into this case,

18   so I'm guessing this was not your decision.

19        MR. CHEEK:  It was not my decision.  That's right.

20        THE COURT:  All right.  Okay.  Well, Mr. Cheek, you

21   have answered my questions.  And so at this point, I will move

22   over to the other counsel in this case.  I think we've covered

23   a lot of ground here.

24        And so why don't we start with Eagle Forum?

25        MR. CHEEK:  Thank you, Your Honor.

1          MR. GRAHAM:  Thank you, Your Honor.

2      I'm John Graham.  Thank you for your time today.  I felt a

3  little funny sitting at this table since we're not parties.

4  But it's the way it worked out.  We were told to sit here, so

5  that's where we sat.

6          THE COURT:  Fair enough.

7          MR. GRAHAM:  It's obvious, Your Honor, that you have

8  read our materials.  You have read the amicus briefs.  You have

9  read the DOJ's response.  So I don't think I need to start from

10  the top.  Obviously, you understand the context of how we got

11  to this point.

12      I think what is important, I guess, a couple of things

13  Mr. Cheek just said, if they wanted to know from the subpoenas

14  who wrote the statute.  And because Your Honor recognized, and

15  I think as Mr. Cheek conceded, 99 percent of that subpoena had

16  nothing whatsoever to do with that question.  If that was their

17  question, the subpoena was amazingly stunningly overbroad for

18  that.

19      But the answer to the question actually they already knew,

20  as well.  And the answer is the Alabama Legislature wrote the

21  statute.  It's their statute.

22      Eagle Forum is not the government.  Eagle Forum has in a

23  declaration said from Ms. Clark they did provide some draft

24  legislation.

25      This was a multi-year process before the Legislature,

1   three years running.  There were groups on both sides.  It was

2   heavily publicized.  There were people advocating on both sides

3   of this.  The Human Rights Campaign was very active in it on

4   the other side of this, among others.  There were -- so it was

5   a long process.

6       But as I think Mr. LaCour had said in the preliminary

7   injunction when Your Honor asked who wrote the statute, the

8   legal answer is and the proper answer is it's the product of

9   the Alabama Legislature.

10      So all the things in our file have nothing whatsoever to

11  do with the ultimate issue before Your Honor in this case,

12  which is, as you have recognized, is this statute

13  constitutional.

14      We don't have a legal dog in that fight.  We have an --

15  obviously have a rooting interest, but we're not a party to the

16  case.

17      But down to how we got to the current issue, the

18  1 percent, basically, as Your Honor has recognized, of what's

19  left of the subpoena of medical studies referenced by the

20  Legislature.

21      Mr. Cheek apparently has not addressed whatsoever the

22  undisputed evidence from the declarations of Ms. Clark and from

23  the text of the statute themselves.  The statute has the

24  legislative findings in Section 2 -- and there's two places

25  where it references studies.  It does not identify specific

 1   studies.  And as Ms. Clark has stated, it's undisputed

 2   evidence, we have no way of identifying what specific studies

 3   the Legislature had in mind when they referenced those in their

 4   findings.  There's no actual way to even respond to the

 5   subpoena as it currently exists.

 6        And beyond that, I think it's still covered by First

 7   Amendment privilege.  I still think it's overbroad.  You know,

 8   the issue of legislative intent itself, I think is irrelevant,

 9   and certainly when you get to nonparties.

10        The Dobbs case before the U.S. Supreme Court on the

11   abortion issue this summer, we quote that.  They have ignored

12   that, as well.

13        But in that case, there was amicus briefs of the parties

14   who were trying to have -- affirm Roe v. Wade.  And they were

15   arguing that the Mississippi abortion law was unconstitutional

16   based on some comments that proponents of that law had made

17   some time ago.  And the Supreme Court said that's just -- that

18   is no way relevant.  It's not anything pertinent to this case.

