**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON: | |
| | |
| AMERICAN ACADEMY OF PEDIATRICS,<br>345 Park Boulevard<br>Itasca, IL 60143 | |
| ENDOCRINE SOCIETY,<br>2055 L Street NW, Suite 600<br>Washington, DC 20036 | |
| WORLD PROFESSIONAL ASSOCIATION<br>FOR TRANSGENDER HEALTH,<br>1300 S. 2nd Street, Suite 180<br>Minneapolis, MN 55454 | |
| AMERICAN ACADEMY OF CHILD &<br>ADOLESCENT PSYCHIATRY,<br>3615 Wisconsin Avenue NW<br>Washington, DC 20016 | |
| AMERICAN ACADEMY OF FAMILY<br>PHYSICIANS,<br>11400 Tomahawk Creek Parkway<br>Leawood, KS 66211 | Misc. Case No. 23-MC-00004 |
| AMERICAN ACADEMY OF NURSING,<br>1000 Vermont Avenue NW, Suite 910<br>Washington, DC 20005 | |
| AMERICAN COLLEGE OF<br>OBSTETRICIANS AND GYNECOLOGISTS,<br>409 12th Street SW<br>Washington, DC 20024 | |
| AMERICAN COLLEGE OF PHYSICIANS,<br>190 N. Independence Mall West<br>Philadelphia, PA 19106 | |
| AMERICAN MEDICAL ASSOCIATION,<br>330 N. Wabash Avenue, Suite 39300<br>Chicago, IL 60611 | |

AMERICAN PEDIATRIC SOCIETY,
9303 New Trails Drive, Suite 350
The Woodlands, TX 77381

AMERICAN PSYCHIATRIC ASSOCIATION,
800 Maine Avenue SW, Suite 900
Washington, DC 20024

ASSOCIATION OF AMERICAN MEDICAL
COLLEGES,
655 K Street NW, Suite 100
Washington, DC 20001

NATIONAL ASSOCIATION OF PEDIATRIC
NURSE PRACTITIONERS,
5 Hanover Square, Suite 1401
New York, NY 10004

NORTH CENTRAL FLORIDA COUNCIL OF
CHILD & ADOLESCENT PSYCHIATRY,
3615 Wisconsin Avenue NW
Washington, DC 20016

SOCIETIES FOR PEDIATRIC UROLOGY,
500 Cummings Center, Suite 4400
Beverly, MA 01915

SOCIETY FOR ADOLESCENT HEALTH
AND MEDICINE,
111 West Jackson Boulevard, Suite 1412
Chicago, IL 60604

SOCIETY FOR PEDIATRIC RESEARCH, and
9303 New Trails Drive, Suite 350
The Woodlands, TX 77381

SOCIETY OF PEDIATRIC NURSES
330 N. Wabash Avenue, Suite 2000
Chicago, IL 60611

| AUGUST DEKKER, et al., | |
| Plaintiffs, | |
| v. | Northern District of Florida Case No. 4:22-cv-325-RH-MAF |
| JASON WEIDA, et al., | |
| Defendants. | |

**INTERIM SECRETARY WEIDA AND THE FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN <u>OPPOSITION TO THE NON-PARTIES JOINT MOTION TO QUASH SUBPOENAS</u>**

## INTRODUCTION

Openness and transparency are hallmarks of the scientific method. Casting themselves in the underlying case as the standard bearers of the prevailing scientific view regarding gender dysphoria treatment—and used as such by Plaintiffs—the non-parties now seek to shield their perspective from any scrutiny. The non-parties refuse to answer whether their perspective is the result of careful study and debate among their memberships or the result of a handful of people dictating a result, as a past president of the American Academy of Pediatrics suggested. *See* App. at 1062-89.

Secretary Weida and the Florida Agency for Health Care Administration ("AHCA") thus oppose the joint motion of the eighteen non-parties[1] to quash the subpoenas[2] served by AHCA pursuant to Federal Rules of Civil Procedure 26, 30, and 45 on November 28, 2022 in connection with an action pending in the United States District Court for the Northern District of Florida, *Dekker, et al. v. Weida, et al.*, No. 4:22-cv-325-RH-MAF. The AHCA subpoenas seek targeted depositions of three of the non-parties and limited sets of documents from all of the non-parties regarding their gender-dysphoria-related guidelines, standards, best-practices, and policy positions

---

[1] The eighteen non-parties—all of which sought to jointly file an amicus brief in the underlying case—are as follows: World Professional Association for Transgender Health, Endocrine Society, American Academy of Pediatrics, American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, National Association of Pediatric Nurse Practitioners, North Central Florida Council of Child & Adolescent Psychiatry, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, and Society of Pediatric Nurses.

[2] Subpoenas for depositions and documents were served on non-parties American World Professional Association for Transgender Health, Endocrine Society, and American Academy of Pediatrics. Subpoenas for documents were served on the remaining non-parties. All have the same counsel.

("gender dysphoria guidelines"). AHCA requests an expedited ruling on the non-parties joint motion to quash subpoenas because the District Court for the Northern District of Florida has expedited the underlying case by setting a **February 7, 2023** discovery deadline, April 7, 2023 summary judgment deadline, and May 9, 2023 bench trial.

The underlying case involves a challenge by four transgender individuals—two adults and two minors—against AHCA's August 21, 2022 rule establishing that "Florida Medicaid does not cover," as "treatment of gender dysphoria," the use of (1) "puberty blockers," (2) "hormones or hormone antagonists," (3) "sex reassignment surgeries," or (4) "other procedures that alter primary or secondary sexual characteristics." Fla. Admin. Code. 59G-1.050(7)(a) ("GAPMS Rule"); App. at 6-7.[3] At its core, the underlying case rises or falls under binding circuit court precedent on "whether, based on current medical knowledge, the state's determination that [certain] treatments [for gender dysphoria—i.e., puberty blockers, cross-sex hormones, surgeries, and treatments that change primary and secondary sex characteristics—]are experimental is reasonable." App. at 12 (Order Denying a Preliminary Injunction); *see* App. at 21 ("GAPMS Report") (AHCA's June 2, 2022 Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria concluding that these treatments "do not conform to GAPMS and are experimental").

The Plaintiffs in the underlying case seek to prove that the non-parties' gender dysphoria guidelines represent the established medical consensus regarding gender-dysphoria treatment and that the State's GAPMS Rule is contrary to that established medical consensus. To that end, Plaintiffs' Complaint is replete with references to the non-parties' gender dysphoria guidelines,

---

[3] This filing refers to Generally Accepted Professional Medical Standards as "GAPMS." "App." citations refer to the appendix.

and a principal focus of Plaintiffs' cross-examination of AHCA's expert at the recent preliminary injunction hearing was on those guidelines.