19   And so they were very clear that's disfavored.  And the

20   Eleventh Circuit said the same thing.

21        So there's just no relevance at all to what's in our files

22   and what our intent was or what our beliefs about this issue

23   were.

24        So I think what we're down to with this 1 percent left of

25   the subpoena is that, you know, it still doesn't meet any of

1  the tests that Your Honor read from Rule 26.

2      It's got to be relevant.  I don't think they're relevant

3  at all.

4      A, we can't even comply with it because we don't know

5  exactly what studies the Legislature meant.  B, whatever

6  studies are in our file aren't relevant.  The statute already

7  references what they reference.

8      Proportional, we still have to go through, as

9  nonparties --

10          THE COURT:  Well, and that's another thing.  You know,

11  the statute doesn't reference any specific study.

12          MR. GRAHAM:  Correct.

13          THE COURT:  So I am puzzled by that.

14          MR. GRAHAM:  And that's why we can't -- we couldn't

15  even specifically respond to this subpoena if we had to at this

16  point.  We would just be guessing as to what the Legislature

17  specifically was referencing in those legislative findings.  So

18  that's another reason why we can't comply.

19          THE COURT:  Mr. Graham, do you speak on behalf of SLI

20  today?

21          MR. GRAHAM:  Yes, sir.

22          THE COURT:  Okay.

23          MR. GRAHAM:  Yes, sir.  And I think at this point

24  everybody acknowledges that SLI was not involved in that part

25  of it and wouldn't have anything to produce.  Even if they had

1    to guess, they don't have any.

2        But you have got relevance.  You've got proportionality to

3    a nonparty, an undue burden.

4        And Ms. Clark's described her file.  She doesn't have like

5    a manilla folder out there that says these are the medical

6    studies that we think the Legislature ought to rely on.

7        She has nothing like that.  She's got a large file.  She's

8    got boxes.  She's a wife and mother.  She's got boxes of

9    materials.  She's got a bunch of e-mails and things on her

10   computer.

11       But to even respond to this 1 percent of the subpoena

12   that's left, she would have to go through all of those, figure

13   out what's medical articles, and then just guess is that

14   something the Legislature may have intended to rely on in their

15   statute.  I mean, that's what it would be would be a guess.  I

16   don't think the law requires that of her, and put her and Eagle

17   Forum in that position.

18       And then you have still got the First Amendment issues.  I

19   think this is covered.  We've briefed all that, as well.

20       I think for all those reasons this subpoena, even as it

21   still currently exists, is due to be quashed.  I don't see any

22   way that this was issued by the Department in good faith.

23       I think the rule does provide for sanctions.  I have

24   nothing against Mr. Cheek.  I don't think he was responsible

25   for this.  I think this was somebody else.  But I think it

 1  ought to be sanctioned.

 2          THE COURT:  And what are the costs at this stage for

 3  both Eagle Forum and SLI in preparation for this hearing and

 4  putting forth this motion?

 5          MR. GRAHAM:  Well, Your Honor, the out-of-pocket

 6  expenses would be -- would be zero, as far as I know.

 7     I have been representing them pro bono in this case.  My

 8  law firm's allowed me to do that.  I appreciate the opportunity

 9  to do that.

10     It's not been without cost.  There's been a lot of time

11  involved, as you can imagine.  I don't know of any actual

12  out-of-pocket expenses.

13          THE COURT:  So you're asking for a punitive monetary

14  sanction, but not one based on attorney fees, or anything like

15  that?

16          MR. GRAHAM:  Well, I think -- I mean, I have kept up

17  with my hours.  And I certainly would be happy to provide Your

18  Honor with those hours and my normal rate, if you think that's

19  appropriate.  I am happy to do that.  We have kept up with it,

20  and it's been substantial.

21          THE COURT:  All right.  Anything else you want to

22  offer to the Court?

23          MR. GRAHAM:  No, sir.  Thank you.

24          THE COURT:  Mr. Cheek, do you want to address those

25  things?