But rather than adequately respond to the subpoenas, the non-parties make insufficient objections. The non-parties assert that they are categorically immune from AHCA's deposing them or seeking documents on whether their gender dysphoria guidelines in fact represent the established medical consensus regarding the treatment of gender dysphoria. Specifically, the non-parties do not wish AHCA to ask relevant questions regarding: (1) the non-parties' policy positions on gender affirming care for gender dysphoria; (2) the consideration of any opposing perspectives, especially given the shift in perspective in the Western European countries, Australia, and New Zealand; (3) the consideration of any side effects and risks associated with the treatments recommended through their gender dysphoria guidelines; (4) the process used to adopt (or approve) any gender dysphoria guidelines; (5) how many of the non-parties' total members, if any, voted to support any gender dysphoria guidelines; and (6) the considerations that went into filing an amicus brief in the underlying case. Nor do the non-parties wish for AHCA to obtain relevant documents—redacted or not—regarding those gender dysphoria guidelines.

The non-parties' objections to the subpoenas are unsupported by law. They should be rejected because the subpoenas: (1) seek relevant information and documents; (2) do not impose any undue burdens; and (3) do not infringe on any First Amendment privilege. Moreover, lest it go unnoticed, the non-parties sought leave to file an amicus brief in the underlying case in which they specifically represented to the District Court for the Northern District of Florida that their own gender dysphoria guidelines are not only consistent with—but actually a part of—the medical community's prevailing accepted standard of care for the treatment of gender dysphoria. There is

simply no reasonable basis for them to complain about having to explain the very gender dysphoria guidelines they themselves have sought to inject into the underlying case.

## BACKGROUND

On April 20, 2022, the Florida Department of Health released guidance on the treatment of gender dysphoria for children and adolescents. App. at 251-52. That same day, AHCA's then-Secretary Marstiller sent a letter to Tom Wallace, AHCA's Deputy Secretary for Medicaid, requesting that AHCA determine if the treatments addressed in the FDOH guidelines are consistent with GAPMS and not experimental. App. at 253-54; *see* § 409.905(9), Fla. Stat. (establishing that AHCA "shall not pay for [Medicaid] services that are . . . experimental").

Subsequently, AHCA released the State's June 2022 GAPMS Report. App. at 17-250. GAPMS is a rule-based process that allows the Medicaid program to decide whether to reimburse or exclude certain health services. Fla. Admin. Code. R. 59G-1.035. As a part of that process, the State consulted with several experts, five of whom provided reports attached to the GAPMS Report. App. at 20-21; 68-250. The GAPMS Report summarized the findings of the consulting experts and concluded as follows: "the evidence shows that [certain] treatments [for gender dysphoria—i.e., puberty blockers, hormones or hormone antagonists, sex reassignment surgeries, and other procedures that alter primary or secondary sexual characteristics—]pose irreversible consequences, exacerbate or fail to alleviate existing mental health conditions, and cause infertility or sterility," and, as such, the "treatments do not conform to GAPMS and are experimental and investigational." App. at 56.

On August 21, 2022, AHCA promulgated a rule establishing that "Florida Medicaid does not cover," as "treatment of gender dysphoria," the use of (1) "puberty blockers," (2) "hormones or hormone antagonists," (3) "sex reassignment surgeries," or (4) "other procedures that alter

primary or secondary sexual characteristics." Fla. Admin. Code. 59G-1.050(7)(a) (GAPMS Rule); App. at 6-7. The State's GAPMS Report supports the GAPMS Rule's limited exclusion of certain treatments for gender dysphoria, as do comments that were provided by detransitioners and parents (in writing and in a public meeting) concerning the GAPMS Report and the GAPMS Rule. App. at 17-250; 255-64; 266-70. The GAPMS Rule became effective August 21, 2022.

On September 7, 2022, Plaintiffs sued AHCA to enjoin the GAPMS Rule. App. at 366-451. Plaintiffs' Complaint alleges that the GAPMS Rule violates the Fourteenth Amendment's equal protection clause, the Affordable Care Act's nondiscrimination provision, and the Medicaid Act. App. at 440-47. In their Complaint, Plaintiffs asked the Court to prohibit AHCA from enforcing or applying the GAPMS Rule and, among other things, direct AHCA and its agents to provide Medicaid coverage for the medically necessary care for the treatment of gender dysphoria without regard to the GAPMS Rule. App. at 447-49. On September 12, 2022, Plaintiffs filed a motion for preliminary injunction.

On September 27, 2022, days before AHCA's deadline to respond to the preliminary injunction motion, all eighteen of the non-parties (along with four others)[4] jointly filed a motion for leave to appear as amicus curiae to which they attached their proposed amicus brief. App. at 452-507. Within their motion and proposed amicus brief, the non-parties held themselves out as a group of "professional medical and mental health organizations" with "scientific views and insights" regarding: (1) the serious medical condition known as gender dysphoria; (2) the accepted standard of care for treating individuals suffering from gender dysphoria; and (3) in their view the lack of evidence for and the harm caused by the GAPMS Rule. App. at 454-55; *see* App. at 455

---

[4] The four non-parties not before the Court are Academic Pediatric Association, American College of Osteopathic Pediatricians, Florida Chapter of the American Academy of Pediatrics, and Pediatric Endocrine Society. Their subpoenas were noticed for compliance in other jurisdictions.

("Amici include both national and state organizations and represent thousands of health care providers who have specific expertise with the issues raised in their amicus brief.").

The non-parties claimed that the guidelines of the American World Professional Association for Transgender Health ("WPATH") and Endocrine Society ("ES") represented the "widely accepted view of the professional medical community" that "gender-affirming care is the appropriate treatment for gender dysphoria and that, for some adolescents, gender-affirming medical interventions are necessary." App. at 482; *see* App. at 482-83 ("The treatment protocols for gender dysphoria are laid out in established, evidence-based clinical guidelines: (i) the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, and (ii) the WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (together, the 'Guidelines'")). The non-parties further claimed that the Endocrine Society and WPATH Guidelines were scientifically developed just like other guidelines promulgated by the non-parties. App. at 489 ("The [WPATH and ES] Guidelines are the product of careful and robust deliberation following the same types of processes—and subject to the same types of rigorous requirements—as other guidelines promulgated by amici and other medical organizations."). Notably, the non-parties specifically represented to the District Court for the Northern District of Florida that their own gender dysphoria guidelines are not only consistent with—but actually a part of—the medical community's prevailing accepted standard of care for the treatment of gender dysphoria. App. at 456 ("The widely accepted recommendation of the medical community, *including that of the respected professional organizations participating here as amici*, is that the standard of care for treating gender dysphoria is 'gender-affirming care.'" (emphasis added)).