1          MR. CHEEK:  Just a few points, Your Honor, if I may.

2      My kind colleague reminded me something that did pop into

3  my head, but I neglected to say, is that if the shoe were on

4  the other foot, and the ALCU, or whomever, had drafted a

5  similar legislation, my job is to get to the heart of the

6  information that's relevant to the case.

7      And so that's not a consideration about an entity or an

8  organization's ideology in terms of whether or not to seek

9  information from them.

10          THE COURT:  I do not think you're idealogical,

11  Mr. Cheek.

12          MR. CHEEK:  I appreciate that.

13          THE COURT:  That's not the point I'm making.

14      The point I'm making is just that this could be turned

15  around on other organizations with the same voracity that it's

16  been sent to Eagle Forum.  And I guarantee you that we would be

17  here arguing it from the other side if that were to happen.

18      I do not think you are idealogical.  I don't think that

19  you are idealogically driven.

20      But the point is, you know, the Department of Justice is

21  conceding that 99 percent of this they don't need.  And so that

22  certainly lends a lot of credibility to the side of the

23  movants.

24      But go ahead.  Let's just hit square in the head what

25  you've just heard from Mr. Graham regarding those studies, what

1   they are --

2              MR. CHEEK:  Yes.

3              THE COURT:  -- et cetera.

4              MR. CHEEK:  Yes.

5        May I address one thing?  Because I don't know that I'm

6   being clear in my point to the Court.

7              THE COURT:  Okay.  Yes.

8              MR. CHEEK:  As career employees -- and it's not -- I

9   am just speaking on behalf of myself.  I'm talking about as

10  career employees, that's -- those are not considerations that

11  we would -- we can make.  And if someone were to have asked us

12  to do something based on some sort of political question, then

13  our obligation is to say, not going to do it.

14       So I feel like I'm beating a dead horse on that.  But I

15  don't know if I'm being super clear with the Court on that.

16       With respect to the issue about they can't know what those

17  studies are that are referenced in the legislation itself,

18  we're not asking for that.  We're simply asking for the authors

19  of the legislation to identify what they had in mind when they

20  quoted several studies and numerous studies in the legislation.

21  That's it.

22       I do want to briefly touch on the First Amendment issues.

23  Again, I am happy to engage in a dialogue.  And I continue to

24  be happy to engage in a dialogue with the subpoenaed parties or

25  party at this point about that issue.

1       I will note that I think they're taking a little bit of an

2  overbroad reading on that because some of the documents that

3  we've subpoenaed do appear to be posted online.  And I am not

4  sure that you can say that we should be allowed -- or required

5  to produce them because, you know, if you post something, it

6  seems to me that there's a decent argument that there's a

7  waiver.

8           THE COURT:  So let me go back here.  We're simply

9  asking for the authors of the legislation to identify what they

10  had in mind when they quoted several studies and numerous

11  studies in the legislation.  That's it.

12      So how does that bear on whether the statute is

13  constitutional or not?

14           MR. CHEEK:  So it gets back to that important

15  government interest.

16      Is there a legitimate, important government interest that

17  is supported by the -- because you have a number of issues in

18  this case -- decisions that are between a parent, a doctor, a

19  child.  Talking about incarcerating physicians, pharmacists.

20      And so if the foundation or some of the foundation of the

21  statute is on shaky ground, that gets at the important

22  government interest and whether it's substantially related to

23  it.  I think it has a very direct bearing on that.  And if not

24  even direct, certainly it could be used as circumstantial

25  evidence.

1      THE COURT:  Let me clear up something, too.

2    You know, I can tell that you are worried that I believe

3  that partisan politics is at work in what you have done.  That

4  is not what I am saying.