On October 3, 2022, the District Court for the Northern District of Florida denied the non-parties' motion for leave to file an amicus brief. App. at 508-10. It did so "based solely on the timing" because allowing the amicus brief would have afforded AHCA very little time to respond prior to its deadline to respond to Plaintiffs' motion for a preliminary injunction. App. at 509. The district court's order suggested that future timely amicus briefs would be allowed. *See* App. at 509 ("As the case progresses, any further proposed amicus brief should be submitted by not later than the deadline for the corresponding filing of the party whose position the amicus seeks to support.").

In November of 2022, shortly after the Rule 26(f) conference between the Parties, AHCA issued the attached subpoenas to each of the non-parties. App. at 511-766. Identical subpoenas were issued to non-parties WPATH, ES, and American Academy of Pediatrics ("AAP") for both depositions and documents. Each of their respective subpoenas contained six deposition topics:

1. The Entity's policy position on gender affirming care for gender dysphoria.
2. Any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria.
3. Any side effects and risks associated with the treatments recommended by a guideline, standard, best-practice, or policy.
4. How the Entity is organized so that [AHCA] may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria.
5. How many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions.
6. Why the Entity sought to file an amicus brief in this case.

Each also contained seven requests for production:

1. Any documents that state the total number of your membership.
2. Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.
3. Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

4. Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

5. Any documents and communications detailing your intention to file an amicus brief in *Dekker v.* [*Weida*], 4:22-cv-00325-RH-MAF (N.D. Fla.).

6. Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best practices, or policy positions on gender-affirming care for gender dysphoria.

7. Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

The subpoenas issued to the remaining non-parties were solely for documents and were identical to the requests for production listed above. Counsel for the non-parties accepted service for all.

On December 2, 2022, non-parties WPATH, ES, and AAP served the attached objections on AHCA. App. at 767-842. Their objections to the deposition topics and requests for production were identical. On December 19, 2022, the other non-parties served the attached omnibus set of objections to requests for production on AHCA. App. at 843-862. Their objections to the requests for production were virtually identical to the objections of WPATH, ES, and AAP. Collectively, the non-parties' December 2 and December 19 responses asserted boilerplate objections to each and every deposition topic and request for production and did not commit to providing any documents in response to AHCA's subpoenas other than providing several website links.

On December 12, 2022, AHCA and non-parties WPATH, ES, and AAP met and conferred regarding the subpoenas, the content of which was memorialized in the attached December 13, 2022 email. App. at 863-66. During that meeting, AHCA explained to the three non-parties that their subpoenas were relevant to the main issue in the underlying case: whether, based on current medical knowledge, it was reasonable for Florida to determine that certain treatments for gender dysphoria—i.e., puberty blockers, cross-sex hormones, surgeries, and treatments that change

primary and secondary sex characteristics—are "experimental." AHCA further explained that it was satisfied with the three non-parties' responses to the first request for production (via their website membership links contained therein) regarding the total number of their memberships. AHCA also narrowed its sixth request for production to any documents and communications with federal or Florida government officials relating to gender dysphoria or the organizations guidelines, standards, best-practices, or policy positions on gender-affirming care.

On December 22, 2022, AHCA and all of the non-parties had another meet and confer, the content of which was memorialized in the attached December 23, 2022 email. App. at 867-76. During that meeting, AHCA narrowed all seven of its requests for production for non-parties WPATH, ES, and AAP to the extent they sought "all documents" and "all communications." Instead, AHCA explained that it is merely seeking substantive documents—e.g., meeting minutes—that are responsive to its requests for production. AHCA further explained that the limitations and compromises established for the requests for production of non-parties WPATH, ES, and AAP would apply to the other non-parties. AHCA proposed that, in lieu of seeking depositions of WPATH, ES, and AAP (but still seeking documents), and subject to the Plaintiffs in the underlying case waiving a hearsay objection to the use of a declaration or affidavit, AHCA would settle for a representative of each organization answering the following questions under oath:

1.  How many members are in their organizations?
2.  What subset of the membership sets their policies, guidelines, and standards of care and how?
3.  What subset of the membership set their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria?
4.  Of the individuals responsible for setting their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria, how many of those individuals dissented from the policies, guidelines, and standards of care on gender-affirming care for gender dysphoria and why?

5. How many members in the organizations as a whole dissented from the organizations' policies, guidelines, and standards of care on gender-affirming care for gender dysphoria and did these members suggest any alternatives (and if so what were they)?

6. What side effects of gender-affirming care for gender dysphoria were these organizations aware of when they developed their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria?

AHCA further proposed that, in lieu of seeking documents, it would be agreeable to a declaration or affidavit from a representative from the other non-parties' organizations that answers the above questions.

On January 10, 2023, AHCA and all of the non-parties had a final meet and confer. The meeting did not result in the non-parties agreeing to comply with their subpoenas. Instead, non-parties WPATH, ES, and AAP continue to refuse to sit for deposition and all of the non-parties continue to refuse to produce documents. The non-parties have now moved to quash the subpoenas. The February 7, 2023 discovery deadline quickly approaches.

**LEGAL STANDARD**

The primary purpose of discovery is to uncover the "truth." *See Butler v. Donovan*, 103 F.R.D. 456, 457 (D.D.C. 1984) ("The purpose of the Federal Rules was to reform the 'sporting' theory of trial and allow for a rational and well-balanced search for truth." (citing *Hickman v. Taylor*, 329 U.S. 495, 500-01 (1947)). To that end, the Federal Rules of Civil Procedure broadly allow parties to obtain discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Relevance 'has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Wall v. Reliance Standard Life Ins. Co.*, 341 F.R.D. 1, 5 (D.D.C. 2022) (citation omitted).

"Federal Rule of Civil Procedure 45 governs discovery of non-parties through subpoena." *In re Subpoena to Am. Hotel & Lodging Ass'n*, No. 19-191 (CKK), 2019 U.S. Dist. LEXIS 205717,

13

at *2 (D.D.C. Nov. 27, 2019). As part of this discovery, Rule 45 "permits a party to issue a subpoena to a non-party to command attendance at a deposition or to produce or permit inspection of documents, information, or tangible things." *Breiterman v. United States Capitol Police*, 323 F.R.D. 36, 42 (D.D.C. Nov. 7, 2017) (citing Fed. R. Civ. P. 45(a)(1)). Relatedly, Rule 30 provides that "[a] party may, by oral questions, depose any person" and that "[t]he deponent's attendance may be compelled by subpoena under Rule 45." Fed. R. Civ. P. 30(a)(1); *see* Fed. R. Civ. P. 30(b)(6) (a party may name an "entity" in its subpoena and the named entity must designate one or more persons who consent to testify on its behalf).