5      MR. CHEEK:  And I didn't mean to suggest that, Your

6  Honor.

7      THE COURT:  But what I am saying -- hold on.  Hold on.

8      MR. CHEEK:  I'm sorry.

9      THE COURT:  What I am saying is, you know, I think you

10  and I both could look back through your career and see many

11  times where there's an administration change, the position of

12  the Department of Justice changed.  And they abandoned one

13  position and took the opposite position under a new

14  administration.  They filed an action against or for

15  legislation that they would not have filed under the previous

16  Attorney General, as things change.

17    And so I was just making the point that some of the

18  parties who happen to be on the plaintiff's side in this case

19  could well find themselves on the other side in a different

20  administration in a different issue.  That's the only point I'm

21  making.

22      MR. CHEEK:  Right.  And I agree completely with that

23  point.

24      THE COURT:  Gotcha.

25      MR. CHEEK:  I do want to step back a little bit,

1    because I think this issue has been framed, not by the Court,

2    but I think we're sort of losing the forest through the trees

3    here.

4         You start with the premise that Your Honor began with --

5    Rule 26 has a broad take on discovery.  And it says you are not

6    entitled to privileged information, it has to be proportional,

7    et cetera.

8         We can't know a number of those issues in advance a lot of

9    times in advance of issuing a subpoena.  And that's why I was

10   saying oftentimes there's a dialogue that occurs about, hey,

11   you know, you're seeking this.  It's work product.  We're not

12   going to produce it.

13        So my point being is it then shifts for the subpoenaed

14   party to say, to raise with the other side, what's going on,

15   why this isn't in compliance with Rule 26.

16        And so we have made those arguments.  And they've

17   obviously appeared in court.

18        So, but I think that's the starting -- that's an important

19   starting point before you get anywhere, as far as talking about

20   sanctions or whatnot of that nature, so...

21             THE COURT:  All right.  I will give you the last word,

22   Mr. Graham.

23             MR. GRAHAM:  Thank you.

24        Judge, I failed to mention before, although it isn't in

25   our filing from this past Wednesday the supplement to our

1    motion to quash.  There's been studies produced in this case by

2    the parties, by the federal government, by the State of Alabama

3    defendants.  I think those were -- a number were produced

4    during the preliminary injunction hearing, as I understand it.

5    There are a number of those before the Eleventh Circuit

6    currently.  I'm sure you have access to all those.

7        But we filed, I think just a copy of the appendix from the

8    State's Eleventh Circuit filing.  And it's, you know, just page

9    after page listing medical articles, all kind of medical

10   articles and studies that the federal government already has.

11       And as Your Honor said, and Mr. Cheek acknowledged, he

12   doesn't -- he doesn't think, doesn't have any theory that

13   there's some secret study out there.  So all this really seems

14   a bit disingenuous why they even need this 1 percent at this

15   point.  And, again, as we said, we can identify the particular

16   studies for sure, anyway.

17       But in terms of the sanction issue, we had also cited in

18   our reply filed on September 28th to the government's

19   opposition to our motions to quash, they had --

20       THE COURT:  So just so I'm clear.  You are saying that

21   you will identify the studies to the government, you just don't

22   want to produce what's in your files?

23       MR. GRAHAM:  No, sir.  I'm sorry.  I must have been

24   unclear.  We cannot identify the particular studies that the

25   Legislature had in mind when they generally referenced studies.

 1          What I'm saying is that there are numerous studies that

 2     both sides to this case -- the state and the federal

 3     government -- have already produced.

 4          And so if we were to go in through Ms. Clark's file and

 5     produce every medical article she has just on the guess that

 6     some of it may or may not have been given to the Legislature,

 7     and then who knows what whether the Legislature relied on that

 8     or not in their findings, you know, putting all that aside, it

 9     would be almost certainly duplicative of what the federal

10     government already has in this case.

11          THE COURT:  So your quote was, And, again, as we said,

12     we can identify the particular studies for sure, anyway.  I'm

13     just -- tell me what that --

14          MR. GRAHAM:  We cannot identify them.

15          THE COURT:  Cannot.

16          MR. GRAHAM:  I'm sorry if I misspoke.  We cannot

17     identify them.