"Rule 45 vests the court 'where compliance is required' with jurisdiction to resolve disputes relating to the subpoena of a non-party." *In re Subpoena to Am. Hotel & Lodging Ass'n*, 2019 U.S. Dist. LEXIS 205717, at *2 (citations omitted); *see* Fed. R. Civ. P. 45(c)(1)-(2) (a subpoena may command a person to attend a deposition or produce documents "within 100 miles" of where the person resides, is employed, or regularly transacts business in person).[5] A non-party may move to quash a subpoena under narrow circumstances including if the subpoena "requires disclosure of privileged or other protected matter, if no exception or waiver applies," or "subjects a person to undue burden." *Gouse v. District of Columbia*, 359 F. Supp. 3d 51, 56 (D.D.C. 2019) (quoting Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv)). "The quashing of a subpoena is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances." *Flanagan v. Wyndham Int'l*, 231 F.R.D. 98, 102 (D.D.C. 2005)." The non-party thus has "a heavy burden to show that the subpoena should not be enforced." *Millennium TGA, Inc. v. Comcast Cable Communs. LLC*, 286 F.R.D. 8, 11 (D.D.C. 2012); *see, e.g.*, *Irons v. Karceski*, 74 F.3d 1262, 1264 (D.C. Cir. 1995) ("[T]he party seeking to quash a subpoena bears a heavy burden of proof[.]"); *Flanagan*, 231

---

[5] The non-parties' subpoenas were noticed by AHCA for compliance in this district.

F.R.D. at 102 ("[T]he movant's burden is greater for a motion to quash than if she were seeking more limited protection.").

Here, because AHCA's subpoenas fall within the permissible scope of Rules 26, 30, and 45, and because the non-parties have failed to meet their burden of proving irrelevance, undue burden, and First Amendment privilege, the motion to quash the subpoenas must be denied.

## ARGUMENT

### I.   The non-parties possess testimony and documents relevant to the main issue in the underlying case.

AHCA's subpoenas to the non-parties seek targeted depositions of three of the non-parties (WPATH, ES, and AAP) and limited sets of documents from all of the non-parties regarding their gender dysphoria guidelines.[6] Contrary to the non-parties' protestations, all such testimony and documents are directly relevant to the main issue in the underlying case.

As explained above, this case involves a challenge by four transgender individuals against AHCA's GAPMS Rule establishing that "Florida Medicaid does not cover," as "treatment of gender dysphoria," the use of (1) "puberty blockers," (2) "hormones or hormone antagonists," (3) "sex reassignment surgeries," or (4) "other procedures that alter primary or secondary sexual characteristics." Fla. Admin. Code. 59G-1.050(7)(a) (GAPMS Rule); App. at 6-7. The District Court for the Northern District of Florida recently stated that the "controlling" question before it is "whether, based on current medical knowledge, the state's determination that [certain] treatments [for gender dysphoria—i.e., puberty blockers, cross-sex hormones, surgeries, and treatments that change primary and secondary sex characteristics—]are experimental is

---

[6] AHCA intends to use the depositions of WPATH, ES, and AAP at trial. *See* Fed. R. Civ. P. 32(a)(4)(B) ("A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . that the witness is more than 100 miles from the place of . . . trial.").

reasonable." App. at 12 (Order Denying a Preliminary Injunction); *see* App. at 21 (GAPMS Report) (concluding that these treatments "do not conform to GAPMS and are experimental").

Under Plaintiffs' theory of the case, the State's GAPMS Rule is contrary to the consensus of the medical establishment (and therefore wrong on the controlling question of experimentality) because the non-parties' gender dysphoria guidelines supposedly represent the established medical consensus regarding the treatment of gender dysphoria. Plaintiffs allege in their Complaint that "[g]ender-affirming care is neither experimental nor investigational; it is the prevailing standard of care, accepted and supported by *every major medical organization* in the United States." App. at 368-69 (emphasis added); *see* App. at 381 ("Gender-affirming care can involve counseling, hormone therapy, surgery, or other medically necessary treatments for gender dysphoria."). In support of that allegation, Plaintiffs allege that WPATH and ES—two of the non-parties—have "published widely accepted guidelines for treating gender dysphoria." App. at 379; *see* App. at 379 (explaining that the goal of those guidelines is "gender-affirming care").

Plaintiffs allege that the WPATH and ES guidelines are "based on the best available science and *expert professional consensus*," "*widely accepted* as best practices guidelines for the treatment of adolescents and adults diagnosed with gender dysphoria," and "*recognized as authoritative by the leading medical organizations*." App. at 379-80 (emphasis added). Plaintiffs further allege in their Complaint that, unlike Florida's GAPMS Rule and its excluded treatments:

> [*T*]*he American Medical Association, American Psychological Association, American Psychiatric Association, Endocrine Society, American College of Obstetricians and Gynecologists, American Academy of Pediatrics, American Academy of Family Physicians, and other major medical organizations* have recognized that gender-affirming care is medically necessary, safe, and effective treatment for gender dysphoria, and that access to such treatment improves the health and well-being of transgender people.

App. at 384. In other words, Plaintiffs' theory of the case turns on the premise that the State's GAPMS determination that certain treatments for gender dysphoria are "experimental" is unreasonable because the entire medical establishment—including each of the non-parties— adheres to gender-affirming-care guidelines that approve of the excluded treatments.

Plaintiffs' cross-examination of AHCA's expert at the recent preliminary injunction hearing confirms that Plaintiffs are seeking to discredit the reasonableness of the State's GAPMS "experimental" treatment determination by relying on the non-parties' gender dysphoria guidelines as the established medical consensus orthodoxy. Specifically, during the cross-examination of Dr. Laidlaw, Plaintiffs elicited that he does not "follow the WPATH standards of care." App. at 902. They went on to ask him whether he is "aware that [his] opposition to gender-affirming care for the treatment of gender dysphoria in youth and adults is contrary to the vast majority of medical associations' recommendations?" App. at 902.[7] The only plausible purpose behind Plaintiffs' line of questioning was a simultaneous attempt to establish that the non-parties gender dysphoria guidelines are the rule, not the exception, and to undermine the reasonableness of the State's determination that certain treatments for gender dysphoria are experimental.