18          Ms. Clark does have --

19          THE COURT:  Are any of these studies that Ms. Clark

20     has or you have, are any of these outside of the public domain?

21          MR. GRAHAM:  Not to my knowledge.

22          So, yes, Your Honor, I'm sorry.  I may have misspoken.  We

23     cannot identify those.  And that was clear in Ms. Clark's

24     second declaration that was filed with our filing of Wednesday

25     of this week.

1       As to the sanction issue Mr. Cheek was talking about,

2  again, just wishing we had more of a dialogue before we got to

3  this point --

4       THE COURT:  And maybe I'm missing this in the

5  pleadings, but have we asked for sanctions in the pleadings?

6       MR. GRAHAM:  I have not filed a motion for sanctions,

7  Your Honor.

8       THE COURT:  So without a motion for sanctions, I don't

9  think we can proceed with that issue today just because DOJ is

10  not on notice of that.  I think we can certainly take that up

11  at a later hearing if you decide to file something.  But I

12  don't know that it would be fair to them to hold a sanction

13  hearing right now and sanction them with no notice that anybody

14  was asking for sanctions.

15       MR. GRAHAM:  Okay.  I totally understand what you're

16  saying.

17     I would just say that this was a -- this was all in the

18  context of their complaint that we not have proper dialogue

19  before we filed our motions to quash.

20     And we pointed out in our reply on September 28th,

21  Eleventh Circuit case, Progressive Emu, Inc., vs. Nutrition &

22  Fitness, Inc., 2019 Eleventh Circuit case.  And which was

23  decided in the context of sanctions for an improper Rule 45

24  subpoena.

25       But the question was the party complaining about the

1    sanctions about who had issued the subpoena was saying that

2    they complained that the defendant had failed to consult with

3    them to narrow the subpoena before they filed the motion to

4    quash, and that, therefore, that alone should preclude the

5    sanctions that were issued before the Court.

6        The Eleventh Circuit said Rule 45 imposes no such

7    obligation.  Instead, it requires those serving a subpoena --

8    the federal government in this case -- to take reasonable steps

9    to avoid imposing undue burden and expense on the recipient of

10   the subpoena, and authorizes sanctions on a party or attorney

11   who fails to comply.  Rule 45 leaves no room for a party or

12   attorney to issue an untimely, facially overbroad and unduly

13   burdensome subpoena and expect to work out the details later.

14       That's their argument.  That's improper.  The Eleventh

15   Circuit has said so.

16           THE COURT:  All right.  I said I was not going to give

17   you the last word, but I'm actually going to allow Mr. Cheek

18   just to respond to that last issue.

19       Thank you, Mr. Graham.

20           MR. CHEEK:  Yes, sir.

21       So, Your Honor, that case, everything that Mr. Graham said

22   is true presumably.  I mean, I take him at his word.

23       But there are also some distinguishing and I think

24   important factors in that case that are different than what we

25   have here.

1          That subpoena was issued beyond the discovery deadline.

2     And so I think the Court had saw that subpoena as an end run

3     around the discovery order that it had specifically set as

4     being especially troublesome to it.  So I think that's an

5     important factor.

6          May I address one other issue?  I promise I will be quick.

7               THE COURT:  Yes.

8               MR. CHEEK:  I do want to make clear that the materials

9     that we are seeking, we are thinking of ways to get at them

10    through different avenues.

11         And that's what discovery is about.  It's about being

12    creative as a lawyer.  And if you run into roadblocks, figure

13    out a different way or different approach to it.

14         I am not sitting here saying we're going to come back and

15    issue another subpoena to these parties -- these nonparties.

16    But I'm just saying this is not unusual.

17         And we're not just saying we're dropping this altogether.

18    We're going to come together -- and we have already been

19    thinking about it -- and try to find ways to get important

20    information to our case.