The non-parties' narrow view of "relevance" misunderstands the broad scope of discovery AHCA is entitled to under Rule 26. *See* Fed. R. Civ. P. 26(b)(1); *Wall*, 341 F.R.D. at 5. They assert

---

[7] A cursory review of Plaintiffs' cross-examination of Dr. Laidlaw confirms that Plaintiffs equate the non-parties' gender dysphoria guidelines with (or as comprising a part of) the established medical consensus regarding the treatment of gender dysphoria. App. at 914 ("So, Dr. Laidlaw, you're aware that your opinions related to gender-affirming care are in contrast to all of those medical associations' statements that we just reviewed?"); *see generally* App. at 900-15 (questioning Dr. Laidlaw regarding the gender dysphoria guidelines of at least ten of the non-parties including WPATH, ES, AAP, American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Psychiatric Association, and Society for Adolescent Health and Medicine).

that their gender dysphoria guidelines—including any policy positions, standards, and best practices (and the circumstances surrounding the adoption thereof)—have absolutely nothing to do with the controlling question of whether "current medical knowledge" supports the State's conclusion that certain treatments for gender dysphoria are experimental. But that can't be right for the very reasons just discussed: the Plaintiffs seem to think that the non-parties' gender dysphoria guidelines are a critical component of their challenge against the GAPMS Rule.

Moreover, each of the declarations filed in connection with the non-parties joint motion to quash subpoenas confirms that the non-parties' gender dysphoria guidelines are relevant to understanding what is and is not the "current medical knowledge" about the treatments for gender dysphoria at issue. *See, e.g.*, App. at 1035-36, 1040 (redacted WPATH declaration stating that "WPATH is internationally recognized for establishing Standards of Care for the treatment of individuals with gender dysphoria. These standards articulate our organizational consensus about the psychiatric, psychological, medical, and surgical management of gender dysphoria. . . . We work with dozens of medical experts every year to understand the latest science, and to review and edit our publications, educational materials, curriculum, and public statements."); App. at 1045 (redacted ES declaration stating that it "publishes policy statements, scientific statements, and clinical practice guidelines" regarding gender dysphoria); App. at 1060 (redacted AAP declaration stating that it "work[s] with dozens of pediatric care experts every year to understand the latest science, and to review and edit our publications materials").

AHCA cannot come to an understanding of the Plaintiffs' theory of what is or is not the "current medical knowledge" of certain gender-dysphoria treatments without asking WPATH, ES, and AAP about their gender dysphoria guidelines, or receiving documents from all of the organizations related to those guidelines. The mere fact that AHCA may test the scientific basis

18

for their policy positions, standards, and best practices through the use of its own experts is no reason to deny the discovery—especially when the non-parties and the Plaintiffs suggest that the only true experts in the field are at WPATH, ES, AAP, and the other non-party organizations. Nor is the fact that the non-parties have sought to make their views known as amicus curiae in the underlying case a bar to AHCA receiving relevant discovery to which it is entitled.

The cases cited by the non-parties do not change the conclusion that AHCA is seeking relevant discovery. In *N.C. Right to Life, Inc. v. Leake*, 231 F.R.D. 49 (D.D.C. 2005), the district court quashed the subpoenas at issue after concluding that "[t]he mere filing of an amicus brief . . . does not open oneself to broad discovery demands, nor does it make one's bias, if any relevant to the underlying action." *Id.* at 51. But AHCA is not seeking discovery from the non-parties because they sought to file an amicus brief in the underlying case. It is instead seeking targeted discovery from the non-parties because Plaintiffs' theory of the case hinges upon the non-parties' gender dysphoria guidelines supposedly representing the established medical consensus regarding the treatment of gender dysphoria.

In addition, because the non-parties' views on gender dysphoria treatment are central to Plaintiffs' case, any bias of the non-parties is clearly relevant to understanding whether their gender dysphoria guidelines are in accord with "current scientific knowledge." This type of bias is different in kind from that considered in *N.C. Right to Life*, where the bias of the non-party amicus curiae had nothing to do with the plaintiffs' "constitutional claims" against several statutes regulating campaign finance and advocacy. *See id.* at 50. The challenge upon which this case turns is a non-constitutional evidence-based one. *See* App. at 13, 15 (Order Denying a Preliminary Injunction) ("If, on the other hand, the state has not reasonably determined the treatments are experimental, the state will be required to pay for the treatments under the Medicaid program, and

there will be no need to reach the constitutional issue . . . . The bottom line is this. The Medicaid claim is likely to control the outcome of this litigation.").

The non-parties cling to *Boe v. Marshall*, No. 2:22-cv-184-LCB, 2022 U.S. Dist. LEXIS 193055 (M.D. Ala. Oct. 24, 2022), but it similarly offers them no reprieve. In *Boe*, the district court quashed the subpoenas at issue there after concluding that they were "unlikely to reveal or lead to any information that would help resolve the fundamental issue in this case, which is whether . . . the [statute] is unconstitutional under the Fourteenth Amendment." *Id.* at *10. Here, the discovery sought by AHCA from the non-parties is relevant to and will help resolve the "controlling" question before the Northern District of Florida of whether, based on current medical knowledge, the State's GAPMS determination that certain treatments for gender dysphoria are experimental is reasonable. Again, this is a non-constitutional evidence-based question.

In sum, there is no reasonable argument that the testimony and documents that AHCA seeks from the non-parties are irrelevant to the underlying case. Each of the six deposition topics and the seven requests for production directly relate to the non-parties' gender dysphoria guidelines. Plaintiffs (and the non-parties in their proposed amicus brief) have held out those gender dysphoria guidelines—which promote gender-affirming care—as the prevailing accepted standard of care for the treatment of gender dysphoria. The credibility of the non-parties' gender dysphoria guidelines (including whether they in fact represent the established medical consensus) is clearly at issue in this case. There is every reason to believe that Plaintiffs will rely on the non-parties gender dysphoria guidelines at summary judgment and trial. Contrary to the non-parties protestations, the oral and written discovery sought from them by AHCA is relevant.

II.     **The subpoenas are not unduly burdensome.**

The non-parties cry undue burden, but fail to meet *their* burden to show that any burden derivative of the subpoenas outweighs AHCA's substantial need for the relevant, sought-after discovery. A proper undue burden analysis shows that AHCA's need for this relevant discovery outweighs the burdens alleged by the non-parties.