21         So I think that's it unless Your Honor has any additional

22    questions.

23              THE COURT:  I don't.

24         Any other attorney wish to be heard today?  State?

25    Anybody else?

1          MR. LACOUR:  Your Honor, Edmund LaCour for the

2  defendants.

3          THE COURT:  Come around to the podium, Mr. LaCour.

4          MR. LACOUR:  Thank you, Your Honor.  I will keep it

5  very brief.

6      The federal government seems to be proceeding on this

7  notion that whenever a law is challenged, that the State has to

8  come forward and compile an administrative record, so to speak,

9  like you might see in an Administrative Procedure Act

10  challenge, where every single piece of paper that every one of

11  the 140 legislators might have looked at over the last

12  five years, or every single website that might have flickered

13  across their screen or cell phone has to come before the Court

14  and all be assessed.

15      But that's not what we look at when a court is looking

16  towards legislative purpose.  It's not the subjective

17  motivations of any one of the 140 members of the Legislature or

18  the Governor, or of her staff.

19      Like in any challenge to a statute, if you're trying to

20  determine its purpose, the best place and oftentimes the only

21  place you even need to look is the text of the statute.  That's

22  the only thing everyone has voted on, agreed upon, and

23  ultimately enacted.

24      And here we have extensive set of legislative purposes

25  laid out in Section 1.  And then if you look at how the statute

 1   operates, you can see how those purposes are advanced.

 2        So that's why we don't think that what they're requesting

 3   is relevant.

 4        And, actually, if you go back and you look at the initial

 5   subpoena, they do reference studies in one of the requests to

 6   Eagle Forum and SLI, but they reference studies you have

 7   internally.

 8        Then there's a separate subpoena where they ask for

 9   different items provided to members of the Legislature.  Those

10   include talking points, among other things, draft legislation.

11   They don't reference studies.

12        So it does appear that this new narrowing of the subpoena

13   request is actually asking for something they didn't even ask

14   for the first time around.

15        But that's all we have to add, Your Honor.  If you have

16   any questions.

17        THE COURT:  So let me ask you that question, then.

18        I mean, does the State believe there are studies that are

19   unknown to all the parties at this point on this issue?

20        MR. LACOUR:  Your Honor, we are not aware of any

21   secret studies cooked up by Eagle Forum or by the Legislature.

22   We're looking at publicly available information.

23        That's how these inquiries usually proceed, just like they

24   proceeded at the preliminary injunction, where we came forward

25   with expert testimony.  They cited certain studies.  We

1  produced certain studies as exhibits.  Plaintiffs and the

2  Department of Justice did the same thing.

3      That's how we think that this case will ultimately be

4  adjudicated when we get to final judgment.  You will hear from

5  experts.  Studies will be put forward.  Our experts will

6  explain why we think some studies are stronger than others.

7  Their experts will presumably have some contrary opinion on

8  some of those issues.  Maybe we'll find some issues of

9  agreement, as well.  That's how these things go.

10      It's not sitting some member of the House or some member

11  of the Senate down to say, tell me every conversation you have

12  had with somebody for the last five years about issues of

13  gender dysphoria.  That's foreign to our concept of government

14  and how courts work.

15          THE COURT:  So I guess my last question would be just

16  so I have some idea of the context of what the request is, you

17  know, to the knowledge of the State, how many studies are out

18  there roughly on this issue?

19          MR. LACOUR:  Your Honor, I --

20          THE COURT:  Are we talking about tens?  Hundreds?

21  More?

22          MR. LACOUR:  One issue is that treating gender

23  dysphoria in children via pharmaceuticals and surgeries has not

24  been all that studied.  So not as many as one would hope.  I

25  think that's one reason the State stepped in here and passed

1    this law.