When reviewing a Rule 45 motion to quash a subpoena, courts generally employ a "balancing test" that weighs the "need" of the party which served the subpoena for, and the "relevance" of, the information being sought against the "burdensomeness" to the movant on which the subpoena was served. *Breiterman*, 323 F.R.D. at 53. Factors considered in the undue burden analysis include "relevance, the need of the party for the documents, whether the request is cumulative and duplicative, the time and expense required to comply . . . and the importance of the issues at stake in the litigation." *Burke v. Air Serv Int'l, Inc.*, No. 07-02335 (HHK)(AK), 2009 U.S. Dist. LEXIS 140406, at *7 (D.D.C. Aug. 11, 2009) (citation omitted); *see also* Fed. R. Civ. P. 26(b)(1)-(2). If the relevance of and need for the requested testimony or documents outweigh the time, expense, or collection efforts of complying with the subpoenas, there is no undue burden. *See Buzzfeed, Inc. v. United States DOJ*, 318 F. Supp. 3d 347, 360 (D.D.C. 2018) (holding that the "Rule 26(b) considerations . . . point[ed] towards a finding of no undue burden").[8]

The first factor of the undue burden analysis—relevance—weighs heavily in AHCA's favor. As explained previously, the testimony and documents AHCA seeks from the non-parties are highly relevant to understanding what is and is not the "current medical knowledge" about

---

[8] Courts have held that "[t]he Rule 45 'undue burden' standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties." *Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007). But this general sensitivity to costs does not relieve a non-party from meeting its heavy burden of showing that quashing a subpoena is warranted. *See Millennium TGA*, 286 F.R.D. at 11; *Irons*, 74 F.3d at 1264; *Flanagan*, 231 F.R.D. at 102.

various treatments for gender dysphoria. The reason that's important to the underlying case is because the controlling question before the District Court for the Northern District of Florida is whether "current medical knowledge" supports the State's conclusion that certain treatments for gender dysphoria are experimental. Plaintiffs seek to answer that question in the negative by attempting to prove that the State's GAPMS determination that certain treatments for gender dysphoria are "experimental" is unreasonable because the entire medical establishment— including each of the non-parties—adheres to gender-affirming-care guidelines for the treatment of gender dysphoria. To counter Plaintiffs' theory of the case, AHCA seeks targeted discovery from the non-parties to test the reasoning behind their gender dysphoria guidelines including the scientific basis for their policy positions, standards, and best practices. Each of the six deposition topics and the seven requests for production directly relate to the non-parties' gender dysphoria guidelines and the circumstances surrounding their adoption. The discovery sought by AHCA is thus clearly relevant to the central issue in the underlying case.

The second factor—need—also weighs heavily in favor of AHCA. As explained previously, understanding what is or is not "current medical knowledge" of the gender-dysphoria treatments at issue, and therefore whether AHCA reasonably determined that such treatments are "experimental," cannot be adequately accomplished without AHCA asking WPATH, ES, and AAP about their gender dysphoria guidelines, or receiving documents from all of the organizations regarding their guidelines. The discovery that AHCA seeks from the non-parties is necessary to test the reasoning behind their guidelines including the scientific basis for their policy positions, standards, and best practices. Without access to the limited discovery it seeks, AHCA's defense of the GAPMS Rule will be significantly curtailed. Simply put, the discovery sought by AHCA is not only important—it is vital to AHCA's defense of the underlying case.

The third factor—burden—weighs in AHCA's favor. As an initial matter, fifteen of the non-parties have clearly not met their burden to demonstrate "facts" in support of their undue burden argument. *See, e.g., Flanagan*, 231 F.R.D. at 102 ("The movant must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one." (citation and brackets omitted)). Three of the non-parties—WPATH, ES, and AAP—filed particularized affidavits alleging facts in support of the motion to quash their respective subpoenas. The remaining fifteen non-parties did not. An absence of affidavits specific to these fifteen non-parties means no facts have been alleged as to any burdens such non-parties may or may not face. All the Court is left with as to these non-parties is the text of the subpoenas themselves, which contain seven narrow requests for production, and no factual assertions to weigh them against. No undue burden can be shown on this record as to these non-parties.

The affidavits of the other three non-parties—WPATH, ES, and AAP—overstate the burdens they anticipate incurring if they comply with their subpoenas. The alleged burdens fall into three general categories: (1) in-house personnel and pro bono counsel needing to speak with potential document custodians to collect, process, and review potentially responsive documents; (2) outside personnel (including a third-party e-discovery vendor and contract attorneys) potentially needing to be hired to collect, process, and review potentially responsive documents; and (3) a designated in-house representative needing to collect and review supporting documents, speak with knowledgeable in-house personnel, and prepare to testify on behalf of the non-party. *See* App. at 1033-41 (redacted WPATH declaration); App. at 1042-51 (redacted ES declaration); App. at 1052-61 (redacted AAP declaration). Each of the non-parties' affidavits alleges that responding to their respective subpoenas will require them to expend "a substantial amount of time

and resources." App. at 1038 (redacted WPATH declaration); App. at 1049 (redacted ES declaration); *see* App. at 1057 (redacted AAP declaration referring to a "substantial investment of time and resources"). But that conclusion is rooted in the flawed premise that AHCA has cast an impossibly wide discovery net over the non-parties. Far from it.

Plainly stated, the non-parties' summations of their alleged burdens (some inherent to any discovery response and others purely speculative) fail to account for the narrow scope of discovery actually sought by AHCA. Recall that AHCA issued subpoenas containing six deposition topics and seven requests for production to these three non-parties. None of them is "scattershot"; each directly relates to the non-parties' gender dysphoria guidelines, and the parameters of each are clearly delineated. None of them is overly "expansive"; each is narrowly targeted to knowledge and documents readily accessible to the non-parties regarding their own gender dysphoria policies and the creation thereof. Moreover, the burdens alleged by the non-parties fail to account for the fact that AHCA substantially *narrowed* all of its requests for production (not just for these three non-parties but for all eighteen of them) to the extent they sought "all documents" and "all communications." At this juncture, AHCA merely seeks substantive documents—e.g., meeting minutes—that are responsive to its requests for production. Additionally, AHCA narrowed the sixth request for production even further to only encompass certain communications with federal or Florida government officials regarding relevant matters. When viewed through this lens, it is readily apparent that the factual bases cited in support of the non-parties' alleged burdens are at best run-of-the-mill and at worst pure speculation. *See, e.g.*, App. at 1037-38 (redacted WPATH declaration alleging that it "could" need to retain additional contract attorneys to review materials, would "likely" need to retain a third-party e-discovery vendor, and would "likely" need a vendor

to process responsive documents for production); App. at 1047 (redacted ES declaration making similar allegations); App. at 1056 (redacted AAP declaration making similar allegations).[9]