2        Just looking at the box I have in my office, the appendix

3    that we submitted to the Eleventh Circuit, and I know there are

4    dozens listed or referenced or included there.  I don't know if

5    it goes into the low hundreds or not, though.

6            THE COURT:  Got it.

7        Anything else?

8            MR. LACOUR:  That's it, Your Honor.

9            THE COURT:  All right.

10           MR. LACOUR:  Thank you.

11           THE COURT:  I was going to let you come back,

12   Mr. Cheek.

13           MR. CHEEK:  I appreciate it.  I will be very, very

14   brief.

15       On Mr. LaCour's point regarding the subpoena not

16   requesting this information, enumerated item number 2 does

17   request that information.

18       And Mr. LaCour and I may disagree on a number of points,

19   but we do agree that the text of the statute is important.  And

20   that text specifically references medical studies.  And that's

21   why we're asking for those materials that the authors relied

22   upon in drafting the statute.

23       If there aren't any other questions, I will sit down.

24           THE COURT:  That's all I have.

25       Why don't we take a 15-minute break, and then I will be

1 | back in 15 minutes.

2 |          (Recess.)

3 |          THE COURT:  All right.  Having heard from all the

4 | parties, let me say this:  Had the Department of Justice not

5 | narrowed their scope and withdrawn the majority of things they

6 | were asking for, I obviously would have been issuing an order

7 | to quash that subpoena for many, if not most of the items

8 | requested.

9 |     This is a technical point, but looking at the subpoena

10 | language regarding the studies requested, this reads one way,

11 | and it says materials considered by Eagle Forum of Alabama in

12 | preparing legislation, et cetera, whereas the narrowed scope

13 | says medical studies or literature referenced in Section 2 of

14 | the Act.  And those are two different things to me.

15 |     And so I will come out with a written order.  But

16 | essentially my ruling would be this:  To the extent that the

17 | Department of Justice wants to issue a new subpoena adopting

18 | this language -- because I don't think this new language was

19 | originally asked for in the subpoena.

20 |     To the extent that they want to ask for that, I do think

21 | that any studies such as they exist may well be relevant to the

22 | ultimate outcome of this.

23 |     I will be honest with you, I am skeptical that Eagle Forum

24 | has a study that the Department of Justice is not aware of.  I

25 | would probably suggest that the way to handle that, because I

1  don't think it's necessary for Eagle Forum to go back and go

2  through all their files and produce the whole study and every

3  single thing they have, what I would suggest is that the

4  Department of Justice send Eagle Forum a letter that says, We

5  are aware of the following studies.  Are you aware of any

6  others?  And if there are studies that are not on that list,

7  then I think the easy way to handle this is Eagle Forum,

8  through their counsel, could provide any additional studies

9  that are not included, but just the cite, just the cite to that

10  study.

11     I don't think it's necessary that Eagle Forum go back

12  through all their files and pull every single box they have and

13  produce the whole study.  Because I suspect these are public

14  studies that are already known.

15     And so I think the unduly burdensome way to do that is

16  just for Eagle Forum to give them the cite to any study that's

17  not included on that list once the subpoena is altered.

18     So I will just say as a caution, you know, Mr. Cheek, I

19  respect that once you got their filings, that you have taken

20  the position that you have today, you know.  But I hope we're

21  not going to go down this road with any organization in

22  addition to Eagle Forum in this case.  Because that subpoena

23  certainly was very overly broad.  I understand why they're here

24  today, and they should be here today.

25     And so I would just say to all parties let's do our very

1  best when we're conducting discovery to follow the rule and the

2  case law interpreting the rule about what's discoverable.

3      All right.  I will get an order out.  I thank all the

4  parties for appearing today.

5      We're adjourned.

6

7          (Whereupon, the above proceedings were concluded at

8      11:21 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATE</u>

2

3

4        I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11  _____          <u>10-16-2022</u>

12  Christina K. Decker, RMR, CRR                Date

13  Federal Official Court Reporter

14  ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25