The fourth and final factor—the importance of the issues at stake in the litigation—further tilts the scale and weighs heavily in AHCA's favor. Plaintiffs in the underlying case seek to enjoin a duly enacted rule promulgated by a State agency pursuant to Florida law. In essence, they seek to require the State of Florida to pay for medical treatments that AHCA previously determined to be experimental within its comprehensive GAPMS Report. The Florida Legislature has assigned to AHCA the critically important task of determining whether such medical treatments are "experimental." *See* § 409.905(9), Fla. Stat. (establishing that AHCA "shall not pay for [Medicaid] services that are . . . experimental"). AHCA is duty bound to make this determination when initially assessing (or reassessing) whether a Medicaid service is reimbursable. *See* § 409.919, Fla. Stat. (mandating that AHCA "shall adopt any rules necessary to comply with or administer" various provisions of Florida law including section 409.905(9), Florida Statutes). Those treatments that are reasonably deemed experimental by AHCA in light of current medical knowledge are thus prohibited by Florida law from receiving Medicaid reimbursement. *See* § 409.905(9), Fla. Stat. The Florida Legislature's prudent and cautious approach to Medicaid reimbursement is eminently reasonable—the short and long-term effects of experimental treatments may pose significant (and unknown) medical risks, the State need not pay for treatments that may cause harm to patients, and the Medicaid agency for the State of Florida is in the best position to make GAPMS determinations regarding whether medical treatments like the ones at issue in the GAPMS Rule are experimental. It is therefore beyond dispute that the issues at stake in the underlying case are

---

[9] In the proposed order accompanying this response, AHCA attempts to further narrow the scope of the discovery sought in the interest of expediting any deposition or production.

important, as the resolution of the case will have significant implications for the health of those who receive Medicaid services in Florida for the treatment of gender dysphoria.[10]

All four of the relevant factors of the undue burden analysis weigh in AHCA's favor. Notably, three of those factors—relevance, need, and the importance of the issues at stake— heavily outweigh any burden identified by the non-parties. Accordingly, the non-parties have failed to meet their burden to prove any undue burden.

### III.   The First Amendment privilege does not allow the non-parties to refuse to appear for deposition or produce documents in response to the subpoenas.

The non-parties assert that they are entitled to First Amendment protection from AHCA's subpoenas. But their objections are insufficient to overcome AHCA's substantial need for the relevant, sought-after discovery.

At the gate, fifteen of the non-parties have failed to meet their burden to demonstrate "facts" in support of their First Amendment privilege argument. *See, e.g.*, *In re Subpoena Duces Tecum*, 439 F.3d 740, 750 (D.C. Cir. 2006) ("It is well established that the proponent of a privilege bears the burden of demonstrating facts sufficient to establish the privilege's applicability."). As explained previously, only three of the non-parties filed particularized affidavits alleging facts in support of the motion to quash their respective subpoenas. Because no facts have been alleged regarding the fifteen non-parties' supposed First Amendment privilege, their argument of First Amendment privilege necessarily fails.

In any event, the First Amendment privilege alleged by all of the non-parties is outweighed and overcome by AHCA's substantial need for the sought-after testimony and documents. The First Amendment protects individuals and organizations from governments "abridging the[ir]

---

[10] A potential additional factor—cumulativeness and duplicativeness—is not at issue here. But even if it were, it would have minimal weight in light of all the other factors.

26

freedom of speech." U.S. Const. amend. I. Courts have interpreted the First Amendment to create a qualified privilege from disclosure of certain activities protected by First Amendment freedoms of speech and association. *See, e.g.*, *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Black Panther Party v. Smith*, 661 F.2d 1243 (D.C. Cir. 1981), *vacated as moot sub nom. Moore v. Black Panther Party*, 458 U.S. 1118 (1982).

"When weighing a claim of First Amendment privilege in the discovery context, the D.C. Circuit has instructed courts that 'the plaintiff's First Amendment claim should be measured against the defendant's need for the information sought.'" *Educ. Fin. Council v. Oberg*, No. 10-mc-0079 (JDB), 2010 U.S. Dist. LEXIS 102221, at *15 (D.D.C. Mar. 18, 2010) (quoting *Black Panther*, 661 F.2d at 1266). A "claim of [First Amendment] privilege" will be at its weakest when there is no "show[ing] that there is some probability that disclosure will lead to reprisal or harassment." *See Black Panther*, 661 F.2d at 1267-68. In contrast, the countervailing "interest in disclosure" will be at its strongest where "the information goes to 'the heart of the matter,' that is, [where] it is crucial to the party's case." *See id.* at 1268 (citation omitted). "The First Amendment privilege inquiry [thus] turns on a balancing of interests: The court must determine whether the interests and need of the party seeking the arguably protected materials outweigh the likely burden on the objecting party's First Amendment rights." *Cruz v. FEC*, 451 F. Supp. 3d 92, 99 (D.D.C. 2020). If the need for the discovery sought "outweighs" the qualified First Amendment privilege asserted, the claim of privilege must be overruled. *See Black Panther*, 661 F.2d at 1266.

In the underlying case, AHCA has a substantial need to obtain the requested testimony and documents from the non-parties. The testimony and documents sought from the non-parties by AHCA go to the heart of the matter: "whether, based on current medical knowledge, the state's determination that [certain] treatments [for gender dysphoria—i.e., puberty blockers, cross-sex

hormones, surgeries, and treatments that change primary and secondary sex characteristics—]are experimental is reasonable." App. at 12 (Order Denying a Preliminary Injunction). The principle thrust of Plaintiffs' cause of action is that the non-parties' gender dysphoria guidelines represent the established medical consensus regarding the treatment of gender dysphoria and, therefore, that the State's GAPMS determination that certain treatments for gender dysphoria are "experimental" is unreasonable. The testimony and documents sought by AHCA are thus critically important to AHCA's defense of the GAPMS Rule and the reasonableness of its determination that certain treatments for gender dysphoria are "experimental." They outweigh any First Amendment privilege the non-parties have attempted to muster.

The State reasonably determined that the medical "treatments" Plaintiffs seek to require it to pay for are "experimental" and contrary to the actual prevailing medical consensus. AHCA must be allowed to seek targeted depositions and limited sets of documents from the very non-parties that Plaintiffs' case against the GAPMS Rule is based on; they and only they have the information necessary to test the credibility of their own gender dysphoria guidelines. AHCA believes that the sought-after-discovery will show that the non-parties' gender dysphoria guidelines do not represent the prevailing medical consensus, that their guidelines were driven by political correctness rather than science, that they were willfully (or ignorantly) blind to the irreversible harms that the treatments they advocate for cause in children, adolescents, and adults, and that their views do not fairly represent the majority of medical practitioners (much less the views of the majority of their own members).

The non-parties' First Amendment privilege claim is overshadowed by AHCA's need for discovery. The alleged First Amendment burdens of WPATH, ES, and AAP fall into two general categories: (1) non-members may be discouraged from joining and (2) members may be

discouraged from participating or exchanging ideas. *See* App. at 1033-41 (redacted WPATH declaration); App. at 1042-51 (redacted ES declaration); App. at 1052-61 (redacted AAP declaration). Each of the non-parties' affidavits alleges, among other things, similar fears of being harassed and interfered with. *See* App. at 1038-40 (redacted WPATH declaration); App. at 1050 (redacted ES declaration); *see* App. at 1059 (redacted AAP declaration).

The non-parties' "fears of harassment and interference with First Amendment rights"—the central focus of any First Amendment privilege claim—are not "substantial." *See Black Panther*, 661 F.2d at 1269. At the outset, it must be stated what AHCA is *not* seeking. AHCA is not seeking the names, addresses, or identities of the non-parties' members. Such persons are and may continue to remain anonymous. It is instead seeking targeted depositions and limited sets of documents from the very non-parties that Plaintiffs' case against the GAPMS Rule is based on. Because AHCA does not seek to discover the names of the non-parties' members, any alleged chill is greatly diminished. Moreover, nothing precludes the non-parties from seeking narrower relief than the wholesale quashal requested by them—e.g., a motion for protective order—if they fear that others might discover the names of their members in any documents they produce or the name of any corporate representative they designate. To be clear, AHCA has no objection to the non-parties redacting names and other identifiers should they choose to do so. And AHCA has no intent of filing or otherwise using any documents it receives from the non-parties in a manner that might cause the non-parties' members to lose their anonymity. To that point, the non-parties' fleeting suggestion that AHCA might "leak" any documents produced to it by the non-parties is unfounded.

Accordingly, because AHCA's need for the targeted depositions and limited sets of documents it seeks outweighs any First Amendment privilege of the non-parties, the non-parties' claim of privilege must be overruled.

**IV.      The State does not need to pay fees.**

Lastly, the non-parties' request for fees necessarily fails because their motion to quash fails. It should be rejected.

Rule 45 requires "[a] party or attorney responsible for issuing and serving a subpoena" to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Where this "duty" is not met, courts "impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." Fed. R. Civ. P. 45(d)(1).

The non-parties' first assertion is that AHCA violated its duty to take reasonable steps to avoid imposing undue burden or expense on them because it declined to withdraw their subpoenas. But as explained previously, the subpoenas seek discovery relevant to the main issues in the underlying case, the subpoenas are not unduly burdensome, and the First Amendment privilege does not allow the non-parties to refuse to appear for deposition or produce documents in response to the subpoenas. In short, AHCA appropriately declined to withdraw the non-parties' subpoenas because it is legally entitled to the relevant information and documents it seeks.

The non-parties second asserted violation of Rule 45(d)(1) fares no better. They claim that AHCA violated its take-reasonable-steps duty by issuing "boilerplate" requests for production that were not individually tailored to each non-party. But what the non-parties fail to acknowledge is that they are each similar organizations—each are "professional medical and mental health organizations" with "scientific views and insights" regarding gender dysphoria treatment. It thus made sense for AHCA to craft narrow discovery requests similar in nature to all of the non-parties. This is especially true in light of the fact that all eighteen of the non-parties filed a motion for leave to appear as amicus curiae in the underlying case to which they attached their proposed amicus

brief. Their alignment in views in their amicus brief reasonably suggested to AHCA that the nature of discovery sought from them should similarly be aligned. Moreover, as explained previously, AHCA did in fact narrow its requests for production and offer additional avenues besides deposition and document production to the non-parties in an attempt to reach an agreement without court intervention. *See Goldberg v. Amgen, Inc.*, 123 F. Supp. 3d 9, 22-23 (D.D.C. 2015) (declining to award sanctions where the parties "attempted to narrow the issues, but ultimately to no avail" and where "nothing on the record . . . . suggest[ed]" that the subpoena was issued "in bad faith or for an improper purpose").[11]

In short, the non-parties' request for fees should be denied.

## CONCLUSION

The non-parties' views regarding the medical community's supposed prevailing accepted standard of care for the treatment of gender dysphoria are the linchpin of Plaintiffs' case against the GAPMS Rule. The only way for AHCA to discern whether the non-parties views in fact represent the established medical consensus regarding gender dysphoria treatment—and for AHCA to adequately defend the GAPMS Rule—is for the non-parties to comply with their respective subpoenas and disclose the narrow range of testimony and documents sought by AHCA.

The non-parties joint motion to quash the subpoenas should be rejected because the subpoenas seek relevant discovery, do not impose undue burdens, and do not infringe on any First Amendment privilege. Accordingly, the Court should deny the non-parties joint motion to quash the subpoenas and order them to comply with their respective subpoenas on or before **February**

---

[11] The non-parties additionally chide AHCA for not preliminarily investigating how many members each organization had. But AHCA fails to understand how that request for production could possibly impose an undue burden or expense on the non-parties. Presumably, each of the non-parties—like most organizations—can discern in short order with minimal expense the total number of its membership.

**1, 2023** so that AHCA may obtain relevant documents and deposition testimony from each of the non-parties and relevant deposition testimony from three of the non-parties (that can then be used at trial) before the Northern District of Florida's discovery cutoff of **February 7, 2023**.

Respectfully submitted,

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Joshua E. Pratt* (FBN 119347)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
jpratt@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301

Dated: January 20, 2023                    (850) 270-5938

*pro hac vice motion pending

*Counsel for Interim Secretary Weida and the Agency for Health Care Administration*

## LOCAL RULE CERTIFICATIONS

The undersigned certifies that this Memorandum of Points and Authorities in Opposition to the Non-Parties Joint Motion to Quash Subpoenas complies with the font type requirements of Local Rule 5.1(d), and that the memorandum does not exceed 45 pages under Local Rule 7(e).

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2023, a true and correct copy of the foregoing was served on counsel for the non-parties by electronic mail and all counsel of record for the parties who have appeared in *Dekker, et al. v. Weida, et al.*, No. 4:22-cv-325-RH-MAF by electronic mail.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

32