# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE SUBPOENAS SERVED ON:

AMERICAN ACADEMY OF PEDIATRICS,
345 Park Boulevard
Itasca, IL 60143

ENDOCRINE SOCIETY,
2055 L Street NW, Suite 600
Washington, DC 20036

WORLD PROFESSIONAL ASSOCIATION
FOR TRANSGENDER HEALTH,
1300 S. 2nd Street, Suite 180
Minneapolis, MN 55454

AMERICAN ACADEMY OF CHILD &
ADOLESCENT PSYCHIATRY,
3615 Wisconsin Avenue NW
Washington, DC 20016

AMERICAN ACADEMY OF FAMILY          Misc. Case No. 23-MC-00004
PHYSICIANS,
11400 Tomahawk Creek Parkway
Leawood, KS 66211

AMERICAN ACADEMY OF NURSING,
1000 Vermont Avenue NW, Suite 910
Washington, DC 20005

AMERICAN COLLEGE OF
OBSTETRICIANS AND GYNECOLOGISTS,
409 12th Street SW
Washington, DC 20024

AMERICAN COLLEGE OF PHYSICIANS,
190 N. Independence Mall West
Philadelphia, PA 19106

AMERICAN MEDICAL ASSOCIATION,
330 N. Wabash Avenue, Suite 39300
Chicago, IL 60611

AMERICAN PEDIATRIC SOCIETY,
9303 New Trails Drive, Suite 350
The Woodlands, TX 77381

AMERICAN PSYCHIATRIC ASSOCIATION,
800 Maine Avenue SW, Suite 900
Washington, DC 20024

ASSOCIATION OF AMERICAN MEDICAL
COLLEGES,
655 K Street NW, Suite 100
Washington, DC 20001

NATIONAL ASSOCIATION OF PEDIATRIC
NURSE PRACTITIONERS,
5 Hanover Square, Suite 1401
New York, NY 10004

NORTH CENTRAL FLORIDA COUNCIL OF
CHILD & ADOLESCENT PSYCHIATRY,
3615 Wisconsin Avenue NW
Washington, DC 20016

SOCIETIES FOR PEDIATRIC UROLOGY,
500 Cummings Center, Suite 4400
Beverly, MA 01915

SOCIETY FOR ADOLESCENT HEALTH
AND MEDICINE,
111 West Jackson Boulevard, Suite 1412
Chicago, IL 60604

SOCIETY FOR PEDIATRIC RESEARCH, and
9303 New Trails Drive, Suite 350
The Woodlands, TX 77381

SOCIETY OF PEDIATRIC NURSES
330 N. Wabash Avenue, Suite 2000
Chicago, IL 60611

App_0002

| | |
|---|---|
| AUGUST DEKKER, et al., | |
| Plaintiffs, | |
| v. | Northern District of Florida Case No. 4:22-cv-325-RH-MAF |
| JASON WEIDA, et al., | |
| Defendants. | |

## **INDEX TO APPENDIX**

| **Tab** | **Title** | **Page No.** |
|:---:|:---|:---:|
| A | Rule 59G-1.050 | 5 |
| B | Order Denying Preliminary Injunction, Doc 64, 4:22cv325-RH-MAF, Northern District of Florida | 8 |
| C | GAPMS Report, with Attachments A-G | 17 |
| D | Department of Health Guidance | 251 |
| E | Letter from Secretary Marstiller to Deputy Secretary Wallace | 253 |
| F | Declaration of Matthew Brackett, with Attachments | 255 |
| G | Complaint, Doc 1, 4:22cv325-RH-MAF, Northern District of Florida | 366 |
| H | Amicus Curiae Motion for Leave to File Brief of Amici Curiae, Doc 34, 4:22cv325-RH-MAF, Northern District of Florida | 452 |
| I | Order Denying leave to File Amicus Briefs, Doc 43, 4:22cv325-RH-MAF, Northern District of Florida | 508 |
| J | Non-Party Medical Association Subpoenas | 511 |
| K | Objections of Non-Parties WPATH, ES, and AAP | 767 |
| L | Omnibus Objections of Other Non-Parties | 843 |
| M | Meet and Confer Email, Dated December 13, 2022 | 863 |

3

| N | Meet and Confer Email, Dated December 23, 2022 | 867 |
|---|---|---|
| O | Transcript from Preliminary Injunction Hearing | 877 |
| P | Joint Motion to Quash | 998 |
| Q | Statement of Points and Authorities ISO Motion to Quash | 1005 |
| R | [Redacted] Declaration of WPATH ISO Motion to Quash | 1033 |
| S | [Redacted] Declaration of Endocrine Society ISO Motion to Quash | 1042 |
| T | [Redacted] Declaration of AAP ISO Motion to Quash | 1052 |
| U | Declaration of Dr. Joseph Zanga, M.D. | 1062 |

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2023, a true and correct copy of the foregoing was served on counsel for the non-parties by electronic mail and all counsel of record for the parties who have appeared in *Dekker, et al. v. Marstiller, et al.*, No. 4:22-cv-00325-RH-MAF by electronic mail.

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Weida and the Agency for Health Care Administration*

4

# Tab A

**59G-1.050 General Medicaid Policy.**

(1) Purpose. This rule specifies requirements that apply to all providers rendering Florida Medicaid services to recipients.

(2) Billing the Recipient. Providers must inform a recipient of his or her responsibility to pay for services that are not covered by Florida Medicaid, and document in the recipient's file that the recipient was informed of his or her liability, prior to rendering each service.

(a) Providers may seek reimbursement from a recipient under the following circumstances:

1. The recipient is not eligible for Florida Medicaid on the date of service.

2. The service rendered is not covered by Florida Medicaid, if the provider seeks reimbursement from all patients for the specific service.

3. The provider verifies that the recipient has exceeded the Florida Medicaid coverage.

4. The recipient is enrolled in a Florida Medicaid managed care plan (plan) and is informed that:

a. The plan denies authorization for the service.

b. The treating provider is not in the plan's provider network (with the exception of emergency services).

(b) Providers may not seek reimbursement from recipients for missed appointments.

(c) Providers may not seek reimbursement from the recipient if the provider fails to bill Florida Medicaid correctly and in a timely manner. Providers who submit a claim to Florida Medicaid for reimbursement of a covered service whether the claim has been approved, partially approved, or denied, may not:

1. Seek reimbursement from the recipient, the recipient's relatives, or any person, or persons, acting as the recipient's designated representative.

2. File a lien against the recipient, the recipient's parent, legal guardian, or estate.

3. Apply money received from any non-Florida Medicaid source to charges related to a claim paid by Florida Medicaid (also known as "balance billing").

4. Turn a recipient's overdue account over to a collection agency, except in circumstances as specified in paragraph (2)(a), above.

(3) Cost of Doing Business. Florida Medicaid does not reimburse for time spent completing and submitting Florida Medicaid claims or time spent responding to an audit.

(4) Emergency Medicaid For Aliens. Florida Medicaid covers emergency services provided to aliens who meet all Florida Medicaid eligibility requirements except for citizenship or alien status, as follows:

(a) Eligibility is only authorized for the duration of the emergency.

(b) Florida Medicaid does not cover continuous or episodic services after the emergency has been alleviated.

(c) Providers must submit documentation establishing the emergency nature of the service with the claim for reimbursement. Exceptions are labor, delivery, and dialysis services, which are considered emergencies and are payable without documentation when the emergency indicator is entered on the claim form.

(5) Free Choice of Providers. Recipients may obtain services from any qualified Florida Medicaid provider that agrees to provide the services in accordance with Title 42, Code of Federal Regulations (CFR), section 431.51, except:

(a) Allowable restrictions specified in section 1915(a) of the Social Security Act.

(b) When the recipient is enrolled in a Florida Medicaid managed care program. Managed care plans may not restrict enrollee choice for a family planning provider and must cover family planning services regardless of whether the provider is in the managed care plan's provider network.

(6) Inmates of a Public Institution. Florida Medicaid does not cover services provided to individuals residing in public institutions as defined in 42 CFR 435.1009 and Section 409.9025, F.S. These individuals include those residing in correctional and holding facilities for prisoners who meet either of the following:

(a) Have been arrested or detained pending disposition of charges.

(b) Held under court order as material witnesses or juveniles.

(7) Gender Dysphoria.

(a) Florida Medicaid does not cover the following services for the treatment of gender dysphoria:

1. Puberty blockers;

2. Hormones and hormone antagonists;

3. Sex reassignment surgeries; and

4. Any other procedures that alter primary or secondary sexual characteristics.

(b) For the purpose of determining medical necessity, including Early and Periodic Screening, Diagnosis, and Treatment (EPSDT), the services listed in subparagraph (7)(a) do not meet the definition of medical necessity in accordance with Rule 59G-1.010, F.A.C.

(8) Out-of-State Services.

(a) Emergency. Florida Medicaid covers emergency services provided out-of-state without a referral, or authorization, when the recipient's health will be endangered if the care and services are postponed until returning to Florida.

(b) Non-Emergency. Florida Medicaid covers services performed out-of-state, in accordance with the service-specific coverage policy, when both of the following are met:

1. The recipient's primary care or specialist physician refers the recipient for services.

2. Services are prior authorized by the Florida Medicaid quality improvement organization in accordance with Florida Medicaid's Authorization Requirements Policy, as incorporated by reference in Rule 59G-1.053, F.A.C.

(c) Florida Medicaid does not cover services for recipients living out-of-state who are enrolled under the Title-IV-E Florida foster or adoption subsidy.

(9) Payment in Full. Providers must accept payment from Florida Medicaid as payment in full, except for Florida Medicaid copayments and coinsurance. For information on copayment requirements and exemptions, refer to Florida Medicaid's General Policies on copayment and coinsurance.

(10) Recipients or Providers that are Out of the Country. Florida Medicaid does not cover services provided to recipients when they are outside of the United States (U.S.), or for services rendered by providers who are not in the U.S.

(11) Refusal of Services.

(a) Providers may not refuse to provide a covered Florida Medicaid service to a recipient solely because the recipient's eligibility does not display in the Florida Medicaid Management Information System, if the recipient has a valid temporary proof of eligibility from the Department of Children and Families, or proof of presumptive eligibility.

(b) Right to Refuse Services. Providers may limit the number of Florida Medicaid recipients the provider serves, and accept or reject recipients in accordance with the policies of the facility or practice, except as follows:

1. A hospital may not refuse to provide emergency services in accordance with the 1986 Emergency Medical Treatment and Active Labor Act.

2. Providers may not deny services to recipients based solely upon race, creed, color, national origin, disabling condition, or disability, in accordance with federal anti-discrimination laws.

(12) Solicitation (Patient Brokering). Providers may not knowingly solicit, offer, pay, or receive any payment, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for furnishing, or arranging for the furnishing of, any item or service for which payment may be made, in whole or in part, under the Florida Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging for, or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Florida Medicaid program.

*Rulemaking Authority 409.919, 409.961 FS. Law Implemented 409.902, 409.9025, 409.973 FS. History–New 3-11-18, Amended 8-21-22.*

Tab B

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

AUGUST DEKKER et al.,

      Plaintiffs,

v.                                  CASE NO.  4:22cv325-RH-MAF

SIMONE MARSTILLER et al.,

      Defendants.

_____/

## ORDER DENYING A PRELIMINARY INJUNCTION

The State of Florida recently adopted a rule barring Medicaid payment for specific categories of treatment for gender dysphoria: puberty blockers, hormone therapy, and surgeries. The plaintiffs assert the rule is unconstitutional, violates the Affordable Care Act's nondiscrimination provision, and violates the federal Medicaid statute. The plaintiffs have moved for a preliminary injunction based only on the Constitution and ACA, not based on the Medicaid statute. This order confirms and briefly summarizes the ruling announced on the record at the conclusion of a hearing on the motion.

I

Medicaid is a jointly funded federal-state program that provides medical care for patients of limited economic means. *See Harris v. James*, 127 F.3d 993, 996 (11th Cir. 1997). Federal law makes some services mandatory but allows states to "place appropriate limits" based on "such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d); *see also Rush v. Parham*, 625 F.2d 1150, 1156 (5th Cir. 1980). States may "set reasonable standards" for "medical necessity." *Garrdio v. Dudek*, 731 F.3d 1152, 1155 (11th Cir. 2013).

Exercising this authority, Florida has long barred payment for physician services that are "clinically unproven [or] experimental." Fla. Stat. § 409.905(9). If there is a difference between "clinically unproven" and "experimental," it makes no difference for purposes of this order. For convenience, when discussing the Florida statute, this order uses the term "experimental," without also referring to "clinically unproven." This is consistent with the way the parties have briefed the issues.

The statute is unquestionably valid, at least on its face. The controlling question in this litigation is whether applying the provision to the gender-dysphoria treatments at issue violates the United States Constitution or federal law.

App_0010

## II

As a prerequisite to a preliminary injunction, a plaintiff must establish a substantial likelihood of success on the merits, that the plaintiff will suffer irreparable injury if the injunction does not issue, that the threatened injury outweighs whatever damage the proposed injunction may cause a defendant, and that the injunction will not be adverse to the public interest. *See*, *e.g.*, *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

## III

In *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980), a Medicaid beneficiary challenged Georgia's refusal to pay for gender-affirming surgery. The state said the surgery was experimental and thus not medically necessary. The district court ruled that the surgery was necessary because the plaintiff's physician said so—that the state was bound by the physician's opinion. Not surprisingly, the Fifth Circuit disagreed.

The Fifth Circuit remanded the case to the district court to determine two things: first, whether Georgia had a policy prohibiting payment for experimental services when it first rejected the plaintiff's application; and second, if it did, "whether its determination that transsexual surgery is experimental is reasonable." *Id*. at 1157. The court said this second question—whether the state's determination

"is" reasonable, would be controlled on remand by "current medical opinion, regardless of the prevailing knowledge at the time of plaintiff's application." *Id*. at 1157 n.13.

*Rush* is binding authority in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc). The remand instructions were the Fifth Circuit's square holding. The case dealt only with surgery, not puberty blockers or hormone therapy, but the same principles apply. The decision thus sets out a roadmap for further proceedings in this court—the same roadmap the district court was required to follow in *Rush*.

There is, however, one difference. This record provides no basis to doubt that Florida prohibited payment for experimental services when the plaintiffs submitted their applications. This was the first of the two questions on remand in *Rush*. The second question thus will be controlling here: whether, based on current medical knowledge, the state's determination that these treatments are experimental is reasonable.

If the state has reasonably determined these treatments are experimental, the refusal to pay for them under the Medicaid program is unconstitutional or violates the ACA nondiscrimination provision only if the state pays for other, equivalently experimental treatments. The plaintiffs will face a difficult task to show that any other treatment is equivalently experimental, because it will be difficult to establish

two things: first, an equivalence between any Florida-Medicaid-eligible service and these treatments for this diagnosis, or second, an equivalence of current medical knowledge between these treatments and any Florida-Medicaid-eligible service. The plaintiffs' suggestion that their diagnoses can be ignored so that equivalence can be established merely by showing that the same procedures are provided for other diagnoses will not do—a treatment that is well established in one circumstance may be experimental in another. The record does not show that the plaintiffs are likely to prevail on this issue.

If, on the other hand, the state has not reasonably determined the treatments are experimental, the state will be required to pay for the treatments under the Medicaid program, and there will be no need to reach the constitutional issue. *See generally Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341, 345-46 (1936) (Brandeis, J., concurring) (setting out fundamental principles of constitutional adjudication, including that, "The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it' ") (quoting earlier authorities in part); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."), *quoted with approval in Williamson v. Brevard Cnty.*, 928 F.3d 1296, 1316-17 (11th Cir. 2019); *Hayburn's Case*, 2 U.S. 408

(1792) (forbidding federal courts from rendering advisory opinions or making determinations that are subject to revision by the executive branch).

In short, the case is likely to rise or fall on the Medicaid claim. The plaintiffs have not moved for a preliminary injunction on that claim. They have not shown a likelihood of success on the merits on the constitutional and ACA claims, because it is likely that the plaintiffs will lose those claims (if they lose the Medicaid claim) or that the other claims will not be reached (if the plaintiffs win the Medicaid claim).

IV

An equally important basis for denying the plaintiffs' motion is that they have not shown they will suffer irreparable harm in the absence of a preliminary injunction. This is so for two reasons.

First, the record does not include medical testimony that the plaintiffs need the treatments at issue and will suffer irreparable harm if it is not provided before the scheduled trial. A factfinder could perhaps conclude, from the plaintiffs' own testimony, that they will suffer irreparable harm, but I do not make that finding on that basis at this time.

Second, the defendants have represented, in opposition to the plaintiffs' motion, that Florida law does not flatly prohibit Medicaid payment for the treatments at issue, and that instead, the plaintiffs may be able to obtain payment

under Florida Statutes § 120.542. That statute allows an agency to grant a variance or waiver from an otherwise uniformly applicable rule. The defendants equated this to the emerging approach in some European countries, where treatment of this kind is available, just not as readily available as in years past. If a plaintiff qualifies for a variance under § 120.542—as one or more of them well might if, as the defendants have said, the challenged rule mirrors the cited European approach—the plaintiff will not suffer irreparable harm. The defendants' representation is a basis for this order denying a preliminary injunction and will bind the defendants as the case goes forward.

## V

A note should be added about what this case does *not* involve. The question presented is only whether Medicaid must *pay* for the treatments at issue. The case does not involve the markedly different question whether a state could *prohibit* treatments of this kind. Florida does not prohibit the treatments.

## VI

The bottom line is this. The Medicaid claim is likely to control the outcome of this litigation. The plaintiffs have not moved for a preliminary injunction on that claim. And they have not established that they will suffer irreparable harm if a preliminary injunction does not issue, partly because they have not sought a variance or waiver.

For these reasons and those set out on the record at the conclusion of the

preliminary-injunction hearing,

IT IS ORDERED:

The preliminary-injunction motion, ECF No. 11, is denied.

SO ORDERED on October 24, 2022.

s/Robert L. Hinkle
United States District Judge

Tab C

# Florida Medicaid

## Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria

## June 2022

**Ron DeSantis, Governor**

**Simone Marstiller, Secretary**



## Contents

Contents ........................................................................................................................1

Introductory Remarks and Abstract ............................................................................2

Health Service Summary ............................................................................................4

**Literature Review: Introduction**.................................................................................9

**Literature Review: Etiology of Gender Dysphoria** .......................................................10

**Literature Review: Desistance of Gender Dysphoria and Puberty Suppression** ...................14

**Literature Review: Cross-Sex Hormones as a Treatment for Gender Dysphoria** ..................17

**Literature Review: Sex Reassignment Surgery**..........................................................23

**Literature Review: Quality of Available Evidence and Bioethical Questions** ........................27

**Coverage Policies of the U.S. and Western Europe** ...................................................31

**Generally Accepted Professional Medical Standards Recommendation** ............................37

**Works Cited** ...........................................................................................................39

**Attachments** .........................................................................................................45

App_0019

## Introductory Remarks and Abstract

**Generally Accepted Professional Medical Standards**

The Secretary of the Florida Agency for Health Care Administration requested that the Division of Florida Medicaid review the treatment of gender dysphoria for a coverage determination pursuant to Rule 59G-1.035, Florida Administrative Code (F.A.C.) (See Attachment A for the Secretary's Letter to Deputy Secretary Tom Wallace). The treatment reviewed within this report included "sex reassignment treatment," which refers to medical services used to obtain the primary and/or secondary physical sexual characteristics of a male or female. As a condition of coverage, sex reassignment treatment must be "consistent with generally accepted professional medical standards (GAPMS) and not experimental or investigational" (Rule 59G-1.035, F.A.C., see Attachment B for the complete rule text).

The determination process requires that "the Deputy Secretary for Medicaid will make the final determination as to whether the health service is consistent with GAPMS and not experimental or investigational" (Rule 59G-1.035, F.A.C.). In making that determination, Rule 59G-1.035, F.A.C., identifies several factors for consideration. Among other things, the rule contemplates the consideration of "recommendations or assessments by clinical or technical experts on the subject or field" (Rule 59G-1.035(4)(f), F.A.C.). Accordingly, this report attaches five assessments from subject-matter experts:

- **Attachment C:** Romina Brignardello-Petersen, DDS, MSc, PhD and Wojtek Wiercioch, MSc, PhD: *Effects of Gender Affirming Therapies in People with Gender Dysphoria: Evaluation of the Best Available Evidence*. 16 May 2022.
- **Attachment D:** James Cantor, PhD: *Science of Gender Dysphoria and Transsexualism*. 17 May 2022.
- **Attachment E:** Quentin Van Meter, MD: *Concerns about Affirmation of an Incongruent Gender in a Child or Adolescent*. 17 May 2022.
- **Attachment F:** Patrick Lappert, MD: *Surgical Procedures and Gender Dysphoria*. 17 May 2022.
- **Attachment G:** G. Kevin Donovan, MD: *Medical Experimentation without Informed Consent: An Ethicist's View of Transgender Treatment for Children*. 16 May 2022.

**Abstract**

Available medical literature provides insufficient evidence that sex reassignment through medical intervention is a safe and effective treatment for gender dysphoria. Studies presenting the benefits to mental health, including those claiming that the services prevent suicide, are either low or very low quality and rely on unreliable methods such as surveys and retrospective analyses, both of which are cross-sectional and highly biased. Rather, the available evidence demonstrates that these treatments cause irreversible physical changes and side effects that can affect long-term health.

Five clinical and technical expert assessments attached to this report recommend against the use of such interventions to treat what is categorized as a mental health disorder (See attachments):

- **Health Care Research:** Brignardello-Petersen and Wiercioch performed a systematic review that graded a multitude of studies. They conclude

2

that evidence supporting sex reassignment treatments is low or very low quality.

- **Clinical Psychology:** Cantor provided a review of literature on all aspects of the subject, covering therapies, lack of research on suicidality, practice guidelines, and Western European coverage requirements.
- **Plastic Surgery:** Lappert provided an evaluation explaining how surgical interventions are cosmetic with little to no supporting evidence to improve mental health, particularly those altering the chest.
- **Pediatric Endocrinology:** Van Meter explains how children and adolescent brains are in continuous phases of development and how puberty suppression and cross-sex hormones can potentially affect appropriate neural maturation.
- **Bioethics:** Donovan provides additional insight on the bioethics of administering these treatments, asserting that children and adolescents cannot provide truly informed consent.

Following a review of available literature, clinical guidelines, and coverage by other insurers and nations, Florida Medicaid has determined that the research supporting sex reassignment treatment is insufficient to demonstrate efficacy and safety. In addition, numerous studies, including the reports provided by the clinical and technical experts listed above, identify poor methods and the certainty of irreversible physical changes. Considering the weak evidence supporting the use of puberty suppression, cross-sex hormones, and surgical procedures when compared to the stronger research demonstrating the permanent effects they cause, these treatments do not conform to GAPMS and are experimental and investigational.

App_0021

## Health Service Summary

**Gender Dysphoria**

Frequently used to describe individuals whose gender identity conflicts with their natural-born sex, the term gender dysphoria has a history of evolving definitions during the past decades (Note: This report uses the term "gender" in reference to the construct of male and female identities and the term "sex" when regarding biological characteristics). Prior to the publication of the *Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders* (DSM-V), the American Psychiatric Association (APA) used the diagnosis of gender identity disorder (GID) to describe individuals who sought to transition to the opposite gender. However, behavioral health clinicians sought a revision after determining that using GID created stigma for those who received the diagnosis. This is despite the APA having adopted GID to replace the previous diagnosis of transsexualism for the exact same reason (APA, 2017).[1]

When crafting its new definition and terminology, the APA sought to remove the stigma of classifying as a disorder the questioning of one's gender identity by focusing instead on the psychological distress that such questioning can evoke. This approach argues that individuals seeking behavioral health and transition services are doing so due to experiencing distress and that gender non-conformity by itself is not a mental health issue. This led to the adoption of gender dysphoria in 2013 when the APA released the DSM-V. In addition to using a new term, the APA also differentiated the diagnosis between children and adolescents and adults, listing different characteristics for the two age groups (APA, 2017).

According to the DSM-V, gender dysphoria is defined as "the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." As for the criteria to receive the diagnosis, the APA issued stricter criteria for children than adolescents and adults. For the former, the APA states that a child must meet six out of eight behavioral characteristics such as having "a strong desire to be of the other gender or an insistence that one is the other gender" or "a strong preference for cross-gender roles in make-believe or fantasy play." The criteria for adults and adolescents are less stringent with individuals only having to meet two out of six characteristics that include "a strong desire to be the other gender" or "a strong desire to be rid of one's primary and/or secondary sexual characteristics." The APA further notes that these criteria can also apply to young adolescents (DSM-V, 2013).

In 2021, the Merck Manual released a slightly different definition for gender dysphoria, citing that the condition "is characterized by a strong, persistent cross-gender identification associated with anxiety, depression, irritability, and often a wish to live as a gender different from the one associated with the

---

[1] The concept of gender being part of identity and disconnected from biological sex originated during the mid-twentieth century and was publicized by psychologist John W. Money. His research asserted that gender was a complete social construct and separate from biology, meaning that parents and/or caregivers could imprint on a young child (under three years) the identity of a boy or girl. In 1967, Money's theories led to a failed experiment on twin boys where physicians surgically transitioned one to appear as a girl. The twin that underwent sex reassignment never fully identified as a female. However, Money never publicly acknowledged this and reported the experiment as a success. Furthermore, he promoted his conclusions across the scientific community, concealing what actually unfolded. As a result, Money's ideas on gender fluidity served as a basis for performing procedures on children with hermaphroditic features or genital abnormalities. The case reveals how the understanding of a concept (e.g., gender) at any given time can lead to incorrect medical decisions with irreversible consequences (Gaetano, 2015).

App_0022

sex assigned at birth." Additionally, the Merck Manual further states that "gender dysphoria is a diagnosis requiring specific criteria but is sometimes used more loosely for people in whom symptoms do not reach a clinical threshold" (Merck Manual, 2021). This definition is largely consistent with the DSM-V but does not emphasize the distress component to the same extent.[2]

Like other behavioral health diagnoses classified in the DSM-V, gender dysphoria has the following subtypes:

- **Early-Onset Gender Dysphoria:** This subtype begins during childhood and persists through adolescence into adulthood. It can be interrupted by periods where the individual does not experience gender dysphoria signs and may classify as homosexual (DSM-V, 2013).
- **Late-Onset Gender Dysphoria:** Occurring after puberty or during adulthood, this subtype does not begin until late adolescence and can emerge following no previous signs of gender dysphoria. The APA attributes this partially to individuals who did not want to verbalize their desires to transition (DSM-V, 2013).

Further studies have identified additional subtypes of gender dysphoria. In 2018, Lisa Littman introduced the concept of a rapid-onset subtype. Classified as rapid-onset gender dysphoria (ROGD), it features characteristics such as sudden beginnings during or following puberty. However, it differs from the DSM-V definitions because ROGD is associated with other causes such as social influences (e.g., peer groups, authority figures, and media). In other words, adolescents who had no history of displaying typical gender dysphoria characteristics go through a sudden change in identity following intense exposure to peers and/or media that heavily promotes transgender lifestyles (Littman, 2018). While more long-term studies are needed to confirm whether ROGD is a temporary or long-term condition, Littman's study has initiated discussions regarding potential causes of gender dysphoria as well as introduced a potential subtype.

Additionally, the frequent use of gender dysphoria in clinical and lay discourse has led to a fracturing of the definition. Studies on the topic frequently do not apply the DSM-V's criteria for the diagnosis and overlook certain key features such as distress. In a 2018 review by Zowie Davy and Michael Toze, the authors evaluated 387 articles that examine gender dysphoria and noted stark departures from the APA's definition. They further asserted that the APA intended to "reduce pathologization" by establishing a new definition for gender dysphoria in the DSM-V. This in turn would reduce diagnoses, although as Davy and Toze note, the tendency for the literature to diverge from the APA's definition may result in increased numbers of individuals classified as having gender dysphoria when they do not meet the DSM-V's criteria (Davy and Toze, 2018). This further raises the question of whether individuals are receiving potentially irreversible treatments for the condition when they might not actually have it.

The current usage of gender dysphoria is the result of discussions spanning across decades as demonstrated in the past editions of the DSM. Until 2013, the APA considered having gender identity issues a mental disorder by itself regardless of the presence of psychological distress. That perspective has since shifted to only consider the adverse psychological effects of questioning one's gender as a disorder. In addition, the APA considers gender as part of one's identity, which is not subject to a diagnosis. Whether the APA has shifted its terminology and criteria for gender identity issues due to

---

[2] Following the release of the Florida Department of Health's guidelines for treating gender dysphoria, Merck removed its definition for "gender dysphoria" from the Merck Manual (Fox News, 2022).

App_0023

emerging clinical data or cultural changes is another question. In 1994, the APA replaced transsexualism with gender identity disorder as part of the "effort to reduce stigma" (APA, 2017). This raises questions about what influences decisions to revise definitions and criteria; is it social trends or medical evidence?

**Behavioral Health Issues Co-Occurring with Gender Dysphoria**

Because gender dysphoria pertains directly to the distress experienced by an individual who desires to change gender identities, secondary behavioral health issues can co-occur such as depression and anxiety. If left untreated, these conditions can lead to the inability to function in daily activities, social isolation, and even suicidal ideation. Studies do confirm that adolescents and adults with gender dysphoria report higher levels of anxiety, depression, and poor peer relationships than the general population (Kuper et al, 2019). Other associated conditions include substance abuse, eating disorders, and compulsivity. A significant proportion of individuals with gender dysphoria also have autism spectrum disorder (ASD) (Saleem and Rizvi, 2017). Although the number reporting secondary issues is increased, individuals diagnosed with gender dysphoria do not necessarily constitute the entire population that is gender non-conforming (i.e., does not identify with natal sex), and no information is available breaking down the percentage of those who are non-conforming with gender dysphoria and those who are non-conforming with no distress. Additionally, available research raises questions as to whether the distress is secondary to pre-existing behavioral health disorders and not gender dysphoria. This is evident in the number of adolescents who reported anxiety and depression diagnoses prior to transitioning (Saleem and Rizvi, 2017).

Furthermore, conventional treatments for secondary behavioral health issues are available. These include cognitive behavioral therapy, medication, and inpatient services. The APA reports that treatments for these are highly effective with 80% to 90% of individuals diagnosed with depression responding positively (APA, 2020). In addition, a high percentage of adolescents diagnosed with gender dysphoria had received psychiatric treatment for a prior or co-occurring mental health issue. A 2015 study from Finland by Kaltiala-Heino et al noted that 75% of children seeking sex reassignment services had been treated by a behavioral health professional (Kaltiala-Heino et al, 2015).

**Diagnosing Gender Dysphoria**

Prior to the publication of the DSM-V, diagnosing individuals experiencing gender identity issues followed a different process. Behavioral health clinicians could assign the diagnosis based on gender non-conformance alone. That has changed since 2013. Today, non-conforming to one's gender is part of personal identity and not a disorder requiring treatment. This change has led professional associations to shift the diagnostic criteria for gender dysphoria to focus on the distress caused by shifting identities (DSM-V, 2013).

For adolescents, the APA identifies "a marked incongruence between one's experienced/expressed gender and natal sex, of at least 6 months' duration" as the core component of gender dysphoria (DSM-V, 2013). What the APA does not elucidate is the threshold for "marked." This raises questions as to whether practitioners exercise uniformity when applying the diagnostic criteria or if they do so subjectively. For example, the WPATH's *Standards of Care for the Health of Transsexual, Transgender, and Gender Non-Conforming People* provides guidance on the processes mental health practitioners should use when assessing for gender dysphoria but offers no benchmarks for meeting diagnostic criteria (WPATH, 2012).

App_0024

Such processes include evaluating for gender non-conforming behaviors and other co-existing mental disorders like anxiety or depression. This involves not only interviewing the adolescent but also the family in addition to reviewing medical histories. WPATH also asserts that gender dysphoria assessments need to account for peer relationships, academic performance, and provide information of potential treatments. This last component is necessary because it might affect an individual's choices regarding transitioning, particularly if the information does not correspond to the desired outcome (WPATH, 2012).

The diagnosis of gender dysphoria is a relatively recent concept in mental health, being the product of decades of discussion and building upon previous definitions. Instead of treating gender non-conformity as a disorder, behavioral health professionals acknowledge it as part of one's identity and focus on addressing the associated distress. Considering the new criteria, this changes the dynamics of the population who would have qualified for a diagnosis before 2013 and those who would today. Given that desiring to transition into a gender different from natal sex no longer qualifies as a disorder, behavioral health professionals are treating distress and referring adolescents and adults to therapies that are used off-label and pose irreversible effects.

**Current Available Treatments for Gender Dysphoria**

At present, proposed treatment for gender dysphoria occurs in four stages, beginning with psychological services and ending with sex reassignment surgery. As an individual progresses through each stage, the treatments gradually become more irreversible with surgical changes being permanent. Because of the increasing effects, individuals must have attempted treatment at the previous stage before pursuing the next one (Note: late adolescents and adults have already completed puberty and do not require puberty blockers). Listed in order, the four stages are as follows:

- **Behavioral Health Services:** Psychologists and other mental health professionals are likely the first practitioners individuals with gender dysphoria will encounter. In accordance with clinical guidelines established by the World Professional Association for Transgender Health (WPATH)[3], behavioral health professionals are supposed to "find ways to maximize a person's overall psychological well-being, quality of life, and self-fulfillment." WPATH further discourages services for attempting to change someone's gender identity. Instead, it instructs practitioners to assess for the condition and readiness for puberty blockers or cross-sex hormones while offering guidance to function in a chosen gender. WPATH does assert that the clinicians do need to treat any other underlying mental health issues secondary or co-occurring with gender dysphoria (WPATH, 2012). However, the organization provides conflicting guidance because it also advises practitioners to prescribe cross-sex hormones on demand (Levine, 2018).
- **Puberty Suppression:** Used only on individuals in the earliest stages of puberty (Tanner stage 2), preventing pubertal onset provides additional time to explore gender identities before the physical characteristics of biological sex develop. This treatment is intended to reduce distress and anxiety related to the appearance of adult sexual physical features. To suppress puberty, pediatric endocrinologists inject gonadotropin releasing hormone (Gn-RH) at specific intervals (e.g., 4 weeks or 12 weeks). The Gn-RH suppresses gonadotropin receptors that allow for the

---

[3] The World Professional Association for Transgender Health asserts that it is a professional organization. However, it functions like an advocacy group by allowing open membership to non-clinicians (WPATH, 2022).

App_0025

development of primary and secondary adult sexual characteristics. Prior to receiving puberty suppression therapy, individuals must have received a diagnosis of gender dysphoria and have undergone a mental health evaluation (Kyriakou et al, 2020).

- **Cross-Sex Hormones:** For adults and late adolescents (16 years or older), the next treatment phase recommended is taking cross-sex hormones (e.g., testosterone or estrogen) to create secondary sex characteristics. In men transitioning into women, these include breast development and widening around the pelvis. Women who transition into men experience deeper voices, redistribution of fat deposits, and growing facial hair. According to the Endocrine Society, late adolescents who qualify for cross-sex hormones must have a confirmed diagnosis of gender dysphoria from a mental health practitioner with experience treating that population. Some physical changes induced by these hormones are irreversible (Endocrine Society, 2017).

- **Sex Reassignment Surgery:** Sometimes referred to as "gender affirming" surgery, this treatment does not consist of just one procedure but several, depending on the desires of the transitioning individual. Primarily, sex reassignment procedures alter the primary and secondary sexual characteristics. Men transitioning into women (trans-females) undergo a penectomy (removal of the penis), orchiectomy (removal of the testes), and vulvoplasty (creation of female genitals). Other procedures trans-females may undergo include breast augmentation and facial feminization. For women that transition into men (trans-males), procedures include mastectomy (removal of the breasts), hysterectomy (removal of the uterus), oophorectomy (removal of the ovaries), and phalloplasty (creation of male genitals). Because of the complexities involved in phalloplasty, many trans-males do not opt for this procedure and limit themselves to mastectomies. Additionally, the effects of sex reassignment surgery, such as infertility, are permanent (WPATH, 2012).

While some clinical organizations assert that they are the standard of care for gender dysphoria, the U.S. Food and Drug Administration (FDA) currently has not approved any medication as clinically indicated for this condition (Unger, 2018). Although puberty blockers and cross-sex hormones are FDA approved, the FDA did not approve them for treating gender dysphoria, meaning that their use for anything other than the clinical indications listed is off-label (American Academy of Pediatrics, 2014). As for surgical procedures, the FDA does not evaluate or approve them, but it does review all surgical devices (FDA, 2021). In addition, the Endocrine Society concedes that its practice guidelines for sex reassignment treatment does *not* constitute a "standard of care" and that its grades for available services are low or very low (Endocrine Society, 2017).[4]

---

[4] Disagreement over how to treat gender dysphoria, gender identity disorder, and transsexualism has persisted since sex reassignment surgery first became available in the 1960s. In a 2006 counterargument, Paul McHugh highlights how individuals seeking surgery had other reasons that extended beyond gender identity, including sexual arousal and guilt over homosexuality. In addition, he asserts that undergoing sex reassignment procedures did not improve a patient's overall behavioral health and that providing a "surgical alteration to the body of these unfortunate people was to collaborate with a mental disorder rather than to treat it" (McHugh, 2006).

## Literature Review: Introduction

Currently, an abundance of literature and studies on gender dysphoria is available through academic journals, clinical guidelines, and news articles. Similar to other mental health issues, the material addresses a broad range of topics consisting of available treatments, etiology (i.e., causes), risks, benefits, and side effects. Although most stories reported by the media indicate that treatments such as cross-sex hormones and sex reassignment surgery are the most effective, research reveals that numerous questions still exist. These include what are the long-term health effects of taking cross-sex hormones, what are the real causes of gender dysphoria, and how many individuals that transition will eventually want to revert to their natal sex. Additionally, much of the available research is inconclusive regarding the effectiveness of sex reassignment treatments with multiple studies lacking adequate sample sizes and relying on subjective questionnaires. While much of the scientific literature leans in favor of cross-sex hormones and surgery as options for improving the mental health of individuals with gender dysphoria, it does not conclusively demonstrate that the benefits outweigh the risks involved, either short or long-term. What studies do reveal with certainty is that sex reassignment surgery and cross-sex hormones pose permanent effects that can result in infertility, cardiovascular disease, and disfigurement. All of this indicates that further research is necessary to validate available treatments for gender dysphoria. Thus, physicians, who recommend sex reassignment treatment, are not adhering to an evidence-based medicine approach and are following an eminence-based model.

The following literature review addresses the multiple facets of this condition and presents areas of ongoing debate and persisting questions. Beginning with the condition's etiology and continuing with evaluations of puberty blockers, cross-sex hormones, and surgery, the review explains each area separately and in context of gender dysphoria at large. Additionally, the review provides an analysis on available research on mental health outcomes as well as the condition's persistence into adulthood. Taken as a whole, the available studies demonstrate that existing gender dysphoria research is inconclusive and that current treatments are used to achieve cosmetic benefits while posing risky side effects as well as irreversible changes.

App_0027

## Literature Review: Etiology of Gender Dysphoria

What causes gender dysphoria is an ongoing debate among experts in the scientific and behavioral health fields. Currently, the research indicates that diagnosed individuals have higher proportions of autism spectrum disorder (ASD), history of trauma or abuse, fetal hormone imbalances, and co-existing mental illnesses. Also, experts acknowledge that genetics may factor into gender dysphoria. Another potential cause is social factors such as peer and online media influence. At the moment, none of the studies provides a definite cause and offer only correlations and weakly supported hypotheses. In addition, evidence favoring a biological explanation is highly speculative. However, the research does raise questions about whether treatments with permanent effects are warranted in a population with disproportionately high percentages of ASD, behavioral health problems, and trauma.

In a 2017 literature review by Fatima Saleem and Syed Rizvi, the authors examine gender dysphoria's numerous potential causes and the remaining questions requiring further research. In conclusion, the pair indicate that associations exist between the condition and ASD, schizophrenia, childhood abuse, genetics, and endocrine disruption chemicals but that more research is needed to improve understanding of how these underlying issues factor into a diagnosis. Throughout the review, Saleem and Rizvi identify the following as potential contributing elements to the etiology of gender dysphoria:

- **Neuroanatomical Etiology:** During fetal development, the genitals and brain develop during different periods of a pregnancy, the first and second trimesters respectively. Because the processes are separate, misaligned development is possible where the brain may have features belonging to the opposite sex. The authors identify one study where trans-females presented with a "female-like putamen" (structure at the base of the brain) when undergoing magnetic resonance imaging (MRI) scans.[5]

- **Psychiatric Associations:** Saleem and Rizvi identify multiple studies reporting that individuals with gender dysphoria have high rates of anxiety and depressive disorders with results ranging as high as 70% having a mental health diagnosis. In addition, the pair note that schizophrenia may also influence desires to transition. However, the review does not assess whether the mental health conditions are secondary to gender dysphoria.

- **Autism Spectrum Disorder:** Evidence suggests a significant percentage of individuals diagnosed with gender dysphoria also have ASD. The authors note that the available studies only establish a correlation and do not identify mechanisms for causation.

- **Childhood Abuse:** Like the above causes, Saleem and Rizvi note that those with gender dysphoria tended to experience higher rates of child abuse across all categories, including neglect, emotional, physical, and sexual.

- **Endocrine Disruptors:** Although this cause still requires substantial research, it is a valid hypothesis regarding how phthalates found in plastics can create an imbalance of testosterone in fetuses during gestation, which can potentially lead to gender dysphoria. The authors point to one study that makes this suggestion.

---

[5] Research on neuroanatomical etiology for gender dysphoria remains highly speculative due to limitations of brain imaging (Mayer and McHugh, 2016). In addition, neuroscience demonstrates that exposures to certain environments and stimuli as well as behaviors can affect brain changes (Gu, 2014). Furthermore, available research indicates that male and female brains have different physical characteristics but cannot be placed in separate categories due to extensive overlap of white/grey matter and neural connections (Joel et al, 2015).

Saleem and Rizvi's review reveal that gender dysphoria's etiology can have multiple factors, most of which require treatments and therapies not consisting of cross-sex hormones or surgery. (Saleem and Rizvi, 2017).

Out of the research on the condition's etiology, a large portion focuses on the correlation with ASD. One of the more substantial studies by Van der Miesen et al published in 2018 evaluates 573 adolescents and 807 adults diagnosed with ASD and compares them to 1016 adolescents and 846 adults from the general population. The authors' findings note that adolescents and adults with ASD were approximately 2.5 times more likely to indicate a desire of becoming the opposite sex. Although the methodology used to reach this conclusion consisted of surveys where respondents had a choice of answering "never," "sometimes," or "often," the results correspond with those of similar studies. Van der Miesen et al also indicate that most responses favoring a change in gender responded with "sometimes." Additionally, the authors do not state how many in their sample group actually had a gender dysphoria diagnosis. (Van der Miesen et al, 2018).

Another study by Shumer et al from 2016 utilizes a smaller sample size (39 adolescents) referred to an American hospital's gender clinic. Unlike Van der Miesen et al's research, Shumer et al evaluate subjects with a diagnosis of gender dysphoria for possible signs of ASD or Asperger's syndrome. Their findings revealed that 23% of patients presenting at the clinic would likely have one of the two conditions. Possible explanations for the high percentage are the methods used to gather the data. Shumer et al requested a clinical psychologist to administer the Asperger Syndrome Diagnostic Scale to the parents of the sample patients, four of whom already had an ASD diagnosis. The authors conclude that the evidence to support high incidence of gender dysphoria in individuals with ASD is growing and that further research is needed to determine the specific cause (Shumer et al, 2016).

Research indicating a strong correlation between ASD and gender dysphoria is not the only area where new studies are emerging. Discussions about the effects of prenatal testosterone levels are also becoming more prevalent. One such example is Sadr et al's 2020 study that looks at the lengths of the index and ring fingers (2D:4D) of both left and right hands of 203 individuals diagnosed with gender dysphoria. The authors used this method because prenatal testosterone levels can affect the length ratios of 2D:4D. By comparing the ratios of a group with gender dysphoria to a cohort from the general population, Sadr et al could assess for any significant difference. Their results indicated a difference in trans-females who presented with more feminized hands. For trans-males, the difference was less pronounced. The results for both groups were slight, and the meta-analysis that accompanies the study notes no statistically significant differences in multiple groups from across cultures. However, Sadr et al further assert that the evidence strongly suggests elevated prenatal testosterone levels in girls and reduced amounts in boys may contribute to gender dysphoria, requiring additional research (Sadr et al, 2020).

In addition to biological factors and correlations with ASD, researchers are exploring psychological and social factors to assess their role in gender dysphoria etiology. This literature examines a range of potential causative agents, including child abuse, trauma, and peer group influences. One such study by Kozlowska et al from 2021 explores patterns in children with high-risk attachment issues who also had gender dysphoria. The authors wanted to assess whether past incidents of abuse, loss, or trauma are associated with higher rates of persons desiring to transition. As a basis, Kozlowska et al cite John Bowlby's research on childhood brain development, noting that the process is not linear and depends

App_0029

heavily on lived experiences. The study further acknowledges that biological factors combined with life events serve as the foundation for the next developmental phase and that early poor-quality attachment issues increase the risk for psychological disorders in adolescence and adulthood. Such disorders include mood and affective disorders, suicidal ideations, and self-harm. Kozlowska et al also cite other studies that indicate a high correlation between gender dysphoria and "adverse childhood events" and further assert that the condition "needs to be conceptualized in the context of the child's lived experience, and the many different ways in which lived experience is biologically embedded to shape the developing brain and to steer each child along their developmental pathway" (Kozlowska et al, 2021).

For their study, Kozlowska et al recruited 70 children diagnosed with gender dysphoria and completed family assessments going back three generations. This in-depth level was necessary to ascertain any and all events that could affect a child's developmental phases. Additionally, the researchers individually assessed the diagnosed children. To establish comparisons, Kozlowska et al performed assessments on a non-clinical group and a mixed-psychiatric group. Their results demonstrate that children with gender dysphoria have significantly higher rates of attachment issues as well as increased reports of "adverse childhood events" such as trauma (e.g., domestic violence and physical abuse). Furthermore, the authors indicate that a high proportion of families reported "instability, conflict, parental psychiatric disorder, financial stress, maltreatment events, and relational ruptures." These results led Kozlowska et al to conclude that gender dysphoria can be "associated with developmental pathways – reflected in at-risk patterns of attachment and high rates of unresolved loss and trauma – that are shaped by disruptions to family stability and cohesion." The study also cites that treatment requires "a comprehensive biopsychosocial assessment with the child and family, followed by therapeutic interventions that address, insofar as possible, the breadth of factors that are interconnected with each particular child's presentation" (Kozlowska et al, 2021).

This recent study raises questions regarding the medical necessity of gender dysphoria treatments such as puberty blockers and cross-sex hormones for adolescents. If high percentages of children diagnosed with gender dysphoria also have histories of trauma and attachment issues, should conventional behavioral health services be utilized without proposing treatments that pose irreversible effects? Would that approach not provide additional time to address underlying issues before introducing therapies that pose permanent effects (i.e., the watchful waiting approach)?

Aside from the notion that childhood abuse and adversity can potentially cause gender dysphoria, other possible explanations such as social factors (e.g., peer influences and media) may be contributing factors. Research on rapid onset gender dysphoria (ROGD) links this phenomenon to peer and social elements. In an analysis utilizing parent surveys, Lisa Littman asserts that the rapid rise of ROGD is not associated with the traditional patterns of gender dysphoria onset (i.e., evidence of an individual's gravitation to the opposite sex documented over multiple years) but rather exposure to "social and peer contagion." Littman uses this term in the context of definitions cited in academic literature, stating that "social contagion is the spread of affect or behaviors through a population" and that "peer contagion is the process where an individual and peer mutually influence each other in a way that promotes emotions and behaviors that can potentially undermine their own development or harm others." Examples of the latter's negative effects include depression, eating disorders, and substance abuse. What prompted this study is a sudden increase of parents reporting their daughters declaring themselves to be transgender without any previous signs of gender dysphoria. Littman also indicates

App_0030

that these parents cite that their daughters became immersed in peer groups and social media that emphasized transgender lifestyles (Littman, 2018).

In addition to identifying characteristics of ROGD, the study examines social media content that provides information to adolescents regarding how to obtain cross-sex hormones through deception of physicians, parents, and behavioral health professionals. Such guidance includes coaching on how to fit a description to correspond to the DSM-V and pressures to implement treatment during youth to avoid a potential lifetime of unhappiness in an undesirable body. Littman further states that "online content may encourage vulnerable individuals to believe that non-specific symptoms and vague feelings should be interpreted as gender dysphoria." The study also notes that none of the individuals assessed using the parental surveys qualified for a formal diagnosis using the DSM-V criteria (Littman, 2018).

The survey responses revealed similar data to Kozlowska et al's study with 62.5% of the adolescents having a mental health or neurodevelopmental disorder. Furthermore, the responses indicate a rapid desire to bypass behavioral health options and pursue cross-sex hormones. 28.1% of parents surveyed stated that their adolescents did not want psychiatric treatments. One parent even reported that their daughter stopped taking prescribed anti-depressants and sought advice only from a gender therapist. Littman's research further reveals that 21.2% of parents responded that their adolescent received a prescription for puberty blockers or cross-sex hormones at their first visit (Littman, 2018). These responses indicate that practitioners do not uniformly follow clinical guidelines when making diagnoses or prescribing treatment.

In the discussion, Littman proposes two hypotheses for the appearance of ROGD. The first states that social and peer contagion is one of the primary causes, and the second asserts that ROGD is a "maladaptive coping mechanism" for adolescents dealing with emotional and social issues. While the surveyed parents did not report early signs of gender dysphoria, a majority noted that their daughters had difficulty in handling negative emotions. Littman concludes that ROGD is distinct from gender dysphoria as described in the DSM-V and that further research is needed to assess whether the condition is short or long-term (Littman, 2018). What the study does not explore, but raises the question, is what proportion of those being treated for gender dysphoria are adolescents with ROGD.

Littman's study along with the others reveal that the causes of gender dysphoria are still a mystery and could have multiple biological and social elements. Because of this ongoing uncertainty, treatments that pose irreversible effects should not be utilized to address what is still categorized as a mental health issue. That allows adequate opportunity for individuals to receive treatment for co-existing mental disorders, establish their gender dysphoria diagnoses, and understand how cross-sex hormones and surgery will alter the appearance of their bodies as well as long-term health.

App_0031

## Literature Review: Desistance of Gender Dysphoria and Puberty Suppression

The World Professional Association for Transgender Health (WPATH) and the Endocrine Society both endorse the use of gonadotropin releasing hormones (Gn-RH) to suppress puberty in young adolescents who have gender dysphoria. Both organizations state that the treatment is safe and fully reversible. In addition, they state that delaying pubertal onset can provide extra time for adolescents to explore the gender in which they choose to live. The associations further state that puberty suppression is necessary to prevent the development of primary and secondary sexual characteristics that can inhibit successful transitions into adulthood (WPATH, 2012; Endocrine Society, 2017). Of the two groups, WPATH offers clinical criteria an individual should meet to qualify for puberty suppression such as addressing psychological co-morbidities and assessing whether gender dysphoria has intensified (WPATH, 2012).

Neither organization explains that the majority of young adolescents who exhibit signs of gender dysphoria eventually desist and conform to their natal sex and that the puberty suppression can have side effects. Both organizations neglect to mention that using Gn-RH for gender dysphoria by altering the appearance is not an FDA-approved clinical indication. Furthermore, the research used to justify puberty suppression is low or very-low quality and little information is available on long-term effects (Hruz, 2019). Additionally, in his assessment, Quentin Van Meter explained that physical differences between central precocious puberty and natural onset puberty demonstrate that Gn-RH does not have permanent adverse effects for those treated for the former but can for the latter such as insufficient bone-mineral density and neural development (Van Meter, 2022). Also, as recently as May 17, 2022, during a U.S. Senate Committee on Appropriations hearing, Lawrence Tabak, acting director of the National Institutes of Health, responded to Senator Marco Rubio, acknowledging that no long-term studies are available evaluating the effects of puberty blockers when used for gender dysphoria (U.S. Senate Committee on Appropriations, 2022).

Currently, some studies provide weak support for this treatment but leave too many questions as to its effectiveness and medical necessity, especially considering how many children decide against transitioning. In addition, puberty blockers halt development of primary and secondary sexual characteristics and deny opportunities for adolescents to adapt and become comfortable with their natal sex. Instead, puberty blockers can serve as a potential "gateway drug" for cross-sex hormones by denying them the experience of physically maturing (Laidlaw et al, 2018).

A 2013 study by Steensma et al offers data on the percentage of children who opt not to transition after experiencing gender dysphoria. The authors follow 127 adolescents (mean age of 15 during the evaluation period) for four years who had been referred to a Dutch gender dysphoria clinic. Out of this cohort, 47 (37%; 23 boys and 24 girls) continued experiencing the condition and applied for sex reassignment treatment. The other 80 adolescents never returned to the clinic. Because this clinic was the only one that treated gender dysphoria in the Netherlands, Steensma et al assumed that those who did not return no longer desired transitioning. The study indicates one of the key predictors for persisting gender dysphoria was the age of first presentation. Older adolescents that started going to the clinic were more likely to persist, while younger adolescents tended not to follow through. Steensma et al provide further insight into other predicting factors, particularly on how each individual views his or her gender identity. The authors note that adolescents who "wished they were the other sex" were more likely to become desisters and that those who "believed that they were the other sex" persisted

14

and later sought sex reassignment treatment (Steensma et al, 2013). While the study focuses on factors that contribute to the condition's persistence or desistance, it raises the question as to whether puberty suppression is necessary when age plays such an important role regarding the decision to transition.

WPATH and the Endocrine Society state that the primary reason for initiating pubertal suppression is not to treat a physical condition but to improve the mental health of adolescents with gender dysphoria. However, available research does not yield definitive results that this method is effective at addressing a mental health issue. The "gold standard" for medical studies is the randomized-controlled trial (RCT). Because RCTs utilize large sample sizes, have blind testing groups (i.e, placebos), and use objective controls, they can offer concrete conclusions and shape the array of established treatments. In addition, RCTs require comparisons between cohort outcomes and ensure that participants are randomly assigned to each group. These measures further reduce the potential for bias and subjectivity (Hariton and Locascio, 2018).

Presently, no RCTs that evaluate puberty suppression as a method to treat gender dysphoria are available. Instead, the limited number of published studies on the topic utilize small sample sizes and subjective methods (Hruz, 2019). A 2015 article by Costa et al is one such example. The study asserts that "psychological support and puberty suppression were both associated with an improved global psychological functioning in gender dysphoric adolescents." To reach this conclusion, the authors selected 201 children diagnosed with the condition and divided them into two groups, one to receive psychological support only and the other to get puberty blockers in addition to psychological support. Costa et al did not create a third group that lacked a gender dysphoria diagnosis to serve as a control. To assess whether puberty suppression is an effective treatment, the authors administered two self-assessments (Utrect Gender Dysphoria Scale and Children's Global Assessment Scale)[6] to the groups at 6-month intervals during a 12-month period. Because the study relies heavily on self-assessments, the conclusions are likely biased and invalid. Another problem that is also present and common throughout articles supporting puberty suppression is the short-term period of the study. Costa et al's conclusions may not be the same if additional follow-ups occurred three or five years later (Costa et al, 2015). This further raises the question whether low-quality studies like Costa et al's should serve as the basis for clinical guidelines advising clinicians to prescribe drugs for off-label purposes.

Aside from questionable research, information regarding the full physical effects of puberty suppression is incomplete. In a 2020 consensus parameter prepared by Chen et al, 44 experts in neurodevelopment, gender development, and puberty/adolescence reached a conclusion stating that "the effects of pubertal suppression warrant further study." The basis for this was that the "full consequences (both beneficial and adverse) of suppressing endogenous puberty are not yet understood." The participating experts emphasized that the treatment's impact on neurodevelopment in adolescents remains unknown. Chen et al explain that puberty-related hormones play a role in brain development as documented in animal studies and that stopping these hormones also prevents neurodevelopment in addition to sexual maturation. The authors further raise the question whether normal brain development resumes as if it had not been interrupted when puberty suppression ceases. Because this

---

[6] Behavioral health practitioners use the Children's Global Assessment Scale (CGAS) to measure child functioning during the evaluation process to determine diagnoses. Available evidence indicates that the CGAS is not effective for evaluating children who experienced trauma and presented with mental health symptoms (Blake et al, 2006).

App_0033

question remains unanswered, it casts doubt on the veracity of organizations' assertions that puberty suppression is "fully reversible" (Chen et al, 2020).

In addition to the unanswered questions and low-quality research, puberty suppression causes side effects, some of which have the potential to be permanent. According to a 2019 literature review by De Sanctis et al, most side effects associated with Gn-RH are mild, consisting mostly of irritation around injection sites. However, clinicians have linked the drug to long-term conditions such as polycystic ovarian syndrome, obesity, hypertension, and reduced bone mineral density. While reports of these events are low and the authors indicate that Gn-RH is safe for treating central precocious puberty (Note: De Sanctis et al do not consider gender dysphoria in their analysis), the review raises questions about whether off-label use to treat a psychological condition is worth the risks (De Sanctis et al, 2019).

Furthermore, De Sanctis et al cite studies noting increased obesity rates in girls who take Gn-RH but that more research is needed to gauge the consistency. Additionally, the authors note that evidence is strong regarding reduced bone mineral density during puberty suppression but indicate that the literature suggests it is reversible following treatment (De Sanctis et al, 2019). While research leans toward the reversibility of effects on bone mineral density, the quantity of studies available on this subject are limited. Also, no long-term research has been completed on how puberty suppression affects bone growth. This is significant because puberty is when bone mass accumulates the most (Kyriakou et al, 2020). One example of a complication involving bone growth and Gn-RH is slipped capital femoral epiphysis. This condition occurs when the head of the femur (i.e., thighbone) can slip out of the pelvis, which can eventually lead to osteonecrosis (i.e., bone death) of the femoral head. Although the complication is rare, its link to puberty suppression indicates that the "lack of adequate sex hormone exposure" could be a cause (De Sanctis et al, 2019).

The current literature on puberty suppression indicates that using it to treat gender dysphoria is off-label, poses potentially permanent side effects, and has questionable mental health benefits. The limited research and lack of FDA approval for that clinical indication prompt questions about whether medications with physically altering effects should be used to treat a problem that most adolescents who experience it will later overcome by conforming to their natal sex. Additional evidence is required to establish puberty suppression as a standard treatment for gender dysphoria.

16

## Literature Review: Cross-Sex Hormones as a Treatment for Gender Dysphoria

Currently, the debate surrounding the use of cross-sex hormones to treat gender dysphoria revolves around their ability to improve mental health without causing irreversible effects. It is not about whether taking cross-sex hormones can alter someone's appearance. The evidence demonstrating the effectiveness of cross-sex hormones in achieving the secondary sexual characteristics of the opposite sex is abundant. Also, the overall scientific consensus concludes that individuals who take cross-sex hormones will reduce the primary sexual function of his or her natal sex organs. What researchers continue evaluating are the short and long-term effects on mental health, impacts on overall physical health, and how the changes affect the ability to detransition. Of these, benefits to mental health overshadow the other discussions. Prescribers of cross-sex hormones focus so heavily on behavioral health outcomes that they de-emphasize that these drugs cause permanent physical changes and side effects that can lead to premature death (Hruz, 2020). Some clinical guidelines such as WPATH's do not even indicate that some of the changes are irreversible.

Like puberty suppression, the Endocrine Society and WPATH provide guidance on administering cross-sex hormones to individuals with gender dysphoria. Both organizations state that this treatment should not be administered without a confirmed diagnosis of gender dysphoria and only after a full psychosocial assessment. In addition, behavioral health practitioners must ensure that any mental comorbidities are not affecting the individual's desire to transition. WPATH and the Endocrine Society further state that clinicians should administer hormone replacements such as testosterone and Estradiol (estrogen) in gradual phases, where the dose increases over several months. For trans-females, the organizations state that progesterone (anti-androgen) is also necessary to block the effects of naturally produced testosterone (WPATH, 2012; Endocrine Society, 2017). When taking cross-sex hormones, trans-males need increased doses for the first six months. After that, the testosterone's effects are the same on lower doses. Once started, individuals cannot stop taking hormones unless they desire to detransition (Unger, 2016).

Although the two groups provide similar guidance, they vary on statements that can have significant impact on long-term outcomes, particularly regarding age. According to WPATH's standards, 16 years is the general age for initiating cross-sex hormones, but the organization acknowledges that the treatment can occur for younger individuals depending on circumstances (WPATH, 2012). This differs from the Endocrine Society, which states no specific age for appropriateness and explains the disagreements in assigning a number. The group highlights that most adolescents have attained sufficient competence by age 16 but may not have developed adequate abilities to assess risk (Endocrine Society, 2017). This raises the question whether adolescents can make sound decisions regarding their long-term health. Additionally, the varying guidance raises an issue with WPATH not only using age 16 as a standard but also indicating that younger adolescents are capable of making that choice.

WPATH's guidance also does not stress the irreversible nature of cross-sex hormones, citing the treatment as "partially reversible" and not indicating which changes are permanent. Furthermore, parts of WPATH's information are misleading and directly conflict with guidance issued by clinics and other sources. One such example consists of WPATH stating that "hormone therapy *may* (emphasis added) lead to irreversible changes." This statement is misleading in light of existing research, which indicates that multiple physical changes are permanent. In addition, WPATH claims that certain effects of cross-

17

sex hormones such as clitoral enlargement can last one to two years when it is actually irreversible (UCSF, 2020). WPATH also does not explain the risks to male fertility, noting that lowered sperm count or sterility is "variable." The University of California at San Francisco (UCSF) provides starkly different information by stating that trans-females should expect to become sterile within a few months of starting cross-sex hormones. UCSF also advises trans-females to consult a sperm bank if they may want to father children after transitioning (WPATH, 2012; UCSF, 2020). Below is a chart that outlines the effects of cross-sex hormones and identifies which ones are reversible or permanent.

| Physical Changes Effectuated by Cross-Sex Hormones | |
|---|---|
| Physical Changes in Trans-Males (Female-to-Male Transitions) | |
| Physical Change | Reversible or Irreversible |
| Oily Skin or Acne | Reversible |
| Facial and Body Hair Growth | Irreversible |
| Male-Pattern Baldness | Irreversible |
| Increased Muscle Mass | Reversible |
| Body Fat Redistribution | Reversible |
| Ceasing of Menstruation | Reversible |
| Enlarged Clitoris | Irreversible |
| Vaginal Atrophy | Reversible |
| Deepening of Voice | Irreversible |
| Physical Changes in Trans-Females (Male-to-Female Transitions) | |
| Body Fat Redistribution | Reversible |
| Decreased Muscle Mass | Reversible |
| Skin Softening or Decrease in Oiliness | Reversible |
| Lower Libido | Reversible |
| Fewer Spontaneous Erections | Reversible |
| Male Sexual Dysfunction | Possibly Irreversible |
| Breast Growth | Irreversible |
| Decrease in Testicular Size | Reversible |
| Decrease in Sperm Production or Infertility | Likely Irreversible |
| Slower Facial and Body Hair Growth | Reversible |

*Sources: UCSF, 2020; WPATH, 2012; Endocrine Society, 2017[7]*

The above chart demonstrates that trans-males and trans-females experience different effects from cross-sex hormones that can cause myriad issues in later life. For example, trans-males who opt to detransition may face challenges related to permanent disfigurement (e.g., facial hair and deepened voices). Trans-females, on the other hand, may not endure the same issues pertaining to visible physical changes but might become despondent over being unable to reproduce. This can occur regardless of whether the transitioning individual is satisfied with sex reassignment. Given that the clinical guidelines do not provide uniform information on the permanent effects of cross-sex hormones, clinicians are unable to make sound recommendations to patients. This treatment can supposedly alleviate symptoms

---

[7] This chart consists of conclusions regarding physical changes made by three different clinical organizations. If one organization determined that a physical change was irreversible, that was sufficient to meet the criteria to be listed as "irreversible" in the chart.

App_0036

of distress. However, cross-sex hormones' permanent effects also have the potential to cause psychological issues.

Arguments favoring cross-sex hormones assert that the desired physical changes can alleviate mental health issues in individuals with gender dysphoria but do not consider that hormones used in this manner, like puberty blockers, are off-label. While the FDA has approved estrogen and testosterone for specific clinical indications (e.g., hypogonadism), it has not cleared these drugs for treating gender dysphoria. Additionally, these arguments do not acknowledge that the U.S. Drug Enforcement Administration (DEA) lists testosterone as a Schedule III controlled substance, meaning that it has a high probability of abuse (DEA, 2022). Furthermore, evidence of psychological benefit from cross-sex hormones is low-quality and relies heavily on self-assessments taken from small sample groups (Hruz, 2020).

A 2019 study by Kuper et al seeks to demonstrate that adolescents desiring cross-sex hormones have elevated rates of depression, anxiety, and challenges with peer relationships. To make their findings, the authors provided questionnaires to 149 adolescents who presented at a gender clinic in Dallas, Texas and concluded that half of the sample group experienced increased psychological issues. One problem with the study is that it relies on parent or self-assessments such as the Youth-Self Report, Body-Image Scale, and the Child Behavior Checklist. While these assessments have strong reliability, the sample is cross-sectional, consisting of gender dysphoric individuals who presented for an initial visit at the clinic. Also, Kuper et al do not directly link these psychological symptoms to gender dysphoria but rather insinuate a strong connection. Without an analysis of the longitudinal histories of the participants, the study cannot demonstrate whether gender dysphoria was a direct cause of the psychological issues, which could possibly result from trauma, abuse, or family dysfunction. Kuper et al's study only presents weak correlation between adolescents who report symptoms of distress and gender dysphoria. While the authors do not claim that the participants' psychological problems caused the condition, they fail to explicitly state that no demonstrable relationship exists and explain that their findings are "broadly consistent with the previous literature" (Kuper et al, 2019).

Additionally, a more comprehensive literature review from 2019 by Nguyen et al evaluates the effect of cross-sex hormones on mental health outcomes. Although the authors argue that the evidence supports the treatment, they do note that available studies use "uncontrolled observational methods" and "rely on self-report." The review also asserts that "future research should focus on applying more robust study designs with large sample sizes, such as controlled prospective cohort studies using clinician-administered ratings and longitudinal designs with appropriately matched control groups." All of these are characteristics of RCTs. While Nguyen et al highlight flaws in the studies in their conclusion, they do not emphasize them in their analysis, opting to focus primarily on results. Another problem with the studies selected for the review is the short-term periods for evaluation. Out of 11 studies Nguyen et al discuss, only one tracks its participants for 24 months. The others only follow their cohorts for 6 or 12 months (Nguyen et al, 2019). Without long-term data to support assertions that cross-sex hormones substantially improve the mental health of individuals with gender dysphoria, the review cannot make definitive conclusions on the treatment's benefits.

Basing their stances on this low-quality evidence, clinical associations such as the American Academy of Pediatrics (AAP) and the American Psychology Association endorse the use of cross-sex hormones as treatments for gender dysphoria. In particular, the AAP discourages use of the term "transition" and

asserts that medical treatments used to obtain secondary characteristics of the opposite sex are "gender affirming." This decision mirrors the DSM-V's interpretation of gender being part of identity. The AAP further states that taking cross-sex hormones is an "affirmation and acceptance of who they (i.e., patient) have always been" (AAP, 2018). The American Psychological Association also takes a similar stance in its *Resolution on Gender Identity Change Efforts* by asserting that medical treatments such as puberty suppression, cross-sex hormones, and surgery improve mental health and quality of life and reinforce the notion that transitioning and seeking sex reassignment therapies do not constitute a psychological disorder (American Psychological Association, 2021). Stances like these can substantially influence practitioners and their treatment recommendations. Given that low-quality evidence serves as the basis for supportive positions, this raises questions about whether clinicians can make informed decisions for their patients that will promote the best outcomes.

James Cantor published a critique in 2020 of the AAP's endorsement of "gender affirming" treatments, arguing that the organization did not base its recommendations on established medical evidence. He asserts that the AAP's position is based on research that does not support intervention but rather supports "watchful waiting" because most transgender youths desist and identify as their natal sex during puberty. Cantor further argues that the AAP not only disregards evidence but also cites "gender affirming" interventions as the only effective method. To conclude, he states the organization is "advocating for something far in excess of mainstream practice and medical consensus" (Cantor, 2020).

Given those evidentiary problems, those who rely on the AAP's endorsement as a basis for "gender affirming" treatments are practicing eminence-based medicine as opposed to evidence-based medicine. Eminence-based medicine refers to clinical decisions made by relying on the opinions of prominent health organizations rather than relying on critical appraisals of scientific evidence (Nhi Le, 2016). While it is true that the AAP has more knowledge than a lay person and a degree of credibility in the medical community, the opinions of such organizations are not valid unless they are based on quality evidence.

Research on sex reassignment also does not adequately address the reasons for and prevalence of detransitioning. Although no definite numbers are available regarding the percentage of transgender people who decide to detransition, research indicates that roughly 8% decide to return to their natal sex. The reasons range from treatment side effects to more self-exploration that provided insight on individuals' gender dysphoria. In a 2020 study by Lisa Littman, 101 people who had detransitioned provided their basis for doing so. Out of the sample group, 96% had taken cross-sex hormones and 33% had sex reassignment surgery. The average age for transitioning was 22 years, and the mean duration for the transition was 4 years. This indicates that even allowing additional time beyond the recommended age of 16 years can still lead to regrets. The study also raises the question as to whether individuals who transitioned at 16 or younger wanted to detransition in greater numbers. The author further offers reasons why these individuals sought cross-sex hormones and surgery, which include having endured trauma (mental or sexual), homophobia (challenged to accept oneself as a homosexual), peer and media influences, and misogyny (applicable only to trans-males). To obtain the results, the participants responded to a survey that asked about their backgrounds (e.g., reasons for transitioning, mental health comorbidities), and motivations for detransitioning. Littman noted that half of the women (former trans-males) had a mental health disorder and/or had experienced trauma within a year of deciding to transition. Men (former trans-females) reported much lower numbers of behavioral health issues and trauma after de-transitioning. Additionally, 77% of men surveyed identified as the opposite gender prior to transition, whereas just 58% of women had (Littman, 2020).

Of the reasons cited for detransitioning, the majority (60%) noted that they became more comfortable with their natal sex. Other reasons included concerns over complications from the treatments, primarily cross-sex hormones, and lack of improved mental health. Other less-cited explanations include concerns about workplace discrimination and worsening physical health. The study also notes that approximately 36% of participants experienced worse mental health symptoms. Based on the findings, Littman concludes that more research is needed in tracking the transgender population to obtain accurate percentages of those who decide to detransition and that men and women reported varying reasons for deciding to transition and later return to their natal sex. The author notes that higher rates of trauma and peer group influences might have contributed to women's decisions, which Littman attributes partially to rapid onset gender dysphoria (Littman, 2020). What the study also indicates is that cross-sex hormones are not a validated treatment for gender dysphoria. Nearly all of the participants had taken them and decided against maintaining the physical changes. Given that the majority of surveyed detransitioners cited that they were comfortable with their biological sex, the study indicates that gender dysphoria is not necessarily a lifelong issue. This necessarily raises doubts about whether cross-hormones, which cause permanent physical damage, is justified.

In addition to the psychological factors, cross-sex hormones pose significant long-term health risks to transitioning individuals. Currently, little information is available given that researchers have not had adequate time to study the effects in this population. However, use of hormones for other conditions has yielded data on how these drugs can affect the body and the cardiovascular system in particular. Because of the high dosages required to achieve physical change and the need to continuously take the drugs, cross-sex hormones can potentially harm quality of life and reduce life expectancy for transitioning individuals. According to Dutra et al, trans-females are three times more likely to die from a cardiovascular event than the general population. In their 2019 literature review, Dutra et al examined the results of over 50 studies evaluating the effects of cross-sex hormones on not only transgender individuals but those with menopause and other endocrine disorders, all of which indicate that use of estrogen or testosterone can increase risks for cardiovascular disease. Throughout their review, Dutra et al cite examples of trans-females having higher triglyceride levels after 24 months of cross-sex hormones and how researchers halted a study on estrogen due to an increase in heart attacks among participants. Another article the authors reference indicates a higher risk for thromboembolisms (i.e., blood clots) in trans-females. For trans-males, Dutra et al explain that research shows significant increased risk for hypertension, high cholesterol, obesity, and heart attacks. One study noted that trans-males have a four times greater risk of heart attack compared to women identifying as their natal sex. Dutra et al conclude that most transgender individuals are younger than 50 and that more studies are needed as this population ages. They do note that available studies indicate that cross-sex hormones pose dangers to long-term cardiovascular health (Dutra et al, 2019).

In sum, the literature reveals that the evidence for cross-sex hormones as a treatment for gender dysphoria is weak and insufficient. Between the permanent effects, off-label use, and consequences to long-term health, cross-sex hormones are a risky option that does not promise a cure but does guarantee irreversible changes to both male and female bodies. Additionally, the inadequate studies serving as the basis for recommendations by clinical associations can lead to providers making poorly informed decisions for their patients. Research asserting that taking cross-sex hormones improves mental health is subjective and short-term. More studies that utilize large sample sizes and appropriate

methods is required before the medical profession should consider cross-sex hormones as one of gender dysphoria's standard treatments.

App_0040

## Literature Review: Sex Reassignment Surgery

The final phase of treatment for gender dysphoria is sex reassignment surgery. This method consists of multiple procedures to alter the appearance of the body to resemble an individual's desired gender. Some procedures apply to the genitals (genital procedures) while others affect facial features and vocal cords (non-genital procedures). While the surgery creates aesthetical aspects, it does not fully transform someone into the opposite biological sex. Transgender persons who undergo the procedures must continue taking cross-sex hormones to maintain secondary sexual characteristics. Additionally, all physical changes are irreversible, and the success rate of a surgery varies depending on the procedure and the population. For example, surgeries for trans-females have much better results than those for trans-males. Complications such as post-operative infections can also arise with the urinary tract system. However, sex reassignment surgery supposedly can provide drastic, if not complete, relief from gender dysphoria (Endocrine Society, 2017). The following is a list of procedures (both genital and non-genital) for trans-females and trans-males that create physical features of the desired sex.

**Procedures for Trans-Females**

- **Genital Surgeries:** These consist of penectomy (removal of the penis), orchiectomy (removal of the testicles), vaginoplasty (construction of a neo-vagina), clitoroplasty (construction of a clitoris), and vulvoplasty (construction of a vulva and labia). To perform, a surgeon begins by deconstructing the penis and removing the testicles. The penile shaft and glans are repurposed to serve as a neo-vagina and artificial clitoris (Note: These are not actual female genitalia but tissue constructed to resemble female anatomy). If the shaft tissue is insufficient, the surgeon may opt to use a portion of intestine to build a neo-vagina. The scrotum serves as material for fashioning a vulva and labia. In addition to constructing female genitalia, the surgeon reroutes the urethra to align with the neo-vagina. Genital surgeries for trans-females result in permanent sterility (Bizic et al, 2014).
- **Chest Surgery:** To attain full breasts, trans-females can undergo enlargement. The procedure is similar to breast augmentation for women where a surgeon places implants underneath breast tissue. Prior to surgery, trans-females need to take cross-sex hormones for roughly 24 months to increase breast size to get maximum benefit from the procedure (Endocrine Society, 2017).
- **Cosmetic and Voice Surgeries:** Designed to create feminine facial features, fat deposits, and vocal sounds, these procedures are secondary to genital procedures and intended to alter trans-females' appearances to better integrate into society as a member of the desired gender (WPATH, 2012).

**Procedures for Trans-Males**

- **Mastectomy:** This is the most performed sex reassignment surgery on trans-males because cross-sex hormones and chest-binding garments are often insufficient at diminishing breasts. To remove this secondary sexual characteristic, trans-males can undergo a mastectomy where a surgeon removes breast tissue subcutaneously (i.e., under the skin) and reconstructs the nipples to appear masculine. The procedure can result in significant scarring (Monstrey et al, 2011).
- **Genital Surgeries:** Unlike the procedures for trans-females, genital surgeries for trans-males are more complex and have lower success rates. Consisting of hysterectomy, oophorectomy

23

(removal of the ovaries), vaginectomy (removal of the vagina), phalloplasty (construction of a penis), and scrotoplasty (construction of prosthetic testicles), a team of surgeons must manufacture a penis using skin from the patient (taken from an appendage) while removing the vagina and creating an extended urethra. The functionality of the artificial penis can vary based on how extensive the construction was. Attaining erections requires additional surgery to implant a prosthesis, and the ability to urinate while standing is often not achieved. Genital procedures for trans-males result in irreversible sterility (Monstrey et al, 2011).

- **Cosmetic Surgeries:** Similar to trans-females, these procedures create masculine facial features, fat deposits, and artificial pectoral muscles. They aid trans-males with socially integrating as their desired gender. Surgery to deepen voices is also available but rarely performed (WPATH, 2012).

Because sex reassignment surgery is irreversible, the criteria for receiving these procedures is the strictest of all gender dysphoria treatments. WPATH and the Endocrine Society suggest rigorous reviews of patient history and prior use of other therapies before approving. Furthermore, the two organizations recommend that only adults (18 years old) undergo sex reassignment surgery.[8] WPATH and the Endocrine Society also recommend ensuring a strongly documented diagnosis of gender dysphoria, addressing all medical and mental health issues, and at least 12 months of cross-sex hormones for genital surgeries. Although the organizations agree on most criteria, they differ on whether hormones should be taken prior to mastectomies. WPATH asserts that hormones should not be a requirement, whereas the Endocrine Society advises up to 2 years of cross-sex hormones before undergoing the procedure (WPATH, 2012; Endocrine Society, 2017). What this indicates is that trans-males might undergo breast removal without having first pursued all options if their clinician adheres to WPATH's guidelines, which can lead to possible regret over irreversible effects.

As with cross-sex hormones, sex reassignment surgery's irreversible physical changes can potentially show marked mental health improvements and prevent suicidality in people diagnosed with gender dysphoria. In April 2022, the chair of the University of Florida's pediatric endocrinology department, Dr. Michael Haller, advocated for the benefits of "gender affirming" treatments (WUSF, 2020). However, the available evidence calls such statements into question. Recent research assessing both cross-sex hormones and sex reassignment surgery indicate that the effects on "long-term mental health are largely unknown." In studies regarding the benefits of surgery, the results have the same weaknesses as the research for the effectiveness of cross-sex hormones. These include small sample sizes, self-report surveys, and short evaluation periods, all of which are insufficient to justify recommendations for irreversible treatments (Bränström et al, 2020).

Two studies conducted in Sweden provide insight on the effectiveness of sex reassignment surgery in improving the behavioral health of transgender persons. Because Sweden has a nationalized health system that collects data on all residents, this country can serve as a resource to assess service utilization and inpatient admissions. Both studies, one by Dhejne et al from 2011 and another by Bränström et al published in 2020, assessed individuals who had received sex reassignment surgery and examined outcomes over several decades. Dhejne et al's findings indicate that sex reassignment

---

[8] Although practice guidelines indicate the minimum age to undergo sex reassignment surgery is 18, available evidence demonstrates that mastectomies have been performed on adolescent girls as young as 13 who experience "chest dysphoria" (Olson-Kennedy et al, 2018).

procedures do not reduce suicidality. The authors explained that individuals who underwent sex reassignment surgery were still more likely to attempt or commit suicide than those in the general population. This study is unique because it monitored the subjects over a long period of time. Dhejne et al note that the transgender persons tracked for the study did not show an elevated suicide risk until ten years after surgery (Dhejne et al, 2011). Given that a high proportion of research follows sex reassignment patients for much shorter timeframes, this evidence indicates that surgery might have little to no effect in preventing suicides in gender dysphoric individuals over the long run.

In addition to having an increased suicide risk, Dhejne et al discuss how individuals who underwent sex reassignment procedures also had higher mortality due to cardiovascular disease. The authors do not list the specific causes but establish the correlation. Given that cross-sex hormones can damage the heart, the increased risk could be related to the drugs and not the surgery. Furthermore, the study explains that the tracked population had higher rates of psychiatric inpatient admissions following sex reassignment. Dhejne et al established this by examining the rates of psychiatric hospitalizations in these individuals prior to surgery and noted higher utilization in the years following the procedures. These results are in comparison to the Swedish population at large. While the study contradicts other research emphasizing improvements in mental health issues, it has its limitations. For example, the sample size is small. Dhejne et al identified only 324 individuals who had undergone sex reassignment surgery between 1973 and 2003. In addition, the authors noted that while the tracked population had increased suicide risks when compared to individuals identifying as their natal sex, the rates could have been much higher if the procedures were not available (Dhejne et al 2011). What this study postulates is that sex reassignment surgery does not necessarily serve as a "cure" to the distress resulting from gender dysphoria and that ongoing behavioral health care may still be required even after a complete transition.

Bränström et al's study evaluating the Swedish population used a larger sample (1,018 individuals who had received sex reassignment surgery) but tracked them for just a ten-year period (2005 to 2015).[9] Unlike Dhejne et al, the authors did not track suicides and focused primarily on mood or anxiety disorder treatment utilization. Their results indicate that transgender persons who had undergone surgery utilized psychiatric outpatient services at lower rates and were prescribed medications for behavioral health issues at an annual decrease rate of 8%. Bränström et al also did not limit comparisons to Sweden's overall population and factored in transgender persons who take cross-sex hormones but have not elected to have surgery. Those results still presented a decrease in outpatient mental health services. However, Bränström et al note that individuals only on cross-sex hormones showed no significant reduction in that category, which calls into question claims regarding effectiveness of cross-sex hormones in ameliorating behavioral issues.

The Bränström et al study prompted numerous responses questioning its methodology. The study lacked a prospective cohort or RCT design, and it did not track all participants for a full ten-year period (Van Mol et al, 2020). These criticisms resulted in a retraction, asserting that Bränström et al's conclusions were "too strong" and that further analysis by the authors revealed that the new "results demonstrated no advantage of surgery in relation to subsequent mood or anxiety disorder-related

---

[9] Although Bränström et al claim to follow individuals for a ten-year period, peer reviews of the research revealed that this was not the case, noting the authors had varying periods of tracking, ranging from one to ten years (Van Mol et al, 2020).

App_0043

health care visits or prescriptions or hospitalizations following suicide attempts in that comparison" (Kalin, 2020).

There are multiple explanations for why the Bränström et al study reached different results than the Dhejne et al study. For starters, Bränström et al tracked a larger sample group over a later period (2005 to 2015 as opposed to 1973 to 2003) during which gender dysphoria underwent a dramatic shift in definition. Also, Dhejne et al did not see elevated suicides until after ten years, raising the question as to whether sex reassignment surgery has temporary benefits on mental health rather than long-term or permanent benefits. Like the other Swedish study, Bränström et al's findings are a correlation and do not specifically state that the procedures cause reduced psychiatric service utilization (Bränström et al, 2020).

A 2014 study by Hess et al in Germany evaluated satisfaction with sex reassignment procedures by attempting to survey 254 trans-females on their quality of life, appearance, and functionality as women. Out of the participants selected, only 119 (47%) returned completed questionnaires, which Hess et al indicate is problematic because dissatisfied trans-females might not have wanted to provide input. The results from the collected responses noted that 65.7% of participants reported satisfaction with their lives following surgery and that 90.2% indicated that the procedures fulfilled their expectations for life as women. While these results led Hess et al to conclude that sex reassignment surgery generally benefits individuals with gender dysphoria, the information is limited and raises questions (Hess et al, 2014). Such questions include whether the participants had mental health issues before or after surgery and did their satisfaction wane over time. Hess et al only sent out one questionnaire and not several to ascertain consistency over multiple years. Questions like these raise doubts about the validity of the study. Although Hess et al's research is just one study, numerous others utilize the same subjective methods to reach their conclusions (Hruz, 2018).

In his assessment, Patrick Lappert contributes additional insight on the appropriate clinical indications for mastectomies, noting that removal of breast tissue is necessary following the diagnosis of breast cancer or as a prophylactic against that disease. He cites that this basis is verifiable through definitive laboratory testing and imaging, making it an objective diagnosis, whereas gender dysphoria has no such empirical methods to assess and depends heavily on the patient's perspective. Also, Lappert notes that trans-males who make such decisions are doing so on the idea that the procedure will reduce their dysphoria and suicide risk. However, they are making an irreversible choice based on anticipated outcomes supported only by weak evidence, and thus cannot provide informed consent (Lappert, 2022).

The literature is inconclusive on whether sex reassignment surgery can improve mental health for gender dysphoric individuals. Higher quality research is needed to validate this method as an effective treatment. This includes studies that obtain detailed participant histories (e.g., behavioral diagnoses) and track participants for longer periods of time. These are necessary to evaluate the full effects of treatments that cause irreversible physical changes. In addition, sex reassignment procedures can result in severe complications such as infections in trans-females and urethral blockage in trans-males. Health issues related to natal sex can also persist. For example, trans-males who undergo mastectomy can still develop breast cancer and should receive the same recommended screenings (Trum et al, 2015). Until more definitive evidence becomes available, sex reassignment surgery should not qualify as a standard treatment for gender dysphoria.

## Literature Review: Quality of Available Evidence and Bioethical Questions

**Quality of Available Evidence**

Clinical organizations that have endorsed puberty suppression, cross-sex hormones, and sex reassignment surgery frequently state that these treatments have the potential to save lives by preventing suicide and suicidal ideation. The evidence, however, does not support these conclusions. James Cantor notes that actual suicides (defined as killing oneself) are low, occur at higher rates for men, and that interpretations of available research indicate a blurring of numbers between those with gender dysphoria and homosexuals (Cantor, 2022). Although information exists that contradicts certain arguments, media outlets continue to report stories emphasizing the "lifesaving" potential of sex reassignment treatment. A May 2022 story by NBC announced survey results under the headline "Almost half of LGBTQ youths 'seriously considered suicide in the past year'" (NBC, 2022). This is a significant claim that can have a sensational effect on patients and providers alike, but how strong is the evidence supporting it? Almost all of the data backing this assertion are based on surveys and cross-studies, which tend to yield low-quality results (Hruz, 2018). In addition, how many gender dysphoric individuals are seeing stories in the media and not questioning the narrative? Because research on the effectiveness of treatments is ongoing, a debate persists regarding their use in the adolescent and young-adult populations, and much of it is due to the low-quality studies serving as evidence.

In their assessment, Romina Brignardello-Petersen and Wojtek Wiercioch examined the quality of 61 articles published between 2020 and 2022 (Note: See Attachment A for the full study). They identified research on the effectiveness of puberty blockers, cross-sex hormones, and sex reassignment surgery and assigned a grade (high, moderate, low, or very low) in accordance with the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) approach. Out of the articles reviewed, all with a few exceptions received grades of low or very low quality when demonstrating outcomes regarding improvements in mental health and overall satisfaction with transitioning. For puberty blockers, Brignardello-Petersen and Wiercioch identified low quality evidence for alleviating gender dysphoria and very low quality for reducing suicidal ideation. The authors also had nearly identical findings for cross-sex hormones. However, they noted moderate quality evidence for the likelihood of cardiovascular side effects. Regarding surgery, Brignardello-Petersen and Wiercioch graded articles that examined overall satisfaction and complication rates. None of the studies received grades higher than low quality. These findings led the authors to conclude that "there is great uncertainty about the effects" of sex reassignment treatments and that the "evidence alone is not sufficient to support" using such treatments. Among the studies graded was one the U.S. Department of Health and Human Services cited in its information on "gender affirming" treatments. The authors noted this research had a "critical risk of bias" and was of low quality (Brignardello-Petersen and Wiercioch, 2022).

For his part, James Cantor provided a review of available literature, which addresses studies on etiology, desistance, effectiveness of puberty blockers and cross-sex hormones, suicidal behaviors, and clinical association and international guidelines. Throughout his analysis, Cantor cites weak evidence, poor methodologies (e.g., retrospective versus prospective studies), and lack of professional endorsements in research that indicates the benefits of sex reassignment treatment. Additionally, he notes that improvements in the behavioral health of adolescents who take cross-sex hormones can be attributed to the counseling they receive concurrently and that suicidality is not likely to result from gender

App_0045

dysphoria but from co-occurring mental disorders. The reasoning behind the third point is based on the blending of suicide and suicidality, which are two distinct concepts. The former refers specifically to killing oneself, and the second regards ideation and threats in attempts to receive help. Cantor specifically notes that actual suicides are highly unlikely among gender dysphoric individuals, particularly trans-males. His other conclusions indicate that young children who experience gender identity issues will most likely desist by puberty, that multiple phenomena can cause the condition, and that Western European health services are not recommending medical intervention for minors. The basis for these statements is the paucity of high to moderate quality evidence on the effectiveness of sex reassignment treatments and numerous studies demonstrating desistance (Cantor, 2022).

Despite the need for stronger studies that provide definitive conclusions, many practitioners stand by the recommendations of the AAP, Endocrine Society, and WPATH. This is evident in a letter submitted to the *Tampa Bay Times*, which was a rebuttal to the Florida Department of Health's (DOH) guidance on treatment for gender dysphoria (Note: The guidance recommends against using puberty blockers, cross-sex hormones, or surgery for minors) (DOH, 2022). The authors, led by six professors at the University of Florida's College of Medicine, state that recommendations by clinical organizations are based on "careful deliberation and examination of the evidence by experts." However, evaluations of these studies show otherwise. Not only does the available research use cross-sectional methods such as surveys, but it provides insufficient evidence based on momentary snapshots regarding mental health benefits. These weak studies are the foundation for the clinical organizations' guidelines that the University of Florida professors tout as a gold standard. In addition, the letter's authors state that DOH's guidance is based on a "non-representative sample of small studies and reviews, editorials, opinion pieces, and commentary" (Tampa Bay Times, 2022). That statement misses the point when it comes to evidence demonstrating whether treatments with irreversible effects are beneficial because the burden of proof is on those advocating for this treatment, not on those acknowledging the need for further research. This raises the question concerning how much academic rigor these professors are applying to practice guidelines released by clinical organizations and whether they also apply the same level of rigor to novel treatments for other conditions (e.g., drugs, medical devices).

Another example of a lack of rigor is a 2019 article by Herman et al from the University of California at Los Angeles (UCLA) that evaluated responses to a 2015 national survey on transgender individuals and suicide. Unlike other studies, this one utilized a large cohort with 28,000 participants from across the U.S. responding. However, the researchers used no screening criteria and did not randomly select individuals. In addition, responses consisted entirely of self-reports with no supporting evidence to even prove a diagnosis of gender dysphoria. Although Herman et al conclude that the U.S. transgender population is at higher risk for suicidal behaviors, the authors' supporting evidence is subjective and serves as a weak basis. Additionally, the survey results do not establish gender dysphoria as a direct cause of suicide or suicidal ideation. The questions required participants to respond about their overall physical and mental health. Out of those that indicated "poor" health, 77.7% reported suicidal thoughts or attempts during the previous year, whereas just 29.1% of participants in "excellent" health had. These percentages indicate that causes beyond gender dysphoria could be affecting suicidal behaviors. Other reasons cited include rejection by family or religious organizations and discrimination. The authors also acknowledge that their findings are broad, not nationally representative, and should serve as a basis for pursuing future research (Herman et al, 2019).

Yet another example is a study published in 2022 by Olson et al tracks 300 young children that identify as transgender over a 5-year period, and asserts low probabilities for detransitioning, while supporting interventions such as puberty blockers. The authors found that children (median age of 8 years) who identified as a gender that differed from their natal sex were unlikely to desist at a rate of 94% and conclude that "transgender youth who socially transitioned at early ages" will continue "to identify that way." While this appears to contradict earlier studies that demonstrate most young adolescents who change gender identities return to their "assigned gender at birth," the authors note differences and limitations with the results. For example, Olson et al notes that they did not verify whether the participants met the DSM-V's diagnostic criteria for gender dysphoria and that the children's families supported the decisions to transition. Instead, the authors relied on a child's chosen pronouns to classify as transgender. Also, Olson et al acknowledged that roughly 66% of the sample was biologically male. This is particularly significant considering that the majority of transitioning adolescents in recent years were natal females. Another issue with the study includes the median age at the end of follow-up (13 years), which is when boys begin puberty. Furthermore, the authors cite that the participants received strong parental support regarding the transitions, which constitutes positive reinforcement (Olson et al, 2022). Other research demonstrates that such feedback on social transitioning from parents and peers can prevent desistance following pubertal onset (Zucker, 2019). Despite these limitations, the New York Times announced the study's publication under the headline "Few Transgender Children Change Their Minds After 5 Years" (New York Times, 2022). Such a title can add to the public's perception that gender dysphoria requires early medical intervention to address.

**Bioethical Questions**

The irreversible physical changes and potential side effects of sex reassignment treatment raise significant ethical questions. These questions concern multiple bioethical principles including patient autonomy, informed consent, and beneficence. In a 2019 article, Michael Laidlaw, Michelle Cretella, and Kevin Donovan argue that prescribing puberty blockers or cross-sex hormones on the basis that they will alleviate psychological symptoms should not be the standard of care for children with gender dysphoria. Additionally, the three authors assert that such treatments "constitute an unmonitored, experimental intervention in children without sufficient evidence of efficacy or safety." The primary ethical question Laidlaw, Cretella, and Donovan pose is whether pushing physical transitioning, particularly without parental consent, violates fully informed consent (Laidlaw et al, 2019).

In accordance with principles of bioethics, several factors must be present to obtain informed consent from a patient. These consist of being able to understand and comprehend the service and potential risks, receiving complete disclosure from the physician, and voluntarily providing consent. Bioethicists generally do not afford the ability of giving informed consent to children who lack the competence to make decisions that pose permanent consequences (Varkey, 2021). Laidlaw, Cretella, and Donovan reinforce this point regarding sex reassignment treatment when they state that "children and adolescents have neither the cognitive nor the emotional maturity to comprehend the consequences of receiving a treatment for which the end result is sterility and organs devoid of sexual function" (Laidlaw et al, 2019). This further raises the question whether clinicians who make such treatment recommendations are providing full disclosure about the irreversible effects and truly obtaining informed consent.

Another issue is the conflict between consumerism and the practitioner's ability to provide appropriate care.  Consumerism refers to patients learning about treatments through media/marketing and requesting their health care provider to prescribe it, regardless of medical necessity. Considering that social media is rife with individuals promoting "gender affirmative" drugs and surgeries, children are making self-assessments based on feelings they may not understand and that can lead to deep regret in the future (Littman, 2018). This can contribute to patients applying pressure on their doctors to prescribe medications not proven safe or effective for the condition. Consumerism can also affect bioethical compliance because it constrains clinicians from using their full "knowledge and skills to benefit the patient," which is "tantamount to a form of patient abandonment and therefore is ethically indefensible" (Varkey, 2021).

In his assessment, G. Kevin Donovan explains the bioethical challenges related to sex reassignment treatment, emphasizing the lack of informed consent when administering these services. He asserts that gender dysphoria is largely a self-diagnosis practitioners cannot verify with empirical tests (e.g., labs and imaging) and that providing such treatments is experimental. Because of the lack of consent and off-label use of puberty blockers and cross-sex hormones, Donovan raises the question as to how "experienced and ethical physicians so mislead others or be so misled themselves?" He further attributes this phenomenon to societal and peer pressures that influence self-diagnosis and confirm decisions to transition. As a result, these pressures lead to individuals wanting puberty blockers, cross-sex hormones, and surgery. Donovan goes on to identify several news stories where embracing sex reassignment treatment is a "cult-like" behavior. To conclude, he links these factors back to the failure to obtain informed consent from transgender patients and how that violates basic bioethical principles (Donovan, 2022).

## Coverage Policies of the U.S. and Western Europe

**U.S. Federal Level Coverage Policies**

**Medicare:** In 2016, the Centers for Medicare and Medicaid Services (CMS) published a decision memo announcing that Medicare Administrative Contractors (MACs) can evaluate sex reassignment surgery coverage on a "case-by-case" basis. [10] CMS specifically noted that the decision memo is not a National Coverage Determination and that "no national policy will be put in place for the Medicare program" (CMS, 2016). This memo was the result of CMS reviewing over 500 studies, reports, and articles to the validity of the procedures. Following its evaluation, CMS determined that "the quality and strength of evidence were low due to mostly observational study designs with no comparison groups, subjective endpoints, potential confounding . . . small sample sizes, lack of validated assessment tools, and considerable (number of participants in the studies) lost to follow up." In 2017, CMS reinforced this position with a policy transmittal that repeated the 2016 memo's criteria (CMS, 2017).

The basis for Medicare's decision is that the "clinical evidence is inconclusive" and that "robust" studies are "needed to ensure that patients achieve improved health outcomes." In its review of available literature, CMS sought to answer whether there is "sufficient evidence to conclude that gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria." After evaluating 33 studies that met inclusion criteria, CMS's review concludes that "not enough high-quality evidence" is available "to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively." Additionally, out of the 33 studies, just 6 provided "useful information" on the procedures' effectiveness, revealing that their authors "assessed quality of life before and after surgery using validated (albeit non-specific) psychometric studies" that "did not demonstrate clinically significant changes or differences in psychometric test results" following sex reassignment surgery (CMS, 2016).

**U.S. Department of Defense – Tricare:** Tricare does not cover sex reassignment surgery, but it will cover psychological services such as counseling for individuals diagnosed with gender dysphoria and cross-sex hormones when medically necessary (Tricare, 2022).[11]

**U.S. Department of Veterans Affairs:** The U.S. Department of Veterans Affairs (VA) does not cover sex reassignment surgery, although it will reimburse for cross-sex hormones and pre- and post-operative care related to transitioning. Because the VA only provides services to veterans of the U.S. armed forces, it cannot offer sex reassignment treatment to children (VA, 2020).[12]

---

[10] The Centers for Medicare and Medicaid Services is part of the U.S. Department of Health and Human Services. Its primary functions are to administer the entire Medicare system and oversee federal compliance of state Medicaid programs. In addition, CMS sets reimbursement rates and coverage criteria for the Medicare program.

[11] Tricare is the insurance program that covers members of the U.S. armed forces and their families. This includes children of all ages.

[12] The U.S. Department of Veterans Affairs oversees the Veterans Health Administration (VHA), which consists of over 1,000 hospitals, clinics, and long-term care facilities. As the largest health care network in the U.S., the VHA provides services to veterans of the U.S. armed forces.

App_0049

**State-Level Coverage Policies**

**Florida:** In April 2022, DOH issued guidance for the treatment of gender dysphoria, recommending that minors not receive puberty blockers, cross-sex hormones, or sex reassignment surgery. [13] The justification offered for recommending against these treatments is that available evidence is low-quality and that European countries also have similar guidelines. Accordingly, DOH provided the following guidelines:

- "Social gender transition should not be a treatment option for children or adolescents."
- "Anyone under 18 should not be prescribed puberty blockers or hormone therapy."
- "Gender reassignment surgery should not be a treatment option for children or adolescents."
- "Children and adolescents should be provided social support by peers and family and seek counseling from a licensed provider."

In a separate fact sheet released simultaneously with the guidance, DOH further asserts that the evidence cited by the federal government cannot establish sex reassignment treatment's ability to improve mental health (DOH, 2022).

**State Medicaid Programs:** Because individual states differ in health services offered, Medicaid programs vary in their coverage of sex reassignment treatments. The following maps identify states that cover sex reassignment treatments, states that have no policy, and states that do not cover such treatments.

---

[13] Unlike the federal government, the State of Florida delegates responsibilities for Medicaid and health care services to five separate agencies (Agency for Health Care Administration, Department of Health, Department of Children and Families, Department of Elder Affairs, and Agency for Persons with Disabilities). Each agency has its own separate head (secretary or surgeon general), which reports directly to the Executive Office of the Governor. As Florida's public health agency, DOH oversees all county health departments, medical professional boards, and numerous health and welfare programs (e.g., Early Steps and Women, Infants, and Children). Because it oversees the boards, DOH has authority to release practice guidelines.

App_0050

State Medicaid programs with coverage decisions regarding puberty blockers:



App_0051

State Medicaid programs with coverage decisions regarding cross-sex hormones:



State Medicaid programs with coverage decisions regarding sex reassignment surgery:



34

**Western Europe**

Scandinavian countries such as Sweden and Finland have released new guidelines on sex reassignment treatment for children. In 2022, the Swedish National Board of Health stated that "the risks of hormonal interventions for gender dysphoric youth outweigh the potential benefits." With the exception of youths who exhibited "classic" signs of gender identity issues, adolescents who present with the condition will receive behavioral health services and gender-exploratory therapy (Society for Evidence Based Gender Medicine, 2022).

In Finland, the Palveluvalikoima issued guidelines in 2020 stating that sex reassignment in minors "is an experimental practice" and that "no irreversible treatment should be initiated." The guidelines further assert that youths diagnosed with gender dysphoria often have co-occurring psychiatric disorders that must be stabilized prior to prescribing any cross-sex hormones or undergoing sex reassignment surgery (Palveluvalikoima, 2020).

The United Kingdom (U.K.) is also reassessing the use of irreversible treatments for gender dysphoria due the long-term effects on mental and physical health. In 2022, an independent interim report commissioned by the U.K.'s National Health Service (NHS) indicates that additional research and systematic changes are necessary to ensure the safe treatment of gender dysphoric youths. These include reinforcing the diagnosis process to assess all areas of physical and behavioral health, additional training for pediatric endocrinologists, and informing parents about the uncertainties regarding puberty blockers. The interim report is serving as a benchmark until the research is completed for final guidelines (The Cass Report, 2022).

Like state Medicaid programs, health systems across Western Europe also vary in their coverage of sex reassignment treatment.

Western European nations' requirements for cross-sex hormones:



*In this context, the age requirement for access to any medical treatment without consent of parents or of a public authority. This age may range from 16 to 18 years depending on each country's laws.*

Western European nations' requirements for sex reassignment surgery:



*In this context, the age requirement for access to any medical treatment without consent of parents or of a public authority. This age may range from 16 to 18 years depending on each country's laws.*

App_0055

## Generally Accepted Professional Medical Standards Recommendation

This report does not recommend sex reassignment treatment as a health service that is consistent with generally accepted professional medical standards. Available evidence indicates that the services are not proven safe or effective treatments for gender dysphoria.

**Rationale**

The available medical literature provides insufficient evidence that sex reassignment through medical intervention is a safe and effective treatment for gender dysphoria. As this report demonstrates, the evidence favoring "gender affirming" treatments, including evidence regarding suicidality, is either low or very low quality:

- **Puberty Blockers:** Evidence does not prove that puberty blockers are safe for treatment of gender dysphoria. Evidence that they improve mental health and reduce suicidality is low or very low quality.
- **Cross-Sex Hormones:** Evidence suggesting that cross-sex hormones provide benefits to mental health and prevents suicidality is low or very low quality. Rather, evidence shows that cross-sex hormones cause multiple irreversible physical consequences as well as infertility.
- **Sex Reassignment Surgery:** Evidence of improvement in mental health and reduction in suicidality is low or very low quality. Sex reassignment surgery results in irreversible physical changes, including sterility.

While clinical organizations like the AAP endorse the above treatments, none of those organizations relies on high quality evidence. Their eminence in the medical community alone does not validate their views in the absence of quality, supporting evidence. To the contrary, the evidence shows that the above treatments pose irreversible consequences, exacerbate or fail to alleviate existing mental health conditions, and cause infertility or sterility. Given the current state of the evidence, the above treatments do not conform to GAPMS and are experimental and investigational.

___✓__**Concur**          ____**Do not Concur**

**Comments:**

_____

_____

_____

_____          6/2/22
*Deputy Secretary for Medicaid (or designee)*          *Date*

App_0056

## Works Cited

Almost Half of LGBTQ Youths 'Seriously Considered' Suicide in Past Year, Survey Says. *NBC News*. 4 May 2022.

American Academy of Pediatrics. Policy Statement: Off-Label Use of Drugs in Children. *Pediatrics*. 2014. 133(3).

American Psychiatric Association. *Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders*. 2013.

American Psychiatric Association. *Gender Dysphoria Diagnosis*. 2017.

American Psychiatric Association. *What Is Depression*. 2020.

American Psychological Association. *APA Resolution on Gender Identity Change Efforts*. 2021.

Baker GM, Guzman-Arocho YD, Bret-Mounet VC, Torous VF, Schnitt SJ, Tobias AM, Bartlett RA, Fein-Zachary VJ, Collins LC, Wulf GM, Heng YJ. Testosterone Therapy and Breast Histopathological Features in Transgender Individuals. *Mod Pathol*. 2021. 34(1).

Blake K, Cangelosi S, Johnson-Brooks S, Belcher HME. Reliability of the GAF and CGAS with Children Exposed to Trauma. *Child Abuse and Neglect*. 2007. 31: 909-915.

Bizic MR, Jeftovic M, Pusica S, Stojanovic B, Duisin D, Vujovic S, Rakic V, Djordjevic ML. Gender Dysphoria: Bioethical Aspects of Medical Treatment. *BioMed Research International*. 2018: 9652305.

Bizic M, Kojovic V, Duisin D, Stanojevic D, Vujovic S, Milosevic A, Korac G, Djordjevic ML. An Overview of Neovaginal Reconstruction Options in Male to Female Transsexuals. *The Scientific World Journal*. 2014. 638919.

Bränström R, Pachankis JE. Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-Affirming Surgeries: A Total Population Study. *American Journal of Psychiatry*. 2020. 177(8).

Brignardello-Petersen R, Wiercioch W. Effects of Gender Affirming Therapies in People with Gender Dysphoria: Evaluation of the Best Available Evidence. Unpublished: Commissioned by the Florida Agency for Health Care Administration. 2022.

Bruggeman BS, Dayton K, Diaz A, Evans J, Haller MJ, Hudak ML, Mathews CA, Shapiro M. We 300 Florida Health Care Professionals Say the State Gets Transgender Guidance Wrong. *Tampa Bay Times*. 27 April 2022.

Cantor J. Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy. *Journal of Sex and Marital Therapy*. 46(4).

Cantor J. *Science of Gender Dysphoria and Transsexualism*. Unpublished. Commissioned by the Florida Agency for Health Care Administration. 2022.

Cass H. *The Cass Review: Independent Review of Gender Identity Services for Children and Young People, Interim Report*. 2022.

App_0057

The Centers for Medicare and Medicaid Services. Decision Memo: Gender Dysphoria and Gender Reassignment Surgery. 30 August 2016.

The Centers for Medicare and Medicaid Services. Pub 100-03 Medicare National Coverage Determinations. 3 March 2017.

Chen D, Strang JF, Kolbuck VD, Rosenthal SM, Wallen K, Waber DP, Steinberg L, Sisk CL, Roth J, Paus T, Mueller SC, McCarthy MM, Micevych PE, Martin CL, Kreukels BPC, Kenworthy L, Herting MM, Herlitz A, Heraldsen RJH, Dahl R, Crone EA, Chelune GJ, Burke SM, Berenbaum SA, Beltz AM, Bakker J, Eliot L, Vilain E, Wallace GL, Nelson EE, Garofalo R. Consensus Parameter: Research Methodologies to Evaluate Neurodevelopmental Effects of Pubertal Suppression in Transgender Youth. *Transgender Health*. 2020. 5(4).

Claahsen-van der Grinten H, Verhaak C, Steensma T, Middelberg T, Roeffen J, Klink D. Gender Incongruence and Gender Dysphoria in Childhood and Adolescence – Current Insights in Diagnostics, Management, and Follow-Up. *European Journal of Pediatrics*. 2020. 180: 1349-1357.

Costa R, Colizzi M. The Effect of Cross-Sex Hormonal Treatment on Gender Dysphoria Individuals' Mental Health: A Systematic Review. *Neuropsychiatric Disease and Treatment*. 2016. 12: 1953-1966.

Costa R, Dunsford M, Skagerberg E, Holt V, Carmichael P, Colizzi M. Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria. *Journal of Sexual Medicine*. 2015. 12(11).

Davy Z, Toze M. What Is Gender Dysphoria? A Critical Systematic Narrative Review. *Transgender Health*. 2018. 3(1).

De Sanctis V, Soliman AT, Di Maio S, Soliman N, Elsedfy H. Long-Term Effects and Significant Adverse Drug Reactions (ADRs) Associated with the Use of Gonadotropin-Releasing Hormone Analogs (GnRHa) for Central Precocious Puberty: A Brief Review of Literature. *Acta Biomed*. 2019. 90(3).

De Vries ALC, McGuire JK, Steensma TD, Wagenaar ECF, Doreleijers TAH, Cohen-Kettenis PT. Young Adult Psychological Outcome after Puberty Suppression and Gender Reassignment. *Pediatrics*. 2014. 134(4).

Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Langstrom N, Landen M. Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden. *PLoS One*. 6(2).

Donovan GK. *Medical Experimentation without Informed Consent: An Ethicist's View of Transgender Treatment for Children*. Unpublished. Commissioned by the Florida Agency for Health Care Administration. 2022.

Dutra E, Lee J, Torbati T, Garcia M, Merz CNB, Shufelt C. Cardiovascular Implications of Gender-Affirming Hormone Treatment in the Transgender Population. *Maturitas*. 2019. 129: 45-49.

Few Transgender Children Change Their Minds After 5 Years, Study Finds. *New York Times*. 4 May 2022.

Gaetano P. David Reimer and John Money Gender Reassignment Controversy: The John/Joan Case. *The Embryo Project Encyclopedia*. 2017.

Geffen S, Horn T, Smith KJ, Cahill S. Advocacy for Gender Affirming Care: Learning from the Injectable Estrogen Shortage. *Transgender Health*. 2018. 3(1).

40

Go JJ. Should Gender Reassignment Surgery Be Publicly Funded? *Bioethical Inquiry*. 2018. 15: 527-534.

Gu J, Kanai, R. What contributes to individual differences in brain structure. *Front Hum Neurosci*. 2014. 8:262.

Hariton E, Locascio JJ. Randomised Controlled Trials – The Gold Standard for Effectiveness Research. *BJOG: An International Journal of Obstetrics and Gynecology*. 2018. 125(13).

Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, Rosenthal SM, Safer JD, Tangpricha V, T'Sjoen GG. Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. *Journal of Clinical Endocrinological Metabolism*. 2017. 102(11).

Herman JL, Brown TNT, Haas AP. *Suicide Thoughts and Attempts Among Transgender Adults: Findings from the 2015 U.S. Transgender Survey*. University of California at Los Angeles School of Law Williams Institute. 2019.

Hess J, Neto RR, Panic L, Rubben H, Senf W. Satisfaction with Male-to-Female Gender Reassignment Surgery. *Deutsches Arzteblatt International*. 2014. 111: 795-801.

Hruz PW. Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria. *Catholic Medical Association*. 2020. 87(1).

James HA, Chang AY, Imhof RL, Sahoo A, Montenegro MM, Imhof NR, Gonzalez CA, Lteif AN, Nippoldt TB, Davidge-Pitts CJ. A Community-Bases Study of Demographics, Medical and Psychiatric Conditions, and Gender Dysphoria/Incongruence Treatment in Transgender/Gender Diverse Individuals. *Biology of Sex Differences*. 2020. 11(55).

Jensen RK, Jensen JK, Simons LK, Chen D, Rosoklija I, Finlayson C. Effect of Concurrent Gonadotropin-Releasing Hormone Against Treatment on Dose and Side Effects of Gender-Affirming Hormone Therapy in Adolescent Transgender Patients. *Transgender Health*. 2019. 4(1).

Joel D., Berman Z., Tavor L. Sex beyond the Genitalia: The Human Brain Mosaic. *Proceedings of the National Academy of Sciences of the United States of America*. 2015. 112(50).

Kalin NH. Reassessing Mental Health Treatment Utilization Reduction in Transgender Individuals after Gender-Affirming Surgeries: A Comment by the Editor on the Process (Letter). *American Journal of Psychiatry*. 2020. 177:765.

Kaltiala-Heino R, Sumia M, Työläjärvi M, Lindberg N. Two years of gender identity service for minors: overrepresentation of natal girls with severe problems in adolescent development. *Child and Adolescent Psychiatry and Mental Health*. 2015. 9(9).

Kozlowska K, Chudleigh C, McClure G, Maguire AM, Ambler GR. Attachment Patterns in Children and Adolescents with Gender Dysphoria. *Frontiers in Psychology*. 2021. 11: 582688.

Kuper LE, Mathews S, Lau M. Baseline Mental Health and Psychosocial Functioning of Transgender Adolescents Seeking Gender-Affirming Hormone Therapy. *Journal of Developmental Behavior Pediatrics*. 2019. 40(8).

Kyriakou A, Nicolaides NC, Skordis N. Current Approach to the Clinical Care of Adolescents with Gender Dysphoria. *Acta Biomed*. 2020. 91(1).

Laidlaw M, Cretella M, Donovan K. The Right to Best Care for Children Does Not Include the Right to Medical Transition. *The American Journal of Bioethics*. 2019. 19(2).

Laidlaw M, Van Meter QL, Hruz PW, Van Mol A, Malone WJ. Letter to the Editor: Endocrine Treatment of Gender-Dsyphoria/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, *Journal of Clinical Endocrinological Metabolism*. 2018.

Lappert P. *Surgical Procedures and Gender Dysphoria*. Unpublished. Commissioned by the Florida Agency for Health Care Administration. 2022.

Lee JY, Finlayson C, Olson-Kennedy J, Garofalo R, Chan YM, Glidden DV, Rosenthal SM. Low Bone Mineral Density in Early Pubertal Transgender/Gender Diverse Youth: Findings from the Trans Youth Care Study. *Journal of the Endocrine Society*. 2020. 4(9).

Levine SB. Informed Consent for Transgendered Patients. *Journal of Sex & Marital Therapy*. 2018. 10:1080.

Littman L. Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners. *Archives of Sexual Behavior*. 2021. 50: 3353-3369.

Littman L. Rapid-Onset Gender Dysphoria in Adolescents and Young Adults: A Study of Parental Reports. *PLOS One*. 2018. 13(8).

Mayer L, McHugh PR. Sexuality and Gender: Findings from the Biological, Psychological, and Social Sciences. *The New Atlantis*. 2016. Fall Edition. 103.

McHugh PR. *The Mind Has Mountains: Reflections on Society and Psychiatry*. The Johns Hopkins University Press. 2006.

Medical Textbook Strips Gender Dysphoria Definition after Being Cited by Florida. *Fox News*. 8 May 2022.

Merck Pharmaceuticals. *Merck Manual: Professional Version*. 2021.

Monstrey SJ, Ceulemans P, Hoebeke P. Sex Reassignment Surgery in the Female-to-Male Transsexual. *Seminars in Plastic Surgery*. 2011. 25(3).

Nguyen HB, Chavez AM, Lipner E, Hantsoo L, Kornfield SL, Davies RD, Epperson CN. Gender-Affirming Hormone Use in Transgender Individuals: Impact on Behavioral Health and Cognition. *Curr Psychiatry Rep*. 2019. 20(12).

Nhi Le HP. *Eminence-Based Medicine vs. Evidence-Based Medicine*. Students 4 Best Evidence. 12 January 2016. https://s4be.cochrane.org/blog/2016/01/12/eminence-based-medicine-vs-evidence-based-medicine/#:~:text=What%20is%20eminence-based%20medicine,appraisal%20of%20scientific%20evidence%20available

App_0060

Olson KR, Durwood L, DeMeules M, McLaughlin KL. Mental Health of Transgender Children Who Are Supported in Their Identities. *Pediatrics*. 2015. 137(3).

Olson KR, Durwood L, Horton R, Gallagher NM, Devor A. Gender Identity 5 Years After Social Transition. *Pediatrics*. 2022; doi: 10.1542/peds.2021-056082.

Olson-Kennedy J, Warus J, Okonta V, Belzer M, Clark LF. Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts. *JAMA Pediatrics*. 2018. 172(5).

Palveluvalikoima of Finland. Recommendation of the Council for Choices in Health Care in Finland (Palko/Cohere Finland): Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors. 2020.

Rafferty J, AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents. *Pediatrics*. 2018. 142(4).

Sadr M, Korashad BS, Talaei A, Fazeli N, Honekopp J. 2D:4D Suggests a Role of Prenatal Testosterone in Gender Dysphoria. *Archives of Sexual Behavior*. 2020. 49: 421-432.

Saleem F, Rizvi SW. Transgender Associations and Possible Etiology: A Literature Review. *Cureus*. 9(12).

Shumer DE, Reisner SL, Edwards-Leeper L, Tishelman A. Evaluation of Asperger Syndrome in Youth Presenting to a Gender Dysphoria Clinic. *LGBT Health*. 2016. 3(5).

Society for Evidence Based Gender Medicine. Summary of Key Recommendations from the Swedish National Board of Health and Welfare (Socialstyrelsen/NBHW). 2022.

Steensma TD, McGuire JK, Kreukels BPC, Beekman AJ, Cohen-Kettenis PT. Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study. *Journal of the American Academy of Child and Adolescent Psychiatry*. 2013. 52(6).

Tordoff DM, Wanta JW, Collin A, Stepney C, Inwards-Breland DJ, Ahrens K. Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care. *JAMA Open Network*. 2022; 59(2).

Trum H, Hoebeke P, Gooren L. Sex Reassignment of Transsexual People from a Gynecologist's and Urologist's Perspective. *Acta Obstetrica et Gynecologica*. 2016. 94: 563-567.

Turban JL, Loo SS, Almazan AN, Keuroghlian AS. Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Method Analysis *LGBT Health*. 2021. 8(4).

UF Doctor Says Gender-Affirming Care Works for Kids Who Need It, and Can Even Save Lives. *Health News Florida*. 26 April 2022.

Unger CA. Hormone Therapy for Transgender Patients. *Translational Andrology and Urology*. 2016. 5(6).

University of California at San Francisco Health System. *Overview of Feminizing Hormone Therapy*. 2020.

App_0061

University of California at San Francisco Health System. *Overview of Masculinizing Hormone Therapy*. 2020.

U.S. Department of Defense, Tricare. *Gender Dysphoria Services*. 2022.

U.S. Department of Health and Human Services: Office for Civil Rights. HHS Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy. 2 March 2022.

U.S. Drug Enforcement Administration. *Drug Fact Sheet: Steroids*. 2020.

A Review of the President's FY 2023 Funding Request and Budget Justification for the National Institutes of Health. U.S. Senate Committee on Appropriations. Subcommittee on Labor, Health and Human Services, Education, and Related Agencies. 17 May 2022.
https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-fy-2023-funding-request-and-budget-justification-for-the-national-institutes-of-health

Van Meter QL. Concerns about Affirmation of an Incongruent Gender in a Child or Adolescent. Unpublished. Commissioned by the Florida Agency for Health Care Administration. 2022.

Van der Miesen AIR, Hurley H, Bal AM, de Vries ALC. Prevalence of the Wish to Be of the Opposite Gender in Adolescents and Adults with Autism Spectrum Disorder. *Archives of Sexual Behavior*. 2018. 47: 2307-2317.

Van Mol A, Laidlaw MK, Grossman M, McHugh PR. Gender-Affirmation Surgery Conclusion Lacks Evidence. *American Journal of Psychiatry*. 2020. 177:765.

Varkey B. Principles of Clinical Ethics and Their Application to Practice. *Medical Principles and Practice*. 2021. 30: 17-28.

World Professional Association for Transgender Health. *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*. 2012.

Zhao JJ, Marchaim D, Palla MB, Bogan CW, Hayakawa K, Tansek R, Moshos J, Muthusamy A, Kotra H, Lephart PR, Wilson AN, Kaye KS. Surgical Site Infections in Genital Reconstruction Surgery for Gender Reassignment, Detroit: 1984-2008. *Surgical Infections*. 2014. 15(2).

Zucker K.  Debate: Different strokes for different folks. *Child and Adolescent Mental Health*. 2019. doi.org/10.1111/camh.12330.

## Attachments

**Attachment A:** Secretary for the Florida Agency for Health Care Administration's Letter to Deputy Secretary Thomas Wallace. 20 April 2022.

**Attachment B:** Complete text of Rule 59G-1.035, F.A.C.

**Attachment C:** Romina Brignardello-Petersen, DDS, MSc, PhD and Wojtek Wiercioch, MSc, PhD: *Effects of Gender Affirming Therapies in People with Gender Dysphoria: Evaluation of the Best Available Evidence*. 16 May 2022.

**Attachment D:** James Cantor, PhD: *Science of Gender Dysphoria and Transsexualism*. 17 May 2022.

**Attachment E:** Quentin Van Meter, MD: *Concerns about Affirmation of an Incongruent Gender in a Child or Adolescent*. 17 May 2022.

**Attachment F:** Patrick Lappert, MD: *Surgical Procedures and Gender Dysphoria*. 17 May 2022.

**Attachment G:** G. Kevin Donovan, MD: *Medical Experimentation without Informed Consent: An Ethicist's View of Transgender Treatment for Children*. 16 May 2022.

App_0063

# ATTACHMENT A



RON DESANTIS
GOVERNOR

SIMONE MARSTILLER
SECRETARY

April 20, 2022

Tom Wallace
Deputy Secretary for Medicaid
Agency for Health Care Administration
2727 Mahan Drive
Tallahassee, FL  32308

Dear Deputy Secretary Wallace:

On April 20, 2022, the Florida Department of Health released guidance on the treatment of gender dysphoria for children and adolescents.[1]  The Florida Medicaid program does not have a policy on whether to cover such treatments for Medicaid recipients diagnosed with gender dysphoria.  Please determine, under the process described in Florida Administrative Code Rule 59G-1035, whether such treatments are consistent with generally accepted professional medical standards and not experimental or investigational.  Pursuant to Rule 59G-1035(5), I look forward to receiving your final determination.

Sincerely,

Simone Marstiller
Secretary

---

[1] *See* https://www.floridahealth.gov/newsroom/2022/04/20220420-gender-dysphoria-press-release.pr.html (last visited Apr. 20, 2022).

2727 Mahan Drive • Mail Stop #
Tallahassee, FL  32308
AHCA.MyFlorida.com

Facebook.com/AHCAFlorida
Twitter.com/AHCA_FL

App_0065

# ATTACHMENT B

**59G-1.035 Determining Generally Accepted Professional Medical Standards.**

(1) Definitions.

(a) Generally accepted professional medical standards – Standards based on reliable scientific evidence published in peer-reviewed scientific literature generally recognized by the relevant medical community or practitioner specialty associations' recommendations.

(b) Health service(s) – Diagnostic tests, therapeutic procedures, or medical devices or technologies.

(c) Relevant – Having a significant and demonstrable bearing on the matter at hand.

(2) Pursuant to the criteria set forth in subparagraph 59G-1.010(166)(a)3., Florida Administrative Code (F.A.C.), the Agency for Health Care Administration (hereafter referred to as Agency) will determine when health services are consistent with generally accepted professional medical standards and are not experimental or investigational.

(3) Health services that are covered under the Florida Medicaid program are described in the respective coverage and limitations handbooks, policies, and fee schedules, which are incorporated by reference in the F.A.C. The public may request a health service be considered for coverage under the Florida Medicaid program by submitting a written request via e-mail to HealthServiceResearch@ahca.myflorida.com. The request must include the name, a brief description, and any additional information that supports coverage of the health service, including sources of reliable evidence as defined in paragraph 59G-1.010(84)(b), F.A.C.

(4) To determine whether the health service is consistent with generally accepted medical standards, the Agency shall consider the following factors:

(a) Evidence-based clinical practice guidelines.

(b) Published reports and articles in the authoritative medical and scientific literature related to the health service (published in peer-reviewed scientific literature generally recognized by the relevant medical community or practitioner specialty associations).

(c) Effectiveness of the health service in improving the individual's prognosis or health outcomes.

(d) Utilization trends.

(e) Coverage policies by other creditable insurance payor sources.

(f) Recommendations or assessments by clinical or technical experts on the subject or field.

(5) Based upon the information collected, a report with recommendations will be submitted to the Deputy Secretary for Medicaid (or designee) for review. The Deputy Secretary for Medicaid (or designee) will make a final determination as to whether the health service is consistent with generally accepted professional medical standards and not experimental or investigational.

(6) In order for the health service to be covered under the Florida Medicaid program, it must also meet all other medical necessity criteria as defined in subsection 59G-1.010(166), F.A.C., and funded through the General Appropriations Act or Chapter 216, F.S.

*Rulemaking Authority 409.919 FS. Law Implemented 409.902, 409.906, 409.912, 409.913 FS. History–New 2-26-14, Amended 9-28-15.*

# ATTACHMENT C

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Main report; May 16, 2022

**Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence**

Romina Brignardello-Petersen, DDS, MSc, PhD

Wojtek Wiercioch, MSc, PhD

### 1. Introduction

We prepared this report to fulfill a request from the Florida Agency for Health Care Administration. This report contains three documents: 1. Main document (this document) summarizing the methodology used and the findings, 2. Methods document, which provides a detailed description of the systematic methodology used to find, prioritize, appraise, and synthesize the evidence, and 3. Results document, which describes the evidence available, the estimates of the effects of gender affirming therapies, and the certainty (also known as quality) of the evidence.

This document is organized in four parts. First, we describe the credentials and expertise of the health research methodologists conducting this evidence evaluation. Second, we summarize the methodology used. Third, we summarize the main findings. Finally, we briefly discuss strengths and limitations of our process and of the evidence.

### 2. Credentials and expertise

Two experts in health research methodology, who specialize in evidence synthesis to support decision making, prepared this report. Their relevant credentials and expertise are described below.

**Dr. Romina Brignardello-Petersen**: Assistant Professor at the Department of Health Research Methods, Evidence, and Impact, at McMaster University. Dr. Brignardello-Petersen obtained a DDS degree (University of Chile) in 2007, an MSc degree in Clinical Epidemiology and Health Care Research (University of Toronto) in 2012, and MSc in Biostatistics (University of Chile) in 2015, and a PhD in Clinical Epidemiology and Health Care Research (University of Toronto) in 2016. Dr. Brignardello-Petersen has worked in evidence synthesis projects since 2010, and her research has focused on the methodology for the development of Systematic Reviews and Clinical Practice Guidelines since 2012. Through January 2022, she has published 122 peer reviewed scientific articles (24 as a first author and 9 as a senior author). Dr. Brignardello-Petersen has acted as a research methodologist for several groups and organizations, including the World Health Organization, the Pan-American Health Organization, the American Society of Hematologists, the American College of Rheumatology, and the Society for Evidence Based Gender Medicine, among others. Her research program has been awarded over $2M CAD from the Canadian Institutes for Health Research. Dr. Brignardello-Petersen has no lived experience as a person or family member of a person with gender dysphoria, and her research interests are not in this area.

**Dr. Wojtek Wiercioch**: Postdoctoral Research Fellow at the Department of Health Research Methods, Evidence, and Impact, at McMaster University. Dr. Wiercioch obtained an MSc degree (2014, McMaster University) and a PhD degree (2020, McMaster University) in Health Research Methodology. Dr. Wiercioch has worked in evidence syntheses projects since 2011, and his research focuses on evidence synthesis, guideline development methodology, and the guideline development process. Through April

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Main report; May 16, 2022

2022, he has published 86 peer-reviewed scientific articles. Dr. Wiercioch has acted as a guideline methodologist for several groups and organizations, including the World Health Organization, the American Society of Hematologists, the Endocrine Society (of America), and the American Association for Thoracic Surgeons, among others. Dr. Wiercioch has no lived experience as a person or family member of a person with gender dysphoria, and his research interests are not in this area.

### 3. Methods

We conducted an overview of systematic reviews. We used a reproducible approach to search, select, prioritize, appraise, and synthesize the available evidence, following high methodological standards. We describe full details of the methodology in an accompanying document.

In brief, we searched for systematic reviews published in English language in Epistemonikos, OVID Medline, and grey literature sources, through April 30, 2022. We selected systematic reviews which included studies on young individuals with a diagnosis of gender dysphoria, who received puberty blockers, cross-sex hormones, or surgeries; and in which authors reported data regarding outcomes important to patients: gender dysphoria, depression, anxiety, quality of life, suicidal ideation, suicide, adverse effects, and complications. Systematic reviews could have included any type of primary study design.

The two reviewers screened all titles and abstracts, followed by full text of potentially relevant systematic reviews. We then prioritized the most useful systematic review providing evidence for each of the outcomes, using pre-established criteria that considered date of publication, applicability, availability of outcome data, methodological quality of the systematic review, and usefulness of the data synthesis conducted in the systematic review (see methods document for details).

After abstracting data from the systematic reviews, we synthesized the best available evidence for each of the outcomes, and assessed the certainty (also known as quality) of the evidence using the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) approach. We conducted GRADE assessments using the information provided by the systematic review authors (risk of bias of primary studies, characteristics of included studies, results reported by the studies). We present the all the information about outcomes in GRADE summary of findings tables.

In addition, to evaluate the robustness of our conclusions, we systematically searched for and evaluated primary studies answering the questions of interest published after the authors of the included systematic reviews conducted their searches.

### 4. Results

We included 61 systematic reviews, from which 3 addressed the effects of puberty blockers, 22 addressed the effects of cross-sex hormones, 30 addressed the effects of surgeries, and 6 addressed the effects of more than one of these interventions. After our prioritization exercise, we included information from 2 systematic reviews on puberty blockers, 4 on cross-sex hormones, and 8 on surgeries.

**4.1 Puberty blockers**

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Main report; May 16, 2022

For most outcomes (except suicidality), there is no evidence about the effect of puberty blockers compared to not using puberty blockers. In other words, no studies compared the outcomes between a group of people with gender dysphoria using puberty blockers and another group of people with gender dysphoria not using them. Therefore, it is unknown whether people with gender dysphoria who use puberty blockers experience more improvement in gender dysphoria, depression, anxiety, and quality of life than those with gender dysphoria who do not use them. There is very low certainty about the effects of puberty blockers on suicidal ideation.

The studies included in the systematic review reported outcomes among a group of people with gender dysphoria after receiving puberty blockers. Low certainty evidence suggests that after treatment with puberty blockers, people with gender dysphoria experience a slight increase in gender dysphoria, and an improvement in depression, and anxiety. Low certainty evidence also suggests that a moderate percentage of patients experience adverse effects. The findings must be interpreted considering that these studies did not have a comparison group, and that it is unknown if people with gender dysphoria that do not use puberty blockers experience similar or different outcomes.

**4.2 Cross sex hormones**
For almost all outcomes (except breast cancer) there is no evidence about the effect of cross sex hormones compared to not using cross sex hormones. In other words, no studies compared the outcomes between a group of people with gender dysphoria using cross sex hormones and another group of people with gender dysphoria not using them. Therefore, it is unknown whether people with gender dysphoria who use cross-sex hormones experience more improvement in gender dysphoria, depression, anxiety, quality of life, and suicidality than those with gender dysphoria who do not use cross-sex hormones. There is low certainty evidence suggesting that cross-sex hormones may not increase the risk of breast cancer.

The studies included in the systematic reviews reported changes in the outcomes among a group of patients with gender dysphoria after the use of cross-sex hormones. Low certainty evidence suggests that after treatment with cross-sex hormones, people with gender dysphoria experience an improvement in gender dysphoria, depression, anxiety, and suicidality. There is very low certainty evidence about the changes in quality of life. There is moderate certainty evidence suggesting a low prevalence of venous thromboembolism after treatment with cross-sex hormones. The findings must be interpreted considering that these studies did not have a comparison group, and that it is unknown if people with gender dysphoria that do not use cross-sex hormones experience similar or different outcomes.

**4.3 Surgeries**
There were no systematic reviews and studies reporting on gender dysphoria, depression, anxiety, and suicidality. Therefore, the effects of surgeries on these outcomes (when compared to a group of patients with gender dysphoria who do not undergo surgery), or the changes in these outcomes (improvements or deterioration) among patients who undergo any gender-affirming surgery is unknown. Because of the lack of comparative studies, it is also unknown whether people with gender dysphoria who undergo surgeries experience more improvement in quality of life or less regret than those with gender dysphoria who do not undergo any surgeries. There is low certainty evidence suggesting that a low percentage of participants experience regret, and very low certainty evidence about changes in quality of life after surgery.

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Main report; May 16, 2022

In assigned females at birth, low certainty evidence suggests that a high percentage of people are satisfied after chest surgery. There is very low certainty evidence, however, about satisfaction after bottom surgery, and about complications after both chest and bottom surgery. In assigned males at birth, low certainty evidence suggests a high percentage of people satisfied and a low percentage of people experiencing regret after vaginoplasty. There is very low certainty, however, about satisfaction with chest surgery and complications and reoperations after bottom surgery.

### 4.4 Evidence published after the systematic reviews selected
We found 10 relevant studies that were published after the systematic reviews were conducted. This evidence was not sufficient to importantly change the conclusions previously made.


## 5. Ā Discussion

### 5.1 Summary of the evidence
In this report, we systematically summarized the best available evidence regarding the effects of puberty blockers, cross-sex hormones, and surgeries in young people with gender dysphoria. We did not find evidence about the effect of these interventions on outcomes important to patients when compared to not receiving the intervention. We found low and very low certainty evidence suggesting improvements in gender dysphoria, depression, anxiety, and quality of life, as well as low rates of adverse events, after treatment with puberty blockers and cross-sex hormones.

### 5.2 Completeness and applicability
There are several gaps in the evidence regarding the effects of puberty blockers, cross-sex hormones, and surgeries in patients with gender dysphoria. Although we found some evidence for all the outcomes of interest, the evidence is suboptimal: several limitations included the lack of studies with a comparison group, and the risk of bias and imprecision, resulting in low or very low certainty evidence for all outcomes.

The applicability of the evidence may also be limited. Although we only rated down for indirectness when it was considered a serious problem (i.e., in evidence about the effects of surgeries, which was collected from people who were importantly older than the target population in this report), there are also potential applicability issues to consider in the evidence regarding the effects of puberty blockers and cross-sex hormones. It is not clear to what extent the people included in the studies were similar enough to the people seeking these treatment options today. For example, some of the included studies were conducted in people who had a diagnosis of gender dysphoria confirmed with strict criteria, as well as a supportive environment. It is important to take into account to what extent this may compromise the applicability of the results to people who are not in the same situation.

### 5.3 Strengths and limitations of the process for developing this report
We followed a reproducible process for developing this report. We used the highest methodological standards and the approach to evidence synthesis we generally use when supporting organizations in the development of their guidelines. This approach is based on prioritizing the sources of evidence most likely to be informative (i.e., to identify and use the evidence with the highest certainty level).

To follow the principles for evidence-based decision making, which require using the best available evidence to inform decisions, we summarized the best available evidence. Because knowing the best

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Main report; May 16, 2022

available evidence necessitates being aware of all the available evidence, we based this report on systematic reviews of the literature. We chose the most trustworthy and relevant systematic reviews among many published reviews.

One potential limitation of the process is that, due to feasibility concerns, we relied on the information reported by the systematic reviewers. Most of the systematic reviews we used, unfortunately, were judged at moderate or low methodological quality, which may raise concerns about the trustworthiness of the evidence presented in this report. We believe, however, that the results and conclusions of this report would not be importantly different had the systematic reviews been conducted following higher methodological standards. Because there are no randomized controlled trials, well-conducted comparative observational studies, or very large case series (which include a large sample of consecutive patients who are representative of the whole population) addressing the effects of puberty blockers, cross-sex hormones, and surgeries; the certainty of the evidence about the effects of these interventions is likely to continue being low or very low, even if a few more studies are included (as observed after searching for primary studies published after the reviews were conducted) or some data points were reported inaccurately in the systematic reviews.

Also due to feasibility concerns, the scope of this report was limited to outcomes that are important to patients. Although some may question the decision of not including surrogate outcomes for which there is evidence available (e.g. bone density, blood pressure), decision makers should rarely consider these outcomes and should instead focus on outcomes that do matter to people and stakeholders (e.g., fractures, cardiovascular events).

## 5.4 Implications
The evidence evaluating the effects of puberty blockers, cross-sex hormones, and surgeries in people with gender dysphoria has important limitations. Therefore, decisions regarding their use should carefully consider other relevant factors. At a patient level, these factors include patients' values and preferences (how patients trade off the potential benefit and harms - what outcomes are more important to them), and resources needed to provide the interventions (and the availability of such resources). At a population level, in addition to these factors, it would be important to consider resources needed to implement the interventions, feasibility, acceptability by relevant stakeholders, and equity.

It is important to note that when there is low or very low certainty evidence, it is rarely appropriate to make decisions that will be applied to the majority of the patients (equivalent to strong recommendations). This implies, at the patient level, that shared decision making is a key part of the decision-making process. At a policy level, extensive debate may be needed.

## 6. Conclusions

Due to the important limitations in the body of evidence, there is great uncertainty about the effects of puberty blockers, cross-sex hormones, and surgeries in young people with gender dysphoria. This evidence alone is not sufficient to support whether using or not using these treatments. We encourage decision makers to be explicit and transparent about which factors play an important role in their decision, and how they are weighed and traded off.

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Methods; May 16, 2022

## Methods

To ensure completeness and feasibility of the evidence review, we used an approach in which we prioritized the types of studies according to the design that was more likely to provide the best available evidence. First, we searched for systematic reviews of the literature. Second, we appraised all existing systematic reviews to select the most trustworthy (highest methodological quality, most up-to-date, most applicable) from which to draw conclusions. Third, we used the information presented in the systematic reviews to abstract information regarding the effects of the interventions of interest. Fourth, we assessed the certainty of the evidence (also known as quality of the evidence) abstracted from the selected systematic reviews. We planned to search for primary studies if systematic reviews were not found.

**Information sources:** We searched for existing systematic reviews in:

1. Epistemonikos (https://www.epistemonikos.org), an electronic database that focuses on systematic reviews. We used a comprehensive search strategy based on the population, using the terms "gender dysphoria", "gender identity disorder" and "transgender". We conducted this search on April 23, 2022.
2. OVID Medline. We used a search strategy based on the population and the interventions of interest, as well as an adaptation of a filter for systematic reviews from the Health Information Research Unit at McMaster University.  We conducted this search on April 23, 2022.
3. Grey literature: we conducted a manual search in the websites of specific health agencies: National Institutes for Health and Care Excellence (NICE), Agency for Healthcare Research and Quality (AHRQ), Canada's Drug and Health Technology Agency (CADTH), and the website from the Society for Evidence-Based Gender Medicine (SEGM). We conducted these searches between April 27-30, 2022.

We used no date limits for the searches, but we did limit to systematic reviews published in English. Search strategies are available in Appendix 1.

**Eligibility criteria:** We included systematic reviews, which we defined as:

1. Reviews in which the authors searched for studies to include in at least one electronic database, and in which there were eligibility criteria for including studies and a methodology for assessing and synthesizing the evidence, or
2. Reviews in which the authors searched for studies to include in at least one electronic database, and although there was no description of eligibility criteria or methodology, the presentation of the results strongly suggested that the authors used systematic methods (e.g. flow chart depicting study selection, tables with the same information from all included studies, synthesis of data at the outcome level).

We screened systematic reviews using the following criteria for inclusion:

App_0074

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Methods; May 16, 2022

o  **Type of participants:** Young individuals (< 25 years old) with a diagnosis of gender dysphoria/gender identity disorder. We included reviews in which authors used any label and diagnostic criteria for this condition. We included reviews in which the participants in the reported studies were older if it was the only evidence available for a specific question. We excluded reviews with mixed populations (i.e. with and without gender dysphoria) in which people without gender dysphoria constituted more than 20% of the total sample.

o  **Type of Interventions:** Puberty blockers, cross-sex hormones, gender affirming surgeries. We included any type of puberty blockers and cross-sex hormones, provided with any regimen. We included the following surgeries: phalloplasty, vaginoplasty, and chest surgery (mastectomy or breast implants/augmentation). We only included these when they were performed for the first time (i.e., not revision surgeries).

o  **Type of comparison:** When the systematic reviews included comparative studies, the comparator of interest was no intervention. Participants could have received psychotherapy or counselling as a cointervention (in both groups).

o  **Type of outcomes:** Gender dysphoria, mental health outcomes (depression and anxiety), quality of life, suicidal ideation, suicide, adverse effects (for puberty blockers and cross-sex hormones only), and satisfaction, complications, reoperation, and regret (for surgeries only). We included any length of follow-up. We excluded surrogate outcomes such as blood pressure, bone mineral density, kidney or liver function test values, etc.

o  **Type of studies included in the systematic reviews:** Any clinical study (studies in which the researchers recruited and measured outcomes in humans) regardless of study design. This included randomized clinical trials, comparative observational studies, and case series. Because we could not quantify effect measures, incidence, or prevalence, we excluded case reports.

We excluded systematic reviews published only in abstract format, and those that we could not retrieve in full text (no access through the McMaster University library, or open access online).

**Selection process:** The two reviewers screened all titles and abstracts independently and in duplicate, followed by screening of full texts of potentially eligible systematic reviews independently and in duplicate, using the systematic review online application Covidence (https://www.covidence.org). We solved disagreements by consensus.

To select the most useful systematic reviews among all of those that met the eligibility criteria, we used the following prioritization criteria:

1. Date of publication: we prioritized systematic reviews published within the last 3 years (2020-2022)

App_0075

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Methods; May 16, 2022

2. Match between eligibility criteria of the review and the question of interest: we prioritized reviews in which the authors specifically included the population, intervention, comparison, and outcomes of interest for this evidence review

3. Outcome data available: we prioritized systematic reviews in which the authors report outcome data

4. Methodological quality: we used a modified version of the items in AMSTAR 2.[1] We modified the items to ensure assessment of methodological rather than reporting quality (Table 1). We rated each systematic review as having high, moderate, low, or critically low methodological quality, according to the guidance from the developers of the tool.[1] We reached consensus on critical items that determined this rating (Table 1). We prioritized selection of systematic reviews with highest methodological quality.

For surgical interventions, in addition, we prioritized systematic reviews that covered all gender affirming surgeries (instead of focusing on a specific type of surgery).

We selected a systematic review specifically for each of the outcomes of interest. In other words, we chose the best systematic review to inform each outcome. Each systematic review, however, could inform more than one outcome.

**Table 1: Items used to rate the methodological quality of the eligible systematic reviews**

| AMSTAR Item | Modification to measure methodological quality |
|---|---|
| 1. Did the research questions and inclusion criteria for the review include the components of PICO? | Does the authors have a clear question and are the eligibility criteria for studies consistent with the question? |
| 2. Did the report of the review contain an explicit statement that the review methods were established prior to the conduct of the review and did the report justify any significant deviations from the protocol? | No modification needed |
| 3. Did the review authors explain their selection of the study designs for inclusion in the review? | No modification needed |
| 4. Did the review authors use a comprehensive literature search strategy? | Did the authors search in at least 2 electronic databases, using a reproducible search strategy? |
| 5. Did the review authors perform study selection in duplicate? | No modification needed |
| 6. Did the review authors perform data extraction in duplicate? | No modification needed |
| 7. Did the review authors provide a list of excluded studies and justify the exclusions? | No modification needed |
| 8. Did the review authors describe the included studies in adequate detail? | No modification needed |
| 9. Did the review authors use a satisfactory technique for assessing the risk of bias (RoB) in individual studies that were included in the review? | No modification needed |

3

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Methods; May 16, 2022

| | |
|---|---|
| 10. Did the review authors report on the sources of funding for the studies included in the review? | Did the review authors consider conflicts of interest and how they may have affected the results of the primary studies? |
| 11. If meta-analysis was performed, did the review authors use appropriate methods for statistical combination of results? | Was the synthesis of evidence done appropriately? (outcome level, appropriate meta analysis or narrative synthesis) |
| 12. If meta-analysis was performed, did the review authors assess the potential impact of RoB in individual studies on the results of the meta-analysis or other evidence synthesis? | Did authors use subgroup or sensitivity analysis to assess the effect of risk of bias in meta-analytic results? Likely not applicable to most cases |
| 13. Did the review authors account for RoB in primary studies when interpreting/discussing the results of the review? | Did the review authors incorporate an assessment of risk of bias at the outcome level when drawing conclusions? |
| 14. Did the review authors provide a satisfactory explanation for, and discussion of, any heterogeneity observed in the results of the review? | Did the review authors incorporate an assessment of heterogeneity at the outcome level when drawing conclusions? |
| 15. If they performed quantitative synthesis did the review authors carry out an adequate investigation of publication bias (small study bias) and discuss its likely impact on the results of the review? | Did the authors address publication bias? (regardless of whether synthesis was using a meta-analysis or narrative) |
| 16. Did the review authors report any potential sources of conflict of interest, including any funding they received for conducting the review? | Did the authors report conflicts of interest and did they manage any existing conflict of interest appropriately? |

Shaded items were items considered critical.

**Data abstraction:** We abstracted outcome data from each of the systematic reviews. To ensure feasibility, we used the data as reported by the authors of the review and did not re-abstract data from the primary studies. One reviewer abstracted the data and a second reviewer checked the data for accuracy.

**Data synthesis:** Using the systematic reviews prioritized, we synthesized the evidence at the outcome level. Because of the higher likelihood of it resulting in higher certainty of evidence (details below) for each outcome, when there was comparative data (i.e. comparison of outcomes between an untreated and a treated group) and non-comparative data (i.e. changes from before to after treatment in one group, or only outcomes after treatment), we prioritized comparative data.

We prioritized numerical results (i.e. magnitudes of effect) and reported estimates and their 95% confidence intervals (CIs). When results were not reported in that way, we calculated the estimates and CIs when systematic review authors provided sufficient information. When necessary, we assumed moderate correlation coefficients for the changes between baseline and follow up (coefficient= 0.4). When this information was not available we reported narratively the effect estimates and ranges.

When a specific study reported the same outcome measured by more than one scale, we chose the scale presented first. We highlighted situations when the results obtained with other scales were importantly different.

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Methods; May 16, 2022

When the same outcome was reported by more than one study but we could not pool the results, we created narrative syntheses.

**Certainty of evidence:** For each outcome, we assessed the certainty of the evidence (also known as quality of the evidence) using the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) approach.[2] The certainty of evidence can be rated as high, moderate, low, or very low (Table 2). For effects of interventions, the certainty of the evidence started as high and could be rated down due to serious concerns about risk of bias, inconsistency, indirectness, imprecision, and publication bias. For inferences about the effect of using a treatment versus no treatment, when there was no comparison group, we assessed risk of bias as very serious and rated down the certainty of the evidence 2 levels by default. We used the same principles when assessing the certainty of the evidence in estimates of prevalence or rates, but did not judge risk of bias as resulting in very serious concerns due to lack of a comparison group. For all assessments, we used the information presented by the authors of the systematic review (e.g. assessments of risk of bias of the included studies, effect estimates from studies).

**Table 2: GRADE levels of certainty of the evidence**

| Certainty level | Definition |
| --- | --- |
| High<br>⊕⊕⊕⊕ | We are very confident that the true result (effect estimate/ prevalence/ mean, etc.) lies close to that of the estimate of the result |
| Moderate<br>⊕⊕⊕◯ | We are moderately confident in the result: the true result is likely to be close to the estimate of the result, bur there is a possibility that it is substantially different |
| Low<br>⊕⊕◯◯ | Our confidence in the result is limited: the true result may be substantially different from the estimate of the result |
| Very low<br>⊕◯◯◯ | We have very little confidence in the result: the true result is likely to be substantially different from the estimate of the result |

**Presentation of results:** We created GRADE Summary of Findings tables in which we describe the evidence available for each of the outcomes, and the certainty of the evidence. These tables contain the following information:

- Ã Outcomes: measurement method (including scales, if applicable) and follow-up
- Ã Estimates of effect: absolute and relative estimates of effect, and their corresponding 95% CIs.
- Ã Number of studies and participants providing evidence for the outcome
- Ã GRADE certainty of the evidence, with a link to detailed explanations (provided at the bottom of the table) of why the certainty of the evidence was rated at a specific level
- Ã A narrative statement about what happens with the outcome, based on the estimate of effect and certainty of evidence.

App_0078

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Methods; May 16, 2022

**Searching for new evidence not included in the systematic reviews:** To assess if newer evidence not included in the included systematic reviews would change the conclusions importantly, we searched for and assessed primary studies answering the questions of interest that were published after the authors of such systematic reviews conducted their searches. We defined an important change in conclusions as a change in the certainty of the evidence (from low/ very low/ not available to high/ moderate).

We searched OVID Medline from January 1, 2019 through May 12, 2022, for studies published in English. We included studies if they enrolled young individuals (< 25 years old, with at least 20% of the people being this age) with a diagnosis of gender dysphoria/gender identity disorder, who received puberty blockers, cross-sex hormones, or surgeries; and measured any of the outcomes of interest.

For outcomes that should be evaluated in a comparative manner (e.g., depression, anxiety, etc.), because they are the only type of study design that would change the conclusions importantly, we selected comparative clinical studies (studies in which the researchers recruited and measured outcomes in humans, and compared a group of people who received the intervention with another one who did not receive the intervention). This included randomized clinical trials, and comparative observational studies. For outcomes that can only occur when the treatment is administered, we included non-comparative observational studies (case series). For these to change conclusions, they should have a sufficiently large sample size, and therefore we excluded case series in which the researchers reported information from <100 people.

Two reviewers screened the potentially relevant articles at title and abstract and full text screening stage. We abstracted relevant study characteristics and outcome data, and assessed risk of bias of comparative studies using the most relevant domains of the Risk of Bias for non-Randomized studies of Interventions (ROBINS-I) tool[3] (table 3). For non-comparative studies, we used a list of custom items that captured the most important potential risk of bias concerns of case series (table 4). We judged the risk of bias of each study as the highest risk of bias of any of the domains assessed (e.g., one domain judged at critical risk of bias resulted in the study judged at critical risk of bias). We summarized this information at the study and judged whether it would have changed the conclusions importantly if added to the body of evidence from the systematic reviews.

**Table 3: Domains used to assess risk of bias of comparative studies**

| Domain | Low | Critical |
|---|---|---|
| Confounding | Adjusted for all relevant confounding factors | No adjustment |
| Classification of intervention | Intervention recorded prospectively or from medical records | Asked patients to recall whether they received the intervention |
| Deviation from intended interventions | No cointerventions or cointerventions balanced between the groups | Cointerventions unbalanced between the groups |

App_0079

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Methods; May 16, 2022

| Missing data | More than 90% of patients who started the study provided outcome data | Less thank 50% of patients who started the study provided outcome data |
|---|---|---|
| Measurement of outcome | All outcomes measured in the same way in both groups | Outcomes measured differently in both groups |

Each domain could be judged at low, moderate, serious, or critical risk of bias. In addition, information could be insufficient to make a judgment. The table describes the criteria used to judge a domain in the extreme categories.

**Table 4: Domains used to assess risk of bias of non- comparative studies**

| Domain | Low | High |
|---|---|---|
| **Representativeness of the sample** | Included all consecutive patients | Highly selected sample based on specific characteristics related with the prognosis after treatment |
| **Classification of the intervention** | Intervention recorded prospectively or from medical records | Asked patients to recall whether they received the intervention |
| **Deviation from intended interventions** | No cointerventions outside what would be observed in practice (or in a small proportion of patients) | Most patients received co interventions that could influence the outcomes |
| **Missing data** | More than 90% of patients who started the study provided outcome data | Less thank 50% of patients who started the study provided outcome data |
| **Measurement of outcome** | Outcomes measured prospectively or from medical records | Outcomes reported by the patients and/ or needed to recall what happened a long time ago |

Each domain could be judged at low, moderate, or high risk of bias. In addition, information could be insufficient to make a judgment. The table describes the criteria used to judge a domain in the extreme categories.

## References

1. Shea BJ, Reeves BC, Wells G, et al. AMSTAR 2: a critical appraisal tool for systematic reviews that include randomised or non-randomised studies of healthcare interventions, or both. *Bmj* 2017;358:j4008. doi: 10.1136/bmj.j4008 [published Online First: 2017/09/25]
2. Blashem H, Helfand M, Schunemann HJ, et al. GRADE guidelines: 3. Rating the quality of the evidence. *Journal of clinical epidemiology* 2011;64:401-06.
3. Sterne JA, Hernan MA, Reeves BC, et al. ROBINS-I: a tool for assessing risk of bias in non-randomised studies of interventions. *BMJ (Clinical research ed)* 2016;355:i4919. doi: 10.1136/bmj.i4919 [published Online First: 2016/10/14]

App_0080

Search Strategies

**Questions Covered:**

PICO questions:

1. Ā For children, adolescents, and young adults (<21) with gender dysphoria, what are the effects of treatment with **puberty blockers (gonadotrophin releasing hormone (GnRH) analogues)** compared to no puberty blockers?

2. Ā For children, adolescents, and young adults (<21) with gender dysphoria, what are the effects of treatment with **cross-sex hormones** compared to no cross-sex hormones?

3. Ā For children, adolescents, and young adults (<21) with gender dysphoria, what are the effects of **gender-affirming surgeries** compared to no surgery?

**Search Strategies:**

Note: Population, puberty blocker, cross-sex hormones search blocks adapted from NICE (2020) evidence reviews. Gender-affirming search block adapted from Wernick *et al.* 2019. Systematic reviews filter adapted from McMaster University Health Information Research Unit (HIRU).

Databases: Medline, Epistemonikos
Grey Literature: CADTH, AHRQ, SEGM, NICE

*Medline*

| OVERVIEW | |
| --- | --- |
| Interface: | Ovid |
| Databases: | OVID Medline Epub Ahead of Print, In-Process & Other Non-Indexed Citations, Ovid MEDLINE(R) Daily and Ovid MEDLINE(R) 1946 to Present |
| Study Types: | Systematic Reviews |
| Search Run: | April 23, 2022 |
| **Search Strategy: search terms [number of results]** | |

*Population*

| | | |
| --- | --- | --- |
| 1 | exp "Sexual and Gender Minorities"/ | 12385 |
| 2 | Gender Dysphoria/ | 774 |
| 3 | Gender Identity/ | 20481 |
| 4 | Gender Role/ | 197 |
| 5 | "Sexual and Gender Disorders"/ | 81 |
| 6 | Transsexualism/ | 4236 |
| 7 | Transgender Persons/ | 5303 |
| 8 | Health Services for Transgender Persons/ | 186 |

9    exp Sex Reassignment Procedures/      1208
10   gender identity disorder.mp.     492
11   non-binary.mp. 566
12   transgender.mp.      9989
13   (gender* adj3 (dysphori* or disorder* or distress or nonconform* or non-conform* or atypical or incongru* or identi* or disorder* or confus* or minorit* or queer* or variant or diverse or creative or explor* or question* or expan* or fluid)).tw.   16428
14   ((sex or gender*) adj3 (reassign* or chang* or transform* or transition* or expression*)).tw.   13749
15   (transgend* or transex* or transsex* or transfem* or transwom* or transma* or transmen* or transperson* or transpeopl*).tw.      19665
16   (genderfluid or genderqueer or agender).mp.    130
17   ((correct or chosen) adj3 name).mp.    591
18   (trans or crossgender* or cross-gender* or crossex* or cross-sex* or genderqueer*).tw.   135313
19   ((sex or gender*) adj3 (reassign* or chang* or transform* or transition* or expression*)).tw.   13749
20   (male-to-female or m2f or female-to-male or f2m).tw.   148579
21   or/1-20 342948

*Cross-Sex Hormones*

22   Hormones/ad, tu, th    4676
23   exp Progesterone/ad, tu, th     11265
24   exp Estrogens/ad, tu, th 29635
25   exp Gonadal Steroid Hormones/ad, tu, th     35375
26   (progesteron* or oestrogen* or estrogen*).tw.   223307
27   ((cross-sex or crossex or gender-affirm*) and (hormon* or steroid* or therap* or treatment* or prescri* or pharm* or medici* or drug* or intervention* or care)).tw.   1488
28   exp Estradiol/ad, tu, th   11197
29   exp Testosterone/ad, tu, th     8710
30   (testosteron* or sustanon* or tostran or testogel or testim or restandol or andriol or testocaps* or nebido or testavan).tw.   86509
31   (oestrad* or estrad* or evorel or ethinyloestrad* or ethinylestrad* or elleste or progynova or zumenon or bedol or femseven or nuvelle).tw.   100252
32   or/22-31    345895

*Puberty Blockers*

33   Gonadotropin-Releasing Hormone/      28809
34   (pubert* adj3 block*).ti,ab.    141
35   ((gonadotrophin or gonadotropin) and releasing).ti,ab.   20121
36   (GnRH adj2 analog*).ti,ab.    2878
37   GnRH*.ti,ab.   24390
38   "GnRH agonist*".ti,ab.   4749
39   Triptorelin Pamoate/    1981
40   triptorelin.ti,ab. 821
41   arvekap.ti,ab.   1

```
42   ("AY 25650" or AY25650).ti,ab.  1
43   ("BIM 21003" or BIM21003).ti,ab.      0
44   ("BN 52014" or BN52014).ti,ab.  0
45   ("CL 118532" or CL118532).ti,ab.      0
46   Debio.ti,ab.      119
47   diphereline.ti,ab.      28
48   moapar.ti,ab.   0
49   pamorelin.ti,ab. 1
50   trelstar.ti,ab.   3
51   triptodur.ti,ab. 1
52   ("WY 42422" or WY42422).ti,ab.      0
53   ("WY 42462" or WY42462).ti,ab.      0
54   gonapeptyl.ti,ab.      0
55   decapeptyl.ti,ab.      225
56   salvacyl.ti,ab.   0
57   Buserelin/      2137
58   buserelin.ti,ab. 1395
59   onist.ti,ab.      0
60   ("hoe 766" or hoe-766 or hoe766).ti,ab. 72
61   profact.ti,ab.   2
62   receptal.ti,ab.   31
63   suprecur.ti,ab. 5
64   suprefact.ti,ab. 25
65   tiloryth.ti,ab.   0
66   histrelin.ti,ab.   78
67   "LHRH-hydrogel implant".ti,ab. 1
68   ("RL 0903" or RL0903).ti,ab.      1
69   ("SPD 424" or SPD424).ti,ab.      1
70   goserelin.ti,ab. 1016
71   Goserelin/      1643
72   ("ici 118630" or ici118630).ti,ab.      51
73   ("ZD-9393" or ZD9393).ti,ab.      0
74   zoladex.ti,ab.   388
75   leuprorelin.ti,ab.      525
76   carcinil.ti,ab.   0
77   enanton*.ti,ab. 26
78   ginecrin.ti,ab.   0
79   leuplin.ti,ab.   15
80   Leuprolide/      3018
81   leuprolide.ti,ab. 2004
82   lucrin.ti,ab.   16
83   lupron.ti,ab.   183
84   provren.ti,ab.   0
85   procrin.ti,ab.   3
86   ("tap 144" or tap144).ti,ab.      41
87   (a-43818 or a43818).ti,ab.      3
88   Trenantone.ti,ab.      2
89   staladex.ti,ab.   0
```

90   prostap.ti,ab.   6
91   Nafarelin/        327
92   nafarelin.ti,ab.   263
93   ("76932-56-4" or "76932564").ti,ab.        0
94   ("76932-60-0" or "76932600").ti,ab.        0
95   ("86220-42-0" or "86220420").ti,ab.        0
96   ("rs 94991 298" or rs94991298).ti,ab.        0
97   synarel.ti,ab.   13
98   deslorelin.ti,ab. 306
99   gonadorelin.ti,ab.        237
100 ("33515-09-2" or "33515092").ti,ab.        0
101 ("51952-41-1" or "51952411").ti,ab.        0
102 ("52699-48-6" or "52699486").ti,ab.        0
103 cetrorelix.ti,ab.  520
104 cetrotide.ti,ab.  52
105 ("NS 75A" or NS75A).ti,ab.        0
106 ("NS 75B" or NS75B).ti,ab.        0
107 ("SB 075" or SB075).ti,ab.        1
108 ("SB 75" or SB75).ti,ab.  67
109 gonadoliberin.ti,ab.        151
110 kryptocur.ti,ab.  7
111 cetrorelix.ti,ab.  520
112 cetrotide.ti,ab.  52
113 antagon.ti,ab.   18
114 ganirelix.ti,ab.   160
115 ("ORG 37462" or ORG37462).ti,ab.        3
116 orgalutran.ti,ab.        26
117 ("RS 26306" or RS26306).ti,ab.   5
118 ("AY 24031" or AY24031).ti,ab.  0
119 factrel.ti,ab.   13
120 fertagyl.ti,ab.   12
121 lutrelef.ti,ab.   5
122 lutrepulse.ti,ab. 3
123 relefact.ti,ab.   10
124 fertiral.ti,ab.   0
125 (hoe471 or "hoe 471").ti,ab.        6
126 relisorm.ti,ab.   4
127 cystorelin.ti,ab. 19
128 dirigestran.ti,ab.        5
129 or/33-128        47108

*Gender-affirming Surgeries*

130 virilization/        2309
131 (virilism or virili?ation or masculini?ation).mp.   5657
132 feminization/    797
133 femini?ation.mp.        3420
134 (vaginoplasty or vaginoplasties).mp.        1022

135 exp Vagina/ or *Reconstructive Surgical Procedures/     78841
136 (vaginoplasty or vaginoplasties).mp.     1022
137 (phalloplasty or phalloplasties).mp.     561
138 exp Penile Prosthesis/   1636
139 "penile reconstruction".mp.     292
140 (vagina reconstruction or vaginal reconstruction).mp.     549
141 (genitoplasty or genitoplasties).mp.     263
142 transsexualism/su [Surgery]     1007
143 sex reassignment.mp.   1668
144 sex transformation.mp. 42
145 or/130-144     91560

*Systematic Review Filter*

147 meta-analysis/  158633
148 (meta anal* or meta-anal* or metaanal*).ti,ab.  231876
149 ((systematic or evidence) adj2 (review* or overview*)).ti,ab.   279806
150 ((pool* or combined) adj2 (data or trials or studies or results)).ab.     65411
151 (search strategy or search criteria or systematic search or study selection or data extraction).ab.     70886
152 (search* adj4 literature).ab.     84593
153 or/146-152     521554

*Combine Interventions and Population*

154 32 or 129 or 145     459771
155 21 and 154     17838

*Limit to Systematic Reviews in English Language*

156 153 and 155     295
157 limit 156 to english language     288

*Epistemonikos*

| OVERVIEW | |
| --- | --- |
| Interface: | https://www.epistemonikos.org/ |
| Database: | Epistemonikos |
| Study Types: | Systematic Reviews |
| Search Run: | April 23, 2022 |
| **Search Strategy: search terms [number of results]** | |

*Population*

(title:((title:(gender dysphoria) OR abstract:(gender dysphoria)) OR (title:(gender identity disorder) OR abstract:(gender identity disorder)) OR (title:(transgender) OR abstract:(transgender))) OR abstract:((title:(gender dysphoria) OR abstract:(gender dysphoria)) OR (title:(gender identity disorder) OR abstract:(gender identity disorder)) OR (title:(transgender) OR abstract:(transgender))))

*Limit to Systematic Reviews*

*Limited by publication type "systematic review" [425]

Canadian Agency for Drugs and Technologies in Health (CADTH)

| OVERVIEW | |
| --- | --- |
| Interface: | https://www.cadth.ca/ |
| Database: | CADTH |
| Study Types: | Systematic Reviews, Health Technology Reviews |
| Search Run: | April 27, 2022 |
| **Search Strategy: search terms [number of results]** | |

"gender dysphoria" [10]
*Limit to Health Technology Review* [2]

"transgender" [9]
*Limit to Health Technology Review* [5]

"gender identity disorder" [1]

Agency for Healthcare Research and Quality (AHRQ)

| OVERVIEW | |
| --- | --- |
| Interface: | https://search.ahrq.gov/ |
| Database: | AHRQ |
| Study Types: | Evidence Based Practice (EPC) Centre Reports, Full Research Reports, Health Technology Assessments |
| Search Run: | April 29, 2022 |
| **Search Strategy: search terms [number of results]** | |
| *Search titles only:* "gender identity disorder" "gender dysphoria" "transgender" [7] | |

Society for Evidence-based Gender Medicine (SEGM)

| OVERVIEW | |
| --- | --- |
| Interface: | https://segm.org/news |
| Database: | SEGM News |
| Study Types: | Systematic Reviews |
| Search Run: | April 30, 2022 |
| **Search Strategy: search terms [number of results]** | |
| *Find in page:* "systematic" [5] | |

National Institute for Health and Care Excellence (NICE)

| OVERVIEW | |
| --- | --- |
| Interface: | https://www.nice.org.uk/ |
| Database: | NICE |
| Study Types: | Systematic Reviews, Guidelines with Systematic Reviews |
| Search Run: | April 30, 2022 |
| **Search Strategy: search terms [number of results]** | |
| gender dysphoria [1]<br>*Limit to Guidance* [1]<br><br>transgender [10]<br>*Limit to Guidance* [7] | |

gender identity disorder [9]
*Limit to Guidance* [8]

**Search Strategies – Individual Studies**

**Questions Covered:**

PICO questions:

1. For children, adolescents, and young adults (<21) with gender dysphoria, what are the effects of treatment with **puberty blockers (gonadotrophin releasing hormone (GnRH) analogues)** compared to no puberty blockers?

2. For children, adolescents, and young adults (<21) with gender dysphoria, what are the effects of treatment with **cross-sex hormones** compared to no cross-sex hormones?

3. For children, adolescents, and young adults (<21) with gender dysphoria, what are the effects of **gender-affirming surgeries** compared to no surgery?

**Search Strategies:**

Note: Population, puberty blocker, cross-sex hormones search blocks adapted from NICE (2020) evidence reviews. Gender-affirming search block adapted from Wernick *et al.* 2019.

Databases: Medline

*Medline*

| OVERVIEW | |
|---|---|
| Interface: | Ovid |
| Databases: | OVID Medline Epub Ahead of Print, In-Process & Other Non-Indexed Citations, Ovid MEDLINE(R) Daily and Ovid MEDLINE(R) 1946 to Present |
| Study Types: | Any |
| Search Run: | May 12, 2022 |
| **Search Strategy: search terms [number of results]** | |
| *Population* | |

| | | |
|---|---|---|
| 1 | exp "Sexual and Gender Minorities"/ | 12631 |
| 2 | Gender Dysphoria/ | 781 |
| 3 | Gender Identity/ | 20586 |
| 4 | Gender Role/ | 204 |
| 5 | "Sexual and Gender Disorders"/ | 81 |
| 6 | Transsexualism/ | 4259 |
| 7 | Transgender Persons/ | 5371 |
| 8 | Health Services for Transgender Persons/ | 187 |
| 9 | exp Sex Reassignment Procedures/ | 1211 |
| 10 | gender identity disorder.mp. | 492 |

11   non-binary.mp. 574

12   transgender.mp.        10079

13   (gender* adj3 (dysphori* or disorder* or distress or nonconform* or non-conform* or atypical or incongru* or identi* or disorder* or confus* or minorit* or queer* or variant or diverse or creative or explor* or question* or expan* or fluid)).ti,ab. 16546

14   ((sex or gender*) adj3 (reassign* or chang* or transform* or transition*)).ti,ab.   9375

15   (transgend* or transex* or transsex* or transfem* or transwom* or transma* or transmen* or transperson* or transpeopl*).ti,ab.     19788

16   (genderfluid or genderqueer or agender).mp.     132

17   ((correct or chosen) adj3 name).mp.     591

18   (trans or crossgender* or cross-gender* or crossex* or cross-sex* or genderqueer*).ti,ab.     135744

19   (male-to-female or m2f or female-to-male or f2m).ti,ab. 149067

20   or/1-19 341083

*Cross-sex Hormones*

21   Hormones/ad, tu, th     4690

22   exp Progesterone/ad, tu, th        11270

23   exp Estrogens/ad, tu, th 29646

24   exp Gonadal Steroid Hormones/ad, tu, th        35401

25   (progesteron* or oestrogen* or estrogen*).ti,ab.        223689

26   ((cross-sex or crossex or gender-affirm*) and (hormon* or steroid* or therap* or treatment* or prescri* or pharm* or medici* or drug* or intervention* or care)).ti,ab.     1507

27   exp Estradiol/ad, tu, th 11200

28   exp Testosterone/ad, tu, th     8722

29   (testosteron* or sustanon* or tostran or testogel or testim or restandol or andriol or testocaps* or nebido or testavan).ti,ab.     86670

30   (oestrad* or estrad* or evorel or ethinyloestrad* or ethinylestrad* or elleste or progynova or zumenon or bedol or femseven or nuvelle).ti,ab.   100411

31   or/21-30        346508

*Puberty Blockers*

32   Gonadotropin-Releasing Hormone/        28845

33   (pubert* adj3 block*).ti,ab.     142

34   ((gonadotrophin or gonadotropin) and releasing).ti,ab.   20158

35   (GnRH adj2 analog*).ti,ab.     2879

36   GnRH*.ti,ab.   24437

37   "GnRH agonist*".ti,ab.   4763

38   Triptorelin Pamoate/     1983

39   triptorelin.ti,ab. 822

40   arvekap.ti,ab.   1

41   ("AY 25650" or AY25650).ti,ab.   1

42   ("BIM 21003" or BIM21003).ti,ab.        0

43   ("BN 52014" or BN52014).ti,ab. 0

44   ("CL 118532" or CL118532).ti,ab.        0

45  Debio.ti,ab.      119
46  diphereline.ti,ab.      28
47  moapar.ti,ab.     0
48  pamorelin.ti,ab. 1
49  trelstar.ti,ab.     3
50  triptodur.ti,ab.  1
51  ("WY 42422" or WY42422).ti,ab.       0
52  ("WY 42462" or WY42462).ti,ab.       0
53  gonapeptyl.ti,ab.        0
54  decapeptyl.ti,ab.        225
55  salvacyl.ti,ab.     0
56  Buserelin/      2137
57  buserelin.ti,ab. 1396
58  onist.ti,ab.     0
59  ("hoe 766" or hoe-766 or hoe766).ti,ab. 72
60  profact.ti,ab.     2
61  receptal.ti,ab.    31
62  suprecur.ti,ab.  5
63  suprefact.ti,ab. 25
64  tiloryth.ti,ab.    0
65  histrelin.ti,ab.   78
66  "LHRH-hydrogel implant".ti,ab.  1
67  ("RL 0903" or RL0903).ti,ab.       1
68  ("SPD 424" or SPD424).ti,ab.       1
69  goserelin.ti,ab.  1017
70  Goserelin/      1644
71  ("ici 118630" or ici118630).ti,ab.       51
72  ("ZD-9393" or ZD9393).ti,ab.     0
73  zoladex.ti,ab.    388
74  leuprorelin.ti,ab.        529
75  carcinil.ti,ab.    0
76  enanton*.ti,ab. 26
77  ginecrin.ti,ab.    0
78  leuplin.ti,ab.     15
79  Leuprolide/      3018
80  leuprolide.ti,ab. 2003
81  lucrin.ti,ab.      16
82  lupron.ti,ab.     183
83  provren.ti,ab.    0
84  procrin.ti,ab.     3
85  ("tap 144" or tap144).ti,ab.       41
86  (a-43818 or a43818).ti,ab.       3
87  Trenantone.ti,ab.        2
88  staladex.ti,ab.   0
89  prostap.ti,ab.    6
90  Nafarelin/      327
91  nafarelin.ti,ab.  263
92  ("76932-56-4" or "76932564").ti,ab.       0

```
93  ("76932-60-0" or "76932600").ti,ab.      0
94  ("86220-42-0" or "86220420").ti,ab.      0
95  ("rs 94991 298" or rs94991298).ti,ab.    0
96  synarel.ti,ab.      13
97  deslorelin.ti,ab. 310
98  gonadorelin.ti,ab.        238
99  ("33515-09-2" or "33515092").ti,ab.      0
100 ("51952-41-1" or "51952411").ti,ab.      0
101 ("52699-48-6" or "52699486").ti,ab.      0
102 cetrorelix.ti,ab. 520
103 cetrotide.ti,ab. 52
104 ("NS 75A" or NS75A).ti,ab.      0
105 ("NS 75B" or NS75B).ti,ab.      0
106 ("SB 075" or SB075).ti,ab.      1
107 ("SB 75" or SB75).ti,ab. 67
108 gonadoliberin.ti,ab.      152
109 kryptocur.ti,ab. 7
110 cetrorelix.ti,ab. 520
111 cetrotide.ti,ab. 52
112 antagon.ti,ab.    18
113 ganirelix.ti,ab.   161
114 ("ORG 37462" or ORG37462).ti,ab.      3
115 orgalutran.ti,ab.        26
116 ("RS 26306" or RS26306).ti,ab.   5
117 ("AY 24031" or AY24031).ti,ab.  0
118 factrel.ti,ab.      13
119 fertagyl.ti,ab.     12
120 lutrelef.ti,ab.     5
121 lutrepulse.ti,ab. 3
122 relefact.ti,ab.     10
123 fertiral.ti,ab.     0
124 (hoe471 or "hoe 471").ti,ab.      6
125 relisorm.ti,ab.     4
126 cystorelin.ti,ab. 19
127 dirigestran.ti,ab.        5
128 or/32-127       47179
```

*Surgery*

```
129 virilization/      2309
130 (virilism or virili?ation or masculini?ation).mp.   5664
131 feminization/    798
132 femini?ation.mp.       3425
133 (vaginoplasty or vaginoplasties).mp.    1032
134 (vaginoplasty or vaginoplasties).mp.    1032
135 (phalloplasty or phalloplasties).mp.    561
136 exp Penile Prosthesis/   1642
137 "penile reconstruction".mp.     292
```

138 (vagina reconstruction or vaginal reconstruction).mp.     550
139 (genitoplasty or genitoplasties).mp.     263
140 transsexualism/su [Surgery]     1007
141 sex reassignment.mp.   1674
142 sex transformation.mp. 42
143 or/129-142     14290

*Any intervention AND population*

144 31 or 128 or 143     386835
145 20 and 144     16516

*Limit to Humans*

146 animals/ not humans/   4972586
147 145 not 146     9281
148 limit 147 to humans     7901

*Limit to Publication Year 2019 to Current*

149 limit 148 to yr="2019 -Current"  1859

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence.
Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Results

**Search results and eligible reviews:** After screening 647 records found through our searches, we found 61 eligible systematic reviews. From these, 27 were published between 2020 and 2022 (Figure 1). Overall, 4% (1/27) of the reviews were judged to be of high methodological quality, 15% (4/27) were moderate methodological quality, 37% (10/27) were low methodological quality, and 44% (12/27) were critically low methodological quality.

We  provide reasons for excluding systematic reviews in appendix 1.

App_0094

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

2

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Figure 1:** PRISMA flow diagram for the selection of systematic reviews. *From:* Page MJ, McKenzie JE, Bossuyt PM, Boutron I, Hoffmann TC, Mulrow CD, et al. The PRISMA 2020 statement: an updated guideline for reporting systematic reviews. BMJ 2021;372:n71. doi: 10.1136/bmj.n71. For more information, visit: http://www.prisma-statement.org/

3

App_0096

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence.
Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Outcomes:**

1. **Puberty blockers:** We found 4 systematic reviews assessing the effects of puberty blockers published between 2020 and 2022.[1-4] From these, we judged 2 as having moderate methodological quality, and 2 as having critically low methodological quality. Details of the assessment are provided in Figure 2.

   Table 1 summarizes the evidence about the effects of puberty blockers on the outcomes of interest. We used information from 2 systematic reviews.[2][3] For most outcomes (except suicidality), there is no evidence about the effect of puberty blockers compared to not using puberty blockers. In other words, no studies compared the outcomes between a group of people with gender dysphoria using puberty blockers and another not using them. Therefore, it is unknown whether people with gender dysphoria who use puberty blockers experience more improvement in gender dysphoria, depression, anxiety, and quality of life than those with gender dysphoria who do not use them. There is very low certainty about the effects of puberty blockers on suicidal ideation (see details in Table 1).

   Studies, however, reported outcomes among a group of people with gender dysphoria after receiving puberty blockers. The findings are:
   - There is low certainty evidence suggesting that treatment with puberty hormones may slightly increase gender dysphoria severity (mean change score in the Utrecht Gender Dysphoria scale, 0.7 points [95% CI, -4.2 to 5.6], range 12-60, with higher scores reflecting more severe gender dysphoria)
   - There is low certainty evidence suggesting that treatment with puberty blockers may decrease depression (mean change score in the Beck Depression Inventory, -3.4 [95% CI, -5.7 to -1.0], range 0-63, with higher scores reflecting more severe depression)
   - There is low certainty evidence suggesting that treatment with puberty blockers may decrease anxiety (mean change score in the Trait Anxiety Scale, trait subscale, -1.5 [95% CI, -4.7 to -1.8], range 0-80, with higher scores reflecting more severe anxiety)
   - There is low certainty evidence suggesting a moderate percentage of patients reporting adverse events after treatment with puberty blockers (see Table 1 for details)
   - There is very low certainty evidence about how puberty blockers affect suicidality

App_0097

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Figure 2:** AMSTAR assessment judgements for systematic reviews addressing puberty blockers

| Review ID | Item 1 | Item 2 | Item 3 | Item 4 | Item 5 | Item 6 | Item 7 | Item 8 | Item 9 | Item 10 | Item 11 | Item 12 | Item 13 | Item 14 | Item 15 | Item 16 | Methodological quality |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AHRQ 2021 | | | | | | | | | | | | | | | | | MODERATE |
| NICE 2020a | | | | | | | | | | | | | | | | | MODERATE |
| Ramos 2020 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| Rew 2020 | | | | | | | | | | | | | | | | | CRITICALLY LOW |

**Figure legend:**

Yes

Probably yes

Probably no

No

Not applicable



Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Table 1: Puberty blockers (gonadotrophin releasing hormone analogues) compared to no puberty blockers in youth (<21 years old) with gender dysphoria**

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** puberty blockers (gonadotrophin releasing hormone analogues)
**Comparison:** no puberty blockers

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no puberty blockers | Risk / mean with puberty blockers | | | | |
| **Gender dysphoria** assessed with: difference (effect) in gender dysphoria proportion or severity | Not reported | | | | | The effects of puberty blockers on gender dysphoria are unknown |
| **Gender dysphoria** assessed with: mean change score in the Utrecht Gender Dysphoria Scale (12-60, higher scores reflect more gender dysphoria, 40 points or more indicate a diagnosis of gender dysphoria) (NICE, 2020a) Follow up: mean 1.9 years (range 0.4 to 5.1 years) | NA | 0.7 (-4.2 to 5.6) | NA | 41 (1 study) | ⊕⊕◯◯ LOW[1] | The mean gender dysphoria score may increase by 0.7 points after puberty blockers |
| **Depression** assessed with: difference (effect) in depression proportion or severity | Not reported | | | | | The effects of puberty blockers on depression are unknown |

6

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Table 1: Puberty blockers (gonadotrophin releasing hormone analogues) compared to no puberty blockers in youth (<21 years old) with gender dysphoria**

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** puberty blockers (gonadotrophin releasing hormone analogues)
**Comparison:** no puberty blockers

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no puberty blockers | Risk / mean with puberty blockers | | | | |
| **Depression** assessed with: mean change score in Beck Depression Inventory-II scale (0-63, higher scores represent more severe depression) (NICE, 2020a) Follow up: mean 1.9 years (range 0.4 to 5.1 years) | NA | -3.4 (-5.7 to -1.0) | NA | 41 (1 study) | ⊕⊕◯◯ LOW[1] | The mean depression score may decrease by 3.4 points after puberty blockers |
| **Anxiety** assessed with: difference (effect) in anxiety proportion or severity | | Not reported | | | | The effects of puberty blockers on anxiety are unknown |
| **Anxiety** assessed with: mean change score in STAI-Trait scale (0-80, higher scores represent more severe anxiety) (NICE, 2020a) Follow up: mean 1.9 years (range 0.4 to 5.1 years) | NA | -1.5 (-4.7 to 1.8) | NA | 41 (1 study) | ⊕⊕◯◯ LOW[1] | The mean anxiety score may decrease by 1.5 points after puberty blockers |

7

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Table 1: Puberty blockers (gonadotrophin releasing hormone analogues) compared to no puberty blockers in youth (<21 years old) with gender dysphoria**

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** puberty blockers (gonadotrophin releasing hormone analogues)
**Comparison:** no puberty blockers

| Outcomes | Anticipated absolute effects[*] (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no puberty blockers | Risk / mean with puberty blockers | | | | |
| **Quality of life** assessed with: any measure | Not reported | | | | | The effects of puberty blockers on quality of life are unknown |
| **Suicidal ideation** difference (effect) in suicidal ideation (Rew, 2020) Follow-up: cross-sectional survey | The authors report that "compared to youth who did not receive pubertal suppression, those who did showed lower lifetime rates of suicidal ideation". | | Not reported | 89 (1 study) | ⊕○○○ VERY LOW[2] | We are very uncertain about the effect of puberty blockers on suicidal ideation |
| **Adverse effects** assessed with: proportion of patients reporting adverse effects (NICE, 2020a) Follow up: mean 2.3 years (range 0.0 to 11.3 years) | NA | 11%[3] (2% to 29%) | NA | 27 (1 study) | ⊕⊕○○ LOW[4] | The proportion of patients reporting adverse effects after treatment with puberty blockers may be 11% |

**STAI-Trait:** Trait Anxiety Scale. Range: 0-80
**CI:** Confidence interval
**NA:** Not applicable

8

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Table 1: Puberty blockers (gonadotrophin releasing hormone analogues) compared to no puberty blockers in youth (<21 years old) with gender dysphoria**

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** puberty blockers (gonadotrophin releasing hormone analogues)
**Comparison:** no puberty blockers

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no puberty blockers | Risk / mean with puberty blockers | | | | |

**GRADE Working Group grades of evidence**
**High certainty:** We are very confident that the true effect lies close to that of the estimate of the effect
**Moderate certainty:** We are moderately confident in the effect estimate: The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different
**Low certainty:** Our confidence in the effect estimate is limited: The true effect may be substantially different from the estimate of the effect
**Very low certainty:** We have very little confidence in the effect estimate: The true effect is likely to be substantially different from the estimate of effect

*Explanations*

1. Ā Mean change rated down due to risk of bias and imprecision. According to the systematic review authors, the study had poor methodological quality. In addition, there are too few participants included, which is not sufficient to make trustworthy inferences (does not meet the optimal information size).

2. Ā The authors of Rew 2020 narratively summarized the outcome of Turban et al. 2020; a cross-sectional online survey study. According to the systematic review authors, Turban et al. did not describe the study participants and the setting in detail and it was unclear whether outcomes were measured in a valid and reliable way. We therefore, downgraded the certainty of evidence by one level from low to very low due to high risk of bias.

3. Ā The authors reported 3/27 (11%) participants treated with GnRHa developed side effects: 1 participant developed sterile abscesses; they were switched from leuprolide acetate to triptorelin, 1 participant developed leg pains and headaches, which eventually resolved without treatment, 1 participant gained 19 kg within 9 months of initiating GnRH analogues.

4. Ā Proportion of adverse effects rated down due to risk of bias and imprecision. According to the systematic review authors, the cohort study Khatchadourian et al. 2014 was assessed at high risk of bias due to incomplete reporting of its cohort. In addition, there are too few participants included, which is not sufficient to make trustworthy inferences (does not meet the optimal information size).

9

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence.
Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**2. Cross-sex hormones:** We found 9 systematic reviews assessing the effects of cross-sex hormones published between 2020 and 2022.[4-12] One of these, however, included both puberty blockers and cross-sex hormones combined in their evidence synthesis as was not prioritized.[5] From the 8 remaining reviews, we judged 1 as having high methodological quality, 2 as having moderate methodological quality, 2 as having low methodological quality, and 3 as having critically low methodological quality. Details of the assessment are provided in Figure 3. Because of its eligibility criteria related to study design, the systematic review judged at high methodological quality[7] did not include any studies and therefore we could not use it to inform any outcome.

Table 2 summarizes the evidence about the effects of cross-sex hormones on the outcomes of interest. We used information from 4 systematic reviews.[6 9 11 12] For most outcomes (all except risk of breast cancer), there is no evidence about the effect of cross-sex hormones compared to not using cross-sex hormones. In other words, no studies compared the outcomes between a group of people with gender dysphoria using cross-sex hormones and another not using it. Therefore, it is unknown whether people with gender dysphoria who use cross-sex hormones experience more improvement in gender dysphoria, depression, anxiety, quality of life, and suicidality than those with gender dysphoria who do not use them. There is low certainty evidence suggesting that cross-sex hormones may not increase or decrease the risk of breast cancer (see details in Table 2).

Studies, however, reported outcomes among a group of people with gender dysphoria after receiving cross-sex hormones. The findings are:

- There is low certainty evidence suggesting that treatment with cross-sex hormones may decrease gender dysphoria severity (mean change score in the Utrecht Gender Dysphoria scale, -42.4 points [95% CI, -44.1 to -40.1], range 12-60, with higher scores reflecting more severe gender dysphoria)
- There is low certainty evidence suggesting that treatment with cross-sex hormones may decrease depression (measured with different scales, see Table 4 for details) and the need for treatment for depression (change in percentage, -39%)
- There is low certainty evidence suggesting that treatment with cross-sex hormones may decrease anxiety (measured with different scales, see Table 4 for details) and the need for treatment for anxiety (change in percentage, -32%)
- There is very low certainty about the change in quality of life after treatment with cross-sex hormones.
- There is low certainty evidence suggesting that treatment with cross-sex hormones may decrease suicidality degree (mean change score in the Ask Suicide-Screening questions scale, -0.84 points [95% CI, -1.30 to -0.44], range 0-4, with higher scores reflecting more severe suicidality) and the percentage of patients with need for treatment due to suicidality/self-harm (change in percentage, -31%). There is very low certainty evidence about the percentage of people with suicidal ideation and suicide attempts after treatment with cross-sex hormones.

App_0103

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence.
Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

- Ā  There is low certainty evidence suggesting a low prevalence of venous thromboembolism after treatment with cross-sex hormones (see Table 2 for details)

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Figure 3:** AMSTAR assessment judgements for systematic reviews addressing cross-sex hormones

| Review ID | Item 1 | Item 2 | Item 3 | Item 4 | Item 5 | Item 6 | Item 7 | Item 8 | Item 9 | Item 10 | Item 11 | Item 12 | Item 13 | Item 14 | Item 15 | Item 16 | Methodological quality |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AHRQ 2021 | | | | | | | | | | | | | | | | | MODERATE |
| Baker 2021 | | | | | | | | | | | | | | | | | MODERATE |
| Fledderus 2020 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| Haupt 2020 | | | | | | | | | | | | | | | | | HIGH |
| Karalexi 2020 | | | | | | | | | | | | | | | | | LOW |
| Kotamarti 2021 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| Mattawanon 2021 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| NICE 2021b | | | | | | | | | | | | | | | | | MODERATE |
| Totaro 2021 | | | | | | | | | | | | | | | | | LOW |



**Figure legend:**

- Yes
- Probably yes
- Probably no
- No
- Not applicable

12

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Table 2: Cross-sex hormones compared to no cross-sex hormones in youth (<21 years old) with gender dysphoria**

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** cross-sex hormones
**Comparison:** no cross-sex hormones

| Outcomes | Anticipated absolute effects[*] (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no cross-sex hormones | Risk / mean with cross-sex hormones | | | | |
| **Gender dysphoria** assessed with: difference (effect) in gender dysphoria percentage or severity | | Not reported | | | | The effects of cross-sex hormones on gender dysphoria are unknown |
| **Gender dysphoria** assessed with: mean change score in the Utrecht Gender Dysphoria Scale (12-60, higher scores reflect more gender dysphoria, 40 points or more indicate a diagnosis of gender dysphoria) (NICE, 2020b) Follow up: 1 year | NA | -42.4 (-44.1 to -40.1) | NA | 23 (1 study) | ⊕⊕◯◯ LOW[1] | The mean gender dysphoria score may decrease by 42 points after cross-sex hormones |
| **Depression** assessed with: difference (effect) in depression percentage or severity | | Not reported | | | | The effects of cross-sex hormones on depression are unknown |

13

App_0106

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 2: Cross-sex hormones compared to no cross-sex hormones in youth (<21 years old) with gender dysphoria

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** cross-sex hormones
**Comparison:** no cross-sex hormones

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no cross-sex hormones | Risk / mean with cross-sex hormones | | | | |
| **Depression** assessed with: mean change score in depression scales (higher scores represent more severe depression) (NICE, 2020b) Follow up: 1 year | NA | The mean depression score reduction was 9.6 points when using the BDI-II scale (n=23) and 7.5 when using the CESD-R scale (n=50). The authors report that both reductions were statistically significant[2] | NA | 73 (2 studies) | ⊕⊕○○ LOW[1] | The mean depression score may decrease after cross-sex hormones |
| **Depression** assessed with: change in percentage of patients with need for treatment (NICE, 2020b) Follow-up: 1 year | NA | The percentage of participants requiring treatment was reduced by 39% (from 54% at baseline), which was statistically significant | NA | 52 (1 study) | ⊕⊕○○ LOW[1] | The percentage of participants requiring treatment may be reduced by 39% after cross-sex hormones |
| **Anxiety** assessed with: difference (effect) in anxiety percentage or severity | Not reported | | | | | The effects of cross-sex hormones on anxiety are unknown |

14

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 2: Cross-sex hormones compared to no cross-sex hormones in youth (<21 years old) with gender dysphoria

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** cross-sex hormones
**Comparison:** no cross-sex hormones

| Outcomes | Anticipated absolute effects[*] (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no cross-sex hormones | Risk/ mean with cross-sex hormones | | | | |
| **Anxiety** assessed with: mean change score in anxiety scales (higher scores represent more severe anxiety) (NICE, 2020b) Follow up: 1 year | NA | The mean anxiety score reduction was 16.5 points when using the STAI-State scale and 14.5 when using the STAI-Trait scale. The authors report that both reductions were statistically significant | NA | 23 (1 study) | ⊕⊕◯◯ LOW[1] | The mean anxiety score may decrease after cross-sex hormones |
| **Anxiety** assessed with: change in percentage of patients with need for treatment (NICE, 2020b) Follow-up: 1 year | NA | The percentage of participants requiring treatment was reduced by 32% (from 48% at baseline), which was statistically significant | NA | 52 (1 study) | ⊕⊕◯◯ LOW[1] | The percentage of participants requiring treatment may be reduced by 32% after cross-sex hormones |
| **Quality of life** assessed with: difference (effect) in quality of life improvement | Not reported | | | | | The effects of cross-sex hormones on quality of life are unknown |

15

App_0108

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Table 2: Cross-sex hormones compared to no cross-sex hormones in youth (<21 years old) with gender dysphoria**

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** cross-sex hormones
**Comparison:** no cross-sex hormones

| Outcomes | Anticipated absolute effects[*] (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no cross-sex hormones | Risk / mean with cross-sex hormones | | | | |
| **Quality of life** assessed with: mean change score in QLES-Q-SF score (higher scores represent better quality of life) (NICE, 2020b) Follow up: 1 year | NA | The mean quality of life score improved, but the differences were not statistically significant. The magnitudes were not reported | NA | 50 (1 study) | ⊕◯◯◯ VERY LOW[3] | We are very uncertain about the quality of life change after cross-sex hormones |
| **Suicide/ suicidal ideation** assessed with: difference (effect) in suicide or suicidal ideation | | Not reported | | | | The effects of cross-sex hormones on suicide/ suicidal ideation are unknown |
| **Suicidality** assessed with: change in score from ASQ instrument (higher scores represent greater degree of suicidality) (NICE, 2020b) Mean follow up: 1 year | NA | -0.84 (-1.30 to -0.44) | NA | 39 (1 study) | ⊕⊕◯◯ LOW[1] | Suicidality scores may decrease by 0.84 points after cross-sex hormones |

16

App_0109

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Table 2: Cross-sex hormones compared to no cross-sex hormones in youth (<21 years old) with gender dysphoria**

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** cross-sex hormones
**Comparison:** no cross-sex hormones

| Outcomes | Anticipated absolute effects[*] (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no cross-sex hormones | Risk / mean with cross-sex hormones | | | | |
| **Suicidal ideation** assessed with: percentage of participants with suicidal ideation measured with PHQ-9 (NICE, 2020b) Follow-up: 1 year | NA | The percentage of participants with suicidal ideation decreased by 6% (from 10% at baseline). The authors did not conduct a statistical analysis | NA | 50 (1 study) | ⊕◯◯◯ VERY LOW[3] | We are very uncertain about the change in percentage of patients in suicidal ideation after cross-sex hormones |
| **Suicide attempts** assessed with: not reported (NICE, 2020b) Follow up: not reported | NA | The percentage of people with lifetime suicide attempts was 15%, those with attempts 3 months before treatment was 2%, and those with attempts at follow up was 5% | NA | 130 (1 study) | ⊕◯◯◯ VERY LOW[3] | We are very uncertain about the percentage of people with suicide attempts after cross-sex hormones |
| **Suicidality/ self-harm** assessed with: change in percentage of patients with need for treatment (NICE, 2020b) Follow-up: 1 year | NA | The percentage of participants requiring treatment was reduced by 31% (from 35% at baseline), which was statistically significant | NA | 52 (1 study) | ⊕⊕◯◯ LOW[1] | The percentage of participants requiring treatment may be reduced by 31% after cross-sex hormones |
| **Venous thromboembolism** assessed with: Risk of VTE | Not reported | | | | | The effects of cross-sex hormones on the risk of VTE are unknown |

17

App_0110

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 2: Cross-sex hormones compared to no cross-sex hormones in youth (<21 years old) with gender dysphoria

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** cross-sex hormones
**Comparison:** no cross-sex hormones

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no cross-sex hormones | Risk / mean with cross-sex hormones | | | | |
| **Venous thromboembolism** assessed with: Prevalence among assigned males at birth (Totaro, 2021) Mean follow up: 4.1 years | NA | **20 per 1,000** (10 to 30) | NA | 11,542 (18 studies) | ⊕⊕⊕◯ MODERATE[4] | The prevalence of VTE among assigned males at birth is probably 2% after cross-sex hormones |
| **Venous thromboembolism** assessed with: Prevalence among assigned females at birth (Kotamarti, 2021) Mean follow up: 5.7 years | NA | **6 per 1,000** (CI not reported)[5] | NA | 4,218 (8 studies) | ⊕⊕⊕◯ MODERATE[6] | The prevalence of VTE among assigned females at birth is probably 0.6% after cross-sex hormones |
| **Breast cancer** assessed with: Risk of breast cancer (Fledderus, 2020) Follow up: not reported | Two studies compare the risk of breast cancer between assigned females at birth using versus not using testosterone, and found no differences (0 vs 1 case [total n= 130], and 1 vs 6 [total n=1579]). A third study compared assigned females at birth with non transgender women and found a lower risk in the former (magnitude not reported) | | NA | 2,938 (3 studies) | ⊕⊕⊕◯ LOW[7] | The risk of breast cancer may not increase or decrease due to the use of cross-sex hormones |

18

App_0111

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 2: Cross-sex hormones compared to no cross-sex hormones in youth (<21 years old) with gender dysphoria

**Patient or population:** youth (<21 years old) with gender dysphoria
**Intervention:** cross-sex hormones
**Comparison:** no cross-sex hormones

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no cross-sex hormones | Risk / mean with cross-sex hormones | | | | |

ASQ: Ask Suicide-Screening Questions. Range 0-4
BDI-II: Beck Depression Inventory. Range: 0-63
CESD-R: Center for Epidemiological Studies Depression Scale. Range: 0-60
CI: Confidence interval
NA: Not applicable
PHQ-9: Patient Health Questionnaire (PHQ) Modified for Teens. For suicidal ideation, it is a single question (yes/no)
QLES-Q-SF: Quality of Life Enjoyment and Satisfaction Questionnaire. Range: 15-75
STAI: State-Trait Anxiety Inventory. Range: 0-80

**GRADE Working Group grades of evidence**
High certainty: We are very confident that the true effect lies close to that of the estimate of the effect
Moderate certainty: We are moderately confident in the effect estimate: The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different
Low certainty: Our confidence in the effect estimate is limited: The true effect may be substantially different from the estimate of the effect
Very low certainty: We have very little confidence in the effect estimate: The true effect is likely to be substantially different from the estimate of effect

*Explanations*

1. Mean change rated down due to risk of bias and imprecision. According to the systematic review authors, the studies had poor methodological quality. In addition, there are too few participants included, which is not sufficient to make trustworthy inferences (does not meet the optimal information size)
2. Similar results when this outcome was measured using the Patient Health Questionnaire (PHQ) Modified for Teens in one of the same studies
3. Rated down due to risk of bias, imprecision, and indirectness. According to the systematic review authors, the studies had poor methodological quality. In addition, there are too few participants included, which is not sufficient to make trustworthy inferences (does not meet the optimal information size). Finally, 30% of the participants did not have a diagnosis of gender dysphoria.
4. Prevalence rated down due to risk of bias. According to the systematic review authors, only 6 out of 18 studies (representing 16.5% of the weight of the studies) were at low risk of bias.

19

App_0112

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

5. A meta-analysis of independent studies reported in this systematic review suggested that the prevalence of VTE in non-transgender females at birth was 1.7% (based on 7 studies and 18,748 persons)

6. Prevalence rated down doe to risk of bias. According to the systematic review authors, all studies had at least one domain judged as problematic.

7. Risk rated down 2 levels because of risk of bias. The researchers did not account for confounding in any of the studies.

20

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence.
Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**3.  Surgeries:** We found 15 systematic reviews assessing the effects of gender-affirming surgeries published between 2020 and 2022. We judged 8 as having low methodological quality and 7 as having critically low methodological quality. Details of the assessment are provided in Figure 4. We present the results regarding the effects of surgeries in three parts. First, we describe the effects of all surgeries on mental health outcomes in all patients. Second, we describe the effects of all surgeries on surgical outcomes in assigned females at birth (transgender males). Finally, we describe the effects of all surgeries on surgical outcomes in assigned males at birth (transgender females).

**3.1  Effects of surgeries on mental health outcomes:** Table 3 summarizes the evidence about the effects of all surgeries on mental health outcomes in all patients. We used information from 2 systematic reviews.[13] [14] There were no systematic reviews and studies reporting on gender dysphoria, depression, anxiety, and suicidality. Therefore, the effects of surgeries on these outcomes (when compared to a group of patients with gender dysphoria who do not undergo surgery), or the changes in these outcomes (improvements or deterioration) among patients who undergo surgeries is unknown.

The systematic reviews addressed quality of life and depression, but none of the included studies included a comparison group. Thus, it is unknown whether people with gender dysphoria who undergo surgeries experience more improvement in quality of life or less regret than those with gender dysphoria who do not undergo surgeries.

Studies, however, reported the following outcomes among a group of people with gender dysphoria after undergoing surgeries. The findings are:
-  There is low certainty evidence suggesting that the percentage of people who experience regret after surgery is low (1%)
-  There is very low certainty evidence about how surgeries affect quality of life (see Table 3 for details)

21

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Figure 4:** AMSTAR assessment judgements for systematic reviews addressing gender-affirming surgery



| Review ID | Item 1 | Item 2 | Item 3 | Item 4 | Item 5 | Item 6 | Item 7 | Item 8 | Item 9 | Item 10 | Item 11 | Item 12 | Item 13 | Item 14 | Item 15 | Item 16 | Methodological quality |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bustos SS 2021 | | | | | | | | | | | | | | | | | LOW |
| Bustos VP 2021 | | | | | | | | | | | | | | | | | LOW |
| Bustos VP 2021b | | | | | | | | | | | | | | | | | LOW |
| Dunford 2021 | | | | | | | | | | | | | | | | | LOW |
| Eftekhar, 2020 | | | | | | | | | | | | | | | | | LOW |
| Falcone 2021 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| Hu, 2022 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| Huayllani 2021 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| Jolly 2021 | | | | | | | | | | | | | | | | | LOW |
| Nassiri 2020 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| Oles 2022 | | | | | | | | | | | | | | | | | LOW |
| Oles 2022b | | | | | | | | | | | | | | | | | LOW |
| Salibian 2021 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| Sijben 2021 | | | | | | | | | | | | | | | | | CRITICALLY LOW |
| Tay 2021 | | | | | | | | | | | | | | | | | CRITICALLY LOW |

**Figure legend:**



Yes

Probably yes

Probably no

No

Not applicable

22

App_0115

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 3: All surgeries compared to no surgeries in young people (<21 years old) with gender dysphoria

**Patient or population**: young people (<21 years old) with gender dysphoria
**Intervention**: surgeries
**Comparison**: no surgeries
**Outcomes**: Mental health and regret

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no surgery | Risk / mean with surgery | | | | |
| **Gender dysphoria** assessed with: any measure | Not reported | | Not reported | | | The effects of surgery on gender dysphoria, the changes in gender dysphoria severity after surgery, and the prevalence of gender dysphoria after surgery are unknown |
| **Depression** assessed with: any measure | Not reported | | Not reported | | | The effects of surgery on depression, the changes in depression severity after surgery, and the prevalence of depression after surgery are unknown |
| **Anxiety** assessed with: any measure | Not reported | | Not reported | | | The effects of surgery on anxiety, the changes in anxiety severity after surgery, and the prevalence of anxiety after surgery are unknown |
| **Suicidality** assessed with: any measure | Not reported | | Not reported | | | The effects of surgery on suicidality, the changes in anxiety severity after surgery, and the prevalence of anxiety after surgery are unknown |
| **Quality of life** assessed with: difference (effect) in quality of life | Not reported | | Not reported | | | The effects of surgery on quality of life are unknown |
| **Quality of life** assessed with: change in quality of life | Not reported | | Not reported | | | The change in quality of life after surgery is unknown |

23

App_0116

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

| Outcome | | | Effect estimate | | № of participants (studies) | Certainty | What happens |
|---|---|---|---|---|---|---|---|
| Quality of life assessed with: mean score in the Short Form-36 Scale (0-100, higher scores reflect better quality of life) (Eftekhar Ardebili, 2020) Follow up: cross-sectional | NA | NA | 59.17 (48.59 to 69.74)[1] | NA | 633 (5 studies) | ⊕◯◯◯ VERY LOW[2] | We are very uncertain about the quality of life after surgeries |
| Regret assessed with: difference (effect) in percentage of people with regret | | | Not reported | | | | The effects of surgery on regret are unknown |
| Regret assessed with: percentage of people with regret (Bustos, 2021) Mean follow up: 4 years | NA | NA | 1% (0 to 2%)[3] | NA | 7928 (27 studies) | ⊕⊕◯◯ LOW[4] | The percentage of people who experience regret is low |

CI: Confidence interval
NA: Not applicable

**GRADE Working Group grades of evidence**
High certainty: We are very confident that the true effect lies close to that of the estimate of the effect
Moderate certainty: We are moderately confident in the effect estimate: The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different
Low certainty: Our confidence in the effect estimate is limited: The true effect may be substantially different from the estimate of the effect
Very low certainty: We have very little confidence in the effect estimate: The true effect is likely to be substantially different from the estimate of effect

*Explanations*

1. Similar scores for assigned males at birth and assigned females at birth.
2. Mean score rated down for risk of bias and inconsistency. According to the systematic review authors, all studies had concerns related to risk of bias. In addition, the smaller studies showed better quality of life than the larger study.
3. Similar percentage for assigned males at birth and assigned females at birth.
4. Percentage rated down due to risk of bias and indirectness. According to the authors, many of the studies had moderate or high risk of bias. The mean age of the participants at the time of surgery was higher than the target population. Because it was considered to not have an important effect on the pooled estimate, we did not rate down for statistical heterogeneity

24

App_0117

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence.
Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

3.2 **Effects of surgeries on assigned females at birth:** Table 4 summarizes the evidence about the effects of all surgeries on surgical outcomes among assigned at birth females. We used information from 3 systematic reviews.[13-17] Due to the nature of the outcomes (i.e. they can only be experienced by people who undergo surgeries), there cannot be studies comparing the outcomes between a group of people with gender dysphoria who undergo surgeries and another who does not.

Studies, therefore, assessed the outcomes among a group of people with gender dysphoria after surgery. The findings are:

- Ā There is low certainty evidence suggesting that the percentage of people who are satisfied after chest surgery is high (92%)
- Ā There is very low certainty evidence about the rate of surgical complications after chest surgery
- Ā There is very low certainty evidence about the percentage of people who are satisfied, and the rate of surgical complications after bottom surgeries (see Table 4 for details)

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 4: All surgeries compared to no surgeries in assigned females at birth (<21 years old) with gender dysphoria

**Patient or population:** assigned females at birth (<21 years old) with gender dysphoria
**Intervention:** surgeries
**Comparison:** no surgeries

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no surgery | Risk / mean with surgery | | | | |
| **Chest surgery** | | | | | | |
| **Satisfaction** assessed with: percentage of people who reported being satisfied (Bustos VP, 2020b) Range of follow up: 6 weeks to 46 months[1] | NA | 92% (88% to 96%)[2] | NA | 733 (14 studies) | ⊕⊕◯◯ LOW[3] | The percentage of people who reports being satisfied may be 92% |
| **Surgical complications** assessed with: rate of complications across patients (Oles, 2022) Range of follow up: 8 weeks to 1 year | NA | 16.8% Range (5.5% to 80.0%) | NA | 1255 (7 studies) | ⊕◯◯◯ VERY LOW[4] | We are very uncertain about the rate of surgical complications |
| **Reoperation** assessed with: rate of reoperation across patients (Oles, 2022) Range of follow up: 8 weeks to 1 year | NA | 6.2% Range (0.7% to 11.2%) | NA | 1214 (6 studies) | ⊕◯◯◯ VERY LOW[4] | We are very uncertain about the rate of reoperation |
| **Bottom surgery** | | | | | | |

26

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 4: All surgeries compared to no surgeries in assigned females at birth (<21 years old) with gender dysphoria

**Patient or population:** assigned females at birth (<21 years old) with gender dysphoria
**Intervention:** surgeries
**Comparison:** no surgeries

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no surgery | Risk / mean with surgery | | | | |
| **Satisfaction** assessed with: percentage of people who reported being satisfied (Oles, 2022b) Range of follow up: 6 weeks to 46 months | NA | 89.6% (45% to 100%)[5] | NA | 1458 (27 studies) | ⊕◯◯◯ VERY LOW[4] | We are very uncertain about the percentage of people who reports being satisfied |
| **Surgical complications- Major** assessed with: percentage of people experiencing major complications (Oles, 2022b) follow up: not reported | NA | The percentage was - 2.3% (range 0 to 20%) experiencing total flap loss - 19.5% (range 0 to 72%) experiencing prosthesis issues - 24.5% (range 0 to 86%) experiencing urethral issues | NA | 3177 (42 studies)[6] | ⊕◯◯◯ VERY LOW[4] | We are very uncertain about the percentage of people who experience major surgical complications |
| **Surgical complications- Minor** assessed with: percentage of people experiencing major complications (Oles, 2022b) follow up: not reported | NA | The percentage varied from 9.3% (range 0% to 45.5%) experiencing donor site issues, to 24% (range 10 to 93%) experiencing urethral issues[7] | NA | 4466 (52 studies)[8] | ⊕◯◯◯ VERY LOW[4] | We are very uncertain about the percentage of people who experience minor surgical complications |

27

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 4: All surgeries compared to no surgeries in assigned females at birth (<21 years old) with gender dysphoria

**Patient or population:** assigned females at birth (<21 years old) with gender dysphoria
**Intervention:** surgeries
**Comparison:** no surgeries

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no surgery | Risk / mean with surgery | | | | |
| **Reoperation** assessed with: rate of reoperation across patients (Oles, 2022b) follow up: not reported | NA | 27.6% Range (2.5% to 40%) | NA | 1624 (15 studies) | ⊕◯◯◯ VERY LOW[4] | We are very uncertain about the percentage of people who undergo reoperations |

**CI:** Confidence interval
**NA:** Not applicable

**GRADE Working Group grades of evidence**
**High certainty:** We are very confident that the true effect lies close to that of the estimate of the effect
**Moderate certainty:** We are moderately confident in the effect estimate: The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different
**Low certainty:** Our confidence in the effect estimate is limited: The true effect may be substantially different from the estimate of the effect
**Very low certainty:** We have very little confidence in the effect estimate: The true effect is likely to be substantially different from the estimate of effect

*Explanations*

1. Studies used different scales to assess satisfaction
2. The percentage was similar when the analysis was done by type of surgery and by follow up time (< 1 year vs 1 year or more). Another systematic review (Oles, 2022) also investigated this outcome, and reported a very similar percentage of satisfaction (91.8%, range 73% to 100%)
3. Percentage of patients satisfied rated down due to risk of bias and indirectness. According to the systematic review authors, several studies were judged at moderate and high risk of bias. In addition, the median of the mean age of patients included in the studies was 28 years
4. Rated down due to risk of bias, inconsistency/ imprecision, and indirectness. Even though the review authors did not assess risk of bias, these studies were included in other systematic reviews in which the authors judged several of them at high risk of bias. The studies report inconsistent results (some high and other low rates). The patients are older than the target population.
5. Results for phalloplasty. Similar results for metoidioplasty (91.3%).

28

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

6. People and studies for urethral complications. 2671 people (37 studies) for prosthesis issues, and 1548 people (22 studies) for total flap loss.

7. Percentage of wound dehiscence 9.8% (range, 2.9% to 75%), percentage of infection/ partial necrosis 10.3% (range, 0 to 45.8%), percentage of prosthesis issues 14.2% (range, 1.6 to 41.9%), percentage of incontinence 15.3% (range, 5.4% to 59.1%).

8. People and studies for infection/ partial necrosis. 2389 people (31 studies) for urethral issues, 1736 people (17 studies) for wound dehiscence, 1080 (10 studies) for prosthesis issues, 1053 people (8 studies) for donor site issues, 131 people (3 studies) for incontinence

29

3.3 **Effects of surgeries on assigned males at birth**: Table 5 summarizes the evidence about the effects of all surgeries on surgical outcomes among assigned at birth males. We used information from 3 systematic reviews.[16][18][19] Due to the nature of the outcomes (i.e. they can only be experienced by people who undergo surgeries), there cannot be studies comparing the outcomes between a group of people with gender dysphoria who undergo surgeries and another who does not.

Studies, therefore, assessed the outcomes among a group of people with gender dysphoria after surgery. The findings are:

- Â There is low certainty evidence suggesting that the percentage of people who are satisfied after vaginoplasty is high (91%)
- Â There is very low certainty evidence about the percentage of people who are satisfied, the rate of complications, and the rate of reoperations after chest surgery (see Table 5 for details)
- Â There is low certainty evidence suggesting that the percentage of people who have regret after vaginoplasty is low (2%)
- Â There is very low certainty evidence about the rate of complications and the rate of reoperations after vaginoplasty (see Table 5 for details)

App_0123

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 5: All surgeries compared to no surgeries in assigned males at birth (<21 years old) with gender dysphoria

**Patient or population:** assigned males at birth (<21 years old) with gender dysphoria
**Intervention:** surgeries
**Comparison:** no surgeries

| Outcomes | Anticipated absolute effects* (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no surgery | Risk/ mean with surgery | | | | |
| **Chest surgery** | | | | | | |
| **Satisfaction** assessed with: percentage of people who reported being satisfied (Oles 2022) Range of follow up: 12 months to 17 years | NA | Range 75% (80/107) to 95% (33/35)[1] | NA | 142 (2 studies) | ⊕○○○ VERY LOW[2] | We are very uncertain about the percentage of people who report being satisfied |
| **Surgical complications** assessed with: rate of complications across patients (Oles 2022) Range of follow up: 2 weeks to 16 years | NA | The complication rates were: - 3.8% (range 0% to 5.5%) of capsular contracture - 2.2% of major hematoma - 2.2% of implant extrusion[3] | NA | 432 (5 studies) | ⊕○○○ VERY LOW[2] | We are very uncertain about the rate of surgical complications |
| **Reoperation** assessed with: rate of reoperation across patients (Oles 2022) Range of follow up: Not reported | NA | 8.6% Range (4.4% to 10.4%) | NA | 291 (2 studies) | ⊕○○○ VERY LOW[2] | We are very uncertain about the rate of reoperation |
| **Bottom surgery** | | | | | | |

31

App_0124

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 5: All surgeries compared to no surgeries in assigned males at birth (<21 years old) with gender dysphoria

**Patient or population:** assigned males at birth (<21 years old) with gender dysphoria
**Intervention:** surgeries
**Comparison:** no surgeries

| Outcomes | Anticipated absolute effects[*] (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no surgery | Risk/ mean with surgery | | | | |
| **Satisfaction** assessed with: percentage of people who reported being satisfied for overall outcomes (Bustos SS, 2021) Range of follow up: 1 week to 11.3 years | NA | 91% (81% to 98%)[4] | NA | 1230 (12 studies) | ⊕⊕◯◯ LOW[5] | The percentage of people who report being satisfied with overall outcomes may be 91% |
| **Regret** assessed with: percentage of people who reported regret (Bustos SS, 2021) Range of follow up: 2 months to 24.1 years | NA | 2% (1% to 3%) | NA | 1137 (15 studies) | ⊕⊕◯◯ LOW[6] | The percentage of people who report regret may be 2% |
| **Surgical complications** assessed with: rate of complications across patients (Bustos SS, 2021) Range of follow up: 3 weeks to 24.1 years | NA | The complication rates were: - 1% (95% CI, <0.1% to 2%) of fistula - 11% (95% CI, 8% to 14%) of stenosis and/or strictures - 4% (95% CI, 1% to 9%) of tissue necrosis - 3% (95% CI, 1% to 4%) of prolapse[7] | NA | 4196 (42 studies)[3] | ⊕◯◯◯ VERY LOW[8] | We are very uncertain about the rate of surgical complications |

32

App_0125

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wierciochc; Results; May 16, 2022

## Table 5: All surgeries compared to no surgeries in assigned males at birth (<21 years old) with gender dysphoria

**Patient or population:** assigned males at birth (<21 years old) with gender dysphoria
**Intervention:** surgeries
**Comparison:** no surgeries

| Outcomes | Anticipated absolute effects[*] (95% CI) | | Relative effect (95% CI) | № of participants (studies) | Certainty of the evidence (GRADE) | What happens |
|---|---|---|---|---|---|---|
| | Risk / mean with no surgery | Risk/ mean with surgery | | | | |
| **Reoperation** assessed with: rate of reoperation across patients (Tay, 2021) Range of follow up: 6 weeks to 14.8 months | NA | One study reported a surgical revision rate of 9% (1/11 patients), and a second study reported that 13% (19/145) patients required repeat surgery due to complications. | NA | 156 (2 studies) | ⊕◯◯◯ VERY LOW[9] | We are very uncertain about the percentage of people who undergo reoperations |

**CI:** Confidence interval
**NA:** Not applicable

**GRADE Working Group grades of evidence**
**High certainty:** We are very confident that the true effect lies close to that of the estimate of the effect
**Moderate certainty:** We are moderately confident in the effect estimate: The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different
**Low certainty:** Our confidence in the effect estimate is limited: The true effect may be substantially different from the estimate of the effect
**Very low certainty:** We have very little confidence in the effect estimate: The true effect is likely to be substantially different from the estimate of the effect

*Explanations*

1. Â Another systematic review, Sijben 2021, reported satisfaction from 3 additional studies: 82% (113/138) were satisfied or very satisfied, 93% (32/34) were happier and more satisfied with their chest, and 79% (28/36) were very satisfied with the overall cosmetic result (very low certainty of evidence due to risk of bias, imprecision, and indirectness).
2. Â Rated down due to risk of bias, indirectness (the included studies were not restricted to youth or young adults), and imprecision (too few participants included, not meeting optimal information size).

33

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

3. Another systematic review, Sijben 2021, reported similar ranges for rates of complication requiring reoperation from 7 studies (835 patients): capsular contraction (range 0.0-5.6%), asymmetry (3.6%), hematoma (range 0.0-2.9%), infection (range 0.0-0.9%), striae distensae (0.7%), implant rupture (0.7%), abscess (0.4%), scarring (0.0%), hypersensitivity (0.0%), and numbness (0.0%) (very low certainty of evidence due to risk of bias, imprecision, and indirectness)

4. Bustos SS et al. 2021 additionally reported on satisfaction for functional (87%, 95% CI 77% to 94%) and aesthetic (90%, 95% CI 84% to 94%) outcomes. Another systematic review and meta-analysis, Oles 2022b, similarly reported that 92.3% (range 23.1% to 100%) of patients (2410/2601) were satisfied after vaginoplasty (very low certainty of evidence due to risk of bias, imprecision, and indirectness).

5. Rated down due to risk of bias (the systematic review authors reported the quality of the included studies to be low to moderate using the New Castle Ottawa scale), and indirectness as the included studies were not restricted to youth or young adults. We did not rate down for imprecision or inconsistency despite high I² values as a satisfaction rate of 80% or above was deemed as a minimum threshold for clinical importance.

6. Rated down due to risk of bias (the systematic review authors reported the quality of the included studies to be low to moderate using the New Castle Ottawa scale), and indirectness as the included studies were not restricted to youth or young adults.

7. Another systematic review, Oles 2022b, similarly reported the percentage of patients experiencing complications from 51 studies, ranging from 2.4% to 12.0% (range 0% to 88%) for minor complications (intraoperative injury, wound dehiscence, superficial necrosis, infection, urinary issues, vaginal prolapse, stenosis, and bleeding) and 1.6% to 2.1% (range 0% to 31%) for major complications (flap/graft necrosis and infection) after genitoplasty (very low certainty of evidence due to risk of bias, imprecision, and indirectness).

8. Rated down due to risk of bias (the systematic review authors reported the quality of the included studies to be low to moderate using the New Castle Ottawa scale), imprecision and inconsistency, with wide confidence intervals and I² values ranging from 65.8% to 94.3%, and indirectness as the included studies were not restricted to youth or young adults.

9. Rated down due to risk of bias, indirectness (the age range of patients in the included studies was 24 to 39 years; the studies included were restricted to those that investigated the use of peritoneum in neovagina construction), and imprecision (too few participants included, not meeting optimal information size).

34

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Results from search for studies not included in the systematic reviews:** After screening 1854 records found through our searches, we found 10 eligible studies (figure 5). From these, 8 were comparative observational studies[20-27] and 2 were non- comparative[28 29]. We provide reasons for excluding studies in appendix 2.



**Figure 5:** PRISMA flow diagram for the selection of primary studies. *From:* Page MJ, McKenzie JE, Bossuyt PM, Boutron I, Hoffmann TC, Mulrow CD, et al. The PRISMA 2020 statement: an updated guideline for reporting systematic reviews. BMJ 2021;372:n71. doi: 10.1136/bmj.n71. For more information, visit: http://www.prisma-statement.org/

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

None of the studies were judged as likely to importantly change the conclusions obtained from the systematic reviews (Tables 6 and 7). The main limitations of the comparative studies were risk of bias concerns (Figures 6 and 7) due to confounding, classification of intervention, and missing data; as well as small sample sizes. Although non-comparative studies were at lower risk of bias, because their results were consistent with those of the included evidence, they were also judged as unlikely to change the conclusions importantly.

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## Table 6: Characteristics of eligible comparative observational studies

| Study ID | Sample size* | Study design | Intervention | Comparator | Outcomes measured | Likely to change conclusions | Reasons |
|---|---|---|---|---|---|---|---|
| VanDerMiesen, 2020 | 450 | Retrospective cohort study | Puberty blockers | Waiting for puberty blockers | Self-harm/ suicidality, internalizing behaviors | No | Reports a small benefit on suicidality and moderate on internalizing behaviours, but high risk of bias |
| Becker-Hebly, 2021 | 75 | Prospective cohort study | 1. Puberty blockers 2. Cross-sex hormones 3. Surgery | No medical intervention yet; psychosocial intervention only | Health-related quality of life | No | Critical risk of bias (missing data due to low response rate, and confounding). Reports small benefit in mean change score for mental and physical dimension QoL as compared to no medical treatment. Imprecision; the 95% CIs for mean change scores are wide. |
| Green, 2021 | 3235 | Cross-sectional study | Cross-sex hormones | Would like to take cross-sex hormones | Depression, suicidality | No | Critical risk of bias, no follow up of patients (measurement of current outcomes and not adjusting for baseline) |
| Tordoff, 2022 | 84 | Prospective cohort study | 1. Puberty blockers 2. Cross-sex hormones | No intervention | Depression, anxiety, suicidal thoughts | No | Moderate risk of bias, small sample size |
| Turban, 2022 | 9341 | Cross-sectional study | Cross-sex hormones | Desired but never accessed gender affirming hormones | Suicidal ideation, suicidal attempt | No | Critical risk of bias, no follow up of patients (measurement of current outcomes and not adjusting for baseline) |
| Grannis, 2021 | 47 | Cross-sectional study | Cross-sex hormones | No intervention yet | Anxiety, depression | No | Critical risk of bias, no follow up of patients, small sample size |
| Fontanari, 2020 | 350 | Cross-sectional study | 1. Cross-sex hormones 2. Cross-sex hormones or surgery | 1. Waiting for cross-sex hormones 2. No intervention | Anxiety, depression, gender distress | No | Critical risk of bias (confounding, self-reported classification of interventions). Online cross-sectional survery reported small benefit in anxiety and depression mean scores, and little to no effect on gender distress with cross-sex hormones and/or surgery. Non-randomized comparative study provides very low certainty evidence due to |

37

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

| Castelo-Branco, 2021 | 205 | Cross-sectional study | Cross-sex hormones | No intervention | Anxiety, depression | No | very serious risk of bias and serious imprecision (95% CIs include little to no effect) |
| | | | | | | | Critical risk of bias due to confounding (non-adjusted analysis). Reported no difference observed in anxiety and depression mean scores (Symptom Checklist-90-Revised scale) between groups. Non-randomized comparative study provides low certainty evidence. |

*Considered the number of participants relevant to the questions of this report, not all people included in the studies

## Table 7: Characteristics of eligible non- comparative observational studies

| Study ID | Sample size | Intervention | Outcomes measured | Likely to change conclusions | Reasons |
|---|---|---|---|---|---|
| Bordas, 2021 | 813 | FtM bottom surgery | Surgical complications, satisfaction | No | Reports rate of complications (10.5%) and satisfaction (79% totally satisfied, 20% mainly satisfied) within range of effects reported by studies already included in systematic reviews. Unlikely to reduce imprecision and inconsistency within body of evidence (3177 and 1458 people, respectively) of non-comparative studies (42 and 27, respectively) to increase certainty of evidence |
| Elias, 2022 | 110 | FtM top surgery | Complications | No | Reports rate of complications (16%) and revision surgery (5%), which is consistent with the rates reported in the studies included. Unlikely to increase the certainty of evidence |

38

App_0131

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Figure 6:** Risk of bias judgements for comparative studies

| Study ID | Intervention | Confounding | Classification of the intervention | Deviations from intended interventions | Missing data | Measurement of outcome | Overall |
|---|---|---|---|---|---|---|---|
| Becker-Hebly, 2021 | Puberty blockers, cross-sex hormones, or surgery | | | | | | CRITICAL |
| Castelo-Branco, 2021 | Cross-sex hormones | | | | | | CRITICAL |
| Fontanari, 2020 | Cross-sex hormones, cross-sex hormones or surgery | | | | | | CRITICAL |
| Grannis, 2021 | Cross-sex hormones | | | | | | CRITICAL |
| Green, 2021 | Cross-sex hormones | | | | | | CRITICAL |
| Tordoff, 2022 | Puberty blockers, cross-sex hormones | | | | | | MODERATE |
| Turban, 2022 | Cross-sex hormones | | | | | | CRITICAL |
| Van Der Miesen, 2020 | Puberty blockers | | | | | | SERIOUS |

**Figure legend:**



Low
Moderate
Serious
Critical
Unclear

39

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

**Figure 7:** Risk of bias judgements for non-comparative studies

| Study ID | Intervention | Representativeness of sample | Classification of intervention | Deviation from intended interventions | Missing data | Measurement of outcome | Overall |
|---|---|---|---|---|---|---|---|
| **Bordas, 2021** | FtM bottom surgery | | | | | | LOW |
| **Elias, 2022** | FtM top surgery | | | | | | MODERATE |

**Figure legend:**



Low

Moderate

High

40

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

## References

1. Ramos GGF, Mengai ACS, Daltro CAT, et al. Systematic Review: Puberty suppression with GnRH analogues in adolescents with gender incongruity. *Journal of endocrinological investigation* 2021;44(6):1151-58. doi: https://dx.doi.org/10.1007/s40618-020-01449-5

2. Rew L, Young CC, Monge M, et al. Review: Puberty blockers for transgender and gender diverse youth-a critical review of the literature. *Child and adolescent mental health* 2021;26(1):3-14. doi: https://dx.doi.org/10.1111/camh.12437

3. Excellence NIfHaC. Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria, 2020.

4. Quality AfHRa. Topic Brief: Treatments for Gender Dysphoria in Transgender Youth, 2021.

5. Baker KE, Wilson LM, Sharma R, et al. Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review. *Journal of the Endocrine Society* 2021;5(4):bvab011. doi: 10.1210/jendso/bvab011

6. Fledderus AC, Gout HA, Ogilvie AC, et al. Breast malignancy in female-to-male transsexuals: systematic review, case report, and recommendations for screening. *Breast (Edinburgh, Scotland)* 2020;53(9213011):92-100. doi: https://dx.doi.org/10.1016/j.breast.2020.06.008

7. Haupt C, Henke M, Kutschmar A, et al. Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women. *The Cochrane database of systematic reviews* 2020;11:CD013138. doi: 10.1002/14651858.CD013138.pub2

8. Karalexi MA, Georgakis MK, Dimitriou NG, et al. Gender-affirming hormone treatment and cognitive function in transgender young adults: a systematic review and meta-analysis. *Psychoneuroendocrinology* 2020;119:104721. doi: 10.1016/j.psyneuen.2020.104721

9. Kotamarti VS, Greige N, Heiman AJ, et al. Risk for Venous Thromboembolism in Transgender Patients Undergoing Cross-Sex Hormone Treatment: A Systematic Review. *The journal of sexual medicine* 2021 doi: 10.1016/j.jsxm.2021.04.006

10. Mattawanon N, Charoenkwan K, Tangpricha V. Sexual Dysfunction in Transgender People: A Systematic Review. *The Urologic clinics of North America* 2021;48(4):437-60. doi: 10.1016/j.ucl.2021.06.004

11. Totaro M, Palazzi S, Castellini C, et al. Risk of Venous Thromboembolism in Transgender People Undergoing Hormone Feminizing Therapy: A Prevalence Meta-Analysis and Meta-Regression Study. *Frontiers in endocrinology* 2021;12:741866. doi: 10.3389/fendo.2021.741866

12. Excellence NIfHaC. Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria., 2020.

13. Eftekhar Ardebili M, Janani L, Khazaei Z, et al. Quality of life in people with transsexuality after surgery: a systematic review and meta-analysis. *Health and quality of life outcomes* 2020;18(1):264. doi: 10.1186/s12955-020-01510-0

14. Bustos VP, Bustos SS, Mascaro A, et al. Regret after Gender-affirmation Surgery: A Systematic Review and Meta-analysis of Prevalence. *Plastic and reconstructive surgery Global open* 2021;9(3):e3477. doi: 10.1097/GOX.0000000000003477

15. Oles N, Darrach H, Landford W, et al. Gender Affirming Surgery: A Comprehensive, Systematic Review of All Peer-reviewed Literature and Methods of Assessing Patient-centered Outcomes (Part 2: Genital Reconstruction). *Annals of surgery* 2022;275(1):e67-e74. doi: 10.1097/SLA.0000000000004717

16. Oles N, Darrach H, Landford W, et al. Gender Affirming Surgery: A Comprehensive, Systematic Review of All Peer-Reviewed Literature and Methods of Assessing Patient-Centered Outcomes (Part 1: Breast/Chest, Face, and Voice). *Annals of surgery* 2022 doi: 10.1097/SLA.0000000000004728

17. Bustos VP, Bustos SS, Mascaro A, et al. Transgender and Gender-nonbinary Patient Satisfaction after Transmasculine Chest Surgery. *Plastic and reconstructive surgery Global open* 2021;9(3):e3479. doi: 10.1097/GOX.0000000000003479

18. Bustos SS, Bustos VP, Mascaro A, et al. Complications and Patient-reported Outcomes in Transfemale Vaginoplasty: An Updated Systematic Review and Meta-analysis. *Plastic and reconstructive surgery Global open* 2021;9(3):e3510. doi: 10.1097/GOX.0000000000003510

19. Tay YT, Lo CH. Use of peritoneum in neovagina construction in gender-affirming surgery: A systematic review. *ANZ journal of surgery* 2021 doi: 10.1111/ans.17147

App_0134

Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch; Results; May 16, 2022

20. Becker-Hebly I, Fahrenkrug S, Campion F, et al. Psychosocial health in adolescents and young adults with gender dysphoria before and after gender-affirming medical interventions: a descriptive study from the Hamburg Gender Identity Service. *European child & adolescent psychiatry* 2021;30(11):1755-67. doi: https://dx.doi.org/10.1007/s00787-020-01640-2

21. Castelo-Branco C, RiberaTorres L, Gomez-Gil E, et al. Psychopathological symptoms in Spanish subjects with gender dysphoria. A cross-sectional study. *Gynecological endocrinology : the official journal of the International Society of Gynecological Endocrinology* 2021;37(6):534-40. doi: https://dx.doi.org/10.1080/09513590.2021.1913113

22. Fontanari AMV, Vilanova F, Schneider MA, et al. Gender Affirmation Is Associated with Transgender and Gender Nonbinary Youth Mental Health Improvement. *LGBT health* 2020;7(5):237-47. doi: https://dx.doi.org/10.1089/lgbt.2019.0046

23. Grannis C, Leibowitz SF, Gahn S, et al. Testosterone treatment, internalizing symptoms, and body image dissatisfaction in transgender boys. *Psychoneuroendocrinology* 2021;132(7612148, qgc):105358. doi: https://dx.doi.org/10.1016/j.psyneuen.2021.105358

24. Green AE, DeChants JP, Price MN, et al. Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth. *The Journal of adolescent health : official publication of the Society for Adolescent Medicine* 2022;70(4):643-49. doi: https://dx.doi.org/10.1016/j.jadohealth.2021.10.036

25. Tordoff DM, Wanta JW, Collin A, et al. Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care. *JAMA network open* 2022;5(2):e220978. doi: https://dx.doi.org/10.1001/jamanetworkopen.2022.0978

26. Turban JL, King D, Kobe J, et al. Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PloS one* 2022;17(1):e0261039. doi: https://dx.doi.org/10.1371/journal.pone.0261039

27. van der Miesen AIR, Steensma TD, de Vries ALC, et al. Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers. *The Journal of adolescent health : official publication of the Society for Adolescent Medicine* 2020;66(6):699-704. doi: https://dx.doi.org/10.1016/j.jadohealth.2019.12.018

28. Bordas N, Stojanovic B, Bizic M, et al. Metoidioplasty: Surgical Options and Outcomes in 813 Cases. *Frontiers in endocrinology* 2021;12(101555782):760284. doi: https://dx.doi.org/10.3389/fendo.2021.760284

29. Elias N, Rysin R, Kwartin S, et al. Breaking the Binary: The Approach to Chest Masculinizing Gender-Affirming Surgery in Trangender Men. *The Israel Medical Association journal : IMAJ* 2022;24(1):20-24.

42

| ID | Study | Reason |
| --- | --- | --- |
| #534 | Abu-Ghname 2020 | Wrong population: non transgender men |
| #434 | Aires 2022 | Wrong interventions: Other type of surgery: glottoplasty |
| #514 | Angus 2021 | Wrong outcomes: It does not include any outcome of interest. Includes: serum total testosterone concentration, body fat redistribution, breast development, and facial/body hair reduction |
| #318 | Baddredine 2022 | Wrong intervention. Continuing vs stopping estrogen during perioperative period of vaginoplasty |
| #40 | Baram 2019 | Wrong outcomes: only clinical outcomes are sperm count, testicular histology, hormone levels, etc. |
| #145 | Barcelos 2022 | Wrong outcomes: sexual satisfaction, desire, and function outcomes only |
| #60 | Boczar 2021 | No outcome data |
| #386 | Bouman 2014 | Wrong population: unclear that more than 80% are transgender |
| #208 | Bustos 2021 | Wrong intervention: niple areola reconstruction |
| #54 | Connelly 2021 | Wrong outcomes: Blood pressure |
| #43 | Coon 2022 | Wrong intervention: facial gender surgery |
| #34 | D'Angelo 2018 | Wrong design: narrative review |
| #165 | Delgado-Ruiz 2019 | Wrong outcomes: bone density |
| #355 | Escandon 2022 | Other type of surgery: facial surgery |
| #129 | Fighera 2019 | Wrong outcomes: bone mass |
| #597 | Hembree 2017 | Practice guideline, does not report the methods/ results of the systematic review in details |
| #120 | Kakadekar 2021 | Wrong outcomes: histological findings |
| #451 | Kennedy 2021 | Wrong intervention: self administered hormones |
| #375 | Kloer 2021 | Wrong outcomes: sexual health and satisfaction outcomes only |
| #439 | Kovar 2019 | More than 20% participants did not have gender dysphoria |
| #297 | Kristensen 2021 | Wrong outcomes: agression and hostility |
| #637 | Leclere 2015 | Wrong design: commentary of a systematic review |
| #293 | Miranda 2021 | Published in abstract format only |
| #624 | Morrison 2016 | Wrong intervention: facial feminization surgery |
| #270 | Narayan 2021 | Wrong design: narrative review |
| #119 | Nolan 2019 | Wrong intervention: phonosurgery |
| #167 | Patel 2021 | Wrong intervention: facial hair transplantation |
| #287 | Ray 2020 | Wrong population: cisgender is the population of interest, transgender included as indirect evidence and not in a systematic manner |
| #518 | Rozga 2020 | Published in abstract format only |
| #265 | Sariyaka 2017 | Wrong population: More than 20% participants did not have gender dysphoria |
| #35 | Sayegh 2019 | Wrong intervention: facial masculinization surgery |
| #124 | Schwarz 2017 | Wrong intervention: laryngeal surgery |

| #97 | Siringo 2021 | Wrong intervention: facial feminization surgery |
| #253 | Song 2016 | Wrong intervention: phonosurgery |
| #250 | Song 2017 | Wrong intervention: phonosurgery |
| #104 | Spanos 2020 | Wrong outcomes: lean mass, fat mass or insulin resistance |
| #257 | Therattil 2017 | Wrong intervention: thyroid chartilage reduction surgery |
| #328 | Tirrell 2022 | Wrong intervention: facial feminization surgery |
| #676 | Traish 2010 | Wrong design: narrative review |
| #279 | VanDamme 2017 | Wrong intervention: voice pitch raising surgery |
| #171 | Vellho 2017 | Wrong outcomes: BMI, blood pressure, hematocrit, hemoglobin, lipid profile, and liver enzymes |
| #112 | Wilson 2020 | Wrong outcomes: prolactine related outcomes (levels, hyperprolactinemia, prolactinoma) |
| #245 | Worth 2018 | Unable to access full text |
| #122 | Ziegler 2018 | Wrong outcomes: voice parameters and satisfaction with voice |
| #499 | Zucker 2021 | Unable to access full text |

| ID | Study | Reason |
|---|---|---|
| #1458 | Al-Tamimi 2019 | Wrong patient population |
| #287 | Al-Tamimi 2020 | Wrong study design: non comparative |
| #403 | Alcon 2021 | Wrong study design: non comparative |
| #214 | Aldridge 2021 | Wrong study design: non comparative |
| #54 | Almazan 2021 | Wrong patient population |
| #1387 | Boas 2019 | Wrong patient population |
| #1323 | Branstrom 2020 | Wrong patient population |
| #1447 | Breidenstein 2019 | Wrong study design: non comparative |
| #114 | Briles 2022 | Insufficient Sample Size <100 |
| #1804 | Butler 2019 | Wrong patient population |
| #716 | Carmichael 2021 | Wrong study design: non comparative |
| #622 | Cocchetti 2021 | Wrong outcomes |
| #1067 | Coon 2020 | Wrong patient population |
| #1835 | Cristofari 2019 | Wrong patient population |
| #1486 | Cuccolo 2019 | Wrong patient population |
| #1276 | deBlok 2020 | Wrong patient population |
| #577 | deRooij 2021 | Wrong patient population |
| #1625 | DeWolf 2019 | Wrong patient population |
| #1759 | Djordjevic 2019 | Wrong patient population |
| #244 | Falcone 2020 | Insufficient Sample Size <100 |
| #258 | FosterSkewis 2021 | Wrong comparator |
| #1583 | Gallagher 2019 | Wrong patient population |
| #139 | Gumussoy 2022 | Wrong study design: non comparative |
| #515 | Hisle-Gorman 2021 | Wrong study design: non comparative |
| #350 | Hougen 2021 | Insufficient Sample Size <100 |
| #1007 | Meyer 2020 | Wrong study design: non comparative |
| #499 | Miller 2021 | Wrong patient population |
| #621 | Mullins 2021 | Wrong study design: non comparative |
| #1653 | Naeimi 2019 | Insufficient Sample Size <100 |
| #1691 | Namba 2019 | Insufficient Sample Size <100 |
| #1770 | Neuville 2019 | Insufficient Sample Size <100 |
| #623 | Neuville 2021 | Insufficient Sample Size <100 |
| #644 | Nieder 2021 | Insufficient Sample Size <100 |
| #1624 | Nikkels 2019 | Wrong patient population |
| #353 | Opsomer 2021 | Wrong patient population |
| #1306 | Papadopulos 2020 | Wrong comparator |
| #640 | Papadopulos 2021 | Insufficient Sample Size <100 |
| #1472 | Pigot 2019 | Wrong patient population |
| #899 | Pigot 2020 | Insufficient Sample Size <100 |
| #1212 | Segev-Becker 2020 | Insufficient Sample Size <100 |
| #1351 | Staples 2020 | Wrong outcomes |
| #645 | Staud 2021 | Insufficient Sample Size <100 |
| #864 | Terrier 2020 | Insufficient Sample Size <100 |
| #1083 | vanderSluis 2020 | Insufficient Sample Size <100 |

| #1204 | Veerman 2020 | Insufficient Sample Size <100 |
| #1409 | Watanabe 2019 | Wrong patient population |
| #512 | Waterschoot 2021 | Insufficient Sample Size <100 |

# ATTACHMENT D

App_0140

# The Science of Gender Dysphoria and Transsexualism

## Report Submitted to the
## Florida Agency for Healthcare Administration

## James M. Cantor, PhD

### 17 May 2022

Ā

TABLE OF CONTENTS

I.     Background & Credentials ................................................................. 1

II.    Summary of Conclusions ................................................................ 2

III.   Science of Gender Dysphoria and Transsexualism ...................................... 3

       A. Adult-Onset Gender Dysphoria ................................................... 4

             1.  Outcome Studies of Transition in Adult-Onset Gender Dysphoria ................. 4

             2.  Mental Health Issues in Adult-Onset Gender Dysphoria ................................. 5

       B. Childhood Onset (Pre-Puberty) Gender Dysphoria .................................... 6

             1.  Follow-up Studies Show Most Children Desist by Puberty ............................. 6

             2.  "Watchful Waiting" and "The Dutch Protocol" ....................................... 9

             3.  Follow-Up Studies of Puberty Blockers and Cross-Sex Hormones ................. 11

                   a.  Four studies found no mental health improvement ................................... 11

                   b.  Five studies confounded psychotherapy and medical treatment .............. 13

                   c.  Two studies showed no superiority of medical intervention above
                       psychotherapy ........................................................................... 15

                   d.  Conclusions ........................................................................ 16

             4.  Mental Health Issues in Childhood-Onset Gender Dysphoria ....................... 17

       C. Adolescent-Onset Gender Dysphoria .............................................. 19

             1.  Features of Adolescent-Onset Gender Dysphoria ............................................ 19

             2.  Social Transition and Puberty Blockers with Adolescent Onset ................... 20

             3.  Mental Illness in Adolescent-Onset Gender Dysphoria ................................. 21

IV.    Other Scientific Claims Assessed ........................................................ 23

       A. Suicide and Suicidality ........................................................... 23

       B. Conversion Therapy .............................................................. 27

       C. Assessing Demands for Social Transition and Affirmation-Only or
          Affirmation-on-Demand Treatment in Pre-Pubertal Children. ........................... 28

       D. Assessing the "Minority Stress Hypothesis" ........................................ 29

V.     Assessing Statements from Professional Associations .................................. 31

       A. Understanding the Value of Statements from Professional Associations ............ 31

       B. Misrepresentations of statements of professional associations. ...................... 32

             1.  World Professional Association for Transgender Health (WPATH) ............... 33

2. Endocrine Society (ES)................................................................ 34

3. Pediatric Endocrine Society and Endocrine Society (ES/PES) ..................... 36

4. American Academy of Child & Adolescent Psychiatry (AACAP) .................. 36

5. American College of Obstetricians & Gynecologists (ACOG) ........................ 38

6. American College of Physicians (ACP)............................................... 39

7. American Academy of Pediatrics (AAP) ............................................. 40

8. The ESPE-LWPES GnRH Analogs Consensus Conference Group................ 41

VI.    International Health Care Consensus ..................................................... 42

1. United Kingdom ..................................................................... 42

2. Finland................................................................................ 43

3. Sweden ............................................................................... 44

4. France ................................................................................ 45

REFERENCES ........................................................................................ 47

**I.   Background & Credentials**

1.   I am a research scientist and clinical psychologist and am currently the Director of the Toronto Sexuality Centre in Canada. For my education and training, I received my Bachelor of Science degree from Rensselaer Polytechnic Institute, where I studied mathematics, physics, and computer science. I received my Master of Arts degree in psychology from Boston University, where I studied neuropsychology. I earned my Doctoral degree in psychology from McGill University, which included successfully defending my doctoral dissertation studying the effects of psychiatric medication and neurochemical changes on sexual behavior, and included a clinical internship assessing and treating people with a wide range of sexual and gender identity issues.

2.   Over my academic career, my posts have included Senior Scientist and Psychologist at the Centre for Addiction and Mental Health (CAMH), Head of Research for CAMH's Sexual Behaviour Clinic, Associate Professor of Psychiatry on the University of Toronto Faculty of Medicine, and Editor-in-Chief of the peer reviewed journal, *Sexual Abuse*. That journal is one of the top-impact, peer-reviewed journals in sexual behavior science and is the official journal of the Association for the Treatment of Sexual Abusers. In that appointment, I was charged to be the final arbiter for impartially deciding which contributions from other scientists in my field merited publication. I believe that appointment indicates not only my extensive experience evaluating scientific claims and methods, but also the faith put in me by the other scientists in my field. I have also served on the Editorial Boards of the *Journal of Sex Research*, the *Archives of Sexual Behavior*, and *Journal of Sexual Aggression*. Thus, although I cannot speak for other scientists, I regularly interact with and am routinely exposed to the views and opinions of most of the scientists active in our field today, within the United States and throughout the world.

3.   My scientific expertise spans the biological and non-biological development

1

of human sexuality, the classification of sexual interest patterns, the assessment and treatment of atypical sexualities, and the application of statistics and research methodology in sex research. I am the author of over 50 peer-reviewed articles in my field, spanning the development of sexual orientation, gender identity, hypersexuality, and atypical sexualities collectively referred to as *paraphilias*. I am the author of the past three editions of the gender identity and atypical sexualities chapter of the *Oxford Textbook of Psychopathology*. These works are now routinely cited in the field and are included in numerous other textbooks of sex research.

4.Ā    I began providing clinical services to people with gender dysphoria in 1998. I trained under Dr. Ray Blanchard of CAMH and have participated in the assessment and treatment of over one hundred individuals at various stages of considering and enacting both transition and detransition, including its legal, social, and medical (both cross-hormonal and surgical) aspects. My clinical experience includes the assessment and treatment of several thousand individuals experiencing other atypical sexuality issues. I am regularly called upon to provide objective assessment of the science of human sexuality by the courts (prosecution and defense), professional media, and mental health care providers.

5.Ā    A substantial proportion of the existing research on gender dysphoria comes from two clinics, one in Canada and one in the Netherlands. The CAMH gender clinic (previously, Clarke Institute of Psychiatry) was in operation for several decades, and its research was directed by Dr. Kenneth Zucker. I was employed by CAMH between 1998 and 2018. Although I was a member of the hospital's adult forensic program, I remained in regular contact with members of the CAMH child psychiatry program (of which Dr. Zucker was a member), and we collaborated on multiple research projects.

## II.Ā   Summary of Conclusions

2

- The scientific research consistently demonstrates that there is more than one distinct phenomenon that can lead to gender dysphoria. These types are distinguished by differing epidemiological and demographic patterns, unique psychological and behavioral profiles, and differing responses to the treatment options.
- Studies show that otherwise mentally healthy adults—undergoing thorough assessment (1−2 year Real Life Experience) and supervised by clinics engaged in gate-keeping roles—adjust well to life as the opposite sex.
- Regarding pre-pubescent children with gender dysphoria, there have been 11 outcomes studies. All 11 reported the majority of children to cease to feel dysphoric by puberty.  They typically report being gay or lesbian instead.
- Regarding pubescent and adolescent age minors, there have been (also) 11 follow-up studies of puberty blockers and cross-sex hormones. In four, mental health failed to improve at all. In five, mental health improved, but because psychotherapy and medical interventions were both provided, which one caused the improvement could not be identified. The two remaining studies employed methods that did permit psychotherapy effects to be distinguished from medical effects, and neither found medical intervention to be superior to psychotherapy-only.
- The research importantly distinguishes completed suicides—which occur primarily in biological males and involve the intent to die—from suicidal ideation, gestures, and attempts—which occur primarily in biological females and represent psychological distress and cries for help. The evidence is minimally consistent with transphobia being the predominant cause of suicidality. The evidence is very strongly consistent with the hypothesis that other mental health issues, such as Borderline Personality Disorder (BPD), cause suicidality and unstable identities, including gender identity confusion.
- The international consensus of public health care services is that there remains no evidence to support medicalized transition for youth. The responses in the U.S. stand in stark contrast with Sweden, Finland, France, and the United Kingdom, which are issuing increasingly restrictive statements and policies, including bans on all medical transition of minors.

## III.  Science of Gender Dysphoria and Transsexualism

6.   One of the most widespread public misunderstandings about transsexualism and people with gender dysphoria is that all cases of gender dysphoria represent the same phenomenon; however, the clinical science has long and consistently demonstrated that gender dysphoric children (cases of *early-onset* gender dysphoria) do not represent the same phenomenon as adult gender dysphoria

3

(cases of *late-onset* gender dysphoria),[1] merely attending clinics at younger ages. That is, gender dysphoric children are not simply younger versions of gender dysphoric adults. They differ in every known regard, from sexual interest patterns, to responses to treatments. A third presentation has recently become increasingly observed among people presenting to gender clinics: These cases appear to have an onset in adolescence in the absence of any childhood history of gender dysphoria. Such cases have been called adolescent-onset or "rapid-onset" gender dysphoria (ROGD). Very many public misunderstandings and expert misstatements come from misattributing evidence or personal experience from one of these types to another.

### A. Adult-Onset Gender Dysphoria

7.  People with adult-onset gender dysphoria typically attend clinics requesting transition services in mid-adulthood, usually in their 30s or 40s. Such individuals are nearly exclusively biological males.[2] They typically report being sexually attracted to women and sometimes to both men and women. Some cases profess asexuality, but very few indicate any sexual interest in or behavior involving men.[3] Cases of adult-onset gender dysphoria are typically associated with a sexual interest pattern (medically, a *paraphilia*) involving themselves in female form.[4]

### 1. Outcome Studies of Transition in Adult-Onset Gender Dysphoria

8.  Clinical research facilities studying gender dysphoria have repeatedly reported low rates of regret (less than 3%) among adult-onset patients who underwent complete transition (*i.e.*, social, plus hormonal, plus surgical transition). This has been widely reported by clinics in Canada,[5] Sweden,[6] and the Netherlands.[7]

9.  Importantly, each of the Canadian, Swedish, and Dutch clinics for adults

---

[1]  Blanchard, 1985.
[2]  Blanchard, 1990, 1991.
[3]  Blanchard, 1988.
[4]  Blanchard 1989a, 1989b, 1991.
[5]  Blanchard, *et al.*, 1989.
[6]  Dhejneberg, *et al.*, 2014.
[7]  Wiepjes, *et al.*, 2018.

App_0147

with gender dysphoria all performed "gate-keeping" procedures, disqualifying from medical services people with mental health or other contraindications. One would not expect the same results to emerge in the absence of such gate-keeping or when gate-keepers apply only minimal standards or cursory assessment.

10.Ā   An important caution applies to interpreting these results: The side-effect of removing these people from the samples of transitioners is that if a researcher compared the average mental health of individuals coming into the clinic with the average mental health of individuals going through medical transition, then the post-transition group would appear to show a substantial improvement, even though transition had *no effect at all*: The removal of people with poorer mental health created the statistical illusion of improvement among the remaining people.

### 2.ĀMental Health Issues in Adult-Onset Gender Dysphoria

11.Ā   The research evidence on mental health issues in gender dysphoria indicates it to be different between adult-onset versus adolescent-onset versus prepubescent-onset types. The co-occurrence of mental illness with gender dysphoria in adults is widely recognized and widely documented.[8] A research team in 2016 published a comprehensive and systematic review of all studies examining rates of mental health issues in transgender adults.[9] There were 38 studies in total. The review indicated that many studies were methodologically weak, but nonetheless demonstrated (1) that rates of mental health issues among people are highly elevated both before *and after* transition, (2) but that rates were less elevated among those who completed transition. Analyses were not conducted in a way so as to compare the elevation in mental health issues observed among people newly attending clinics to improvement after transition. Also, several studies showed more than 40% of patients to become "lost to follow-up." With attrition rates that high, it is unclear to what

---

[8]   *See, e.g.*, Hepp, *et al.*, 2005.
[9]   Dhejne, *et al.*, 2016.

extent the information from the remaining participants would accurately reflect the whole population. The very high rate of "lost to follow-up" leaves open the possibility of considerably more negative results overall.

12.Ā   The long-standing and consistent finding that gender dysphoric adults continue to show high rates of mental health issues after transition indicates a critical point: To the extent that gender dysphoric children resemble adults, we should not expect mental health to improve as a result of transition—that is, transition does not appear to be what causes mental health improvement. Rather, mental health issues should be resolved before any transition, as has been noted in multiple standards of care documents, as detailed in their own section of this report.

### B. Childhood Onset (Pre-Puberty) Gender Dysphoria

### 1.ĀFollow-up Studies Show Most Children Desist by Puberty

13.Ā   Prepubescent children (and their parents) have been approaching mental health professionals for help with their unhappiness with their sex and belief they would be happier living as the other for many decades. The large majority of childhood onset cases of gender dysphoria occur in biological males, with clinics reporting 2–6 biological male children to each female.[10]

14.Ā   In total, there have been 11 outcomes studies of these children, listed in Appendix 1. In sum, despite coming from a variety of countries, conducted by a variety of labs, using a variety of methods, all spanning four decades, every study without exception has come to the identical conclusion: Among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender over the course of puberty—ranging from 61–88% desistance across the large, prospective studies. Such cases are often referred to as "desisters," whereas children who continue to feel gender dysphoric are often called "persisters."

15.Ā   Notably, in most cases, these children were receiving professional

---

[10]   Cohen-Kettenis, *et al.*, 2003; Steensma, *et al.,* 2018; Wood, *et al.*, 2013.

psychosocial support across the study period aimed, not at affirming cross-gender identification, but at resolving stressors and issues potentially interfering with desistance. While beneficial to these children and their families, the inclusion of therapy in the study protocol represents a complication for the interpretation of the results: It is not possible to know to what extent the outcomes were influenced by the psychosocial support or would have emerged regardless. In science, this is referred to as a confound.

16.Ā   While the absolute number of those who present as prepubescent children with gender dysphoria and "persist" through adolescence is very small in relation to the total population, persistence in some subjects was observed in each of these studies. Thus, a clinician cannot take either outcome for granted.

17.Ā   It is because of this long-established and unanimous research finding of desistance being probable but not inevitable, that the "watchful waiting" method became the standard approach for assisting gender dysphoric children. The balance of potential risks to potential benefits is very different for groups likely to desist versus groups unlikely to desist: If a child is very likely to persist, then taking on the risks of medical transition might be more worthwhile than if that child is very likely to desist in transgender feelings.

18.Ā   The consistent observation of high rates of desistance among pre-pubertal children who present with gender dysphoria demonstrates a pivotally important— yet often overlooked—feature: because gender dysphoria so often desists on its own, clinical researchers cannot assume that therapeutic intervention cannot facilitate or speed desistance for at least some patients. That is, gender identity is not the same as sexual orientation, and it cannot be assumed that gender identity is as unchangeable as is sexual orientation. Such is an empirical question, and there has not yet been any such study.

19.Ā   It is also important to note that research has not yet identified any reliable

7

procedure for discerning which children who present with gender dysphoria will persist, as against the majority who will desist, absent transition and "affirmation." Such a method would be valuable, as the more accurately that potential persisters can be distinguished from desisters, the better the risks and benefits of options can be weighted. Such "risk prediction" and "test construction" are standard components of applied statistics in the behavioral sciences. Multiple research teams have reported that, on average, groups of persisters are somewhat more gender non-conforming than desisters, but not so different as to usefully predict the course of a particular child.[11]

20.  In contrast, one research team (the aforementioned Olson group) claimed the opposite, asserting that they developed a method of distinguishing persisters from desisters, using a single composite score representing a combination of children's "peer preference, toy preference, clothing preference, gender similarity, and gender identity."[12] They reported a statistical association (mathematically equivalent to a correlation) between that composite score and the probability of persistence. As they indicated, "Our model predicted that a child with a gender-nonconformity score of .50 would have roughly a .30 probability . . . of socially transitioning. By contrast, a child with gender-nonconformity score of .75 would have roughly a .48 probability."[13] Although the Olson team declared that "social transitions may be predictable from gender identification and preferences,"[14] their actual results suggest the opposite: The gender-nonconforming group who went on to transition (socially) had a mean composite score of .73 (which is less than .75), and the gender-nonconforming group who did not transition had a mean composite score of .61, also less than .75.[15] Both of those are lower than the value of .75, so both of those would be more likely than not

---

[11]  Singh, *et al.* (2021); Steensma *et al.*, 2013.
[12]  Rae, *et al.*, 2019, at 671.
[13]  Rae, *et al.*, 2019, at 673.
[14]  Rae, *et al.*, 2019, at 669.
[15]  Rae, *et al.*, 2019, Supplemental Material at 6, Table S1, bottom line.

App_0151

to desist, rather than to proceed to transition. That is, Olson's model does not distinguish likely from unlikely to transition; rather, it distinguishes unlikely from even less likely to transition.

21.  Although it remains possible for some future discovery to yield a method to identify with sufficient accuracy which gender dysphoric children will persist, there does not exist such a method at the present time. Moreover, in the absence of long-term follow-up, it cannot be known what proportions come to regret having transitioned and then *de*transition. Because only a minority of gender dysphoric children persist in feeling gender dysphoric in the first place, "transition-on-demand" increases the probability of unnecessary transition and unnecessary medical risks.

### 2.  "Watchful Waiting" and "The Dutch Protocol"

22.  It was this state of the science—that the majority of prepubescent children will desist in their feelings of gender dysphoria and that we lack an accurate method of identifying which children will persist—that led to the development of a clinical approach, The Dutch Protocol,[16] including its "Watchful Waiting" period. Internationally, the Dutch Protocol remains the most empirically supported protocol for the treatment of children with gender dysphoria.

23.  The purpose of the protocol was to compromise the conflicting needs among: clients' initial wishes upon assessment, the long-established and repeated observation that those wishes will change in the majority of (but not in all) childhood cases, and that cosmetic aspects of medical transition are perceived to be better when they occur earlier rather than later.

24.  The Dutch Protocol was developed over many years by the Netherlands' child gender identity clinic, incorporating the accumulating findings from their own research as well as those reported by other clinics working with gender dysphoric

---

[16]   Delemarre-van de Waal & Cohen-Kettenis (2006).

children. They summarized and explicated the approach in their peer-reviewed report, *Clinical management of gender dysphoria in children and adolescents: The Dutch Approach*.[17] The components of the Dutch Approach are:

- Ā no social transition at all considered before age 12 (watchful waiting period),
- Ā no puberty blockers considered before age 12,
- Ā cross-sex hormones considered only after age 16, and
- Ā resolution of mental health issues before any transition.

25.Ā   For youth under age 12, "the general recommendation is watchful waiting and carefully observing how gender dysphoria develops in the first stages of puberty."[18]

26.Ā   The age cut-offs of the Dutch Approach were not based on any research demonstrating their superiority over other potential age cut-off's. Rather, they were chosen to correspond to the ages of consent to medical procedures under Dutch law. Nevertheless, whatever the original rationale, the data from this clinic simply contain no information about the safety or efficacy of employing these measures at younger ages.

27.Ā   The authors of the Dutch Approach repeatedly and consistently emphasize the need for extensive mental health assessment, including clinical interviews, formal psychological testing with validated psychometric instruments, and multiple sessions with the child and the child's parents.

28.Ā   Within the Dutch approach, there is no social transition before age twelve. That is, social affirmation of the new gender may not begin until age 12—as desistance is less likely to occur past that age. "Watchful Waiting" refers to a child's developmental period up to that age. Watchful waiting does not mean do nothing but passively observe the child. Rather, such children and families typically present with substantial distress involving both gender and non-gender issues, and it is during the watchful waiting period that a child (and other family members as appropriate) would

---

[17]   de Vries & Cohen-Kettenis, 2012
[18]   de Vries & Cohen-Kettenis, 2012, at 301.

App_0153

undergo therapy, resolving other issues which may be exacerbating psychological stress or dysphoria. As noted by the Dutch clinic, "[T]he adolescents in this study received extensive family or other social support . . . [and they] were all regularly seen by one of the clinic's psychologists or psychiatrists."[19] One is actively treating the person, while carefully "watching" the dysphoria.

### 3.   Follow-Up Studies of Puberty Blockers and Cross-Sex Hormones

29.    Very many strong claims have appeared in the media and on social media asserting that transition results in improved mental health or, contradictorily, in decreased mental health. In the highly politicized context of gender and transgender research, many outlets have cited only the findings which appear to support one side, cherry-picking from the complete set of research reports. It total, there have been 11 prospective outcomes studies following up gender dysphoric children undergoing medically induced suppression of puberty or cross-sex hormone treatment. Four studies failed to find evidence of improvement in mental health functioning at all, and some groups deteriorated on some variables.[20] Five studies successfully identified evidence of improvement, but because patients received psychotherapy along with medical services, which of those treatments caused the improvement is unknowable.[21] In the remaining two studies, both psychotherapy and medical interventions were provided, but the studies were designed in such a way as to allow the effects of psychotherapy to be separated from the effects of the puberty-blocking medications.[22] As detailed in the following, neither identified benefits of medication over psychotherapy alone.

### a.   Four studies found no mental health improvement

30.    Carmichael, *et al.* (2021) recently released its findings from the Tavistock

---

[19]   de Vries, *et al.*, 2011, at 2280-2281.
[20]   Carmichael, *et al.*, 2021; Hisle-Gorman, *et al.*, 2021; Kaltiala, *et al.,* 2020; Kuper, *et al.*, 2020.
[21]   de Vries, *et al.*, 2011; Tordoff, *et al.,* 2022; van der Miesen, *et al.,* 2020.
[22]   Achille, *et al.*, 2020; Costa, *et al.,* 2015.

and Portman clinic in the U.K.[23] Study participants were ages 12–15 (Tanner stage 3 for natal males, Tanner stage 2 for natal females) and were repeatedly tested before beginning puberty-blocking medications and then every six months thereafter. Cases exhibiting serious mental illnesses (*e.g.*, psychosis, bipolar disorder, anorexia nervosa, severe body-dysmorphic disorder unrelated to gender dysphoria) were excluded. Relative to the time point before beginning puberty suppression, there were *no* significant changes in any psychological measure, from either the patients' or their parents' perspective.

31. In Kuper, *et al.* (2020), a multidisciplinary team from Dallas published a prospective follow-up study which included 25 youths as they began puberty suppression.[24] (The other 123 study participants were undergoing cross-sex hormone treatment.) Interventions were administered according to practice guidelines from the Endocrine Society.[25] Their analyses found *no statistically significant changes* in the group undergoing puberty suppression on any of the nine measures of wellbeing measured, spanning tests of body satisfaction, depressive symptoms, or anxiety symptoms.[26] Notably, whereas the Dutch Protocol includes age 12 as a minimum for puberty suppression treatment, this team provided such treatment beginning at age 9.8 years (full range: 9.8–14.9 years).[27]

32. Hisle-Gorman, *et al.* (2021) analyzed military families' healthcare data to compare 963 transgender and gender-diverse youth before versus after hormonal treatment, with their non-gender dysphoric siblings as controls. The study participants included youth undergoing puberty-blocking as well as those undergoing cross-sex hormone treatment, but these subgroups did not differ from each other. Study participants had a mean age of 18 years when beginning the study, but their

---

[23] Carmichael, *et al.*, 2021.
[24] Kuper, *et al.*, 2020, at 5.
[25] Kuper, *et al.*, 2020, at 3, referring to Hembree, *et al.*, 2017.
[26] Kuper, *et al.*, 2020, at Table 2.
[27] Kuper, *et al.*, 2020, at 4.

App_0155

initial clinical contacts and diagnoses occurred at a mean age of 10 years. According to the study, "mental health care visits overall did not significantly change following gender-affirming pharmaceutical care,"[28] yet, "psychotropic medication use *increased,*"[29] indicating *deteriorating* mental health.

33.  Kaltiala et al. (2020) similarly reported that after cross-sex hormone treatment, "Those who had psychiatric treatment needs or problems in school, peer relationships and managing everyday matters outside of home continued to have problems during real-life."[30] They concluded, "Medical gender reassignment is not enough to improve functioning and relieve psychiatric comorbidities among adolescents with gender dysphoria. Appropriate interventions are warranted for psychiatric comorbidities and problems in adolescent development."[31]

### b.  Five studies confounded psychotherapy and medical treatment

34.   The initial enthusiasm for medical blocking of puberty followed largely from early reports from the Dutch clinical research team suggesting at least some mental health improvement.[32] It was when subsequent research studies failed to replicate those successes that it became apparent that the successes were due, not to the medical interventions, but to the psychotherapy that accompanied such interventions in most clinics, including the Dutch clinic.

35.   The Dutch clinical research team followed up a cohort of youth  at their clinic undergoing puberty suppression[33] and later cross-hormone treatment and surgical sex reassignment.[34] The youth improved on several variables upon follow-up as compared to pre-suppression measurement, including depressive symptoms and

---

[28]   Hisle-Gorman, et al., 2021, at 1448.
[29]   Hisle-Gorman, et al., 2021, at 1448, emphasis added.
[30]   Kaltiala et al., 2020, at 213.
[31]   Kaltiala et al., 2020, at 213.
[32]   de Vries, *et al.,* 2011; de Vries, *et al.,* 2014
[33]   de Vries, *et al.*, 2011.
[34]   de Vries, *et al.,* 2014.

general functioning. No changes were detected in feelings of anxiety or anger or in gender dysphoria as a result of puberty suppression; however, natal females using puberty suppression suffered *increased* body dissatisfaction both with their secondary sex characteristics and with nonsexual characteristics.[35]

36.  As the report authors noted, while it is possible that the improvement on some variables was due to the puberty-blockers, it is also possible that the improvement was due to the mental health support, and it is possible that the improvement occurred only on its own with natural maturation. So any conclusion that puberty blockers improved the mental health of the treated children is not justified by the data. Because this study did not include a control group (another group of adolescents matching the first group, but *not* receiving medical or social support), these possibilities cannot be distinguished from each other. The authors of the study were explicit in noting this themselves: "All these factors may have contributed to the psychological well-being of these gender dysphoric adolescents."[36]

37.  In a 2020 update, the Dutch clinic reported continuing to find improvement in transgender adolescents' psychological functioning, reaching age-typical levels, "after the start of specialized transgender care involving puberty suppression."[37] Unfortunately, because the transgender care method of that clinic involves both psychosocial support and puberty suppression, it again cannot be known which of those (or their combination) is driving the improvement. Also, the authors indicate that the changing demographic and other features among gender dysphoric youth might have caused the treated group to differ from the control group in unknown ways. As the study authors noted again, "The present study can, therefore, not provide evidence about the direct benefits of puberty suppression over time and long-

---

[35]  Biggs, 2020.
[36]  de Vries, *et al.* 2011, at 2281.
[37]  van der Miesen, *et al.*, 2020, at 699.

App_0157

term mental health outcomes."[38]

38.  Allen, *et al.* (2019) reported on a sample of 47 youth, ages 13–20, undergoing cross-sex hormone treatment. They reported observing increases in measures of well-being and decreases in measures of suicidality; however, as the authors also noted, "whether a patient is actively receiving psychotherapy" may have been a confounding variable.[39]

39.  Tordoff, *et al.* (2022) reported on a sample of youth, ages 13–20 years, treated with either puberty blockers or cross-sex hormones. There were improvements in mental health functioning; however, 62.5% of the sample was again receiving mental health therapy.[40]

### c.  Two studies showed no superiority of medical intervention above psychotherapy

40.  Costa, *et al.* (2015) reported on preliminary outcomes from the Tavistock and Portman NHS Foundation Trust clinic in the UK. They compared the psychological functioning of one group of youth receiving psychological support with a second group receiving both psychological support as well as puberty blocking medication. Both groups improved in psychological functioning over the course of the study, but no statistically significant differences between the groups was detected at any point.[41] As those authors concluded, "Psychological support and puberty suppression were both associated with an improved global psychosocial functioning in GD adolescence. Both these interventions may be considered effective in the clinical management of psychosocial functioning difficulties in GD adolescence."[42] Because psychological support does not pose the physical health risks that hormonal interventions or surgery does (such as loss of reproductive function) however, one

---

[38]  van der Miesen, *et al.*, 2020, at 703.
[39]  Allen, *et al.,* 2019.
[40]  Tordoff, et al., 2022, Table 1.
[41]  Costa, *et al.*, at 2212 Table 2.
[42]  Costa, *et al.*, at 2206.

15

cannot justify taking on the greater risks of social transition, puberty blockers or surgery without evidence of such treatment producing superior results. Such evidence does not exist. Moreover, this clinical team subsequently released the final version of this preliminary report, finding that neither group actually experienced significant improvement,[43] making moot any discussion of the source any improvement.

41.   Achille, *et al.* (2020) at Stony Brook Children's Hospital in New York treated a sample of 95 youth with gender dysphoria, providing follow-up data on 50 of them. (The report did not indicate how these 50 were selected from the 95.) As well as receiving puberty blocking medications, "Most subjects were followed by mental health professionals. Those that were not were encouraged to see a mental health professional."[44] The puberty blockers themselves "were introduced in accordance with the Endocrine Society and the WPATH guidelines."[45] Upon follow-up, some incremental improvements were noted; however, after statistically adjusting for psychiatric medication and engagement in counselling, "*most predictors did not reach statistical significance*."[46] That is, puberty blockers did not improve mental health any more than did mental health care on its own.

### d.   Conclusions

42.   The authors of the original Dutch studies were careful not to overstate the implications of their results, "We *cautiously* conclude that puberty suppression *may be* a valuable *element* in clinical management of adolescent gender dysphoria."[47] Nonetheless,  many other clinics and clinicians intrepidly proceeded on the basis of only the perceived positives, broadened the range of people beyond those represented in the research findings, and removed the protections applied in the procedures that

---

[43]   Carmichael, et al., 2021.
[44]   Achille, *et al.*, 2020, at 2.
[45]   Achille, *et al.*, 2020, at 2.
[46]   Achille, *et al.*, 2020, at 3 (italics added).
[47]   de Vries, *et al.* 2011, at 2282, italics added.

led to those outcomes. Many clinics and individual clinicians have reduced the minimum age for transition to 10 instead of 12. While the Dutch Protocol involves interdisciplinary teams of clinicians, many clinics now rely on a single assessor, in some cases one without adequate professional training in childhood and adolescent mental health. Comprehensive, longitudinal assessments (*e.g.*, 1 to 2 *years*[48]) became approvals after one or two assessment sessions. Validated, objective measures of youths' psychological functioning were replaced with clinicians' subjective (and first) opinions, often reflecting only the clients' own self-report. Systematic recordings of outcomes, so as to allow for detection and correction of clinical deficiencies, were eliminated.

43. Notably, Dr. Thomas Steensma, central researcher of the Dutch clinic, has decried other clinics for "blindly adopting our research" despite the indications that those results may not actually apply: "We don't know whether studies we have done in the past are still applicable to today. Many more children are registering, and also a different type."[49] Steensma opined that "every doctor or psychologist who is involved in transgender care should feel the obligation to do a good pre- and post-test." But few if any are doing so.

### 4. Mental Health Issues in Childhood-Onset Gender Dysphoria

44. As shown by the outcomes studies, there is little evidence that transition improves the mental well-being of children. As shown repeatedly by clinical guidelines from multiple professional associations, mental health issues are expected or required to be resolved *before* undergoing transition. The reasoning behind these conclusions is that children may be expressing gender dysphoria, not because they are experiencing what gender dysphoric adults report, but because they mistake what their experiences indicate or to what they might lead. For example, a child

---

[48]   de Vries, *et al.*, 2011.
[49]   Tetelepta, 2021.

App_0160

experiencing depression from social isolation might develop the hope—and the unrealistic expectation—that transition will help them fit in, this time as and with the other sex.

45.  If a child undergoes transition, discovering only then that their mental health or social situations will not in fact change, the medical risks and side-effects (such as sterilization) will have been borne for no reason. If, however, a child resolves the mental health issues first, with the gender dysphoria resolving with it (which the research literature shows to be the case in the large majority), then the child need not undergo transition at all, but retains the opportunity to do so later.

46.  Elevated rates of multiple mental health issues among gender dysphoric children are reported throughout the research literature. A formal analysis of children (ages 4–11) undergoing assessment at the Dutch child gender clinic showed 52% fulfilled criteria for a DSM axis-I disorder.[50] A comparison of the children attending the Canadian versus Dutch child gender dysphoria clinic showed only few differences between them, but a large proportion in both groups were diagnosable with clinically significant mental health issues. Results of standard assessment instruments (Child Behavior Check List, or CBCL) demonstrated that the average score was in the clinical rather than healthy range, among children in both clinics.[51] When expressed as percentages, among 6–11-year-olds, 61.7% of the Canadian and 62.1% of the Dutch sample were in the clinical range.

47.  A systematic, comprehensive review of all studies of Autism Spectrum Disorders (ASDs) and Attention-Deficit Hyperactivity Disorder (ADHD) among children diagnosed with gender dysphoria was recently conducted. It was able to identify a total of 22 studies examining the prevalence of ASD or ADHD I youth with gender dysphoria. Studies reviewing medical records of children and adolescents

---

[50]   Wallien, *et al.*, 2007.
[51]   Cohen-Kettenis, *et al.*, 2003, at 46.

referred to gender clinics showed 5–26% to have been diagnosed with ASD.[52] Moreover, those authors gave specific caution on the "considerable overlap between symptoms of ASD and symptoms of gender variance, exemplified by the subthreshold group which may display symptoms which could be interpreted as either ASD or gender variance. Overlap between symptoms of ASD and symptoms of GD may well confound results."[53] As noted elsewhere herein, when two or more issues are present at the same time, researchers cannot distinguish when a result is associated with or caused by the issue of interest or one of the side issues.[54] The rate of ADHD among children with GD was 8.3–11%. Conversely, in data from children (ages 6–18) with Autism Spectrum Disorders (ASDs) show they are more than seven times more likely to have parent-reported "gender variance."[55]

### C. Adolescent-Onset Gender Dysphoria

#### 1.  Features of Adolescent-Onset Gender Dysphoria

48.   In the social media age, a third profile has recently begun to present clinically or socially, characteristically distinct from the two previously identified profiles.[56] Unlike adult-onset or childhood-onset gender dysphoria, this group is predominately biologically female. This group typically presents in adolescence, but lacks the history of cross-gender behavior in childhood like the childhood-onset cases have. It is that feature which led to the term Rapid Onset Gender Dysphoria (ROGD).[57] The majority of cases appear to occur within clusters of peers and in association with increased social media use[58] and especially among people with autism or other neurodevelopmental or mental health issues.[59]

49.   It cannot be easily determined whether the self-reported gender dysphoria

---

[52] Thrower, *et al.*, 2020.
[53] Thrower, *et al.*, 2020, at 703.
[54] Cohen-Kettenis *et al.,* 2003, at 51; Skelly *et al.,* 2012.
[55] Janssen, *et al.*, 2016.
[56] Kaltiala-Heino, *et al.*, 2015; Littman, 2018.
[57] Littman, 2018.
[58] Littman, 2018.
[59] Kaltiala-Heino, *et al.*, 2015; Littman, 2018; Warrier, *et al.*, 2020.

is a result of other underlying issues or if those mental health issues are the result of the stresses of being a sexual minority, as some writers are quick to assume.[60] (The science of the *Minority Stress Hypothesis* appears in its own section.) Importantly, and unlike other presentations of gender dysphoria, people with rapid-onset gender dysphoria often (47.2%) experienced *declines* rather than improvements in mental health when they publicly acknowledged their gender status.[61] Although long-term outcomes have not yet been reported, these distinctions demonstrate that one cannot apply findings from the other types of gender dysphoria to this type. That is, in the absence of evidence, researchers cannot assume that the pattern found in childhood-onset or adult-onset gender dysphoria also applies to adolescent-onset gender dysphoria. The multiple differences already observed between these groups argue against predicting that features present in one type would generalize to be present in all types of gender dysphoria.

## 2.  Social Transition and Puberty Blockers with Adolescent Onset

50.  There do not yet exist prospective outcomes studies either for social transition or for medical interventions for people whose gender dysphoria began in adolescence. That is, instead of taking a sample of individuals and following them forward over time (thus permitting researchers to account for people dropping out of the study, people misremembering the order of events, etc.), all studies have thus far been *retrospective*. It is not possible for such studies to identify what factors caused what outcomes. No study has yet been organized in such a way as to allow for an analysis of the adolescent-onset group, as distinct from childhood-onset or adult-onset cases. Many of the newer clinics (not the original clinics which systematically tracked and reported on their cases' results) fail to distinguish between people who had childhood-onset gender dysphoria and have aged into adolescence versus people

---

[60]   Boivin, *et al.*, 2020.
[61]   Biggs, 2020; Littman, 2018.

whose onset was not until adolescence. (Analogously, there are reports failing to distinguish people who had adolescent-onset gender dysphoria and aged into adulthood from adult-onset gender dysphoria.) Studies selecting groups according to their current age instead of their ages of onset produces confounded results, representing unclear mixes according to how many of each type of case wound up in the final sample.

### 3. Mental Illness in Adolescent-Onset Gender Dysphoria

51.   In 2019, a Special Section appeared in the *Archives of Sexual Behavior* titled, "Clinical Approaches to Adolescents with Gender Dysphoria." It included this brief yet thorough summary of rates of mental health issues among adolescents expressing gender dysphoria, by Dr. Aron Janssen of the Department of Child and Adolescent Psychiatry of New York University:[62] The literature varies in the range of percentages of adolescents with co-occurring disorders. The range for depressive symptoms ranges was 6–42%,[63] with suicide attempts ranging 10 to 45%.[64] Self-injurious thoughts and behaviors range 14–39%.[65] Anxiety disorders and disruptive behavior difficulties including Attention Deficit/Hyperactivity Disorder are also prevalent.[66] Gender dysphoria also overlaps with Autism Spectrum Disorder.[67]

52.   Of particular concern in the context of adolescent onset gender dysphoria is Borderline Personality Disorder (BPD; diagnostic criteria to follow). It is increasingly hypothesized that very many cases appearing to be adolescent-onset gender dysphoria actually represent cases of BPD.[68] That is, some people may be misinterpreting their experiencing of the broader "identity disturbance" of symptom Criterion 3 to represent a gender identity issue specifically. Like adolescent-onset

---

[62]   Janssen, *et al.*, 2019.
[63]   Holt, *et al.*, 2016; Skagerberg, *et al.*, 2013; Wallien, *et al.*, 2007.
[64]   Reisner, *et al.*, 2015.
[65]   Holt, *et al.*, 2016; Skagerberg, *et al.*, 2013.
[66]   de Vries, *et al.*, 2011; Mustanski, *et al.*, 2010; Wallien, *et al.*, 2007.
[67]   de Vries, *et al.*, 2010; Jacobs, *et al.*, 2014; Janssen, *et al.*, 2016; May, *et al.*, 2016; Strang, *et al.*, 2014, 2016.
[68]   *E.g.*, Anzani, *et al.,* 2020; Zucker, 2019.

gender dysphoria, BPD begins to manifest in adolescence, is three times more common in biological females than males, and occurs in 2–3% of the population, rather than 1-in-5,000 people. (Thus, if even only a portion of people with BPD experienced an identity disturbance that focused on gender identity and were mistaken for transgender, they could easily overwhelm the number of genuine cases of gender dysphoria.)

53.  DSM-5-TR Diagnostic Criteria for Borderline Personality Disorder:

> A pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:
>
> 1. Frantic efforts to avoid real or imagined abandonment. (Note: Do not include suicidal or self-mutilating behaviour covered in Criterion 5.)
>
> 2. A pattern of unstable and intense interpersonal relationship characterized by alternating between extremes of idealization and devaluation.
>
> 3. *Identity disturbance: markedly and persistently unstable self-image or sense of self.*
>
> 4. Impulsivity in at least two areas that are potentially self-damaging (e.g., spending, sex, substance abuse, reckless driving, binge eating). (Note: Do not include suicidal or self-mutilating behavior covered in Criterion 5.)
>
> 5. *Recurrent suicidal behaviour, gestures, or threats, or self-mutilating behavior.*
>
> 6. Affective instability due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days).
>
> 7. Chronic feelings of emptiness.
>
> 8. Inappropriate, intense anger or difficulty controlling anger (e.g., frequent displays of temper, constant anger, recurrent physical fights).
>
> 9. Transient, stress-related paranoid ideation or severe dissociative symptoms.

(Italics added.)

54.  Mistaking cases of BPD for cases of Gender Dysphoria may prevent such youth from receiving the correct mental health services for their condition, and a primary cause for concern is symptom Criterion 5: Recurrent suicidality. (The research on suicide and suicidality are detailed in their own section herein.)

22

Regarding the provision of mental health care, the distinction between these conditions is crucial: A person with BPD going undiagnosed will not receive the appropriate treatments (the currently most effective of which is Dialectical Behavior Therapy). A person with a cross-gender identity would be expected to feel relief from medical transition, but someone with BPD would not: The problem was not about *gender* identity, but about having an *unstable* identity. Moreover, after a failure of medical transition to provide relief, one would predict for these people increased levels of hopelessness and increased risk of suicidality.

55.  Regarding research, there have now been several attempts to document rates of suicidality among gender dysphoric adolescents. The scientific concern presented by BPD is that it poses a potential confound: Samples of gender dysphoric adolescents could appear to have elevated rates of suicidality, not because of the gender dysphoria (or transphobia in society), but because of the number of people with BPD in the sample.

## IV.  Other Scientific Claims Assessed

### A. Suicide and Suicidality

56.  Social media increasingly circulate demands for transition accompanied by hyperbolic warnings of suicide should there be delay or obstacle. Claims accompany admissions that "I'd rather have a trans daughter than a dead son," and such threats are treated as the justification for referring to affirming gender transitions as 'life-saving' or 'medically necessary'. Such claims convey only grossly misleading misrepresentations of the research literature, however, deploying terms for their shock value rather than accuracy, and exploiting common public misperceptions about suicide. Indeed, suicide prevention research and public health campaigns repeatedly warn against circulating such exaggerations, due to the risk of copy-cat

behavior they encourage.[69]

57.   Despite that the media treat them as near synonyms, suicide and suicidality are distinct phenomena. They represent different behaviors with different motivations, with different mental health issues, and with different clinical needs. *Suicide* refers to completed suicides and the sincere intent to die. It is substantially associated with impulsivity, using more lethal means, and being a biological male.[70] *Suicidality* refers to parasuicidal behaviors, including suicidal ideation, threats, and gestures. These typically represent cries for help rather than an intent to die and are more common among biological females. Suicidal threats can indicate any of many problems or represent emotional blackmail, as typified by "If you leave me, I will kill myself." Professing suicidality is also used for attention-seeking or for the support or sympathy it evokes from others, denoting distress much more frequently than an intent to die.

58.   Notwithstanding public misconceptions about the frequency of suicide and related behaviors, the highest rates of suicide are among middle-aged and elderly men in high income countries.[71] Biological males are at three times greater risk of death by suicide than are biological females, whereas suicidal ideation, plans, and attempts are three times more common among biological females.[72] In contrast with completed suicides, the frequency of suicidal ideation, plans, and attempts is highest during adolescence and young adulthood, with reported ideation rates spanning 12.1–33%.[73] Relative to other countries, Americans report elevated rates of each of suicidal ideation (15.6%), plans (5.4%), and attempts (5.0%).[74] Suicide attempts occur up to 30

---

[69]   Gould & Lake, 2013.
[70]   Freeman, *et al.,* 2017.
[71]   Turecki & Brent, 2016
[72]   Klonsky et al., 2016; Turecki & Brent, 2016
[73]   Borges e a., 2010; Nock et al., 2008
[74]   Klonsky, et al., 2016.

App_0167

times more frequently than completed suicides.[75] The rate of completed suicides in the U.S. population is 14.5 per 100,000 people.[76] The widely discrepant numbers representing completed suicides versus transient suicidal ideation has left those statistics open to substantial abuse in the media and social media. Despite public media guidelines urging "Avoid dramatic headlines and strong terms such as 'suicide epidemic',"[77] that is exactly what mainstream outlets have done.[78]

59.  There is substantial research associating sexual orientation with suicidality, but much less so with completed suicide.[79] More specifically, there is some evidence suggesting gay adult men are more likely to die by suicide than are heterosexual men, but there is less evidence of an analogous pattern among lesbian women. Regarding suicidality, surveys of self-identified LGB Americans repeatedly report rates of suicidal ideation and suicide attempts 2–7 times higher than their heterosexual counterparts.  Because of this association of suicidality with sexual orientation, one must apply caution in interpreting findings allegedly about gender identity: Because of the overlap between people who self-identify as non-heterosexual and as non-cis-gendered, correlations detected between suicidality and gender dysphoria may instead reflect (be confounded by) homosexuality. Indeed, other authors have made explicit their surprise that so many studies, purportedly of gender identity, entirely omitted measurement or consideration of sexual orientation, creating the situation where features that seem to be associated with gender identity instead reflect the sexual orientation of the members of the sample.[80]

60.   Among post-transition transsexuals, completed suicide rates are elevated,

---

[75]  Bachman, 2018.
[76]  World Health Organization, 2022.
[77]  Samaritans, 2020.
[78]  E.g., MSNBC, 2015, *Trans youth and suicide: An epidemic*.
[79]  Haas, *et al.*, 2011.
[80]  McNeil, *et al.* (2017)

but are nonetheless rare.[81] Regarding suicidality, there have been three recent, systematic reviews of the research literature.[82] All three included specific methods to minimize any potential effects of cherry-picking findings from within the research literature. Compiling the results of 108 articles reported from 64 research projects, Adams and Vincent (2019) found an overall average rate of 46.55% for suicidal ideation (ranging 18.18%–95.5%) and an overall average rate of 27.19% for suicidal attempts (ranging 8.57%–52.4%). These findings confirmed those reported by McNeil, *et al.* (2017), whose review of 30 articles revealed a range of 37%–83% for suicidal ideation and 9.8%–43% for suicidal attempts. Thus, on the one hand, these ranges are greater than those reported for the mainstream population—They instead approximate the rates reported among sexual orientation minorities. On the other hand, with measures so lacking in reliability that they produce every result from 'rare' to 'almost everyone', it is unclear which, if any of them, represents a valid conclusion.

61.Ā  McNeil *et al.* (2017) observed also the research to reveal rates of suicidal ideation and suicidal attempts to be related—not to transition status—but to the social support received: The studies reviewed showed support to decrease suicidality, but transition not to. Indeed, in some situations, social support was associated with *increased* suicide attempts, suggesting the reported suicidality may represent attempts to evoke more support.[83]

62.Ā  Marshall et al. (2016) identified and examined 31 studies, again finding rates of suicidal ideation and suicide attempts to be elevated, particularly among biological females, indicating that suicidality patterns correspond to biological sex rather than self-identified gender.[84]

---

[81]  Wiepjes, *et al.,* 2020.
[82]  Adams & Vincent, 2019; Marshall, *et al.,* 2016; McNeil, *et al.* (2017).
[83]  Bauer, *et al*., 2015; Canetto, et al., 2021.
[84]  Marshall, et al., 2016.

App_0169

63.  Despite that mental health issues, including suicidality, are repeatedly required by clinical standards of care to be resolved before transition, threats of suicide are instead oftentimes used as the very justification for labelling transition a 'medical necessity'. However plausible it might seem that failing to affirm transition causes suicidality, the epidemiological evidence indicates that hypothesis to be incorrect: Suicide rates remains elevated even after complete transition, as shown by a comprehensive review of 17 studies of suicidality in gender dysphoria.[85]

64.  The scientific study of suicide is inextricably linked to that of mental illness, and Borderline Personality Disorder is repeatedly documented to be greatly elevated among sexual minorities[86].

### B. Conversion Therapy

65.  Activists and social media increasingly, but erroneously, apply the term "conversion therapy" moving farther and farther from what the research has reported. "Conversion therapy" (or "reparative therapy" and other names) was the attempt to change a person's sexual orientation; however, with the public more frequently accustomed to "LGB" being expanded to "LGBTQ+", the claims relevant only to sexual orientation are being misapplied to gender identity. The research has repeatedly demonstrated that once one explicitly acknowledges being gay or lesbian, this is only very rarely are mistaken. That is entirely unlike gender identity, wherein the great majority of children who declare cross-gender identity cease to do so by puberty, as already shown unanimously by all follow-up studies. As the field grows increasingly polarized, any therapy failing to provide affirmation-on-demand is mislabeled "conversion therapy."[87] Indeed, even actions of non-therapists, unrelated

---

[85]  McNeil, *et al.,* 2017.
[86]  Reuter, *et al.,* 2016; Rodriguez-Seiljas, *et al.,* 2021; Zanarni, *et al.,* 2021.
[87]  D'Angelo, *et al.,* 2021.

to any therapy, have been labelled conversion therapy, including the prohibition of biological males competing on female teams.[88]

### C. Assessing Demands for Social Transition and Affirmation-Only or Affirmation-on-Demand Treatment in Pre-Pubertal Children.

66.Ā   Colloquially, affirmation refers broadly to any actions that treat the person as belonging to a new gender. In different contexts, that could apply to social actions (use of a new name and pronouns), legal actions (changes to birth certificates), or medical actions (hormonal and surgical interventions). That is, social transition, legal transition, and medical transition (and subparts thereof) need not, and rarely do, occur at the same time. In practice, there are cases in which a child has socially only partially transitioned, such as presenting as one gender at home and another at school or presenting as one gender with one custodial parent and another gender with the other parent.

67.Ā   Referring to "affirmation" as a treatment approach is ambiguous: Although often used in public discourse to take advantage of the positive connotations of the term, it obfuscates what exactly is being affirmed. This often leads to confusion, such as quoting a study of the benefits and risks of social affirmation in a discussion of medical affirmation, where the appearance of the isolated word "affirmation" refers to entirely different actions.

68.Ā   It is also an error to divide treatment approaches into affirmative versus non-affirmative. As noted already, the widely adopted Dutch Approach (and the guidelines of the multiple professional associations based on it) cannot be said to be either: It is a staged set of interventions, wherein social transition (and puberty blocking) may not begin until age 12 and cross-sex hormonal and other medical interventions, later.

69.Ā   Formal clinical approaches to helping children expressing gender dysphoria

---

[88]   Turban, 2021, March 16.

employ a gate-keeper model, with decision trees to help clinicians decide when and if the potential benefits of affirmation of the new gender would outweigh the potential risks of doing so. Because the gate-keepers and decision-trees generally include the possibility of affirmation in at least some cases, it is misleading to refer to any one approach as "the affirmation approach." The most extreme decision-tree would be accurately called affirmation-*on-demand,* involving little or no opportunity for children to explore at all whether the distress they feel is due to some other, less obvious, factor, whereas more moderate gate-keeping would endorse transition only in select situations, when the likelihood of regretting transition is minimized.

70.   Many outcomes studies have been published examining the results of gate-keeper models, but no such studies have been published regarding affirmation-on-demand with children. Although there have been claims that affirmation-on-demand causes mental health or other improvement, these have been the result only of "retrospective" rather than "prospective" studies. That is, such studies did not take a sample of children and follow them up over time, to see how many dropped out altogether, how many transitioned successfully, and how many transitioned and regretted it or detransitioned. Rather, such studies took a sample of successfully transitioned adults and asked them retrospective questions about their past. In such studies, it is not possible to know how many other people dropped out or regretted transition, and it is not possible to infer causality from any of the correlations detected, despite authors implying and inferring causality.

### D. Assessing the "Minority Stress Hypothesis"

71.   The elevated levels of mental health problems among lesbian, gay, and bisexual populations is a well-documented phenomenon, and the idea that it is caused by living within a socially hostile environment is called the *Minority Stress Hypothesis.*[89] The association is not entirely straight-forward, however. For example,

---

[89]   Meyer, 2003.

although lesbian, gay, and bisexual populations are more vulnerable to suicide ideation overall, the evidence specifically on adult lesbian and bisexual women is unclear. Meyer did not include transgender populations in originating the hypothesis, and it remains a legitimate question to what extent and in what ways it might apply to gender identity.

72.  Minority stress is associated, in large part, with being a visible minority. There is little evidence that transgender populations show the patterns suggested by the hypothesis. For example, the minority stress hypothesis would predict differences according to how visibly a person is discernable as a member of the minority, which often changes greatly upon transition. Biological males who are very effeminate stand out throughout childhood, but in some cases can successfully blend in as adult females; whereas the adult-onset transitioners blend in very much as heterosexual cis-gendered males during their youth and begin visibly to stand out in adulthood, only for the first time.

73.  Also suggesting minority stress cannot be the full story is that the mental health symptoms associated with minority stress do not entirely correspond with those associated with gender dysphoria. The primary symptoms associated with minority stress are depressive symptoms, substance use, and suicidal ideation.[90] The symptoms associated with gender dysphoria indeed include depressive symptoms and suicidal ideation, but also include anxiety symptoms, Autism Spectrum Disorders, and personality disorders.

74.  A primary criterion for readiness for transition used by the clinics demonstrating successful transition is the absence or resolution of other mental health concerns, such as suicidality. In the popular media, however, indications of mental health concerns are instead often dismissed as an expectable result caused by Sexual Minority Stress (SMS). It is generally implied that such symptoms will resolve

---

[90]   Meyer, 2003.

upon transition and integration into an affirming environment.

## V.  Assessing Statements from Professional Associations

### A. Understanding the Value of Statements from Professional Associations

75.  The value of position statements from professional associations should be neither over- nor under-estimated. In the ideal, an organization of licensed health care professionals would convene a panel of experts who would systematically collect all the available evidence about an issue, synthesizing it into recommendations or enforceable standards for clinical care, according to the quality of the evidence for each alternative. For politically neutral issues, with relevant expertise contained among association members, this ideal can be readily achievable. For controversial issues with no clear consensus, the optimal statement would summarize each perspective and explicate the strengths and weaknesses of each, providing relatively reserved recommendations and suggestions for future research that might resolve the continuing questions. Several obstacles can hinder that goal, however. Committees within professional organizations are typically volunteer activities, subject to the same internal politics of all human social structures. That is, committee members are not necessarily committees of experts on a topic—they are often committees of generalists handling a wide variety of issues or members of an interest group who feel strongly about political implications of an issue, instead of scientists engaged in the objective study of the topic.

76.  Thus, documents from professional associations may represent required standards, the violation of which may merit sanctions, or may represent only recommendations or guidelines. A document may represent the views of an association's full membership or only of the committee's members (or majorities thereof). Documents may be based on systematic, comprehensive reviews of the available research or selected portions of the research. In sum, the weight best placed

31

on any association's statement is the amount by which that association employed evidence versus other considerations in its process.

### B. Misrepresentations of statements of professional associations.

77.  In the presently highly politicized context, official statements of professional associations have been widely misrepresented. In preparing the present report, I searched the professional research literature for documentation of statements from these bodies and from my own files, for which I have been collecting such information for many years. I was able to identify statements from six such organizations. Although not strictly a medical association, the World Professional Association for Transgender Health (WPATH) also distributed a set of guidelines in wide use and on which other organizations' guidelines are based.

78.  Notably, despite that all these medical associations reiterate the need for mental health issues to be resolved before engaging in medical transition, only the AACAP members have medical training in mental health. The other medical specialties include clinical participation with this population, but their assistance in transition generally assumes the mental health aspects have already been assessed and treated beforehand.

79.  With the broad exception of the AAP, their statements repeatedly noted instead that:

- Desistance of gender dysphoria occurs in the majority of prepubescent children.
- Mental health issues need to be assessed as potentially contributing factors and need to be addressed before transition.
- Puberty-blocking medication is an experimental, not a routine, treatment.
- Social transition is not generally recommended until after puberty.

Although some other associations have published broad statements of moral support for sexual minorities and against discrimination, they did not include any specific standards or guidelines regarding medical- or transition-related care.

32

### 1. World Professional Association for Transgender Health (WPATH)

80. The WPATH standards as they relate to prepubescent children begin with the acknowledgement of the known rates of desistance among gender dysphoric children:

> [I]n follow-up studies of prepubertal children (mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6–23% of children (Cohen-Kettenis, 2001; Zucker & Bradley, 1995). Boys in these studies were more likely to identify as gay in adulthood than as transgender (Green, 1987; Money & Russo, 1979; Zucker & Bradley, 1995; Zuger, 1984). Newer studies, also including girls, showed a 12–27% persistence rate of gender dysphoria into adulthood (Drummond, Bradley, Peterson-Badali, & Zucker, 2008; Wallien & Cohen-Kettenis, 2008).[91]

81. That is, "In most children, gender dysphoria will disappear before, or early in, puberty."[92]

82. Although WPATH does not refer to puberty blocking medications as "experimental," the document indicates the non-routine, or at least inconsistent availability of the treatment:

> Among adolescents who are referred to gender identity clinics, the number considered eligible for early medical treatment—starting with GnRH analogues to suppress puberty in the first Tanner stages—differs among countries and centers. Not all clinics offer puberty suppression. If such treatment is offered, the pubertal stage at which adolescents are allowed to start varies from Tanner stage 2 to stage 4 (Delemarre-van de Waal & Cohen-Kettenis, 2006; Zucker et al., [2012]).[93]

83. WPATH neither endorses nor proscribes social transitions before puberty, instead recognizing the diversity among families' decisions:

> Social transitions in early childhood do occur within some families with early success. This is a controversial issue, and divergent views are held by health professionals. The current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition during early childhood.[94]

84. It does caution, however, "Relevant in this respect are the previously described relatively low persistence rates of childhood gender dysphoria."[95]

---

[91] Coleman, *et al.*, 2012, at 172.
[92] Coleman, *et al.*, 2012, at 173.
[93] Coleman, *et al.*, 2012, at 173.
[94] Coleman, *et al.*, 2012, at 176.
[95] Coleman, *et al.*, 2012, at 176 (quoting Drummond, *et al.*, 2008; Wallien & Cohen-Kettenis, 2008).

85. The WPATH standards have been subjected to standardized evaluation, the Appraisal of Guidelines for Research and Evaluation ("AGREE II") method, as part of an appraisal of all published Clinical Practice Guidelines (CPGs) regarding sex and gender minority healthcare.[96] Utilizing community stakeholders to set domain priorities for the evaluation, the assessment concluded that the guidelines regarding HIV and its prevention were of high quality, but that "[t]ransition-related CPGs tended to lack methodological rigour and rely on patchier, lower-quality primary research."[97] The WPATH guidelines were recommended for use. Indeed, the WPATH guidelines received unanimous ratings of "Do not recommend."[98]

86. Finally, it should be noted that WPATH is in stark opposition to international standards: Public healthcare systems throughout the world have instead been ending the practice of medical transition of minors, responding to the increasingly recognized risks associated with hormonal interventions and the now clear lack of evidence that medical transition was benefitting most children, as opposed to the mental health counseling accompanying transition.

### 2. Endocrine Society (ES)

87. The 150,000-member Endocrine Society appointed a nine-member task force, plus a methodologist and a medical writer, who commissioned two systematic reviews of the research literature and, in 2017, published an update of their 2009 recommendations, based on the best available evidence identified. The guideline was co-sponsored by the American Association of Clinical Endocrinologists, American Society of Andrology, European Society for Paediatric Endocrinology, European Society of Endocrinology, Pediatric Endocrine Society (PES), and the World Professional Association for Transgender Health (WPATH).

88. The document acknowledged the frequency of desistance among gender

---

[96]   Dahlen, *et al.,* 2021.
[97]   Dahlen, *et al.*, 2021, at 6.
[98]   Dahlen, *et al.*, 2021, at 7.

34

dysphoric children:

> Prospective follow-up studies show that childhood GD/gender incongruence does not invariably persist into adolescence and adulthood (so-called "desisters"). Combining all outcome studies to date, the GD/gender incongruence of a minority of prepubertal children appears to persist in adolescence. . . . In adolescence, a significant number of these desisters identify as homosexual or bisexual.[99]

89.  The statement similarly acknowledges inability to predict desistance or persistence, "With current knowledge, we cannot predict the psychosexual outcome for any specific child."[100]

90.  Although outside their area of professional expertise, mental health issues were also addressed by the Endocrine Society, repeating the need to handle such issues before engaging in transition, "In cases in which severe psychopathology, circumstances, or both seriously interfere with the diagnostic work or make satisfactory treatment unlikely, clinicians should assist the adolescent in managing these other issues."[101] This ordering—to address mental health issues before embarking on transition—avoids relying on the unproven belief that transition will solve such issues.

91.  The Endocrine Society did not endorse any affirmation-only approach. The guidelines were neutral with regard to social transitions before puberty, instead advising that such decisions be made only under clinical supervision: "We advise that decisions regarding the social transition of prepubertal youth are made with the assistance of a mental health professional or similarly experienced professional."[102]

92.  The Endocrine Society guidelines make explicit that, after gathering information from adolescent clients seeking medical interventions and their parents, the clinician "provides correct information to prevent unrealistically high expectations [and] assesses whether medical interventions may result in unfavorable

---

[99]   Hembree, *et al.*, 2017, at 3876.
[100]  Hembree, *et al.*, 2017, at 3876.
[101]  Hembree, *et al.*, 2017, at 3877.
[102]  Hembree, *et al.*, 2017, at 3872.

psychological and social outcomes."[103]

### 3. Pediatric Endocrine Society and Endocrine Society (ES/PES)

93.   In 2020, the 1500-member Pediatric Endocrine Society partnered with the Endocrine Society to create and endorse a brief, two-page position statement.[104] Although strongly worded, the document provided no specific guidelines, instead deferring to the Endocrine Society guidelines.[105]

94.   It is not clear to what extent this endorsement is meaningful, however. According to the PES, the Endocrine Society "recommendations include evidence that treatment of gender dysphoria/gender incongruence is medically necessary and should be covered by insurance."[106] However, the Endocrine Society makes neither statement. Although the two-page PES document mentioned insurance coverage four times, the only mention of health insurance by the Endocrine Society was: "If GnRH analog treatment is not available (insurance denial, prohibitive cost, or other reasons), postpubertal, transgender female adolescents may be treated with an antiandrogen that directly suppresses androgen synthesis or action."[107] Despite the PES asserting it as "medically necessary," the Endocrine Society stopped short of that. Its only use of that phrase was instead limiting: "We recommend that a patient pursue genital gender-affirming surgery only after the MHP and the clinician responsible for endocrine transition therapy both agree that surgery is medically necessary and would benefit the patient's overall health and/or well-being."[108]

### 4. American Academy of Child & Adolescent Psychiatry (AACAP)

95.   The 2012 statement of the American Academy of Child & Adolescent Psychiatry (AACAP) is not an affirmation-only policy. It notes:

> Just as family rejection is associated with problems such as depression,

---

[103]   Hembree, *et al.*, 2017, at 3877.
[104]   PES, online; Pediatric Endocrine Society & Endocrine Society, Dec. 2020.
[105]   Pediatric Endocrine Society & Endocrine Society, Dec. 2020, at 1; Hembree, *et al.*, 2017.
[106]   Pediatric Endocrine Society & Endocrine Society, Dec. 2020, at 1.
[107]   Hembree, *et al.* 2017, at 3883.
[108]   Hembree, *et al.*, 2017 at 3872, 3894.

suicidality, and substance abuse in gay youth, the proposed benefits of treatment to eliminate gender discordance in youth must be carefully weighed against such possible deleterious effects. . . . In general, it is desirable to help adolescents who may be experiencing gender distress and dysphoria to defer sex reassignment until adulthood, or at least until the wish to change sex is unequivocal, consistent, and made with appropriate consent.[109]

96.  The AACAP's language repeats the description of the use of puberty blockers only as an exception: "For situations in which deferral of sex reassignment decisions until adulthood is *not clinically feasible*, one approach that has been described in case series is sex hormone suppression under endocrinological management with psychiatric consultation using gonadotropin-releasing hormone analogues."[110]

97.  The AACAP statement acknowledges the long-term outcomes literature for gender dysphoric children: "In follow-up studies of prepubertal boys with gender discordance—including many without any mental health treatment—the cross gender wishes usually fade over time and do not persist into adulthood,"[111] adding that "[c]linicians should be aware of current evidence on the natural course of gender discordance and associated psychopathology in children and adolescents in choosing the treatment goals and modality."[112]

98.  The policy similarly includes a provision for resolving mental health issues: "Gender reassignment services are available in conjunction with mental health services focusing on exploration of gender identity, cross-sex treatment wishes, counseling during such treatment if any, and *treatment of associated mental health problems*."[113] The document also includes minority stress issues and the need to deal with mental health aspects of minority status (*e.g.*, bullying).[114]

99.  Rather than endorse social transition for prepubertal children, the AACAP

---

[109]  Adelson & AACAP, 2012, at 969.
[110]  Adelson & AACAP, 2012, at 969 (italics added).
[111]  Adelson & AACAP, 2012, at 963.
[112]  Adelson & AACAP, 2012, at 968.
[113]  Adelson & AACAP, 2012, at 970 (italics added).
[114]  Adelson & AACAP, 2012, at 969.

App_0180

indicates: "There is similarly no data at present from controlled studies to guide clinical decisions regarding the risks and benefits of sending gender discordant children to school in their desired gender. Such decisions must be made based on clinical judgment, bearing in mind the potential risks and benefits of doing so."[115]

### 5.  American College of Obstetricians & Gynecologists (ACOG)

100.  The American College of Obstetricians & Gynecologists (ACOG) published a "Committee Opinion" expressing recommendations in 2017. The statement indicates it was developed by the ACOG's Committee on Adolescent Health Care, but does not indicate participation based on professional expertise or a systematic method of objectively assessing the existing research. It includes the disclaimer: "This document reflects emerging clinical and scientific advances as of the date issued and is subject to change. The information should not be construed as dictating an exclusive course of treatment or procedure to be followed."[116]

101.  Prepubertal children do not typically have clinical contact with gynecologists, and the ACOG recommendations include that the client additionally have a primary health care provider.[117]

102.  The ACOG statement cites the statements made by other medical associations—European Society for Pediatric Endocrinology (ESPE),, PES, and the Endocrine Society—and by WPATH.[118] It does not cite any professional association of *mental* health care providers, however. The ACOG recommendations repeat the previously mentioned eligibility/readiness criteria of having no mental illness that would hamper diagnosis and no medical contraindications to treatment. It notes: "*Before* any treatment is undertaken, the patient must display eligibility and readiness (Table 1), meaning that the adolescent has been evaluated by a mental

---

[115]  Adelson & AACAP, 2012, at 969.
[116]  ACOG, 2017, at 1.
[117]  ACOG, 2017, at 1.
[118]  ACOG, 2017, at 1, 3.

health professional, has no contraindications to therapy, and displays an understanding of the risks involved."[119]

103.  The "Eligibility and Readiness Criteria" also include, "Diagnosis established for gender dysphoria, transgender, transsexualism."[120] This standard, requiring a formal diagnosis, forestalls affirmation-on-demand because self-declared self-identification is not sufficient for DSM diagnosis.

104.  ACOG's remaining recommendations pertain only to post-transition, medically oriented concerns. Pre-pubertal social transition is not mentioned in the document, and the outcomes studies of gender dysphoric (prepubescent) children are not cited.

### 6.  American College of Physicians (ACP)

105.  The American College of Physicians published a position paper broadly expressing support for the treatment of LGBT patients and their families, including nondiscrimination, antiharassment, and defining "family" by emotional rather than biological or legal relationships in visitation policies, and the inclusion of transgender health care services in public and private health benefit plans.[121]

106.  ACP did not provide guidelines or standards for child or adult gender transitions. The policy paper opposed attempting "reparative therapy;" however, the paper confabulated sexual orientation with gender identity in doing so. That is, on the one hand, ACP explicitly recognized that "[s]exual orientation and gender identity are inherently different."[122] It based this statement on the fact that "the American Psychological Association conducted a literature review of 83 studies on the efficacy of efforts to change *sexual orientation*."[123] The APA's document, entitled "Report of the American Psychological Task Force on appropriate therapeutic responses to

---

[119]  ACOG, 2017, at 1, 3 (citing the Endocrine Society guidelines) (italics added).
[120]  ACOG, 2017, at 3 Table 1.
[121]  Daniel & Butkus, 2015a, 2015b.
[122]  Daniel & Butkus, 2015b, at 2.
[123]  Daniel & Butkus, 2015b, at 8 (italics added).

*sexual orientation*" does not include or reference research on gender identity.[124] Despite citing no research about transgenderism, the ACP nonetheless included in its statement: "Available research does not support the use of reparative therapy as an effective method in the treatment of LGB*T* persons."[125] That is, the inclusion of "T" with "LGB" is based on something other than the existing evidence.

107.Ā There is another statement,[126] which was funded by ACP and published in the Annals of Internal Medicine under its "*In the Clinic*" feature, noting that "'In the Clinic' does not necessarily represent official ACP clinical policy."[127] The document discusses medical transition procedures for adults rather than for children, except to note that "[n]o medical intervention is indicated for prepubescent youth,"[128] that a "mental health provider can assist the child and family with identifying an appropriate time for a social transition,"[129] and that the "child should be assessed and managed for coexisting mood disorders during this period because risk for suicide is higher than in their cisgender peers."[130]

### 7.Ā American Academy of Pediatrics (AAP)

108.Ā The policy of the American Academy of Pediatrics (AAP) is unique among the major medical associations in being the only one to endorse an affirmation-on-demand policy, including social transition before puberty without any watchful waiting period. Although changes in recommendations can obviously be appropriate in response to new research evidence, the AAP provided none. Rather, the research studies AAP cited in support of its policy simply did not say what AAP claimed they did. In fact, the references that AAP cited as the basis of their policy instead outright contradicted that policy, repeatedly endorsing watchful waiting.[131] Moreover, of all

---

[124] APA, 2009 (italics added).
[125] Daniel & Butkus, 2015b, at 8 (italics added).
[126] Safer & Tangpricha, 2019.
[127] Safer & Tangpricha, 2019, at ITC1.
[128] Safer & Tangpricha, 2019, at ITC9.
[129] Safer & Tangpricha, 2019, at ITC9.
[130] Safer & Tangpricha, 2019, at ITC9.
[131] Cantor, 2020.

App_0183

the outcomes research published, the AAP policy cited *one*, and that without mentioning the outcome data it contained.[132]

109. Immediately following the publication of the AAP policy, I conducted a point-by-point fact-check of the claims it asserted and the references it cited in support. I submitted that to the *Journal of Sex & Marital Therapy*, a well-known research journal of my field, where it underwent blind peer review and was published. I append that article as part of this report. *See* Appendix 2. A great deal of published attention ensued; however, the AAP has yet to respond to the errors I demonstrated its policy contained. Writing for *The Economist* about the use of puberty blockers, Helen Joyce asked AAP directly, "Has the AAP responded to Dr Cantor? If not, have you any response now?" The AAP Media Relations Manager, Lisa Black, responded: "We do not have anyone available for comment."

### 8. The ESPE-LWPES GnRH Analogs Consensus Conference Group

110. Included in the interest of completeness, there was also a collaborative report in 2009, between the European Society for Pediatric Endocrinology (ESPE) and the Lawson Wilkins Pediatric Endocrine Society (LWPES).[133] Thirty experts were convened, evenly divided between North American and European labs and evenly divided male/female, who comprehensively rated the research literature on gonadotropin-release hormone analogs in children.

111. The effort concluded that "[u]se of gonadotropin-releasing hormone analogs for conditions other than central precocious puberty requires additional investigation and cannot be suggested routinely."[134] However, gender dysphoria was not explicitly mentioned as one of those other conditions.

---

[132]   Cantor, 2020, at 1.
[133]   Carel et al., 2009.
[134]   Carel et al. 2009, at 752.

## VI.  International Health Care Consensus

### 1. United Kingdom

112.  The National Health Service (NHS) of the United Kingdom centralizes gender counselling and transitioning services in a single clinic, the Gender Identity Development Service (GIDS) of the Tavistock and Portman NHS Foundation Trust. Between 2008 and 2018, the number of referrals to the clinic had increased by a factor of 40, leading to a government inquiry into the causes[135]. The GIDS was repeatedly accused of over-diagnosing and permitting transition in cases despite indicators against patient transition, including by 35 members of the GIDS staff, who resigned by 2019[136].

113.  The NHS appointed Dr. Hilary Cass, former President of the Royal College of Paediatrics and Child Health, to conduct an independent review[137]. That review included a systematic consolidation of all the research evidence, following established procedures for preventing the "cherry-picking" or selective citation favouring or down-playing any one conclusion[138]. The review's results were unambiguous: "The critical outcomes for decision making are the impact on gender dysphoria, mental health and quality of life. The quality of evidence for these outcomes was assessed as very low"[139], again using established procedures for assessing clinical research evidence (called GRADE). The review also assessed as "very low" the quality of evidence regarding "body image, psychosocial impact, engagement with health care services, impact on extent of an satisfaction with surgery and stopping treatment"[140]. The report concluded that of the existing research, "The studies included in this evidence review are all small, uncontrolled observational studies, which are subject to bias and confounding....They suggest little change with GnRH analogues [puberty

---

[135]  Marsh, 2020; Rayner, 2018.
[136]  BBC, 2021; Donnelly, 2019.
[137]  National Health Service, 2020, Sept. 22.
[138]  National Institute for Health and Care Excellence, 2020.
[139]  National Institute for Health and Care Excellence, 2020, p. 4.
[140]  National Institute for Health and Care Excellence, 2020, p. 5.

blockers] from baseline to follow-up"[141].

## 2. Finland

114. In Finland, the assessments of mental health and preparedness of minors for transition services are centralized by law into two research clinics, Helsinki University Central Hospital and Tampere University Hospital. The eligibility of minors began in 2011. In 2019, Finnish researchers published an analysis of the outcomes of adolescents diagnosed with transsexualism and receiving cross-sex hormone treatment[142]. That study showed that despite the purpose of medical transition to improve mental health: "Medical gender reassignment is not enough to improve functioning and relieve psychiatric comorbidities among adolescents with gender dysphoria. Appropriate interventions are warranted for psychiatric comorbidities and problems in adolescent development"[143]. The patients who were functioning well after transition were those who were already functioning well before transition, and those who were functioning poorly, continued to function poorly after transition.

115. Consistent with the evidence, Finland's health care service (Council for Choices in Health Care in Finland—COHERE) thus ended the surgical transition of minors, ruling in 2020 that "Surgical treatments are not part of the treatment methods for dysphoria caused by gender-related conflicts in minors" (COHERE, 2020). The review of the research concluded that "[N]o conclusions can be drawn on the stability of gender identity during the period of disorder caused by a psychiatric illness with symptoms that hamper development." COHERE also greatly restricted access to puberty-blocking and other hormonal treatments, indicating they "may be considered if the need for it continues *after* the other psychiatric symptoms have

---

[141] National Institute for Health and Care Excellence, 2020, p. 13.
[142] Kaltiala et al., 2020.
[143] Kaltiala et al., 2020, p. 213.

ceased and adolescent development is progressing normally"[144]. The council was explicit in noting the lack of research needed for decision-making, "There is also a need for more information on the *disadvantages* of procedures and on people who regret them"[145].

### 3. Sweden

116. Ā Sweden's national health care policy regarding trans issues has developed quite similarly to that of the UK. Already in place 20 years ago, Swedish health care policy permitted otherwise eligible minors to receive puberty-blockers beginning at age 14 and cross-sex hormones at age 16.) At that time, only small numbers of minors sought medical transition services. An explosion of referrals ensued in 2013–2014. Sweden's Board of Health and Welfare reported that, in 2018, the number of diagnoses of gender dysphoria was 15 times higher than 2008 among girls ages 13–17.

117. Ā Sweden has long been very accepting with regard to sexual and gender diversity. In 2018, a law was proposed to lower the age of eligibility for surgical care from age 18 to 15, remove the requirement for parental consent, and lower legal change of gender to age 12. A series of cases of regret and suicide were reported in the Swedish media, leading to questions of mental health professionals failing to consider. In 2019, the Swedish Agency for Health Technology Assessment and Assessment of Social Services (SBU) therefore conducted its own comprehensive review of the research[146]. Like the UK, the Swedish investigation employed methods to ensure the encapsulation of the all the relevant evidence[147].

118. Ā The SBU report came to the same conclusions as the UK commission. From 2022 forward, the Swedish National Board or Health and Welfare therefore

---

[144] Council for Choices in Health Care in Finland, 2020; italics added.
[145] Council for Choices in Health Care in Finland, 2020; italics added.
[146] Orange, 2020, Feb 22.
[147] Swedish Agency for Health Technology Assessment and Assessment of Social Services, 2019.

"recommends restraint when it comes to hormone treatment…Based on the results that have emerged, the National Board of Health and Welfare's overall conclusion is that the risks of anti-puberty and sex-confirming hormone treatment for those under 18 currently outweigh the possible benefits for the group as a whole"[148]. Neither puberty blockers nor cross-sex hormones would be provided under age 16, and patients ages 16–18 would receive such treatments only within research settings (clinical trials monitored by the appropriate Swedish research ethics board).

### 4.  France

119.  In 2022, the Académie Nationale de Médecine of France issued a strongly worded statement, citing the Swedish ban on hormone treatments. "[A] great medical caution must be taken in children and adolescents, given the vulnerability, particularly psychological, of this population and the many undesirable effects, and even serious complications, that some of the available therapies can cause…such as impact on growth, bone fragility, risk of sterility, emotional and intellectual consequences and, for girls, symptoms reminiscent of menopause"[149]. For hormones, the Académie concluded "the greatest reserve is required in their use," and for surgical treatments, "[T]heir irreversible nature must be emphasized." The Académie did not outright ban medical interventions, but warned "the risk of over-diagnosis is real, as shown by the increasing number of transgender young adults wishing to "detransition". Rather than medical interventions, it advised health care providers "to extend as much as possible the psychological support phase." The Académie reviewed and emphasized the evidence indicating the very large and very sudden increase in youth requesting medical transition. It attributed the change, not to society now being more accepting of sexual diversity, but to social media, "underlining the addictive character of excessive consultation of social networks which is both

---

[148]   Swedish National Board of Health and Welfare, 2022.
[149]   Académie Nationale de Médecine, 2022, Feb. 25.

App_0188

harmful to the psychological development of young people and responsible, for a very important part, of the growing sense of gender incongruence."

REFERENCES

Académie Nationale de Médecine. (2022, Feb. 25). Medicine and gender transidentity in children and adolescents. Retrieved from https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en

Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: Preliminary results. *International Journal of Pediatric Endocrinology*. doi: 10.1186/s13633-020-00078-2

Adams, N. J., & Vincent, B. (2019). Suicidal thoughts and behaviors among transgender adults in relation to education, ethnicity, and income: A systematic review. *Transgender Health, 4,* 226–246.

Adelson, S. L., & American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues. (2012). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *Journal of the American Academy of Child & Adolescent Psychiatry, 51,* 957–974.

Allen, L. R., Watson, L. B., Egan, A. M., & Moser, C. N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology, 7,* 302-311.

American College of Obstetricians and Gynecologists. (2017). Care for transgender Adolescents. Committee Opinion No. 685. Retrieved from www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2017/01/care-for-transgender-adolescents

American Psychiatric Association. (2022). Diagnostic and statistical manual for mental disorders, fifth edition, text revision (DSM-5-TR). Washington, DC: Author.

American Psychological Association, Task Force on Appropriate Therapeutic Responses to Sexual Orientation. (2009). Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation. Retrieved from http://www. apa.org/pi/lgbc/publications/therapeutic-resp.html

Anzani, A., De Panfilis, C., Scandurra, C., & Prunas, A. (2020). Personality disorders and personality profiles in a sample of transgender individuals requesting gender-affirming treatments. *International Journal of Environmental Research and Public Health, 17,* 1521. Retrieved from https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7084367/

Bachmann, S. (2018). Epidemiology of suicide and the psychiatric perspective. International *Journal of Environmental Research and Public Health, 15,* 1425.

Bauer, G. R., Scheim, A. I., Pyne, J., Travers, R., & Hammond, R. (2015). Intervenable factors associated with suicide risk in transgender persons: A respondent driven sampling study in Ontario, Canada. *BMC Public Health,* 15,

App_0190

525.

BBC News. (2021, Sept. 5). NHS child gender identity clinic whistleblower wins tribunal. *British Broadcasting Company*. Retrieved from https://www.bbc.com/news/uk-58453250

Biggs, M. (2019). A letter to the editor regarding the original article by Costa et al: Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *Journal of Sexual Medicine, 16,* 2043.

Biggs, M. (2020). Gender dysphoria and psychological functioning in adolescents treated with GnRHa: Comparing Dutch and English prospective studies. *Archives of Sexual Behavior*, 49, 2231–2236.

Blanchard, R. (1985). Typology of male-to-female transsexualism. *Archives of Sexual Behavior*, 14, 247–261.

Blanchard, R. (1988). Nonhomosexual gender dysphoria. *The Journal of Sex Research*, 24, 188–193.

Blanchard, R. (1989a). The classification and labeling of nonhomosexual gender dysphorias. *Archives of Sexual Behavior*, 18, 315–334.

Blanchard, R. (1989b). The concept of autogynephilia and the typology of male gender dysphoria. *Journal of Nervous and Mental Disease*, 177, 616–623.

Blanchard, R. (1990). Gender identity disorders in adult women. In R. Blanchard & B. W. Steiner (Eds.), *Clinical management of gender identity disorders in children and adults* (pp. 77–91). Washington, DC: American Psychiatric Press.

Blanchard, R. (1991). Clinical observations and systematic studies of autogynephilia. *Journal of Sex and Marital Therapy*, 17, 235–251.

Blanchard, R., Steiner, B. W., Clemmensen, L. H., & Dickey, R. (1989). Prediction of regrets in postoperative transsexuals. *Canadian Journal of Psychiatry*, 34, 43–45.

Boivin, L., Notredame, C.-E., Jardri, R., & Medjkane, F. (2020). Supporting parents of transgender adolescents: Yes, but how? *Archives of Sexual Behavior*, 49, 81–83.

Borges, G., Nock, M. K., Haro Abad, J. M., Hwang, I., Sampson, N. A., Alonso, J., Helena Andrade, L.…Kessler, R. C. (2010) Twelve-month prevalence of and risk factors for suicide attempts in the World Health Organization World Mental Health Surveys. *Journal of Clinical Psychiatry, 71,* 1617–1628.

Bränström, R., & Pachankis, J. E. (2019). Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: A total population study. *American Journal of Psychiatry, 177,* 727–734.

Canetto, S. S., Antonelli, P., Ciccotti, A., Dettore, D., & Lamis, D. A. (2021). Suicidal as normal: A lesbian, gay, and bisexual youth script? *Crisis, 42,* 292–300.

Cantor, J. M. (2020). Transgender and gender diverse children and adolescents:

Fact-checking of AAP policy. *Journal of Sex & Marital Therapy*, 46, 307–313.

Carel, J. C., Eugster, E. A., Rogol, A., Ghizzoni, L., Palmert, M. R.; ESPE-LWPES GnRH Analogs Consensus Conference Group, Antoniazzi, F., Berenbaum, S., Bourguignon, J. P., Chrousos, G. P., Coste, J., Deal, S., de Vries, L., Foster, C., Heger, S., Holland, J., Jahnukainen, K., Juul, A., Kaplowitz, P., Lahlou, N., Lee, M. M., Lee, P., Merke, D. P., Neely, E. K., Oostdijk, W., Phillip, M., Rosenfield, R. L., Shulman, D., Styne, D., Tauber, M., Wit, J. M. (2009). Consensus statement on the use of gonadotropin-releasing hormone analogs in children. *Pediatrics*, 123(4), e752–e762.

Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., Skageberg, E. M., Khadr, S., Viner, R. M. (2021). Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PLosONE*, 16(2): e0243894.

Cohen-Kettenis, P. T. (2001). Gender identity disorder in DSM? *Journal of the American Academy of Child & Adolescent Psychiatry*, 40, 391–391.

Cohen-Kettenis, P. T., Owen, A., Kaijser, V. G., Bradley, S. J., & Zucker, K. J. (2003). Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: A cross-national, cross-clinic comparative analysis. *Journal of Abnormal Child Psychology*, 31, 41–53.

Cohen, J., Cohen, P., West, S. G. Cohen, J., Cohen, P., West, S. G., & Aiken, L. S. (2003). *Applied multiple regression/correlation analysis for the behavioral sciences (3rd ed.).* Mahwah, NJ: Lawrence Erlbaum Associates.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W. J., Monstrey, S., Adler, R. K., Brown, G. R., Devor, A. H., Ehrbar, R., Ettner, R., Eyler, E., Garofalo, R., Karasic, D. H., Lev, A. I., Mayer, G., Meyer-Bahlburg, H., Hall, B. P., Pfaefflin, F., Rachlin, K., Robinson, B., Schechter, L. S., Tangpricha, V., van Trotsenburg, M., Vitale, A., Winter, S., Whittle, S., Wylie, K. R., & Zucker, K. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism*, 13, 165–232.

Costa, R., Dunsford, M., Skagerberg, E., Holt V., Carmichael, P., & Colizzi, M. (2015). Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *Journal of Sexual Medicine*, 12, 2206–2214.

Council for Choices in Health Care in Finland (COHERE). (2020, June 16). Medical treatment methods for dysphoria associated with variations in gender identity in minors—Recommendation. [Translated] Retrieved from https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474

Dahlen, S., Connolly, D., Arif, I., Hyder Junejo, M., Bewley, S., & Meads, C. (2021). *International clinical practice guidelines for gender minority/trans people: Systematic review and quality assessment. BMJ Open, 11,* e048943.

49

D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. *Archives of Sexual Behavior, 50,* 7–16.

Daniel, H., & Butkus, R. (2015a). Lesbian, gay, bisexual, and transgender health disparities: Executive summary of a policy position paper from the American College of Physicians. *Annals of Internal Medicine*, 163, 135–137.

Daniel, H., & Butkus, R. (2015b). Appendix: Lesbian, gay, bisexual, and transgender health disparities: A policy position paper from the American College of Physicians. *Annals of Internal Medicine*, 163(2), [unpaginated].

de Vries, A. L. C. & Cohen-Kettenis, P. T. (2012). Clinical management of gender dysphoria in children and adolescents: The Dutch Approach. *Journal of Homosexuality*, 59, 301–320.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, 134, 1–9.

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *Journal of Sexual Medicine*, 8, 2276–2283.

de Vries, A. L., Doreleijers, T. A., Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Psychiatric comorbidity in gender dysphoric adolescents. *Journal of Child Psychology and Psychiatry*, 52, 1195–1202.

de Vries, A. L., Noens, I. L., Cohen-Kettenis, P. T., van Berckelaer- Onnes, I. A., & Doreleijers, T. A. (2010). Autism spectrum disorders in gender dysphoric children and adolescents. *Journal of Autism and Developmental Disorders*, 40, 930–936.

Delemarre-van de Waal, H. A., & Cohen- Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology*, 155 (suppl 1), S131–S137.

Dhejne, C., Van Vlerken, R., Geylens, G., & Arcelus, J. (2016). Mental health and gender dysphoria: A review of the literature. *International Review of Psychiatry*, 28, 44–57.

Dhejneberg, C., Öberg, K., Arver, S., & Landén, M. (2014). An analysis of all applications for sex reassignment surgery in Sweden, 1960–2010: Prevalence, incidence, and regrets. *Archives of Sexual Behavior*, 43, 1535–1545.

Donnelly, L. (2019, Dec. 12). Children's transgender clinic hit by 35 resignations in three years as psychologists warn of gender dysphoria 'over-diagnoses'. *The Telegraph*. Retrieved from https://www.telegraph.co.uk/news/2019/12/12/childrens-transgender-clinic-hit-35-resignations-three-years-/?WT.mc_id=tmg_share_em

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., & Zucker, K. J. (2008). A follow up study of girls with gender identity disorder. *Developmental Psychology*, 44, 34–

45.

Durwood, L., McLaughlin, K. A., & Olson, K. R. (2017). Mental health and self-worth in socially transitioned transgender youth. *Journal of the American Academy of Child & Adolescent Psychiatry*, 56, 116–123.

Finland Ministry of Social Affairs and Health, Council for Choices in Health Care. (2020, June 11). *Medical treatment methods for dysphoria associated with variations in gender identity in minors—Recommendation.* Retrieved from https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474

Finland Ministry of Social Affairs and Health, Council for Choices in Health Care. (2020, June 16). *Medical treatments for gender dysphoria that reduces functional capacity in transgender people—Recommendation.* Retrieved from https://palveluvalikoima.fi/documents/1237350/22895838/Summary+transgender.pdf/2cc3f053-2e34-39ce-4e21-becd685b3044/Summary+transgender.pdf?t=1592318543000

Freeman, A., Mergl, R., Kohls, E., Székely, A., Gusmao, R., Arensman, E., Koburger, N., Hegerl, U., & Rummel-Kluge, C. (2017). A cross-national study on gender differences in suicide intent. *BMC Psychiatry, 17,* 234.

Gould, M. S., & Lake, A. M. (2013, Feb. 6). II.4 *The contagion of suicidal behavior.* Forum on Global Violence Prevention, Board on Global Health; Institute of Medicine; National Research Council. Contagion of Violence: Workshop Summary. National Academies Press: Washington, DC. Retrieved from https://www.ncbi.nlm.nih.gov/books/NBK207262/

Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.* New Haven, CT: Yale University Press.

Haas, A. P., Eliason, M., Mays, V. M., Mathy, R. M., Cochran, S. D., D'Augelli, A. R., Silverman, M. M., Fisher, P. W., Hughes, T., Rosario, M., Russell, S. T., Malley, E., Reed, J., Litts, D. A., Haller, E., Sell, R. L., Remafedi, G., Bradford, J., Beautrais, A. L., Brown, G. K., … Clayton, P. J. (2011). Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: Review and recommendations. *Journal of homosexuality, 58,* 10–51.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Rosenthal, S. M., Safer, T. D., Tangpricha, V., & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/ gender-incongruent persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism*, 102, 3869–3903.

Hepp, U., Kraemer, B., Schnyder, U., Miller, N., & Delsignore, A. (2005). Psychiatric comorbidity in gender identity disorder. *Journal of Psychosomatic Research, 58,* 259–261.

Hisle-Gorman, E., Schvey, N. A., Adirim, T. A., Rayne, A. K., Susi, A., Roberts, T. A., & Klein, D. A. (2021). Mental healthcare utilization of transgender youth before and after affirming treatment. *The Journal of Sexual Medicine, 18,* 1444–1454.

App_0194

Holt, V., Skagerberg, E., & Dunsford, M. (2016). Young people with features of gender dysphoria: Demographics and associated difficulties. *Clinical Child Psychology and Psychiatry, 21*, 108–118.

Jacobs, L. A., Rachlin, K., Erickson-Schroth, L., & Janssen, A. (2014). Gender dysphoria and co-occurring autism spectrum disorders: Review, case examples, and treatment considerations. *LGBT Health, 1*, 277–282.

Janssen, A., Busa, S., Wernick, J. (2019). The complexities of treatment planning for transgender youth with co-occurring severe mental illness: A literature review and case study. *Archives of Sexual Behavior, 48*, 2003–2009.

Janssen, A., Huang, H., & Duncan, C. (2016). Gender variance among youth with autism spectrum disorders: A retrospective chart review. *Transgender Health, 1*, 63–68.

Kalin, N. H. (2020). Reassessing mental health treatment utilization reduction in transgender individuals after gender-affirming surgeries: A comment by the Editor on the process. *American Journal of Psychiatry, 177,* 765.

Kaltiala-Heino, R., Sumia, M., Työläjärvi, M., & Lindberg, N. (2015). Two years of gender identity service for minors: Overrepresentation of natal girls with severe problems in adolescent development. *Child and Adolescent Psychiatry and Mental Health, 9*, 9.

Kaltiala, R, Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry, 74,* 213–219.

Kaltiala, R., Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry, 74,* 213–219.

Klonsky, E. D., May, A. M., Saffer, B. Y. (2016). Suicide, suicide attempts, and suicidal ideation. *Annual Review of Clinical Psychology, 12,* 307–330.

Kuper, L. E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body dissatisfaction and mental health outcomes of youth on gender- affirming hormone therapy. *Pediatrics, 145*, e20193006.

Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a raid onset of gender dysphoria. *PLoS ONE, 13*(8), e0202330.

Marsh, S. (2020, Sept. 20). NHS to hold review into gender identity services for children and young people. *The Guardian.* Retrieved from https://www.theguardian.com/society/2020/sep/22/nhs-to-hold-review-into-gender-identity-services-for-children-and-young-people

Marshall, E., Claes, L. L., Bouman, W. P., Witcomb, G. L., & Arcelus, J. (2016). Non-suicidal self-injury and suicidality in trans people: A systematic review of the literature. *International Review of Psychiatry, 28,* 58–69.

May, T., Pang, K., & Williams, K. J. (2016). Gender variance in children and adolescents with autism spectrum disorder from the National Database for

52

Autism Research. *International Journal of Transgenderism, 18*, 7–15.

McCall, B. (2021, October 7). Psychiatrists shift stance on gender dysphoria, recommend therapy. *Medscape Psychiatry.* Retrieved from www.medscape.com/viewarticle/960390?src=soc_tw_share

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). Suicide in trans populations: A systematic review of prevalence and correlates. *Psychology of Sexual Orientation and Gender Diversity, 4,* 341–353.

Meyer, I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. *Psychological Bulletin, 129*, 674–697.

Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/role in childhood: Longitudinal follow-up. *Journal of Pediatric Psychology, 4*, 29–41.

MSNBC. (2015, Jan. 5). *Trans youth and suicide: An epidemic.* Retrieved from https://www.msnbc.com/ronan-farrow/watch/trans-youth-and-suicide-an-epidemic-380294211712

Mustanski, B. S., Garofalo, R., & Emerson, E. M. (2010). Mental health disorders, psychological distress, and suicidality in a diverse sample of lesbian, gay, bisexual, and transgender youths. *American Journal of Public Health, 100*, 2426–2432.

Nainggolan, L. (2021, May 12). Hormonal Tx of youth with gender dysphoria stops in Sweden. Medscape Psychiatry. Retrieved from www.medscape.com/viewarticle/950964?src=soc_tw_share

National Health Service (NHS). (2020, Sept. 22). NHS announces independent review into gender identity services for children and young people. United Kingdom. Retrieved from https://www.england.nhs.uk/2020/09/nhs-announces-independent-review-into-gender-identity-services-for-children-and-young-people/

National Institute for Health and Care Excellence (NICE). (2020, Oct. 14). Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria. Retrieved from https://arms.nice.org.uk/resources/hub/1070905/attachment

Nock, M. K., Borges, G., Bromet, E. J., Alonso, J., Angermeyer, M., Beautrais, A….Williams, D. (2008). Cross-national prevalence and risk factors for suicidal ideation, plans and attempts. *British Journal of Psychiatry, 192,* 98–105.

Olson, K. R., Durwood, L., DeMeules, M., & McLaughlin, K. A. (2016). Mental health of transgender children who are supported in their identities. *Pediatrics, 137*, e20153223.

Orange, R. (2020, Feb 22). Teenage transgender row splits Sweden as dysphoria diagnoses soar by 1,500%: New health report and TV debates highlight backlash against gender reassignment. *The Guardian.* Retrieved from https://www.theguardian.com/society/2020/feb/22/ssweden-teenage-transgender-row-dysphoria-diagnoses-soar

Pediatric Endocrine Society & Endocrine Society. (2020, December 15). *Transgender health*. Retrieved from www.endocrine.org/advocacy/position-statements/transgender-health.

Pediatric Endocrine Society. (Online). About PES. Retrieved from https://pedsendo.org/about-pes/

Rae, J. R., Gülgoz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. *Psychological Science, 30*, 669–681.

Rafferty, J., AAP Committee on psychosocial aspects of child and family health, AAP Committee on adolescence, AAP Section on lesbian, gay, bisexual, and transgender health and wellness. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics, 142*(4), e20182162

Rayner, G. (2018, Sept. 16). Minister orders inquiry into 4000 percent rise in children wanting to change sex. *The Telegraph*. Retrieved from https://www.telegraph.co.uk/politics/2018/09/16/minister-orders-inquiry-4000-per-cent-rise-children-wanting/

Reisner, S. L., Vetters, R., Leclerc, M., Zaslow, S., Wolfrum, S., Shumer, D., & Mimiaga, M. J. (2015). Mental health of transgender youth in care at an adolescent urban community health center: A matched retrospective cohort study. *Journal of Adolescent Health, 56(3)*, 274–279.

Reuter, T. R., Sharp, C., Kalpakci, A. H., Choi, H. J., & Temple, J. R. (2016). Sexual orientation and Borderline Personality Disorder features in a community sample of adolescents. *Journal of Personality Disorders, 30,* 694–707.

Rodriguez-Seijas, C., Morgan, T. A., & Zimmerman, M. (2021). A population-based examination of criterion-level disparities in the diagnosis of Borderline Personality Disorder among sexual minority adults. *Assessment, 28,* 1097–1109.

Safer, J. D., Tangpricha, V. (2019). In the clinic: Care of the transgender patient. *Annals of Internal Medicine, 171*(1), ITC1–ITC6.

Samaritans. (2020). *Media guidelines for reporting suicide*. Ewell, Surrey, UK. Retrived from https://media.samaritans.org/documents/Media_Guidelines_FINAL_v2_TABa8C6.pdf

Schumm, W. R., & Crawford, D. W. (2020). Is research on transgender children what it seems? Comments on recent research on transgender children with high levels of parental support. *The Linacre Quarterly, 87,* 9–24.

Schumm, W. R., Crawford, D. W., Fawver, M. M., Gray, N. K., Niess, Z. M., & Wagner, A. D. (2019). Statistical errors in major journals: Two case studies used in a basic statistics class to assess understanding of applied statistics. *Psychology and Education—An Interdisciplinary Journal, 56,* 35–42.

Singh, D., Bradley, S. J., & Zucker, K. J. (2021). A follow-up study of boys with gender identity disorder. *Frontiers in Psychiatry*, 12, 632784.

App_0197

Skagerberg, E., Parkinson, R., & Carmichael, P. (2013). Self-harming thoughts and behaviors in a group of children and adolescents with gender dysphoria. *International Journal of Transgenderism, 14*, 86–92.

Skelly, A. C., Dettori, J. R., & Brodt, E. D. (2012). Assessing bias: The importance of considering confounding. *Evidence-based Spine-Care Journal, 3,* 9–12.

Steensma, T. D., Cohen-Kettenis, P. T., & Zucker, K. J. (2018). Evidence for a change in the sex ratio of children referred for gender dysphoria: Data from the Center of Expertise on Gender Dysphoria in Amsterdam (1988–2016). *Journal of Sex & Marital Therapy, 44,* 713–715.

Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52*, 582–590.

Strang, J. F., Kenworthy, L., Dominska, A., Sokoloff, J., Kenealy, L. E., Berl, M., … Wallace, G. L. (2014). Increased gender variance in autism spectrum disorders and attention deficit hyperactivity disorder. *Archives of Sexual Behavior, 43*, 1525–1533.

Strang, J. F., Meagher, H., Kenworthy, L., de Vries, A. L., Menvielle, E., Leibowitz, S., … Anthony, L. G. (2016). Initial clinical guidelines for co-occurring autism spectrum disorder and gender dysphoria or incongruence in adolescents. *Journal of Clinical Child and Adolescent Psychology, 47*, 105–115.

Swedish Agency for Health Technology Assessment and Assessment of Social Services (SBU). (2019, Sept. 6). Gender dysphoria in children and adolescents: An inventory of the literature. A systematic scoping review. Retrieved from https://www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/

Swedish Agency of Health Technology Assessment and Assessment of Social Services. (2019). *Gender dysphoria in children and adolescents: An inventory of the literature.* Retrieved from: www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/

Swedish National Board of Health and Welfare (NBHW). (2020, Feb. 22). Uppdaterade rekommendationer för hormonbehandling vid könsdysfori hos unga. [*Updated recommendations for hormone therapy for gender dysphoria in young people.*] Author: Socialstyrelsen. Retrieved from https://www.socialstyrelsen.se/om-socialstyrelsen/pressrum/press/uppdaterade-rekommendationer-for-hormonbehandling-vid-konsdysfori-hos-unga/

Tetelepta, B. (2021, Feb 27). More research is urgently needed into transgender care for young people: 'Where does the large flow of children come from?' [translated]. Algemeen Dagblad. Retrieved from www.ad.nl/nijmegen/dringend-meer-onderzoek-nodig-naar-transgenderzorg-aan-jongeren-waar-komt-de-grote-stroom-kinderen-vandaan~aec79d00/?referrer=https%3A%2F%2Ft.co%2F.

Thrower, E., Bretherton, I., Pang, K. C., Zajac, J. D., & Cheung, A. S. (2020). Prevalence of Autism Spectrum Disorder and Attention-Deficit Hyperactivity Disorder amongst individuals with Gender Dysphoria: A systematic review.

App_0198

*Journal of Autism and Developmental Disorders*, 50, 695–706.

Turban, J. (2021, March 16). Trans girls belong on girls' sports teams. *Scientific American.* www.scientificamerican.com/article/trans-girls-belong-on-girls-sports-teams/

Turecki, G., & Brent, D. A. (2016). Suicide and suicidal behavior. *Lancet, 387,* 1227–1239.

United Kingdom National Health Service (NHS), National Institute for Health and Care Excellence, (2021, March 11). *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria.* Retrieved from www.evidence.nhs.uk/document?id=2334888&returnUrl=search%3ffrom%3d2020-01-01%26q%3dgender%2bdysphoria%26sp%3don%26to%3d2021-03-31

van der Miesen, A. I. R., Steensma, T. D., de Vries, A. L. C., Bos, H., Popma, A. (2020). Psychological functioning in transgender adolescence before and after gender-affirmative care compared with cisgender general population peers. *Journal of Adolescent Health, 66*, 699–704.

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child & Adolescent Psychiatry, 47,* 1413–1423.

Wallien, M. S., Swaab, H., & Cohen-Kettenis, P. T. (2007). Psychiatric comorbidity among children with gender identity disorder. *Journal of the American Academy of Child and Adolescent Psychiatry, 46*, 1307–1314.

Warrier, V., Greenberg, D. M., Weir, E., Buckingham, C., Smith, P., Lai, M.-C., Allison, C., & Baron-Cohen, S. (2020). Elevated rates of autism, other neurodevelopmental and psychiatric diagnoses, and autistic traits in transgender and gender-diverse individuals. *Nature Communications, 11,* 3959.

Wiepjes, C. M., den Heijer, M., Bremmer, M. A., Nota, N. M., de Block, C. J. M., Coumou, B. J. G., & Steensma, T. D. (2020). Trends in suicide death risk in transgender people: Results from the Amsterdam Cohort of Gender Dysphoria study (1972–2017). *Acta Psychiatrica Scandinavica, 141,* 486–491.

Wiepjes, C. M., Nota, N. M., de Bok, C. J. M., Klaver, M., de Vries, A. L. C., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M-B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels B. P. C., & den Heijer, M. (2018). The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine, 15*, 582–590.

World Health Organization (2022). *Age standardized suicide rates (per 100 000 population.* Retrieved from https://www.who.int/data/gho/data/themes/mental-health/suicide-rates

Wood, H., Sasaki, S., Bradley, S. J., Singh, D., Fantus, S., Own-Anderson, A., Di Giacomo, A., Bain, J., & Zucker, K. J. (2013). Patterns of referral to a gender identity service for children and adolescents (1976–2011): Age, sex ratio, and sexual orientation. *Journal of Sex & Marital Therapy, 39,* 1–6.

Zanarini, M. C., Magni, L. R., Temes, C. M., Hein, K. E., Aguirre, B. A., & Goodman, M. (2021). Sexual orientation and gender of intimate relationship partners among adolescents with BPD and psychiatrically healthy adolescents. *Journal of Personality Disorders, 35 (Suppl. B),* 1–7.

Zucker, K. J. (2019). Adolescents with gender dysphoria: Reflections on some contemporary clinical and research issues. *Archives of Sexual Behavior, 48,* 1983–1992.

Zucker, K. J., & Bradley, S. J. (1995). *Gender identity disorder and psychosexual problems in children and adolescents.* New York: Guilford Press.

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., Wood, H., Singh, D., & Choi, K. (2012). Demographics, behavior problems, and psychosexual characteristics of adolescents with gender identity disorder or transvestic fetishism. *Journal of Sex & Marital Therapy, 38,* 151–189.

Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172*, 90–97.

App_0200

APPENDICES

## Appendix 1

The Outcomes Studies of Childhood-Onset Gender Dysphoria

## Appendix 2

Peer-reviewed article:

Cantor, J. M. (2020). Transgender and gender diverse children and adolescents: Fact-checking of AAP policy. *Journal of Sex & Marital Therapy, 46,* 307–313. doi: 10.1080/0092623X.2019.1698481

## Prospective Outcomes Studies of Gender Dysphoric Children

| | | |
|---|---|---|
| 2/16 | gay | Lebovitz, P. S. (1972). Feminine behavior in boys: Aspects of its |
| 4/16 | trans-/crossdress | outcome. *American Journal of Psychiatry, 128,* 1283–1289. |
| 10/16 | straight/uncertain | |
| | | |
| 2/16 | trans- | Zuger, B. (1978). Effeminate behavior present in boys from |
| 2/16 | uncertain | childhood: Ten additional years of follow-up. *Comprehensive* |
| 12/16 | gay | *Psychiatry, 19, 363–369.* |
| | | |
| 0/9 | trans- | Money, J., & Russo, A. J. (1979). Homosexual outcome of |
| 9/9 | gay | discordant gender identity/role: Longitudinal follow-up. *Journal of* |
| | | *Pediatric Psychology, 4,* 29–41. |
| | | |
| 2/45 | trans-/crossdress | Zuger, B. (1984). Early effeminate behavior in boys: Outcome and |
| 10/45 | uncertain | significance for homosexuality. *Journal of Nervous and Mental* |
| 33/45 | gay | *Disease, 172,* 90–97. |
| | | |
| 1/10 | trans- | |
| 2/10 | gay | Davenport, C. W. (1986). A follow-up study of 10 feminine |
| 3/10 | uncertain | boys.  *Archives of Sexual Behavior, 15,*511–517. |
| 4/10 | straight | |
| | | |
| 1/44 | trans- | Green, R. (1987). *The "sissy boy syndrome" and the development* |
| 43/44 | cis- | *of homosexuality.* New Haven, CT: Yale University Press. |
| | | |
| 0/8 | trans- | Kosky, R. J. (1987). Gender-disordered children: Does inpatient |
| 8/8 | cis- | treatment help? *Medical Journal of Australia, 146,* 565–569. |
| | | |
| 21/54 | trans- | Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual |
| 33/54 | cis- | outcome of gender-dysphoric children. *Journal of the American* |
| | | *Academy of Child and Adolescent Psychiatry, 47,* 1413–1423. |
| | | |
| 3/25 | trans- | Drummond, K. D., Bradley, S. J., Badali-Peterson, M., & Zucker, K. |
| 6/25 | lesbian/bi- | J. (2008). A follow-up study of girls with gender identity |
| 16/25 | straight | disorder. *Developmental Psychology, 44,* 34–45. |
| | | |
| | | Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., |
| 47/127 | trans- | & Cohen-Kettenis, P. T. (2013). Factors associated with desistence |
| 80/127 | cis- | and persistence of childhood gender dysphoria: A quantitative follow- |
| | | up study. *Journal of the American Academy of Child and Adolescent* |
| | | *Psychiatry, 52,* 582–590. |
| | | |
| 17/139 | trans- | Singh, D., Bradley, S. J., and Zucker, K. J. (2021) A follow-up study |
| 122/139 | cis- | of boys with gender identity disorder. Frontiers in Psychiatry, 12, |
| | | 632784. doi: 10.3389/fpsyt.2021.632784 |





## Journal of Sex & Marital Therapy

ISSN: 0092-623X (Print) 1521-0715 (Online) Journal homepage: https://www.tandfonline.com/loi/usmt20

# Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy

## James M. Cantor

**To cite this article:** James M. Cantor (2020) Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy, Journal of Sex & Marital Therapy, 46:4, 307-313, DOI: 10.1080/0092623X.2019.1698481

**To link to this article:** https://doi.org/10.1080/0092623X.2019.1698481

Published online: 14 Dec 2019.

Submit your article to this journal ↗

Article views: 2055

View related articles ↗

View Crossmark data ↗

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=usmt20

JOURNAL OF SEX & MARITAL THERAPY
2020, VOL. 46, NO. 4, 307–313
https://doi.org/10.1080/0092623X.2019.1698481





# Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy

James M. Cantor

Toronto Sexuality Centre, Toronto, Canada

## ABSTRACT

The American Academy of Pediatrics (AAP) recently published a policy statement: *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents*. Although almost all clinics and professional associations in the world use what's called the *watchful waiting* approach to helping gender diverse (GD) children, the AAP statement instead rejected that consensus, endorsing *gender affirmation* as the only acceptable approach. Remarkably, not only did the AAP statement fail to include any of the actual outcomes literature on such cases, but it also misrepresented the contents of its citations, which repeatedly said the very opposite of what AAP attributed to them.

The American Academy of Pediatrics (AAP) recently published a policy statement entitled, *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents* (Rafferty, AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness, 2018). These are children who manifest discontent with the sex they were born as and desire to live as the other sex (or as some alternative gender role). The policy was quite a remarkable document: Although almost all clinics and professional associations in the world use what's called the *watchful waiting* approach to helping transgender and gender diverse (GD) children, the AAP statement rejected that consensus, endorsing only *gender affirmation*. That is, where the consensus is to delay any transitions after the onset of puberty, AAP instead rejected waiting before transition. With AAP taking such a dramatic departure from other professional associations, I was immediately curious about what evidence led them to that conclusion. As I read the works on which they based their policy, however, I was pretty surprised—rather alarmed, actually: These documents simply did not say what AAP claimed they did. In fact, the references that AAP cited as the basis of their policy instead outright contradicted that policy, repeatedly endorsing *watchful waiting*.

The AAP statement was also remarkable in what it left out—namely, the actual outcomes research on GD children. In total, there have been 11 follow-up studies of GD children, of which AAP cited one (Wallien & Cohen-Kettenis, 2008), doing so without actually mentioning the outcome data it contained. The literature on outcomes was neither reviewed, summarized, nor subjected to meta-analysis to be considered in the aggregate—It was merely disappeared. (The list of all existing studies appears in the appendix.) As they make clear, *every* follow-up study of GD children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition. AAP is, of course, free to establish whatever policy it likes on

CONTACT James Cantor ✉ jamescantorphd@gmail.com 🏢 Toronto Sexuality Centre, 2 Carlton Street, suite 1820, Toronto, Ontario M5B 1J3, Canada.

© 2019 Taylor & Francis Group, LLC

whatever basis it likes. But any assertion that their policy is based on evidence is demonstrably false, as detailed below.

AAP divided clinical approaches into three types—conversion therapy, watchful waiting, and gender affirmation. It rejected the first two and endorsed *gender affirmation* as the only acceptable alternative. Most readers will likely be familiar already with attempts to use conversion therapy to change sexual orientation. With regard to gender identity, AAP wrote:

> "[C]onversion" or "reparative" treatment models are used to prevent children and adolescents from identifying as transgender or to dissuade them from exhibiting gender-diverse expressions. … Reparative approaches have been proven to be not only unsuccessful[38] but also deleterious and are considered outside the mainstream of traditional medical practice.[29,39–42]

The citations were:

38. Haldeman DC. The practice and ethics of sexual orientation conversion therapy. *J Consult Clin Psychol.* 1994;62(2):221–227.

29. Adelson SL; American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry.* 2012;51(9):957–974.

39. Byne W. Regulations restrict practice of conversion therapy. *LGBT Health.* 2016;3(2):97–99.

40. Cohen-Kettenis PT, Delemarrevan de Waal HA, Gooren LJ. The treatment of adolescent transsexuals: changing insights. *J Sex Med.* 2008;5(8):1892–1897.

41. Bryant K. Making gender identity disorder of childhood: historical lessons for contemporary debates. *Sex Res Soc Policy.* 2006;3(3):23–39.

42. World Professional Association for Transgender Health. *WPATH De-Psychopathologisation Statement.* Minneapolis, MN: World Professional Association for Transgender Health; 2010.

AAP's claims struck me as odd because *there are no studies of conversion therapy for gender identity.* Studies of conversion therapy have been limited to *sexual orientation,* and, moreover, to the sexual orientation *of adults,* not to gender identity and not of children in any case. The article AAP cited to support their claim (reference number 38) is indeed a classic and well-known review, but it is a review of sexual orientation research *only.* Neither gender identity, nor even children, received a single mention in it. Indeed, the narrower scope of that article should be clear to anyone reading even just its title: "The practice and ethics of *sexual orientation* conversion therapy" [italics added].

AAP continued, saying that conversion approaches for GD children have already been rejected by medical consensus, citing five sources. This claim struck me as just as odd, however—I recalled associations banning conversion therapy for sexual orientation, but not for gender identity, exactly because there is no evidence for generalizing from adult sexual orientation to childhood gender identity. So, I started checking AAP's citations for that, and these sources too pertained only to sexual orientation, not gender identity (specifics below). What AAP's sources *did* repeatedly emphasize was that:

A. Sexual orientation of adults is unaffected by conversion therapy and any other [known] intervention;

B. Gender dysphoria in childhood before puberty desists in the majority of cases, becoming (cis-gendered) homosexuality in adulthood, again regardless of any [known] intervention; and

C. Gender dysphoria in childhood persisting after puberty tends to persist entirely.

That is, in the context of GD children, it simply makes no sense to refer to externally induced "conversion": The majority of children "convert" to cisgender or "desist" from transgender

JOURNAL OF SEX & MARITAL THERAPY  309

*regardless* of any attempt to change them. "Conversion" only makes sense with regard to adult sexual orientation because (unlike childhood gender identity), adult homosexuality never or nearly never spontaneously changes to heterosexuality. Although gender identity and sexual orientation may often be analogous and discussed together with regard to social or political values and to civil rights, they are nonetheless distinct—with distinct origins, needs, and responses to medical and mental health care choices. Although AAP emphasized to the reader that "gender identity is not synonymous with 'sexual orientation'" (Rafferty et al., 2018, p. 3), they went ahead to treat them as such nonetheless.

To return to checking AAP's fidelity to its sources: Reference 29 was a practice guideline from the Committee on Quality Issues of the American Academy of Child and Adolescent Psychiatry (AACAP). Despite AAP applying this source to *gender identity,* AACAP was quite unambiguous regarding their intent to speak to sexual orientation and *only* to sexual orientation: "Principle 6. Clinicians should be aware that there is no evidence that *sexual orientation* can be altered through therapy, and that attempts to do so may be harmful. There is no established evidence that change in a predominant, enduring *homosexual* pattern of development is possible. Although sexual fantasies can, to some degree, be suppressed or repressed by those who are ashamed of or in conflict about them, sexual desire is not a choice. However, behavior, social role, and—to a degree—identity and self-acceptance are. Although operant conditioning modifies sexual fetishes, it does not alter *homosexuality.* Psychiatric efforts to alter *sexual orientation* through 'reparative therapy' *in adults* have found little or no change in *sexual orientation,* while causing significant risk of harm to self-esteem" (AACAP, 2012, p. 967, italics added).

Whereas AAP cites AACAP to support gender affirmation as the only alternative for treating GD children, AACAP's actual view was decidedly neutral, noting the lack of evidence: "Given the lack of empirical evidence from randomized, controlled trials of the efficacy of treatment aimed at eliminating gender discordance, the potential risks of treatment, and longitudinal evidence that gender discordance persists in only a small minority of untreated cases arising in childhood, further research is needed on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention before any treatment to eliminate gender discordance can be endorsed" (AACAP, 2012, p. 969). Moreover, whereas AAP rejected watchful waiting, what AACAP recommended was: "In general, it is desirable to help adolescents who may be experiencing gender distress and dysphoria to defer sex reassignment until adulthood" (AACAP, 2012, p. 969). So, not only did AAP attribute to AACAP something AACAP never said, but also AAP withheld from readers AACAP's actual view.

Next, in reference 39, Byne (2016) also addressed only sexual orientation, doing so very clearly: "Reparative therapy is a subset of conversion therapies based on the premise that *same-sex attraction* are reparations for childhood trauma. Thus, practitioners of reparative therapy believe that exploring, isolating, and repairing these childhood emotional wounds will often result in reducing *same-sex attractions*" (Byne, 2016, p. 97). Byne does not say this of gender identity, as the AAP statement misrepresents.

In AAP reference 40, Cohen-Kettenis et al. (2008) did finally pertain to gender identity; however, this article never mentions conversion therapy. (!) Rather, in this study, the authors presented that clinic's lowering of their minimum age for cross-sex hormone treatment from age 18 to 16, which they did on the basis of a series of studies showing the high rates of success with this age group. Although it did strike me as odd that AAP picked as support against conversion therapy an article that did not mention conversion therapy, I could imagine AAP cited the article as an example of what the "mainstream of traditional medical practice" consists of (the logic being that conversion therapy falls outside what an 'ideal' clinic like this one provides). However, what this clinic provides is the very *watchful waiting* approach that AAP rejected. The approach

espoused by Cohen-Kettenis (and the other clinics mentioned in the source—Gent, Boston, Oslo, and now formerly, Toronto) is to make puberty-halting interventions available at age 12 because: "[P]ubertal suppression may give adolescents, together with the attending health professional, more time to explore their gender identity, without the distress of the developing secondary sex characteristics. The precision of the diagnosis may thus be improved" (Cohen-Kettenis et al., 2008, p. 1894).

Reference 41 presented a very interesting history spanning the 1960s–1990s about how feminine boys and tomboyish girls came to be recognized as mostly pre-homosexual, and how that status came to be entered into the DSM at the same time as homosexuality was being *removed* from the DSM. Conversion therapy is never mentioned. Indeed, to the extent that Bryant mentions treatment at all, it is to say that treatment is entirely irrelevant to his analysis: "An important omission from the *DSM* is a discussion of the kinds of treatment that GIDC should receive. (This omission is a general orientation of the DSM and not unique to GIDC)" (Bryant, 2006, p. 35). How this article supports AAP's claim is a mystery. Moreover, how AAP could cite a 2006 history discussing events of the 1990s and earlier to support a claim about the *current* consensus in this quickly evolving discussion remains all the more unfathomable.

Cited last in this section was a one-paragraph press release from the World Professional Association for Transgender Health. Written during the early stages of the American Psychiatric Association's (APA's) update of the DSM, the statement asserted simply that "The WPATH Board of Directors strongly urges the de-psychopathologisation of gender variance worldwide." Very reasonable debate can (and should) be had regarding whether gender dysphoria should be removed from the DSM as homosexuality was, and WPATH was well within its purview to assert that it should. Now that the DSM revision process is years completed however, history has seen that APA ultimately retained the diagnostic categories, rejecting WPATH's urging. This makes AAP's logic entirely backwards: That WPATH's request to depathologize gender dysphoria was *rejected* suggests that it is *WPATH's* view—and therefore the AAP policy—which fall "outside the mainstream of traditional medical practice." (!)

AAP based this entire line of reasoning on their belief that conversion therapy is being used "to prevent children and adolescents from identifying as transgender" (Rafferty et al., 2018, p. 4). That claim is left without citation or support. In contrast, what is said by AAP's sources is "delaying affirmation should *not* be construed as conversion therapy or an attempt to change gender identity" in the first place (Byne, 2016, p. 2). Nonetheless, AAP seems to be doing exactly that: simply relabeling any alternative approach as equivalent to conversion therapy.

Although AAP (and anyone else) may reject (what they label to be) conversion therapy purely on the basis of political or personal values, there is no evidence to back the AAP's stated claim about the existing science on gender identity at all, never mind gender identity of children.

AAP also dismissed the watchful waiting approach out of hand, not citing any evidence, but repeatedly calling it "outdated." The criticisms AAP provided, however, again defied the existing evidence, with even its own sources repeatedly calling watchful waiting the current standard. According to AAP:

> [G]ender affirmation is in contrast to the outdated approach in which a child's gender-diverse assertions are held as "possibly true" until an arbitrary age (often after pubertal onset) when they can be considered valid, an approach that authors of the literature have termed "watchful waiting." This outdated approach does not serve the child because critical support is withheld. Watchful waiting is based on binary notions of gender in which gender diversity and fluidity is pathologized; in watchful waiting, it is also assumed that notions of gender identity become fixed at a certain age. The approach is also influenced by a group of early studies with validity concerns, methodologic flaws, and limited follow-up on children who identified as TGD and, by adolescence, did not seek further treatment ("desisters").[45,47]

The citations from AAP's reference list are:

JOURNAL OF SEX & MARITAL THERAPY  311

45. Ehrensaft D, Giammattei SV, Storck K, Tishelman AC, Keo-Meier C. Prepubertal social gender transitions: what we know; what we can learn—a view from a gender affirmative lens. *Int J Transgend.* 2018;19(2):251–268

47. Olson KR. Prepubescent transgender children: what we do and do not know. *J Am Acad Child Adolesc Psychiatry.* 2016;55(3):155–156.e3

I was surprised first by the AAP's claim that watchful waiting's delay to puberty was somehow "arbitrary." The literature, including AAP's sources, repeatedly indicated the pivotal importance of puberty, noting that outcomes strongly diverge at that point. According to AAP reference 29, in "*prepubertal* boys with gender discordance—including many without any mental health treatment—the cross gender wishes usually fade over time and do not persist into adulthood, with only 2.2% to 11.9% continuing to experience gender discordance" (Adelson & AACAP, 2012, p. 963, italics added), whereas "when gender variance with the desire to be the other sex is present *in adolescence*, this desire usually does persist through adulthood" (Adelson & AACAP, 2012, p. 964, italics added). Similarly, according to AAP reference 40, "Symptoms of GID *at prepubertal ages* decrease or even disappear in a considerable percentage of children (estimates range from 80–95%). Therefore, any intervention in childhood would seem premature and inappropriate. However, GID persisting *into early puberty* appears to be highly persistent" (Cohen-Kettenis et al., 2008, p. 1895, italics added). That follow-up studies of prepubertal transition differ from postpubertal transition is the very meaning of non-arbitrary. AAP gave readers exactly the reverse of what was contained in its own sources. If AAP were correct in saying that puberty is an arbitrarily selected age, then AAP will be able to offer another point to wait for with as much empirical backing as puberty has.

Next, it was not clear on what basis AAP could say that watchful waiting withholds support—AAP cited no support for its claim. The people in such programs often receive substantial support during this period. Also unclear is on what basis AAP could already know exactly which treatments are "critical" and which are not—Answering that question is the very purpose of this entire endeavor. Indeed, the logic of AAP's claim appears entirely circular: It is only if one were already pre-convinced that gender affirmation is the only acceptable alternative that would make watchful waiting seem to withhold critical support—What it delays is gender affirmation, the method one has already decided to be critical.

Although AAP's next claim did not have a citation appearing at the end of its sentence, binary notions of gender were mentioned both in references 45 and 47. Specifically, both pointed out that existing outcome studies have been about people transitioning from one sex to the other, rather than from one sex to an in-between status or a combination of masculine/feminine features. Neither reference presented this as a reason to reject the results from the existing studies of complete transition however (which is how AAP cast it). Although it is indeed true that the outcome data have been about complete transition, some future study showing that partial transition shows a different outcome would not invalidate what is known about complete transition. Indeed, data showing that partial transition gives better outcomes than complete transition would, once again, support the watchful waiting approach which AAP rejected.

Next was a vague reference alleging concerns and criticisms about early studies. Had AAP indicated what those alleged concerns and flaws were (or which studies they were), then it would be possible to evaluate or address them. Nonetheless, the argument is a red herring: Because all of the later studies showed the same result as did the early studies, any such allegation is necessarily moot.

Reference 47 was a one-and-a-half page commentary in which the author off-handedly mentions criticisms previously made of three of the eleven outcome studies of GD children, but does not provide any analysis or discussion. The only specific claim was that studies (whether early or late) had limited follow-up periods—the logic being that had outcome researchers lengthened the follow-up period, then people who seemed to have desisted might have returned to the clinic as

cases of "persistence-after-interruption." Although one could debate the merits of that prediction, AAP instead simply withheld from the reader the result from the original researchers having tested that very prediction directly: Steensma and Cohen-Kettenis (2015) conducted another analysis of their cohort, by then ages 19–28 (mean age 25.9 years), and found that 3.3% (5 people of the sample of 150) later returned. That is, in long-term follow-up, the childhood sample showed 66.7% desistence instead of 70.0% desistance.

Reference 45 did not support the claim that watchful-waiting is "outdated" either. Indeed, that source said the very opposite, explicitly referring to watchful waiting as the *current* approach: "Put another way, if clinicians are straying from SOC 7 guidelines for social transitions, not abiding by the watchful waiting model *favored by the standards,* we will have adolescents who have been consistently living in their affirmed gender since age 3, 4, or 5" (Ehrensaft et al., 2018, p. 255). Moreover, Ehrensaft et al. said there are cases in which they too would still use watchful waiting: "When a child's gender identity is unclear, the watchful waiting approach can give the child and their family time to develop a clearer understanding and is not necessarily in contrast to the needs of the child" (p. 259). Ehrensaft et al. are indeed critical of the watchful waiting model (which they feel is applied too conservatively), but they do not come close to the position the AAP policy espouses. Where Ehrensaft summaries the potential benefits and potential risks both to transitioning and not transitioning, the AAP presents an ironically binary narrative.

In its policy statement, AAP told neither the truth nor the whole truth, committing sins both of commission and of omission, asserting claims easily falsified by anyone caring to do any fact-checking at all. AAP claimed, "This policy statement is focused specifically on children and youth that identify as TGD rather than the larger LGBTQ population"; however, much of that evidence was about sexual orientation, not gender identity. AAP claimed, "Current available research and expert opinion from clinical and research leaders … will serve as the basis for recommendations" (pp. 1–2); however, they provided recommendations entirely unsupported and even in direct opposition to that research and opinion.

AAP is advocating for something far in excess of mainstream practice and medical consensus. In the presence of compelling evidence, that is just what is called for. The problems with Rafferty, however, do not constitute merely a misquote, a misinterpretation of an ambiguous statement, or a missing reference or two. Rather, AAP's statement is a systematic exclusion and misrepresentation of entire literatures. Not only did AAP fail to provide compelling evidence, it failed to provide the evidence at all. Indeed, AAP's recommendations are *despite* the existing evidence.

## Disclosure statement

No potential conflict of interest was reported by the author.

## References

Rafferty, J., AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics, 142*(4), e20182162 doi:10.1542/peds.2018-2162

Steensma, T. D., & Cohen-Kettenis, P. T. (2015). More than two developmental pathways in children with gender dysphoria? *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 147–148. doi:10.1016/j.jaac.2014.10.016

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,* 1413–1423. doi:10.1097/CHI.0b013e31818956b9



## Appendix

| Count | Group | Study |
|---|---|---|
| 2/16<br>4/16<br>10/16 | gay*<br>trans-/crossdress<br>straight*/uncertain | Lebovitz, P. S. (1972). Feminine behavior in boys: Aspects of its outcome.<br>   *American Journal of Psychiatry, 128,* 1283–1289. |
| 2/16<br>2/16<br>12/16 | trans-<br>uncertain<br>gay | Zuger, B. (1978). Effeminate behavior present in boys from childhood:<br>   Ten additional years of follow-up. *Comprehensive Psychiatry, 19,* 363–369. |
| 0/9<br>9/9 | trans-<br>gay | Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant<br>   gender identity/role: Longitudinal follow-up. *Journal of Pediatric Psychology, 4,* 29–41. |
| 2/45<br>10/45<br>33/45 | trans-/crossdress<br>uncertain<br>gay | Zuger, B. (1984). Early effeminate behavior in boys: Outcome and<br>   significance for homosexuality. *Journal of Nervous and Mental Disease, 172,* 90–97. |
| 1/10<br>2/10<br>3/10<br>4/10 | trans-<br>gay<br>uncertain<br>straight | Davenport, C. W. (1986). A follow-up study of 10 feminine boys. *Archives of*<br>   *Sexual Behavior, 15,* 511–517. |
| 1/44<br>43/44 | trans-<br>cis- | Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.*<br>   New Haven, CT: Yale University Press. |
| 0/8<br>8/8 | trans-<br>cis- | Kosky, R. J. (1987). Gender-disordered children: Does inpatient treatment help?<br>   *Medical Journal of Australia, 146,* 565–569. |
| 21/54<br>33/54 | trans-<br>cis- | Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric<br>   children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,*<br>   1413–1423. |
| 3/25<br>6/25<br>16/25 | trans-<br>lesbian/bi-<br>straight | Drummond, K. D., Bradley, S. J., Badali-Peterson, M., & Zucker, K. J. (2008). A follow-up study<br>   of girls with gender identity disorder. *Developmental Psychology, 44,* 34–45. |
| 17/139<br>122/139 | trans-<br>cis- | Singh, D. (2012). *A follow-up study of boys with gender identity disorder.* Unpublished doctoral<br>   dissertation, University of Toronto. |
| 47/127<br>80/127 | trans-<br>cis- | Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013).<br>   Factors associated with desistence and persistence of childhood gender dysphoria:<br>   A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent*<br>   *Psychiatry, 52,* 582–590. |

*For brevity, the list uses "gay" for "gay and cis-", "straight" for "straight and cis-", etc.

ATTACHMENT E

**Concerns about Affirmation of an Incongruent Gender in a Child or Adolescent**

Quentin L. Van Meter, M.D.
May 17, 2022

## Qualifications

I received my B.A. in Science at the College of William and Mary and my M.D. from the Medical College of Virginia, Virginia Commonwealth University. I am currently a pediatric endocrinologist in private practice in Atlanta, Georgia. I am the President of Van Meter Pediatric Endocrinology, P.C. I am on the clinical faculties of Emory University School of Medicine and Morehouse College of Medicine, in the role of adjunct Associate Professor of Pediatrics. I am board certified in Pediatrics and Pediatric Endocrinology. I have been licensed to practice medicine in Georgia since 1991. I have been previously licensed to practice medicine in California, Louisiana, and Maryland.

I did my Pediatric Endocrine fellowship at Johns Hopkins Hospital from 1978-1980. The faculty present at that time had carried on the tradition of excellence established by Lawson Wilkins, M.D. Because of the reputation of the endocrine program as a center for exceptional care for children with disorders of sexual differentiation, I had well-above average exposure to such patients. As a Pediatric Fellow, I was also exposed to adults with Gender Identity Disorder, then called Trans-Sexuality, and received training from John Money, Ph.D., in his Psycho-hormonal Division.  Over the past 44 years, I have closely followed the topic of incongruent gender in children adolescents and adults, but I am focusing in this document on working with children and adolescents. To get a more solid understanding of how male and female human beings develop in utero, it is important to start at the point when a sperm meets an egg.

## Differentiation in the Fetus

From the moment of conception, a fetus is determined to be either a male (XY), female (XX), or in rare cases, to have a combination of sex-determining chromosomes, many of which are not compatible with life, and some of which are the cause of identifiable clinical syndromes. The presence of a Y chromosome in the developing fetus directs the developing gonadal tissue to develop as a testicle. The absence of a functional Y chromosome allows the gonadal tissue to develop as an ovary. Under the influence of the mother's placental hormones, the testicle will produce testosterone which directs the genital tissue to form a penis and a scrotum. Simultaneously, the testicle produces anti-Müllerian Hormone (AMH) which regresses development of the tissue that would otherwise develop into the uterus, fallopian tubes, and upper third of the vagina. This combination of actions in early fetal development is responsible for what we subsequently see on fetal sonograms, and what we observe at birth as male or female genitalia. It is only when the genital structures are ambiguous in appearance that sex determination is withheld until a thorough expert team evaluation has occurred.

For reasons most often occurring as random events, there are malfunctions of the normal differentiation. These aberrations of normal development are responsible for what we classify as Disorders of Sexual Differentiation (DSD), and they represent a very small fraction of the human population. The incidence of such circumstances occurs in 1:4500 to 1:5500 births.[1] Sex is binary, male or female, and is determined by chromosomal complement and corresponding reproductive role. The exceedingly rare DSDs are all medically identifiable deviations from this sexual binary norm. The 2006 consensus statement of the Intersex Society of North America and the 2015 revision of the Statement do not endorse DSD as a third sex.[2] DSD outcomes range from appearance of female external genitalia in an XY male (complete androgen insensitivity syndrome) to appearance of male external genitalia in an XX female (severe congenital adrenal hyperplasia).

As one would expect, there are variations of the degree of hormonally driven changes that create ambiguous genital development that prevent assigning of a specific classification as either male or female at birth. DSD patients are not "transgender"; they have an objective, physical, medically verifiable, physiologic condition. Transgender people generally do not have intersex conditions or any other verifiable physical anomaly. People who identify as "feeling like the opposite sex" or "somewhere in between" do not comprise a third sex. They remain biological men or biological women.

In some DSDs there exist more than one set of chromosomes. When there is a divergence of the appearance of the external genitalia from the chromosomally determined sex due to the presence of both an ovarian and testicular cell lines in a patient simultaneously, the patient is classified as having ovo-testicular DSD (formerly termed a true hermaphrodite). When there is a disruption in the development of genital structures but there is solely testicular tissue present in the chromosomal male or solely ovarian tissue in the chromosomal female, the term 46 XY DSD or 46 XX DSD is used instead respectively (formerly termed male pseudohermaphrodite or female pseudohermaphrodite).

The decision to assign a sex of rearing is complex and is specific to the diagnosis. Patients with complete androgen insensitivity (CAIS) are XY DSD but are never reared as a male. Because testosterone never influences development, they become happy, functional female adults with infertility. Females with severe congenital adrenal hyperplasia (CAH) are XX DSD but are not reared as males despite the male appearance of the genitalia at birth. Although these girls may show a tendency for male play behaviors as children, they generally assume a female sexual identity. Therapeutic interventions in the DSD individuals from infancy onward are aimed at what function can be expected from their disordered sexual anatomy in terms of function and fertility. Most often, the chromosomal sex aligns with the sex of rearing.

**Gender Identity**

"Gender" is a term that refers to the psychological and cultural characteristics associated with biological sex. It is a psychological concept and sociological term, not a biological one. The term gender possessed solely a linguistic meaning prior to the 1950s. This changed when sexologists of the 1950s and 1960s co-opted the term to conceptualize cross-dressing and transsexualism in their psychological practice. "Gender identity" is a term coined by my former endocrine faculty member John Money in the 1970s and has come to refer to an individual's mental and emotional sense of being male or female. The norm is for individuals to have a gender identity that aligns with one's biological sex.

Gender discordance (formerly Gender Identity Disorder) is used to describe a psychological condition in which a person experiences marked incongruence between his experienced gender and the gender associated with his biological sex. He will often express the belief that he is the opposite sex. Up until 2010, gender discordance occurred in 0.001% of biological females and in 0.0033% of biological males.[3] Exact numbers are hard to document since reporting is often anecdotal. Gender discordance is not considered a normal developmental variation.

"Gender Dysphoria" is a diagnostic term to describe the emotional distress caused by gender incongruity.[4] John Money played a prominent role in the early development of gender theory and transgenderism. He understood gender to be "the social performance indicative of an internal sexed identity."[5] He joined the Johns Hopkins faculty in 1951 specifically to have access to children diagnosed with DSD, hoping to prove his theory that gender was arbitrary and fluid. Money experimented with DSD infants by assigning them to the opposite biological sex through surgical revision, counseling, and hormonal manipulation during puberty. His mode of operation was to have a theory and then experiment with patients to see how his theory worked.

**Ethics in Clinical Research on Human Subjects**

It is important to discuss the need for ethics to play a role in the design of clinical studies involving human patients.  To have a hypothesis, as did John Money, is not at issue.  However, to clearly elucidate the potential for harm and balance that knowledge with the potential benefits is key and essential.  After the travesties of open-ended experimentation in the Nazi concentration camps, international guidelines were established to protect human subjects from just such experimentation.[6]  John Money ignored these guidelines as he assigned genders to infants and toddlers with ambiguous genitalia.  There was no informed consent of the patients, who were infants and toddlers, and their parents were just told to follow the advice of Dr. Money and to trust that he had the correct information.  There was no standardized protocol to follow, and no known outcome that could be guaranteed.  This kind of endeavor did not anticipate or prevent adverse outcomes and was the antithesis of ethical science. Money never submitted his research proposals for review by an independent external review board.  This left the patients unprotected and vulnerable to harm, and, indeed, in the case of the Reimer twins, to death due to drug addiction/overdose in one brother and to suicide in the other.[7]

Near the end of my fellowship training at Johns Hopkins, a male infant was sent to our clinic to assess the cause of his very small penis and testicles. My attending physician and I laid out a diagnostic work-up based on the known science which would help us understand whether the problem was due to a pituitary deficiency or an inability of tissue response to hormones. We purposely left John Money off the care "team," having some serious concerns about his tendency to dismiss science and to experiment. We sent the family home with their son and were quite surprised when the mother returned six weeks later with a baby wearing a pink dress and an eyelet bonnet. Without our knowledge, Dr. Money had intervened and told the family that our protocol was nonsense and the baby needed to be reared as female. On physical exam, there was clear evidence that not only was the baby able to produce testosterone, but his penis responded well, as expected, to the hormone production by his own body. The family was relieved but had not been spared suffering under the experimentation by Dr. Money. They had suffered deeply when they divulged to their extended family that their baby boy was actually a baby girl, and then they suffered even more when they recanted and resumed calling him a boy.

Because of his experience with infants, Money initially garnered support from endocrine colleagues and surgical colleagues, and Johns Hopkins became a renowned center for care of patients with DSD in the 1970s, receiving referrals from around the world. Follow-up studies on these infants later showed, however, that altering their natal sexual identity via social intervention could lead to severe psychological harm. Clinical case reports of children with DSD have revealed that gender identity is indeed not immune to environmental input.[8]

Meanwhile, Money had expanded into the field of adult patients with persistent gender identity disorder. This very small group of patients chose voluntarily, as adults, to enter a very precise protocol which began with living socially as the opposite sex for a year, eventually receiving hormonal therapy to change their physical appearance to some extent. The final step was surgical revision of the body structures that would otherwise be at odds with their desired gender identity. This small group of patients was followed for a number of years past their final surgical procedures and required continuous counseling. These patients expressed some degree of subjective satisfaction but showed no objective improvement in overall wellbeing.[9] The legacy of John Money fell into disrepute and the transsexual treatment program at Johns Hopkin was closed in the 1980s based on the lack of evidence that this protocol produced an effective cure.

**Etiology of Gender Disorders**

Transgender affirming professionals claim transgender individuals have a "feminized brain" trapped in a male body at birth and vice versa based upon various brain studies. Diffusion-weighted MRI scans have demonstrated that the pubertal testosterone surge in boys increases white matter volume. A study by Rametti and colleagues found that the white matter microstructure of the brains of female-to-male (FtM) transsexual adults, who had not begun testosterone treatment, more closely resembled that of men than that of women.[10] Other

diffusion-weighted MRI studies have concluded that the white matter microstructure in both FtM and male-to-female (MtF) transsexuals falls halfway between that of genetic females and males.[11] These studies, however, are of limited clinical significance due to the small number of subjects and failure to account for neuroplasticity.

Neuroplasticity is the well-established phenomenon in which long-term behavior alters brain microstructure. For example, the MRI scans of experienced cab drivers in London are distinctly different from those of non-cab drivers, and the changes noted are dependent on the years of experience.[12] There is no evidence that people are born with brain microstructures that are forever unalterable, but there is significant evidence that experience changes brain microstructure.[13,14] Therefore, any transgender brain differences would more likely be the result of transgender behavior than its cause.

Furthermore, infants' brains are imprinted prenatally by their own endogenous sex hormones, which are secreted from their gonads beginning at approximately eight weeks' gestation.[15,16,17] There are no published studies documenting MRI-verified differences in the brains of gender-disordered children or adolescents. The DSD guidelines also specifically state that current MRI technology cannot be used to identify those patients who should be raised as males or raised as females.[18] Behavior geneticists have known for decades that while genes and hormones influence behavior, they do not hard-wire a person to think, feel, or behave in a particular way. The science of epigenetics has established that genes are not analogous to rigid "blueprints" for behavior. Rather, humans "develop traits through the dynamic process of gene-environment interaction. ... [genes alone] don't determine who we are." [19]

Regarding transgenderism, twin studies of adults prove definitively that prenatal genetic and hormone influence is minimal. The largest twin study of transgender adults found that only 20 percent of identical twins were both transgender-identified.[20] Since identical twins contain 100 percent of the same DNA from conception and develop in exactly the same prenatal environment exposed to the same prenatal hormones, if genes and/or prenatal hormones contributed to a significant degree to transgenderism, the concordance rates would be close to 100 percent. Instead, 80 percent of identical twin pairs were discordant. This difference would indicate that at least 80 percent of what contributes to transgenderism as an adult in one co-twin consists of one or more non-shared post-natal experiences including but not limited to non-shared family experiences. These findings also mean that persistent GD is due predominately to the impact of nonshared environmental influences. These studies provide compelling evidence that discordant gender is not hard-wired genetically.

**Gender Dysphoria vs. Gender Identity Disorder**

Up until the recent revision of the DSM-IV criteria, the American Psychological Association (APA) held that Gender Identity Disorder (GID) was the mental disorder described as a discordance between the natal sex and the gender identity of the patient. Dr. Kenneth Zucker, who is a highly respected clinician and researcher from Toronto, carried on evaluation and

treatment of GID patients for forty years. His works, widely published, found that the vast majority of boys and girls with GID identify with their biological sex by the time they emerge from puberty to adulthood, through either watchful waiting or family and individual counseling.[21] His results were mirrored in studies from Europe.[22,23]

When the DSM-V revision of the diagnosis of GID was proposed by the APA committee responsible for revision, Dr. Zucker strongly opposed the change to the term Gender Dysphoria, which purposefully removed gender discordance as a mental disorder apart from the presence of significant emotional distress. With this revision, Gender Dysphoria describes the mental anguish which is experienced by the gender discordant patient. The theory that societal rejection is the root cause of Gender Dysphoria was validly questioned by a study from Sweden which showed that the dysphoria was not eliminated by hormones and sex reassignment surgery even with widespread societal acceptance.[24]

**Treatment of Gender Dysphoria**

The treatment of children and adolescents with gender discordance and accompanying gender dysphoria should include an in-depth evaluation of the child and family dynamics. This evaluation provides a basis on which to proceed with psychologic therapy. The entire biologic and social family should be involved in psychological therapy designed to assist the patient, if at all possible, to align gender identity with natal sex. Psychological support by competent counselors with an intent of resolving the gender conflict should be provided as long as the patient continues to suffer emotionally. Given the high degree of eventual desistance of gender discordance/dysphoria by the end of puberty, it would be ethical and logical to counsel the patient and family to rear the child in conformity with natal sex.

There should be no interruption of natural puberty. Natural pubertal maturation in accordance with one's natal sex is not a disease. It is designed to carry malleable, immature children forward to be healthy adults capable of conceiving their own progeny by providing either a sperm or an egg.  Puberty affects physical changes, some of them painful, unique to the natal sex to reflect the laws of nature. Interruption of puberty has been reserved for children who begin puberty at an age much younger than normal in an effort to preserve final height potential and avoid the social consequences of precocious maturation.[25]

There are a number of physical changes that are a consequence of normally timed puberty that could be classified as disadvantageous: changes in body proportions can alter success with dance and gymnastics; acne can be severe and disfiguring; a boy soprano can suddenly hardly carry a tune. It has not been the ethical standard of care to stop puberty so that these changes can be circumvented. Erikson described the stage of adolescence as "Identity versus Role Confusion" during which the teen works at developing a sense of self by testing roles then integrating them into a single identity.[26] This process is often unpleasant regardless of the presence or absence of gender identity conflicts. The major benefit of enduring puberty in a GD patient is that it provides a strong likelihood of alignment of his gender identity with his

natal sex. There is no doubt that these patients need compassionate care to get them through their innate pubertal changes.

The light at the end of the tunnel is the proven scientific evidence that 80%- 95% of pre-pubertal children with GD will come to identify with their biological sex by late adolescence. Some will require lifelong supportive counseling while others will not.[27] Intervention at a young age with gonadotropin releasing hormone analogs (often referred to as puberty blockers) to either stop puberty early on or prevent it from starting before it naturally occurs is suggested by guidelines developed by WPATH without scientific basis. These guidelines are essentially nothing more than an open-ended experiment in the manner of John Money. They represent the ideas of their authors with clear admission that there is no long-term evidence that harm will exceed benefits as these patients grow to old age. There is evidence that bone mineral density is irreversibly decreased if puberty blockers are used during the years of adolescence.[28] To treat puberty as a pathologic state of health that should be avoided by using puberty blockers (GnRH analogs) is to interrupt a major necessary physiologic transformation at a critical age when such changes can effectively happen. We have definite evidence of the need for estrogen in females to store calcium in their skeleton in their teen years. That physiologic event can't be put off successfully to a later date. It is very difficult to imagine ethical controlled clinical trials that could elucidate the effects of delaying puberty until the age of consent.

The use of cross-sex hormones during this same time frame has no basis of safety and efficacy. The use of such treatment in adults raises scientifically valid concerns that were amply expressed in the 2009 Endocrine Society Guidelines on Transgender treatment. The next step in WPATH-recommended intervention is to use cross-sex hormone therapy during the time when the patient would naturally be experiencing endogenous pubertal changes. This too is not based on scientifically proven theories. The use of cross-sex hormones can cause permanent infertility.[29]

The final recommended step is so-called "sex reassignment surgery," which can include surgical removal of the breasts in natal females, or removal of the penis and scrotum in natal males. Each of these steps has adverse outcomes, some reversible and others not. Mastectomies leave scars, and there is great difficulty in creating a functional vaginal-like orifice, and certainly no success in creating an innervated erectile penis where none existed previously. Sex reassignment surgery is, by nature, permanent.

**Recurrent Themes that Are Repeatedly Published**

Puberty blockers are stated to be completely reversible in their effects on the adolescent who has entered puberty based on clinical studies in young children with precocious puberty who have been treated with these drugs. This is comparing apples to oranges. Precocious puberty, by definition, is defined as puberty which starts before the 8th birthday for a female child or the before the 9th birthday in a male child. The end of treatment is carefully timed so that resumption of puberty occurs at the average age for females (10.5 years) and males (11.5

years). This allows the necessary functions of puberty to prepare the body for reproduction and affects the bones, gonads, and brain, among other body systems. On the other hand, blocking puberty at the age of normal puberty prevents the needed accretion of calcium into the skeleton and prevents the maturation of the gonads. There is no long-term data that compares bone, gonad, and brain health in pubertal-aged patients who have had puberty interrupted and those who have not, as was noted as a concern in the Endocrine Society Guidelines. There are no such ongoing studies completed that guarantee the full reversibility of blocking puberty in this age group, but there is evidence that normal bone density can't be fully reestablished. Without any verifiable safety data, using the puberty blockers for interrupting normal puberty is not a sanctionable off-label use of these drugs and is therefore to be considered uncontrolled, non-consentable experimentation on children.

Advocates for the social, medical and surgical affirmation of gender incongruent children insist that they are only following established standards of care. There are no standards of care for transgender health. Standards of care established by broad consensus are reached by inclusion of the whole spectrum of opinions, clinical experience and published science in the formation thereof. The guidelines published by WPATH[30], the Endocrine Society,[29,31] the American Academy of Pediatrics[32], and the Pediatric Endocrine Society[33] are solely the opinions of like-minded practitioners who excluded any contrary opinion. The Endocrine Society Guidelines, as mentioned before, clearly stated that they are not to be considered standards of care. Before true consensus-driven standards of care are established for the treatment of transgender patients of all ages, following the current guidelines is risky experimentation in a manner reminiscent of John Money's tactics.

**What We Do Know and Do Not Know**

We do know that social affirmation of an incongruent gender tears the fabric of the patient's life into pieces- pitting family members against each other, ruining child friendships and it introduces the child to a fantasy world, much of it on the internet. Kenneth Zucker aptly documented the detrimental effects of such affirmation and the immense amount of work it takes to undo these effects when the child does come to realize they can't change their sex and wants to go back to identifying with their sex[34]. We do not know that social affirmation does anything other than push the child away from the proven, 80-90% effective, so-called watch-and wait treatment option. Embarrassingly unscientific short term convenience sample studies purport to show that all gender incongruent children who are socially affirmed have improved mental health and are therefore better off than those children who are not allowed to socially transition.[35]

We do know that blocking puberty during the age when puberty naturally happens lessens accretion of calcium into the skeleton and that this can't be regained by allowing puberty to resume or by using cross sex hormones. We do know that the ovary and testicle cease to mature with treatment. What we do not know is whether allowing puberty to resume will allow the ovary and testicle to fully mature and have full function in terms of fertility. We do

not know if brain development that is halted with puberty blockers can return to full . function once puberty is allowed to resume.

We do know that elevated levels of testosterone in females and of estrogen in males create significant medical morbidity.  This knowledge comes from the evaluation and treatment of naturally occurring disease states in children and adults.  Treatment of these conditions is aimed at returning hormone levels to normal, thereby avoiding cancers, heart disease, and stroke. We do not know that elevating testosterone in females and estrogen in males to levels ten-fold higher than these known disease states is safe, but common sense would say it can't possibly be safe.

**The Myth of Increased Suicide**

The affirmation advocates repeatedly refer to the established increased risk of suicide if any of the affirmation strategies are not followed to completion. They point to their own published studies touting dramatic improvement in mental health status of patients who are affirmed in all three ways, but they cite data from convenience sampling, which never should be sued to prove anything other than association, at best.  Such studies can never prove causation. There are only two total population studies in the peer-reviewed medical literature.[24,36,37] They show that when every recorded case in the population of Sweden was analyzed, neither medical affirmation nor medical affirmation followed by surgical affirmation improved the mental health of the patients in the long run.

**What of the Nearly Logarithmic Increase in Incidence of Gender Incongruence?**

Data collection in this regard is subject to estimates based on surveys, which can easily alter the numbers upward or downward, depending on who designed the survey and to whom it was presented.  Fear, self-loathing or suicide will necessarily lower the numbers of survey participants whose lives are made miserable by the choice to affirm an incongruent gender. Instant gratification, payback to strict parents, and current celebrity will draw survey participants to express euphoric satisfaction with their decision to affirm their incongruent gender, especially when the surveys are circulated by trans-activist organizations, such as the Trevor Project.  What had been in 2010 a nearly invisible fraction of adults who admitted to living with an incongruent gender has exponentially increased in frequency to as many as one out of five students in a suburban Pittsburgh school district in 2021.  After I completed my fellowship at Johns Hopkins in 1980, it was not until 1993 that a biologic male presented to my private practice office with a desire to be treated with estrogen to feminize his body so that he could appear to be a female and identify as such.  There was nothing in published medical literature that I could find to guide my treatment options.  I canvassed my broad contact pediatric endocrinology network across the United States, and nobody had heard of such a clinical case, and none had any suggestions about what I should do. In the ensuing 19 years, the number of transgender treatment centers have burgeoned from zero to several hundred between university-based centers and Planned parenthood. Minority stress theory is frequently used to cover this explosion in numbers, but that is utterly impossible.  What does

explain this increase is online recruiting and grooming of vulnerable children and adolescents by a generously funded political movement aimed at dissolving the reality and birthright of biologic sex.  This will not end well.  By the time a plethora of legal action against those who promoted and engineered the social, medical, and surgical affirmation of incongruent gender knocks down this house of cards, millions of children and adolescents will have been medically, surgically, and mentally maimed as well sterilized.

### Endnotes

[1] Lee PA et al, Global Disorders of Sex Development Update since 2006: Perceptions, Approach and Care, 2016 Horm Res Paediatr.

[2] Lee PA et al, Consensus Statement on Management of Intersex Disorders, Pediatrics 2006; 118 e488-e500.

[3] Seaborg E, About Face, Endocrine News 2014 (May) 16-19.

[4] American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders. 5th ed; 2013:451-459.

[5] Jeffreys, S. Gender Hurts: A feminist analysis of the politics of transgenderism. Routledge. 2014 (p. 27).

[6] Annas GJ and Grodin MA, Reflections on the 70th Anniversary of the Nuremberg Doctor's Trial, AM J Pub Health 2018;108:10-12

[7] https://www.baltimoresun.com/news/bs-xpm-2000-02-10-0002100278-story.html

[8] Whitehead, N. My Genes Made Me Do It. Chapter 5.

[9] Meyer J.K. and Reter D. Sex Reassignment Follow-up. Arch. Gen. Psychiatry 36:1010-1015, 1979.

[10] Rametti G, Carrillo B, Gomez-Gil E, et al. White matter microstructure in female to male transsexuals before cross-sex hormonal treatment. A diffusion tensor imaging study. J Psychiatr Res 2011; 45:199-204.

[11] Kranz GS, Hahn A, Kaufmann U, et al. White matter microstructure in transsexuals and controls.

[12] Maguire EA et al, Navigation-related structural change in the hippocampi of taxi drivers, PNAS 2000; 97:4398- 4403.

[13] Gu J, Kanai R. What contributes to individual differences in brain structure? Front Hum Neurosci 2014; 8:262.

[14] Sale A, Berardi N, Maffei L, Environment and Brain Plasticity: Towards an Endogenous Pharmacotherapy, Physiol Rev 2014; 94: 189 –234.

[15] Reyes FI, Winter JS, Faiman C. Studies on human sexual development fetal gonadal and adrenal sex steroids. J Clin Endocrinol Metab 1973; 37(1):74-78.

[16] Lombardo M. Fetal testosterone influences sexually dimorphic gray matter in the human brain. J Neurosci 2012; 32:674-680.

[17] Campano A. [ed]. Geneva Foundation for Medical Education and Research. Human Sexual Differentiation; 2016. Available at ww.gfmer.ch/Books/Reproductive_health/Human_ sexual_differentiation.html. Accessed May 11, 2016.

[18] Lee PA et al, Consensus Statement on Management of Intersex Disorders, Pediatrics 2006; 118 e488-e500.

[19] Shenk, D. The Genius in All of Us: Why everything you've been told about genetics, talent, and IQ is wrong. (2010) New York, NY: Doubleday; p. 18.

[20] Diamond, M. "Transsexuality Among Twins: identity concordance, transition, rearing, and orientation." International Journal of Transgenderism, 14(1), 24-38.

[21] Zucker KJ, Gender Identity Disorder, in Rutter M, Taylor EA, editors. Child and Adolescent psychiatry, 4th ed, Malden Mass: Blackwell, 2006: 737-753.

[22] Wallien MS, Cohen-Kettenis PT. Psychosexual outcome of gender-dysphoric children. J AM Academy Child Adolescent Psychiatry 2008; 47:1413-1423.

[23] Schechner T. Gender Identity Disorder: A Literature Review from a Developmental Perspective. Isr J Psychiatry Related Sci 2010; 47:42-48.

[24] Dhejne C, et al. Long-term Follow-up of transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden PLoS One February 2011 Vol 6 Issue 2, e16885.

[25] Carel JC, Eugster EA, Rogol A, et al. Consensus statement on the use of gonadotropin-releasing hormone analogs in children. Pediatrics. 2009 Apr. 123(4):e752-62.

[26] Erikson EH (1993). Childhood and society. WW Norton & Company.

[27] Zucker KJ, Gender Identity Disorder, in Rutter M, Taylor EA, editors. Child and Adolescent psychiatry, 4th ed, Malden Mass: Blackwell, 2006: 737-753.

[28] J Clin Endo Metab 2008; 93:190-195.

[29] Hembree WC et al, Endocrine Treatment of Transsexual Persons: and Endocrine Society Clinical Practice Guideline, J Clin Endo Metab2009; 94:3132-3154.

[30] Coleman E, Bockting W, Botzer M et al, Standards of Care for the Health of Transsexual, Transgender, and Gender-Non-conforming People, version 7, International Journal of Transgenderism 2012;13(4): 165-232

[31] Wylie W et al, "Endocrine Treatment of Gender-dysphoric/Gender-incongruent Persons: An Endocrine Society Clinical Practice Guideline, JCEM 2017; 102:3869-3903

[32] Rafferty J, Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents, Pediatrics, 2018:142:e20182162

[33] Lopez X et al, Pediatric Endocrine Society Transgender Health Special Interest Group statement on gender-affirmative approach to care the Pediatric Endocrine Society, 2017 Curr Opin Pediatr;29:475-480.

[34] Zucker K. J. (2019), Debate: Different strokes for different folks. Child Adolesc Ment Health. doi:10.1111/camh.12330

[35] Olson KR et al, Mental Health of Transgender Children Who are Supported in Their Identities, Pediatrics 2016;137 e20153223

_____

[36] Branstrom R Pachankis JE Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study, Am J Psychiatry 2020; 177:727-734

[37] Bränström R and Pachankis JE. Toward Rigorous Methodologies for Strengthening Causal Inference in the Association Between Gender-Affirming Care and Transgender Individuals' Mental Health: Response to Letters. American Journal of Psychiatry 2020 177:8, 769-772  doi: 10.1176/appi.ajp.2020.20050599.

# ATTACHMENT F

# Florida Medicaid Project: Surgical Procedures and Gender Dysphoria

Patrick Lappert, M.D.

May 17, 2022

**Florida Medicaid Project: Surgical Procedures and Gender Dysphoria**

Patrick Lappert, M.D.

# Overview

The "Gender Affirmation" care model for children who suffer from gender identity issues is experimental in nature because it is based on low to very low-quality scientific evidence. There is no body of quality scientific evidence to support the hypothesis that gender dysphoria with its associated problems of self-harm and suicide, is improved long-term by gender affirmation surgical procedures.

The best evidence available today demonstrates that transgender is not a single condition that can be explained by any single factor. There are vast differences in age of presentation, predominant sex, persistence into adulthood, and resolution during adolescent development. Moreover, there are numerous and common co-morbid conditions such as autism-spectrum disorder, major anxiety disorders, and clinical depression that severely affect any sense of certainty about the true cause of the child's dysphoria, as well as their capacity to understand and give assent to irreversible medical and surgical procedures that lead to permanent sterility, sexual impotence, and a lifetime of medical problems associated with affirmation care.

The process of obtaining medical informed consent as part of gender affirming surgery is morally indefensible, and likely legally indefensible as well. Parents of suffering children are led by medical professionals to believe that there is only one valid option of care (affirmation medicine and surgery), utterly concealing the historic reality that greater than 92% of children desist in their cross-sex self-identification when treated using the "watchful waiting" therapeutic strategy. Parents are told that if they do not consent to affirmation care, there is a high likelihood that their child will die from suicide. This is not informed consent, but rather consent under duress.

Gender identity is being presented as a fixed and unchanging, biologically determined, personal characteristic. It is not. The medical literature has consistently shown over many years that the vast majority of children with cross-sex gender identity resolve the issue during adolescence and adopt a gender identity that is congruent with their biological sex.

Because surgeons who perform gender affirmation surgeries have no diagnostic test to predict who among the self-identified transgender minors would have persisted in their cross-sex self-identification into adulthood, and who among those children would have desisted, they have no way to know, in any particular case if the irreversible surgery is being performed on a person who would have continued to self-identify in the cross-sex persona into adulthood. Given the historically well-known desistance rate, it is possible that as many as 90% of children are undergoing surgery based upon an incorrect diagnosis.

"Gender Affirming" breast surgery for self-identifying transgender minors is not medically and ethically equivalent to similar procedures performed for objectively identifiable medical conditions. Transgender breast surgery is always cosmetic (aesthetic) in nature because the indication is a hoped-for improvement in the interior emotional life of the patient. Transgender surgery is not based in any medical diagnosis and does not seek to restore any form or function that may have been lost due to trauma, disease, or developmental accident. It begins with normal structures and changes their appearance in order to achieve a subjective improvement and is therefore cosmetic surgery.

Because gender affirming surgery is cosmetic (aesthetic) in nature, such surgeries must never be offered if they are known to predictably produce an irreversible loss of function. To knowingly sacrifice a human capacity (breast feeding, capacity for sexual intimacy, fertility) in the pursuit of a cosmetic result in a minor who is incapable of giving informed consent, is morally indefensible. The hoped-for subjective improvement that is sought in transgender surgery is a short-lived improvement and is only supported by low to very low-quality scientific evidence. Long term longitudinal cohort studies that are based in level III evidence show that affirmation surgical care is of no benefit in reducing self-harm including suicide.

## Problems with Informed Consent

The protection of children in situations requiring informed consent is a crucial problem that the state has a historic and abiding interest in. In the particular situation of self-identified transgender children, it becomes a most significant problem, given that they are being submitted for permanently life-altering interventions. In my opinion as a plastic and reconstructive surgeon, the life-altering nature of hormonal and surgical interventions needs to be addressed from the moment of the child's entry into the gender-transition system, given the fact that the overwhelming majority of children who first begin puberty blockade, go onto the physically altering and permanent changes produced by cross sex hormones, and many ultimately also pursue surgery, as is attested to by multiple papers, the content of which is examined below. Informed consent has several requirement that need to be met if such consent is to be deemed valid. These requirements include a thorough discussion of the details of the proposed procedure including risks, known complications, and some measure of the likelihood of a favorable outcome. The discussion must include alternative treatments, and their risks, known complications and their likelihood of a favorable outcome. In the case of the interventions associated with gender-transition medicine and surgery, the favorable outcomes should be evident over the lifetime of the patient, given that they are permanently sacrificing structures and capacities (breasts and breast-feeding, or genitals and fertility).

Because the commonly cited medical literature used in support of these surgeries is of low to very low quality, it must be recognized that such surgeries must be considered experimental in nature given the unknown long-term effects of treatment, and the vast uncertainty in the patient selection and diagnostic processes. Yet the experts who provide opinion in support of these surgeries speak with absolute certainty of their efficacy, and the absence of any alternative treatment. Considering these factors severally and together it becomes difficult to imagine a

more flawed consent process. It also becomes understandable how parents can be drawn into uninformed participation given the simultaneous presentation of dire consequences if gender dysphoria is left untreated, and the insistence that affirmation care including surgery is the only way to bring lasting happiness to the child.

## Chest Masculinization" in Natal Females is Not Ethically Equivalent to Mastectomies for Breast Cancer

When mastectomy is performed for the management of breast cancer, or to mitigate the proven risk of developing breast cancer in women, it is done on the basis of objective diagnoses either by pathological examination of biopsy tissue, or as in the case of prophylactic mastectomy, on the basis of genetic analysis that shows known markers of increased risk of developing breast cancer. These tests (microscopic examination of tissue specimens, detection of cell surface markers with proven association with malignancy, and genetic screening of at-risk patients) have known positive predictive value for the diagnosis of breast cancer, and these tests have known error rates that can be used when obtaining informed consent for mastectomy. The validity of these tests has been proven using scientific methodologies that produce high quality evidence in longitudinal population studies with control populations, and very long follow up. As the result, when a woman gives consent for mastectomy to control or prevent the potentially lethal disease, it is with a clear and proven evaluation of the risks and benefits that consent is obtained. Mastectomy is being performed based upon an objective diagnosis of a potentially lethal condition, and the surgical procedure has proven benefit in management of that condition.

In stark contrast, this is not the case when mastectomy is performed to "masculinize" the chest of girls and women who self-identify as transgender or who self-report symptoms of dysphoria. In the self-identified transgender adolescent, breasts are being removed on the basis of a diagnosis that is made by the patient since there are no tests with known error rates that can be used to predict who will benefit from this disfiguring and irreversible surgery. The claim is made that chest masculinization has proven benefit in reducing dysphoria and the associated risk of suicide. But published studies that make this claim of benefit offer evidence that is low to very low quality, typically small case collections with self-selection bias, very short follow up, and no case controls.

The best data presently available on the long-term effects of medical and surgical transitioning are long-term, longitudinal, population-based studies. For example, Dehjne, et al., examined the putative long-term benefit of full transitioning (including hormonal and surgical treatments) found in the Swedish medical database. (See Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden; Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. V. Johansson, Niklas Långström, Mikael Landén; PLOSOne February 22, 2011 https://doi.org/10.1371/journal.pone.0016885). That database includes all persons in the Swedish medical system, from pre-natal to death. It reports all episodes of care and all demographic information in a uniform vocabulary. Furthermore, Sweden has been on the forefront of "gender affirmation" long before the American medical

system seriously considered its claims. Because of the nature of Sweden's database, it is possible to study a cohort of patients that very closely matches the inquiry group with regards to age, sex, economic status, etc. It is possible to ask with great precision such questions as, "What is the likelihood that a fully transitioned transgender male will be hospitalized for psychiatric illness when compared to the age/sex matched control group?" Even more, one could urgently ask, "What is the relative risk of suicide in transgender persons, when compared to age/sex matched controls?"

Why are such longitudinal, population-based studies superior to the case-collection/case series methodology? Because confounding variables such as age, sex, and self-selection biases are removed. In the flawed case-collection methodology, the reported cases are typically only those who return for follow up. You have no way of knowing if the patient had a good outcome or didn't return for follow up because they were in a psychiatric hospital, were incarcerated, or committed suicide. In the Swedish longitudinal study, the suicide is in the same database, as are the other issues of hospitalization, incarceration, and addiction treatment, among other rates of comorbidity. Thus the longitudinal population study can give us what is called a "hazard ratio" for a particular study population (patients who have completed transgender transition in this case).

What this Swedish study shows us that the risk of completed suicide in all transgender persons is 19.1 times higher than in the control cohort. If you look only at patients who have transitioned — patients after "treatment" — from female to "male presentation," the risk of completed suicide is 40 times higher than in the general population. (Note: this finding is consistent with the historic Branstrom 10-year follow up study, which found no benefits to "transitioning treatments" but did note an increased risk of serious suicide attempts and anxiety disorders AFTER "treatment.") (Correction to Bränström and Pachankis, Am J Psychiatry 177:8, August 2020; see detailed citations in the "Notes" section of this report below).

Another cautionary note was added to the literature by the reputed Cochrane Review, a UK based international association of researchers who examine the quality of scientific evidence used in medical decision making. The Cochrane Review recently published findings concerning the medical evidence used to support the decision to give young women cross sex hormones as part of the transition process. The authors summarize the world literature review thus: "We found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition. This lack of studies shows a gap between current clinical practice and clinical research." (Does hormone therapy help transgender women undergoing gender reassignment to transition? See, Haupt C, Henke M, Kutschmar A, Hauser B, Baldinger S, Saenz SR, Schreiber G., Cochrane Review, 28 Nov 2020).

Similar issues of very poor, low quality scientific support for chest masculinization surgery can be seen in a recent article by Tolstrup et al. published in the journal Aesthetic Plastic Surgery (See Anders Tolstrup, Dennis Zetner, Jacob Rosenberg, Outcome Measures in Gender-Confirming Chest Surgery: A Systematic Scoping Review, Aesthetic Plast Surg 2020 Feb;44(1):219-228. doi: 10.1007/s00266-019-01523-1. Epub 2019 Oct 29). The article reports a

comprehensive review of the world literature concerning the efficacy of "gender confirming" chest surgery in transgender patients. The authors found 849 articles on the subject, published in peer reviewed medical journals. Of these 849 articles, only 47 could be included in the review. This means that only 5.5% of all the published, peer-reviewed transgender surgery articles demonstrated even rudimentary scientific rigor. Of those 47 articles, the authors report that only 29 of the articles addressed mental health outcomes (3.4% of all the articles). What is startling is that the mental health outcomes were judged only on the basis of uncorroborated, untested, and unassessed patient subjective reporting with descriptors that varied so widely from article to article that results could not even be compared. The authors summarize by saying, "Evaluation of outcomes in gender-confirming chest surgery showed large variations in reporting, and further streamlining of reporting is therefore required to be able to compare surgical outcomes between studies." None of these negligent articles even bothered to examine rates of psychiatric hospitalization, substance abuse, self-harm behaviors, and suicide. This tells us that the main reason for performing these surgeries (psychological distress and suicide risk) isn't even evaluated with regard to efficacy.

An example of an article with very low-quality data, reckless (now banned practices), and methodology, published in a "leading journal," and promoted as evidence for the efficacy of "chest masculinization" surgery makes this fact very clear. The lead author (Olson-Kennedy, a leading national advocate for the transgender treatment enterprise) is a board-certified pediatrician who leads the gender clinic for the Los Angeles Children's Hospital. The article appeared in 2018 (See J. Olson-Kennedy, J. Warus, MD1, et al., Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults; Comparisons of Nonsurgical and Postsurgical Cohorts., JAMA Pediatr. 2018;172(5):431-436. doi:10.1001/jamapediatrics. 2017.5440. In their summary of findings, the authors reported that "chest dysphoria" is common among "trans males" (natal females seeking to present as males) and claimed that dysphoria is "decreased by surgery." They claim that regret for surgery is "rare." The article reports breast removal surgery on at least one girl aged 13 years. (Note that this reckless, experimental practice has now apparently been abandoned as unethical/experimentation on children by England, Sweden, and Finland. The average age of patients in the study was 19. Children were entered into the study through recruitment from among patients visiting the clinic and by telephone over a six-month period. The authors found that, of the patients recruited from among visitors to the clinic (convenience sampling), there was an over-representation of non-operated patients, so the authors were forced to reach out to all the post-surgical patients by phone. Twenty-six percent of the clinic's post-surgical patients could not be reached for various reasons including no working phone, or failure to respond to multiple messages. The 26% drop-out rate is never even questioned by these authors. Were surgical patients lost to follow up because of dissatisfaction, psychiatric hospitalization, or suicide? This problem is called "self-selection bias," and it is evidence of careless study design. Of the remaining 74% of patients, only 72% completed the survey. This is a second example of self-selection bias. Why would some post-surgical patients who had been successfully contacted, not complete the survey? The authors — demonstrating multiple levels of confirmation bias — do not even ask such essential questions. (See detailed citations in the "Notes" section of this report below).

In the study, dysphoria was evaluated using what the author called "a novel measure," which amounted to a series of subjective questions about happiness that was in part designed by the adolescent test subjects themselves. Essentially, the methodology used an entirely unvalidated ("junk science") test instrument, with no known error rates and no proven predictive power. Furthermore, the post-surgical patients were administered the survey at widely varying time intervals post-surgery. The longest interval between surgery and the satisfaction survey was 5 years, but children less than a year post-surgery were included in this obviously flawed sample, and yet the authors claim evidence of "negligible regret." This is a remarkable, misleading, and deceptive claim given that long-term, longitudinal population studies show that there is a dramatic rise in post-surgical problems such as depression, hospitalization, substance abuse, and suicide beginning at around seven years post-surgery (Ibid). Surely the authors are familiar with the world literature on transgender outcomes?

Having deceptively or negligently promised in the introduction to their paper that "chest dysphoria" is reduced by surgery, at the conclusion the authors confessed to the fact that the study design and execution produced very low-quality data that is not useful for patient selection, or prediction of outcomes. They even confessed that the study does not address the efficacy of surgery in improving outcomes regarding the single most compelling reason for performing the operation: mitigation of depression and suicide. The authors write, "An additional limitation of the study was the small sample size. The nonsurgical cohort was a convenience sample, recruited from those with appointments during the data collection period. There could be unknown imbalances between the nonsurgical and postsurgical cohorts that could have confounded the study findings."

Finally, the authors did not even bother to validate their "Chest Dysphoria Scale." Such a "made-up" scale is unlikely to accurately represent distress or correlate with properly validated measures of quality of life, depression, anxiety, or functioning. Their own analysis at the conclusion or the paper directly contradicts the deceptive claim made in their introduction.

This is the kind of "junk science" that is used to support transgender medicine and surgery. The paper is only a few years old. It was written by board certified physicians who practice in one of the nation's largest pediatric gender clinics and was published in a peer-reviewed medical journal. It is essentially useless in making any clinical decisions regarding who should be offered surgery, what is the likelihood they will benefit from it, and what is the likelihood they will regret their decision. Most importantly, it does not even measure the effect of therapy on suicide risk. The very morbidity (the risk of suicide) that they claim is improved by surgery is not even measured in their low-quality study.

Because of the very low-quality scientific support for mastectomy in the management of gender dysphoria, valid consent would demand that these procedures be described as experimental, would need the approval of ethics panels to monitor human experimentation, and would require the use of valid controls found in long-term, longitudinal population-based study models. These are the kinds of patient protections now endorsed in England, Sweden and Finland but still

ignored in the US environment where proper scientific critiques of such studies can get faculty "cancelled."

Even though the transgender treatment industry has been performing these surgeries for over 50 years, gender treatment centers continue to publish the same low quality, methodologically defective studies based upon collected cases that are degraded in value by self-selection bias, confirmation bias, and short-term follow-up, while continuing to deceptively claim that such defective research provides a sufficient scientific basis for performing irreversible, disfiguring, and ultimately sterilizing hormonal treatments and surgeries on children.

## "Chest Masculinization" in Natal Females is Not Ethically Equivalent to Gynecomastectomy

Gynecomastectomy is the surgical treatment of gynecomastia, a fairly common condition in which males develop female-type breast gland tissue. Proponents of "masculinization" mastectomy in natal females erroneously equate the ethics of removing healthy breast tissue from gender dysphoric children with the removal of abnormal breast tissue in men (gynecomastia). In the case of gynecomastectomy in male patients, the operation is performed to remove the objectively diagnosed presence of female type glandular breast tissue present in a male patient. Physical examination demonstrates the presence of a dense retro-areolar mass which is tender and sometimes disfiguring. Pathological examination of the removed tissue will demonstrate the presence of female-type fibroglandular tissue in a male patient. This is an objectively abnormal condition. It should further be noted that the absence of such abnormal, female-type fibroglandular tissue in the submitted surgical specimen places the chest recontouring in the category of cosmetic surgery and is therefore not typically paid for by third-party payors.

A comprehensive literature review on the subject of gynecomastectomy and suicidal behavior conducted by Sollie in 2018 ( Management of gynecomastia—changes in psychological aspects after surgery—a systematic review: Gland Surg. 2018 Aug; 7(Suppl 1): S70–76.doi: 10.21037/gs.2018.03.09) did not produce a single paper claiming improvement in suicide rate in patients who underwent this surgery. There were many reports concerning improvement in the pain that men with this objective condition suffer with. The remainder of the reported data was in the category of subjective "satisfaction survey". This tells us that the author did not distinguish between medically indicated and aesthetic surgeries. Nonetheless, no claim is made of decreased suicide rates in a suicidal population of male patients. This is because any male patient seeking removal of abnormal, female-type, breast tissue who reported suicidal ideation would be considered incompetent to give consent and would require a psychiatric evaluation and treatment to manage suicidal thinking before being considered for surgery. This kind of decision in favor of psychiatric support does not appear to be at work in the transgender affirmation world. There, and there alone, is suicidal thinking considered a qualification for a surgery.

# "Chest Masculinization" in Natal Females is Not Ethically Equivalent to Breast Reduction

It should be obvious that "Chest Masculinization" surgery in natal females is not ethically equivalent to breast reduction surgery in non-transgender females. In the case of breast reduction for females with excessively large breasts (macromastia, or gigantomastia), the operation is performed to relieve a debilitating orthopedic complaint of neck, back, and shoulder pain associated with the postural/mechanical effects of the weight of the breasts. These patients experience significant activity restriction and chronic pain that is not relieved by medical management or physical therapy. Furthermore, there is voluminous actuarial data, based upon many years of longitudinal population-based study by medical insurance agencies that is used to predict who will benefit from surgery, and who will not. These physical, objective tests, based upon the actual measurement of the breasts, and the patient's overall body habitus, have known error rates that can be used to predict the likelihood that a breast reduction will relieve the orthopedic complaints of neck, back, and shoulder pain. When the tissue specimens are submitted to pathology, they are weighed in order to ensure that enough tissue has been removed so that there will be a very high likelihood that the surgery will relieve the orthopedic condition of neck, back, and shoulder pain ( Accuracy of Predicted Resection Weights in Breast Reduction Surgery, Theodore A. Kung, MD, Raouf Ahmed, MBBS1 Christine O. Kang, MPH,1 Paul S. Cederna, MD, and Jeffrey H. Kozlow, MD; Plast Reconstr Surg Glob Open. 2018 Jun; 6(6): e1830.

Based upon that, adequate pre-operative consent can be obtained. The supporting data is based in very high-quality methodology. There is no quality research data, no pre-operative test or study, and no known error rates that can be used to predict the likelihood that any child suffering from gender dysphoria will benefit from the experimental procedures of mastectomy and chest "masculinization." As noted above, because of the very low quality data, transgender chest masculinization is at best experimental and at worst, should be viewed as a form of medical child abuse — it is important to note that Finland, Sweden, and the UK apparently now all agree with this analysis, as they have all retreated from such reckless surgical procedures for (See detailed citations in the "Notes" section of this report below).

It is crucial to remember that "chest masculinization-affirmation surgery" of healthy breast tissue results in a complete loss of function, that this loss is two-fold (breast feeding and erotic sensibility), and the cause of the loss is two-fold (gland removal and severing of the intercostal nerve). (See Breast Reduction with Use of the Free Nipple Graft Technique; Stephen R. Colen, MD; Aesthetic Surgery Journal, (Breast Reduction with Use of the Free Nipple Graft Technique; Stephen R. Colen, MD; Aesthetic Surgery Journal, Volume 21, Issue 3, May 2001, Pages 261–271, https://doi.org/10.1067/maj.2001.116439).

If a patient who undergoes "chest masculinization" should regret the surgery, they do have the option of breast reconstruction. However, all that will be produced is a counterfeit of a breast. The patient will have lost the function of breast feeding. Additionally, the most commonly performed "masculinization" surgery involves the removal of the nipples, and subsequent re-

attachment in the form of a nipple graft. Those nipples will have lost their native nerve connections that provoke erotic sensibility. All that can be hoped for is the eventual random ingrowth of local skin sensation, but there will never be erotic sensation because the particular branch of the fourth intercostal nerve which communicates with particular centers in the brain responsible for oxytocin release and erotic provocation will have been permanently severed. This means that breast function has been completely and irreversibly sacrificed for the sake of producing a cosmetic result (a masculine appearing chest). This is the exact opposite of the goals of any reconstructive surgery. It must therefore be understood that "chest masculinization" is a cosmetic procedure that has violated the most essential principle of cosmetic surgery: never sacrifice function for the sake of a cosmetic result.

## Erroneous use of the word "Reconstructive" to describe Gender Affirmation Surgeries

The transgender treatment enterprise uses the word "reconstructive" to characterize a group of surgical treatments that seek to alter the sexed appearance of the person. It is important to understand that these procedures, because of the indications for surgery, the motivations for surgery, and the outcomes of surgery, are not reconstructive, but are to be properly understood to be cosmetic in nature.

Reconstructive surgeries are procedures that seek to establish or restore structures and their functioning that have been lost due to trauma, disease, in-utero developmental abnormalities, or surgical treatment for disease. Such reconstructive surgeries must begin with the objective characterization of the defect, including abnormalities of form, and associated loss of function. This process of defining the defect begins with a thorough understanding of normal human form and function and seeks to select, develop, and execute procedures that will restore both. In some cases function may be emphasized more than form, as when the mangled hand of a man is reconstructed. In other cases, reconstruction of form is all that is possible because as yet there are no techniques to restore function. An example of this is seen in the reconstruction of a woman's breast following cancer care. All that can be offered is the appearance of a breast; she will never be able to feed an infant through the reconstructed part.

This is to be contrasted with cosmetic, or aesthetic surgery in which the appearance of a structure is modified in order to produce a subjective (aesthetic) result for the patient. No functional restoration is addressed because no functional or structural loss exists. The object of the surgery is aesthetic. There is no lost form or function that needs to be reconstructed. It is aesthetic surgery because the motivation is aesthetic (subjective feelings about appearance). Further evidence for this is the fact that nearly the entirety of the outcome studies cited in support of these surgeries use subjective questionnaires which the patient fills out. The questions used are typical of those used to evaluate any aesthetic surgery. They are called "satisfaction surveys". Such surveys are prone to suffer from self-selection bias, confirmation bias, and high drop-out rates.

One of the key problems that the transgender treatment enterprise faces on a daily basis is the issue of third-party payment for services. No health insurance provider, including federal and state agencies will pay for cosmetic surgery. For this reason, it is necessary, in order for the business model to succeed, that providers characterize their services as reconstructive. This is doubly difficult given the intense political pressure that has been exerted upon the medical community to "de-pathologize" the condition of transgender. This is seen in the abandoning of the diagnostic nomenclature of "body dysmorphic disorder", and "gender identity disorder" in favor of the more recent DSM manual using the term "gender dysphoria". This leads transgender treatment providers into the difficult situation of claiming that transgender is not a pathology, while at the same time insisting that the services are medically necessary and describing the procedures as reconstructive without characterizing any physical/ functional defect.

As we consider the specific "gender affirming" surgical procedures we will see that comparison to medically indicated surgeries on both men and women actually serves to reinforce the evidence that these surgeries are essentially and fundamentally cosmetic.

## Masculinizing and Feminizing Chest Surgeries are Not "Medically Necessary"

Supporters of "transitioning" treatments justify surgical treatment based upon "medical necessity." They claim that gender dysphoria can lead to debilitating anxiety and depression, as well as serious incidents of self-harm, including self-mutilation, suicide attempts, and suicide. Yet with only a single exception, in the studies they cite no measures are made of the effects of surgery on what is claimed to constitute the "medical necessity" for these procedures. In contrast, the Branstrom study[1] documented no reliable benefits for transgender surgery/hormonal treatments and no reduction in suicide and even an increase in serious suicide attempts requiring hospitalization in patients receiving surgery. These recent, long-term, published, peer reviewed, credible research findings are quite contrary to the claims of supporters of "transitioning treatments" — as are the National Science Reviews in this area from England-NICE, Sweden, and Finland. (See detailed citations in the Notes section in this declaration).

Scientific rigor would demand an examination of objective outcomes such as: rates of substance abuse, psychiatric hospitalization, self-harm, or suicide, and how they were changed by surgery. One paper does ask these crucial questions concerning efficacy is a very comprehensive, long term, longitudinal population cohort study which actually shows the opposite of what experts claim for these patient outcomes. When followed beyond eight years post operatively, this paper shows that patients receiving these treatments have the same alarmingly high rates of hospitalization, substance abuse, self-harm, and completed suicide as persons who have had no medical or surgical intervention.

---

[1]*Correction of a key study: No evidence of "gender-affirming" surgeries improving mental health.* Home. (2020, August 30). Retrieved May 17, 2022, from https://segm.org/ajp_correction_2020

In summary, on the issue of the efficacy of these surgeries, the scientific support is very weak, while the scientific evidence rejecting the hypothesis of efficacy is remarkably strong (See Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden; Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. V. Johansson, Niklas Långström, Mikael Landén; PLOS One February 22, 2011 https://doi.org/10.1371/journal.pone.0016885).

The surgical removal of the breasts, and the re-contouring of the chest through liposuction is a common procedure for women who seek to present as men. These operations are performed in both men and women, for a variety of reasons. They are generally very safe, and typically performed in the outpatient setting. It is important to understand that the only way of distinguishing cosmetic breast surgery from "medically necessary" surgery is based upon the diagnosis of underlying pathology. For example, breast reduction may be cosmetic, or it may be medically indicated. In both cases, the patient presents with a complaint that her breasts are too big. The distinction between cosmetic breast reduction and medically indicated breast reduction is based upon the presenting symptoms of orthopedic problems when working, such as chronic neck back and shoulder pain caused by the weight of the breasts. But even then, the weight of the removed tissue is factored into the objective verification that the surgery was "medically necessary." There is a vast body of medical and actuarial data that demonstrates the relationship between the weight of the breast tissue removed and the probability that back pain will be cured by performing a breast reduction.

The same issues are at stake in breast enhancement for men seeking to present as women. Cross-sex hormones will have caused varying degrees of gynecomastia (breast enlargement in men). Surgical enhancement procedures are exactly the same in both men and women.

Medically necessary surgery in women is based upon the diagnosis of an objective medical condition, such as Poland's syndrome (congenital absence of a breast), surgical absence of the breast following cancer care. In men, the objective diagnosis of gynecomastia might warrant surgery based upon medical necessity, but it would be the removal of tissue that has objective pathological features (breast gland proliferation in a man). A rare diagnosis of breast cancer in a man might warrant chest wall reconstruction after cancer care. On the other hand, cosmetic surgery of the breast is entirely about the subjective feelings of the patient, and that is all that we find in the case of the self-identified transgender patient.

In the case of transgender chest surgery, the diagnosis is based on the patient's subjective report of dysphoria, but the medical necessity is based on the expectation that surgery will relieve the patient of the risk of, among other things, major depression, self-harm behaviors, and suicide. None among the many papers typically cited by supporters of "transitioning treatments" address themselves to the question of medical necessity for either masculinizing surgery, or feminizing surgery. They only address technical issues, management of complications, and subjective outcomes that employ precisely the same language that is used to assess every

other cosmetic surgery of the breast. Such papers often begin with standard language about the suffering of self-identified transgender adolescents, and their risk of self-harm. They will claim that the reported surgeries somehow reduce the risk of suicide, or the frequency or severity of self-harm, but they never report actual results of improvement in the risk of suicide, or substance abuse, or cutting, or sexual risk taking. The claim of benefit is unsupported in the scientific literature.

In summary, the medical necessity of transgender chest surgery is not supported by scientific evidence and appears to be firmly in the category of cosmetic surgery. What is more, the surgeries when performed on natal females causes a life-long loss of function, placing those surgeries in the category of malpractice. No other cosmetic procedure is expected to produce major functional loss. Such a result would only be the result of a complication, or other surgical misadventure. To actually have a 100% certainty of loss when surgical consent is being obtained constitutes a complete neglect of one of the foundational principles in plastic surgery: Never sacrifice function for the sake of a cosmetic result.

## About the Author

Education and Training: I received my Bachelor of Arts in Biological Sciences at the University of California, Santa Barbara, 1979. There I was engaged in research in cell membrane physiology with Dr. Philip C. Laris, studying stoichiometry of the sodium: potassium ATPase pump. I received my M.D., Doctor of Medicine degree at the Uniformed Services University of the Health Sciences, 1983 at Bethesda, Md. I served my General Surgery Residency at the Naval Hospital Oakland/UC Davis East Bay Consortium, 1987-1991 and served as Chief Resident, Department of Surgery, Naval Hospital Oakland, 1990-1991. I also served a Plastic Surgery Residency at the University of Tennessee-Memphis, 1992-1994. My professional background, experience, and publications are described in more detail in my curriculum vitae, which is attached as Exhibit A to this declaration.

Board Certifications in Medicine: I have been Board Certified in Surgery (American Board of Surgery, 1992), in Plastic Surgery (American Board of Plastic Surgery, 1997; American Board of Plastic Surgery, 2008).

Medical Staff Appointments: I served as the Staff General Surgeon at the Naval Hospital Oakland, CA 1991-1992 and as Associate Professor of Surgery, UC Davis-East Bay, 1991-1992. I also served as a Plastic and Reconstructive Surgeon, Naval Medical Center, Portsmouth, Virginia, 1994-2002 and as Chairman, Department of Plastic and Reconstructive Surgery, Naval Hospital Portsmouth, Virginia, 1996-2002. I later served as Clinical Assistant Professor, Department of Surgery, Uniformed Services University of the Health Sciences, 1995-2002 and as Founding Director, Pediatric Cleft Palate and Craniofacial Deformities Clinic, Naval Hospital Portsmouth, Virginia, 1996-2002 also as the Founding Director, Wound Care Center, Naval Hospital Portsmouth, Virginia, 1995-2002. I have also served as a Staff Plastic Surgeon in Nebraska and Alabama.

U.S. Surgeon General Service: I served as a Specialty Leader, Plastic and Reconstructive Surgery, Office of the Surgeon General-USN, 1997-2002.

Faculty Appointments: I served as Teaching Faculty at Eastern Virginia Medical School, Division of Plastic Surgery, 1995-2002. I also served on the teaching faculty of the Via College of Osteopathic Medicine, 2017-2020.

Military Service: I served as an Aviation Officer Candidate, Naval Aviation Schools Command, NAS Pensacola, 1978 and was Commissioned an Ensign, MC, USNR 1979 and Commissioned as a Lieutenant, MC, USN 1983. I served as a Designated Naval Flight Surgeon, Naval Aerospace Medical Institute, 1985, and I was Assigned Marine Fighter/Attack Squadron-451, serving as Flight Surgeon, and serving as Radar Intercept Officer in the Marine F4S Phantom, accumulating 235 flight hours, and trained for qualification as an Air Combat Tactics Instructor. I was deployed to the Western Pacific as UDP forward deployed fighter squadron in Korea, Japan, and the Philippines. I served in the US Navy for 24 years, and I served in the USMC for 3 years. I retired with the rank of Captain, USN in 2002.

Publications - Peer Reviewed Medical Journals: Lappert PW. Peritoneal Fluid in Human Acute Pancreatitis. Surgery. 1987 Sep; 102(3):553-4; Toth B, Lappert P. Modified Skin Incisions for Mastectomy: The Need for Plastic Surgical Input in Preoperative Planning. J Plastic and Reconstructive Surgery. 1991; 87 (6): 1048-53; Lappert P. Patch Esophagoplasty. J Plastic and Reconstructive Surgery. 1993; 91 (5): 967-8; Smoot E C III, Bowen D G, Lappert P, Ruiz J A. Delayed development of an ectopic frontal sinus mucocele after pediatric cranial trauma. J Craniofacial Surg. 1995;6(4):327–331; Lappert PW. Scarless Fetal Skin Repair: "Unborn Patients" and "Fetal Material". J Plastic and Reconstructive Surgery. 1996 Nov; 98(6): 1125; Lappert PW, Lee JW. Treatment of an isolated outer table frontal sinus fracture using endoscopic reduction and fixation. Plastic and Reconstructive Surgery 1998; 102(5): 1642-5.

Publications - Medical Textbooks: Wound Management in the Military. Lappert PW, Weiss DD, Eriksson E. Plastic Surgery: Indications, Operations, and Outcomes, Vol. 1; 53-63. Mosby. St. Louis, MO 2000.

Operations and Clinical Experience: Consultations and Discussions: As a physician and surgeon, I have treated many thousands of patients in 7 states and 4 foreign nations. My practice has included Primary Care, Family Medicine, Aerospace Medicine, General Surgery, Reconstructive Surgery for combat injured, cancer reconstructive surgeries including extensive experience with microvascular surgery, Pediatric Congenital Deformity, and the care of chronic wounds. I have practiced in rural medicine, urban trauma centers, military field hospitals, university teaching hospitals, and as a solo private practitioner. In my private practice I have had occasion to treat many self-identified transgender patients for skin pathologies related to their use of high dose sex steroids, laser therapies for management of facial hair both in transitioners and detransitioners. I have performed breast reversal surgeries for detransitioning patients. My practice is rated as "LGBTQ friendly" on social media. I have consulted with families with children who are experiencing gender discordance. I have given many presentations to professional meetings of educators and counselors on the subject of transgender, and the present state of the science and treatment. I have discussed the scientific issues relevant to the case with many physicians and experts over a number of years and also discussed related issues with parents and others.

# ATTACHMENT G

Florida Medicaid Project: Treatment for Transgender Children

Medical Experimentation without Informed Consent:

An Ethicist's View of Transgender Treatment for Children

G. Kevin Donovan, MD, MA
5-12-2022

# Florida Medicaid Project: Treatment for Transgender Children

## Medical Experimentation without Informed Consent:
## An Ethicist's View of Transgender Treatment for Children

## I.  The Issue

Growing controversy attends the diagnosis and treatment of individuals identifying as transgender, particularly those who are still children or adolescents. As was recently pointed out, leading medical, mental health, and public health organizations support understanding gender-diverse youth and providing gender-affirming medical (hormonal) and other(surgical) care as the standard of care, including the American Academy of Pediatrics, American Psychological Association, Centers for Disease Control and Prevention, Society for Adolescent Health and Medicine, and the American Medical Association. Major nursing organizations—the American Nurses Association and the American Academy of Nursing— have made statements that young people's access to inclusive, safe, and competent health care is a human rights issue.  (Wolfe, I., & Goepferd, A. "Child Abuse in Texas." *The Hastings Center*. 14 Mar. 2022) However, this widespread support is not going unchallenged, even by those who have been providing medical interventions for these children and adolescents.

Recently, questions have arisen about the appropriateness of both the diagnosis, and the safety and efficacy of these interventions that have been strongly encouraged up until now. Currently, less than half of state Medicaid programs provide gender affirming care. (Mallory, C., & Tentindo,W. "Medicaid coverage of gender-affirming care." Williams Institute, UCLA School of Law. Oct 2019). The Florida Surgeon General has said that minors should not undergo gender transition procedures, puberty blockers and hormone treatments. "Florida Department of Health Releases Guidance on Treatment of Gender Dysphoria for Children and Adolescents." 20220420-Gender-Dysphoria-Press-Release | Florida Department of Health.) In Texas, the state attorney general issued a decision that gender-affirming medical treatments such as puberty-suppressing hormones fall under the definition of child abuse in Texas state law. In fact, 34 states have introduced legislation to limit hormonal and surgical interventions for such transgender patients. This aligns with similar reassessments and limitations in the United Kingdom, Sweden, Finland, and France. A new position statement from the Royal Australian and New Zealand College of Psychiatrists (RANZCP) stresses the importance of a mental health evaluation for people with gender dysphoria — in particular for children and adolescents — before any firm decisions are made on whether to prescribe hormonal treatments to transition or to perform surgeries, often referred to as "gender-affirming care." "There is a paucity of quality evidence on the outcomes of those presenting with gender dysphoria. In particular, there is a need for better evidence in relation to outcomes for children and young people," the guidance states.

Given the legitimate concerns about the diagnosis, treatment, and the paucity of supportive, scientific studies in regard to the interventions being offered to minors who identify as transgender, I will offer a view of these from the perspective of an ethicist and pediatrician. This will be done in the face of strong and sometimes heated opposition to any variance from the currently prevailing recommendations. Each category of currently recommended or potential treatments will be briefly considered within this framework. The evidence base for these will be reviewed, and an overall argument made that such interventions must be considered as medical experimentation, subject to the requirements of research in childhood with informed consent. Finally, I will conclude with an examination of the fundamental flaw of the transgender project in childhood, and how it is leading to inevitable and controversial challenges.

1

In order to do this, we must review the ethical requirements for medical research in childhood and the elements of **informed consent**. Because of numerous abuses in the past, a strong system of regulations and oversight has been developed for the protection of human subjects in the United States. This began with the Belmont Report: (https://www.hhs.gov/ohrp/regulations-and-policy/belmont-report/index.html) The report not only described the ethical principles listed below, but led to guidelines for research protections that are now codified in Federal regulations (Code of Federal Regulations, or 'CFR') and monitored by the U.S. Department of Health and Human Services (DHHS). These led to the establishment of IRBs (Institutional Review Boards) which are responsible for the protection of human subjects in federally funded research—IRBs are the Federally mandated committees that review research activities for the protection of human subjects. The Office for Human Research Protections (OHRP) provides leadership in the protection of the rights, welfare, and wellbeing of subjects involved in research conducted or supported by the DHHS. The OHRP helps ensure this by providing clarification and guidance, developing educational programs and materials, maintaining regulatory oversight, and providing advice on ethical and regulatory issues in biomedical and social-behavioral research. These measures have laid the ground rules for human research, in adults and children including the need for informed consent.

Although adults may be included in research, this should only be done with *fully informed consent*, and the requirements will differ for children and other vulnerable subjects. The bedrock of these protections lies in obtaining the informed consent from the participant. Informed consent to medical treatment and research involvement is fundamental to both ethics and law. The process requires that a *fully autonomous patient* have the ability to *understand relevant medical information* about the proposed interventions, including the *risks, benefits if any, and alternatives* (including doing nothing/non-participation). and consent *voluntarily* without *coercion*. This is rooted in respect for the **ethical principles** of **autonomy**, **beneficence**, and **justice**.

*Autonomy* is derived from respect for persons, which requires that we not only respect those who are fully autonomous but protect those individuals that are not fully autonomous. Vulnerable subjects such as children cannot legally or ethically participate in the consent process due to their age and maturity level. The rules for their involvement are set out by the Code of Federal Regulations (46 CFR 401-409). While consent cannot be given for another person, parents or guardians can give "permission" and children can give assent to the extent that they are able. The process of obtaining assent should be appropriate to the age, maturity, and psychological development of the child. The consent process must contain three ethically required components: *information*, *comprehension*, and *voluntariness*. Deficiencies in any of these categories would invalidate the process. The main contention here is that deficiencies in *all* these categories can be found in the current approach to minors who identify as transgender, and current attempts at treatment should not proceed as they are now practiced.

*Beneficence* is reflected in the complementary expressions of (1) do no harm and (2) maximize possible benefits and minimize possible harms. An assessment of risks and benefits will depend heavily on the delivery of accurate and complete information as described above. An assessment of risk will include both the probability and the severity of envisioned harms, both physical and psychological.

Finally, *justice* requires fairness in distribution of risks and benefits. It suggests that not only should like cases be treated alike, but different approaches are appropriate for different circumstances. This is highly relevant in the selection process for those being subjected to the various interventions while still minors.

Thus the process of informed consent must proceed with a correct diagnosis, the nature and purpose of recommended interventions, the known burdens and benefits of all options, including doing nothing or forgoing the intervention. While not able to do an exhaustive review of these elements as they apply to the main treatment approaches recommended for transgender minors, we can briefly examine each category to assess for obvious deficiencies. The issue of deficient information will be significant in each category, and questions of comprehension and voluntariness will be addressed at the end.

## II.    The Interventions

### Surgery

A variety of surgeries have been performed on transgender adults. These range from removal of both breasts (bilateral mastectomy) and associated chest reconstruction, nipple repositioning, dermal implant and tattooing, to gender surgery for trans men which includes construction of a penis (phalloplasty or metoidioplasty), construction of a scrotum (scrotoplasty) and testicular implants, or a penile implant. Removal of the womb (hysterectomy) and the ovaries and fallopian tubes (salpingo-oophorectomy) may also be considered. Surgery for trans women includes removal of the testes (orchidectomy), removal of the penis (penectomy), construction of a vagina (vaginoplasty), construction of a vulva (vulvoplasty), construction of a clitoris (clitoroplasty), as well as breast implants for trans women, facial feminisation surgery and hair transplants. Certainly there are multiple known risks to this long list of surgeries. These used to be described as "sex-change" operations: they are now termed "gender affirming surgeries." The semantic shift is important, as we will see.

Most, but not all, practitioners would delay undertaking these permanent alterations in minor children and adolescents. This may be as much for legal reasons as for medical considerations. However, the lack of sexual maturity in younger patients, especially if previously delayed by puberty blocking agents, makes the sparse tissue more difficult to work with and outcomes less favorable, with problems such as wound rupture more likely. These are not challenges that are routinely described to minors at the beginning of their treatment progression with puberty blocking agents or hormones. This deficit of information would be a major failing.

### Hormonal Treatment

Treatment with cross-sex hormones is a mainstay of gender affirming care. These result in the changes in body habitus, facies, voice tone, and hair development that transgender patients seek. They are described as "gender affirming", "life-saving" and "a human right" by their proponents. They have been prescribed by Planned Parenthood clinics and others after a first visit for gender dysphoria (https://www.plannedparenthood.org/planned-parenthood-greater-texas/patient-resources/transgender-healthcare). Surely no one would argue that such a precipitous practice has been accompanied by a full psychological evaluation, or disclosure of medical risks. Chief among these is the fact that the resulting bodily changes will not disappear, even if the initial desire for them changes. And this change is no unlikely development – upwards of 80% of minors who identify as transgender will reverse this identity by the time they reach their mid-20's if left untreated, and revert to their previous identification, albeit possibly with a same-sex attraction. It is more than simply changes in one's body that are at risk; sex hormones have an important and lasting effect on brain development and adolescent psychology. To not fully appreciate this fact, or to not have it delineated in the first place, is an egregious failure of informed consent.

App_0245

## Puberty Blockers

Perhaps the greatest failure of informed consent, and non-disclosure of human experimentation outcomes, is found in the supposedly benign use of puberty blocking agents in minors. They are routinely and widely prescribed with the thought that this will "buy time" for those questioning their gender as minors. Children and their supportive parents are assured that they are a benign intervention whose effects are easily reversible, just in case the child decides not to transition. Some potential effect on the development of bone density may be mentioned. The extent of this danger is just now being appreciated, with severe and disabling osteoporosis described in at least one child in Sweden. This led to new guidelines for gender-affirming care issued in February by the National Board of Health and Welfare. It stated that, based on current knowledge: "the risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits, and that the treatments should be offered only in exceptional cases." However, the effect of puberty blocking agents (started in early adolescent development) on long-term sexual function seems to be largely unstudied. Current guidelines recommend starting puberty blockers at the earliest stage of sexual maturation in children (Tanner two). These will not only prevent the enlargement of penile tissue, it will desensitize the orgasmic potential for tissues later exposed to cross-sex hormones. Simply put, transgender adults treated in early adolescence with puberty blockers may never experience orgasm. When children with gender dysphoria are given these powerful hormones (around age 11) they are too young to appreciate the implications of what will happen.

It is not simply a matter of chronology. As children mature into adolescents and adults, their brains are also being formed and reformed under the influence of sex hormones. There is evidence for structural changes, and these are likely to be demonstrated in cognitive and behavioral changes. In fact, the development of the adolescent brain and the maturation of its rational and executive functions does not typically complete until one's early 20s. Although the deleterious effects on sexual development and function in adulthood from puberty blockers may be predicted, no one is entirely certain of the effects on other critical areas such as brain development and bone density. Carefully constructed and monitored studies have not been done. *Until they are, these off-label treatments with puberty blockers and cross sex hormones can only be considered experimental.* Experimental interventions should be done as carefully as any other research, and fully informed consent is the only ethical way to enter into such studies. Clearly, this is not the current practice.

## III.   The Fundamental Flaw

There appears to have been a headlong rush in the past decade towards the process of gender affirming care described above. After close scrutiny, it can only be seen as off label experimentation, despite the fact that informed consent practices do not conform to this reality. Given this, we must ask ourselves: how can experienced and ethical physicians so mislead others or be so misled themselves? In 2013, the American Psychiatric Association published their update of the Diagnostic and Statistical Manual of Mental Disorders, the DSM-5. In it the diagnosis of "gender identity disorder" was replaced with "gender dysphoria." This was done to "avoid stigma and ensure clinical care for individuals who see and feel themselves to be a different gender" other than the one to which they were born. The APA stated that "it is important to note the gender nonconformity is not in itself a mental disorder. The critical element of gender dysphoria is the presence of clinically significant distress associated with the condition." Dysphoria is a state of uneasiness, unhappiness, or dissatisfaction. With this change in terminology there was also a shift from seeking or correcting the underlying cause of the dysphoria, and a focus on transitioning to the preferred gender.

4

This revision has probably done more harm than good by accepting a self-diagnosis characterized by the belief that the patient (or their essence) is "trapped in the wrong body." This concept relies on the Cartesian duality, a body-self dichotomy. It reverts to the fallacious "ghost in the machine" concept. In reality, we cannot be trapped in the wrong body; we **are** our bodies, which are an integral and inseparable part of ourselves. To assert that there is a female self inside a male body (or the reverse), is to fail to achieve a full understanding that we are embodied persons, unified body and mind, if you will. A generation ago, sex and gender were taken to be synonyms for the same phenomena. Even now, a transgender female, no matter how much or how long of a hormonal therapeutic regimen they undergo, is still genetically male. Ignoring this fact has led to a contradiction, where sympathetic practitioners recommend "holistic care" while insisting on a fragmented concept of the self. This approach has been warmly embraced, even insisted upon, by many practitioners while viewed as nonsensical and even ludicrous by many laypersons.

Inevitably this has led to added difficulties. Even young patients are encouraged to begin puberty blockers and then hormones based on a self-diagnosis. Self-diagnosing psychiatric conditions is always fraught with the possibility of error. In this case, there can be no confirmatory lab tests, radiologic exams, or genetic findings. Moreover, the dysphoria can only be diagnosed and opened to treatment if it is causing significant trauma to the individual. The clinically significant distress manifests itself in underlying psychiatric diagnoses such as depression and suicidality. It is argued that embarking on affirmative treatment as early as possible is urgently needed to prevent further psychiatric complications, a contested assertion. Studies have shown that adult transgender persons continue to have evidence of depression and suicidality following treatment. The rate of suicide among post-operative transgender adults in a study from Sweden found an incidence 20 times greater than that of the general population. Such treatment may not be urgently needed to protect adolescents; it may not even be effective protection for their adult counterparts.

The claim of urgency coupled with an impulse toward nonjudgmental empathy for the disturbed patients has led to a frantic insistence on a single approach that may seem almost cult like in its insularity and opposition to outside challenges. Both parents (Trinko, K.(Nov. 19, 2018 "What It's Like to Lose Your Children to the 'Transgender Cult,' From a Mom Who Knows." *The Daily Signal*, 30 Oct. 2019) and teachers (Manning, M. for The Mail on Sunday. "Whistleblower Teacher Makes Shocking Claim That 'Most Are Autistic'." *Daily Mail Online*, Associated Newspapers, 19 Nov. 2018, https://www.dailymail.co.uk/news/article-6401593/Whistleblower-teacher-makes-shocking-claim-autistic.html.) report that their children or students are being wrongly encouraged at school to think of themselves as transgender. Sometimes this is the result of overenthusiastic acceptance or "love bombing". Sometimes it appears to influence the susceptible, as in autistic children. Sometimes transgender counseling is taking place even without the parents' knowledge, and this troubling approach has been supported in the literature with statements that adolescents should be legally empowered to obtain puberty-blocking without parental consent (Priest, M. Transgender Children and the Right to Transition: Medical Ethics When Parents Mean Well but Cause Harm. Am J Bioeth. 2019 Feb;19(2):45-59).

Inevitably, this has resulted in complications and conflicts. The media have been replete with reports of such things as contested accessibility of transgender females to such things as domestic abuse shelters, female prisons, and female sports competitions. Similar issues regarding bathroom accessibility in schools recently came to a boil in Virginia, when it came to light that a sexual assault by a self-described trans- female (with a penis) was repeated in another school after the perpetrator was transferred. (Poff, J. "Loudoun superintendent failed to inform state of school sexual assault." Washington Examiner, 4 May 2022.) These issues are far from any resolution by debate, discussion, or legislation. In fact, both sides of the debate have doubled down with insistence that the opposing viewpoint must not only be rejected but considered unethical and made illegal.

Some disturbing trends have developed resulting not only from this dichotomy of opinion about the proper treatment approach, but ultimately based in the acceptance of the mind-body dichotomy. There has been a change in the diagnosed population. As Abigail Schrier pointed out:

> For the nearly 100-year diagnostic history of gender dysphoria, it overwhelmingly afflicted boys and men, and it began in early childhood (ages two to four). According to the DSM-V, the latest edition of the historical rate of incidence was 0.01 percent of males (roughly one in 10,000).

> For decades, psychologists treated it with "watchful waiting" — that is, a method of psychotherapy that seeks to understand the source of a child's gender dysphoria, lessen its intensity, and ultimately help a child grow more comfortable in her own body. Now such an approach is disdained by the term "conversion therapy", and labelled as unethical, and even made illegal.

She continues:

> Since nearly seven in 10 children initially diagnosed with gender dysphoria eventually outgrew it, the conventional wisdom held that, with a little patience, most kids would come to accept their bodies. The underlying assumption was children didn't always know best. But in the last decade, watchful waiting has been supplanted by "affirmative care," which assumes children do know what's best. Affirmative care proponents urge doctors to corroborate their patients' belief that they are trapped in the wrong body. The family is pressured to help the child transition to a new gender identity — sometimes having been told by doctors or activists that, if they don't, their child may eventually commit suicide. From there, pressures build on parents to begin concrete medical steps to help children on their path to transitioning to the "right" body. That includes puberty blockers as a preliminary step. Typically, cross-sex hormones follow and then, if desired, gender surgery. (Shrier, A. "Top Trans Doctors Blow the Whistle on 'Sloppy' Care." Emmaus Road Ministries, 5 Oct. 2021)

These pressures apply not only to parents, but to the children themselves because of the strong emphasis on affirmative support for anyone declaring themselves transgender. As one mother described: "A lot of these kids have concurrent mental health issues, and they find a place to fit in because as soon as you say that you're trans, you get love-bombed," she reflects. "You get love-bombed online, you get love-bombed on at school … As soon as you say you're trans, you turn into a star. And kids are thirsty for that kind of affirmation." (Trinko, 2019)

Two phenomena may be associated with this. Strong affirmation for the diagnosis and hormonal treatment may be altering the natural course of the phenomenon in childhood. It may not only be easier to identify as transgender in today's environment; it may be more difficult to turn ones back on the diagnosis. This may help explain a recent report that found that an average of 5 years after their initial social transition, 7.3% of youth had retransitioned (changed gender identity) at least once. At the end of this period, most youth identified as binary transgender youth (94%), including 1.3% who retransitioned to another identity before returning to their binary transgender identity. 2.5% of youth identified as cisgender and 3.5% as nonbinary. Later cisgender identities were more common amongst youth whose initial social transition occurred before age 6 years; the retransition often occurred before age 10. Unlike previous studies of transgender youth, males were not predominant, but were outnumbered by 2 to 1. Moreover, this is a direct contradiction of previous data showing a high rate of reversion towards a sex/gender coherence in children as they mature. (Olson, Kristina R., Durwood, Lily, Horton, Rachel, Gallagher, Natalie M., & Devor, Aaron; Gender Identity 5 Years

6

App_0248

After Social Transition. Pediatrics 2022; 10.1542/peds.2021-056082) We must ask if this represents a shift towards being trapped in a wrong diagnosis, rather than a child being trapped in a wrong body.

In fact, there has been another shift. Unlike in the past, we now see increased numbers of females identifying as transgender, and later in their adolescence. Sometimes this occurs in large cohorts within a single school or peer group, a phenomenon labelled "rapid onset gender dysphoria." Both these phenomena call into question the underlying cause for the concept of gender dysphoria. Rather than approaching it as an accurate self-diagnosis that must be affirmed and treated to change the outward sexual appearance, isn't there a better model? We may be making a fundamental mistake in approaching transgender phenomena, not as a disease or disorder, but at most a dysphoria that is a cause for affirmation. This contrasts with our approach to similar conditions claiming a mind- body divergence, such as anorexia nervosa or body integrity identity disorder. The former is familiar to most Americans. The latter is a rare mental disorder characterized by a desire to have a physical disability, claiming discomfort with being able-bodied and often resulting in a request for amputation of the body part that makes them uncomfortable. People with this condition may refer to themselves as "trans abled."

In all three of these conditions there is a claim for a mismatch between one's mental bodily image and physical body. All tend to find an onset in prepubescence and are frequently associated with other mental disturbances. "Affirmative care" is the only recommended standard for transgender patients. It is horribly disturbing to contemplate amputation of a healthy limb because of a mental disorder (although this has been done). No one would seriously consider surgery to limit caloric intake or weight gain for a patient with anorexia nervosa, in order to support and affirm her distorted body image. Nevertheless, sex change operations have been recast as "gender affirming surgeries". The change in language reflects the change in attitude that distorts the approach to treatment for a psychiatric, not medical/surgical, disorder.

Finally, what are we to make of this situation, as a medical profession, and as a society? This question cannot be answered until both the affected people and profession can overcome our collective hubris. It is not enough to admit we don't know all the answers. We must see that we are not yet certain of all the questions that must be answered. In such a situation, competing interests must not pretend to take the moral high ground when no one can be certain where it will be located. First and foremost, we must back off from our current approaches until questions can be answered with proper studies, done with sufficient patients, and sufficient controls, over a sufficient period of time. Any insistence on a single course of therapy without this information could prove to be the same type of morally unacceptable interventions that caused formal research protections to be created in the first place.

In the meantime, we must adopt a more respectful tone with those whom we disagree. As John Milton said, "Where there is much desire to learn, there of necessity will be much arguing, much writing, many opinions; for opinion in good men is but knowledge in the making." Most important of all, in order to protect the current and future well-being of these affected children, we must rely on the ancient principal of medical ethics "In the first place, do no harm." Until we can demonstrate the efficacy and safety of any proposed treatment or intervention, its usage must properly be considered a medical experimentation and require fully informed consent. Anything less is a betrayal of both our principles and our progeny.

---

About the author: *Dr. Donovan's observations flow from his professional experience. He has been a Board-certified pediatrician for over 40 years, as an academic physician who rose to Vice-chair of the Department of Pediatrics and ultimately interim Chair at the University of Oklahoma in Tulsa. His professional role and interests expanded in the 1990's after he took a sabbatical in medical ethics at*

App_0249

*Georgetown University under the world-famous Dr. Edmund Pellegrino, a founding father of modern bioethics. He subsequently went on to earn a master's degree in Bioethics and founded the first bioethics center in his home university, where he was responsible for ethics training and education for students and physicians. He also served as clinical ethics consultant for three teaching hospitals. He was chair of the Section on Bioethics for the American Academy of Pediatrics (AAP) for three years and then their first liaison member of the AAP Committee on Bioethics. He has also served as the chair for a hospital Intuitional Review Board for 17 years. Finally, he was asked to become Director for the Center for Clinical Bioethics at Georgetown University School of Medicine, where he served from 2012-2020. His duties included teaching, consultation, publishing papers and speaking on bioethics extensively at the local, national, and international level on four continents. He has been interviewed and quoted on National Broadcasting Company (NBC), National Public Radio (NPR), Eternal Word Television Network (EWTN), and Al Jazeera, as well as the New York Times and the Washington Post, among others. He was awarded the Humanism in Medicine award from the Gold Foundation, which recognizes physicians to have successfully integrated humanism into the delivery of care to their patients and families. He has also offered formal testimony on bioethical issues before state legislatures and the U.S. Congress.*

Tab D



**Mission:**
To protect, promote & improve the health
of all people in Florida through integrated
state, county & community efforts.

**Ron DeSantis**
Governor

**Joseph A. Ladapo, MD, PhD**
State Surgeon General

**Vision:** To be the **Healthiest State** in the Nation

## Treatment of Gender Dysphoria for Children and Adolescents
April 20, 2022

The Florida Department of Health wants to clarify evidence recently cited on a fact sheet released by the US Department of Health and Human Services and provide guidance on treating gender dysphoria for children and adolescents.

Systematic reviews on hormonal treatment for young people show a trend of low-quality evidence, small sample sizes, and medium to high risk of bias. A paper published in the International Review of Psychiatry states that 80% of those seeking clinical care will lose their desire to identify with the non-birth sex. One review concludes that "hormonal treatments for transgender adolescents can achieve their intended physical effects, but **evidence regarding their psychosocial and cognitive impact is generally lacking.**"

According to the Merck Manual, "gender dysphoria is characterized by a strong, persistent cross-gender identification associated with anxiety, depression, irritability, and often a wish to live as a gender different from the one associated with the sex assigned at birth."

Due to the lack of conclusive evidence, and the potential for long-term, irreversible effects, the Department's guidelines are as follows:

- Social gender transition should not be a treatment option for children or adolescents.

- Anyone under 18 should not be prescribed puberty blockers or hormone therapy.

- Gender reassignment surgery should not be a treatment option for children or adolescents.

  o Based on the currently available evidence, "encouraging mastectomy, ovariectomy, uterine extirpation, penile disablement, tracheal shave, the prescription of hormones which are out of line with the genetic make-up of the child, or puberty blockers, are all clinical practices which run an **unacceptably high risk of doing harm.**"

- Children and adolescents should be provided social support by peers and family and seek counseling from a licensed provider.

These guidelines do not apply to procedures or treatments for children or adolescents born with a genetically or biochemically verifiable disorder of sex development (DSD). These disorders include, but are not limited to, 46, XX DSD; 46, XY DSD; sex chromosome DSDs; XX or XY sex reversal; and ovotesticular disorder.

The Department's guidelines are consistent with the federal Centers for Medicare and Medicaid Services age requirement for surgical and non-surgical treatment. These guidelines are also in line with the guidance, reviews, and recommendations from Sweden, Finland, the United Kingdom, and France.

Parents are encouraged to reach out to their child's health care provider for more information.

**Florida Department of Health**
**Office of the State Surgeon General**
4052 Bald Cypress Way, Bin A-00 • Tallahassee, FL 32399-1701
PHONE: 850/245-4210 • FAX: 850/922-9453
FloridaHealth.gov



Accredited Health Department
Public Health Accreditation Board

App_0252

Tab E



RON DESANTIS
GOVERNOR

SIMONE MARSTILLER
SECRETARY

April 20, 2022

Tom Wallace
Deputy Secretary for Medicaid
Agency for Health Care Administration
2727 Mahan Drive
Tallahassee, FL  32308

Dear Deputy Secretary Wallace:

On April 20, 2022, the Florida Department of Health released guidance on the treatment of gender dysphoria for children and adolescents.[1]  The Florida Medicaid program does not have a policy on whether to cover such treatments for Medicaid recipients diagnosed with gender dysphoria.  Please determine, under the process described in Florida Administrative Code Rule 59G-1035, whether such treatments are consistent with generally accepted professional medical standards and not experimental or investigational.  Pursuant to Rule 59G-1035(5), I look forward to receiving your final determination.

Sincerely,

Simone Marstiller
Secretary

---

[1] *See* https://www.floridahealth.gov/newsroom/2022/04/20220420-gender-dysphoria-press-release.pr.html (last visited Apr. 20, 2022).

2727 Mahan Drive • Mail Stop #
Tallahassee, FL  32308
AHCA.MyFlorida.com

Facebook.com/AHCAFlorida
Twitter.com/AHCA_FL

App_0254

Tab F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                             Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## DECLARATION OF MATTHEW BRACKETT

I, Matthew Brackett, hereby declare and state as follows:

1.     I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this declaration and would testify completely to those facts if called to do so.

2.     I am a program consultant for the Agency for Health Care Administration. While working for the agency, I prepared approximately ten reports supporting determinations of generally accepted professional medical standards.

3.     I was responsible for preparing the report, Florida Medicaid Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria ("the GAPMS Report"), which was published in June 2022.

4.     The GAPMS Report was created after "the Florida Department of Health released guidance on the treatment of gender dysphoria for children and adolescents."

1

GAPMS Report Att. A. Because the "Florida Medicaid program" did "not have a policy on whether to cover such treatments for Medicaid recipients diagnosed with gender dysphoria," *id.*, Secretary Marstiller requested the Division of Florida Medicaid to review "sex reassignment treatments" of gender dysphoria for a coverage determination under Rule 59G-1.035, Florida Administrative Code. Secretary Marstiller's request to the Division of Florida Medicaid is Attachment A to the GAPMS Report.

5.      "Sex reassignment treatments" refer to "medical services used to obtain primary and/or secondary physical sexual characteristics of a male or female." GAPMS Report at 2. The following sex reassignment treatments were discussed in the GAPMS Report: puberty blockers, cross-sex hormones, and sex reassignment surgery.

6.      As a condition for coverage, under Rule 59G-1.035, Florida Administrative Code, the treatments must be consistent with generally accepted professional medical standards and must not be experimental or investigational. That rule is Attachment B to the GAPMS Report. The Deputy Secretary for Medicaid makes the final determination as to whether treatments are consistent with generally accepted professional medical standards.

7.      The GAPMS Report included assessments from six subject-matter experts: Romina Brignardello-Petersen, Wojtek Wiercioch, James Cantor, Quentin Van Meter, Patrick Lappert, and G. Kevin Donovan. Those experts discussed the following subject matters concerning gender dysphoria: health care research, clinical psychology,

2

plastic surgery, pediatric endocrinology, and bioethics. Their reports are Attachments C through G to the GAPMS Report.

8.    Specifically, for health care research, Dr. Brignardello-Petersen and Dr. Wiercioch "performed a systematic review that graded a multitude of studies. They conclude[d] that evidence supporting sex reassignment treatments is low or very low quality." GAPMS Report at 2-3.

9.    For clinical psychology, Dr. Cantor "provided a review of literature on all aspects of the subject, covering therapies, lack of research on suicidality, practice guidelines, and Western European coverage requirements." *Id.* at 3.

10.    For plastic surgery, Dr. Lappert "provided an evaluation explaining how surgical interventions are cosmetic with little to no supporting evidence to improve mental health, particularly those altering the chest." *Id.*

11.    For pediatric endocrinology, Dr. Van Meter "explain[ed] how children and adolescent brains are in continuous phases of development and how puberty suppression and cross-sex hormones can potentially affect appropriate neural maturation." *Id.*

12.    And for bioethics, Dr. Donovan "provide[d] additional insight on the bioethics of administering these treatments, asserting that children and adolescents cannot provide truly informed consent." *Id.*

13.    The GAPMS Report concluded that "[a]vailable medical literature provides insufficient evidence that sex reassignment through medical intervention is

3

safe and effective treatment for gender dysphoria. Studies presenting the benefits to mental health, including those claiming that the services prevent suicide, are either low or very low quality and rely on unreliable methods such as surveys and retrospective analyses, both of which are cross-sectional and highly biased. Rather, the available evidence demonstrates that these treatments cause irreversible physical changes and side effects that can affect long-term health." *Id.* at 2.

14.    Specifically, for puberty blockers, "[e]vidence does not prove that puberty blockers are safe for treatment of gender dysphoria. Evidence that they improve mental health and reduce suicidality is low or very low quality." *Id.* at 38.

15.    For cross-sex hormones, "[e]vidence suggesting that cross-sex hormones provide benefits to mental health and prevents suicidality is low or very low quality. Rather, evidence shows that cross-sex hormones cause multiple irreversible physical consequences as well as infertility." *Id.*

16.    And for sex reassignment surgery, "[e]vidence of improvement in mental health and reduction in suicidality is low or very low quality. Sex reassignment surgery results in irreversible physical changes, including sterility." *Id.*

17.    The GAPMS Report also noted the emerging international consensus on treatments for gender dysphoria. Attachment D to the GAPMS Report provides more information on the consensus.

18.    In Sweden, for example, "the Swedish National Board of Health stated that 'the risks of hormonal interventions for gender dysphoric youth outweigh the

4

potential benefits.' With the exception of youths who exhibited 'classic' signs of gender identity issues, adolescents who present with the condition will receive behavioral health services and gender-exploratory therapy." *Id.* at 35.

19.     "In Finland, the Palveluvalikoima issued guidelines in 2020 stating that sex reassignment in minors 'is an experimental practice' and that 'no irreversible treatment should be initiated.' The guidelines further assert that youths diagnosed with gender dysphoria often have co-occurring psychiatric disorders that must be stabilized prior to prescribing any cross-sex hormones or undergoing sex reassignment surgery." *Id.*

20.     And in the United Kingdom, the government "is also reassessing the use of irreversible treatments for gender dysphoria due the long-term effects on mental and physical health. In 2022, an independent interim report commissioned by the U.K.'s National Health Service (NHS) indicates that additional research and systematic changes are necessary to ensure the safe treatment of gender dysphoric youths. These include reinforcing the diagnosis process to assess all areas of physical and behavioral health, additional training for pediatric endocrinologists, and informing parents about the uncertainties regarding puberty blockers. The interim report is serving as a benchmark until the research is completed for final guidelines." *Id.*

21.     As a result, the GAPMS Report did "not recommend sex reassignment treatment as a health service that is consistent with generally accepted professional medical standards. Available evidence indicates that the services are not proven safe or effective treatments for gender dysphoria." *Id.*

App_0260

22.     On July 8, 2022, the agency held an in-person hearing to receive public comments on the proposed changes to Rule 59G-1.050, Florida Administrative Code. I served as a panelist during the hearing. Attendees included physicians, attorneys, individuals who had detransitioned, and other interested parties. A true and correct copy of the transcript of the hearing is attached to this declaration.

23.     Some attendees voiced opposition to the proposed rule change, but the overwhelming majority spoke in favor of the changes that will prohibit Medicaid coverage of puberty blockers, cross-sex hormones, and sex reassignment surgery when used to treat gender dysphoria.

24.     Several attendees' comments were notable. The first attendee who spoke was Chloe Cole, a 17-year-old detransitioner, and said:

> I was medically transitioned from ages 13 to 16.  My parents took me to a therapist to affirm my male identity. The therapist did not care about causality or encourage me to learn to be comfortable in my body because of—partially due to California's conversion therapy bans. He brushed off my parents' concerns about that because he had hormones, puberty blockers, and surgeries. My parents were given a suicide threat as a reason to move me forward in my transition. My endocrinologist, after two or three appointments, put me on puberty blockers and injectable testosterone. At age 15, I asked to remove my breasts. My therapist continued to affirm my transition. I went to a top surgery class that was filled with around 12 girls that thought they were men—I thought that they were men. Most were my age or younger. None of us were going to be men. We were just fleeing from the uncomfortable feeling of becoming women. I was unknowingly physically cutting off my true self from my body, irreversibly and painfully. Our transidentities were not questioned. I went through with the surgery. Despite having therapists and attending the top surgery class, I really didn't understand all of the ramifications of

6

any of the medical decisions I was making. I wasn't capable of understanding it, and it was downplayed consistently. My parents, on the other hand, were pressured to continue my so-called gender journey with the suicide threat. I have been forced to realize that I will never be able to breastfeed a child, despite my increasing desire to as I mature. I have blood clots in my urine. I am unable to fully empty my bladder.  I do not yet know if I am capable of carrying a child to full term. In fact, even the doctors who put me on puberty blockers and testosterone do not know. No child should have to experience what I have. My consent was not informed . . . .

Tr. 2:2 – 3:22.

25. Sophia Galvin, another detransitioner, also spoke and stated:

I began detransitioning at 17 and a half socially.  At 18 was when I began detrans—I mean transitioning medically. I had a history of mental illness. I had suicidal ideation and I would self-harm. And my wanting to transition was all in an effort to escape the fear of being a woman in this society and because of traumas that I had been through in my life. So I continued down the process, and then ended up removing my breasts at 19 years old because I was trapped, afraid to go back to my original ideo— to my original sex, and basically look crazy to the people around me. When I detransitioned—after I detransitioned, it was very difficult because I didn't have any support.  The doctor basically just told me to stop the hormones.  I didn't have any one to speak to about it, I didn't go to a mental health counselor, and I didn't prepare anything. I just really want to say that this is not good for children. I was harmed by this, and it should not be covered under Medicaid.

*Id.* at 4:2-25.

26. Katie Caterbury, a mother, spoke and stated:

At the age of 14, my once healthy and happy daughter was convinced by the Gay-Straight Alliance at school that she was my son.  At the age of 16, a physician injected her with testosterone without my consent and without my knowledge.  At the age of 17, Medicaid paid surgeons to perform a double mastectomy and a hysterectomy as an outpatient. At age 19,

7

Medicaid paid for her to undergo a phalloplasty. She had and still has private insurance that was bypassed. I fought against what happened to my daughter every step of the way, but to no avail. How can any rational adult, much less a physician, not know that it is impossible to change one's biological sex?  Why are there doctors convincing trusting parents to affirm the lie that biological sex is changeable? They prescribe irreversible puberty-blocking drugs and powerful wrong-sex hormones and amputate healthy breasts and remove reproductive organs from children against the protests of their parents. . . . Why is this being funded with taxpayer dollars? This must be stopped. . . .

*Id.* at 5:3 – 6:18.

27.    The agency also received comments concerning the proposed rule change. Several stakeholder and advocacy groups, including the Endocrine Society, the American Academy of Pediatrics, and Yale University, raised concerns about the proposed rule change. The agency reviewed the comments and ultimately determined that the comments were not persuasive.

28.    It should also be noted that the agency offers coverage of services for gender dysphoria. Those services are community-based health services; psychiatric services; emergency services and inpatient services in hospital settings; and behavioral services provided in schools and by school districts. Documents evidencing these treatments are attached to this declaration.

"I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my current knowledge and belief." Executed this 3rd day of October 2022.

Respectfully submitted,

/s/ Matthew Brackett

_____

Matthew Brackett

TAPED PROCEEDINGS
IN RE:  PROPOSED RULE 59G-1.050
HELD ON JULY 8, 2022

Transcribed by:

CLARA C. ROTRUCK

Court Reporter

1                    TAPED PROCEEDINGS

2            MS. COLE:  My name is Chloe Cole, and I am a

3     17-year-old detransitioner from the Central Valley

4     of California.  I was medically transitioned from

5     ages 13 to 16.  My parents took me to a therapist

6     to affirm my male identity.  The therapist did not

7     care about causality or encourage me to learn to be

8     comfortable in my body because of -- partially due

9     to California's conversion therapy bans.  He

10    brushed off my parents' concerns about that because

11    he had hormones, puberty blockers, and surgeries.

12    My parents were given a suicide threat as a reason

13    to move me forward in my transition.

14            My endocrinologist, after two or three

15    appointments, put me on puberty blockers and

16    injectable testosterone.  At age 15, I asked to

17    remove my breasts.

18            My therapist continued to affirm my

19    transition.  I went to a top surgery class that was

20    filled with around 12 girls that thought they were

21    men -- I thought that they were men.  Most were my

22    age or younger.  None of us were going to be men.

23    We were just fleeing from the uncomfortable feeling

24    of becoming women.

25            I was unknowingly physically cutting off my

1    true self from my body, irreversibly and painfully.

2    Our transidentities were not questioned.

3         I went through with the surgery.  Despite

4    having therapists and attending the top surgery

5    class, I really didn't understand all of the

6    ramifications of any of the medical decisions I was

7    making.  I wasn't capable of understanding it, and

8    it was downplayed consistently.

9         My parents, on the other hand, were pressured

10   to continue my so-called gender journey with the

11   suicide threat.

12        I have been forced to realize that I will

13   never be able to breastfeed a child, despite my

14   increasing desire to as I mature.  I have blood

15   clots in my urine.  I am unable to fully empty my

16   bladder.  I do not yet know if I am capable of

17   carrying a child to full term.  In fact, even the

18   doctors who put me on puberty blockers and

19   testosterone do not know.

20        No child should have to experience what I

21   have.  My consent was not informed and I was filled

22   by (inaudible).

23        A VOICE:  Thank you for your comment.

24        (Applause.)

25        A VOICE:  The next speaker will be Sophia

FOR THE RECORD REPORTING, INC. 850.222.5491

1    Galvin.

2         MS. GALVIN:  My name is Sophia Galvin.  I am a

3    detransitioner.  I began detransitioning at 17 and

4    a half socially.  At 18 was when I began

5    detrans- -- I mean transitioning medically.

6         I had a history of mental illness.  I had

7    suicidal ideation and I would self-harm.  And my

8    wanting to transition was all in an effort to

9    escape the fear of being a woman in this society

10   and because of traumas that I had been through in

11   my life.

12        So I continued down the process, and then I

13   ended up removing my breasts at 19 years old

14   because I was trapped, afraid to go back to my

15   original ideo- -- to my original sex, and basically

16   look crazy to the people around me.

17        When I detransitioned -- after I

18   detransitioned, it was very difficult because I

19   didn't have any support.  The doctor basically just

20   told me to stop the hormones.  I didn't have anyone

21   to speak to about it, I didn't go to a mental

22   health counselor, and I didn't prepare anything.  I

23   just really want to say that this is not good for

24   children.  I was harmed by this, and it should not

25   be covered under Medicaid.

1          A VOICE:  Thank you for your comments.

2          (Applause.)

3          A VOICE:  The next speaker is Katie Caterbury.

4          MS. CATERBURY:  At the age of 14, my once

5     healthy and happy daughter was convinced by the

6     Gay-Straight Alliance at school that she was my

7     son.  At the age of 16, a physician injected her

8     with testosterone without my consent and without my

9     knowledge.  At the age of 17, Medicaid paid

10    surgeons to perform a double mastectomy and a

11    hysterectomy as an outpatient.  At age 19, Medicaid

12    paid for her to undergo a phalloplasty.

13         She had and still has private insurance that

14    was bypassed.  I fought against what happened to my

15    daughter every step of the way, but to no avail.

16         How can any rational adult, much less a

17    physician, not know that it is impossible to change

18    one's biological sex?  Why are there doctors

19    convincing trusting parents to affirm the lie that

20    biological sex is changeable?  They prescribe

21    irreversible puberty-blocking drugs and powerful

22    wrong-sex hormones and amputate healthy breasts and

23    remove reproductive organs from children against

24    the protests of their parents.

25         Affirming the false notion to a child that it

FOR THE RECORD REPORTING, INC. 850.222.5491

1    is possible to change one's sex is child abuse.

2    Administering powerful hormones that cause

3    irreversible changes to their bodies and their

4    brains is child abuse.  Amputating the healthy body

5    parts of a child whose brain has not reached full

6    decision-making maturity is simply criminal.

7        Why are these doctors not criminally charged?

8    Why is this being funded with taxpayer dollars?

9    This must be stopped.

10       Three years ago, I traveled to Washington,

11   DC -- Washington, DC, to speak to federal

12   lawmakers.  I begged their staff to do something.

13   Democrats and Republicans, no one seemed to care.

14   But I will not give up trying until this medical

15   experiment on children is over.

16       To every single person fighting for the health

17   and lives of our children, I am profoundly

18   grateful.  Thank you.

19       (Applause.)

20       A VOICE:  Just so we get through all the

21   speakers, we'd ask that you hold your applause

22   until the end of the program.

23       Next speaker will be Jeanette Cooper.

24       MS. COOPER:  My name is Jeanette Cooper, and I

25   am here on behalf of Partners for Ethical Care, a

1    nonpartisan, nonprofit organization that has no

2    paid staff.

3        No therapy is better than bad therapy, and

4    children are suffering because parents cannot find

5    professionals to serve the psychological needs of

6    their families and children, and they are being met

7    with a medical treatment for a psychological

8    condition.  We need to make space in the public

9    sphere for ethical therapists by removing the

10   medical treatment option.

11       Nearly every therapist who publicly speaks is

12   a cheerleader for gender identity affirmation,

13   gluing that poisoned bandage on the skin of

14   children, causing permanent psychological and

15   physical harm by solidifying an idea that maybe you

16   were born in the wrong body.

17       We are here to state the obvious.  No child

18   can or ever will be born in the wrong body.

19   Everyone knows what a woman is, but some people are

20   afraid to say it.  We are not afraid.

21       Our organization was founded by a handful of

22   mothers who realized that no one was coming to

23   protect these children.  We could not wait any

24   longer for help to arrive.

25       Families are desperate to find actual support.

FOR THE RECORD REPORTING, INC. 850.222.5491

App_02717

1      They do not want a poisoned bandage that

2      cosmetically covers a wound that grows deeper when

3      covered and left untreated.  Affirmation is a

4      poisoned bandage that does not help to heal, but

5      hides a deep need that will not be helped by

6      injections and surgeries.

7          The state has no business using taxpayer

8      funding to turn children into permanent medical

9      patients.  The state has no business assisting

10      doctors in selling disabilities to vulnerable,

11      suffering children by prescribing puberty blockers,

12      cross-sex hormones, and extreme cosmetic body

13      modification.  These so-called treatments are not

14      real health care.

15          The state should, however, fund legitimate and

16      proven care.  For many children, a transidentity is

17      a crutch.  It is a placeholder that stands in for

18      real suffering that hasn't been named.  If they can

19      find a pediatrician, family therapist, or other

20      professionals who will address their actual needs,

21      children discard their transidentity and move

22      forward with self-actualization, rather than

23      staying in a state of stunted psychological and

24      physical growth, surviving with superficial,

25      short-term validation like a street drug that needs

1    to be injected every day.  Our job is to protect

2    children, and we have to step in because the

3    medical field is failing these families.

4        Thank you for stepping in now before it costs

5    the State of Florida much more than dollars.  Thank

6    you for this proposed rule.  We support you.

7        (Applause.)

8        A VOICE:  Thank you for your comments.

9        Next speaker, Donna Lambart.

10       MS. LAMBART:  Hello.  My name is Donna

11   Lambart.  I am here on behalf of concerned parents

12   to speak in support of the rule to stop allowing

13   Medicaid to pay medical transition of children in

14   Florida.

15       Today I appeal to you on behalf of over 2,600

16   parents in our group.  As parents, we know our

17   kids.  As people, we know right from wrong.  But

18   the health care professionals are presenting many

19   of us with a false and painful choice:  Accept what

20   we know will permanently harm our children or lose

21   them to suicide.  These false ideas are being

22   stated in the presence of children.  This is not

23   only cruel, it's simply not true.  There is no data

24   to prove that medically transitioning minors

25   prevents suicide.

1          Society, the Internet, media, schools, and

2     government convince kids that their parents que- --

3     if their parents question -- if their parents

4     question their identity, it is because their

5     parents hate them.  Parents who are unwilling to

6     drop all rational thinking and surrender to the

7     affirmation-only model of care pay a social,

8     emotional, and custodial price no parent should

9     ever have to pay.

10         Parents lose their children every day to

11    people who help them transition, leading them down

12    a dangerous medical path that permanently --

13    permanently harming their healthy bodies with

14    off-label drugs and experimental surgeries.

15         I interact with parents on a -- every day

16    whose children are instantly derailed as a result

17    of adopting a transgender identity.  These children

18    become angry and hostile and resentful.  They begin

19    lashing out at anyone who will not agree with their

20    new-found identity.  Parents are left -- have been

21    forced to rely on each other to figure out how best

22    to navigate this destructive social phenomenon.

23         The current one-size-fits-all affirmation

24    model cuts parents out of the equation, charging

25    forward with a rigid, transition-only course of

1    action.

2        A VOICE:  Ma'am, excuse me, your time is up.

3    Could you please wrap it up?

4        MS. LAMBART:  Yes.

5        I would just like to say that on behalf of

6    thousands of loving parents, we ask Florida -- the

7    health -- to stand up for the protection of

8    children and teens who are under -- who are being

9    offered a magic fix.  Parents deserve support and

10   children deserve sound care.

11       Thank you for your support and your time.

12       (Applause.)

13       A VOICE:  Thank you for your comments.

14       The next speaker is Gerald Buston.

15       MR. BUSTON:  Ladies and gentlemen, I am here

16   as a Christian pastor.  71 years ago, I gave my

17   life to Jesus Christ and chose to live my life

18   according to the Word of God, the Bible.  The Bible

19   teaches that God makes people male and female, and

20   it says that repeatedly.  Jesus said that himself.

21   And for us to try to transition people away from

22   what God did should be -- well, it definitely is a

23   sin, but it should be a criminal abuse of children,

24   especially when they're not at the age where they

25   can properly process what they're doing to

1      themselves or allowing to be done to themselves.

2          I urge Medicaid don't support this.  I urge

3      the State of Florida to pass laws against it and

4      not allow our children to be abused the way they

5      are being abused by people that have one goal in

6      mind, and that is depopulating the world by cutting

7      back on the birth rate and by cutting back on the

8      population we have in our world right now.

9          So I support the bill that we do not pay for

10     this kind of stuff, and I would say let's go

11     further and pass laws against it and make that

12     extreme child abuse to do that to children that

13     don't have the right to know.

14         (Applause.)

15         A VOICE:  The next speaker is -- I believe

16     it's Brady or perhaps Brandy Andrews.

17         MS. ANDREWS:  Hey there, Brandy Andrews.  I'm

18     here to speak in support of banning Medicaid

19     funding for transgender surgeries and treatments.

20         Transgender surgeries, puberty blockers, and

21     cross-sex hormone treatments have been shown to be

22     extremely harmful, especially to minors, causing

23     sterility and irreversible physical and

24     psychological damage.

25         Physically healthy, gender-confused girls are

1    being given double mastectomies at 13 and

2    hysterectomies at 16, while males are referred for

3    surgical castration and penectomies at 16 and 17,

4    respectively.

5        How have we reached this point in life where

6    we're allowing this at such a young age, but yet

7    you have to be 16 to drive a car, 18 to buy a pack

8    of cigarettes, where we're allowing children to

9    change their genders before they've even reached

10   puberty or shortly after?

11       Pharmaceutical companies are unethically

12   enriching themselves off the destruction of

13   countless young lives that are being fed puberty

14   blockers, which these companies are advertising

15   children.  It's just straight-up child abuse, and

16   it's preying on our society's most vulnerable

17   youth.

18       Let kids be kids.  I am asking Medicaid to

19   stop funding experimental medical treatments on

20   minors.  Thank you.

21       (Applause.)

22       A VOICE:  If I could remind folks to please

23   state your name before you start your comments.

24       Next speaker is Sabrina Hartsfield.

25       MS. HARTSFIELD:  Good afternoon.  My name is

FOR THE RECORD REPORTING, INC. 850.222.5491

1    Sabrina Hartsfield, and I am speaking just from my

2    own opinions.  I am an alumni of Florida State

3    University and I am a born-again Christian.

4        Because of this conviction, I believe we as

5    human beings have an obligation to ensure poor and

6    marginalized people of all ages have adequate

7    medical care through the Medicaid program.

8        Without gender-affirming health care,

9    transgender and gender nonconforming individuals

10   will die.  According to every major legitimate

11   medical organization, gender affirming care is the

12   treatment for gender dysphoria.

13       I am here today to speak against Rule

14   59G-1.050, the Florida Medicaid trans and medical

15   care ban, from being put into place.

16       Gender-affirming care is medically necessary

17   and life-saving treatment that should be decided

18   between a patient, their caregivers, and a health

19   care professional, not big government.

20       Florida is about freedom from big government

21   overreach.  Medicaid should cover all

22   medically-necessary treatment, and under the right

23   to privacy found in Florida's constitution, this

24   is, again, a decision that should be hands -- in

25   the hands of the patient and their health care

1    providers.

2         This rule also violates the nondiscrimination

3    protections for people of all gender identities

4    found in the Affordable Care Act and the Medicaid

5    Act.

6         Transgender and gender nonconforming people

7    who have gender dysphoria are already at increased

8    risk for negative health outcomes, such as being

9    diagnosed with anxiety or depression, battling a

10   substance use disorder, and attempting suicide.

11   Denying medical care that has been determined to be

12   the best practice by every major medical

13   association from the American Psychological

14   Association to the American Medical Association to

15   the Endocrine Society will be life-threatening.

16   Denying transgender and gender nonconforming people

17   medical care can lead to depression, self-harming,

18   social rejection, and suicidal behavior.

19        If the trans medical care ban is enacted, it

20   will be putting the lives of over 9,000 transgender

21   Floridians in danger.

22        Please block proposed Rule 59G-1.050.

23        (Applause.)

24        A VOICE:  The next speaker is Simone Chris.

25        MS. CHRIS:  Good afternoon.  My name is Simone

1    Chris and I'm an attorney.  I'm the director of the

2    Transgender Rights Initiative Southern Legal

3    Council.  We are a statewide, not-for-profit,

4    public interest civil rights law firm that utilizes

5    federal impact litigation policy reform and

6    individual advocacy to ensure communities that we

7    serve have access to justice and freedom from

8    discrimination.

9        We vehemently oppose the proposed rule based

10   both on the science and evidence supporting the

11   medical necessity of treatment for gender dysphoria

12   and our own extensive experience working with

13   hundreds of transgender adults and minors and

14   witnessing the tremendous benefits that access to

15   such care provides.

16       In effect, the proposed rule creates a blanket

17   exclusion for coverage of medically-necessary

18   health care for one of the most vulnerable

19   populations in our state, eliminating the right of

20   all transgender Floridians with Medicaid to even

21   have their health care needs subjected to a

22   medical-necessity analysis.  The insidiousness of

23   this rule is exacerbated by the fact that it places

24   in its cross-hairs the individuals in our state who

25   are already disproportionately likely to experience

FOR THE RECORD REPORTING, INC. 850.222.5491

1    poverty, homelessness, unemployment, poor mental

2    and physical health outcomes, and to have the least

3    access to resources in health care as it is.

4        We urge AHCA to reject these proposed changes

5    to the rule excluding the coverage for all

6    medically-necessary gender-affirming care because

7    it directly contravenes the widely accepted,

8    authoritative standards of care and the consensus

9    of every major medical association in our country.

10    It will cause significant harm to the individuals

11    that we serve by depriving them of critical,

12    life-saving medical care.  It interferes with and

13    substitutes the state's judgment in place of the

14    doctor/patient relationship, the rights of the

15    individual, and the fundamental rights of a parent

16    to determine appropriate medical treatment for

17    their own child, and it is a shameful waste of

18    state resources.

19        Similar exclusions have been enjoined or

20    struck down by courts across the country as

21    inconsistent with the rights guarantee to Medicaid

22    recipients under the Medicaid Act, under the equal

23    protection clause of the 14th Amendment, the

24    Affordable Care Act.  And this litigation that the

25    state will certainly find itself embroiled in is

1          wasting valuable state resources that could be

2          better utilized enhancing the lives of Floridians

3          rather than attacking them.

4                  Thank you.

5                  (Applause.)

6                  A VOICE:  Matthew Benson.

7                  DR. BENSON:  My name is Matthew Benson.  I'm a

8          board-certified pediatrician and pediatric

9          endocrinologist in the state, and I agree with this

10         rule.  I think the data on which the gender

11         affirmative model is based is not scientific.

12                 The National Board of Health and Welfare of

13         Sweden has recently enacted in that country pretty

14         significant restrictions.  And if we're going to do

15         this type of care, it needs to be under an

16         IRB-approved protocol and it needs to be based on

17         the best data.

18                 I'm used to prescribing these medications in

19         the sense of puberty blockers.  And one of the

20         largest studies that came from Sweden was published

21         around 2016, and basically what they showed is that

22         in those individuals who are transgender and

23         receive these types of procedures, the rates of

24         overall mortality compared to the general

25         population was three times that of the general

1      population; completed suicide, 19 times that of the

2      general population; five times suicide attempts of

3      the general population.  Similarly, in Denmark, out

4      of a 20-year period, by the time a similar study

5      was done, 10 percent of the population had died.

6          We need better data.  We need long-term

7      perspective trials where we can look at adverse

8      effects.  We need much more robust data to justify

9      these kinds of very aggressive therapies.  And

10     we've already seen two individuals, Chloe and

11     Sophia, testify here today about how they were

12     harmed by these procedures.

13         Thank you for your time.

14         (Applause.)

15         A VOICE:  Next speaker, Karen Shoen.

16         MS. SHOEN:  My name is Karen Shoen.  I'm with

17     the Florida Citizens Alliance and I'm a former

18     teacher.

19         I would like to know why .03 percent of the

20     population is dictating to 99.97 percent of the

21     population to accept and pay for an elective

22     surgery.  Kids change their minds.  I can tell you

23     as a teacher, one day they want to be a fireman,

24     the next day they want to be an engineer, and then

25     they go into being something else.

FOR THE RECORD REPORTING, INC. 850.222.5491

 1          The problem is we are not explaining the

 2     wonders of what it is to be comfortable in your

 3     body with both our parents and in our biology and

 4     hygiene glasses.  So kids become fearful.  It's our

 5     job to take that fear away as a teacher, not to

 6     force them into something else.

 7          The children may be afraid of maturing, they

 8     may be afraid of a lot of things, but we're not

 9     looking for the root cause, we are now suggesting

10     and implanting in their brains that they're not

11     comfortable in their body.

12          I'd like to leave you with this thought:  Can

13     I drive a car?  No, you're 13.  Can I have a drink?

14     No, you're 13.  Can I shoot a gun?  No, you're 13.

15     Can I change my gender?  Yes, you're in charge.

16     How is that possible?

17          (Applause.)

18          A VOICE:  Next speaker, Bill Snyder.

19          MR. SNYDER:  Thank you.  Bill Snyder.  I

20     (inaudible) Monticello.

21          I want to talk about a disease that has

22     infected society today called reality disease.

23     Charlie had reality disease.  He woke up one

24     morning and wouldn't get out of bed and go to work.

25     His wife said, "Charlie, you've got to get up,

FOR THE RECORD REPORTING, INC. 850.222.5491

1    you've got to go to work." He said, "I can't, I'm

2    dead." His wife said, "You're not dead, you're

3    talking to me. I can see you breathing." Charlie

4    says, "I can't get up and go to work, I'm dead."

5    The wife called in a psychologist. Psychologist

6    gave Charlie a lengthy interview. At the end of

7    the interview, the psychologist said, "Charlie,

8    come on, we're going to go downtown." They went

9    downtown to the morgue. The psychologist opened a

10   locker, (inaudible) out a cadaver on a tray, pulled

11   the sheet back over the feet of the cadaver, said,

12   "Charlie, dead people's hearts don't beat, they

13   don't have circulation, they do not bleed." He

14   took the toe of the cadaver, stuck a pin in it. No

15   blood came out. The psychologist said, "See,

16   Charlie, dead people don't bleed. Now, give me

17   your thumb." Took Charlie's thumb, stuck a pin in

18   it, out came bright, red blood. The psychologist

19   said, "See, Charlie, you're not dead. That's

20   blood." Charlie said, "What do you know? Dead

21   people do bleed."

22        The further we live from reality, the further

23   we move from morality, the further we move from

24   virtue, the more secular we become. The more

25   secular we become, the less freedom we have.

1      Please approve this proposed rule change.  Thank

2      you.

3          (Applause.)

4          A VOICE:  Next speaker, Ingrid Ford.

5          MS. FORD:  Yes.  Good afternoon.  I'm Ingrid

6      Ford.  Thank you for the opportunity.  I'm with

7      Christian Family Coalition.  I've been a college

8      counselor 15 years, and I'm here in support -- I'm

9      to speak in support of Rule 59G-1.050 to ban

10     Medicaid funding from transgender surgeries and

11     treatments.

12         This rule will protect Florida residents,

13     especially minors, from harmful transgender

14     surgeries, harmful blockers, and other unnatural

15     therapies being promoted by radical gender ideals

16     and with no basis in science.

17         This rule also will protect taxpayers from

18     being forced to subsidize these highly unethical

19     and dangerous procedures, which can cost upwards of

20     $300,000.

21         Thank you.

22         (Applause.)

23         A VOICE:  Next speaker, Richard Carlins.

24         MR. CARLINS:  Hello, my name is Richard

25     Carlins and I am in support of the rule and I'm

FOR THE RECORD REPORTING, INC. 850.222.5491

1    just going to speak from the heart a little bit.  I

2    feel like I'm walking in a house of mirrors or

3    something or it's just -- it's surreal, the world

4    that I live in today from the world that I grew up

5    in.

6        I had a traditional family, a mother and

7    father.  We're saying the Pledge of Allegiance in

8    schools and having prayer in schools.  We were

9    founded upon Biblical principles.  Our constitution

10   goes hand in hand with that.  We're battling with

11   each other right now, you know, over things that

12   were clearly right and wrong before.

13       Seriously, a kid has no idea.  They're being

14   indoctrinated.  They're being indoctrinated even

15   through commercials, Disney World, Coca-Cola

16   commercials, the restaurants they go to.  And then

17   when they want to be what it is that they were

18   pushed to be, we mutilate their bodies and it's

19   irreversible.  It's horrendous.  It's a horrendous

20   evil.

21       And with that, I go.  I just can't believe

22   where we're at.  And we're -- God raises up nations

23   and he brings down nations, and we are in judgment

24   right now.  This is wrong, we need to be able to

25   admit that it is wrong and to help the children to

1    have wholesome lives that history prior to us --

2    this is just recent this -- what we're battling

3    with right now.  I'm just -- you know, not

4    well-studied or anything, but I think it's 1,500

5    years that we've been living in Judeo-Christian

6    principles, you know, and it's just recently that

7    we're throwing any mention of God, the Bible, under

8    the bus.  They're not allowed to hear it.  They're

9    not allowed to know it.  If you feel like you want

10   to have pleasure this way or that way, with this,

11   with that, you can and we're going to support it

12   and do whatever it is so that you can never change

13   your mind again and give you nothing wholesome to

14   hold onto.  That's all.

15        (Applause.)

16        A VOICE:  Amber Hand.  Amber Hand.

17        MS. HAND:  Hi, I'm Amber Hand and I am just

18   with the body of Christ.

19        So I come today because I represent -- well, I

20   come from a family, my mom was gay and my dad was

21   gay.  He struggled with his identity his whole

22   life, but he fought against it because he was a

23   Christian.  And I was taught by my dad I was a

24   little girl, and by mom, I was a little boy.  And

25   so I got real confused, you know what I mean, and

1      I'm 36 today and I just realized -- last year I was

2      thinking about getting a sex change still.  I've

3      always thought about it.  And when I was a kid, I

4      was like, "When I get boobs, I'm going to cut them

5      off with a butter knife," you know what I mean?

6           And when we're kids, we're so impressionable.

7      I remember my sister going and seeing my dad use

8      the bathroom, and she went to use the bathroom like

9      him, but he corrected her, you know, because we

10     have to teach these kids right from wrong.  And

11     it's wrong to take kids and teach them, "Hey, you

12     can make whatever decision you want and you don't

13     even know mentally what you're really going through

14     as a child."  We need to take Medicaid and treat

15     people for psychiatric problems and depression and

16     teach them like you can be a female, it's okay to

17     be a female today and say that you're a woman, you

18     know, like -- and I just realized now at 36 that I

19     want to have a baby, and if I had done that, I

20     would have never been able to have a child.

21          And I just have to say that the Bible says,

22     "Beloved, I wish above all things that thou mayest

23     prosper and be in health even as thy soul

24     prospers."  And when we struggle with identity, our

25     souls are in turmoil.  And if we just begin to

FOR THE RECORD REPORTING, INC. 850.222.5491

1    realize that we just need to teach these kids right

2    from wrong and that it's not okay to change your

3    identity when God made you a male or a female, and

4    when a little boy puts on a high heel because he

5    sees his mother wearing a high heel, it's just

6    play, like it's okay, but that's not what you wear,

7    and teach him what to wear.  We just don't

8    understand as kids what's going on until somebody

9    teaches us.  We have learned behavior.  We're

10   programming kids these days with everything --

11        A VOICE:  Time's up.  Please wrap it up.

12        MS. HAND:  -- (inaudible) around us to be

13   somebody we're not.  God bless.

14        (Applause.)

15        A VOICE:  Shauna Peace.

16        MS. PEACE:  Hi, my name is Shauna Peace, and I

17   am just am here to speak in support of Rule

18   59G-1.050 to ban Medicaid funding on transgender

19   surgery and treatment.

20        Children are being pressured and socialized at

21   a very young age to identify as transgender.  Much

22   of the pressure is coming from on-line social

23   networking sites that celebrate and encourage

24   transgenderism while denying normal heterosexual

25   behaviors.  It accounts for much of the metric rise

FOR THE RECORD REPORTING, INC. 850.222.5491

1      in the children's identifying as transgender in the

2      recent years.  It has doubled since 2017, according

3      to the news sensors for the Centers for Disease

4      Control and Prevention.

5          The most thorough followup of sex reassignment

6      people, which was conducted in Sweden, documented

7      that 10 to 15 years after surgical reassignment,

8      the suicide rate is twenty times to comparable

9      peers.  The alarmingly high suicide rate among

10     post-operative transgender demonstrates the deep

11     regret that may feel after irreversible mutilating

12     their bodies with these barbaric procedures.

13         I am here today because I have had children

14     that have battled with identity and sexual

15     identity, and that my stepson is now identified as

16     female.  He wanted to when he was younger in years,

17     to change, but now that he has gotten into his 20s,

18     he has now decided that he wants to have children,

19     and if you mutilate these children's bodies at an

20     early age, they don't understand that they will

21     never be able to procreate ever again.  Whether you

22     go female or male or male or female, neither sex

23     will be able to procreate ever again.  And I just

24     think it's mutilating and it's not right.

25         Thank you very much.

FOR THE RECORD REPORTING, INC. 850.222.5491

1          (Applause.)

2          A VOICE:  The next speaker, Leonard Lord.

3          MR. LORD:  My name is Leonard Lord.  I am much

4     in favor of the bill.

5          Even as a boy, I wasn't comfortable in my body

6     because I didn't know why I was here.  So when I

7     got the age to say, "I want to find out why I'm

8     here," I spent three days fasting, praying, seeking

9     God.  He brought me to his Word, and I found out

10    that the only way I got comfortable in my body was

11    to know what I was created for.

12         And so what I found, either we're playing

13    games, or if we really believe there's a God and

14    the Bible is true, we find out this whole problem

15    happens because we do not retain the knowledge of

16    God in our conscience and are given over onto our

17    own deception.

18         And now I hear all of the mental problems

19    we're having.  Well, it's real simple.  God's

20    spirit is the answer to what's missing in our

21    lives.  We're only complete in Jesus Christ.  And

22    the scripture says in Timothy 1:7, God has not

23    given us a spirit of fear, we ought to fear man or

24    woman, but he's given us power, love, and a sound

25    mind.  You take the Bible out of school, you take

FOR THE RECORD REPORTING, INC. 850.222.5491

1    God out of school, you take prayer out of school,

2    and what have you got?  You have no power, you have

3    no love, and you have no sound mind.

4         So I'm just saying let's go back to getting

5    mentally right is the only way I can at 75 is to

6    know God created me, his Word is true, live in

7    supernatural peace and joy and know where you'll

8    spend eternity and don't live confused.

9         A VOICE:  Thirty seconds.

10        MR. LORD:  The devil is the author of

11   confusion.  Get a pure heart and live in peace and

12   joy and enjoy things.  If you spend your life

13   trying to find out if you're a man or a woman,

14   you'll never know why you're here.

15        All I can say, God bless you, I'm in support

16   of the bill, and hopefully America will wake up and

17   be a shining city on a hill for all the nations one

18   more time.  Lord bless you.

19        (Applause.)

20        A VOICE:  Pam Olsen.  Pam Olsen.

21        A VOICE:  Dan or Pam?

22        A VOICE:  Pam.

23        MS. OLSEN:  It's me, Pam Olsen.

24        Thank you for this proposal.  I've read all

25   the pages.  It's excellent.  I am for stopping

1    Medicaid from paying for children and teenagers to

2    have sex changes.

3         I've talked to a lot of kids that are

4    confused, and they are confused.  That's what's

5    going on today.  There is so much onslaught against

6    these kids, and you've got kids saying, "I'm a boy,

7    I'm a girl; no, I'm a girl, I'm a boy."  You have

8    kids today saying, "I'm a furry animal."  Are we

9    going to start paying for them to have furry animal

10   body parts put into them?  I mean, where does this

11   stop?

12        And I am so thankful that this has been

13   proposed, that we will stop the madness in Florida

14   and we will not do this.  I hope that you guys do

15   approve this today because it matters for the sake

16   of the children.  You know, I've got 12 grandkids

17   and I'm going to fight tenaciously, not only for my

18   grandkids, but for their friends and for all the

19   children across our state, our nation.  We need to

20   say stop the nonsense and let's do what is right.

21   There are boys, there are girls, there are men,

22   there are women.

23        Thank you so much for approving this.  I

24   believe you will do that.  Thank you.

25        (Applause.)

FOR THE RECORD REPORTING, INC. 850.222.5491

1          A VOICE:   Jon Harris Maurer.

2          MR. MAURER:   Good afternoon.   My name is Jon

3     Harris Maurer and I'm the public policy director

4     for Equality Florida, the state's largest civil

5     rights organization based on securing full equality

6     for Florida's LGBTQ community.

7          The proposed change to Rule 59G-1.050 is

8     without sound scientific basis, it is without legal

9     basis, and it is clearly discriminatory.   The

10    agency should reject it.

11         The proposed rule is about politics, not

12    public health.   We urge you to listen to the

13    numerous medical professionals opposed to the rule.

14    Experts from the country's and the world's leading

15    health organizations disagree with the fundamental

16    premise of the proposed rule.   They endorse

17    gender-afforming [sic] care.   These organizations

18    represent millions of medical professionals, and

19    they recommend gender-affirming care.   We're

20    talking about the American Academy of Pediatrics

21    and its Florida chapter, the American Medical

22    Association, the American College of Obstetricians

23    and Gynecologists, the American College of

24    Physicians, the American Psychiatric Association,

25    the American Psychological Association, the

FOR THE RECORD REPORTING, INC. 850.222.5491

1    American Academy of Family Physicians, the American

2    Academy of Child and Adolescent Psychiatry, the

3    Endocrine Society, the Society for Adolescent

4    Health and Medicine, the Pediatric Endocrine

5    Society, the World Professional Health Association

6    for Transgender Health, and others; again,

7    representing millions of medical professionals.

8         Furthermore, AHCA lacks the specific delegated

9    rulemaking authority to adopt the proposed rule.

10   The statutes that AHCA names as its authority to

11   make this proposed rule --

12        A VOICE:  Thirty seconds.

13        MR. MAURER:  -- grant no authority for

14   (inaudible) patient of the individual role for

15   health care practitioners to make decisions with

16   their patients.

17        The rule is simply discriminatory, it

18   undeniably targets the transgender community.  You

19   may not understand what it's like to be

20   transgender --

21        A VOICE:  Fifteen seconds.

22        MR. MAURER:  -- or to be a parent of a

23   transgender kid just trying to find the best care

24   for your kid, but transgender Floridians are here

25   in this audience and they're telling you about how

FOR THE RECORD REPORTING, INC. 850.222.5491

1    harmful this rule would be to the more than 9,000

2    transgender Floridians on Medicaid.  We know these

3    therapies are safe because the agency is not

4    opposing them for all Floridians.

5         A VOICE:  Sir, please wrap it up.  Your time

6    is up.

7         MR. MAURER:  In conjunction with the state

8    willingly ignoring the body of scientific evidence

9    that supports gender-affirming care, there's no

10   question of the politically-calculated animus

11   behind this proposed rule.  Please reject the

12   proposed rule.

13        (Applause.)

14        A VOICE:  I appreciate your comments.  I would

15   just ask for decorum in the crowd.  We want to give

16   everybody equal opportunity to speak.

17        A VOICE:  Next speaker, Anthony Verdugo.

18        MR. VERDUGO:  Thank you.  Good afternoon.  I

19   want to start off by thanking all of you for being

20   here today and for your public service.

21        My name is Anthony Verdugo.  I am the founder

22   and executive director of the Christian Family

23   Coalition.  We are a leading human rights and

24   social justice advocacy organization of Florida,

25   and we're here to strongly support Rule 59G-1.050

1    to ban Medicaid funding for transgender surgeries

2    and treatment.

3         They call it gender-affirming care.  They

4    don't care and it's not affirming.  Let's get that

5    straight.  And we know that because of heroes who

6    are among us here today, folks like Chloe Cole and

7    Sophia Galvin.  They are heroes because they've had

8    the courage to come out and speak the truth in

9    love.

10        And everyone needs to be respected and treated

11   with dignity, but this is a war on children.  These

12   are crimes against humanity.  Groomers are using

13   their authority as adults to pressure children and

14   ruin their lives.

15        I'm going to share with you about a brand, the

16   No. 1 prescribed puberty blocker in America.  It's

17   called Lupron.  And they themselves list on their

18   package that "Emotional instability is a side

19   effect and warrants prescribers to monitor for

20   development or worsening of psychiatric symptoms

21   during treatment."

22        These so-called medical organizations which

23   were just listed --

24        A VOICE:  Thirty seconds.

25        MR. VERDUGO:  -- have been discredited.

FOR THE RECORD REPORTING, INC. 850.222.5491

1    World-renowned organizations such as the Royal

2    College of General Practitioners in the United

3    Kingdom, Australian College of Physicians, and the

4    American College of Pediatricians -- and I will end

5    with their quote -- say, "Americans are being led

6    astray by a medical establishment driven by a

7    dangerous ideology and economic opportunity, not

8    science and the Hippocratic oath."  The suppression

9    of normal puberty, the use of disease-causing

10   cross-sex hormones, and the surgical mutilation and

11   sterilization of children constitute atrocities to

12   be banned, not health care.  Let kids be kids.

13        Thank you.

14        (Applause.)

15        A VOICE:  Next speaker, Roberto Rodriguez.

16        MR. RODRIDGUEZ:  Thank you very much for this

17   opportunity.  I love America as a veteran,

18   ex-police officer, father, grandfather -- let me

19   see what else, you know, and a father of a veteran

20   who is serving in the Navy today as a pilot.  And

21   first of all, I wanted to thank you.  You guys made

22   me cry.  Why?  Because, you know, I have a

23   question.  Has -- you know, anybody can answer it.

24   Has a doctor ever been wrong?  You know, has a

25   parent ever been wrong?  Has teachers ever been

FOR THE RECORD REPORTING, INC. 850.222.5491

1    wrong?  Have scientists ever been wrong?  But,

2    then, why are we listening and waiting for

3    scientists and doctors to talk different to what we

4    have evidence here today?

5         We have the evidence right here today.  They

6    came walking in this place and we're being blind to

7    them, and I want to recognize you and I want you to

8    let you know that the true dream is interwoven in

9    every atom of your existence.  God will fulfill his

10   true dream to you, no matter what man try to do to

11   you.  You have a purpose, you have a reason, and

12   today proves it.

13        And I'm here to tell you that this rule, we

14   need to go ahead, I support it.  We need to stop

15   being ignorant to what faces us and listening to

16   people.

17        I am from the Centers of God and I have

18   multiple churches that will stand here today.  So

19   I'll tell you what, we're bigger than any

20   organization there is right now and represent that

21   we are for this rule.

22        God bless you and thank you.  We love you guys

23   for serving.  Thank you.

24        (Applause.)

25        A VOICE:  Next speaker, Michael Haller, M.D.

FOR THE RECORD REPORTING, INC. 850.222.5491

App_030<sup>0</sup>6

1        All right.  Michael Haller, M.D.

2            DR. HALLER:  Good afternoon, everyone.  My

3    name is Michael Haller and I am a graduate of the

4    University of Florida's College of Medicine,

5    pediatric residency, and the pediatric

6    endocrinology fellowship.  I hold a Master's in

7    clinical investigation and I am the professor and

8    chief of the Pediatric Endocrinology Division at

9    the University of Florida.  The views expressed

10   here are, however, my own.

11           I have trained thousands of medical providers,

12   participated in the development of national

13   guidelines, and have treated tens of thousands of

14   children, including many transgender youth.

15           I provide this background with full humility,

16   but also to establish myself as an actual expert,

17   both in the management of gender-diverse youth and

18   as one who can review and analyze relevant

19   literature.

20           The Gapums document and proposed rule change

21   seeking to remove Medicare -- medical -- Medicaid

22   coverage for gender dysphoria makes numerous false

23   claims, uses a biased review of the literature, and

24   relies on more so-called experts who actually lack

25   actual expertise in the care of children with

1      dysphoria.

2           While there are a number of flaws, the state's

3      plan following deserves specific commentary.

4           First, the state's primary assertion that

5      gender-affirming therapy has not demonstrated

6      efficacy and safety is patently false.  Nearly

7      every major medical organization that provides care

8      for children, as you heard previously, have

9      provided well-evidenced guidelines supporting

10     gender-affirming care as the standard of care.  The

11     assertion from the state, the data included in

12     those guidelines, are not as robust as the state

13     would like them to be --

14          A VOICE:  Thirty seconds.

15          DR. HALLER:  -- is at best a double standard,

16     and is at worst discriminary [sic] political fear.

17     The state is either unwilling or willfully chooses

18     to ignore the totality of evidence in support of

19     gender-affirming care, and the latter seems most

20     likely.

21          Second, the state's use of --

22          A VOICE:  Fifteen seconds.

23          DR. HALLER:  -- (inaudible) experts as

24     (inaudible) advisers seeking to discredit evidence

25     used (inaudible) of care is laughable.  Several of

FOR THE RECORD REPORTING, INC. 850.222.5491

1    the state's own experts have been legally

2    discredited from testifying as such in cases

3    regarding gender-affirming care, while others have

4    acknowledged publicly that they have never provided

5    gender-related care to children.

6        A VOICE:  Wrap it up.

7        DR. HALLER:  The proposal to limit

8    gender-affirming care to those dependent on

9    Medicaid is poorly conceived, is likely to cause

10    significant harm to Floridians dependent on

11    Medicaid, and should be rejected.  Thank you.

12        (Applause.)

13        A VOICE:  Next speaker, Robert Yules.

14        Jason, did you want to comment?

15        A VOICE:  I'm sorry, we have -- the panel has

16    one comment to that.  I'm going to refer this to

17    Dr. Van.

18        DR. V:  So just some insight into the support

19    of gender-affirming care by the large societies,

20    medical societies in the United States.  The

21    American Academy of Pediatrics has actually made a

22    statement against this -- this, and the Florida

23    chapter as well.

24        These are not standards of care.  Standards of

25    care by definition are an arduous process of

1      listening to all input from every side, every

2      aspect, of a medical condition, and these

3      individuals get together and they agree on

4      someplace in the middle that they can all live with

5      as a then standard of care.

6          These are merely guidelines.  The guidelines

7      from the Endocrine Society specifically state they

8      are not standards of care.  They're just

9      guidelines.  They are the opinions of the

10     individuals who wrote the guidelines.  The

11     Endocrine Society guidelines were written by nine

12     people in the first go-round and ten in the second

13     go-round, all of which were ideologues from the

14     World Professional Association of Transgender

15     health.

16          That group -- that interest group excluded

17     world renowned experts in the field and did not

18     listen to their input, didn't include their input

19     on purpose.  And so it's not surprising that you

20     come up with one view that does not really

21     represent any kind of standards of care.

22          So we have to stop using the term "standards

23     of care" when there are absolutely no standards of

24     care in this instance that have been addressed.

25          (Applause.)

FOR THE RECORD REPORTING, INC. 850.222.5491

1          A VOICE:  Mr. Yules.  Mr. Yules.

2          DR. HALLER:  I would also --

3          A VOICE:  Sir, you've spoken already.  If you

4     have further comments, please submit them in

5     writing.

6          A VOICE:  No, I'm sorry, Dr. Haller.  If you

7     have further comments, you can -- you can refer

8     them in writing.  You can refer them in writing,

9     Doctor.

10         A VOICE:  Robert Yules.

11         MR. YULES:  Yes, my name is Robert Yules.

12     It's an honor and privilege to be here.  I was born

13     and raised in St. Petersburg, Florida, and my, how

14     things have changed.  Forty-three years ago, my

15     senior high school class came here to view the

16     legislature, and the topic of the day was about

17     dog-catching rules in the state of Florida.  My,

18     how far we've come.

19         This was not even in the purview of anyone at

20     that time.  This was not in the purview of anyone

21     ten years ago.  This was not in the purview really

22     of anyone five years ago to bring it to the state

23     level, the city level, the classroom level, to be

24     driven by the teachers' unions with all of their

25     ideology, and really it begins and ends when man

1        proclaims himself as God.  The truth begins with me

2        and it ends with me.  And our country is in a lot

3        of trouble because people aren't willing to say

4        "No, that's not your truth."  There is a truth.

5        That might be your perspective of the truth, but

6        there is not your truth, your truth, your truth, my

7        truth, his truth.  It's not the way it works, and

8        we're going down -- just even philosophically and

9        morally, we're going down a very, very slippery

10        road when we start delving into these things.

11            It's interesting to me also how a child cannot

12        own this or own that or own this, and the thing

13        we've been told for the last ten years, "Well,

14        their brain's not fully developed until around 25."

15        Everybody says that, right?  Their brains aren't

16        developed until they're 25, and now our governor

17        caught such flack because he said don't teach

18        kindergarteners --

19            A VOICE:  Thirty seconds.

20            MR. YULES:  -- about transgendering, leave it

21        out till third grade.  I think they should leave it

22        out till 12th grade and let parents have those

23        conversations with people.  Put it back where

24        parents talk to their own kids, and let's -- let's

25        make school about science, technology,

FOR THE RECORD REPORTING, INC. 850.222.5491

1        engineering --

2                A VOICE:  Fifteen seconds.

3                MR. YULES:  -- and mathematics and get back

4        where we need to be.

5                Thank you so much for your time.  Thank you.

6                (Applause.)

7                A VOICE:  At this time, we would like to

8        remind everyone that they can submit comments in

9        writing to medicaidrulecomments@ahca.myflorida.com.

10       Information is provided on cards at the exit when

11       we are finished, as well as up on the screen.

12       We'll continue with the speakers.

13               A VOICE:  Flaugh.  Keith Flaugh.

14               MR. FLAUGH:  Good afternoon.  My name is Keith

15       Flaugh.  I am one of the founders of an

16       organization called Florida Citizens Alliance,

17       which is a not-for-profit organization of almost

18       200,000 parents and grandparents, and we focus on K

19       through 12 education.

20               We have recently completed a detailed study in

21       all 67 county school districts based on 58 novels

22       that we found throughout.  I've left a copy with

23       Cole.  I would encourage you to read it.

24               Twenty of those are LGBTQ and gender --

25       promoting gender dysphoria.  Some of these

                 FOR THE RECORD REPORTING, INC. 850.222.5491

1    materials are actually designed for pre-K.

2         Children in our public schools are being

3    purposefully confused, desensitized, and even

4    pressured into abnormal sexual behavior.  Gender

5    idealogues are coaching kids to be into this

6    dysphoria, and even telling them to threaten

7    suicide.

8         There is a considerable debate in the

9    psychiatric and medical circles about whether the

10   transgender condition is biological or

11   psychological.  In numerous public schools, staffs

12   and even teachers are aiding this dysphoria and

13   purposely hiding what they're doing from the

14   parents.  Further, taxpayers shouldn't have to pay

15   for this.

16        Florida Citizens Alliance strongly supports

17   the rule of 59G-1.050, especially to protect minors

18   from the harmful transgender surgeries, hormone

19   blockers, and other unnatural therapies.  Thank

20   you.

21        (Applause.)

22        A VOICE:  Robert Roper.

23        MR. ROPER:  Hi, my name is Robert Roper.  I'm

24   here to speak in support of the rule to ban

25   Medicaid funding for transgender surgeries and

FOR THE RECORD REPORTING, INC. 850.222.5491

1    treatments.  The most important aspect of this rule

2    is that it serves to protect the children of the

3    state of Florida.

4        Gender confusion is the only disorder that

5    comes with a false assertion that a child can

6    actually be born in the wrong body.  They are led

7    to believe that some day they'll actually become a

8    member of the opposite sex.  That's impossible.

9    Maybe that's why they call it "transgender."  You

10   never actually arrive at the desired outcome.

11       Gender confusion is the only disorder that the

12   body is mangled to conform to the thoughts of the

13   mind.

14       Gender confusion is the only disorder that the

15   child actually dictates his or her medical care to

16   medical and -- medical professionals and

17   counselors, instead of the other way around.

18       Gender confusion is the only disorder that the

19   parent can be completely excluded from determining

20   what is best for their own child.

21       Gender confusion is the only disorder that the

22   treatment takes the child down a dead-end road

23   literally.  What we are seeing in Florida and

24   across the nation is a social media-driven epidemic

25   manufactured by social media influencers making a

1    lot of money off the very vulnerable element of our

2    society -- that's our children.

3         While most counselors somehow have been

4    convinced that affirmation is the only way, even

5    the APA would be the first to affirm that a child

6    simply does not have the capacity to make these

7    kinds of long-range decisions.  In fact, you don't

8    need to be a doctor --

9         A VOICE:  Thirty seconds.

10        MR. ROPER:  -- of psychology to know this.

11   Ask any parent.  They will tell you that a child

12   wants what they want, and they want it now.

13        What some -- some will call on their faith,

14   some will call on a counselor, but all do so to be

15   delivered from the disorder, not to be sent deeper

16   into it.

17        A VOICE:  Fifteen seconds.

18        A VOICE:  You don't give drugs to a drug

19   addict, alcohol to an alcoholic, porn to someone

20   addicted to pornography.  This is not a form of

21   treatment.

22        In closing, transgender regret is among the

23   fastest-growing movements on social media today --

24        A VOICE:  (Inaudible).

25        MR. ROPER:  -- on Reddit this morning.  I

1      found a thread with 35,600 entries of people

2      regretting their transgenderism.  It increased to a

3      hundred more while I drove here today.

4          Watchful waiting from loving parents yields an

5      exponentially higher success rate of resolving

6      gender disorders than any prescription drugs or

7      surgery, 90 plus percent.  This rule will protect

8      Florida residents.

9          (Applause.)

10         A VOICE:  Carl Charles.

11         MR. CHARLES:  Good afternoon.  My name is Carl

12     Charles and I'm a senior attorney in the Atlanta,

13     Georgia, office of Lambda Legal, the nation's

14     oldest and largest legal organization fighting for

15     the rights of LGBT people and everyone living with

16     HIV.

17         We are here today to share that we strongly

18     oppose and are deeply disturbed by AHCA's notice of

19     proposed rule, which if approved will remove

20     coverage of medically-necessary care for

21     transgender youth and adults from the Florida

22     Medicaid program.  This essential and in some cases

23     life-saving care is clinically effective, evidence

24     based, and widely accepted and used by medical

25     professionals across the country to treat gender

1   dysphoria.

2       Unlawful exclusions of this kind cause

3   significant harm to a state's most vulnerable

4   residents.  Indeed, should this proposed rule be

5   adopted, it will cause serious, immediate, and

6   irreparable harm to transgender Medicaid

7   participants in Florida who already experience

8   well-documented and pervasive stigma,

9   discrimination in their day-to-day lives, including

10  significant challenges, if not all-out barriers to

11  accessing competent health care services.

12      We are especially concerned by the

13  administration's characterization of this care as

14  experimental and ineffective.  This is contrary to

15  all available medical evidence and relies on

16  misrepresentations of the findings of various

17  studies, as well as reports by so-called experts,

18  one of whom is on this panel, who have been

19  discredited and notably do not treat transgender

20  people --

21      A VOICE:  Thirty seconds.

22      MR. CHARLES:  -- in their medical practice.

23      Finally, I would like to note for the record

24  as to whether or not this was a negotiated

25  rulemaking process and who on the panel is a

1    transgender Medicaid recipient in Florida.  Okay,

2    there's no one.

3         Finally, singling out transgender Medicaid

4    participants for unequal treatment by denying them

5    coverage for services that non-trans Medicaid

6    participants access plainly violates the equal

7    protection clause of the U.S. Constitution and

8    federal law.

9         A VOICE:  Time.  Please wrap up your comment.

10        A VOICE:  Furthermore, Section 15-57 of the

11   Affordable Care Act prohibits discrimination on the

12   basis of sex by any health program or activity

13   receiving federal financial assistance.

14        Finally, shame on you all for proposing this

15   rule.

16        (Applause.)

17        A VOICE:  Jason, did you want to comment?

18        A VOICE:  Just quickly, I would like to refer

19   everyone to the Gapums report, in particular the

20   numerous appendices that we attached to that

21   report.  There have been references to the numerous

22   clinical organizations that have endorsed these

23   procedures, and in particular, I would refer you to

24   Dr. Canter's report, pages 27 through 28 -- I'm

25   sorry, pages 32 through 42, which go through each

FOR THE RECORD REPORTING, INC. 850.222.5491

1    one of those organizations.  Thank you.

2         A VOICE:  Speaker Ed Wilson.

3         MR. WILSON:  Ed Wilson.  I've traveled here

4    today to speak in support of Rule 59G-1.050 to ban

5    Medicare funding from being used for transgender

6    treatments and surgeries.

7         This rule will protect children who are not

8    mature enough to be comfortable in their own body

9    or to have sexual desires that they have not gone

10   through puberty yet from making mistakes that will

11   destroy their lives.

12        Children are being misguided into believing

13   that they're transgender.  Taxpayer money should

14   never be used to destroy innocent lives.

15        Transgender treatments and surgeries never

16   actually succeed in changing someone to the

17   opposite sex, but do cause permanent harm to the

18   people who undergo such treatments.

19        Health care professionals need to focus on

20   healing the mind of confused and/or abused people,

21   not mutilating their bodies.  As Anthony already

22   quoted, I'm going to skip part of the quote from

23   the American College of Pediatrics, but it ends

24   with, "The suppression of normal puberty, the use

25   of disease-causing cross-sex hormones, and the

1     surgical mutilation and sterilization of children

2     constitute atrocities to be banned, not health

3     care.

4          Please take their advice.  Ban these

5     atrocities --

6          A VOICE:  Thirty seconds.

7          MR. WILSON:  -- and keep Medicaid about health

8     care.  Thank you very much.

9          (Applause.)

10         A VOICE:  Speaker Suzanne Zimmerman.

11         MS. ZIMMERMAN:  I'm Suzanne Zimmerman, and I

12    am merely a mother, grandmother, great-grandmother,

13    aunt, great-aunt, and specifically great great-aunt

14    of a young child who is going through the throes of

15    gender dysphoria from the age -- a young age.  He

16    is now 8 years old, and I pray that our state

17    doesn't make it easy for her parents to be

18    dissuaded toward gender change.

19         I listened to the young people here who have

20    gone through this, and I think they speak volumes

21    more than any of the rest of us could say because

22    they've been through the difficulties and they've

23    learned through the difficulties.

24         And my bottom line is God doesn't make

25    mistakes.  We're all created equal and different,

FOR THE RECORD REPORTING, INC. 850.222.5491

1    each in His image, and there are many, many

2    different people in this world and we are to love

3    them all.  It's a commandment, it's God

4    commandment, and He loves us all.

5         I urge you to support this ban to make it easy

6    through Medicaid to have --

7         A VOICE:  Thirty seconds.

8         MS. ZIMMERMAN:  -- the surgery for children

9    who are children with very young brains.  Have a

10   heart and please pass this ban.  Thank you.

11        (Applause.)

12        A VOICE:  Judy Hollerza, H-o-l-l-e-r-z-a.

13        MS. HOLLERIN:  I'm Judy Hollerin, poor work --

14   poor penmanship apparently.

15        I support -- I support that we ban -- that we

16   ban this.  I -- every day, of course, we wake up

17   seeing new things that we can't believe are

18   happening to us today.  And I support everything

19   that's been said -- everything in support of that

20   has been said today.

21        The idea that Medicaid should be doing --

22   should be supporting this or paying for it --

23   again, this expansion of us paying for these kinds

24   of critical things without further thought.  My,

25   I -- I would like to look 20 years younger, but I

1     do not expect Medicaid to be paying for it.  Enough

2     said.

3          (Applause.)

4          A VOICE:  Next speaker, Ezra Stone.

5          MR. STONE:  Good afternoon.  My name is Ezra

6     Stone and I'm a licensed clinical social worker.

7          Social work is a profession with a long

8     history of valuing human dignity and autonomy, and

9     according to the values of my profession, I have an

10     ethical obligation to support my clients in

11     reaching their fullest potential, problem-solving

12     barriers to treatment with them, and collaborating

13     with other professionals.

14          Additionally, we have a professional

15     obligation to provide evidence-based treatment, and

16     there is significant research that medical

17     transition is safe, effective at relieving symptoms

18     of dysphoria, and improves mental health.

19          In my private therapy practice, my clients

20     express tremendous relief at being able to access

21     medical care, which decreases their anxiety and

22     depression and increases their feelings of safety,

23     comfort, and joy as their bodies and minds become

24     more congruent.  Understanding and being seen as

25     their true selves creates a sense of belonging,

FOR THE RECORD REPORTING, INC. 850.222.5491

1     which is a fundamental human need.

2          On the other hand, the current political

3     climate in the state is causing significant harm to

4     transgender, nonbinary questioning and gender

5     diverse Floridians.  My clients report increases in

6     anxiety with each proposed anti-LGBT measure the

7     state takes, fear violence in their daily lives,

8     and worry about their continued access to medical

9     care.

10          These observations from my clinical practice

11     support the research on the minority stress model,

12     which demonstrates that expecting experiences of

13     harm, marginalization, and rejection have a

14     negative impact on people's mental health and

15     overall well-being.

16          Passing this change to Medicaid --

17          A VOICE:  Thirty seconds.

18          MR. STONE:  -- will not only take away

19     medically-necessary care from several thousand of

20     the most vulnerable Floridians, but it will also

21     further create a climate of fear for LGBT people

22     and their health care providers across the state.

23          (Applause.)

24          A VOICE:  Jason.  Speaker Peggy Joseph.

25          MS. JOSEPH:  Hello.  I'm Peggy Joseph, and I

1    would just like to share some thoughts from an

2    author and doctor, Ryan T. Anderson, who wrote

3    about -- a book called, "When Harry Became Sally."

4         So in 2016, the Obama administration and the

5    Center for Medicare and Medicaid Services revisited

6    the question of whether sex reassignment surgery

7    would have to be covered by Medicare plans.  It

8    refused on the grounds that we lack evidence that

9    it benefits patients.  They stated, "Based on a

10   thorough review of the clinical evidence available,

11   there is not enough evidence to determine whether

12   gender reassignment surgery improves health

13   outcomes."

14        There were conflicting study results, and the

15   quality and strength of evidence were low.  Many

16   studies that reported positive outcomes were

17   exploratory-type studies with no confirming

18   follow-up.  The author says, "The lack -- the lost

19   of follow-up could be pointing to suicide."

20        The largest and most robust study, a study

21   from Sweden, found a 19 times greater likelihood of

22   death by suicide and a host of other poor outcomes.

23        To provide the best possible care serving the

24   patient's interest requires an understanding of

25   human --

FOR THE RECORD REPORTING, INC. 850.222.5491

1          A VOICE:  Thirty seconds.

2          MS. JOSEPH:  -- wholeness and well-being.  The

3     minimal standard of care should be with a standard

4     of normality.  Our brains and senses are designed

5     to bring us into contact with reality.  Thoughts

6     that distort --

7          A VOICE:  Fifteen seconds.

8          MS. JOSEPH:  -- (inaudible) are misguided and

9     cause harm.  Okay.

10         (Applause.)

11         A VOICE:  Next speaker, Jack Barton.

12         A VOICE:  Actually, I have one comment with

13    respect to that, so as a partial addendum to my

14    earlier answer focusing on some of the clinical

15    organizations in the United States, but I wanted to

16    also mention because it has come up a couple times

17    here, that the Gamus report on pages 35 and 36 also

18    talks about international consensus as also talked

19    about in Dr. James Canter's report on pages 42

20    through 45.  So I would encourage people to look at

21    that as well.

22         A VOICE:  Go ahead.

23         MR. BARTON:  My name is Jack Barton.  I'm here

24    with the Christian Family Coalition.  I'm an

25    Assembly of God pastor.  The 37 years I have

1      counseled, among them I've counseled lesbians,

2      gays, and bisexuals.  I believe in First

3      Corinthians 6:9, that people can escape from that

4      life.  Unfortunately for the transgender, they

5      suffer.  These young people have made that clear.

6          I believe that gender dysphoria should be

7      labeled as child abuse, it is not something that

8      should be happening to our children, and with the

9      doctors that will participate in this, it's not so

10     unlike the doctor who tears a child apart in

11     abortion and calls it health care.

12         These are the issues:  The puberty blockers,

13     the hormone manipulations, that's not science.  The

14     only name that was left out before was Anthony

15     Fauci.  I kept waiting to hear them to say that.

16         Every -- any procedure like this should be

17     labeled criminal.  You have a child that at that

18     age doesn't know if they like vanilla ice cream or

19     if they like chocolate ice cream, and yet they're

20     going to let them march in and either make that

21     decision to be led down that path.  Nearly

22     90 percent of those that escape from that life do

23     it by the time they reach the end of puberty

24     because they come back to their senses that they

25     were created male and female by God.

FOR THE RECORD REPORTING, INC. 850.222.5491

1          Suicide that we talk about so much comes when

2     a person has followed up on these things, has done

3     it, and now they are confused because they still

4     don't find the completion that they thought they

5     felt.

6          Among those that go through these processes,

7     many of it comes from child abuse that happened

8     when they were kids, some who have wanted to have

9     acceptance by others and were rejected.  One man,

10    his grandmother wanted a granddaughter.  She

11    dressed him like that, and so he adopted that life.

12         A VOICE:  Thirty seconds.

13         MR. BARTON:  I'll close with this.  There are

14    two genders, male and female.  Women bear children,

15    women breastfeed, women have menstrual cycles.  Men

16    do not.  I would not provide the anorexic with food

17    and I would not say give money to do something that

18    would harm a child.

19         A VOICE:  Fifteen seconds.

20         MR. BARTON:  It's a terrible thing to do and I

21    ask you to stand your ground.

22         (Applause.)

23         A VOICE:  Jose Martin.

24         MR. MARTIN:  Good afternoon.  Thank you for

25    letting me speak.  I'm also with the Christian

1    Coalition, and I'm here to speak in support of Rule

2    59G-1.050.  I am a father and a grandfather, and I

3    am here to stand against mutilation that we all are

4    asked to fund.  The people we are talking about

5    need counseling, not promotion to a destructive

6    choice.

7         I also want to remind that one day we will all

8    stand before a living God and give account for

9    where we stand on this and other issues.  And I

10   also want to thank you brave people, who I think

11   are more qualified than all the other experts that

12   came up, because you are living and you lived

13   through it and you know the results of that, and I

14   thank you.  Thank you very much.

15        (Applause.)

16        A VOICE:  Folks, we have a number of speakers

17   coming up from the same organization.  We just ask

18   that you be respectful of others' time.  We've got

19   a number of speakers to get through before 5:00

20   p.m., so if you could just be brief and support

21   comments of others, if possible.  Thank you.

22        Next speaker, Bob Johnson.

23        MR. JOHNSON:  Good afternoon, Bob Johnson.  I

24   am a retired and recovering attorney, but I am --

25   and I'll be very brief.

FOR THE RECORD REPORTING, INC. 850.222.5491

1          I say thank you to the Florida Division of

2     Medicaid for putting together this report.  I've

3     read the whole report.  It's not my area of

4     expertise, but I've had significant experience

5     working with the development of agency rules,

6     statements of need, and reasonableness as we call

7     them in the state that I come from, and I just want

8     to compliment the agency.  I've read through it.  I

9     think the case is compelling for the rule change.

10    I strongly support the rule change.

11         There is specifics in there again that's not

12    an area that I studied, but in reading the report

13    and looking how thorough that it was put together,

14    the case has been made for the need to adopt this

15    rule change, the case has been made for the

16    reasonableness of what you're proposing.  I just

17    found it compelling the fact that the FDA does not

18    approve any medication as clinically indicated for

19    gender dysphoria.  The fact that there's no

20    randomized, controlled trials for the use of these

21    puberty suppression, that's the gold standard, I

22    know, in medical studies, and there are no

23    randomized, controlled trials, and the fact that

24    there's no long-term data.  I just think there is

25    so much concrete, substantial evidence that totally

1    justifies it, and I would just echo many of the

2    others that have testified here today.  I urge you

3    to go forward, adopt these rules, changes --

4         A VOICE:  Thirty seconds.

5         MR. JOHNSON:  -- (inaudible) we need them, we

6    need them in the state of Florida.  Thank you.

7         (Applause.)

8         A VOICE:  Next speaker, Sandy Westad,

9    W-e-s-t-a-d, I believe.

10        MS. WESTAD:  My name is Sandy Westad and I'm

11   also here with CFC, Christian Family Coalition.

12        I -- I want to speak from the heart.  I'm a

13   mother, I'm a grandmother, I'm a sister, whatever,

14   and my heart is breaking for what these kids are

15   going through.  It just seems to me that if the

16   parents -- the parents need to stay in control.

17   They need to stay in the authority of their

18   children.  They need to be able to speak to their

19   kids about the sex and the transgender.

20        Kids play house.  They pretend.  You know,

21   they do things in a play world, but they don't want

22   to be or understand or even know what it is to

23   change from one sex to another.  They pretend.  I

24   remember my sons playing and pretending they were

25   girls and sometimes they would pretend they were

1    boys, but they were boys and they grew up to be

2    boys.  They didn't want to be girls.  They felt

3    that that was what they were supposed to be.  Jesus

4    made them boys, and they were going to stay boys.

5    But the thing is we -- we need to understand that

6    children cannot make those kinds of decisions.

7    They cannot --

8         A VOICE:  Thirty seconds.

9         A VOICE:  -- decide who they are.  The parents

10   need to be their guide, and the parents -- God gave

11   children parents for a reason.

12        So I just support this bill, this rule, and I

13   thank you so much for everyone that's here.

14        (Applause.)

15        A VOICE:  Gail Carlins.

16        MS. CARLINS:  Good afternoon.  I'm Gail

17   Carlins and I'm with CFC also.  And I am in favor,

18   I support this rule change here with not having the

19   funds -- the Medicaid funds go to supporting these.

20        My beliefs are based on the Bible, and the

21   Bible, I believe, is the only truth that there is.

22   And the Bible says, as was mentioned a couple

23   times, God created male and female.  If you want to

24   bring science into it, females have two X

25   chromosomes, males have an X and a Y chromosome.

FOR THE RECORD REPORTING, INC. 850.222.5491

1        It's an impossibility to change from one to the
2   other.  That cannot be done.  And so no matter what
3   kind of mutilation or anything is done to a person,
4   they can't change it.
5        So, again, I am in support of this bill and I
6   thank you for your time.
7        (Applause.)
8        A VOICE:  Dorothy Berring.
9        MS. BERRING:  Good afternoon.  My name is
10  Dorothy Berring, also with the Christian Family
11  Coalition.  I also live in The Villages, Florida.
12       First of all, I would like to thank our brave
13  governor once again for bringing this to the
14  forefront.  We are -- Florida definitely is going
15  to make change, and thank you to these brave people
16  and to Amber for not going along with what you were
17  trying to be brainwashed into believing.
18       Again, it's strange, you know, they're
19  definitely targeting our -- our youngest.  We can't
20  seem to find baby formula anywhere, but yet
21  Medicaid can fund this nonsense.
22       Again, this has to be left up to the parents.
23  Whatever you choose to practice in the privacy of
24  your own home is your business.  I'm not
25  discriminating against any genders or whatever.  I

FOR THE RECORD REPORTING, INC. 850.222.5491

1        just -- it needs to be taken out of the schools,

2        and this doctor that was from UF or USF or

3        whatever, it's shameful, shameful what you are

4        trying to teach our students, and that's why we are

5        in this bloody mess right now.  Okay?  And this

6        needs to be changed --

7              A VOICE:  Thirty seconds.

8              MS. BERRING:  -- and you all need to listen.

9              And thank you, doctors, for being here and for

10       giving us this forum.  Thank you.

11             (Applause.)

12             A VOICE:  We would ask that the comments be

13       focused on the rule and be respectful of other

14       speakers, please.

15             Troy Peterson.

16             MR. PETERSON:  Good afternoon, Troy Peterson.

17       I come supporting Anthony and Christian Family

18       Coalition.  I'm also the President of Warriors of

19       Faith here in Florida.  We brought a few people

20       with us from the Tampa Bay area, and really we come

21       representing thousands that stand in agreement with

22       this rule.

23             And I want to thank you, doctors.  I read the

24       40-page report.  I'm not a doctor, I'm a pastor.

25       But when I saw the evidence, I could clearly see

1          that we need this rule.

2               In the book of Genesis, in the beginning God

3          created man in his own image, male and female, and

4          then he said, "Be fruitful and multiply the earth."

5          So that's why I'm here is because I'm opposed to

6          even that doctor back there.  And I appreciate you

7          said that because if I had any authority in the

8          medical field, I would have his license revoked.

9               The most thorough follow-up of sex reassigning

10         people, which was conducted in Sweden, documented

11         that 10 to 15 years --

12              A VOICE:  Thirty seconds.

13              MR. PETERSON:  -- of surgical reassessment,

14         that the suicide rate is 20 times that of the

15         comparable peers.

16              I also read in the medical evidence that

17         50 percent --

18              A VOICE:  Fifteen seconds.

19              MR. PETERSON:  -- of the gender

20         identity-confused children have thoughts of

21         suicide.

22              Thank you for your time.

23              (Applause.)

24              A VOICE:  Janet Rath.

25              MS. RATH:  Hi, my name is Janet Rath.  I'm a

1    mother, a grandmother, and a new great-grandmother.

2    And I think 50 years ago as parents, we were

3    smarter than what is going on today.  Parents are

4    left out of their children's lives.  Some of it is

5    the parents' fault, and some of it's the teachers'

6    faults.

7        I have a granddaughter that's a teacher who

8    has said that if she has a child that comes in and

9    identifies as a cat, she must have a litter box

10   there and a bowl of water.

11       We are as a country going absolutely insane,

12   absolutely insane.  We all bought into Dr. Fauci,

13   who was nothing but a money-grabbing liar -- pardon

14   my French -- and we have been hoodwinked ever

15   since.  We have got to stop this.

16       Chinese children in third grade are learning

17   advanced calculus.  Our third graders are learning

18   which bathroom to use.  I'm sorry, but I do not

19   want my great granddaughter growing up in this

20   world if this is what it's going to turn into.  We

21   have got to change, and we had best do it now.

22   Thank you.

23       (Applause.)

24       A VOICE:  Gerald Loomer, L-o-o-m-e-r, Gerald.

25       MR. LOOMER:  Good afternoon.  My name is

1    Gerald Loomer.  I drove three and a half hours from

2    Lady Lake, Florida, to be here because I want to

3    support Rule 59G-1.050.  Especially I want to

4    support the best governor in the United States, Ron

5    DeSantis who also supports this.

6        (Applause.)

7        MR. LOOMER:  But I'd like to share three quick

8    stories with you.  The first is the little girl who

9    saw her brothers go fishing with their dad, out in

10   the backyard playing catch with a football, says,

11   "You know, I'd like to spend more time with Dad.

12   If I were a boy, I could spend more time with Dad."

13       Or the boy who said, "You know, those girls,

14   they're in the kitchen cooking with Mom, they go

15   shopping with Mom, they're doing makeup with Mom.

16   I want to spend more time with Mom.  I think I

17   should be a girl, then I can spend more time with

18   Mom."  Well, those things passed.

19       Remember the child who said, "Can I drive the

20   car?"  "Of course not, you're 13 years old."

21   "Well, can I drink a beer?"  "Of course not, you're

22   13 years old."  "Can I smoke a cigarette?"

23       A VOICE:  Thirty seconds.

24       MR. LOOMER:  "Of course not, you're 13 years

25   old."  "Can I take hormones to block puberty?"

FOR THE RECORD REPORTING, INC. 850.222.5491

1     "No, you're 13 years old.  Of course, you can.  You

2     know what you want."  "Can I take cross-sex

3     hormones?"

4          A VOICE:  Fifteen seconds.

5          MR. LOOMER:  "You're 13 years old.  Of course,

6     you can.  You know what you want."  "Can I have

7     gender sterilizing surgery?"  "You're 13 years old.

8     Of course, you can, you know what you want."  "Can

9     I have body-mutilating surgery" --

10         A VOICE:  Time.  Please wrap up your comment.

11         MR. LOOMER:  -- "that's going to alter my

12    sex?"  "Of course, you can, you's are 13 years old,

13    you know what you want."

14         A VOICE:  Sir, your time is up.  Please wrap

15    it up.

16         MR. LOOMER:  How absurd is all of this?

17    Continue to keep this resolution.

18         Thank you.

19         (Applause.)

20         A VOICE:  Pastor Marta Marcano.

21         MS. MARCANO:  Good afternoon.  I'm Pastor

22    Marta Marcano from (inaudible) Jacksonville,

23    Florida.  I'm a director of Protect our Children

24    Project, Duval County chapter, and an organizer of

25    the Christian Family Coalition in Jacksonville too.

1        I'm here to let you know that I'm support of

2    the Rule 59G-1.050 to ban Medicaid funding for

3    transgenders, surgeries, (inaudible) blockers, and

4    other unnatural therapies.

5        Also, this rule protect taxpayers from being

6    forced to subsidize the (inaudible) is driving by

7    unethical pharmaceutical companies enriching

8    themselves with the puberty blockers.  That is an

9    atrocity of children abuse.

10        World-renowned Swedish psychiatric,

11    Dr. Christopher Gilbert, has said that pediatric

12    confusion is possibly one of the greater --

13        A VOICE:  Thirty seconds.

14        MS. MARCANO:  -- scandal in medical history

15    and call for an immediate moratorium.

16        As a pastor --

17        A VOICE:  Fifteen seconds.

18        MS. MARCANO:  -- I want to remind you that doc

19    do not been a stumbling block for the little one,

20    because Hebrews 10:31 said --

21        A VOICE:  Time.  Please complete your comment.

22        MS. MARCANO:  -- "It's a fearful thing to fall

23    into the hands of the living God."

24        Please protect our children.  Thank you very

25    much for this time.

1          (Applause.)

2          A VOICE:  Paul Arrans.

3          MR. ARRANS:  Good afternoon.  My name is Paul

4      Arrans.  I'm a physician.  In practice, I've had

5      transgender patients, and I have transgender

6      personal friends with whom I discuss their medical

7      care at length.

8          With profound respect for the young people who

9      testified earlier, I still oppose this amendment

10     (inaudible) the preponderance of medical science

11     and practice when we do irreparable harm to the

12     health and well-being of thousands of transgender

13     Floridians of all ages and their families.

14         The American Academy of Pediatrics and its

15     Florida chapter representing thousands of

16     board-certified pediatricians have directly

17     reviewed many controversial assertions in your

18     publication on gender dysphoria, and the Florida

19     Department of Health's statement responded.

20         Contrary to an earlier comment, the Endocrine

21     Society has stated, "Both medical intervention for

22     transgender youth and adults, including puberty

23     suppression, hormone therapy, and

24     medically-indicated surgery has been established as

25     the standard of care.  Federal and private

       FOR THE RECORD REPORTING, INC. 850.222.5491

1    insurance should cover such interventions as

2    prescribed by a physician," end quote.

3        Gender dysphoria is very real.  You can learn

4    this for yourselves by meeting with transgender

5    people.  You will then realize that denial of

6    appropriate gender-affirming care at any age would

7    be inhumane and a violation of human rights.  These

8    medically-necessary treatments are the generally

9    accepted professional medical standards,

10   (inaudible) authoritative opposition to the

11   proposed rule.

12       A VOICE:  Thirty seconds.

13       MR. ARRANS:  (Inaudible) to just rush this

14   through, thereby putting the health and lives of

15   trans people in danger.

16       It feels like Medicaid is crossing into a

17   political lane by seeking to preempt

18   provider/patient/family decision-making here, and I

19   urge you to withdraw this proposal.

20       A VOICE:  Fifteen seconds.

21       MR. ARRANS:  This represents knowledge and

22   practice regarding gender-affirming care.  If you

23   are still determined to address this topic, at

24   least convene (inaudible) panels of experts,

25   including transgender community members, who inform

FOR THE RECORD REPORTING, INC. 850.222.5491

1    yourselves and the public about the overwhelming

2    evidence --

3        A VOICE:  Time.

4        MR. ARRANS -- against denying coverage for

5    gender-affirming care.

6        Thank you for the opportunity to testify.

7        (Applause.)

8        A VOICE:  Thank you for that comment.  I'm

9    going to refer for further comment to Dr. Van.

10   VANMOLE, VANMO, VENMO?

11       DR. V:  I would encourage everybody just to

12   read the Gaplins report, and particularly the

13   attachment to it.  A great deal of attention has

14   been put in there into evaluating the science.  And

15   some of the studies that have been brought up, both

16   pro and con, are involved -- they're specifically

17   the flaws that are in so many of these studies.

18   Specifically --

19       A VOICE:  Hold on.

20       A VOICE:  (Inaudible) while Dr. Vanmo speaks.

21       DR. V:  Yeah, and by the way, I like the idea

22   that everybody lets everybody speak.  So it kinds

23   of bothers me when I'm hearing speakers shout it

24   down because they're saying something you don't

25   like.  How we treat other people with whom we

1          disagree is a reflection of our own character, not

2          theirs.  So, please, let -- due decorum.

3              First of all, the Endocrine Society's 2017

4          guidelines are guidelines, just that.  And it

5          states specifically page 3895 that they do not

6          guarantee an outcome and they do not establish a

7          standard of care.  It's in black and white there.

8              I would refer you also, as is mentioned in the

9          Gaplins report, the histories in the United

10          Kingdom, Sweden, Finland, France, four nations that

11          were leading this from quite some time, they did

12          national-level reviews involving scientific

13          organizations, divisions of governments, medical

14          professionals.  And mind you, these are nations

15          that were leading it.  And after review, they all

16          came to the same conclusion, this should not be

17          going on in minors at all under 16, and only

18          between 16 and 18 under tightly-regulated studies,

19          the kind of which we really don't see happening.

20              And they also came to the conclusion that

21          strong psychological support is what's needed when

22          we talk about evaluating kids for this.  We have

23          four decades of literature showing the overwhelming

24          probability of mental health problems, adverse

25          childhood events, neuropsychological problems like

FOR THE RECORD REPORTING, INC. 850.222.5491

1    autism spectrum disorder, and other things that

2    need to be addressed.  And, in fact, also for these

3    nations, somebody strongly demonstrating

4    psychologic instability -- quite specifically, you

5    say you're suicidal -- blocks you from the

6    transition pathway.  They insist that those things

7    be taken care of first because transition simply

8    won't fix them.  The underlying problems of a

9    transgender youth become the underlying problems of

10   an adult who identifies as transgender.  That's

11   what is going on here.

12       So, again, I'd refer you to the report and

13   some of the other letter, complaints, that I've

14   seen come in in the past 24 hours from the AAP, as

15   well as from the Endocrine Society, what they're

16   complaining about is actually addressed here,

17   including some of the studies they bring up, and

18   there too, it's a very well-researched document.

19   The State of Florida put a lot of effort into this.

20       You're free to disagree, but please make sure

21   you've read it and understand it before you do.

22       A VOICE:  Just to be a little bit more

23   specific with respect to the report, I'd refer you

24   to Dr. Rigner (inaudible) Peterson's report, which

25   is Attachment C to the Gaplins report, and also a

1    doctor named Paul Hruz, H-r-u-z.  Title of his

2    publication is, "Deficiencies in Scientific

3    Evidence for Medical Management of Gender

4    Dysphoria."  He did not provide an expert report

5    for purposes of this report, but he is published in

6    medically reviewed literature, and I would

7    encourage you to read that as well.

8         Thank you.

9         (Applause.)

10        A VOICE:  January Littlejohn.

11        MS. LITTLEJOHN:  My name is January

12   Littlejohn.  I am a mother of three children and a

13   licensed mental health counselor.

14        In the spring of 2020, our 13-year-old

15   daughter told us that she was experiencing distress

16   over her sex and that she didn't feel like a girl.

17   She had expressed no previous signs of gender

18   confusion, and three of her friends at school had

19   recently started identifying as transgender.

20        As we tried to understand our own observations

21   and seek professional help, we discovered that her

22   middle school had socially transitioned her without

23   our knowledge or consent.  Her mental health

24   spiraled.  We worked with a psychologist to help

25   our daughter explore and resolve co-occurring

issues, including low self-esteem and anxiety.  We
also gave her more one-on-one time, in-person
activities away from trans influences, limited her
Internet use, and declined to affirm her
newly-chosen name and pronouns.  We set appropriate
boundaries and allowed her to choose her hair style
and clothing, but denied harmful requests such as
breast binders, puberty blockers, cross-sex
hormones, and surgeries.

It was clear from our conversations that our
daughter was uncomfortable with her developing body
and had an intense fear of being sexualized.  She
was filled with self-loathing and was in true
emotional pain, but had been led by peers and
influencers to believe that gender was the source
of her pain.

What she really needed was for us to help her
make sense of her confusion and remind her that
hormones and surgeries could never change her sex
or resolve her issues.

A VOICE:  Thirty seconds.

MS. LITTLEJOHN:  I shudder to think what could
have happened if we had affirmed her false identity
and consented to medical treatment as opposed to
what we did, which was to lovingly affirm her as

FOR THE RECORD REPORTING, INC. 850.222.5491

 1      she is:  Beautifully unique and irreplaceable and

 2      undeniably female.

 3          A VOICE:  Fifteen seconds.

 4          MS. LITTLEJOHN:  Our daughter has desisted and

 5      is on a path to self-love, but, unfortunately,

 6      gender-dysphoric children are being encouraged

 7      through activism and peer pressure to disassociate

 8      from their bodies and to believe their body parts

 9      can be simply removed --

10          A VOICE:  Time.  Please finish your comment.

11          MS. LITTLEJOHN:  -- modified, or replaced.

12          The irreversible consequences of medically

13      transitioning, including loss of sexual and

14      reproductive function, cannot be fully understood

15      by children or teens who lack the necessary

16      maturity or experience.  These children need love

17      and therapy, not hormones or surgery.

18          Thank you.

19          (Applause.)

20          A VOICE:  Next up, Kendra Paris.

21          MS. PARIS:  Hi there, my name is Kendra Paris.

22      I still suffer from being an attorney.  I'm a

23      mental health attorney, and I wanted to follow up

24      on the comment about the lack of peer-reviewed

25      standards of care, because as an attorney, the lack

1    of peer-reviewed standards of care mean that a lot

2    of people who are harmed or experience bad outcomes

3    from these surgeries or other interventions have no

4    ability to sue, and I find that problematic as an

5    attorney.  They've had decades to create

6    peer-reviewed standards of care, and they have not.

7    And I suspect some people don't want those

8    standards of care because it would open them up to

9    lawsuits for bad outcomes, which is not happening

10   right now and it really frustrates me.

11        You all are so brave.  I'm so proud of you for

12   coming and telling your stories.

13        We just don't know, and I want to talk about a

14   particularized thing that we don't know yet.  When

15   you put a female on testosterone, within about five

16   years, she's going to have to have a hysterectomy,

17   though you passed most recent standards of care,

18   recommend hormone -- cross-sex hormone therapy for

19   females at 14.  So we're talking about a potential

20   hysterectomy before she turns 20.  We have known

21   for a very long time that hysterectomies correlated

22   with negative mental health outcomes and cognitive

23   decline.  And we know that the earlier a

24   hysterectomy is performed, the worse mental health

25   and cognitive decline is.  Essentially, the earlier

1    you do the hysterectomy, the earlier the onset of

2    dementia.

3           And so what I am very concerned about is in, I

4    don't know, 10, 20, 30 years, we're going to have

5    an absolute wave of young females, 40, 50 years

6    old, with early-onset cognitive decline --

7           A VOICE:  Thirty seconds.

8           MS. PARIS:  -- or dementia in our assisted

9    living facilities.

10          And in surveys and anecdotal experience is

11   starting to indicate that some individuals who are

12   trans and have dementia forget that they're trans.

13   In a state like Florida, we have substituted

14   judgment.

15          A VOICE:  Fifteen seconds.

16          MS. PARIS:  So if they don't have written

17   documentation allowing for their medical proxy to

18   allow for detransition, they might be cut off.  And

19   I really worry that we have not considered all of

20   the implications of this.

21          So I appreciate the rulemaking and I thank

22   you --

23          A VOICE:  Time.

24          MS. PARIS:  -- for your time.  Thank you.

25          (Applause.)

FOR THE RECORD REPORTING, INC. 850.222.5491

1        A VOICE:  Nathan (inaudible).

2        MR. BRUMER:  My name is Nathan Brumer.  I am

3   Florida's LGBTQ consumer advocate as appointed by

4   Commissioner of Agriculture Nikki Fried.  One of

5   FDACS' many critical roles here in the state

6   includes serving as Florida's consumer protection

7   agency.

8        On behalf of health care consumers, I provide

9   the following comments in opposition to the

10  proposed changes to Rule 59G-1.050:  As a state

11  agency, FDACS encourages all consumers to remain

12  aware, vigilant, and act when necessary, but to do

13  so, we know consumers must be provided with

14  accurate information, education, choice, safety,

15  representation, and redress.

16       Documented, well-researched standards of care

17  have been established, are based on a wide range of

18  evidence, and conclude gender-affirming medical

19  care is medically necessary and safe and effective.

20  In other words, gender-affirming care is the

21  standard of care, and the proposed rule as it

22  stands would deny health care consumers in the

23  state of Florida access to the standard of care.

24       State agencies must serve and advocate for all

25  Floridians.  We should not deny any Floridian the

FOR THE RECORD REPORTING, INC. 850.222.5491

1    ability to thrive.  We serve the public good and we

2    must defend the rights of every Floridian,

3    including transgender Floridians, and this includes

4    the right to nondiscriminatory health care

5    coverage.  We must work to increase access to

6    health care, not lessen it or remove it all

7    together.

8        A VOICE:  Thirty seconds.

9        MR. BRUMER:  On a personal note, Florida is my

10   home state.  I am one of thousands, tens of

11   thousands of transgender Floridians here in our

12   state who have had the privilege to have access to

13   gender-affirming health care --

14       A VOICE:  Fifteen seconds.

15       MR. BRUMER -- for decades who are happy and

16   successful and thriving.  I'm an attorney, I'm an

17   advocate, and I work for and very hard and I'm

18   proud to serve the State of Florida.  We are part

19   of the fabric of this nation --

20       A VOICE:  Time.  Please wrap up your comment.

21       MR. BRUMER -- and of this great state, and we

22   deserve the rights and benefits afforded to all.

23       (Applause.)

24       A VOICE:  Nathan Bremmer.

25       MR. NEWELL:  Hi, I'm Nathan Newell.  I think

FOR THE RECORD REPORTING, INC. 850.222.5491

1    we got the Nathans mixed up.  Here (inaudible) for

2    support.  Tell you a little bit, I have a son, I

3    have four children.  My son, 15, is -- doing

4    everything we can to keep him straight.  He doesn't

5    make good decisions.  One of the things lately, you

6    know those little things on the side of the road

7    that flashes and tells you your speed?  Well, we

8    had one of those near our house.  So he decides to

9    take his dirt bike in pitch black and with his

10   friends out there and go 80 miles per hour down the

11   road.  We know this because of the ring.  He was

12   bragging to his friends, so we watched the ring and

13   saw that.

14        Then a couple days ago, he was upset with us

15   and said he was leaving.  So we said, "Where are

16   you going to go, Hunter?"  He goes, "I'm going to

17   St. Teresa, I got friends down there."  "How are

18   you going to get there, Hunter?"  "I'm going to

19   ride my bike."  I said, "It's going to take you

20   forever," and he goes, "It's going to take me four

21   hours."

22        So, anyways, this 15-year-old, he's not making

23   good decisions.  And to sit here and to even think

24   that these kids can make a decision on what they

25   want that's going to be with them for the rest of

1    life is child abuse.  These doctors are despicable.

2    They need to have their license taken away.  They

3    are a disgrace to the human race.  It's just

4    despicable to think that these people are taking

5    care of us and taking care of our children, and I

6    appreciate what y'all are doing.

7         (Applause.)

8         A VOICE:  We'd ask that you please be

9    respectful to the other speakers.

10        A VOICE:  Thank you for your comments.  We

11   respect your comment, we respect everybody's

12   comments, including the doctors that you

13   referenced.

14        A VOICE:  Nathan Brumer.

15        Dotty McPherson.

16        MS. MCPHERSON:  Hi there, I'm Dotty McPherson.

17   I'm speaking as the District 2 representative for

18   the Florida Federation of Republican Women.

19        The age of majority is 18, but even at 18,

20   children don't have the maturity to handle certain

21   responsibilities given them, like driving, alcohol.

22   Even older adults don't.

23        Your agency's safety net programs include

24   programs for abused and neglected children, but not

25   gender decisions.  Please prevent funding the

1    destruction of children's genitalia and hormonal

2    balance.

3        Please consider unintended consequences of,

4    No. 1, is taxpayer money that will need to be used

5    for lawsuits by those whose lives are ruined from

6    surgeries that got -- that they got while they were

7    immature or too young to understand, also by

8    parents whose parental rights were denied to

9    protect their children's future.

10       I grew up in a low-income neighborhood on the

11   low-income side of town.  When I got to junior high

12   school, I saw how rich kids were, and a lot of them

13   were just real brainiacs, and I felt so inadequate.

14   I had a terrible inferiority complex, but I got

15   over it.  I graduated with honors from FSU.  I had

16   a good job and made a good life for myself and my

17   four children.  Life isn't fair.  We've got to stop

18   giving in to the poor, pitiful me syndrome.  People

19   need to get their brains right and --

20       A VOICE:  Thirty seconds.

21       MS. MCPHERSON:  -- get straight.  Government

22   has no business funding these things.  Our elected

23   governor has authority to make this rule, which

24   should be upheld.  Please support our governor's

25   rule.  Thank you.

1        (Applause.)

2        A VOICE:  I'm going to get this first name

3   wrong, but I think it's Marjorie Caulkins.

4        MS. CAULKINS:  Hello, my name is (inaudible)

5   Caulkins and I am from Milton, Florida, and I came

6   in support of the ban of Medicaid funding for

7   transgender surgeries and treatments.

8        I believe that Floridians do not need our

9   taxpayers' money to be spent in this funding of

10  surgeries that are both unnecessarily and

11  tremendously harmful.

12       As a mother of two, I believe there is a war

13  on our children and we need to stand on the right

14  side of this war and protect our children, support

15  our Governor DeSantis.  We are blessed with our

16  governor, and I think we should be on the right

17  side and support this rule and ban Medicaid funding

18  for transgender surgeries.

19       Thank you so much, and thank you for your

20  service.

21       (Applause.)

22       A VOICE:  James Caulkins.

23       MR. CAULKINS:  Hi.  I'm James Caulkins from

24  Milton, Florida, and I just want to say we really

25  need this rule passed to support Rule 59G-1.050 to

1   ban Medicaid funding for transgender surgery and

2   treatment.

3       We are in a battle in this country, and I'd

4   like to thank all the people who showed up today,

5   because your voice matters.  Our state -- the

6   people have spoken.  They elected the greatest

7   governor in the United States, Ron DeSantis.  They

8   put Republicans in office in this state to stand

9   for what's right, and this rule change is what's

10  right.

11      We don't need this stuff, this evil, this

12  Medicaid funding for transgender surgery.  We don't

13  need this in our state of Florida.  We need to lead

14  in Florida, we need to lead the other states in

15  Florida against this evil transgender surgeries.

16      So please pass this rule.  Thank you all so

17  much for your public service and God bless the

18  state of Florida.  Thank you.

19      (Applause.)

20      A VOICE:  Tuana Aman.

21      MS. AMAN:  Thank you for the opportunity for

22  us to be here.  I am in support of the ban to the

23  Medicaid funding for transgender surgeries and

24  treatments.  And let me say that years ago, I was

25  told that I needed to go on hormone therapy, and I

1    had one doctor tell me that it was the right thing

2    to do, but as I did more and more surg- -- more and

3    more study and research, I saw the risks involved

4    to hormonal therapy.  And when someone tries to

5    tell you there isn't any risk to these kinds of

6    procedures and these kinds of things that are

7    happening to young people, to young kids -- I mean,

8    I'm an adult who's fully developed, right, as a

9    human being now, right, and they say 25 generally,

10   look at these kids and their development, the

11   process.

12       And what I think is even more sad is that

13   they're born like the young girl with a certain

14   amount of eggs that will be released every month

15   from the time she starts puberty, and here we're

16   trying to prevent those natural things from

17   occurring and expect it not to have any problems.

18       I was watching Bill Mayer, which he's not a

19   favorite of conservatives, right?  And he came out

20   a couple of weeks ago and was slammed by the LGBT

21   community because he said, "Isn't it

22   interesting" -- and this is him, right -- "Isn't it

23   interesting that if you look at Los Angeles and New

24   York and Miami and all these different hubs, that's

25   where this transgender service -- these surgeries

FOR THE RECORD REPORTING, INC. 850.222.5491

1     are going on, the focus," and he got slammed.  They

2     said they wanted him off the air, and, I mean, he

3     had -- they had a campaign against him --

4          A VOICE:  Thirty seconds.

5          MS. AMAN:  -- because it was focused on the

6     fact that he was just saying, "Isn't there

7     something ironic about the fact that you look at

8     the rest of the country and these things aren't

9     going on, and then you look at these hubs where

10    social engineering is happening and where people

11    are being influenced that I" --

12         A VOICE:  Fifteen seconds.

13         MS. AMAN:  -- "can't go out into the media and

14    say anything against transgender, because what will

15    happen?  I will be criticized and condemned."  It

16    isn't fair.  I think it's right to be here and have

17    the opportunity to give our voices, but I believe

18    that the government should not be involved in

19    supporting any --

20         A VOICE:  Time.  Please wrap up your comment.

21         MS. AMAN:  -- kind of procedure for these

22    young kids.  Thank you.  Amen.

23         (Applause.)

24         A VOICE:  Jason, do you have a follow up?

25         A VOICE:  Just very quickly.  We appreciate

1      your comments, just like we appreciate the comments

2      of everyone in this room and all the people that

3      have made comments on-line and otherwise.

4          I just wanted to make sure -- clear, just so

5      we're crystal-clear about the purpose of this rule

6      is that we're not talking about a ban of treatment

7      for gender dysphoria.  We're talking about not

8      covering through reimbursement in the Florida

9      Medicaid program for the services that are

10     enumerated in the rule itself.

11         I also want to make clear that there are other

12     comprehensive coverage of services for gender

13     dysphoria currently in the Florida Medicaid

14     program, and I just want to read a couple of those:

15     "Community-based health services provided by an

16     array of provider types; psychiatric services

17     provided by a physician or other qualified health

18     care practitioner in office settings, clinics, and

19     hospitals; emergency services and inpatient

20     services in hospital settings; behavioral health

21     services provided in schools and by school

22     districts."

23         So I just wanted to make sure that everyone

24     was crystal-clear about the purpose of this rule.

25     I very much appreciate your comment and the

1 comments of everybody else.

2   A VOICE:  Thank you, everyone, for your

3 participation in this hearing.  We will accept

4 written material or comments until 5:00 p.m. on

5 Monday, July 11, 2022.  Comments may be submitted

6 by e-mail to

7 medicaidrulecomments@ahca.myflorida.com.

8   That being our time, this hearing is now

9 closed.  Thank you.

10   (Whereupon, the hearing was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FOR THE RECORD REPORTING, INC. 850.222.5491

1                 C E R T I F I C A T E

2    STATE OF FLORIDA    )

3    COUNTY OF LEON      )

4            I hereby certify that the foregoing transcript

5    is of a tape-recording taken down by the undersigned,

6    and the contents thereof were reduced to typewriting

7    under my direction;

8            That the foregoing pages 02 through 91

9    represent a true, correct, and complete transcript of

10   the tape-recording;

11           And I further certify that I am not of kin or

12   counsel to the parties in the case; am not in the

13   regular employ of counsel for any of said parties; nor

14   am I in anywise interested in the result of said case.

15           Dated this 19th day of July, 2022.

16

17

18

19           CLARA C. ROTRUCK

20           Notary Public

21           State of Florida at Large

22           Commission Expires:

23           November 13, 2022

24           Commission NO.: GG 272880

25

        FOR THE RECORD REPORTING, INC. 850.222.5491

# Medicaid Certified School Match Program Fee Schedule

## 2022

**\*Reimbursement amount is the Federal Share of these fees. However, reimbursement can also be based on the individual school district's cost and vary from school district to school district.**

| Occupational Therapy Services | | | | |
|---|---|---|---|---|
| **Code** | **Modifier** | **Description of Service** | **Maximum Fee** | **Maximum Allowable Units** |
| 97165 | | Occupational Therapy Evaluation, Low Complexity | $51.05 | 1 per year |
| 97166 | | Occupational Therapy Evaluation, Moderate Complexity | $51.05 | 1 per year |
| 97167 | | Occupational Therapy Evaluation, High Complexity | $51.05 | 1 per year |
| 97530 | | Occupational Therapy Treatment Individual Session | $17.86 | 4 per day, 14 per week |
| 97530 | HM | Occupational Therapy Individual Session Provided by an Occupational Therapy Assistant | $14.30 | 4 per day, 14 per week |
| 97150 | GO | Occupational Therapy Group Session by an Occupational Therapist | $3.47 | 4 per day, per week |
| 97150 | UC | Occupational Therapy Group Session by an Occupational Therapy Assistant | $2.74 | 4 per day |
| 97542 | GO | Wheelchair Evaluation and Fitting by an Occupational Therapist | $51.05 | 1 per 5 years |
| 92597 | GO | AAC Initial Evaluation Provided by an Occupational Therapist | $102.63 | 1 per 5 years |
| 29799 | HA | Application of Casting or Strapping | $19.56 | 2 per day |

| Physical Therapy Services | | | | |
|---|---|---|---|---|
| **Code** | **Modifier** | **Description of Service** | **Maximum Fee** | **Maximum Allowable Units** |
| 97161 | | Physical Therapy Evaluation, Low Complexity | $51.05 | 1 per year |
| 97162 | | Physical Therapy Evaluation, Moderater Complexity | $51.05 | 1 per year |
| 97163 | | Physical Therapy Evaluation, High Complexity | $51.05 | 1 per year |
| 97110 | | Physical Therapy Treatment Individual Session | $17.86 | 4 per day, 14 per week |
| 97110 | HM | Physical Therapy Individual Session Provided by a Physical Therapy Assistant | $14.29 | 4 per day, 14 per week |
| 97150 | GP | Physical Therapy Group Session by a Physical Therapist | $3.47 | 4 per day |
| 97150 | HM | Physical Therapy Group Session by a Physical Therapist Assistant | $2.74 | 4 per day |
| 97542 | GP | Wheelchair Evaluation and Fitting by a Physical Therapist | $51.05 | 1 per 5 years |
| 92597 | GP | AAC Initial Evaluation Provided by a Physical Therapist | $102.63 | 1 per 5 years |
| 29799 | HA | Application of Casting or Strapping | $19.56 | 2 per day |

| Speech-Language Pathology Services | | | | |
|---|---|---|---|---|
| **Code** | **Modifier** | **Description of Service** | **Maximum Fee** | **Maximum Allowable Units** |
| 92521 | | Evaluation/ Re-evaluation of speech fluency (e.g., stuttering, cluttering) | $51.05 | 1 per 5 months |
| 92522 | | Evaluation/ Re-evaluation of speech sound production (e.g., articulation, phonological process, apraxia, dysarthria) | $51.05 | 1 per 5 months |

| 92523 | | Evaluation/ Re-evaluation of speech sound production (e.g., articulation, phonological process, apraxia, dysarthria); with evaluation of language comprehension and expression (e.g., receptive and expressive language) | $51.05 | 1 per 5 months |
|---|---|---|---|---|
| 92524 | | Evaluation/ Re-evaluation Behavioral and qualitative analysis of voice and resonance | $51.05 | 1 per 5 months |
| 92610 | | Evaluation/Re-Evaluation of oral and pharyngeal swallowing function | $48.94 | 1 per 5 months |
| 92507 | | Speech-Language Pathology Individual Session by a Speech-Language Pathologist | $17.86 | 4 per day, 14 per week |
| 92507 | HM | Speech-Language Pathology Individual Session Provided by a Speech Therapy Assistant | $14.30 | 4 per day, 14 per week |
| 92508 | | Speech-Language Pathology Group Session by a Speech-Language Pathologist | $3.47 | 4 per day 14 per week |
| 92508 | HM | Speech-Language Pathology Group Session by a Speech-Language Pathology Assistant | $3.74 | 4 per day, 14 per week |
| 92597 | | AAC Initial Evaluation Provided by a Speech-Language Pathologist | $102.63 | 1 per 5 years |
| 92597 | GN | AAC Re-Evaluation Provided by a Speech-Language Pathologist | $52.63 | 1 per 6 months |
| 92609 | | AAC Fitting, Adjustment, and Training Visit | $42.11 | 8 per year |

## TRANSPORTATION

Transportation fees vary for each school district.  They are not included in this appendix, instead each district is notified of its fee.

| Behavioral Services | | | | | |
|---|---|---|---|---|---|
| Code | Modifier 1 | Modifer 2 | Description of services | Maximum Fee | Maximum Allowable Units |
| H0031 | AH | | Psychologist-Individual Service-Evaluation | $9.66 | 32 units per school district |

| | | | | | staff member, per day. |
|---|---|---|---|---|---|
| H0046 | AH | | Psychologist-Individual Service-All Else | $9.66 | 32 units per school district staff member, per day. |
| H0046 | AH | HQ | Psychologist-Group Service | $4.95 | 32 units per school district staff member, per day. |
| H0031 | SE | | Certified Behavior Analyst-Individual Service-Evaluation | $8.00 | 32 units per school district staff member, per day. |
| H2019 | HA | | Certified Behavior Analyst-Individual Service-All Else | $10.41 | 32 units per school district staff member, per day. |
| H2019 | HA | HQ | Certified Behavior Analyst-Group Service | $3.24 | 32 units per school district staff member, per day. |
| H0002 | HA | | Certified Behavior Analyst (Bachelor's Level) and Certified Assistant Behavior Analyst-Individual Service-Evaluation | $6.70 | 32 units per school district staff member, per day. |
| H2014 | HA | | Certified Behavior Analyst (Bachelor's Level) and Certified Assistant Behavior Analyst-Individual Service-All Else | $6.70 | 32 units per school district staff member, per day. |
| H2014 | HA | HQ | Certified Behavior Analyst (Bachelor's Level) and Certified Assistant Behavior Analyst-Group Service | $3.35 | 32 units per school district staff member, per day. |
| H0031 | HU | | Social Worker (Master's Level); Marriage and Family Therapist; Mental Health and Guidance Counselors Individual Service - Evaluation | $8.97 | 32 units per school district staff member, per day. |
| H0046 | SE | | Social Worker (Master's Level); | $8.97 | 32 units per school district |

| Code | Modifier | | Description of Service | Maximum Fee | Maximum Allowable Units |
|---|---|---|---|---|---|
| | | | Marriage and Family Therapist; Mental Health and Guidance Counselors-Individual Service-All Else | | staff member, per day. |
| H0046 | SE | HQ | Social Worker (Master's Level); Marriage and Family Therapist; Mental Health and Guidance Counselors-Group Service | $4.25 | 32 units per school district staff member, per day. |
| H0002 | HN | | Social Worker (Bachelor's Level)-Individual Service-Evaluation | $7.17 | 32 units per school district staff member, per day. |
| H0046 | HN | | Social Worker (Bachelor's Level)-Individual Service-All Else | $7.17 | 32 units per school district staff member, per day. |
| H0046 | HN | HQ | Social Worker (Bachelor's Level)-Group Service | $3.40 | 32 units per school district staff member, per day. |

| Nursing Services | | | | |
|---|---|---|---|---|
| Code | Modifier | Description of Service | Maximum Fee | Maximum Allowable Units |
| T1002 | | Nursing Service-Registered Nurse | $6.20 | 32 units per nurse or aide, per day |
| T1003 | | Nursing Service-Licensed Practical Nurse | $4.80 | 32 units per nurse or aide, per day |
| T1004 | | Nursing Service-School Health Aide | $3.80 | 32 units per nurse or aide, per day |
| T1002 | KO | Medication Administration-Registered Nurse | $2.07 | 32 units per nurse or aide, per day |
| T1003 | KO | Medication Administration-Licensed Practical Nurse | $1.06 | 32 units per nurse or aide, per day |
| T1004 | KO | Medication Administration-School Health Aide | $.80 | 32 units per nurse or aide, per day |

# Behavioral Health Overlay Services Fee Schedule
## 2022

| Description of Service | Procedure Code | Modifier | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| Behavioral health overlay services | H2020 | HA | $32.75 per day | Medicaid will not reimburse for behavioral health overlay services when a recipient is absent because he or she is in a Department of Juvenile Justice detention center placement.<br><br>Medicaid will not reimburse a provider for behavioral health overlay services if the provider has been paid for the provision of the same type of services by another purchasing entity. |

Florida Medicaid Community Behavior Health Fee Schedule

2022

| Description of Service | Procedure Code | Mod | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| **59G-4.028: Behavioral Health Assessment Services Coverage Policy** | | | | |
| Psychiatric evaluation by a physician | H2000 | HP | $210.00 per evaluation | Medicaid reimburses a maximum of two psychiatric evaluations per recipient, per state fiscal year. |
| Psychiatric evaluation by a non-physician | H2000 | HO | $150.00 per evaluation | Medicaid reimburses a maximum of two psychiatric evaluations per recipient, per state fiscal year. |
| Brief behavioral health status exam | H2010 | HO | $14.66 per quarter hour | There is a maximum daily limit of two quarter-hour units.<br>Medicaid reimburses for brief behavioral health status examinations a maximum of 10 quarter-hour units annually (2.5 hours), per recipient, per state fiscal year.<br>A brief behavioral assessment is not reimbursable on the same day that a psychiatric evaluation, bio-psychosocial assessment, or in-depth assessment has been completed by a qualified treating practitioner. |
| Psychiatric review of records | H2000 | | $26.00 per review | Medicaid reimburses a maximum of two psychiatric reviews of records, per recipient, per state fiscal year.<br>This service may not be billed for review of lab work (see medication management). |
| In-depth assessment, new patient, mental health | H0031 | HO | $125.00 per assessment | Medicaid reimburses one in-depth assessment, per recipient, per state fiscal year.<br>An in-depth assessment is not reimbursable on the same day for the same recipient as a biopsychosocial evaluation.<br>A bio-psychosocial evaluation is not reimbursable for the same recipient after an in-depth assessment has been completed, unless there is a documented change in the recipient's status and additional information must be gathered to modify the recipient's treatment plan. |
| In-depth assessment, established patient, mental health | H0031 | TS | $100.00 per assessment | Medicaid reimburses one in-depth assessment, per recipient, per state fiscal year.<br>An in-depth assessment is not reimbursable on the same day for the same recipient as a biopsychosocial evaluation.<br>A bio-psychosocial evaluation is not reimbursable for the same recipient after an in-depth assessment has been completed, unless there is a documented change in the recipient's status and additional information must be gathered to modify the recipient's treatment plan. |
| In-depth assessment, new patient, substance abuse | H0001 | HO | $125.00 per assessment | Medicaid reimburses one in-depth assessment, per recipient, per state fiscal year.<br>An in-depth assessment is not reimbursable on the same day for the same recipient as a biopsychosocial evaluation.<br>A bio-psychosocial evaluation is not reimbursable for the same recipient after an in-depth assessment has been completed, unless there is a documented change in the recipient's status and additional information must be gathered to modify the recipient's treatment plan. |
| In-depth assessment, established patient, substance abuse | H0001 | TS | $100.00 per assessment | Medicaid reimburses one in-depth assessment, per recipient, per state fiscal year.<br>An in-depth assessment is not reimbursable on the same day for the same recipient as a biopsychosocial evaluation.<br>A bio-psychosocial evaluation is not reimbursable for the same recipient after an in-depth assessment has been completed, unless there is a documented change in the recipient's status and additional information must be gathered to modify the recipient's treatment plan. |

App_0362

Florida Medicaid Community Behavior Health Fee Schedule

2022

| Description of Service | Procedure Code | Mod | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| Bio-psychosocial Evaluation, mental health | H0031 | HN | $48.00 per assessment | Medicaid reimburses one biopsychosocial evaluation, per recipient, per state fiscal year. A bio-psychosocial evaluation is not reimbursable on the same day for the same recipient as an in-depth assessment. |
| Bio-psychosocial evaluation, substance abuse | H0001 | HN | $48.00 per assessment | Medicaid reimburses one biopsychosocial evaluation, per recipient, per state fiscal year. A bio-psychosocial evaluation is not reimbursable on the same day for the same recipient as an in-depth assessment. |
| Psychological testing | H2019 | | $15.00 per quarter hour | Medicaid reimburses a maximum of 40 quarter-hour units (10 hours) of psychological testing per state fiscal year. |
| Limited functional assessment, mental health | H0031 | | $15.00 per assessment | Medicaid reimburses a maximum of three limited functional assessments, per recipient, per state fiscal year. |
| Limited functional assessment, substance abuse | H0001 | | $15.00 per assessment | Medicaid reimburses a maximum of three limited functional assessments, per recipient, per state fiscal year. |
| Treatment plan development, new and established patient, mental health | H0032 | | $97.00 per event | Medicaid reimburses for the development of one treatment plan per provider, per state fiscal year. Medicaid reimburses for a maximum total of two treatment plans per recipient per state fiscal year. The reimbursement date for treatment plan development is the day it is authorized by the treating practitioner. |
| Treatment plan development, new and established patient, substance abuse | T1007 | | $97.00 per event | Medicaid reimburses for the development of one treatment plan per provider, per state fiscal year. Medicaid reimburses for a maximum total of two treatment plans per recipient per state fiscal year. The reimbursement date for treatment plan development is the day it is authorized by the treating practitioner. |
| Treatment plan review, mental health | H0032 | TS | $48.50 per event | Medicaid reimburses a maximum of four treatment plan reviews, per recipient, per state fiscal year. The reimbursement date for a treatment plan review is the day it is authorized by the treating practitioner. |
| Treatment plan review, substance abuse | T1007 | TS | $48.50 per event | Medicaid reimburses a maximum of four treatment plan reviews, per recipient, per state fiscal year. The reimbursement date for a treatment plan review is the day it is authorized by the treating practitioner. |
| **59G-4.029: Behavioral Health Medication Management Services Coverage Policy** | | | | |
| Medication management | T1015 | | $60.00 per event | Medicaid reimburses medication management as medically necessary. Medication management is not reimbursable on the same day, for the same recipient, as brief group medical therapy or brief individual medical psychotherapy. |
| Behavioral health medical screening, mental health | T1023 | HE | $43.62 per event | Medicaid reimburses two behavioral health medical screening services, per recipient, per state fiscal year. Behavioral health-related medical screening services are not reimbursable on the same day, for the same recipient, as behavioral health-related medical services: verbal interactions, medication management. |

App_0363

Florida Medicaid Community Behavior Health Fee Schedule

2022

| Description of Service | Procedure Code | Mod | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| Behavioral health medical screening, substance abuse | T1023 | HF | $43.62 per event | Medicaid reimburses two behavioral health medical screening services, per recipient, per state fiscal year. Behavioral health-related medical screening services are not reimbursable on the same day, for the same recipient, as behavioral health-related medical services: verbal interactions, medication management. |
| Behavioral health-related medical services: verbal interaction, mental health | H0046 | | $15.00 per event | Medicaid reimburses 52 behavioral health-related medical services: medical procedures, per recipient, per state fiscal year. Behavioral health-related medical services: verbal interactions are not reimbursable on the same day as behavioral health screening services. |
| Behavioral health-related medical services: verbal interaction, substance abuse | H0047 | | $15.00 per event | Medicaid reimburses 52 behavioral health-related medical services: medical procedures, per recipient, per state fiscal year. Behavioral health-related medical services: verbal interactions are not reimbursable on the same day as behavioral health screening services. |
| Behavioral health-related medical services: medical procedures, mental health | T1015 | HE | $10.00 per event | Medicaid reimburses 52 behavioral health-related medical services: medical procedures, per recipient, per state fiscal year. |
| Behavioral health-related medical services: medical procedures, substance abuse | T1015 | HF | $10.00 per event | Medicaid reimburses 52 behavioral health-related medical services: medical procedures, per recipient, per state fiscal year. |
| Behavioral health-related medical services: alcohol and other drug screening specimen | H0048 | | $10.00 per event | Medicaid reimburses 52 behavioral health – related medical services: alcohol and other drug screening specimen collections, per recipient, per state fiscal year. |
| Medication-assisted treatment services | H0020 | | $67.48 weekly rate | Medicaid reimburses medication assisted treatment services 52 times, per recipient, per state fiscal year. The service is billed one time per seven days. This service is not reimbursable using any other procedure code. |
| **59G-4.031: Behavioral Health Community Support Services Coverage Policy** | | | | |
| Psychosocial rehabilitation services | H2017 | | $9.00 per quarter hour | Medicaid reimburses a maximum of 1,920 quarter-hour units (480 hours) of psychosocial rehabilitation services, per recipient, per state fiscal year. These units count against clubhouse service units. |
| Clubhouse services | H2030 | | $5.00 per quarter hour | Medicaid reimburses a maximum of 1920 quarter-hour units (480 hours) annually, per recipient, per state fiscal year. These units count against psychosocial rehabilitation units of service. |
| **59G-4.052: Behavioral Health Therapy Services** | | | | |
| Brief individual medical psychotherapy, mental health | H2010 | HE | $15.00 per quarter hour | There is a maximum daily limit of two quarter-hour units. Medicaid reimburses a maximum of 16 quarter-hour units (4 hours) of brief individual medical psychotherapy, per recipient, per state fiscal year.* Brief individual medical psychotherapy is not reimbursable on the same day, for the same recipient, as brief group medical therapy or medication management. |

Florida Medicaid Community Behavior Health Fee Schedule

2022

| Description of Service | Procedure Code | Mod | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| Brief individual medical psychotherapy, substance abuse | H2010 | HF | $15.00 per quarter hour | There is a maximum daily limit of two quarter-hour units.<br>Medicaid reimburses a maximum of 16 quarter-hour units (4 hours) of brief individual medical psychotherapy, per recipient, per state fiscal year.<br>Brief individual medical psychotherapy is not reimbursable on the same day, for the same recipient, as brief group medical therapy or medication management. |
| Brief group medical therapy | H2010 | HQ | $8.65 per quarter hour | There is a maximum daily limit of two quarter-hour units.<br>Medicaid reimburses a maximum of 18 quarter-hour units (4.5 hours) of group medical therapy, per recipient, per state fiscal year.<br>Brief group medical therapy is not reimbursable on the same day, for the same recipient as brief individual medical psychotherapy or behavioral health-related medical services: verbal interactions, medication management. |
| Individual and family therapy | H2019 | HR | $18.33 per quarter hour | Medicaid reimburses a maximum of 104 quarter-hour units (26 hours) of individual and family therapy services, per recipient, per state fiscal year.<br>There is a maximum daily limit of four quarter-hour units (1 hour). |
| Group therapy | H2019 | HQ | $6.67 per quarter hour | Medicaid reimburses a maximum of 156 quarter-hour units (39 hours) of group therapy services, per recipient, per state fiscal year. |
| **59G-4.370: Behavioral Intervention Services Coverage Policy** | | | | |
| Therapeutic behavioral on-site services, therapy | H2019 | HO | $16.00 per quarter hour | Medicaid reimburses therapeutic behavioral on-site therapy services a maximum combined limit of a total of 36 15-minute units per month (9 hours) by a master's level or certified behavioral analyst. |
| Therapeutic behavioral on-site services, behavior management | H2019 | HN | $10.00 per quarter hour | Medicaid reimburses therapeutic behavioral on-site behavior management and therapeutic behavioral on-site therapy services for a maximum combined total of 36 15-minute units per month (9 hours) by a master's level practitioner, certified behavioral analyst, or certified associate behavioral analyst. |
| Therapeutic behavioral on-site services, therapeutic support | H2019 | HM | $4.00 per quarter hour | Medicaid reimburses therapeutic behavioral on-site therapeutic support services for a maximum of 128 quarter-hour units per month (32 hours), per recipient. |
| Behavioral health day services, mental health | H2012 | | $12.50 per hour | Medicaid reimburses a maximum of 190-hour units per recipient, per state fiscal year.<br>Medicaid will not reimburse for behavioral health day services the same day as psychosocial rehabilitation services. |
| Behavioral health day services, substance abuse | H2012 | HF | $12.50 per hour | Medicaid reimburses a maximum of 190-hour units per recipient, per state fiscal year.<br>Medicaid will not reimburse for behavioral health day services the same day as psychosocial rehabilitation services. |
| **59G-4.127: Florida Assertive Community Treatment (FACT) Services Coverage Policy** | | | | |
| Florida Assertive Community Treatment | H0040 | | $27.40 per day | Medicaid reimburses 1 unit per day for 365 or 366 days per state fiscal year per recipient. |

App_0365

Tab G

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
**Tallahassee Division**

| | |
|---|---|
| AUGUST DEKKER, legally known as KORI DEKKER; BRIT ROTHSTEIN; SUSAN DOE, a minor, by and through her parents and next friends, JANE DOE and JOHN DOE; and K.F., a minor, by and through his parent and next friend, JADE LADUE, | Civil Action No. |
| *Plaintiffs*, | **COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF** |
| v. | |
| SIMONE MARSTILLER, in her official capacity as Secretary of the Florida Agency for Health Care Administration; and FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, | |
| *Defendants*. | |

Plaintiffs AUGUST DEKKER, legally known as KORI DEKKER;[1] BRIT

ROTHSTEIN; SUSAN DOE, a minor, by and through her parents and next friends,

JANE DOE and JOHN DOE;[2] and K.F., a minor, by and through his parent and next

---

[1] Although Plaintiff's legal name is Kori Dekker, he is known by and uses the name August Dekker in accordance with his male gender identity. Accordingly, this Complaint refers to Plaintiff as August and uses male pronouns to refer to him.

[2] As set forth in the motion to proceed pseudonymously, Plaintiff Susan Doe, and her parents and next friends, Jane Doe and John Doe, seek to proceed pseudonymously in order to protect Susan Doe's right to privacy given that she is a

1

friend JADE LADUE,[3] by and through the undersigned counsel, bring this lawsuit against Defendants SIMONE MARSTILLER, in her official capacity as Secretary of the Florida Agency for Health Care Administration, and the FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION ("AHCA") to challenge the adoption of a rule, Florida Administrative Code 59G-1.050(7), prohibiting Medicaid coverage of services for the treatment of gender dysphoria and to seek declaratory and injunctive relief.

## **INTRODUCTION**

1.     A person's access to health care should not be contingent on their sex, gender identity, or whether they are transgender.  Yet, that is exactly the situation in Florida.  AHCA has made access to medically necessary health care for Medicaid beneficiaries contingent on whether they are transgender.

2.     Empirical evidence and decades of clinical experience demonstrate that medical care for the treatment of gender dysphoria, also known as gender-affirming care, is medically necessary, safe, and effective for both transgender adolescents and adults with gender dysphoria.  Gender-affirming care is neither experimental nor

---

minor and the disclosure of her identity "would reveal matters of a highly sensitive and personal nature, specifically [Susan Doe]'s transgender status and [her] diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019).

[3] Because he is a minor, Plaintiff K.F. is proceeding under his initials pursuant to Federal Rule of Civil Procedure 5.2(a).

App_0368

investigational; it is the prevailing standard of care, accepted and supported by every major medical organization in the United States.

3. Under newly adopted Rule 59G-1.050(7) of the Florida Administrative Code (the "Challenged Exclusion"), transgender Medicaid beneficiaries are denied coverage for gender-affirming care to treat gender dysphoria, without regard to the actual generally accepted professional medical standards that govern such care or the particular medical needs of any Medicaid beneficiary. Specifically, any health care service that "alter[s] primary or secondary sexual characteristics" is ineligible for Medicaid coverage, though only when that service is being used to treat gender dysphoria. These same health care services, however, are routinely covered by Medicaid when they are for medically necessary purposes other than the treatment of gender dysphoria.

4. The Challenged Exclusion represents dangerous governmental action that threatens the health and wellbeing of transgender Medicaid beneficiaries.

5. The purpose of Medicaid is to provide health care coverage to individuals who have low income and cannot otherwise afford the costs of necessary medical care. By denying coverage for gender-affirming care, Defendants effectively *categorically* deny access to medically necessary care to thousands of Floridians who lack other means to pay for such care.

App_0369

6.     Defendants' actions not only come within the context of a series of measures the State has adopted targeting transgender people for discrimination, but they stand in sharp contrast not just to the well-established evidence and widely accepted view of the medical and scientific community in the United States, but also to the policies of the vast majority of states, which provide Medicaid coverage for gender-affirming care.

7.     If allowed to remain in effect, the Challenged Exclusion will have immediate dire physical, emotional, and psychological consequences for transgender Medicaid beneficiaries.

8.     These consequences need not occur, however, as the Challenged Exclusion is unlawful in multiple respects and therefore should be preliminarily and permanently enjoined.[4]

9.     First, the Challenged Exclusion, which Defendant Marstiller enforces, violates the United States Constitution's guarantee of equal protection of the laws. Under the Fourteenth Amendment's Equal Protection Clause, Defendants are prohibited from discriminating against persons based on sex and transgender status.

---

[4] Blanket bans like the Challenged Exclusion have been repeatedly found to be unlawful and unconstitutional forms of discrimination. *See, e.g.*, *Fain v. Crouch*, 3:20-cv-00740, Dkt. #271 (S.D.W.V. Aug. 2, 2022) (granting summary judgment in favor of plaintiffs on causes of action also brought in this Complaint); *Flack v. Wis. Dep't. of Health Services*, 3:18-cv-00309-wmc, Dkt. #217 (W.D. Wis. Aug. 16, 2019) (same).

10.     Second, the Challenged Exclusion violates Section 1557 of the Patient Protection and Affordable Care Act (the "ACA"), 42 U.S.C. § 18116, which prohibits discrimination on the basis of sex by health programs or activities, any part of which receives federal funding, such as Medicaid.

11.     Third, the Challenged Exclusion violates the Medicaid Act's Early and Periodic Screening, Diagnostic, and Treatment provisions, which require Defendants to affirmatively arrange for services that are necessary to "correct or ameliorate" a health condition for Medicaid beneficiaries under 21 years of age, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r) ("EPSDT Requirements"), as well as the Medicaid Act's requirement for Defendants to ensure comparable coverage to every Medicaid beneficiary, 42 U.S.C. § 1396a(a)(10)(B)(i) ("Comparability Requirements").

12.     Accordingly, Plaintiffs seek relief related to Defendants' adoption and enforcement of the Challenged Exclusion, including declaratory and preliminary and permanent injunctive relief, as well as compensatory damages, attorney's fees, and costs.

App_0371

## PARTIES

### A.    Plaintiffs

*Plaintiff August Dekker*

13.    Plaintiff August Dekker is a 28-year-old transgender man.  August, who has been diagnosed with gender dysphoria, is enrolled in and receives his health care coverage through Florida's Medicaid program.  At the recommendation of his health care providers, August receives medically necessary hormone therapy to treat his gender dysphoria, which Florida's Medicaid program has covered until now.  August has been enrolled in Medicaid at all times relevant to this complaint.  August lives in Hernando County, Florida.

*Plaintiff Brit Rothstein*

14.    Plaintiff Brit Rothstein is a 20-year-old transgender man.  Brit, who has been diagnosed with gender dysphoria, is enrolled in and receives his health care coverage through Florida's Medicaid program.  At the recommendation of his health care providers, Brit receives medically necessary hormone therapy to treat his gender dysphoria, which Florida's Medicaid program has covered until now, and is scheduled to obtain chest surgery as treatment for his gender dysphoria in December 2022, which Medicaid had pre-authorized.  Brit has been enrolled in Medicaid at all times relevant to this complaint.  As he is college student, Brit lives in Orange

6

County, Florida while he is in school, and lives in Broward County, Florida, along with his family, when he is out of school.

**Plaintiff Susan Doe**

15. Plaintiff Susan Doe is a 12-year-old transgender adolescent girl. Susan Doe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her next friends and parents, Jane Doe and John Doe. Susan, who has been diagnosed with gender dysphoria, is enrolled in and receives her health care coverage through Florida's Medicaid program. At the recommendation of her health care providers, Susan receives medically necessary puberty delaying medication to treat her gender dysphoria, which Florida's Medicaid program has covered until now. Susan has been enrolled in Medicaid at all times relevant to this complaint. Susan, Jane, and John live in Brevard County, Florida.

**Plaintiff K.F.**

16. Plaintiff K.F. is a 12-year-old transgender adolescent boy. K.F. sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friend and parent, Jade Ladue. K.F., who has been diagnosed with gender dysphoria, is enrolled in and receives his health care coverage through Florida's Medicaid program. At the recommendation of his health care providers, K.F. receives medically necessary puberty delaying medication to treat his gender dysphoria, which Florida's Medicaid

7

program has covered until now.  K.F. has been enrolled in Medicaid at all times relevant to this complaint.  Jade and K.F. live in Sarasota County, Florida.

### B. **Defendants**

17.  Defendant Simone Marstiller is sued in her official capacity as Secretary of AHCA, the "single state agency authorized to manage, operate, and make payments for medical assistance and related services under Title XIX of the Social Security Act [Medicaid]." Fla. Stat. §§ 409.902, 409.963 (2022); *see also* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.  Defendant Marstiller is responsible for the enforcement of the Challenged Exclusion.  Defendant Marstiller is responsible for ensuring that the operation of Florida's Medicaid program complies with the United States Constitution and the Medicaid Act and its implementing regulations. Defendant Marstiller's official place of business is located in Tallahassee, Leon County, Florida.

18.  Defendant AHCA is the "single state agency authorized to manage, operate, and make payments for medical assistance and related services under Title XIX of the Social Security Act [Medicaid]."  Fla. Stat. §§ 409.902, 409.963 (2022). As such, AHCA receives federal funding to support the Florida Medicaid Program. AHCA uses the funds it receives from the federal government in part to cover health care services for persons enrolled in the Florida Medicaid Program.  Moreover, AHCA oversees the promulgation of all Medicaid rules, fee schedules, and coverage

App_0374

policies into the Florida Administrative Code. Fla. Stat. § 409.919 (2022). Defendant AHCA is based and headquartered in Tallahassee, Leon County, Florida.

## JURISDICTION AND VENUE

19.    The Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

20.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202, 42 U.S.C. § 1983, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

21.    Under 28 U.S.C. § 1391(b), venue is proper in the U.S. District Court for the Northern District of Florida because all Defendants reside within this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. Venue is proper in the Tallahassee Division of the Northern District of Florida under N.D. Fla. Loc. R. 3.1(B) because it is where the Defendants reside and where a substantial portion of the acts or omissions complained of herein occurred.

22.    This Court has personal jurisdiction over Defendants because they are domiciled in Florida and/or have otherwise made and established contacts with Florida sufficient to permit the exercise of personal jurisdiction over them.

## FACTUAL BACKGROUND

### A.    Gender Identity and Gender Dysphoria

23.    A person's sex is multifaceted, and comprised of a number of characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and most importantly, gender identity.

24.    Gender identity is a person's internal sense of their sex. It is an essential element of human identity that everyone possesses, and a well-established concept in medicine. Gender identity is innate; immutable; has significant biological underpinnings, such as the sex differentiation of the brain that takes place during prenatal development; and cannot be altered.

25.    Gender identity is the most important determinant of a person's sex. Everyone has a gender identity.

26.    A person's sex is generally assigned at birth based solely on a visual assessment of external genitalia. External genitalia, however, are only one of several sex-related characteristics that comprise a person's sex, and as a result, are not always indicative of a person's sex.

27.    For most people, their sex-related characteristics are aligned, and the visual assessment performed at birth serves as an accurate proxy for that person's sex.

10

28.    The term "sex assigned at birth" is the most precise terms to use because not all of the physiological aspects of a person's sex are always in alignment with each other as typically male or typically female.

29.    For these reasons, the Endocrine Society, an international medical organization of over 18,000 endocrinology researchers and clinicians, warns practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.[5]

30.    When a person's gender identity does not match that person's sex assigned at birth, gender identity is the critical determinant of that person's sex.

31.    Individuals whose sex assigned at birth aligns with their gender identity are referred to as cisgender. Transgender people, on the other hand, have a gender identity that differs from the sex assigned to them at birth. A transgender boy or man is someone who was assigned a female sex at birth but has a male gender identity. A transgender girl or woman is someone who was assigned a male sex at birth but has a female gender identity.

---

[5] *See* Wylie C. Hembree, *et al.*, *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society* Clinical Practice Guideline*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869, 3875 (2017), https://perma.cc/FM96-L228 (hereinafter "Endocrine Society Guidelines").

11

32.     The health and wellbeing of all people, including those who are transgender, depends on their ability to live in a manner consistent with their gender identity.

33.     Scientific and medical consensus recognizes that attempts to change an individual's gender identity to bring their gender identity into alignment with their sex assigned at birth are ineffective and harmful.  Attempts to force transgender people to live in accordance with their sex assigned at birth, a practice often described as "conversion," or "reparative" therapy, is universally known to cause profound harm and is widely considered unethical and, in some places, unlawful.

34.     For transgender people, the incongruence between their gender identity and sex assigned at birth can result in clinically significant stress and discomfort known as gender dysphoria.

35.     Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. The World Health Organization's International Classification of Diseases, which is the diagnostic and coding compendia used by medical professionals, refers to the condition as "gender incongruence."  Gender dysphoria is also recognized by the leading medical and mental health professional groups in the United States, including the American Academy of Pediatrics,

12

App_0378

American Medical Association, the American Psychological Association, American Psychiatric Association, and the Endocrine Society, among others.

36.    If left untreated, gender dysphoria can result in debilitating anxiety, severe depression, self-harm, and even suicidality. Untreated gender dysphoria often intensifies with time.  The longer an individual goes without or is denied adequate treatment for gender dysphoria, the greater the risk of severe harms to the person's health.

37.    The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published widely accepted guidelines for treating gender dysphoria.[6]  The goal of medical treatment for gender dysphoria is to eliminate clinically significant distress by helping a transgender person live in accordance with their gender identity.  This treatment is sometimes referred to as "gender transition," "transition related care," or "gender-affirming care."

38.    WPATH is an international and multidisciplinary association whose mission is to promote evidence-based health care protocols for transgender people. WPATH publishes the Standards of Care based on the best available science and expert professional consensus.

---

[6] Endocrine Society Guidelines; World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (7th Version, 2012), https://perma.cc/62K5-N5SX (hereinafter, "WPATH Standards of Care").

13

39.     The WPATH Standards of Care and Endocrine Society Guidelines are widely accepted as best practices guidelines for the treatment of adolescents and adults diagnosed with gender dysphoria and have been recognized as authoritative by the leading medical organizations.

40.     The WPATH Standards of Care and Endocrine Society Guidelines recognize that puberty delaying medication, hormone therapy, and surgery to align a person's primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring) with their gender identity are medically necessary services for many people with gender dysphoria.

41.     The precise treatment of gender dysphoria for any individual depends on that person's individualized needs.  The guidelines for medical treatment of gender dysphoria differ depending on whether the treatment is for an adolescent (minors who have entered puberty) or an adult.  No pharmaceutical or surgical intervention is recommended or necessary prior to the onset of puberty, however. The individualized steps that many transgender people take to live in a manner consistent with their gender identity are known as "a transition" or "transitioning." The precise steps involved in transitioning are particular to the individual but may include social, medical, and legal transition.  Determinations regarding medically necessary care are made on an individualized basis between by the medical professional and the patient.

14

42.     Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life.  Social transition can include wearing attire, following grooming practices, and using pronouns consistent with that person's gender identity.  The steps a transgender person can take as part of their social transition help align their gender identity with all aspects of everyday life.

43.     Many transgender individuals also pursue legal transition, which involves taking steps to formally amend their legal identification documents to align with their gender identity, such as changing one's name through a court ordered legal name change and updating the name and gender marker on their driver's license, birth certificate, and other identification documents.

44.     Medical transition, a critical part of transitioning for many transgender people, includes gender-affirming care that brings the sex-specific characteristics of a transgender person's body into alignment with their identity.

45.     Gender-affirming care can involve counseling, hormone therapy, surgery, or other medically necessary treatments for gender dysphoria.

46.     The most effective treatment for transgender adolescents and adults with gender dysphoria, in terms of both their mental and medical health, contemplates an individualized approach.  Medical and surgical treatment interventions are determined by the health care team (usually involving medical and

15

mental health professionals) in collaboration with the patient, and the patient's parents/guardians, if the patient is an adolescent.

47. Under the WPATH Standards of Care, medical interventions may become medically necessary and appropriate after transgender youth reach puberty. In providing medical treatments to adolescents, pediatric physicians and endocrinologists work in close consultation with qualified mental health professionals experienced in diagnosing and treating gender dysphoria.

48. For many transgender adolescents, going through puberty as the sex assigned to them at birth can cause extreme distress. Puberty delaying medication allows transgender adolescents to pause puberty, thus minimizing and potentially preventing the heightened gender dysphoria and permanent physical changes that puberty would cause.

49. Puberty delaying treatment is reversible. When the adolescent discontinues treatment, puberty will resume. Puberty delaying treatment does not cause infertility.

50. For some transgender adolescents and adults, it is necessary to undergo hormone therapy, which involves taking hormones for the purpose of bringing their secondary sex characteristics into alignment with their gender identity (testosterone for transgender males, and estrogen and testosterone suppression for transgender females). Secondary sex characteristics are bodily features not associated with

16

external and internal reproductive genitalia (primary sex characteristics). Secondary sex characteristics include, for example, hair growth patterns, body fat distribution, and muscle mass development. Hormone therapy can have significant masculinizing or feminizing effects and can assist in bringing transgender people's secondary sex characteristics into alignment with their gender identity, and therefore is medically necessary care for transgender people who need it to treat their gender dysphoria.

51. Gender-affirming surgery might be sought by transgender people after puberty to treat symptoms of gender dysphoria by better aligning their primary or secondary sex characteristics with their gender identity. Though not all transgender people require or seek gender-affirming surgical care, such care can be medically necessary when determined to be in the best interests of the patient and supported by empirical evidence.

52. Gender-affirming medical care can be lifesaving treatment and has been shown to positively impact the short and long-term health outcomes for transgender people of all ages.

53. All of the treatments used to treat gender dysphoria are also used to treat other diagnoses or conditions. These treatments are not excluded from Medicaid coverage under the Challenged Exclusion when used to treat any diagnosis or condition other than gender dysphoria, yet they carry comparable risks and side

17

effects to those that can be present when treating gender dysphoria. Thus, the use of these treatments for gender dysphoria are not any more risky than for other conditions and diagnoses for which the same treatments are regularly used.

54.     The consequences of untreated, or inadequately treated, gender dysphoria, however, are dire, as untreated gender dysphoria is associated with both clinically significant anxiety, depression, self-harm, and suicidality and higher levels of stigmatization, discrimination, and victimization, contributing to negative self-image and the inability to function effectively in daily life.

55.     When transgender people are provided with access to appropriate and individualized gender-affirming care in connection with treatment of gender dysphoria, its symptoms can be alleviated and even prevented.

56.     As such, the American Medical Association, American Psychological Association, American Psychiatric Association, Endocrine Society, American College of Obstetricians and Gynecologists, American Academy of Pediatrics, American Academy of Family Physicians, and other major medical organizations have recognized that gender-affirming care is medically necessary, safe, and effective treatment for gender dysphoria, and that access to such treatment improves the health and well-being of transgender people.  These groups and others have explicitly advocated against blanket bans on gender-affirming care like the Challenged Exclusion.

18

57.     The medical procedures for the treatment of gender dysphoria are not "cosmetic" or "elective" or for the mere convenience of the patient, but instead are medically necessary for the treatment of the diagnosed medical condition. They are not experimental or investigational, because decades of both clinical experience and medical research show that they are essential to achieving well-being for transgender patients with gender dysphoria.

**B.      The Medicaid Act and Florida's Medicaid Program**

**i.        Medicaid Coverage**

58.     The Medicaid Act, Title XIX of the Social Security Act of 1965, 42 U.S.C. §§ 1396-1396w-6, creates a joint federal-state program that provides health care services to specified categories of low-income individuals.

59.     Medicaid is designed to "enabl[e] each State, as far as practicable...to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence and self-care...." 42 U.S.C. § 1396-1.

60.     States are not required to participate in the Medicaid program—but all states do.  States that choose to participate must comply with the Medicaid Act and its implementing regulations. In return, the federal government reimburses each

App_0385

participating state for a substantial portion of the cost of providing medical assistance. *See id.* §§ 1396b(a), 1396d(b), 1396(c).

61. The Medicaid Act requires each participating state to designate a single state agency charged with administering or supervising the state's Medicaid program. *Id.* § 1396a(a)(5). While a state may delegate certain responsibilities to other entities, such as local agencies or Medicaid managed care plans, the single state agency is ultimately responsible for ensuring compliance with all aspects of the Medicaid Act. *See, e.g.*, 42 C.F.R. §§ 438.100(a)(2), 438.100(d).

62. Each participating state must maintain a comprehensive state plan for medical assistance, approved by the Secretary of the U.S. Department of Health and Human Services. 42 U.S.C. § 1396a.

63. The state plan must describe how the state will administer its Medicaid program and affirm the state's commitment to comply with the Medicaid Act and its implementing regulations. *Id.*

64. Under the Medicaid Act, a participating state must provide medical assistance to certain eligibility groups. *Id.* § 1396a(a)(10)(A)(i). One such group is children and adolescents under age 18 whose household income is below 133% of the federal poverty level. *Id.* §§ 1396a(a)(10)(A)(i)(VI)-(VII), 1396a(l). Another mandatory eligibility category is individuals with a disability who receive Supplemental Security Income or meet separate disability and financial eligibility

20

standards established by the state. *Id.* §§ 1396a(a)(10)(A)(i)(II), 1396a(f). States have the option to cover additional eligibility groups. *Id.* §§ 1396a(a)(10)(A)(ii).

65.     States must administer Medicaid in "the best interests of recipients." 42 U.S.C. § 1396a(a)(19).

### ii.     The Medicaid EPSDT Requirements

66.     The Medicaid Act requires each participating state to cover certain health care services, including inpatient and out-patient hospital services and physician services, when medically necessary. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d.  States have the option to cover additional services, including prescription drugs, when medically necessary. *Id.*

67.     One mandatory benefit under Medicaid is Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) services for beneficiaries under age 21.  *Id.* §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r).

68.     The fundamental purpose of the EPSDT Requirements is to "[a]ssure that health problems are diagnosed and treated early, before they become more complex and their treatment more costly."  Ctrs. for Medicare & Medicaid Servs., State Medicaid Manual § 5010.B.

69.     Pursuant to the EPSDT requirements, states must cover four specific, separate categories of screening services: medical, vision, dental, and hearing. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396d(r)(1)-(4).

21

70.     States also must cover "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in [1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." *Id.* § 1396d(r)(5).  In other words, states participating in Medicaid must cover all medically necessary services for beneficiaries under age 21, even when those services are not covered for adults.

71.     Services that fall under 42 U.S.C. § 1396d(a) include inpatient and outpatient hospital services, physician services, and prescription drugs.  *Id.* § 1396d(a)(1), (2), (5)(A), (12).

72.     Gender-affirming medical treatments, including puberty delaying medication, hormone therapy, and surgery come within the services described in section § 1396d(a) and, thus, are EPSDT services when they are necessary to correct or ameliorate gender dysphoria.  *Id.* § 1396d(r)(5) (incorporating services listed in § 1396d(a)).

73.     States must "arrang[e] for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by" screening services.  *Id.* § 1396a(a)(43)(C).

App_0388

74. States must initiate EPSDT services in a timely manner, as appropriate to the individual needs of the beneficiary, and absolutely no later than 6 months from the date of the request. 42 C.F.R. § 441.56(e).

### iii. The Medicaid Comparability Requirements

75. Under the Medicaid Act, "the medical assistance made available to any individual ... shall not be less in amount, duration or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i).

76. "Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b).

77. A state "Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service ... to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

### iv. Florida's Medicaid Program

78. The State of Florida participates in the federal Medicaid program. Fla. Stat. §§ 409.901-409.9205. AHCA is the single state agency in Florida that is responsible for administering and implementing Florida's Medicaid program consistent with the requirements of federal law. *See* Fla. Stat. § 409.902; 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.

23

79.     AHCA contracts with private managed care plans to provide health care services to most Medicaid beneficiaries. Fla. Stat. § 409.964.

80.     The federal government reimburses Florida for approximately 60% of the cost of providing medical assistance through its Medicaid program. *See* U.S. Dep't of Health & Hum. Servs., Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2022 Through September 30, 2023, 86 Fed. Reg. 67479, 67481 (Nov. 26, 2021).

81.     Florida regulations require AHCA to cover health care services that are medically necessary within the scope of Fla. Admin. Code R. 59G-1.035(6), 59G-1.010. To qualify as medically necessary, a service must meet several conditions. *See* Fla. Admin. Code R. 59G-1.010, incorporating by reference AHCA, Definitions Policy at 2.83 (2017) (defining medically necessary care).

82.     For one, the service must be consistent with generally accepted professional medical standards and not experimental or investigational. *Id*.; Fla. Admin. Code R. 59G-1.035. To determine whether a particular service is consistent with generally accepted professional medical standards, AHCA must consider: "(a) Evidence-based clinical practice guidelines. (b) Published reports and articles in the authoritative medical and scientific literature related to the health service (published in peer-reviewed scientific literature generally recognized by the relevant medical

App_0390

community or practitioner specialty associations). (c) Effectiveness of the health service in improving the individual's prognosis or health outcomes. (d) Utilization trends. (e) Coverage policies by other creditable insurance payor sources. (f) Recommendations or assessments by clinical or technical experts on the subject or field." *Id*. § 59G-1.035(4).

83.    After considering those factors, AHCA must submit a report with recommendations to the Deputy Secretary for Medicaid for review, and the Deputy Secretary makes a final determination as to whether the health service is consistent with generally accepted professional medical standards and not experimental or investigational. *Id*. § 59G-1.035(5).

84.    Until August 21, 2022, Florida Medicaid covered the full range of gender-affirming treatments, including puberty delaying medication, hormone therapy, and surgical care.

85.    Effective August 21, 2022, Florida excluded the coverage without any intervening change in federal Medicaid laws or the standard of care for gender dysphoria, as recognized by the medical community.

### C.    Defendants Adopt the Challenged Exclusion and Target Transgender Medicaid Beneficiaries for Discrimination.

86.    On April 20, 2022, Florida's Department of Health ("FDOH") issued a misleading and factually inaccurate set of guidelines titled "Treatment of Gender

App_0391

Dysphoria for Children and Adults" (hereinafter "FDOH Guidelines").[7]  FDOH

issued the FDOH Guidelines in direct response to the fact sheet from the U.S.

Department of Health & Human Services regarding "Gender-Affirming Care and

Young People."[8]

87.    The FDOH Guidelines, which are non-binding in nature, directly

contradicted the guidance from HHS, as well as the established medical guidelines

supported by the country's largest and leading medical organizations.

88.    The FDOH Guidelines stated that:

- Social gender transition should not be a treatment option for children
  or adolescents.

- Anyone under 18 should not be prescribed puberty delaying
  medication or hormone therapy.

- Gender reassignment surgery should not be a treatment option for
  children or adolescents.

89.    Under the WPATH Standards of Care and Endocrine Society

Guidelines, no one is provided pharmaceutical treatment for gender dysphoria until

*after* the onset of puberty.  No surgical interventions are recommended for

---

[7] *See Treatment of Gender Dysphoria for Children and Adults*, FLORIDA DEP'T OF
HEALTH (April 20, 2022), https://perma.cc/W33H-6P5Q.

[8] *See Gender-Affirming Care and Young People*, U.S. Dep't of Health & Human
Servs. (March 2022), https://perma.cc/399W-T6AC.

App_0392

transgender adolescents prior to the age of 18, *except* for limited reconstructive surgery for adolescents who have reached Tanner Stage 5 and for whom it is deemed medically necessary by qualified mental and medical health care professionals.

90.     The FDOH Guidelines were criticized by, among others, a group of more than 300 Florida health care professionals who care for transgender and gender diverse youth.  This group denounced the FDOH Guidelines for citing "a selective and non-representative sample of small studies and reviews, editorials, opinion pieces and commentary to support several of their substantial claims" and misrepresenting "high-quality studies" by making "conclusions that are not supported by the authors of the articles."[9]

91.     The 300 Florida health care professionals further stated that the FDOH Guidelines "contradict[] existing guidelines from the American Academy of Pediatrics, the Endocrine Society, the American Academy of Child and Adolescent Psychiatry and the World Professional Association for Transgender Health," and that "[t]hese national and international guidelines are the result of careful deliberation and examination of the evidence by experts including pediatricians, endocrinologists, psychologists and psychiatrists."

---

[9] Brittany S. Bruggeman, *et al*., *Opinion: We 300 Florida health care professionals say the state gets transgender guidance wrong | Open letter*, TAMPA BAY TIMES (Apr. 27, 2022), https://perma.cc/5UWE-LURH.

App_0393

92.     On April 20, 2022, based on the publication of the FDOH Guidelines, Secretary Marstiller sent a letter to Tom Wallace, AHCA's Deputy Secretary for Medicaid, requesting that AHCA determine if the treatments addressed in the FDOH Guidelines "are consistent with generally accepted professional medical standards and not experimental or investigational."[10]

93.     The request from Secretary Marstiller to Deputy Secretary Wallace was highly unusual, as AHCA does not generally draft a GAPMS report for services that it is already covering.

94.     While AHCA purported to go through its required rule-making process, it was clear the outcome was predetermined: to restrict access to medically necessary gender-affirming care for transgender people in Florida.

95.     On June 2, 2022, Defendants published their report, "Florida Medicaid: Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria" (hereinafter "GAPMS Memo").[11] The publication of the GAPMS Memo was accompanied by the publication of a political webpage within AHCA's website titled "Let Kids Be Kids"

---

[10] *Letter from AHCA Secretary Marstiller to Deputy Secretary Wallace* (April 20, 2022), https://perma.cc/YS7S-DFAX.

[11] AHCA, *Florida Medicaid: Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria* (June 2, 2022), https://perma.cc/SUB9-V7DW.

App_0394

(https://ahca.myflorida.com/letkidsbekids/) that included graphics, misleading "fact-checking" of HHS's guidance, and false assertions about social media's alleged influence on experiences of gender dysphoria.

96.     The GAPMS Memo wrongly concluded that gender-affirming medical treatments, including puberty blockers, hormone therapy, and surgery, "do not conform to GAPMS [("generally accepted professional medical standards")] and are experimental and investigational."  Deputy Secretary Wallace signed the GAPMS Memo and noted his concurrence.

97.     To support this conclusion, the GAPMS Memo cited to, and relied upon, five non-peer-reviewed, unpublished "assessments" that Defendants commissioned.  The "assessments" are the following:

- Romina Brignardello-Petersen, DDS, MSc, PhD and Wojtek Wiercioch, MSc, PhD: Effects of Gender Affirming Therapies in People with Gender Dysphoria: Evaluation of the Best Available Evidence. 16 May 2022.

- James Cantor, PhD: Science of Gender Dysphoria and Transsexualism. 17 May 2022.

- Quentin Van Meter, MD: Concerns about Affirmation of an Incongruent Gender in a Child or Adolescent. 17 May 2022.

App_0395

- Patrick Lappert, MD: Surgical Procedures and Gender Dysphoria. 17 May 2022.

- Kevin Donovan, MD: Medical Experimentation without Informed Consent: An Ethicist's View of Transgender Treatment for Children. 16 May 2022.

98.     These "assessments" illustrate how the GAPMS Memo is the product of bias and was engineered to achieve a particular result.

99.     For example, although the GAPMS Memo presents Dr. Quentin van Meter as an expert in medical treatment for gender dysphoria, at least one court in Texas barred him from providing expert testimony on the on the "question of whether an adolescent transgender child should be administered puberty blockers and whether affirmation of an incongruent gender in a child is harmful or not."[12] Dr. Van Meter is the president of the American College of Pediatricians (not to be confused with the American Academy of Pediatrics).  The American College of Pediatricians is not a professional association but instead a political group that, among other things, opposes marriage equality for same-sex couples, supports the

---

[12] Stephen Caruso, *A Texas judge ruled this doctor was not an expert. A Pennsylvania Republican invited him to testify on trans health care*, PENNSYLVANIA CAPITOL-STAR (Sept. 15, 2020), https://perma.cc/P8AU-3RFC.

30

provision of conversion therapy, and describes childhood gender dysphoria as "confusion."

100.  The GAPMS Memo also cites to Dr. James Cantor as an expert on gender dysphoria.  However, Dr. Cantor admitted in court to having no clinical experience in treating gender dysphoria in minors and no experience monitoring patients receiving medical or surgical treatments for gender dysphoria.[13]

101.  AHCA's GAPMS Memo also cites to an "assessment" authored by Dr. Romina Brignardello-Petersen and a post-doctoral fellow purporting to review the scientific literature regarding gender dysphoria and its treatment. Dr. Brignardello-Petersen has no particular expertise regarding gender dysphoria and is a member of the Society for Evidence Based Gender Medicine ("SEGM"), a group that opposes standard medical care for gender dysphoria, has no publications or conferences, and, upon information and belief, consists solely of a website created by a small group of people.

102.  AHCA cites to an "assessment" by Dr. Patrick Lappert, a non-board-certified plastic surgeon. A federal court recently noted that there is evidence that calls Dr. Lappert's "bias and reliability [to testify regarding gender dysphoria] into

---

[13] In *Eknes-Tucker v. Marshall*, No. 2:22-CV-184-LCB, 2022 WL 1521889, at *5 (M.D. Ala. May 13, 2022), based on Dr. Cantor's lack of experience in providing this type of care, "the Court gave his testimony regarding the treatment of gender dysphoria in minors very little weight."

31

serious question" and that Dr. Lappert "is not qualified to render opinions about the diagnosis of gender dysphoria, its possible causes, … the efficacy of puberty blocking medication or hormone treatments, the appropriate standard of informed consent for mental health professionals or endocrinologists, or any opinion on [] non-surgical treatments," and that his views "do not justify the exclusion" of gender-affirming medical care.[14]

103.   On June 17, 2022, AHCA issued a Notice of Proposed Rule seeking to amend Florida Administrative Code 59G-1.050 to prohibit Florida Medicaid from covering "services for the treatment of gender dysphoria," including: "1. Puberty blockers; 2. Hormones and hormone antagonists; 3. Sex reassignment surgeries; and 4. Any other procedures that alter primary or secondary sexual characteristics."  The Proposed Rule also stated that, "For the purpose of determining medical necessity, including Early and Periodic Screening, Diagnosis, and Treatment (EPSDT)," the aforementioned services "do not meet the definition of medical necessity in accordance with Rule 59G-1.010, F.A.C."[15]

---

[14] *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 3226731, at *12-13, 32 (M.D.N.C. Aug. 10, 2022).

[15] https://www.flrules.org/gateway/View_Notice.asp?id=25979915.

App_0398

104.   The Proposed Rule sought to prohibit Medicaid coverage of medical treatment for gender dysphoria for both transgender adolescents and adults, going beyond the FDOH Guidance.

105.   During the 21 days following the issuance of the Proposed Rule, from June 17, 2022 to July 8, 2022, thousands of comments were submitted by individuals, organizations, and medical professionals across Florida in opposition to the rule.

106.   On July 8, 2022, AHCA held a public hearing on the proposed rule.

107.   The hearing, which was set for 3:00pm on a Friday afternoon, featured a "panel of doctors," none of whom had any clinical experience treating gender dysphoria, to respond to any substantive comments from the audience.  The panel of doctors included: Dr. Andre Van Mol; Dr. Quentin Van Meter; and Dr. Miriam Grossman.

108.   The panel highlighted AHCA's singular focus on prohibiting coverage of and access to medically necessary gender-affirming care.

109.   Dr. Andre Van Mol is a board member of Moral Revolution (https://www.moralrevolution.com/), an organization that believes that "[t]he multitude of possible gender identities and the normalization of same-sex sexual behavior points to a society that has abandoned the desire to accurately define and socialize humanity as a reflection of God's image," and that "[s]ome people

App_0399

experience same-sex attraction and gender dysphoria … not because they were 'born that way,' but because they were born human into a fallen world, and because society has disrupted and confused how we teach children who they are."

110.   In reference to transgender youth, Dr. Miriam Grossman has stated that "conditioning children into believing that a lifetime of impersonating someone of the opposite sex, achievable only through chemical and surgical interventions, is harmful to youths."

111.   The public hearing was also characterized by participants who were flown in from out of state, who did not profess to be Florida Medicaid participants, or who were opponents of transgender rights bussed in to testify in support of the rule.  Many of them were carrying signs and shirts reflecting the "Let Kids Be Kids" slogan that appears on AHCA's webpage regarding the GAPMS Memo.  AHCA allowed stickers containing their slogan to be passed out at the front door and at the sign-in table as attendees entered.

112.   Notwithstanding the seemingly biased nature of the proceedings, thousands of commenters submitted written comments and many testified at the hearing in opposition to the Proposed Rule.  The range of comments highlighted, among other things: the significant and immediate harms that transgender Medicaid beneficiaries in Florida would suffer; the flaws of the GAPMS Memo; the well-documented evidence base for gender-affirming care, including that it is safe and

34

effective for the treatment of gender dysphoria; and that the Proposed Rule was unlawful.

113. Among the comments submitted to Defendants in opposition to the Proposed Rule was a comment by a team of legal and medical experts from Yale Law School, the Yale School of Medicine's Child Study Center and Departments of Psychiatry and Pediatrics, University of Texas Southwestern, and University of Alabama at Birmingham that identifies and refutes the many unscientific claims behind the GAPMS Memo.[16]

114. The comment by the team of experts indicated that:

- **The GAPMS Memo falsely claims that the scientific evidence does not support medical treatment for gender dysphoria.** In fact, medical care for gender dysphoria is supported by a robust scientific consensus. The specific medical services at issue have been used worldwide for decades, meet generally accepted medical standards, and are not experimental.

- **The GAPMS Memo urges a discriminatory policy that violates the federal and state constitutions and federal and state law.** AHCA offered the report to justify the denial of Medicaid coverage for medical

---

[16] *Letter from Anne L. Alstott et al. to AHCA Secretary Marstiller* (July 8, 2022), https://perma.cc/E432-YUQ7.

care for gender dysphoria. But this discriminatory policy illegally targets transgender people. Neither the June 2 GAPMS Memo nor the AHCA proposal would apply to similar treatments routinely offered to cisgender people.

- **The GAPMS Memo repeatedly and erroneously dismisses solid medical research studies as "low quality," demonstrating a faulty understanding of statistics, medical regulation, and scientific research.** The GAPMS Memo makes unfounded criticisms of robust and well-regarded clinical research, while disregarding other relevant studies altogether. If Florida's Medicaid program applied the June 2 GAPMS Memo's approach to all medical procedures equally, it would have to deny coverage for widely used medications like statins (cholesterol-lowering drugs taken by millions of older Americans) and common medical procedures like mammograms and routine surgeries.

- **The GAPMS Memo cites sources that have no scientific merit.** The GAPMS Memo relies on pseudo-science, particularly purported expert "assessments" that are biased and full of errors. The "assessments" are written by authors whose testimony has been disqualified in court and who have known ties to anti-LGBTQ advocacy groups. The GAPMS

36

Memo's unfounded claims come from unqualified sources, which include a blog entry, letters to the editor, and opinion pieces.

115.  The comment by the team of experts was accompanied by the publication of a report, "A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria," that represents the first comprehensive examination of Florida's GAPMS Memo. The authors of this report contend that the GAPMS Memo is a misleading document intended to justify denying Florida Medicaid coverage for gender dysphoria treatment.[17]

116.  In its comment, the American Academy of Pediatrics noted: "[T]he mental and physical health and well-being of transgender children and adolescents often rely on their abilities to access much needed mental and physical health care—care that is in keeping with the widely recognized evidence-based standards of care for gender dysphoria. In proposing this rule, Florida ignores broad consensus among the medical community as to what those evidence-based standards of care are, and instead seeks, for its own discriminatory reasons, to impose alternate standards and

---

[17] *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria* (July 8, 2022), https://perma.cc/XZV3-PBEA.

App_0403

an outright ban of specific treatments for transgender adolescents in the state's Medicaid program."[18]

117.    Similarly, the Endocrine Society submitted a comment stating: "The proposed rule would deny Medicaid beneficiaries with gender dysphoria access to medical interventions that alleviate suffering, are grounded in science, and are endorsed by the medical community. The medical treatments prohibited by the proposed rule can be a crucial part of treatment for people with gender dysphoria and necessary to preserve their health. … [R]esearch shows that people with gender dysphoria who receive puberty blockers and/or hormone therapy experience less depression, anxiety, and suicidal ideation. Several studies have found that hormone therapy is associated with reductions in the rate of suicide attempts and significant improvement in quality of life. In light of this evidence supporting the connection between lack of access to gender-affirming care and lifetime suicide risk, banning such care can put patients' lives at risk."[19]

118.    In addition, interviews with researchers whose studies were cited within the FDOH Guidelines and GAPMS Memo have expressed alarm at how Defendants

---

[18] *Letter from the American Academy of Pediatrics and the Florida Chapter of the AAP to AHCA Deputy Secretary Tom Wallace* (July 7, 2022), https://perma.cc/ND5M-TGYJ.

[19] *Letter from the Endocrine Society to AHCA* (July 8, 2022), https://perma.cc/F5TX-J3JY.

App_0404

have misinterpreted and misrepresented their studies to justify the Challenged Exclusion.[20]

119.   Notwithstanding the thousands of comments submitted to AHCA in opposition to the Proposed Rule, as well as the substantive evidence and extensive commentary submitted by leading medical and legal experts and organizations, Defendants filed the Challenged Exclusion as a final rule for adoption on August 1, 2022, a mere three weeks after the close of the public comment period and without having responded in writing to material or timely written comments, as required by Fla. Stat. § 120.54(3)(e)(4).

120.   Notice of the Final Adopted Version of the Challenged Exclusion was published on FLRules.com on August 10, 2022 and stated that the Challenged Exclusion would become effective on August 21, 2022.[21]

121.   The Challenged Exclusion, in its final adopted form within Florida Administrative Code 59G-1.050, states as follows:

(7) Gender Dysphoria.

(a) Florida Medicaid does not cover the following services for the treatment of gender dysphoria:

---

[20] Sam Greenspan, *How Florida Twisted Science to Deny Healthcare to Trans Kids*, VICE NEWS (Aug. 3, 2022), https://perma.cc/GZ6P-W2WN.

[21] https://www.flrules.org/gateway/View_Notice.asp?id=26157328.

1. Puberty blockers;

2. Hormones and hormone antagonists;

3. Sex reassignment surgeries; and

4. Any other procedures that alter primary or secondary sexual characteristics.

(b) For the purpose of determining medical necessity, including Early and Periodic Screening, Diagnosis, and Treatment (EPSDT), the services listed in subparagraph (7)(a) do not meet the definition of medical necessity in accordance with Rule 59G-1.010, F.A.C.

122.    Coverage for the four services listed within the Challenged Exclusion is still available when those services are medically necessary for the treatment of conditions other than gender dysphoria.

123.    The Challenged Exclusion ignores the established scientific and medical consensus that the four specified services are frequently medically necessary, safe, and effective for treating gender dysphoria.

124.    The Challenged Exclusion results in AHCA refusing to cover medically necessary treatments for gender dysphoria.

125.    In addition, the Challenged Exclusion is one of a series of measures the State has taken targeting transgender people, and LGBTQ people more broadly, for discrimination.

App_0406

126.  For example, surrounding the GAPMS Memo's release and the adoption of the Challenged Exclusion:

a.  The FDOH issued its factually inaccurate April 2022 guidelines titled "Treatment of Gender Dysphoria for Children and Adults";[22]

b.  Florida enacted its infamous "Don't Say Gay" law, Fla. Stat. § 1001.42(8)(c) (2022);[23]

c.  Governor DeSantis removed a state attorney from office for, in part, saying he would refuse to enforce any laws criminalizing gender-affirming care;[24]

d.  The FDOH sent the Florida Board of Medicine ("FBOM") a "Petition to Initiate Rulemaking," asking it to, among other things, adopt a categorical ban on the provision of gender-affirming medical care to people under 18 years of age and, with respect to adults, to adopt a 24-hour waiting period;[25]

---

[22] *Treatment of Gender Dysphoria for Children and Adults*, FLORIDA DEP'T OF HEALTH (April 20, 2022), https://perma.cc/W33H-6P5Q.

[23] Enacted July 1, 2022, the law seeks to erase LGBTQ people and related content from Florida public schools.  The widely used "Don't Say Gay" moniker fails to recognize the harms this law intentionally inflicts upon transgender people and others who identify as members of the LGBTQ community.

[24] Florida Executive Order No. 22-176 (Aug. 4, 2022), https://perma.cc/VSG9-2SUJ.

[25] *Petition to Initiate Rulemaking Setting the Standard of Care for Treatment of Gender Dysphoria* (July 28, 2022), https://perma.cc/3PP7-N6WW.

App_0407

e. The FBOM initiated a rulemaking process for a proposed rule to, among other things, ban gender-affirming care for people under the age of 18;[26]

f. The Florida Department of Business and Professional Regulation lodged a public nuisance complaint against a bar catering to transgender people when that bar had a drag queen reading event;[27] and

g. Florida officials and their spokespersons made a litany of statements denigrating transgender people.[28]

127. The discriminatory animus by Defendants toward transgender people is clearly evident by their actions, as the adoption of the Challenged Exclusion deliberately targets transgender people for discrimination in Florida.

---

[26] *Meeting Minutes*, FLORIDA BOARD OF MED. (Aug. 5, 2022), https://perma.cc/52A3-2E5V.

[27] *Fla. Dep't of Bus. and Prof. Reg., Div. of Alcoholic Beverages and Tobacco v. R House, Inc.*, Case No. 2022-035976, Admin. Complaint (July 26, 2022), https://perma.cc/8DRL-KVWY.

[28] Jeremy Redfern (@JeremyRedfernFL), Twitter (Aug. 14, 2022), https://tinyurl.com/2p8vajvw; Governor Ron DeSantis (@GovRonDeSantis), Twitter (Aug. 16, 2022), https://tinyurl.com/yckkuh32; Christina Pushaw (@ChristinaPushaw), Twitter (Aug. 19, 2022), https://tinyurl.com/2p8r5r6c.

42

### D.    The Plaintiffs

*Plaintiff August Dekker*

128.    August Dekker is a 28-year-old transgender man.

129.    August is unemployed and receives Supplemental Security Income due to disability, as he lives with debilitating rheumatoid arthritis.  He has been a Medicaid beneficiary in Florida since 2014.

130.    August experiences and has been diagnosed with gender dysphoria.

131.    As a child, even as early as 5 years of age, August felt uncomfortable being perceived as a girl.  For example, he would always choose to play a male character when he was roleplaying with his brothers and would also play male characters when he would play "house."

132.    Around the age of 13, August was extremely distraught when he got his first period.  He ran to his mom crying and wondering what was happening because he did not feel that he was a girl.

133.    However, because of his family's religious beliefs, August felt forced to suppress his gender identity as a child and adolescent, which caused him great distress and anxiety.

134.    Once he graduated high school, August felt freer to explore his gender expression and come to terms with his gender identity as a man.  By 2015, August began to socially transition and live openly as the man that he is.

43

135.   Not long after, August decided to seek out medical care. It took him a while to find a provider who would be qualified and with whom he felt comfortable. Once he found a provider at Metro Inclusive Health in Tampa, August began working with a therapist before starting hormone therapy.  The therapist diagnosed August with gender dysphoria in 2017.

136.   Following the diagnosis of gender dysphoria and working with and under the care of his medical and mental health providers, August began undergoing hormone therapy as medically necessary treatment for his gender dysphoria in 2017.

137.   August has since worked with different medical and mental health providers, who continue to recommend hormone therapy as medically necessary treatment for his gender dysphoria.  He now sees a therapist at Solace Behavioral Health in Tampa and receives his hormone therapy through Planned Parenthood in Tampa.

138.   At present, at the recommendation of his medical and mental health providers, August is being prescribed testosterone hormone therapy as treatment for his gender dysphoria.  The prescription must be written every month.  Up until now, Medicaid has covered August's testosterone hormone therapy.

139.   In addition, in consultation with and under the care of his medical and mental health providers, August obtained chest surgery as treatment for his gender dysphoria in April 2022.  This surgical treatment, which was covered by Medicaid,

44

was recommended by his providers as medically necessary treatment for August's gender dysphoria. And it was covered by Medicaid.

140. Medicaid has always covered August's medically necessary gender-affirming medical care as recommended by his medical and mental health providers to treat his gender dysphoria.

141. Being able to receive hormone therapy in the form of testosterone injections and to have chest surgery has allowed August to bring his body into alignment with who he is, provided a great deal of relief to August, and relieved some of the clinically significant distress underlying his gender dysphoria. It has given August the ability to not hate himself or his body and has brought great comfort to his life.

142. Having access to this medically necessary care has allowed August to be the version of himself that he pictured growing up. For August, it feels natural and normal to be able to live as the man that he is.

143. Following his chest surgery, August was able to celebrate his birthday with some friends outdoors in a state park. Having a more masculine chest that conformed with his identity allowed August to be shirtless in public for the first time ever, just like any other man. It was an afternoon full of joy and laughter for August, and he had never felt more euphoric about his body than he did in that moment.

App_0411

144.   AHCA's adoption of the Challenged Exclusion has caused August a great deal of distress and anxiety.  When August first learned of the new regulation, he felt a great sense of dread.  August is now fearful of the future.

145.   August's only source of income is his monthly Supplemental Security Income payments of $841.  He uses this limited income to pay for rent, food, and necessities, and simply cannot afford his medically necessary hormone therapy without Medicaid, which would cost $60-65 per month.

146.   While August could ask some family and friends for money in order to afford his medically necessary care, that is neither guaranteed nor sustainable.  It also feels dehumanizing and shameful to August to have to ask for help all the time, especially when his hormone therapy is medically necessary health care recommended by his doctors and which Medicaid has covered until now.

147.   August also has experienced the physical effects of having to stop hormone therapy for a period of time.  That experience caused him to lose muscle mass, have a higher pitched voice, and lose some of his body and facial hair such that it caused him distress and to a degree that people started perceiving him as a woman instead of the man that he is.  It caused August great discomfort and anguish to be perceived as such, and he does not want to ever have to experience that again.

148.   The adoption of the Challenged Exclusion, along with other actions taken by Florida's current administration targeting transgender people, have shaken

46

August and caused him to lose hope. August no longer feels safe to be an out transgender person in Florida. Because of the discrimination he sees stoked by Florida's policy decisions to target transgender people, August often worries that someone will perceive him as transgender and decide they want to hurt him. He is frightened about the possibility that losing access to his medically necessary gender-affirming care will cause physical changes that will make it more likely for someone to perceive him as transgender or more feminine. If someone perceives him as transgender or more feminine, August is afraid that they will verbally or physically assault him.

149.   It is incredibly stressful and debilitating for August to have to worry about whether he will be able to get the medical care that he needs, or whether in its absence, he will be incorrectly perceived as female.

150.   The Challenged Exclusion threatens the health and wellbeing of transgender Medicaid beneficiaries like August.

### *Plaintiff Brit Rothstein*

151.   Brit Rothstein is a 20-year-old transgender man.

152.   Brit is a junior in at the University of Central Florida (UCF), where he is studying digital media and minoring in information technology. Brit has a full scholarship to attend UCF, which is the only way that he is able to go to college as his family is low-income and could not otherwise afford tuition and living expenses.

47

App_0413

Brit worked hard to obtain a Florida Bright Futures scholarship so that he would be able to attend college. He also received a Top Ten Knights Scholarship from the UCF. In addition, Brit participates in a federal work study program, which provides part-time jobs for students with financial need, while taking 15 credits this semester.

153. Given his and his family's very limited income, as well as his age, Brit receives his health care coverage through Florida's Medicaid program, as administered through Sunshine Health.

154. A transgender man, Brit was incorrectly assigned the sex female at birth, but his gender identity is male.

155. Brit experiences gender dysphoria in relation to the disconnect between his sex assigned at birth and his gender identity.

156. Since the third grade, Brit has been aware of his male gender identity. When he was younger, Brit's mom would try to force him to wear dresses to church but he hated dresses and would only want to wear slacks. He also did not understand why he could not have short hair. Even as a child, stereotypical assumptions and expectations regarding his sex assigned at birth did not make sense to him.

157. In the sixth grade, as he approached puberty, Brit's anxiety and depression surrounding his sex assigned at birth was exacerbated, and he would become physically ill when he had to go into the girls' locker room for P.E. Fortunately, there was a guidance counselor who understood the discomfort that Brit

48

experienced in the locker room and the manifesting anxiety and distress it caused him, so she helped him transfer out of P.E.

158.   While he was in the seventh grade, Brit was seeing a therapist due to unrelated issues.  His therapist saw how much Brit was struggling with not being able to live his life as a boy and, through his sessions with his therapist, Brit became more comfortable with how he was feeling and came to understand that he was a boy.  Brit's therapist also helped Brit navigate how to talk to others about his gender identity.

159.   After a lot of research about how to explain to his family how he felt and that he was transgender, Brit came out to his dad in 2015, at age 13, and asked that he be treated in accordance with his male gender identity.  Brit's parents are divorced, and he came out only to his dad at first.  Brit's dad was very supportive and allowed Brit to wear a binder (a garment that helps to give the appearance of a flatter chest) at his house and live as his true authentic self when he was there.

160.   Unfortunately, Brit was not able to do the same at his mother's house because she disapproved of him.  For example, when Brit came out to his mother as transgender in 2016, she called him an "abomination" and disowned him.  Brit has not had any contact with his mother or her side of the family since then.

161.   Around July 2015, when Brit was 14 years old, Brit began seeing a psychologist, and continued therapy with her until he went to college.  Brit's

App_0415

psychologist diagnosed him with gender dysphoria and, after a couple of years of counseling, the psychologist referred Brit to Joe DiMaggio Children's Hospital to meet with a pediatric endocrinologist.

162.   Because Brit's mother objected to the medical care for Brit's gender dysphoria recommended by Brit's mental health and medical providers, Brit's dad had to go to court, where he was granted by the court sole decision-making authority as it related to issues involving Brit's gender identity.

163.   Thereafter, when Brit was 17 years old, he began to see a pediatric endocrinologist at Joe DiMaggio.  By then, Brit had been diagnosed with gender dysphoria approximately four years prior and had been in consistent and regular counseling since that time.  Brit was also living in accordance with his male gender identity to the maximum extent possible, given his family situation.

164.   Brit's pediatric endocrinologist determined that it was medically necessary for Brit to begin hormone blockers, which she prescribed for him, and oversaw his treatment.  Months later, Brit also began testosterone hormone therapy as medically necessary treatment for his gender dysphoria at his pediatric endocrinologist's recommendation.  Medicaid has covered Brit's gender-affirming health care needs, including therapy, blood tests, office visits, and his prescriptions for hormone blockers and testosterone.

50

165.   Hormone therapy, in the form of testosterone, has impacted Brit's life in many positive ways, including the changes to his physical body, his mental and emotional health, and even the self-confidence he has gained through existing in a body that feels more like his own.

166.   When he was 18, Brit was able to obtain a court order for legal name change, changing his legal name to Brit Andrew Rothstein, which aligned with his gender identity and who he knows himself to be.  Brit also amended his legal government-issued identification documents to reflect his new legal name and correct gender marker as male.

167.   Still, however, Brit continues to experience significant dysphoria related to his chest.  Ever since his chest developed, Brit has hated the way it looks and feels, and has long known that he needs to have chest surgery to bring his body into alignment with who he is.

168.   Brit wears a binder almost every day, usually for 10-12 hours per day, depending on his schedule. His binder causes him discomfort, leaves skin indentations, and sometimes causes bruising on his ribcage.  In 2018, Brit had to go to the emergency room for chest contusions caused by wearing his binder for too long.  Having top surgery would allow Brit to no longer wear a restrictive binder just to navigate his daily life.  Unfortunately, there are very few medical providers in

51

Florida who are both competent in performing gender-affirming chest surgery, and even fewer who also take Medicaid.

169.   Brit finally found a surgeon at the University of Miami who accepts Medicaid for chest surgeries in January 2022.  Brit had his consultation with the surgeon in May and the surgeon recommended that Brit undergo gender-affirming chest surgery, which was pre-authorized by Medicaid.  When Brit received his pre-authorization on August 11, 2022, he felt blessed to finally have the chance to obtain the gender-affirming care he needed.

170.   Brit was elated to learn that he would finally be getting the surgery that he needed and had long awaited, and he even had a date scheduled: December 22, 2022.  For Brit, it would be an understatement to say that he was looking forward to the surgery.  The surgery would allow Brit to bring his body into alignment with who he is.  It would also eliminate the need for Brit to wear a restrictive and painful binder to hide that part of his body.

171.   However, the very next day after Brit learned his surgery had been pre-authorized, Brit learned that AHCA adopted a rule that prohibited Medicaid coverage for Brit's medically necessary gender-affirming chest surgery.  To Brit, it was a punch to the gut to learn that the state of Florida had decided to strip coverage for medically necessary medical care from him and other transgender Floridians on Medicaid.  It was the highest of highs followed by the lowest of lows.

App_0418

172.   What is worse, without Medicaid, Brit cannot afford to pay for his testosterone prescription or for his surgery, which is still scheduled for December 22, 2022.   Because of the Challenged Exclusion, Brit is unable to access to the medical care for his gender dysphoria that his medical providers have determined is medically necessary for his health and wellbeing.

173.   Brit's family is also of very limited income, and he does not have family members who can pay for his care.  Brit's dad is a single parent, who has arranged his entire life around being the sole-caretaker for Brit's twin sister, who lives with cerebral palsy and other disabilities.  Brit's dad needs to have the same schedule as his sister because she requires around the clock care and attention.  As such, Brit's has worked as a teachers' assistant for students with special education needs in the Broward County School District, a job which pays approximately $21,000 per year. Brit's dad is thus barely able to make ends meet and cannot afford to financially help Brit access the medical care he needs.

174.   Brit has spent a long time fighting to become the man that he knows himself to be.  He has overcome obstacles and worked hard to get an education and have access to the medical care his providers have deemed medically necessary to treat his gender dysphoria, yet Defendants have created an unnecessary additional barrier blocking Brit from the medical care that he needs, and which would allow him to feel like his body is in alignment with who he truly is.

App_0419

175.   Even though Brit is legally male in the eyes of the state and federal government, has testosterone circulating through his body, and has grown facial hair, Brit still lives in fear every day that he will be misperceived as female or perceived as transgender due to his chest.

176.   In high school, Brit recognized how fortunate he was to have a supportive parent who loved him for who he is.  Not everyone has that.  There were multiple students at Brit's high school who attempted or died by suicide, so Brit decided that he needed to advocate for those who did not have the support that he had from his dad.  As a result, Brit was invited to join the Broward County Superintendent's LGBTQ+ Advisory Council, and Brit was the President of his school's Gay/Straight Alliance (GSA) Club.  Brit supported his fellow transgender classmates the best that he could, because Brit believes that everyone deserves to feel accepted for who they are.

177.   For Brit, the State's decision to deny transgender people, like himself, of access to medically necessary health care and being treated differently than others solely for being transgender is unthinkable and wrong.

### *Plaintiff Susan Doe*

178.   Susan Doe is the daughter of Jane and John Doe.

179.   Jane Doe is a full-time mom and homemaker.  John Doe works for the federal government.  He has worked there for 19 years.

App_0420

180.   Along with their two children, Jane and John live in Brevard County, Florida.

181.   Jane and John adopted Susan, their 12-year-old daughter, out of medical foster care in Florida when she was 2 years old.

182.   Susan is transgender.

183.   When Jane and John adopted Susan out of foster care, Susan had several medical issues.  She was originally placed in regular foster care and was then moved into the medical foster care program after an incident where she stopped breathing as an infant.  At the time she came into the Does' care, she had severe acid reflux that needed treatment and was barely meeting developmental milestones.

184.   Because Jane and John adopted Susan out of foster care, she is eligible for Medicaid coverage until she turns 18.  Susan has thus been eligible for and enrolled in Florida's Medicaid program since she entered Florida's foster care system as an infant.  Jane and John have kept Susan on Medicaid in order to ensure continuity of care with her existing providers and to ensure that her medical needs are properly met.

185.   Although Susan was assigned male at birth, she has known that she is a girl from a very young age.  When she was 3 years old, Susan first told her parents that she was a girl.  Jane and John allowed Susan to explore her gender expression in deliberate and gradual steps.  For example, Susan liked to wear ribbons in her hair

App_0421

and pink bracelets to school, even when she still wore typical boy clothes and had not yet grown out her hair. Jane and John kept princess dresses for Susan at home, and she would often change into a dress as soon as she came home from school.

186. When Susan was in first grade, she became extremely unhappy with her assigned gender. Before that time, she had mostly been a very happy-go-lucky child, but starting in first grade she began getting angry and frustrated easily, and then would become incredibly sad, often crying for 20 minutes or more.

187. Jane and John consulted resources online and researched gender dysphoria in children, and as Susan's parents, had to acknowledge that the discrepancy between Susan's sex assigned at birth and how she felt inside was causing her to suffer.

188. The Does looked for a therapist for Susan. Ultimately, Susan and Jane were able to go to one session with a therapist when Susan was 6, and the therapist advised Jane on how to best support Susan. The therapist told Jane to keep listening to Susan and to allow her to express herself, as Jane and John had been doing. The therapist also suggested buying clothes from the girls' department that were gender neutral so Susan could wear them to school without attracting attention about her gender presentation.

App_0422

189.   Susan had her last short haircut when she was 6 years old, and when she saw how it looked, she started crying because she felt like the short haircut did not reflect her identity.  After that, she started growing out her hair.

190.   Around the same time, Jane found out that Susan had started to introduce herself to people with her chosen name, which has since become her legal name, and is more typically feminine.

191.   During the summer of 2017, which was the summer before Susan started second grade, Susan told Jane and John unequivocally: "I need to be a girl." To ensure that they were properly supporting Susan, Jane and John took Susan to see a therapist as a family.  The therapist diagnosed Susan with gender dysphoria. The therapist also made clear to the Does that Susan knows exactly who she is and that any problems stemmed from when people question Susan's identity.   The therapist thus recommended Jane and John continue to support Susan in her social transition.

192.   Following the therapist's advice, Jane and John followed Susan's lead and bought her more traditionally feminine clothes, including dresses and skirts to wear to school.  Jane and John also worked with the principal and teachers at Susan's school to try to make sure that they used the appropriate name and pronouns for Susan.  In addition, the therapist shared with Jane and John, and the Does in turn

shared with Susan's school, the latest research on helping children with gender dysphoria adjust well at school, in addition to in the home.

193.   After Susan was able to socially transition and live in accordance with her firmly asserted female gender identity, Jane and John observed Susan feeling a sense of joy.  Susan was happy and comfortable in her own skin.

194.   In addition, the therapist further recommended that Susan see a pediatric endocrinologist, who could monitor her hormone levels for the onset of puberty and assist with any future medical needs.

195.   Jane and John looked for a pediatric endocrinologist that was close to them, but ultimately began working with a pediatric endocrinologist at Joe DiMaggio Children's Hospital in south Florida.  Susan has been seeing her pediatric endocrinologist since 2019.  The Does drive three hours there and three hours back for every appointment.  Initially, the pediatric endocrinologist closely monitored Susan's hormone levels to determine the onset of puberty.  Susan had visits approximately every three months.

196.   Jane and John have been very deliberate in their approach to supporting Susan.  Their goal has always been to support their daughter while following the advice and recommendations of medical and health professionals experienced in dealing with gender identity and gender dysphoria.

App_0424

197.    In July 2020, after Susan began the onset of puberty, the pediatric endocrinologist started Susan on a puberty delaying medication called Lupron as medically necessary treatment for Susan's gender dysphoria.  The medication, which Medicaid has been covering, prevents Susan from developing secondary sex characteristics consistent with male puberty.    According to the pediatric endocrinologist, it is medically necessary for Susan to receive a Lupron injection every three months in order for her to live authentically in a manner consistent with her gender identity and to treat her gender dysphoria.  By preventing the physical manifestations that accompany male puberty, Susan is also able to avoid negative social and emotional consequences associated with her being forced to develop the characteristics aligned with a gender with which she does not identify.

198.    When Susan learned that the puberty delaying medication was necessary to suppress male puberty, she was happy at the prospect.  There is nothing worse in Susan's mind than male puberty; she describes it as a "nightmare."

199.    Susan's pediatric endocrinologist is currently monitoring Susan to determine when it would be medically appropriate for her to begin hormone therapy.  Susan is very eager to go through female puberty.   At this point, the pediatric endocrinologist thinks that Susan could be ready to start hormone therapy in a year or two.

App_0425

200.   In August 2021, the Does' therapist retired from her practice.   In November 2021, Susan began seeing another therapist, who is a Licensed Clinical Social Worker.   Like the first therapist, the second therapist diagnosed Susan with gender dysphoria.   The second therapist has further supported Susan in managing the symptoms of her dysphoria.

201.   In light of Defendants' adoption of the Challenged Exclusion, the Does understand that Florida's Medicaid program will no longer cover Lupron for Susan as treatment for her gender dysphoria.   The Challenged Exclusion will also prohibit Medicaid from covering hormone therapy as treatment for Susan's gender dysphoria when Susan is ready to begin the treatment, per the medical guidance of her pediatric endocrinologist.

202.   Susan is due to have her next Lupron injection on October 3, 2022.   Due to the Challenged Exclusion, Medicaid will refuse to pay for the medically necessary Lupron injection when it is needed.

203.   Jane and John worry about the potential physical and mental health consequences of depriving Susan of the medically necessary treatment recommended by her doctors.   Not providing such treatment is not an option for them.   For Jane and John, providing Susan with the medical treatment for gender dysphoria that she requires is necessary to ensure her health and well-being.

60

204.   If Susan had to stop taking Lupron and go through male puberty as a result of the Challenged Exclusion, she would be devastated.  Susan has been living as a girl in every aspect of her life since 2017.  Her legal name was changed to her current affirmed name in 2018, and in 2020, her birth certificate was amended to reflect that she is female.

205.   If Susan were no longer able to access the medical care that she needs to align her body with her gender identity, Susan's mental health would suffer tremendously.  Susan would not want to leave the house, and Jane and John fear that she might engage in self-harm. Going through male puberty would be torture for Susan.  It would also be agony for Jane and John to watch Susan suffer needlessly when this could be easily eliminated with what they understand to be effective medical care for treating their daughter's gender dysphoria.

206.   Through their experience with Susan's medical treatment and extensive conversations with her medical providers over the past five years, Jane and John understand that gender-affirming treatment is medically necessary, safe, and effective treatment for Susan's gender dysphoria.

207.   Unlike Susan, Jane and John receive their health coverage through John's employer-provided health plan.

208.   While the Does can add Susan to John's health plan, they cannot do so until the open enrollment period near the end of the year, and Susan's coverage

61

would not start before January 1, 2023. Thus, given her need for her next Lupron shot in early October 2022, this is not a feasible solution.

209. In any event, as a child adopted out of foster care, Susan is entitled to have her medical needs covered by Medicaid and Jane and John should not have to move Susan to John's employer-provided health plan in order for her to continue receiving medically necessary care.

210. With Medicaid no longer covering Susan's Lupron treatment, Jane and John will have no choice but to try to pay for her upcoming three-month Lupron injection out of pocket. Based on their research, the retail price for a single Lupron shot is roughly $11,000. As the parents of two children with only one income, Jane and John do not have sufficient resources to provide this care without sacrifice. Jane and John would have to take on debt to pay for Susan's puberty delaying medication and it would be a hardship for them.

211. Even if the Does are able to add Susan to John's health plan, Susan's health care would be more expensive for them, as they would have a $300 annual deductible for Susan and higher cost-sharing for Susan's gender-affirming care. These are costs they did not have prior to the Challenged Exclusion due to Medicaid's coverage of the medical treatment for Susan's gender dysphoria.

App_0428

212. Jane and John not only worry about the multitude of harms that would be imposed on their family by the Challenged Exclusion, but also about the effect that Defendants' actions will have on other transgender people and their families.

213. The Does have begun considering moving out of state in order to protect their daughter from state-sponsored discrimination. Jane and John do not wish to move if it can be avoided, as, among other things, it could mean John having to switch jobs and separating Susan and their son from their long-term health care providers, friends, and family. That said, the health and wellbeing of their adolescent children are paramount to them.

214. The Does consider Defendants' decision to stop covering medically necessary gender-affirming medical care through Medicaid to be tragic and dehumanizing. They are concerned about the message the State of Florida is sending by excluding transgender people from Medicaid coverage to which they otherwise would be entitled simply because they are transgender.

215. Jane and John keep in touch with other families in the LGBTQ+ affirming foster care community and are concerned for the ability of some children to find foster and adoptive families because of the state's hostility toward LGBTQ+ people and concerns about being able to meet the health care needs of those children through Medicaid.

*Plaintiff K.F.*

216.  K.F. is the 12-year-old son of Jade Ladue and stepson of Joshua Ladue.

217.  Joshua has raised K.F. since he was three years old and K.F. considers and calls Joshua "dad."

218.  Jade is a patient coordinator at a dental office, while Joshua receives Social Security Disability Insurance because he is diagnosed with venous malformation, a type of vascular condition that results from the veins in his leg having developed abnormally.

219.  K.F., Jade, and Joshua all live in Sarasota County along with K.F.'s four siblings, ranging in age from five to sixteen years old.  They moved to Florida from Massachusetts as a family in August 2020.

220.  K.F. is transgender.

221.  Because of K.F.'s age and the Ladue family's income, he is eligible for Medicaid.  He has been eligible for and enrolled in the program since he and his family moved to Florida.  Prior to the Ladue family's move, K.F. was enrolled in Massachusetts's Medicaid program.

222.  Although K.F. was assigned female at birth, he has known he was a boy from a very young age.  When he was 7 years old, he came out to his grandparents during a camping trip, telling them that he has known since he was four years old that he is a boy and was born in the wrong body.  In looking back on K.F.'s

childhood, both Jade and Joshua see that K.F. was showing them that he was a boy well before that conversation K.F. had with his grandparents. K.F. always wanted to wear traditional boy clothes (no dresses or skirts), insisted on his hair being kept short, and loved to play shirtless with other boys in their neighborhood.

223. K.F. has never wavered about his gender identity.

224. As with all of their children before their pre-teen years, Joshua and Jade established strict limitations on K.F.'s consumption of television, movies, videos, and video games. At the age of seven, when K.F. came out as transgender, he had never heard of the concept of gender dysphoria, or transgender people, beyond his own experience, which he described first to his grandparents, and then to Jade and Joshua, as simply "being a boy."

225. After K.F. confided in his parents, Jade decided the next best step would be to locate a therapist who specializes in gender dysphoria. Soon after, K.F. had his first appointment with a Licensed Mental Health Counselor. After thorough evaluation, the therapist was the first to diagnose K.F. with gender dysphoria and made sure that Jade and Joshua understood K.F.'s diagnosis and walked them carefully through what they should expect as K.F. got older.

226. After K.F. began therapy, Jade joined a local PFLAG group, an organization which is dedicated to supporting, educating, and advocating for

65

App_0431

LGBTQ+ people and their families. She joined the group because it was important to her and Joshua that they demonstrate to K.F. their commitment to supporting him.

227. K.F. was living fully in accordance with his male gender identity in every aspect of his home life and he wanted to be treated accordingly at school. Thus, when K.F. entered the second grade, K.F.'s therapist helped facilitate a meeting between Jade and his school administrators and teachers to talk about K.F.'s gender identity and what actions the school should take to ensure he was fully affirmed and supported as a boy with his classmates in the school environment.

228. Once K.F.'s licensed mental health provider gave her professional recommendation that it was appropriate for K.F. to begin seeing a pediatric endocrinologist, she referred K.F. to the Gender Multispecialty Service (GeMS) Program at Boston Children's Hospital, the first pediatric and adolescent transgender health program in the United States. K.F. had his first appointment with the GeMS Program on September 13, 2015. That first appointment was incredibly thorough, lasting over two hours, and was overall a very happy occasion. It was clear to Jade that K.F. would be receiving the best possible care and the team of providers confirmed everything that K.F.'s therapist had told them: that K.F. is a transgender boy and that his parents and extended family supporting him in his affirmation of his male gender identity was the best decision for his health and well-being.

66

229.  GeMS continued K.F.'s therapy and started him with pediatric nurse practitioner.  The nurse practitioner's role was to monitor K.F.'s hormone levels for the onset of puberty and assist with any future gender-affirming health care needs.  K.F.'s care with GeMS continued until the family moved to Florida in August 2020.

230.  Before the Ladue family moved, in the summer of 2020, K.F.'s medical providers determined that based on the onset of K.F.'s puberty, it was medically necessary for K.F. to receive his first puberty delaying medication.  At the recommendation of K.F.'s medical providers, K.F. received a Supprelin implant, a form of puberty delaying medication which would prevent the onset of secondary sex characteristics typical of girls and women.  K.F. received the implant on August 8, 2020, and it was fully covered by Massachusetts' Medicaid program.

231. According to K.F.'s former and current medical providers, it is medically necessary for K.F. to receive puberty delaying medication so that K.F. can live authentically in a manner consistent with his gender identity and to treat his gender dysphoria.  By preventing the physical manifestations that would accompany the puberty of his sex assigned at birth, K.F. is also able to avoid negative social and emotional consequences associated with his being forced to develop secondary sex characteristics that do not align with his male gender identity.

232.  As his parent, it is also important to Jade and Joshua that K.F. be able to choose with whom to disclose this deeply personal, private information about

App_0433

himself. Because of the puberty delaying medication, K.F. has that option, and the inherent protection and privacy that it provides.

233. When Jade and Joshua decided to move their family to Florida, Jade researched programs in the state that offered the same or similar level of care afforded by GeMS. Finding a program that offers high quality gender-affirming care and that accepts Medicaid can be challenging. Fortunately, through that research, Jade found the Emerge Gender & Sexuality Clinic for Children, Adolescents and Young Adults based at Johns Hopkins All Children's Hospital (Johns Hopkins Gender Clinic) located in St. Petersburg, Florida.

234. Once they moved, K.F. initiated care with a doctoral-level pediatric nurse practitioner specializing in endocrinology at the Johns Hopkins Gender Clinic. In April 2022, K.F. received his second Supprelin implant which was fully covered by his Florida Medicaid plan.

235. K.F. typically visits the Johns Hopkins Gender Clinic every six months. Recently, however, K.F. has had more frequent visits because his medical provider is monitoring whether K.F.'s second implant is adequately suppressing puberty and there is a possibility that K.F. may need a different type of puberty delaying medication to suppress puberty and successfully continue his medical transition. K.F. has another appointment scheduled at the end of October 2022 to check in with K.F.'s medical provider.

App_0434

236.    K.F. is adamant that he does not want breasts and would eventually like to have facial hair and muscles.  The idea of developing typically female secondary sex characteristics makes K.F. extremely anxious; he prays every night that his puberty delaying medication will be successful.  Since K.F. came to understand and express the dysphoria he experienced resulting from his sex assigned at birth at an early age, Jade and Joshua were able to get him the mental health and medical treatment that was necessary, and as a result K.F. is perceived as and accepted by other people as male and very few people know he is transgender.  Developing secondary sex characteristics typically associated with girls and women, instead of those aligned with his male gender identity, would be tremendously emotionally and physically painful for K.F.

237.    In the event K.F.'s current implant is not effective, and because Florida Medicaid now excludes coverage of puberty delaying medication when used to treat gender dysphoria, the Ladues would have to pay out of pocket for Lupron Depot shots, the treatment K.F.'s medical provider has indicated would be the next step for K.F.  Those monthly shots would cost between $1,000 to $2,000 per shot out of pocket.  The Ladue family has limited income, and they are very worried because they would not be able to afford these treatments without Medicaid coverage.

238.    K.F.'s medical providers have also told the Ladues that likely within the next year, when K.F. is fourteen years old, that it will be medically indicated for

him to begin hormone therapy (testosterone) at a dose appropriate to his age and body composition. K.F. is very excited about starting testosterone therapy. K.F. usually hates receiving shots but he told Jade he would be happy to take a monthly shot if it meant that he would experience the male puberty that is aligned with his gender identity, such as his voice deepening and growing facial hair.

239.  Jade and Joshua are so grateful that K.F. was confident enough and felt safe to come out to them at such a young age. His identifying his gender dysphoria at a young age combined with a loving and supportive immediate and extended family means that they were able to ensure that K.F. received the health care appropriate for him as soon as possible. As a result, his gender dysphoria has been well managed.

240.  While K.F. has always dealt with anxiety, before he came out, it was much worse. He experienced what Jade would describe as "night terrors" and had a persistent stomachache. The Ladues would get calls from K.F.'s school that he was not doing well and was often in the nurse's office. The Ladues went to doctors to determine the source of K.F.'s distress, but no one could identify what was causing the problem. After he had firmly established gender-affirming care with GeMS, K.F. became a completely different child; it was like night and day. He had a smile on his face, a light in his eye, and even a glow about him. His performance and

attendance in school improved, as did his peer relationships. Like any parent, Jade and Joshua were relieved to see their child happy and thriving.

241. K.F. has also begun the process of legal transition. He has legally changed his name and the family is currently in the process of having his gender marker changed on his birth certificate and records with the Social Security Administration.

242. Under the Challenged Exclusion, Medicaid will no longer cover puberty delaying medications for K.F. as treatment for his gender dysphoria. The Challenged Exclusion will also prohibit Medicaid from covering hormone therapy as a medically necessary treatment for K.F.'s gender dysphoria when K.F., pursuant to the medical expertise and recommendations of his physicians, is ready to begin that treatment.

243. Jade and Joshua are incredibly worried about the potential physical and mental health consequences of depriving K.F. the medically necessary treatment recommended by his health care providers. K.F. has been living as a boy in every aspect of his life--medically, legally, and socially--since 2016.

244. If he were no longer able to access the medication that aligns his body with his gender identity, K.F.'s mental health would suffer tremendously, and he would be devastated. Jade and Joshua fear that K.F., and the whole family with him, would go down a dark and scary road fast. For example, they fear that K.F. would

71

not leave his bedroom and he would refuse to go to school, or that he would cut off his communications with his friends, teammates, and teachers. Given how much his gender-affirming care has improved his life and mental health, Jade and Joshua can only assume that reversing that course of treatment would result in the unthinkable happening.

245.   Because of these concerns, K.F. going without treatment is simply not an option for the Ladue family. They believe providing K.F. with the medical treatment for gender dysphoria that he requires is necessary to ensure his health and well-being.

246.   The Ladue family is under 138% of the federal poverty limit; that is why their children, including K.F., qualify for Florida's Medicaid program. Whether it be paying for a different puberty delaying medication if K.F.'s provider determines the current implant is not working or beginning K.F.'s course of hormone therapy in the next year, the Ladue family simply does not have sufficient resources to provide K.F. the gender-affirming care he requires. They simply could not pay out of pocket for the cost of K.F.'s care.

247.   Joshua receives his health insurance through Medicare. He cannot add K.F. to his health insurance. Jade has access to health care coverage for family members because of her job, but the cost of adding K.F. is unaffordable for their family.

App_0438

248.   While Florida is their home, ultimately, the Ladue family will be forced to move if necessary to protect their son's access to medication that is necessary for his health and well-being.  Doing so would mean Jade would have to find a new job, Joshua would have to establish his Social Security payment through a new field office, and the kids would be uprooted and forced to start at new schools and make new friends.

249.   In addition, the Ladues are Christian and just joined a church that they attend every Sunday.  So far, they have felt very welcome and would be sad to break a tie with this faith community and the other communities and relationships they have established in South Florida.

250.   For K.F., this would be a particularly difficult and painful transition. K.F. is doing well academically, socially, and athletically.  He is on the golf team at his school and he is looking forward to upcoming tryouts out for the basketball team in their town.  It is awful for Jade and Joshua to even think that K.F. would have to end this participation and leave his teammates because Florida refuses to provide him with coverage for the medical treatment that he needs to live and thrive, medical treatment that is available to many other cisgender young people, simply because K.F. is transgender.

App_0439

## **CLAIMS FOR RELIEF**

## **COUNT I**
### **Deprivation of Equal Protection in Violation of the Fourteenth Amendment of the U.S. Constitution**

### **(All Plaintiffs Against Defendant Simone Marstiller)**

251.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 250 of this Complaint as though fully set forth herein.

252.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

253.    Plaintiffs state this cause of action against Defendant Marstiller, in her official capacity, for purposes of seeking declaratory and injunctive relief, and to challenge her adoption and enforcement of the discriminatory Exclusion both facially and as applied to Plaintiffs.

254.    Defendant Marstiller is a person acting under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs equal protection of the law.

255.    Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

74

256.   Discrimination on the basis of nonconformity with sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics are all forms of discrimination on the basis of sex.

257.   A person is defined as transgender precisely because of the perception that they contradict gender stereotypes associated with the sex they were assigned at birth. When a transgender person affirms their authentic gender, it inherently contradicts standard gender stereotypes expected of the individual based on their sex assigned at birth.

258.   In addition, under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to strict, or at least heightened, scrutiny. Indeed, transgender people have suffered a long history of discrimination in Florida and across the country and continue to suffer such discrimination to this day; they are a discrete and insular group and lack the political power to protect their rights through the legislative process; they have largely been unable to secure explicit state and federal protections to protect them against discrimination; their transgender status bears no relation to their ability to contribute to society; and gender identity is a core, defining trait so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

75

259.   By adopting and enforcing the Challenged Exclusion categorically excluding "services for the treatment of *gender* dysphoria," including "*[s]ex* reassignment surgeries" and any "procedures that alter primary or secondary *sexual* characteristics," Defendant Marstiller is engaging in constitutionally impermissible discrimination based on sex, including, *inter alia*, discrimination based on nonconformity with sex stereotypes and transgender status.

260.   Through her duties and actions to design, administer, and implement the Challenged Exclusion, Defendant Marstiller has unlawfully discriminated—and continues to unlawfully discriminate—against Plaintiffs based on sex-related considerations.

261.   The Challenged Exclusion treats Plaintiffs differently from other persons who are similarly situated.

262.   Under the Challenged Exclusion, transgender Medicaid beneficiaries who require gender-affirming care are denied coverage for that medically necessary care, while other Medicaid participants can access the same care as long as it is not required for the treatment of gender dysphoria, i.e., gender transition.

263.   The Challenged Exclusion on its face and as applied to Plaintiffs deprives transgender Medicaid beneficiaries of their right to equal protection of the laws and stigmatizes them as second-class citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment.

App_0442

264. Defendants' promulgation and continued enforcement of the Challenged Exclusion did not, and does not, serve any rational, legitimate, important, or compelling state interest. Rather, the Challenged Exclusion serves only to prevent Plaintiffs and other transgender Medicaid beneficiaries from obtaining medically necessary medical care and services to treat their gender dysphoria, complete their gender transition, and live as their authentic selves.

265. As a direct and proximate result of the discrimination described above, Plaintiffs have suffered injury and damages, including mental pain and suffering and emotional distress. Without injunctive relief from Defendants' discriminatory Challenged Exclusion of coverage for gender-affirming care, Plaintiffs will continue to suffer irreparable harm in the future.

## COUNT II
### Discrimination on the Basis of Sex in Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116
### (All Plaintiffs Against AHCA)

266. Plaintiffs reallege and incorporate by reference paragraphs 1 to 250 of this Complaint as though fully set forth herein.

267. Section 1557 of the ACA, 42 U.S.C. § 18116, provides, in relevant part that, "an individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681, et seq.)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied

77

the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

268.   Discrimination on the basis of nonconformity with sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics are all forms of discrimination encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

269.   Defendant AHCA receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA.   The Centers for Medicare & Medicaid Services ("CMS"), operating within HHS, provide federal financial assistance to AHCA for the state's participation in the Medicaid program. Indeed, Defendant AHCA has a published Notice of Nondiscrimination Policy on its website, stating that the "This Notice is provided as required by … Section 1557 of the Affordable Care Act and implementing regulations."

270.   A covered entity, such as Defendant AHCA, cannot provide or administer health care coverage which contains a categorical exclusion of coverage for gender-affirming health care, or otherwise impose limitations or restrictions on coverage for specific health services related to gender transition if such limitation or restriction results in discrimination on the basis of sex.

App_0444

271. Plaintiffs have a right under Section 1557 to receive Medicaid coverage through AHCA free from discrimination on the basis of sex, sex characteristics, gender, nonconformity with sex stereotypes, transgender status, or gender transition.

272. By categorically excluding "services for the treatment of *gender* dysphoria," including "*[s]ex* reassignment surgeries" and any "procedures that alter primary or secondary *sexual* characteristics," Defendant AHCA has discriminated against Plaintiffs on the basis of sex in violation of Section 1557 and has thereby denied Plaintiffs the full and equal participation in, benefits of, and right to be free from discrimination in a health program or activity.

273. As a result of the Challenged Exclusion, Plaintiffs have and will continue to suffer harm. By knowingly and intentionally offering coverage to Plaintiffs that discriminates on the basis of sex, Defendant AHCA has intentionally violated the ACA, for which Plaintiffs are entitled to injunctive relief, compensatory and consequential damages, and other relief.

274. Without injunctive relief from Defendants' discriminatory Challenged Exclusion of coverage for gender-affirming care, Plaintiffs will continue to suffer irreparable harm in the future.

App_0445

## COUNT III
### Violation of the Medicaid Act's EPSDT Requirements,
### 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5)
### (Plaintiffs Brit Rothstein, Susan Doe, and K.F. Against Defendant Marstiller)

275.   Plaintiffs reallege and incorporate by reference paragraphs 1 to 250 of this Complaint as though fully set forth herein.

276.   The Medicaid Act mandates that states provide Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") services, which include all services necessary to "correct or ameliorate" a physical or mental health condition, to Medicaid beneficiaries under age 21. 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), 1396d(r)(5).

277.   The Challenged Exclusion, and Defendants' refusal, based on the Challenged Exclusion, to provide coverage for services for the treatment of gender dysphoria to Plaintiffs Brit Rothstein, Susan Doe, and  K.F., and transgender Medicaid beneficiaries under age 21, violates the Medicaid Act's EPSDT requirements, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5), which are enforceable by Plaintiffs under 42 U.S.C. § 1983.

## COUNT IV
### Violation of the Medicaid Act's Comparability Requirements,
### 42 U.S.C. § 1396a(a)(10)(B)(i)

### (All Plaintiffs Against Defendant Marstiller)

278.   Plaintiffs reallege and incorporate by reference paragraphs 1 to 250 of this Complaint as though fully set forth herein.

80

279. The Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B)(i), require that the "medical assistance made available to [eligible individuals] shall not be less in amount, duration, or scope than the medical assistance made available to" other eligible individuals.

280. The Challenged Exclusion, and Defendants' refusal, based on the Challenged Exclusion, to provide coverage for services for the treatment of gender dysphoria to Plaintiffs and other transgender Medicaid beneficiaries, while covering the same services for other Florida Medicaid beneficiaries with different diagnoses, violate the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B)(i), which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants on all claims, as follows:

A. Issue preliminary and permanent injunctions prohibiting Defendants from any further enforcement or application of the Challenged Exclusion and directing Defendants and their agents to provide Medicaid coverage for the medically necessary care for the treatment of gender dysphoria without regard to the Challenged Exclusion;

81

B.     Enter a declaratory judgment that the Challenged Exclusion, which categorically excludes coverage for medically necessary care for the treatment of gender dysphoria, both on its face and as applied to Plaintiffs:

i.     Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex, including transgender status, nonconformity with sex stereotypes, sex characteristics, gender, gender identity, sex assigned at birth, and gender transition;

ii.     Violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including transgender status, nonconformity with sex stereotypes, sex characteristics, gender, gender identity, sex assigned at birth, and gender transition);

iii.     Violates the Medicaid Act's EPSDT Requirements, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5); and

iv.     Violates the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B)(i);

C.     Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

82

D.    Award the declaratory and injunctive relief requested in this action against Defendants' officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with them;

E.    Award compensatory and consequential damages to Plaintiffs in an amount that would fully compensate each of them for: (1) the harms to their short- and long-term health and well-being from being denied access to medically necessary health care as a result of the Challenged Exclusion and its application to them; (2) their economic losses; and (3) all other injuries that have been caused by Defendants' acts and omissions alleged in this Complaint;

F.    Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 or other applicable statutes; and

G.    Award such other and further relief as the Court may deem just and proper.

\*       \*       \*       \*       \*

Respectfully submitted this 7th day of September 2022.

83

**PILLSBURY WINTHROP SHAW
PITTMAN, LLP**

By: */s/ Jennifer Altman*
**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux**\*\* (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

By: */s/ Abigail Coursolle*
**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.**

By: */s/ Omar Gonzalez-Pagan*
**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

By: */s/ Simone Chriss*
**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

By: */s/ Katy DeBriere*
**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Application for admission pro hac vice
forthcoming.*
\*\* *Application for admission to the Northern
District Court forthcoming.*

84

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

August Dekker, known as Kori Dekker; Brit Rothstein; Susan Doe, a minor by and through her parents and next friends, Jane Doe and John Doe; and K.F., a minor, by and through her parent and next friend, Jade Ladue

## DEFENDANTS

Simone Marstiller, in her official capacity as Secretary for the Florida Agency for Health Care Administration; and Florida Agency for Health Care Administration

**(b)** County of Residence of First Listed Plaintiff    Hernando County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Leon County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Simone Chriss and Chelsea Dunn, Southern Legal Counsel, 1229 NW 12th Ave. Gainesville, FL 32601, (325) 271-8890; Katy DeBriere, Florida Health Justice Project, 3900 Richmond St., Jacksonville, FL 32205, (352) 278-6559; Jennifer Altman, Shani Rivaux, Pillsbury Winthrop Shaw Pittman, LLP ("Pillsbury"), 600 Brickell Ave., Ste. 3100, Miami, FL 33131, (786) 913-4900; William C. Miller, Gary J. Shaw, Pillsbury, 1200 17th St. N.W., Washington, D.C. 20036, (202) 663-8000; Joe Little, Pillsbury, 500 Capitol Mall, Ste. 1800, (916) 329-4700; Abigail Coursolle, National Health Law Program ("NHeLP"), 3701 Wilshire Blvd., Ste. 315, Los Angeles, CA, 90010, (310) 736-1652; Catherine McKee (NHeLP), 1512 E. Franklin St., Chapel Hill, N.C., (919) 968-6308; Omar Gonzalez-Pagan, Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal"), 120 Wall St., 19th Floor, New York, NY 10005, (212) 809-8585; Carl S. Charles, Lambda Legal, 1 West Court Square, Ste. 105, Decatur, GA (404) 897-1880

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983; 42 U.S.C. 18116

Brief description of cause:
Challenging Defendant's exclusion of Medicaid coverage for gender affirming care

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE    Honorable Mark E. Walker    DOCKET NUMBER    4:20-cv-00020

DATE    9/7/2022

SIGNATURE OF ATTORNEY OF RECORD    /s/ Jennifer Altman

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

Tab H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.

SIMONE MARSTILLER, et al.,

     Defendants.

Case No. 4:22-cv-00325-RH-MAF

---

## MOTION OF AMERICAN ACADEMY OF PEDIATRICS AND ADDITIONAL NATIONAL AND STATE MEDICAL AND MENTAL HEALTH ORGANIZATIONS FOR LEAVE TO FILE BRIEF OF AMICI CURIAE

*Amici curiae* hereby move for leave to file the attached brief of *amici curiae*.

1.     *Amici curiae* are the American Academy of Pediatrics ("AAP"), the Academic Pediatric Association, the American Academy of Child & Adolescent Psychiatry ("AACAP"), the American Academy of Family Physicians ("AAFP"), the American Academy of Nursing ("AAN"), the American College of Obstetricians and Gynecologists ("ACOG"), the American College of Osteopathic Pediatricians ("ACOP"), the American College of Physicians ("ACP"), the American Medical Association ("AMA"), the American Pediatric Society ("APS"), the American Psychiatric Association ("APA"), the Association of

American Medical Colleges ("AAMC"), the Endocrine Society, the Florida
Chapter of the American Academy of Pediatrics ("FCAAP"), the National
Association of Pediatric Nurse Practitioners ("NAPNAP"), the North Central
Florida Council of Child & Adolescent Psychiatry ("NORCEF"), the Pediatric
Endocrine Society ("PES"), the Societies for Pediatric Urology ("SPU"), the
Society for Adolescent Health and Medicine ("SAHM"), the Society for Pediatric
Research ("SPR"), the Society of Pediatric Nurses ("SPN"), and the World
Professional Association for Transgender Health ("WPATH") (collectively,
"*amici*").

2.    *Amici* respectfully move for leave to file the attached amicus brief in
support of Plaintiffs' Motion for a Preliminary Injunction. *Amici* have met and
conferred with the parties in good faith as required by the Local Rules and
understand that Plaintiffs consent to, and Defendants oppose, the filing of *amici*'s
brief.

3.    As a group of well-respected medical and mental health organizations,
*amici* seek to offer this Court their scientific views and insights regarding the
serious medical condition known as gender dysphoria; the accepted standard of
care—known as gender-affirming care—for treating individuals (and particularly
adolescents) suffering from gender dysphoria; and the consequences of denying
Florida Medicare coverage for important gender-affirming care to such patients as

2

would be required by Rule 59G-1.010(7) of the Florida Administrative Code (the "Medicaid Ban").

**WHEREFORE**, *amici* respectfully request an order granting leave to file the attached brief of *amici curiae*.

## INTERESTS OF *AMICI CURIAE*

*Amici* are a group of 22 professional medical and mental health organizations seeking to ensure that all individuals, including those with gender dysphoria, receive the optimal medical and mental healthcare they need and deserve. *Amici* include both national and state organizations and represent thousands of health care providers who have specific expertise with the issues raised in the amicus brief.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION

By submitting an amicus brief in this matter, *amici* seek to assist this Court on an issue of great importance to many transgender individuals, including adolescents and their families, as well as the medical professionals who treat them: the prevention and treatment of gender dysphoria. *Amici* intend to provide this Court with an empirically grounded view of (i) gender dysphoria; (ii) gender-affirming care, which is the accepted standard of care for treating adolescents at risk of or suffering from gender dysphoria; and (iii) the irreparable harm that would be caused to adolescent patients if the Medicaid Ban is not enjoined. *Amici*

App_0455

thus fulfill the quintessential role for amici curiae, and courts routinely authorize the filing of amicus briefs in such circumstances. *See, e.g.*, *Shoemaker v. City of Howell*, 795 F.3d 553, 562 (6th Cir. 2015) (describing the "traditional function of an amicus curiae" as "assist[ing] in cases of general public interest by supplementing the efforts of private counsel and by drawing the court's attention to [matters] that might otherwise escape consideration") (internal quotations omitted).

Gender dysphoria is a clinical condition that is marked by distress due to an incongruence between the patient's gender identity *(i.e.*, the innate sense of oneself as being a particular gender) and sex assigned at birth. This incongruence can lead to clinically significant distress and impair functioning in many aspects of the patient's life. The widely accepted recommendation of the medical community, including that of the respected professional organizations participating here as *amici*, is that the standard of care for treating gender dysphoria is "gender-affirming care."

Because the Medicaid Ban would eliminate coverage for important gender-affirming care, it is antithetical to the mission and values of *amici*, all of whom are committed to ensuring that all patients, including transgender individuals, receive the best possible medical care. Drawing on empirical research and *amici's* extensive experience and expertise in their respective fields, the proposed amicus brief: (i) provides background on gender identity and gender dysphoria; (ii)

4

describes the professionally-accepted medical guidelines for treating gender dysphoria as they apply to adolescents, and the scientifically rigorous process by which these guidelines were developed; (iii) describes the evidence that suggests the effectiveness of this care for adolescents with gender dysphoria; and (iv) corrects multiple inaccuracies in the basis for the Medicaid Ban, the Division of Florida Medicaid's June 2, 2022 "Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria" (the "GAPMS Report").

Courts regularly permit *amici* to file *amicus curiae* briefs to offer their unique expertise and insight on issues of physical and mental health and welfare, including with respect to transgender youth. For example, district courts in two states considering challenges to similar laws targeting gender-affirming care have accepted and cited amicus briefs filed by many of the same organizations that seek to file a brief here. *See, e.g.*, *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 890 (E.D. Ark. 2021), *aff'd sub nom. Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (citing brief and observing "[t]he consensus recommendation of medical organizations is that the only effective treatment for individuals at risk of or suffering from gender dysphoria is to provide gender-affirming care."); *Eknes-Tucker v. Marshall*, 2022 WL 1521889, at *2 (M.D. Ala. May 13, 2022) (citing

brief and observing *amici* "endorse these guidelines as evidence-based methods for treating gender dysphoria in minors."). [1]

Moreover, there is no downside to granting *amici*'s motion for leave to file the amicus brief. Courts have recognized that "it is preferable to err on the side of" permitting amicus briefs. *Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 133 (3d Cir. 2002) (Alito, J.). This is so because "[i]f an amicus brief that turns out to be unhelpful is filed, the [court], after studying the case, will often be able to make that determination without much trouble and can then simply disregard the amicus brief." *Id.* "On the other hand, if a good brief is rejected, the [court] will be deprived of a resource that might have been of assistance." *Id.*

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court grant their motion for leave to file their proposed amicus curiae brief (attached hereto) in support of Plaintiffs' Motion for a Preliminary Injunction.

---

[1] *See also, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 n.1 (4th Cir. 2020) (crediting "leading medical, public health, and mental health organization[]" amici with helping the court to "develop[] a fact-based understanding of what it means to be transgender"); *Adams by Kasper v. Sch. Bd. of St. Johns Cnty.*, 318 F. Supp. 3d 1293, 1298 n.14 (M.D. Fla. 2018) (granting leave to file an amicus brief in support of a transgender male student, and noting that "the position of [amici] as to the appropriate standard of care for gender dysphoria is useful to understanding that diagnosis").

6

Dated: September 27, 2022

Respectfully submitted,

_/s/ Cortlin H. Lannin_

D. Jean Veta (*pro hac vice* forthcoming)
William Isasi (*pro hac vice* forthcoming)
Emily Mondry (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com
wisasi@cov.com
emondry@cov.com

Cortlin H. Lannin (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000

*Counsel for Amici Curiae*

App_0459

## CERTIFICATE OF WORD COUNT

According to Microsoft Word, the word processing system used to prepare this Motion and Memorandum, there are 403 total words contained within the Motion, and there are 815 words contained within the Memorandum of Law.

*/s/ Cortlin H. Lannin*
Cortlin H. Lannin

## CERTIFICATE OF SATISFACTION OF
## ATTORNEY-CONFERENCE REQUIREMENT

Pursuant to Local Rule 7.1(B), counsel for *amici* conferred with counsel for the parties on September 22, 2022.  Plaintiffs consented to the filing of *amici*'s brief; Defendants oppose the filing.

*/s/ Cortlin H. Lannin*
Cortlin H. Lannin

8

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

      Plaintiffs,

v.

SIMONE MARSTILLER, et al.,

      Defendants.

Case No. 4:22-cv-00325-RH-MAF

# BRIEF OF *AMICI CURIAE* AMERICAN ACADEMY OF PEDIATRICS AND ADDITIONAL NATIONAL AND STATE MEDICAL AND MENTAL HEALTH ORGANIZATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel for the American Academy of Pediatrics ("AAP"), the Academic Pediatric Association, the American Academy of Child & Adolescent Psychiatry ("AACAP"), the American Academy of Family Physicians ("AAFP"), the American Academy of Nursing ("AAN"), the American College of Obstetricians and Gynecologists ("ACOG"), the American College of Osteopathic Pediatricians ("ACOP"), the American College of Physicians ("ACP"), the American Medical Association ("AMA"), the American Pediatric Society ("APS"), the American Psychiatric Association ("APA"), the Association of American Medical Colleges ("AAMC"), the Endocrine Society, the Florida Chapter of the American Academy of Pediatrics ("FCAAP"), the National Association of Pediatric Nurse Practitioners ("NAPNAP"), the North Central Florida Council of Child & Adolescent Psychiatry ("NORCEF"), the Pediatric Endocrine Society ("PES"), the Societies for Pediatric Urology ("SPU"), the Society for Adolescent Health and Medicine ("SAHM"), the Society for Pediatric Research ("SPR"), the Society of Pediatric Nurses ("SPN"), and the World Professional Association for Transgender Health ("WPATH") certify that:

1.      AAP, the Academic Pediatric Association, AACAP, AAFP, AAN, ACOG, ACOP, ACP, AMA, APS, APA, AAMC, the Endocrine Society, FCAAP,

App_0462

NAPNAP, NORCEF, PES, SPU, SAHM, SPR, SPN, and WPATH, respectively, have no parent corporation.

2.    No corporations hold any stock in AAP, the Academic Pediatric Association, AACAP, AAFP, AAN, ACOG, ACOP, ACP, AMA, APS, APA, AAMC, the Endocrine Society, FCAAP, NAPNAP, NORCEF, PES, SPU, SAHM, SPR, SPN, or WPATH.

App_0463

# **TABLE OF CONTENTS**

Corporate Disclosure Statement...............................................................ii

Table of Contents.................................................................................iv

Table of Authorities ...........................................................................vi

STATEMENT OF INTEREST OF *AMICI CURIAE*........................................1

INTRODUCTION ................................................................................3

ARGUMENT......................................................................................5

I.     Understanding Gender Identity and Gender Dysphoria............................5

II.    The Widely Accepted Guidelines for Treating Adolescents with
Gender Dysphoria Provide for Medical Interventions When Indicated. .......8

      A.    The Gender Dysphoria Treatment Guidelines Include Thorough
Mental Health Assessments and, for Some Adolescents,
Medical Interventions................................................................8

          1.    A Robust Diagnostic Assessment Is Required Before
Medical Interventions Are Provided. ...................................9

          2.    The Guidelines Recommend Only Non-Medical
Interventions for Prepubertal Children Suffering from
Gender Dysphoria............................................................11

          3.    In Certain Circumstances, the Guidelines Provide for the
Use of Medical Interventions to Treat Adolescents
Suffering from Gender Dysphoria. ....................................11

      B.    The Guidelines for Treating Gender Dysphoria Were
Developed Through a Robust and Transparent Process,
Employing the Same Scientific Rigor That Underpins Other
Medical Guidelines. ................................................................15

      C.    Scientific Evidence Indicates the Effectiveness of Treating
Gender Dysphoria According to the Guidelines.............................16

App_0464

III.   The GAPMS Report Is Factually Inaccurate and Ignores the
       Recommendations of the Medical Community.........................................20

       A.    There is No Evidence That Gender Dysphoria Can Be Caused
             by Underlying Mental Illness or "Social Contagion".....................21

       B.    The Vast Majority of Adolescents Diagnosed with Gender
             Dysphoria Will Persist Through Adulthood.................................24

       C.    There Is No Accepted Protocol of "Watchful Waiting" for
             Adolescents with Gender Dysphoria...........................................26

       D.    The International Medical Community Has Endorsed Gender-
             Affirming Care, Contrary to the State's Assertions.......................27

IV.    The Medicaid Ban Would Irreparably Harm Many Medicaid
       Recipients with Gender Dysphoria By Denying Them the Treatment
       They Need.......................................................................................30

       CONCLUSION..............................................................................31

v

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brandt v. Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021)......................................................20

*Brandt ex rel. Brandt v. Rutledge*,
    -- F.4d --, 2022 WL 3652745 (8th Cir. Aug. 25, 2022) ..........................20, 29

**Other Authorities**

Am. Psychological Ass'n, *Guidelines for psychological practice with transgender and gender nonconforming people*, 70(9) AMERICAN PSYCHOLOGIST 832, 862 (2015) ("Am. Psychological Ass'n Guidelines"),
    https://www.apa.org/practice/guidelines/transgender.pdf ..............................6

*Australian Standards of Care and Treatment Guidelines for Trans and Gender Diverse Children and Adolescents*, ROYAL CHILDREN'S HOSP. MELBOURNE (Oct. 2021), https://auspath.org.au/wp-content/uploads/2021/10/australian-standards-of-care-and-treatment-guidelines-for-trans-and-gender-diverse-children-and-adolescents_v1-3.pdf ...............................................................28

Christal Achille et al., *Longitudinal impact of gender-affirming endocrine intervention on the mental health and wellbeing of transgender youths: preliminary results*, 8 INT'L J PEDIATRIC ENDOCRINOLOGY 1-5 (2020),
    https://pubmed.ncbi.nlm.nih.gov/32368216 ...............................................17

Stewart L. Adelson, *Practice parameter on gay, lesbian, or bisexual sexual orientation, gender non-conformity, and gender discordance in children and adolescents*, 51 J. AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY 957, 964 (2020),
    https://pubmed.ncbi.nlm.nih.gov/22917211 ...............................................25

Zoe Aldridge et al., *Long Term Effect of Gender Affirming Hormone Treatment on Depression and Anxiety Symptoms in Transgender People: A Prospective Cohort Study*, 9 ANDROLOGY 1808-1816

vi

(2021) .......................................................................... 18

Luke R. Allen et al., *Well-being and suicidality among transgender
youth after gender-affirming hormones*, 7(3) CLINICAL PRAC.
PEDIATRIC PSYCH. 302 (2019), https://psycnet.apa.org/record/2019-
52280-009 .............................................................. 17, 19

Emmanuel Allory et al., The Expectations of Transgender People in
the Face of their Health-Care Access Difficulties and How They
Can Be Overcome: A Qualitative Study in France, 21 PRIMARY
HEALTH CARE RSCH. & DEV. 1 (2020),
https://www.cambridge.org/core/services/aop-cambridge-
core/content/view/A0A151385D44C3FB8B971956DBFB5EFF/S1
463423620000638a.pdf/div-class-title-the-expectations-of-
transgender-people-in-the-face-of-their-health-care-access-
difficulties-and-how-they-can-be-overcome-a-qualitative-study-in-
france-div.pdf .............................................................. 29

Greta R. Bauer et al., *Do Clinical Data from Transgender Adolescents
Support the Phenomenon of "Rapid Onset Gender Dysphoria"?*,
243 J. PEDIATRICS 224 (2022),
https://www.jpeds.com/article/S0022-3476(21)01085-4/pdf .......................... 23

Greta R. Bauer et al., *Transgender Youth Referred to Clinics for
Gender-Affirming Medical Care in Canada*, 148(5) PEDIATRICS 1
(2021) .......................................................................... 28

Susan D. Boulware et al., *Biased Science: The Texas and Alabama
Measures Criminalizing Medical Treatment for Transgender
Children and Adolescents Rely on Inaccurate and Misleading
Scientific Claims* 1 (Apr. 28, 2022),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4102374 .......... 23, 25, 26

James M. Cantor, *The Science of Gender Dysphoria and
Transsexualism* (May 17, 2022) ("Cantor Report")) .............................. 24, 25

James M. Cantor, *Transgender and Gender Diverse Children and
Adolescents: Fact-Checking of AAP Policy*, J. SEX & MARITAL
THERAPY (2019),
https://www.ohchr.org/sites/default/files/Documents/Issues/Sexual
Orientation/IESOGI/Other/Rebekah_Murphy_20191214_JamesCa

App_0467

ntor-fact-checking_AAP-Policy.pdf ("Cantor Editorial").......................24, 25

*Care of Children and Adolescents with Gender Dysphoria: Summary*, SOCIALSTYRELSEN (2022), https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf ............................ 29

Polly Carmichael et al., *Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK*, 16(2) PLOS ONE e0243894 (2021), https://pubmed.ncbi.nlm.nih.gov/33529227 .................................... 17

Rosalia Costa et al., *Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria*, 12(11) J. SEXUAL MED. 2206–2214 (2015), https://pubmed.ncbi.nlm.nih.gov/26556015 ............................................... 17

Annelou L.C. de Vries et al., *Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study*, 8(8) J. SEXUAL MED. 2276-2283 (2011), https://pubmed.ncbi.nlm.nih.gov/20646177 .........................................17, 19

Annelou L.C. de Vrie et al., *Young adult psychological outcome after puberty suppression and gender reassignment*, 134(4) PEDIATRICS 696-704 (2014), https://pubmed.ncbi.nlm.nih.gov/25201798............. 17, 19, 20

Division of Florida Medicaid, *Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria* (June 2, 2022) ( "GAPMS Report"), https://www.ahca.myflorida.com/letkidsbekids/docs/AHCA_GAP MS_June_2022_Report.pdf ..............................................................passim

Endocrine Society, *Methodology*, https://www.endocrine.org/clinical-practice-guidelines/methodology ............................................................... 15

Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (2020) ( "Endocrine Soc'y Position Statement"), https://www.endocrine.org/advocacy/position-statements/transgender-health ...................................................................8

App_0468

*Ethics Council Publishes Ad Hoc Recommendation on Transgender Identity in Children and Adolescents*, GERMAN ETHICS COUNSEL (Feb. 20, 2020), https://www.ethikrat.org/mitteilungen/mitteilungen/2020/deutscher-ethikrat-veroeffentlicht-ad-hoc-empfehlung-zu-trans-identitaet-bei-kindern-und-jugendlichen ................................................................. 28

*Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria*, NICE (Mar. 11, 2021) ....................................................................................... 30

*Gender Incongruence: National Academic Guideline*, HELSEDIREKTORATET (2020), https://www.helsedirektoratet.no/retningslinjer/kjonnsinkongruen ............... 28

Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, J. ADOLESCENT HEALTH (2021), https://www.jahonline.org/article/S1054-139X(21)00568-1/fulltext ......................................................... 18

*Guidelines on Healthcare Concerning Gender Identity Matters*, RETSINFORMATION (2018), https://www.retsinformation.dk/eli/retsinfo/2019/9060 .............................. 28

Gordon Guyatt et al., *GRADE guidelines: 1. Introduction - GRADE evidence profiles and summary of findings tables*, 64 J. CLINICAL EPIDEMIOLOGY 383 (2011), https://www.who.int/alliance-hpsr/resources/publications/HSR-synthesis-Guyatt-2011.pdf ........................ 15

Gordon H. Guyatt et al., *GRADE: an emerging consensus on rating quality of evidence and strength of recommendations*, 336 BMJ 924 (2008), https://www.who.int/hiv/topics/treatment/grade_guyatt_2008.pdf ................. 15

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017) ("Endocrine Society Guidelines"), https://academic.oup.com/jcem/article/102/11/3869/4157558 .................... passim

Jody L. Herman et al., *Ages of Individuals Who Identify as*

App_0469

*Transgender in the United States*, WILLIAMS INST. (Jan. 2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf....................................................................6

Jody L. Herman et al., *Suicide Thoughts And Attempts Among Transgender Adults:, Findings From The 2015 US Transgender Survey*, UCLA WILLIAMS INST. (2019), https://escholarship.org/uc/item/1812g3hm......................................................7

Jessica Hunter et al., *Gender Minority Stress in Trans and Gender Diverse Adolescents and Young People*, 26(4) CLINICAL CHILD PSYCH. & PSYCHIATRY 1182-1195 (2021)..................................................22

Michael S. Irwig, *Detransition Among Transgender and Gender-Diverse People—An Increasing and Increasingly Complex Phenomenon*, J. CLINICAL ENDOCRINOLOGY & METABOLISM 1 (June 2022), https://pubmed.ncbi.nlm.nih.gov/35678284...........................26

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students–19 States and Large Urban School Districts, 2017*, US Dep't of Health and Human Servs., Centers for Disease Control & Prevention, 68 MORBIDITY & MORTALITY WKLY. REP. 67 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf...............7

Rittakerttu Kaltiala et al., *Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria*, 74(3) NORDIC J. PSYCHIATRY 213 (2020)....................................8

Brayden N. Kameg & Donna G. Nativio, *Gender dysphoria in youth: An overview for primary care providers*. 30(9) J. AM. ASSOC. NURSE PRACT. 493 (2018), https://pubmed.ncbi.nlm.nih.gov/30095668 ...................................................7

Joseph G. Kosciw et al., *The 2017 National School Climate Survey*, GLSEN (2018), https://www.glsen.org/sites/default/files/2019-10/GLSEN-2017-National-School-Climate-Survey-NSCS-Full-Report.pdf..............................................................................................22

Laura E. Kuper et al., *Body dissatisfaction and mental health outcomes of youth on gender-affirming hormone therapy*, 145(4)

x

PEDIATRICS e20193006 (2020),
https://pubmed.ncbi.nlm.nih.gov/32220906 .......................................... 17,18

Lisa Littman, *Correction: Parent Reports of Adolescents and Young
Adults Perceived to Show Signs of a Rapid Onset of Gender
Dysphoria*, 14(3) PLOS ONE e0214157 (March 2019),
https://journals.plos.org/plosone/article?id=10.1371%2Fjournal.po
ne.0214157.......................................................................................................23

Lisa Littman, *Parent Reports of Adolescents and Young Adults
Perceived to Show Signs of a Rapid Onset of Gender Dysphoria*.
14(3) PLOS ONE e0214157 (Aug. 2018),
https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0
202330 .............................................................................................................22

Diego Lopez de Lara et al., *Psychosocial assessment in transgender
adolescents*, 93(1) ANALES DE PEDIATRIA 41-48 (English ed.
2020), https://www.researchgate.net/publication/342652073........................ 18

James L. Madara, *AMA to states: Stop interfering in healthcare of
transgender children*, AM. MED. ASS'N (Apr. 26, 2021),
https://www.ama-assn.org/press-center/press-releases/ama-states-
stop-interfering-health-care-transgender-children; *see also* Am.
Psychological Ass'n, *APA Resolution on Gender Identity Change
Efforts* (2021), https://www.apa.org/about/policy/resolution-
gender-identity-change-efforts.pdf...........................................................................6

Simona Martin et al., *Criminalization of Gender-Affirming Care—
Interfering with Essential Treatment for Transgender Children and
Adolescents*, 385 NEW ENG. J. MED. 579 (2021),
https://www.nejm.org/doi/full/10.1056/NEJMp2106314.............. 12, 13, 15, 16

Anna I.R. van der Miesen, *Psychological functioning in transgender
adolescents before and after gender-affirmative care compared
with cisgender general population peers*, 66(6) J. ADOLESCENT
HEALTH 699-704 (2020).........................................................................................17

M. Hassan Murad et al., H*ormonal Therapy and Sex Reassignment: A
Systematic Review and Meta-Analysis of Quality of Life and
Psychosocial Outcomes*, 72(2) CLINICAL ENDOCRINOLOGY 214
(Feb. 2010), https://onlinelibrary.wiley.com/doi/10.1111/j.1365-

xi

2265.2009.03625.x .................................................................. 31

*NHS Standard Contract for Gender Identity Service for Children and Adolescents*, NHS ENGLAND (Dec. 30, 2019), https://www.england.nhs.uk/wp-content/uploads/2017/04/gender-development-service-children-adolescents.pdf ........................................... 30

Larry Nuttbrock et al., *Gender Abuse, Depressive Symptoms, And Substance Use Among Transgender Women: A 3-Year Prospective Study*, 104(11) AM. J. PUB. HEALTH 2199–2206 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4202966/ ........................... 8

Amit Paley, *The Trevor Project 2020 National Survey*, at 1, https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf ....................................................................... 7

Ken C. Pang et al., *Long-term Puberty Suppression for a Nonbinary Teenager*, 145(2) PEDIATRICS e20191606 (2019), https://watermark.silverchair.com/peds_20191606.pdf ................................. 3

Amanda L. Peterson et al., *Ambient Discrimination, Victimization, And Suicidality In A Non-Probability US Sample Of LGBTQ Adults*, 50(3) ARCHIVES SEXUAL BEHAV. 1003–1014 (2021) ......................... 8

*Protocol for Access Without Discrimination to Health Care Services for Lesbian, Gay, Bisexual, Transsexual, Transvestite, Transgender and Intersex Persons and Specific Care Guidelines*, GOV'T OF MEX. (June 15, 2020), https://www.gob.mx/cms/uploads/attachment/file/558167/Versi_n_15_DE_JUNIO_2020_Protocolo_Comunidad_LGBTTI_DT_Versi_n_V_20.pdf ....................................................................... 28

Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) PEDIATRICS e20182162 (2018) ("AAP Policy Statement"), https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for .............................. passim

*Recommendation (In Finnish)*, COHERE (June 2020), https://palveluvalikoima.fi/documents/1237350/22895838/Transsukupuolisuus+suositus.pdf/82b60104-291c-7d8c-9e88-

App_0472

1b1fc9bba527/Transsukupuolisuus+suositus.pdf?t=159231854400
0 .................................................................................................... 29

Stephen M. Rosenthal, *Challenges in the care of transgender and gender-diverse youth: an endocrinologist's view*, 17(10) NATURE REV. ENDOCRINOLOGY 581, 586 (Oct. 2021), https://pubmed.ncbi.nlm.nih.gov/34376826 ......................................... 20, 25

Annemieke S. Staphorsius et al., *Puberty suppression and executive functioning: an fMRI-study in adolescents with gender dysphoria*, 6 PSCYHONEUROENDOCRINOLOGY 190 (2015), https://pubmed.ncbi.nlm.nih.gov/25837854 ............................................... 13

Rebecca L. Stotzer, *Violence Against Transgender People: A Review of United States Data*, 14(3) AGGRESSION & VIOLENT BEHAV. 170-179 (2009)...................................................................................... 21

Rylan J. Testa et al., *Suicidal Ideation in Transgender People: Gender Minority Stress and Interpersonal Theory Factors*, 126(1) J. ABNORMAL PSYCH. 125-36 (2017)............................................................ 22

Diana M. Tordoff et al., Mental Health Outcomes In Transgender And Nonbinary Youths Receiving Gender-Affirming Care, 5(2) JAMA NETWORK OPEN e220978 (2022), https://pubmed.ncbi.nlm.nih.gov/35212746/ ............................................... 17

*Transgender New Zealanders: Children and Young People*, NEW ZEALAND MINISTRY OF HEALTH (2020), https://www.health.govt.nz/your-health/healthy-living/transgender-new-zealanders/transgender-new-zealanders-children-and-young-people...................................................................................................... 28

Jack L. Turban et al., *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults*, J. PLOS ONE (2022), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0 261039 ....................................................................................... 17, 18

Jack L. Turban et al., *Pubertal suppression for transgender youth and risk of suicidal ideation*, 145(2) PEDIATRICS e20191725 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7073269 ..................... 17, 18

xiii

WPATH, *Standards of Care for the Health of Transgender and Gender Diverse People* (8th Version) ("WPATH Guidelines"), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.210 0644 ....................................................................................................passim

Talen Wright et al., *Accessing and Utilising Gender-Affirming Healthcare in England and Wales: Trans and Non-Binary People's Accounts of Navigating Gender Identity Clinics*, 21 BMC HEALTH SERVS. RSCH. 1 (2021), https://pubmed.ncbi.nlm.nih.gov/34182985/ ............................................. 30

*The World Professional Association for Transgender Health: Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 7), https://wpath.org/publications/soc ......................................................... 30

App_0474

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* are the American Academy of Pediatrics ("AAP"), the Academic Pediatric Association, the American Academy of Child & Adolescent Psychiatry ("AACAP"), the American Academy of Family Physicians ("AAFP"), the American Academy of Nursing ("AAN"), the American College of Obstetricians and Gynecologists ("ACOG"), the American College of Osteopathic Pediatricians ("ACOP"), the American College of Physicians ("ACP"), the American Medical Association ("AMA"), the American Pediatric Society ("APS"), the American Psychiatric Association ("APA"), the Association of American Medical Colleges ("AAMC"), the Endocrine Society, the Florida Chapter of the American Academy of Pediatrics ("FCAAP"), the National Association of Pediatric Nurse Practitioners ("NAPNAP"), the North Central Florida Council of Child & Adolescent Psychiatry ("NORCEF"), the Pediatric Endocrine Society ("PES"), the Societies for Pediatric Urology ("SPU"), the Society for Adolescent Health and Medicine ("SAHM"), the Society for Pediatric Research ("SPR"), the Society of Pediatric Nurses ("SPN"), and the World Professional Association for Transgender Health ("WPATH").[1]

*Amici* are professional medical and mental health organizations seeking to

---

[1] Plaintiffs have consented to the filing of this brief; Defendants have not consented to the filing of this brief. *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

App_0475

ensure that all individuals, including those with gender dysphoria, receive the optimal medical and mental healthcare they need and deserve. *Amici* represent thousands of healthcare providers who have specific expertise with the issues raised in this brief. The Court should consider *amici*'s brief because it provides important expertise and addresses misstatements about the treatment of gender dysphoria.

2

**INTRODUCTION**

Rule 59G-1.010(7) of the Florida Administrative Code (the "Medicaid Ban") eliminates Florida Medicaid coverage for critical, medically necessary, evidence-based treatments for gender dysphoria. Denying coverage for such care effectively denies access to it for Florida Medicaid recipients who meet the requisite medical criteria, putting them at risk of significant harm. The basis for the Medicaid Ban, the Division of Florida Medicaid's June 2, 2022 "Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria" (the "GAPMS Report") [2], mischaracterizes the professionally-accepted medical guidelines for treating gender dysphoria and the guidelines' supporting evidence. Below, *amici* provide the Court with an accurate description of these treatment guidelines and summarize the scientific evidence supporting the medical interventions prohibited by the Medicaid Ban. While the Medicaid Ban affects all patients who are receiving treatment for gender dysphoria, this brief focuses primarily on the experience of transgender adolescents.

Gender dysphoria is a clinical condition that is marked by distress due to an incongruence between the patient's gender identity (i.e., the innate sense of oneself

---

[2] Available at https://www.ahca.myflorida.com/letkidsbekids/docs/ AHCA_GAPMS_June_2022_Report.pdf.

App_0477

as being a particular gender) and sex assigned at birth. This incongruence can lead to clinically significant distress and impair functioning in many aspects of the patient's life.[3] If not treated, or treated improperly, gender dysphoria can result in debilitating anxiety, depression, and self-harm, and is associated with higher rates of suicide. As such, the effective treatment of gender dysphoria saves lives.

The widely accepted recommendation of the medical community, including that of the respected professional organizations participating here as *amici*, is that the standard of care for treating gender dysphoria is "gender-affirming care."[4] Gender-affirming care is care that supports individuals with gender dysphoria as they explore their gender identity—in contrast with efforts to change the individual's gender identity to match their sex assigned at birth, which are known to be ineffective and harmful. For adolescents with persistent gender dysphoria that worsens with the onset of puberty, gender-affirming care may include medical interventions to align their physiology with their gender identity. Empirical evidence indicates that gender-affirming care, including gender-affirming medical interventions, in carefully evaluated patients who meet diagnostic criteria can

---

[3] *See, e.g.*, Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) PEDIATRICS e20182162, at 2-3, tbl.1 (2018) (hereinafter, "AAP Policy Statement"), https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for.

[4] *Id.* at 10.

4

alleviate clinically significant distress and lead to significant improvements in the mental health and overall well-being of adolescents with gender dysphoria.

The Medicaid Ban disregards this medical evidence by precluding Florida Medicaid reimbursement for the treatment of patients with gender dysphoria in accordance with the accepted standard of care. Accordingly, *amici* urge this Court to grant Plaintiffs' motion for a preliminary injunction.

## **ARGUMENT**

This brief first provides background on gender identity and gender dysphoria. It then describes the professionally-accepted medical guidelines for treating gender dysphoria as they apply to adolescents, the scientifically rigorous process by which these guidelines were developed, and the evidence that supports the effectiveness of this care for adolescents with gender dysphoria. Finally, the brief corrects multiple inaccuracies in the GAPMS Report, and explains how the Medicaid Ban would irreparably harm adolescents with gender dysphoria by denying crucial care to those who need it.

## **I.      Understanding Gender Identity and Gender Dysphoria.**

A person's gender identity is a person's deep internal sense of belonging to a particular gender.[5] Most people have a gender identity that aligns with their sex

---

[5] AAP Policy Statement at 2 tbl. 1.

assigned at birth.[6]  However, transgender people have a gender identity that does not align with their sex assigned at birth.[7]  In the United States, it is estimated that approximately 1.4 million individuals are transgender.[8]  Individuals often start to understand their gender identity during prepubertal childhood and adolescence.

Today, there is an increasing understanding that being transgender is a normal variation of human identity.[9]  However, many transgender people suffer from gender dysphoria, a serious medical condition in which the patient experiences significant distress that can lead to "impairment in peer and/or family relationships, school performance, or other aspects of their life."[10]  Gender dysphoria is a formal diagnosis under the American Psychiatric Association's Diagnostic and Statistical Manual

---

[6] *See* Am. Psychological Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70(9) AMERICAN PSYCHOLOGIST 832, 862 (2015) (hereinafter, "Am. Psychological Ass'n Guidelines"), https://www.apa.org/practice/guidelines/transgender.pdf.

[7] *See id.* at 863.

[8] *See* Jody L. Herman et al., *Ages of Individuals Who Identify as Transgender in the United States*, Williams Inst., at 2 (Jan. 2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf.

[9] James L. Madara, *AMA to States: Stop Interfering in Healthcare of Transgender Children*, Am. Med. Ass'n (Apr. 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children; *see also* Am. Psychological Ass'n, *APA Resolution on Gender Identity Change Efforts*, 4 (Feb. 2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

[10] AAP Policy Statement at 3.

6

(DSM-5-TR).

If untreated or inadequately treated, gender dysphoria can cause depression, anxiety, self-harm, and suicidality.[11] Indeed, over 60% of transgender adolescents and young adults reported having engaged in self-harm during the preceding 12 months, and over 75% reported symptoms of generalized anxiety disorder in the preceding two weeks.[12] Even more troubling, more than 50% of this population reported having seriously considered attempting suicide,[13] and more than one in three transgender adolescents reported having attempted suicide in the preceding 12 months.[14] The statistics are similar for transgender adults.[15]

---

[11] *See* Brayden N. Kameg & Donna G. Nativio, *Gender Dysphoria In Youth: An Overview For Primary Care Providers*. 30(9) J. AM. ASSOC. NURSE PRAC. 493 (2018), https://pubmed.ncbi.nlm.nih.gov/30095668.

[12] *See* Amit Paley, *The Trevor Project 2020 National Survey*, at 1, https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf.

[13] *See id*. at 2.

[14] *See* Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students–19 States and Large Urban School Districts, 2017*, US Dep't of Health and Human Servs., Centers for Disease Control & Prevention, 68 MORBIDITY & MORTALITY WKLY. REP. 67, 70 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf.

[15] Transgender adults, like adolescents, have a higher prevalence of depression and suicidality than the general population. *See, e.g.*, Jody L. Herman et al., *Suicide Thoughts And Attempts Among Transgender Adults:, Findings From The 2015 US Transgender Survey*, UCLA Williams Inst. (2019), https://escholarship.org/uc/item/1812g3hm. Elevated rates of depression and

7

## II.   The Widely Accepted Guidelines for Treating Adolescents with Gender Dysphoria Provide for Medical Interventions When Indicated.

The widely accepted view of the professional medical community is that gender-affirming care is the appropriate treatment for gender dysphoria and that, for some adolescents, gender-affirming medical interventions are necessary.[16] This care greatly reduces the negative physical and mental health consequences that result when gender dysphoria is untreated.[17]

### A.   The Gender Dysphoria Treatment Guidelines Include Thorough Mental Health Assessments and, for Some Adolescents, Medical Interventions.

The treatment protocols for gender dysphoria are laid out in established, evidence-based clinical guidelines: (i) the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, and (ii) the WPATH Standards of Care for the Health of Transsexual,

---

suicidality in transgender adults have also been linked to societal stigma, abuse, violence, and discrimination. *See, e.g.*, Larry Nuttbrock et al., *Gender Abuse, Depressive Symptoms, And Substance Use Among Transgender Women: A 3-Year Prospective Study,* 104(11) AM. J. PUB. HEALTH 2199–2206 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4202966/; Amanda L. Peterson et al., *Ambient Discrimination, Victimization, And Suicidality In A Non-Probability US Sample Of LGBTQ Adults*, 50(3) ARCHIVES SEXUAL BEHAV. 1003–1014 (2021).

[16] *See, e.g.*, Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (2020) (hereinafter, "Endocrine Soc'y Position Statement"), https://www.endocrine.org/advocacy/position-statements/transgender-health.

[17] *See id.*

8

Transgender, and Gender-Nonconforming People (together, the "Guidelines").[18] Both sets of guidelines have been developed by expert clinicians who have worked with gender dysphoric patients for many years.

The Guidelines provide that all youth with gender dysphoria should be evaluated, diagnosed, and treated by a qualified health care professional ("HCP"). Further, the Guidelines provide that each patient who receives gender-affirming care should receive only evidence-based, medically necessary, and appropriate interventions that are tailored to the patient's individual needs.[19]

### 1. A Robust Diagnostic Assessment Is Required Before Medical Interventions Are Provided.

According to the Guidelines, gender-affirming care for adolescents begins with a thorough evaluation by a HCP who: (1) is licensed by their statutory body and holds a master's degree or equivalent in a relevant clinical field; (2) has expertise and received theoretical and evidence-based training in child, adolescent, and family

---

[18] Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017) (hereinafter, "Endocrine Society Guidelines"), https://academic.oup.com/jcem/article/102/11/3869/4157558; WPATH, *Standards of Care for the Health of Transgender and Gender Diverse People* (8th Version) (hereinafter "WPATH Guidelines"), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.

[19] The Guidelines also include robust procedures regarding gender-affirming care for adults with gender dysphoria, although that topic is beyond the scope of this brief.

9

mental health; (3) has expertise and received training in gender identity development, gender diversity in children and adolescents, can assess capacity to consent, and possesses knowledge about gender diversity across the life span; (4) has expertise and received training in autism spectrum disorders and other neurodevelopmental presentations, or collaborates with a developmental disability expert when working with neurodivergent patients; and (5) continues engagement in professional development in areas relevant to gender diverse children, adolescents, and families.[20]

Prior to developing a treatment plan, the HCP should conduct a "comprehensive biopsychosocial assessment" of the adolescent patient.[21] The HCP conducts this assessment to "understand the adolescent's strengths, vulnerabilities, diagnostic profile, and unique needs," so that the resulting treatment plan is appropriately individualized.[22] This assessment must be conducted collaboratively with the patient and their caregiver(s).[23]

---

[20] *See* WPATH Guidelines at S49.

[21] *Id.* at S50.

[22] *Id.*

[23] *Id.*

App_0484

### 2. The Guidelines Recommend Only Non-Medical Interventions for Prepubertal Children Suffering from Gender Dysphoria.

For prepubertal children suffering from gender dysphoria, the Guidelines provide for mental healthcare and support for the child and their family.[24] The Guidelines do *not* recommend that any medical interventions (such as medications or surgery) be provided to prepubertal children with gender dysphoria.[25]

### 3. In Certain Circumstances, the Guidelines Provide for the Use of Medical Interventions to Treat Adolescents Suffering from Gender Dysphoria.

For youths whose gender dysphoria continues into adolescence—after the onset of puberty—the Guidelines provide that, in addition to mental healthcare, medical interventions may be indicated. Before an adolescent may receive any medical interventions for gender dysphoria, a qualified HCP must determine that: (1) the adolescent meets the diagnostic criteria of gender incongruence according to the World Health Organization's International Classification of Diseases; (2) the adolescent has demonstrated a sustained and persistent pattern of gender nonconformity or gender dysphoria; (3) the adolescent has demonstrated the emotional and cognitive maturity required to provide informed consent for treatment; (4) any coexisting psychological, medical, or social problems that could

---

[24] *See id.* at S73–S74; Endocrine Society Guidelines at 3877-78.

[25] *See* WPATH Guidelines at S64; Endocrine Society Guidelines at 3871.

11

interfere with diagnosis, treatment, or the adolescent's ability to consent have been addressed; (5) the adolescent has been informed of the reproductive effects of treatment in the context of their stage in pubertal development and discussed fertility preservation options; and (6) the adolescent has reached Tanner stage 2 of puberty to initiate pubertal suppression.[26] Further, a pediatric endocrinologist or other clinician experienced in pubertal assessment must (7) agree with the indication for treatment, (8) confirm the patient has started puberty, and (9) confirm that there are no medical contraindications.[27]

If all of the above criteria are met, the Guidelines instruct that gonadotropin-releasing hormone (GnRH) analogues, or "puberty blockers," may be offered beginning at the onset of puberty.[28] The purpose of puberty blockers is to delay pubertal development until adolescents are old enough and have had sufficient time to make more informed decisions about whether to pursue further treatments.[29] Puberty blockers also can make pursuing transition later in life easier, because they

---

[26] WPATH Guidelines at S59-65.

[27] Endocrine Society Guidelines at 3878 tbl.5.

[28] WPATH Guidelines at S64; Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, 385 NEW ENG. J. MED. 579 (2021), https://www.nejm.org/doi/full/10.1056/NEJMp2106314.

[29] WPATH Guidelines at S112.

App_0486

prevent irreversible bodily changes such as protrusion of the Adam's apple or breast growth.[30] Puberty blockers have well-known efficacy and side-effect profiles.[31] In addition, their effects are generally reversible.[32] In fact, puberty blockers have been used by pediatric endocrinologists for more than 40 years for the treatment of precocious puberty.[33] The risks of any serious adverse effects of these treatments are exceedingly rare when provided under clinical supervision.[34]

Later in adolescence—and if the criteria below are met—hormone therapy may be used to initiate puberty consistent with the patient's gender identity.[35] Hormone therapy is only prescribed when a qualified MHP has confirmed the persistence of the patient's gender dysphoria, the patient's mental capacity to assent

---

[30] *See* AAP Policy Statement at 5.

[31] *See* Martin, *supra* note 28 at 2.

[32] *See id.*

[33] *See* F. Comite et al., *Short-Term Treatment of Idiopathic Precocious Puberty with a Long-Acting Analogue of Luteinizing Hormone-Releasing Hormone — A Preliminary Report*, 305 NEW ENG. J. MED. 1546 (1981).

[34] *See, e.g.*, Annemieke S. Staphorsius et al., *Puberty Suppression and Executive Functioning: An Fmri-Study in Adolescents with Gender Dysphoria*, 6 PSCYHONEUROENDOCRINOLOGY 190 (2015), https://pubmed.ncbi.nlm.nih.gov/25837854 (no adverse impact on executive functioning); Ken C. Pang et al., *Long-term Puberty Suppression for a Nonbinary Teenager*, 145(2) PEDIATRICS e20191606 (2019), https://watermark.silverchair.com/peds_20191606.pdf (exceedingly low risk of delayed bone mineralization from hormone treatment).

[35] Martin, *supra* note 28 at 2.

13

to the treatment, and that any coexisting problems have been addressed.[36]  A pediatric endocrinologist or other clinician experienced in pubertal induction must also agree with the indication, the patient and their parents or guardians must be informed of the potential effects and side effects, and the patient and the patient's parents or guardians must give their informed consent.[37]  Hormone therapy involves using gender-affirming hormones to allow adolescents to develop secondary sex characteristics consistent with their gender identity.[38]  Although some of these changes become irreversible after those secondary sex characteristics are fully developed, others are partially reversible if the patient discontinues use of the hormones.[39]

The Guidelines contemplate that the prescription of puberty blockers and/or hormone therapy be coupled with education on the safe use of such medications and close monitoring to mitigate any potential risks.[40]  Decisions regarding the appropriate treatment for each patient with gender dysphoria are made in consultation with the patient, their parents or guardians, and the medical and mental

---

[36] Endocrine Society Guidelines at 3878 tbl.5.

[37] See id.

[38] See AAP Policy Statement at 6.

[39] See id. at 5-6.

[40] See Endocrine Society Guidelines at 3871, 3876.

14

healthcare team. There is "no one-size-fits-all approach to this kind of care."[41]

**B. The Guidelines for Treating Gender Dysphoria Were Developed Through a Robust and Transparent Process, Employing the Same Scientific Rigor That Underpins Other Medical Guidelines.**

The Guidelines are the product of careful and robust deliberation following the same types of processes—and subject to the same types of rigorous requirements—as other guidelines promulgated by *amici* and other medical organizations.

For example, the Endocrine Society's Guidelines were developed following a 26-step, 26-month drafting, comment, and review process.[42] The Endocrine Society imposes strict evidentiary requirements based on the internationally recognized Grading of Recommendations Assessment, Development and Evaluation (GRADE) system.[43] That GRADE assessment is then reviewed, re-reviewed, and reviewed again by multiple, independent groups of professionals.[44] Reviewers are subject to

---

[41] Martin, *supra* note 28, at 1.

[42] *See, e.g.*, Endocrine Society Guidelines at 3872-73 (high-level overview of methodology).

[43] *See* Gordon Guyatt et al., *GRADE Guidelines: 1. Introduction - GRADE Evidence Profiles and Summary of Findings Tables*, 64 J. CLINICAL EPIDEMIOLOGY 383 (2011), https://www.who.int/alliance-hpsr/resources/publications/HSR-synthesis-Guyatt-2011.pdf; Gordon H. Guyatt et al., *GRADE: An Emerging Consensus on Rating Quality of Evidence and Strength of Recommendations*, 336 BMJ 924 (2008), https://www.who.int/hiv/topics/treatment/grade_guyatt_2008.pdf.

[44] Endocrine Society, *Methodology*, https://www.endocrine.org/clinical-practice-

15

strict conflict of interest rules, and there is ample opportunity for feedback and debate through the years-long review process. [45] Further, the Endocrine Society continually reviews its own guidelines and recently determined the 2017 transgender care guidelines continue to reflect the best, most up-to-date available evidence.

First published in 1979, the WPATH Standards of Care are currently in their 8th Edition. The current Standards of Care are the result of a robust drafting, comment, and review process that took many years. [46] The draft guidelines went through rigorous review and were publicly available for discussion and debate, including multiple rounds of feedback from experts in the field as well as from transgender individuals. [47]

### C. Scientific Evidence Indicates the Effectiveness of Treating Gender Dysphoria According to the Guidelines.

The results of multiple studies indicate that adolescents suffering from gender dysphoria who receive medical interventions as part of their gender-affirming care experience improvements in their overall well-being. [48] Nine studies have been published that investigated the use of puberty blockers on adolescents suffering from

---

guidelines/methodology.

[45] *See id.*

[46] *See* WPATH Guidelines at S247-51.

[47] *See id.*

[48] *See* Martin, *supra* note 28, at 2.

16

gender dysphoria,[49] and eight studies have been published that investigated the use

of hormone therapy to treat adolescents suffering from gender dysphoria.[50]  These

---

[49] *See, e.g.*, Christal Achille  et al., *Longitudinal Impact of Gender-Affirming Endocrine Intervention on The Mental Health and Wellbeing of Transgender Youths: Preliminary Results*, 8 INT'L J PEDIATRIC ENDOCRINOLOGY 1-5 (2020), https://pubmed.ncbi.nlm.nih.gov/32368216; Polly Carmichael et al., *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old Young People With Persistent Gender Dysphoria in the UK*, 16(2) PLOS ONE e0243894 (2021), https://pubmed.ncbi.nlm.nih.gov/33529227; Rosalia Costa et al., *Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria*, 12(11) J. SEXUAL MED. 2206–2214 (2015), https://pubmed.ncbi.nlm.nih.gov/26556015; Annelou L.C. de Vries et al., *Puberty Suppression In Adolescents With Gender Identity Disorder: A Prospective Follow-Up Study*, 8(8) J. SEXUAL MED. 2276-2283 (2011), https://pubmed.ncbi.nlm.nih.gov/20646177; Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression And Gender Reassignment*, 134(4) PEDIATRICS 696-704 (2014), https://pubmed.ncbi.nlm.nih.gov/25201798; Laura E. Kuper,  et al., *Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, 145(4) PEDIATRICS e20193006 (2020), https://pubmed.ncbi.nlm.nih.gov/32220906; Jack L. Turban et al., *Pubertal Suppression For Transgender Youth And Risk of Suicidal Ideation*, 145(2) PEDIATRICS e20191725 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7073269; Anna I.R. van der Miesen, *Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers*, 66(6) J. ADOLESCENT HEALTH 699-704 (2020); Diana M. Tordoff et al., *Mental Health Outcomes In Transgender And Nonbinary Youths Receiving Gender-Affirming Care*, 5(2) JAMA NETWORK OPEN e220978 (2022), https://pubmed.ncbi.nlm.nih.gov/35212746/.

[50] *See, e.g.*, Christal Achille  et al., *Longitudinal Impact of Gender-Affirming Endocrine Intervention on The Mental Health and Well-Being of Transgender Youths: Preliminary Results*, 8 INT'L J. PEDIATRIC ENDOCRINOLOGY 1-5 (2020), https://pubmed.ncbi.nlm.nih.gov/32368216; Luke R. Allen  et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones*, 7(3)

17

studies find positive mental health outcomes for those adolescents who received

puberty blockers or hormone therapy, including statistically significant reductions

in anxiety, depression, and suicidal ideation.[51]

For example, a 2020 study analyzed survey data from 89 transgender adults

who had access to puberty blockers while adolescents and from more than 3,400

transgender adults who did not.[52] The study found that those who received puberty

_____

CLINICAL PRAC. PEDIATRIC PSYCH. 302 (2019), https://psycnet.apa.org/record/2019-52280-009; Diego Lopez de Lara et al., *Psychosocial Assessment in Transgender Adolescents*, 93(1) ANALES DE PEDIATRIA 41-48 (English ed. 2020), https://www.researchgate.net/publication/342652073; Annelou L.C. De Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134(4) PEDIATRICS 696-704 (2014); Rittakerttu Kaltiala et al., *Adolescent Development And Psychosocial Functioning After Starting Cross-Sex Hormones For Gender Dysphoria*, 74(3) NORDIC J. PSYCHIATRY 213 (2020); Laura E. Kuper et al., *Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, 145(4) PEDIATRICS e20193006(2020), https://pubmed.ncbi.nlm.nih.gov/32220906; Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, J. ADOLESCENT HEALTH (2021), https://www.jahonline.org/article/S1054-139X(21)00568-1/fulltext; Jack L. Turban et al., *Access To Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, J. PLOS ONE (2022), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0261039.

[51] The data likewise indicates that adults who receive gender-affirming care experience positive mental health outcomes. *See, e.g.*, Zoe Aldridge et al., *Long Term Effect of Gender Affirming Hormone Treatment on Depression and Anxiety Symptoms in Transgender People: A Prospective Cohort Study*, 9 ANDROLOGY 1808-1816 (2021).

[52] *See* Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145(2) PEDIATRICS e20191725 (2020),

blocking treatment had lower odds of lifetime suicidal ideation than those who wanted puberty blocking treatment but did not receive it, even after adjusting for demographic variables and level of family support.[53] Approximately *nine in ten* transgender adults who wanted puberty blocking treatment but did not receive it reported lifetime suicidal ideation.[54] Additionally, a longitudinal study of nearly 50 transgender adolescents found that suicidality was decreased by a statistically-significant degree after receiving gender-affirming hormone treatment.[55]

As another example, a prospective two-year follow-up study of adolescents with gender dysphoria published in 2011 found that treatment with puberty blockers was associated with decreased depression and improved overall functioning.[56] A six-year follow-up study of 55 individuals from the 2011 study found that subsequent treatment with hormone therapy followed by surgery in adulthood was associated with a statistically significant decrease in depression and anxiety.[57]

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7073269.

[53] *See id.*

[54] *See id.*

[55] *See* Luke R. Allen et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones*, 7(3) CLINICAL PRAC. PEDIATRIC PSYCH. 302 (2019), https://psycnet.apa.org/record/2019-52280-009.

[56] *See* Annelou L.C. de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8(8) J. SEXUAL MED. 2276 (2011), https://pubmed.ncbi.nlm.nih.gov/20646177.

[57] Annelou L.C. de Vries et al., *Young Adult Psychological outcome After Puberty*

19

"Remarkably, this study demonstrated that these transgender adolescents and young adults had a sense of well-being that was equivalent or superior to that seen in age-matched controls from the general population."[58]

As scientists and researchers, *amici* always welcome more research, including on this crucial topic. However, the available data indicate that the gender-affirming treatments prohibited by the Medicaid Ban are effective for the treatment of gender dysphoria. As the Eighth Circuit recently recognized in affirming an order preliminarily enjoining enforcement of a similar Arkansas law, "there is substantial evidence … that the [Arkansas] Act prohibits medical treatment that conforms with the recognized standard of care."[59]

## III. The GAPMS Report Is Factually Inaccurate and Ignores the Recommendations of the Medical Community.

The GAPMS Report asserts that puberty blockers, gender-affirming hormone therapy, and gender-affirming surgeries are not "consistent with generally

---

*Suppression and gender Reassignment*, 134(4) PEDIATRICS 696 (2014), https://pubmed.ncbi.nlm.nih.gov/25201798.

[58] Stephen M. Rosenthal, *Challenges in the Care of Transgender and Gender-Diverse Youth: An Endocrinologist's View*, 17(10) NATURE REV. ENDOCRINOLOGY 581, 586 (Oct. 2021), https://pubmed.ncbi.nlm.nih.gov/34376826.

[59] *Brandt ex rel. Brandt v. Rutledge*, -- F.4d --, 2022 WL 3652745, at *4 (8th Cir. Aug. 25, 2022); *see also Brandt v. Rutledge*, 551 F. Supp. 3d 882, 890 (E.D. Ark. 2021) ("The consensus recommendation of medical organizations is that the only effective treatment for individuals at risk of or suffering from gender dysphoria is to provide gender-affirming care.").

App_0494

accepted professional medical standards" and that there is insufficient evidence that these medical interventions are safe and effective.[60]  However, this assertion is premised on speculative and discredited claims about gender dysphoria and mischaracterizations of the Guidelines and scientific research regarding these gender-affirming medical interventions.

### A.    There is No Evidence That Gender Dysphoria Can Be Caused by Underlying Mental Illness or "Social Contagion"

In light of the "number of adolescents who reported anxiety and depression diagnoses prior to transitioning," the GAPMS Report asserts that "available research raises questions as to whether [individuals'] distress is secondary to pre-existing behavioral health disorders[.]"[61]  In other words, the GAPMS Report speculates that mental health concerns such as depression and anxiety may cause individuals to develop a gender identity that is incongruent with their sex assigned at birth.  However, the Report cites no evidence for this assertion, and the scientific research suggests the Report has it backwards:  research has shown that transgender individuals frequently experience discrimination, harassment, and even violence on account of their gender identity,[62] and that these experiences lead to

---

[60] GAPMS Report at 38.

[61] GAPMS Report at 6.

[62] *See, e.g.*, Rebecca L. Stotzer, *Violence Against Transgender People: A Review of United States Data*, 14(3) AGGRESSION & VIOLENT BEHAV. 170-179 (2009);

21

mental health concerns, including, for example, depression and anxiety. [63]

The GAPMS Report also claims that exposure to "peer groups and social media that emphasized transgender lifestyles" can cause "rapid-onset gender dysphoria" in adolescents. [64] However, there is no credible evidence to support this notion. The term "rapid onset gender dysphoria" was coined in 2018 by the author of an anonymous survey of parents of transgender youth, who were recruited from websites that promote the belief that "social contagion" causes transgender identity. [65] The survey, which is the only source cited by the GAPMS Report in

---

Joseph G. Kosciw et al., *The 2017 National School Climate Survey*, GLSEN, at 94 (2018), https://www.glsen.org/sites/default/files/2019-10/GLSEN-2017-National-School-Climate-Survey-NSCS-Full-Report.pdf; *see also* Amit Paley, *The Trevor Project 2020 National Survey*, https://www.thetrevorproject.org/survey-2020/ ("Discrimination & Physical Harm" section) (noting that 40 percent of transgender students reported being physically threatened or harmed due to their gender identity).

[63] *See* Rylan J. Testa et al., *Suicidal Ideation in Transgender People: Gender Minority Stress and Interpersonal Theory Factors*, 126(1) J. ABNORMAL PSYCH. 125-36 (2017); Jessica Hunter et al., *Gender Minority Stress in Trans and Gender Diverse Adolescents and Young People*, 26(4) CLINICAL CHILD PSYCH. & PSYCHIATRY 1182-1195 (2021).

[64] GAPMS Report at 12-13.

[65] *Id.* at 12; Lisa Littman, *Parent Reports of Adolescents and Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria*. 14(3) PLOS ONE e0214157, at 2, 8-9 (Aug. 2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0202330 (stating that survey participants were recruited from the websites YouthTransCriticalProfessionals.org, TransgenderTrend.com, and 4thWaveNow.com).

App_0496

support of its claim, suffers from numerous flaws and has been widely criticized.[66] Moreover, the journal in which the survey was published subsequently published an extensive correction stating, among other things, that "[r]apid-onset gender dysphoria (ROGD) is not a formal mental health diagnosis," and the "report did not collect data from the adolescents and young adults (AYAs) or clinicians and therefore does not validate the phenomenon."[67] Significantly, the GAPMS Report does not cite or even mention this correction.[68]

Moreover, subsequent peer-reviewed research does "not find support . . . for a new etiologic phenomenon of rapid onset gender dysphoria during adolescence."[69] On the contrary, one recent study showed that most adolescents—

---

[66] *See, e.g.*, Susan D. Boulware et al., *Biased Science: The Texas and Alabama Measures Criminalizing Medical Treatment for Transgender Children and Adolescents Rely on Inaccurate and Misleading Scientific Claims* 1, 18 (Apr. 28, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4102374.

[67] Lisa Littman, *Correction: Parent Reports of Adolescents and Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria*, 14(3) PLOS ONE e0214157 (March 2019), https://journals.plos.org/plosone/article?id=10.1371%2Fjournal.pone.0214157.

[68] The GAPMS Report's reliance on the survey is also puzzling: According to the report, studies (such as surveys) that "rel[y] heavily" on participants' subjective responses "likely [have] biased and invalid" results. GAPMS Report at 15.

[69] Greta R. Bauer et al., *Do Clinical Data from Transgender Adolescents Support the Phenomenon of "Rapid Onset Gender Dysphoria"?*, 243 J. PEDIATRICS 224, 225-26 (2022), https://www.jpeds.com/article/S0022-3476(21)01085-4/pdf ("This putative phenomenon was posited based on survey data from a convenience sample of parents recruited from websites, and may represent the perceptions or

23

nearly 70%—referred to a clinic for puberty blockers or hormone therapy had known their gender was different from the one assigned at birth for three or more years.[70] The study also showed no correlation between recent gender knowledge (defined as two years or less having passed since you "realized your gender was different from what other people called you") and support from online friends or transgender friends.[71]

## B. The Vast Majority of Adolescents Diagnosed with Gender Dysphoria Will Persist Through Adulthood.

The GAPMS Report asserts that "the majority of young adolescents who exhibit signs of gender dysphoria eventually desist and conform to their natal sex[.]"[72] However, the sources it cites in support of its "desistance" claim—an editorial written by James Cantor and an "assessment" that Cantor prepared for AHCS—state only that "desistance" is common among *prepubertal children* with gender dysphoria.[73] The GAPMS Report improperly conflates prepubertal

---

experiences of those parents, rather than of adolescents, particularly those who may enter into clinical care." (internal citations omitted)).

[70] *See id*. at 225 fig.

[71] Id. at 224-27.

[72] GAPMS Report at 14.

[73] *See id.* at 20, 27-28, 39; James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. Sex & Marital Therapy 307, 308-09 (2019), https://www.ohchr.org/sites/default/files/Documents/Issues/SexualOrientation/IES

24

children with adolescents, which is an important distinction, as prepubertal

children are not eligible under the Guidelines for any of the gender-affirming,

medical interventions excluded from coverage by the Medicaid Ban.[74]  The

Guidelines endorse the use of medical interventions only to treat adolescents and

adults with gender dysphoria, and only when the relevant criteria are met.[75]

There are *no* studies to support the proposition that adolescents with gender

dysphoria are likely to later identify as their sex assigned at birth, whether they

receive treatment or not.[76]  On the contrary, "[l]ongitudinal studies have indicated

that the emergence or worsening of gender dysphoria with pubertal onset is

associated with a very high likelihood of being a transgender adult."[77]

Moreover, while desistance may occur for many reasons, detransitioning is

---

OGI/Other/Rebekah_Murphy_20191214_JamesCantor-fact-checking_AAP-
Policy.pdf (hereinafter "Cantor Editorial")); James M. Cantor, *The Science of
Gender Dysphoria and Transsexualism* (May 17, 2022), GA PMS Report Attach. D
¶¶ 14-16 (hereinafter "Cantor Report")).

[74] *See* Boulware et al., *supra* note 66, at 18.

[75] *See* Endocrine Society Guidelines at 3871, 3879; WPATH Guidelines at S32,
S48.

[76] *See, e.g.*, Stewart L. Adelson, *Practice Parameter on Gay, Lesbian, or Bisexual
Sexual Orientation, Gender Non-Conformity, and Gender Discordance in Children
and Adolescents*, 51 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 957, 964
(2020), https://pubmed.ncbi.nlm.nih.gov/22917211 ("In contrast, when gender
variance with the desire to be the other sex is present in adolescence, this desire
usually does persist through adulthood").

[77] Rosenthal, *supra* note 58 at 585.

not the same as regret. The State incorrectly assumes that an individual who detransitions—the definition of which varies from study to study[78]—must do so because they have come to identify with their sex assigned at birth. This ignores the most common reported factors that contribute to a person's choice to detransition, such as pressure from parents and discrimination.[79]

In addition, while the percentage of adolescents seeking gender-affirming care has increased, that percentage remains very low—only 1.8% of high-school students identify as transgender.[80] Further, this increase in adolescents seeking care "certainly reflects" reduced social stigma and expanded care options.[81]

## C. There Is No Accepted Protocol of "Watchful Waiting" for Adolescents with Gender Dysphoria.

Based on its unsupported claim that many adolescents with gender dysphoria

---

[78] Michael S. Irwig, *Detransition Among Transgender and Gender-Diverse People—An Increasing and Increasingly Complex Phenomenon*, J. CLINICAL ENDOCRINOLOGY & METABOLISM 1, 1 (June 2022), https://pubmed.ncbi.nlm.nih.gov/35678284 ("Detransition refers to the stopping or reversal of transitioning which could be social (gender presentation, pronouns), medical (hormone therapy), surgical, or legal.").

[79] *See id.* (discussing "largest study to look at detransition").

[80] *See* Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 MORBIDITY & MORTALITY WKLY. REP. 67, 68 (2019), https://pubmed.ncbi.nlm.nih.gov/30677012.

[81] *See* Boulware et al., *supra* note 66, at 20.

26

will eventually come to identify as their sex assigned at birth, the GAPMS Report

questions the medical necessity of puberty blockers and hormone therapy for

adolescents and suggests that a "watchful waiting" approach may be more

appropriate. In this regard, some practitioners use a "watchful waiting" approach

for prepubertal children with gender dysphoria, which involves waiting until the

patient reaches adolescence before considering social transition.[82] However,

"watchful waiting" is not recommended for gender-dysphoric adolescents, as it can

cause immense harm by denying them evidence-based treatments that could

alleviate their distress and forcing them to experience full endogenous puberty,

resulting in physical changes that may be reversed—if at all—only through

surgery.[83]

### D. The International Medical Community Has Endorsed Gender-Affirming Care, Contrary to the State's Assertions.

The GAPMS Report wrongly suggests that an international debate rages

over whether to provide gender-affirming care.[84] It attempts to rely on examples

from France, Sweden, Finland, and the United Kingdom, but all of these countries

provide gender-affirming care to adolescents when medically indicated.

---

[82] Doc. 78-32 at 4.

[83] Doc. 78-32 at 4; Doc. 69-18 at 21.

[84] *See* GAPMS Report at 35-37.

27

App_0501

Transgender youth also have access to gender-affirming care in developed nations across the world including Australia,[85] Canada,[86] Denmark,[87] Germany,[88] Mexico,[89] New Zealand,[90] Norway,[91] and Spain,[92] among others. Although some

---

[85] *See Australian Standards of Care and Treatment Guidelines for Trans and Gender Diverse Children and Adolescents*, ROYAL CHILDREN'S HOSP. MELBOURNE (Oct. 2021), https://auspath.org.au/wp-content/uploads/2021/10/australian-standards-of-care-and-treatment-guidelines-for-trans-and-gender-diverse-children-and-adolescents_v1-3.pdf.

[86] *See* Greta R. Bauer et al., *Transgender Youth Referred to Clinics for Gender-Affirming Medical Care in Canada*, 148(5) PEDIATRICS 1 (2021).

[87] *See Guidelines on Healthcare Concerning Gender Identity Matters*, RETSINFORMATION (2018), https://www.retsinformation.dk/eli/retsinfo/2019/9060.

[88] *See Ethics Council Publishes Ad Hoc Recommendation on Transgender Identity in Children and Adolescents*, GERMAN ETHICS COUNSEL (Feb. 20, 2020), https://www.ethikrat.org/mitteilungen/mitteilungen/2020/deutscher-ethikrat-veroeffentlicht-ad-hoc-empfehlung-zu-trans-identitaet-bei-kindern-und-jugendlichen.

[89] *See Protocol for Access Without Discrimination to Health Care Services for Lesbian, Gay, Bisexual, Transsexual, Transvestite, Transgender and Intersex Persons and Specific Care Guidelines*, GOV'T OF MEX. (June 15, 2020), https://www.gob.mx/cms/uploads/attachment/file/558167/Versi_n_15_DE_JUNIO_2020_Protocolo_Comunidad_LGBTTI_DT_Versi_n_V_20.pdf.

[90] *See Transgender New Zealanders: Children and Young People*, NEW ZEALAND MINISTRY OF HEALTH (2020), https://www.health.govt.nz/your-health/healthy-living/transgender-new-zealanders/transgender-new-zealanders-children-and-young-people.

[91] *See Gender Incongruence: National Academic Guideline*, HELSEDIREKTORATET (2020), https://www.helsedirektoratet.no/retningslinjer/kjonnsinkongruens.

[92] *See* Diego Lopez de Lara et al., *Psychosocial Assessment in Transgender Adolescents*, 93 ANALES DE PEDIATRÍA ENGLISH EDITION 1 (2020), https://europepmc.org/article/MED/32144041.

28

of these countries have debated how best to care for transgender patients, none have come close to banning gender-affirming care for all minors.[93] As described below, the Medicaid Ban would make Florida an outlier in the international medical community, not the norm.

France's health care system covers gender-affirming care for young people.[94] Sweden offers gender-affirming care through its national health care system, and youth in Sweden are able to access gender-affirming care when their providers deem it medically necessary.[95] Finland also offers gender-affirming care to transgender adolescents through its national healthcare system.[96] Yet, gender-

---

[93] *See Brandt*, -- F.4d --, 2022 WL 3652745, at *4 (observing that "[e]ven international bodies that consider hormone treatment for adolescents to be 'experimental' have not banned the care" implicated by the Arkansas law banning gender-affirming care).

[94] *See* Emmanuel Allory et al., *The Expectations of Transgender People in the Face of their Health-Care Access Difficulties and How They Can Be Overcome: A Qualitative Study in France*, 21 PRIMARY HEALTH CARE RSCH. & DEV. 1, 2 (2020), https://www.cambridge.org/core/services/aop-cambridge-core/content/view/A0A151385D44C3FB8B971956DBFB5EFF/S1463423620000638a.pdf/div-class-title-the-expectations-of-transgender-people-in-the-face-of-their-health-care-access-difficulties-and-how-they-can-be-overcome-a-qualitative-study-in-france-div.pdf.

[95] *See Care of Children and Adolescents with Gender Dysphoria: Summary*, SOCIALSTYRELSEN (2022), https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf.

[96] *Recommendation (In Finnish)*, COHERE (June 2020), https://palveluvalikoima.fi/documents/1237350/22895838/Transsukupuolisuus+suositus.pdf/82b60104-291c-7d8c-9e88-

App_0503

affirming care for young people in the United States also involves extensive
psychosocial support and therapy, as discussed above.[97]

The United Kingdom's approach to gender-affirming care is a collaborative
process, requiring clinical, patient, and parental participation to move forward with
treatment.[98] The UK's National Institute for Health and Care Excellence (NICE)
recommends that providers create management plans tailored to the individual,
which may include puberty blockers and hormones.[99] Indeed, the United
Kingdom's National Health Service provides gender-affirming care to adolescents
free of charge.[100]

## IV.    The Medicaid Ban Would Irreparably Harm Many Medicaid Recipients with Gender Dysphoria By Denying Them the Treatment They Need.

The Medicaid Ban denies Medicaid recipients in Florida with gender

---

1b1fc9bba527/Transsukupuolisuus+suositus.pdf?t=1592318544000.

[97] *See The World Professional Association for Transgender Health: Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 7), https://wpath.org/publications/soc.

[98] *See NHS Standard Contract for Gender Identity Service for Children and Adolescents*, NHS ENGLAND (Dec. 30, 2019), https://www.england.nhs.uk/wp-content/uploads/2017/04/gender-development-service-children-adolescents.pdf.

[99] *See Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria*, NICE (Mar. 11, 2021).

[100] *See* Talen Wright et al., *Accessing and Utilising Gender-Affirming Healthcare in England and Wales: Trans and Non-Binary People's Accounts of Navigating Gender Identity Clinics*, 21 BMC HEALTH SERVS. RSCH. 1, 2 (2021), https://pubmed.ncbi.nlm.nih.gov/34182985/.

App_0504

dysphoria access to medical interventions designed to improve health outcomes and alleviate suffering and which are grounded in science, and endorsed by the medical community. The medical treatments excluded from coverage by the Medicaid Ban can be a crucial part of treatment for adolescents with gender dysphoria and necessary to preserve their health. As discussed above, research shows that adolescents with gender dysphoria who receive puberty blockers and/or hormone therapy experience less depression, anxiety, and suicidal ideation. Several studies have found that hormone therapy is associated with reductions in the rate of suicide attempts and significant improvement in quality of life.[101] In light of this evidence supporting the connection between lack of access to gender-affirming care and lifetime suicide risk, banning such care can put patients' lives at risk.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.

---

[101] *See* M. Hassan Murad et al., H*ormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes*, 72(2) CLINICAL ENDOCRINOLOGY 214 (Feb. 2010), https://onlinelibrary.wiley.com/doi/10.1111/j.1365-2265.2009.03625.x; *see also* Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, *supra* note 52.

31

Dated: September 27, 2022

Respectfully submitted,

*/s/ Cortlin H. Lannin*

D. Jean Veta  (*pro hac vice* forthcoming)
William  Isasi  (*pro hac vice* forthcoming)
Emily Mondry (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com
wisasi@cov.com
emondry@cov.com

*Counsel for Amici Curiae*

Cortlin H. Lannin (*pro hac vice*
forthcoming)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000

32

## CERTIFICATE OF WORD COUNT

According to Microsoft Word, the word processing system used to prepare this brief, there are 6,402 total words contained within the brief.

/s/ Cortlin H. Lannin
Cortlin H. Lannin

## CERTIFICATE OF SATISFACTION OF
## ATTORNEY-CONFERENCE REQUIREMENT

Pursuant to Local Rule 7.1(B), counsel for *amici* conferred with counsel for the parties on September 22, 2022. Plaintiffs consented to the filing of *amici*'s brief; Defendants oppose the filing.

/s/ Cortlin H. Lannin
Cortlin H. Lannin

App_0507

Tab I

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

AUGUST DEKKER et al.,

      Plaintiffs,

v.                          CASE NO.  4:22cv325-RH-MAF

SIMONE MARSTILLER et al.,

      Defendants.

_____/

## ORDER DENYING LEAVE TO FILE AMICUS BRIEFS

The plaintiffs have moved for a preliminary injunction. The motion is being

briefed and will be heard on an expedited basis. Shortly before the deadline for the

defendants' brief in response to the motion, two groups filed separate motions for

leave to file amicus briefs. They tendered the proposed briefs. Allowing the briefs

would afford the defendants very little time to respond. This order denies leave

based solely on the timing. As the case progresses, any further proposed amicus

brief should be submitted by not later than the deadline for the corresponding filing

of the party whose position the amicus seeks to support.

IT IS ORDERED:

The motions for leave to file amicus briefs, ECF Nos. 34 and 40, are denied.

SO ORDERED on October 3, 2022.

s/Robert L. Hinkle_____
United States District Judge

Tab J

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                               Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

### NOTICE OF SUBPOENA DUCES TECUM AND DEPOSITION OF REPRESENTATIVE OF UNINCORPORATED ASSOCIATION

To:   World Professional Association for Transgender Health
       c/o 850 Tenth Street, N.W., Washington, DC 20001

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will take the deposition of a representative of the World Professional Association for Transgender Health ("the Entity") under oath as follows:

     Date:       December 13, 2022

     Time:       10:00 A.M. EST

     Location:   2300 N Street NW, Suite 643A, Washington, DC 20037

The deposition will begin at 10:00 a.m. at Holtzman Vogel Baran Torchinsky & Josefiak PLLC, 2300 N Street NW, Suite 643A, Washington, DC 20037, or at another time and location mutually agreed upon by Defendants and the Entity. The deposition will be taken before an officer authorized to administer oaths and will be recorded stenographically and by videotape.

Please take further notice that Defendants, by and through undersigned counsel, will serve a subpoena ("the Subpoena") to the Entity that also commands it to produce documents in response to the document requests set forth in Exhibit A to the Subpoena by November 28, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended by through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case. Defendants also note

2

their duty to advise the Entity about their duty to confer and discuss what individual will serve as its designee.

Dated: November 8, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2022, a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

3

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**
**Gary J. Shaw**
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little**
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

4

/s/ Mohammad O. Jazil
Mohammad O. Jazil

EXHIBIT 1

App_0517

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida ▼

| | |
|---|---|
| August Dekker, et al. | ) |
| *Plaintiff* | ) |
| v. | ) |
| Simone Marstiller, et al. | ) |
| | ) |
| *Defendant* | ) |

Civil Action No. 4:22-cv-00325-RH-MAF

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: World Professional Association for Transgender Health

_____
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: 2300 N Street NW, Suite 643A, Washington, DC 20037 | Date and Time: |
|---|---|
| | 12/13/2022 10:00 am |

The deposition will be recorded by this method:  stenographic, audio, and videotape

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Exhibit A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  11/08/2022

CLERK OF COURT

OR

_____    _____
*Signature of Clerk or Deputy Clerk*          /s/ Mohammad O. Jazil
                                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendant Marstiller and Defendant Agency for Health Care Administration _____ , who issues or requests this subpoena, are:

Mohammad O. Jazil, 119 S. Monroe St. Suite 500, Tallahassee, FL 32301, 850-270-5938, mjazil@holtzmanvogel.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0518

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A) *Appearance Not Required.*** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

7

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

8

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

9

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.      "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.      "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.      "You" or "your" is defined as the World Professional Association for Transgender Health and any of its members.

App_0524

REQUESTS FOR PRODUCTION

Request No. 1:      Any documents that state the total number of your membership.

Request No. 2:      Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:      Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:      Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:      Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:      Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

App_0526

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                              Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA DUCES TECUM AND DEPOSITION OF REPRESENTATIVE OF UNINCORPORATED ASSOCIATION

To:      Endocrine Society
           2055 L Street NW, Suite 600, Washington, DC 20036

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will take the deposition of a representative of the Endocrine Society ("the Entity") under oath as follows:

Date:        December 12, 2022

Time:        10:00 A.M. EST

Location:    2300 N Street NW, Suite 643A, Washington, DC 20037

The deposition will begin at 10:00 a.m. at Holtzman Vogel Baran Torchinsky & Josefiak PLLC, 2300 N Street NW, Suite 643A, Washington, DC 20037, or at

another time and location mutually agreed upon by Defendants and the Entity. The deposition will be taken before an officer authorized to administer oaths and will be recorded stenographically and by videotape.

Please take further notice that Defendants, by and through undersigned counsel, will serve a subpoena ("the Subpoena") to the Entity that also commands it to produce documents in response to the document requests set forth in Exhibit A to the Subpoena by November 28, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended by through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case. Defendants also note their duty to advise the Entity about their duty to confer and discuss what individual will serve as its designee.

Dated: November 8, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2022, a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

3

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**
**Gary J. Shaw**
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little**
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

4

_/s/ Mohammad O. Jazil_
Mohammad O. Jazil

App_0531

EXHIBIT 1

App_0532

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida  ▾

| | |
|---|---|
| August Dekker, et al. | ) |
| _Plaintiff_ | ) |
| v. | ) |
| Simone Marstiller, et al. | ) |
| | ) |
| | ) |
| _Defendant_ | ) |

Civil Action No.  4:22-cv-00325-RH-MAF

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Endocrine Society

_____
_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_ **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: 2300 N Street NW, Suite 643A, Washington, DC 20037 | Date and Time: 12/12/2022 10:00 am |
|---|---|

The deposition will be recorded by this method:  stenographic, audio, and videotape

☑ _Production:_ You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Exhibit A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  11/08/2022

| | | |
|---|---|---|
| _CLERK OF COURT_ | | |
| | OR | /s/ Mohammad O. Jazil |
| _____ | | _____ |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ Defendant Marstiller and Defendant Agency for Health Care Administration , who issues or requests this subpoena, are:

Mohammad O. Jazil, 119 S. Monroe St. Suite 500, Tallahassee, FL 32301, 850-270-5938, mjazil@holtzmanvogel.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A) *Appearance Not Required.*** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***

    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

7

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

8

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

9

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.    "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.    "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.    "You" or "your" is defined as the Endocrine Society and any of its members.

REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

Request No. 7:    Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

App_0541

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

    Plaintiffs,

v.                                 Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

    Defendants.

_____/

**NOTICE OF SUBPOENA DUCES TECUM AND DEPOSITION OF
REPRESENTATIVE OF UNINCORPORATED ASSOCIATION**

To:    American Academy of Pediatrics
       601 13th Street, NW, Suite 400 North, Washington, DC 20005

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26, 30, and 45 of the Federal Rules

of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care

Administration, by and through their attorneys, will take the deposition of a

representative of the American Academy of Pediatrics ("the Entity") under oath as

follows:

    Date:        December 14, 2022

    Time:        10:00 A.M. EST

    Location:    2300 N Street NW, Suite 643A, Washington, DC 20037

The deposition will begin at 10:00 a.m. at Holtzman Vogel Baran Torchinsky & Josefiak PLLC, 2300 N Street NW, Suite 643A, Washington, DC 20037, or at another time and location mutually agreed upon by Defendants and the Entity. The deposition will be taken before an officer authorized to administer oaths and will be recorded stenographically and by videotape.

Please take further notice that Defendants, by and through undersigned counsel, will serve a subpoena ("the Subpoena") to the Entity that also commands it to produce documents in response to the document requests set forth in Exhibit A to the Subpoena by November 28, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended by through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case. Defendants also note

their duty to advise the Entity about their duty to confer and discuss what individual will serve as its designee.

Dated: November 8, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2022, a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

3

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**
**Gary J. Shaw**
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little**
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

4

/s/ Mohammad O. Jazil
Mohammad O. Jazil

EXHIBIT 1

App_0547

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Northern District of Florida  ▼

| | |
|---|---|
| August Dekker, et al. | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   4:22-cv-00325-RH-MAF |
| Simone Marstiller, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                        American Academy of Pediatrics

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: 2300 N Street NW, Suite 643A, Washington, DC 20037 | Date and Time: |
|---|---|
| | 12/14/2022 10:00 am |

The deposition will be recorded by this method:   stenographic, audio, and videotape

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Exhibit A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/08/2022

| *CLERK OF COURT* | |
| | OR |
| | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Defendant Marstiller and Defendant Agency for Health Care Administration
, who issues or requests this subpoena, are:

Mohammad O. Jazil, 119 S. Monroe St. Suite 500, Tallahassee, FL 32301, 850-270-5938, mjazil@holtzmanvogel.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0548

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
        **(i)** is a party or a party's officer; or
        **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A) *Appearance Not Required.*** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
        **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
        **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***

    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

        **(i)** fails to allow a reasonable time to comply;
        **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
        **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
        **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

        **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
        **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
        **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
        **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
        **(i)** expressly make the claim; and
        **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

7

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

## DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

9

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the American Academy of Pediatrics and any of its members.

10

REQUESTS FOR PRODUCTION

Request No. 1:      Any documents that state the total number of your membership.

Request No. 2:      Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:      Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:      Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:      Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:      Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

Request No. 7:    Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

12

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                              Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

**NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND
INFORMATION OF UNINCORPORATED ASSOCIATION**

To:      American Academy of Child & Adolescent Psychiatry
           3615 Wisconsin Avenue, N.W.
           Washington, D.C. 20016

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of

Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care

Administration, by and through their attorneys, will serve a subpoena ("the

Subpoena") to the American Academy of Child & Adolescent Psychiatry ("the

Entity") that commands it to produce documents in response to the requests set forth

in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually

agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice

as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and
the Agency for Health Care
Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the

foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

App_0561

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of Florida ▾

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           American Academy of Child & Adolescent Psychiatry
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:     See Exhibit A.

| Place: 2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022  10:00 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/15/2022

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration _____ , who issues or requests this subpoena, are:
Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0562

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
    **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**
    **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
    **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
    **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) Claiming Privilege or Protection.**
    **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

7

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the American Academy of Child & Adolescent Psychiatry and any of its members.

9

REQUESTS FOR PRODUCTION

Request No. 1:    Any documents that state the total number of your membership.

Request No. 2:    Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:    Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:    Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:    Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:    Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                            Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:       American Academy of Family Physicians
             1133 Connecticut Ave NW,
             Washington, DC 20036

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the American Academy of Family Physicians ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

App_0575

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                              American Academy of Family Physicians
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Exhibit A.

| Place: | 2300 N Street NW, Suite 643A | Date and Time: | |
|---|---|---|---|
| | Washington, DC 20037 | | December 12, 2022  10:00 a.m. |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  11/15/2022

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration_____ , who issues or requests this subpoena, are:
Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                              *Server's signature*

                                    _____
                                              *Printed name and title*

                                    _____
                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.     Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.     Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

App_0580

3.    "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.    "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.    "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.    "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.    "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.    "You" or "your" is defined as the American Academy of Family Physicians and any of its members.

9

## REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                          Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:       American Academy of Nursing
          1000 Vermont Ave NW
          Suite 910
          Washington, DC 20005

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the American Academy of Nursing ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

5

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: American Academy of Nursing

_____

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Exhibit A.

| Place: 2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022   10:00 a.m. |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 11/15/2022

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration _____, who issues or requests this subpoena, are: Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0590

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                            *Server's signature*

                                                  _____
                                                            *Printed name and title*

                                                  _____
                                                            *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.     Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.     Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

7

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.      "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.      "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the American Academy of Nursing and any of its members.

9

## REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:      Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                           Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:      American College of Obstetricians and Gynecologists
          409 12th Street SW
          Washington, DC 20024

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the American College of Obstetricians and Gynecologists ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the

foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

5

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Northern District of Florida

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| *Plaintiff* | ) |
| v. | )  Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          American College of Obstetricians and Gynecologists

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:          See Exhibit A.

| Place:  2300 N Street NW, Suite 643A  Washington, DC 20037 | Date and Time:  December 12, 2022   10:00 a.m. |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/15/2022

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration _____ , who issues or requests this subpoena, are:
Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0604

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

7

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the American College of Obstetricians and Gynecologists and any of its members.

REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:    Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                          Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:      American College of Physicians
           25 Massachusetts Avenue NW
           Suite 700
           Washington, DC 20001

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the American College of Physicians ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

App_0617

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida ▢▾

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                        American College of Physicians
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following
documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the
material:          See Exhibit A.

| Place: 2300 N Street NW, Suite 643A | Date and Time: |
|---|---|
| Washington, DC 20037 | December 12, 2022   10:00 a.m. |

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or
other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party
may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance;
Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to
respond to this subpoena and the potential consequences of not doing so.

Date:   11/15/2022

|  |  |  |
|---|---|---|
| *CLERK OF COURT* | OR | |
| | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller
and the Florida Agency for Health Care Administration                    , who issues or requests this subpoena, are:
Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com,
850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the
inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before
it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0618

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $        0.00        .

I declare under penalty of perjury that this information is true.

Date: _____                _____
                                                    *Server's signature*

                                                    _____
                                                    *Printed name and title*

                                                    _____
                                                    *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.     If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.     These requests call for the production of all responsive documents in your possession, custody, or control.

## DEFINITIONS

1.     "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.     "Any," "each," and "every" should be understood to include and encompass "all."

7

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the American College of Physicians and any of its members.

## REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                            Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:      American Medical Association
25 Massachusetts Ave NW
Washington, DC 20001

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the American Medical Association ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

App_0631

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
Northern District of Florida ▾

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                    American Medical Association
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:     See Exhibit A.

| Place: 2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022   10:00 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

     The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  11/15/2022

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration _____, who issues or requests this subpoena, are: Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0632

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____              _____
                                                   *Server's signature*

                                         _____
                                                    *Printed name and title*

                                         _____
                                                     *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) Command to Produce Materials or Permit Inspection.**
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) Quashing or Modifying a Subpoena.**
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2) Claiming Privilege or Protection.**
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you
must produce documents as they are kept in the ordinary course of business or must
organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form
ready to load to an electronic discovery platform: either single-page Tagged Image
File Format (.TIFF) or document-level PDF files, along with image load files
(.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-
page TIFF images should be named according to a unique and sequential Bates
number. The image load files should indicate page breaks, and each TIFF in a
production must be referenced in the corresponding image load file. During the
process of converting ESI from the electronic format of the application in which the
ESI is normally created, viewed, and/or modified to TIFF, metadata values should
be extracted and produced in the .DAT file. To the extent they are available, the
metadata values that are to be extracted and produced in the .DAT file are: (a) for
emails: email subject, author, recipient, CC, BCC, received date, received time, sent
date, sent time; (b) for electronic files: file name, author created date, created time,
modified time, and extension; ( c) for all ESI: custodian or source, original path, and
MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

7

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the American Medical Association and any of its members.

9

REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:    Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                              Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:       American Pediatric Society
           601 13th Street, NW, Suite 400 North
           Washington, DC 20005

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the American Pediatric Society ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the

foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

App_0644

EXHIBIT 1

App_0645

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of Florida ▾

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                    American Pediatric Society
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:      See Exhibit A.

| Place: 2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022   10:00 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/15/2022

                    *CLERK OF COURT*
                                            OR
                                                    /s/ Mohammad O. Jazil
_____        _____
     *Signature of Clerk or Deputy Clerk*                *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration_____, who issues or requests this subpoena, are:
Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                    *Server's signature*

                                 _____
                                    *Printed name and title*

                                 _____
                                    *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) *For Other Discovery.*** A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) *Command to Produce Materials or Permit Inspection.***
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) *Quashing or Modifying a Subpoena.***
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2) *Claiming Privilege or Protection.***
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

7

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the American Pediatric Society and any of its members.

9

REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

App_0654

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                                                          Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:      American Psychiatric Association
          800 Maine Avenue SW
          Suite 900
          Washington, DC 20024

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the American Psychiatric Association ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the

foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*


/s/ Mohammad O. Jazil
Mohammad O. Jazil

App_0658

EXHIBIT 1

App_0659

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      American Psychiatric Association

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:      See Exhibit A.

| Place: 2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022   10:00 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/15/2022

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration                     , who issues or requests this subpoena, are:
Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                              *Server's signature*

                                                 _____
                                                              *Printed name and title*

                                                 _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin,
production attachment range number end, attachment name, and production doc
page count. Files that are not easily converted to image format, such as spreadsheet,
presentation, audio and video, database, and drawing files, should be produced in
native format. If a document is produced in native format, a single-page
Bates-stamped TIFF image slip-sheet containing text stating the document has been
produced in native format should also be provided. Each such native file should be
named for its Bates number with its original file extension, and should be linked
directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly
make the claim and describe the nature of the withheld documents, communications,
or tangible things in a manner that, without revealing information itself privileged
or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in
your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively,
whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and
encompass "all."

7

3.    "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.    "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.    "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.    "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.    "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.      "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.      "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the American Psychiatric Association and any of its members.

9

## REQUESTS FOR PRODUCTION

Request No. 1:      Any documents that state the total number of your membership.

Request No. 2:      Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:      Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:      Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:      Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:      Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                            Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:      Association of American Medical Colleges
655 K Street, NW
Suite 100
Washington, DC 20001

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the Association of American Medical Colleges ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

App_0673

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida  ▢ ▾

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        Association of American Medical Colleges
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:        See Exhibit A.

| Place: 2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022   10:00 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/15/2022

|  |  |
|---|---|
| *CLERK OF COURT* | OR |
| _____ | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration _____ , who issues or requests this subpoena, are: Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0674

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____             _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) Quashing or Modifying a Subpoena.**
  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.     Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.     Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

7

3. "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4. "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5. "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6. "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7. "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the Association of American Medical Colleges and any of its members.

App_0680

REQUESTS FOR PRODUCTION

Request No. 1:      Any documents that state the total number of your membership.

Request No. 2:      Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:      Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:      Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:      Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:      Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:    Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                              Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:       National Association of Pediatric Nurse Practitioners
C/O 850 Tenth St., N.W.
Washington, D.C. 20001

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the National Association of Pediatric Nurse Practitioners ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the

foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

App_0687

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida ▢▾

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          National Association of Pediatric Nurse Practitioners
_____
*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:          See Exhibit A.

| Place:  2300 N Street NW, Suite 643A Washington, DC 20037 | Date and Time: December 12, 2022   10:00 a.m. |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  11/15/2022

| CLERK OF COURT | OR | |
|---|---|---|
| _____ | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration _____ , who issues or requests this subpoena, are: Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0688

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____     on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____        _____
                                                                           *Server's signature*

                                                      _____
                                                                           *Printed name and title*

                                                      _____
                                                                           *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.     If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.     These requests call for the production of all responsive documents in your possession, custody, or control.

## DEFINITIONS

1.     "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.     "Any," "each," and "every" should be understood to include and encompass "all."

7

3.     "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.     "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.     "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.     "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.     "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.  "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.  "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.  "You" or "your" is defined as the National Association of Pediatric Nurse Practitioners and any of its members.

9

REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:    Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                         Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:   North-Central Florida Council of Child and Adolescent Psychiatry
3615 Wisconsin Avenue, NW
Washington, D.C. 20016

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the North-Central Florida Council of Child and Adolescent Psychiatry ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the

foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

App_0701

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

AUGUST DEKKER, et al.,

_____
*Plaintiff*

v.                                                                Civil Action No.  4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

_____
*Defendant*

)
)
)
)
)
)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      North Central Florida Council of Child & Adolescent Psychiatry

_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:      See Exhibit A.

| Place:   2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022   10:00 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/15/2022

_____

*CLERK OF COURT*

OR

_____                              /s/ Mohammad O. Jazil
*Signature of Clerk or Deputy Clerk*                         *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Secretary Marstiller and the Florida Agency for Health Care Administration_____ , who issues or requests this subpoena, are: Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0702

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

### PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.     Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.     Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.     If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.     These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.     "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.     "Any," "each," and "every" should be understood to include and encompass "all."

7

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.    "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.    "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.    "You" or "your" is defined as the North-Central Florida Council of Child and Adolescent Psychiatry and any of its members.

9

REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

      Plaintiffs,

v.                                     Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

      Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:      Societies for Pediatric Urology
C/O 850 Tenth St., N.W.
Washington, D.C. 20001

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the Societies for Pediatric Urology ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the

foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida ⬇

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                          Societies for Pediatric Urology

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:        See Exhibit A.

| Place: 2300 N Street NW, Suite 643A Washington, DC 20037 | Date and Time: December 12, 2022   10:00 a.m. |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/15/2022

|  *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration                         , who issues or requests this subpoena, are:
Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0716

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____  on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.    Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.    Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

7

3.    "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.    "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.    "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.    "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.    "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the Societies for Pediatric Urology and any of its members.

9

REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                            Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:        Society for Adolescent Health and Medicine
C/O 850 Tenth St., N.W.
Washington, D.C. 20001

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the Society for Adolescent Health and Medicine ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

EXHIBIT 1

App_0729

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida ▾

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:              Society for Adolescent Health and Medicine
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:     See Exhibit A.

| Place: 2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022   10:00 a.m. |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 11/15/2022

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration _____, who issues or requests this subpoena, are: Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0730

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $       0.00       .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                          *Server's signature*

                                              _____
                                                          *Printed name and title*

                                              _____
                                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) Claiming Privilege or Protection.**
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1. Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2. Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

## DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

7

3.    "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.    "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.    "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.    "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.    "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.     "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.     "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.     "You" or "your" is defined as the Society for Adolescent Health and Medicine and any of its members.

9

REQUESTS FOR PRODUCTION

Request No. 1:      Any documents that state the total number of your membership.

Request No. 2:      Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:      Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:      Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:      Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:      Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

      Plaintiffs,

v.                              Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

      Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:        Society for Pediatric Research
                C/O 850 Tenth St., N.W.
                Washington, D.C. 20001

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the Society for Pediatric Research ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil

Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the

foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*

/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

# EXHIBIT 1

App_0743

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Florida ▼

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Society for Pediatric Research
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:     See Exhibit A.

| Place: 2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022   10:00 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 11/15/2022
_____

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration _____, who issues or requests this subpoena, are: Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0744

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____            _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3.      If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4.      These requests call for the production of all responsive documents in your possession, custody, or control.

DEFINITIONS

1.      "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2.      "Any," "each," and "every" should be understood to include and encompass "all."

7

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.      "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.      "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.      "You" or "your" is defined as the Society for Pediatric Research and any of its members.

App_0750

## REQUESTS FOR PRODUCTION

Request No. 1:     Any documents that state the total number of your membership.

Request No. 2:     Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:     Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:     Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:     Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:     Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                                  Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS AND INFORMATION OF UNINCORPORATED ASSOCIATION

To:       Society of Pediatric Nurses
            C/O 850 Tenth St., N.W.
            Washington, D.C. 20001

To all parties and their attorneys of record:

Please take notice that pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Defendants Simone Marstiller and the Agency for Health Care Administration, by and through their attorneys, will serve a subpoena ("the Subpoena") to the Society of Pediatric Nurses ("the Entity") that commands it to produce documents in response to the requests set forth in Exhibit A to the Subpoena by December 12, 2022, or such other date as mutually agreed upon. A copy of the subpoena, including Exhibit A, is attached to this Notice as Exhibit 1.

Defendants seek to examine (1) the Entity's policy position on gender-affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side effects and risks associated with the treatments recommended through a guideline, standard, best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the Entity sought to file an amicus brief in this case.

2

Dated: November 15, 2022

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for Secretary Marstiller and the Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022 a true and correct copy of the foregoing document was served upon all counsel of record via email, as follows:

Chelsea Lee Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave
Gainesville, FL 32601
Chelsea.Dunn@southernlegal.org

Gary Joseph Shaw
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
Gary.Shaw@pillsburylaw.com

Katherine Jean Ann Debriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
Debriere@floridahealthjustice.org

Joseph K. Little
PILLSBURY WINTHROP SHAW
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
Joe.Little@pillsburylaw.com

Simone Michelle Chriss
SOUTHERN LEGAL COUNSEL INC
1229 NW 12th Ave

Omar Gonzalez-Pagan
LAMBDA LEGAL
120 Wall Street, 19th Floor

3

Gainesville, FL 32601

Abigail K Coursolle
NATIONAL HEALTH LAW
PROGRAM – LOS ANGELES
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Coursolle@healthlaw.org

Carl Solomon Charles
LAMBDA LEGAL
1 West Court Square, Suite 105
Decatur, GA 30030
CCharles@lambdalegal.org

Catherine Anne McKee
NATIONAL HEALTH LAW
PROGRAM – CHAPEL HILL
1512 E Franklin St, Suite 110
Chapel hill, NC 27514
Mckee@healthlaw.org

New York, NY 10005
OGonzalez-Pagan@lambdalegal.org

Shani Rivaux
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Shani.Rivaux@pillsburylaw.com

William Clarke Miller
PILLSBURY WINTHROP SHAW
1200 17th Street NW
Washington, DC 20036
William.C.Miller@pillsburylaw.com

Jennifer G. Altman
PILLSBURY WINTHROP SHAW
600 Brickell Ave, Suite 3100
Miami, FL 33131
Jennifer.Altman@pillsburylaw.com

*Counsel for Plaintiffs*


/s/ Mohammad O. Jazil
Mohammad O. Jazil

4

**EXHIBIT 1**

App_0757

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida ▢▾

| | |
|---|---|
| AUGUST DEKKER, et al., | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                          Society of Pediatric Nurses
_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:        See Exhibit A.

| Place: 2300 N Street NW, Suite 643A<br>Washington, DC 20037 | Date and Time:<br>December 12, 2022   10:00 a.m. |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/15/2022

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ | | /s/ Mohammad O. Jazil |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Secretary Marstiller and the Florida Agency for Health Care Administration                          , who issues or requests this subpoena, are:
Mohammad O. Jazil, 119 South Monroe St., Suite 500, Tallahassee, FL 32301, mjazil@holtzmanvogel.com, 850-391-0503

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App_0758

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:22-cv-00325-RH-MAF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____              _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A

INSTRUCTIONS

1.      Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, you must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in this demand.

2.      Electronically stored information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: either single-page Tagged Image File Format (.TIFF) or document-level PDF files, along with image load files (.OPT), document-level text (.TXT) files, and a metadata load file (.DAT). single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed, and/or modified to TIFF, metadata values should be extracted and produced in the .DAT file. To the extent they are available, the metadata values that are to be extracted and produced in the .DAT file are: (a) for emails: email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files: file name, author created date, created time, modified time, and extension; ( c) for all ESI: custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment: production number

6

begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

3. If a claim of privilege or other protection is asserted, you must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

4. These requests call for the production of all responsive documents in your possession, custody, or control.

## DEFINITIONS

1. "And" and "or" shall be construed either conjunctively or disjunctively, whichever provides the broadest meaning possible.

2. "Any," "each," and "every" should be understood to include and encompass "all."

7

3.      "Communication" means any means of written or oral communication, including but not limited to via telephone, letter, notes, email, facsimile, memoranda, face-to-face meetings, electronic calendar appointments and meetings, text message, instant message, and social media or other apps.

4.      "Document" or "documents" have the broadest meaning that can be ascribed pursuant to Federal Rule of Civil Procedure 34. These terms include emails, correspondence, messages on any messaging platform (e.g., Signal, WhatsApp, Teams), social media posts and content, notes, memoranda, reports, calendar entries, telexes, facsimile transmissions, presentation materials, minutes of meetings, telecopies, photographs, pictures, recordings, messages, or call logs. These terms also include any originals or drafts, in any form or medium.

5.      "Include" or "including" are to be read as followed by the phrase "without limitation" and have the broadest meaning possible.

6.      "Relating to" means respecting, referring to, stating, describing, containing, mentioning, discussing, associated with, pertaining to, or relevant to, the item or subject matter set forth in the request.

7.      "Gender dysphoria" is defined in accordance with the September 27, 2022 Brief of Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of

8

Plaintiffs' Motion for Preliminary Injunction, in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

8.    "Gender affirming care" is defined to include social transitioning, hormone therapy (including cross-sex hormones and puberty blockers), and surgery.

9.    "Members" or "membership" is defined to include all members, fellows, students, residents, agents, or any other individuals associated or affiliated with your organization.

10.    "You" or "your" is defined as the Society of Pediatric Nurses and any of its members.

9

## REQUESTS FOR PRODUCTION

Request No. 1:      Any documents that state the total number of your membership.

Request No. 2:      Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

Request No. 3:      Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:      Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:      Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:      Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

10

Request No. 7:     Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

11

Tab K

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

AUGUST DEKKER, et al.,

Plaintiffs,

v.

SIMONE MARSTILLER, et al.,

Defendants.

No. 4:22-cv-00325-RH-MAF

---

## WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH'S RESPONSES AND OBJECTIONS TO RULE 45 SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION AND TO PRODUCE DOCUMENTS

Pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, non-party World Professional Association for Transgender Health ("WPATH"), through its undersigned counsel, hereby responds and objects to the subpoena for deposition testimony and the production of documents ("Requests") served by Defendants Simone Marstiller and the Agency for Health Care Administration, ("Defendants") in the above-captioned proceeding.

### GENERAL OBJECTIONS

The following General Objections are incorporated in full into all Specific Objections set forth below:

App_0768

1.      These responses are made solely for the purpose of this action.  By responding to the Requests, WPATH does not waive any objections that it may have to admission into evidence of these responses or any information and/or documents produced in response to the Requests on any applicable grounds.

2.      WPATH objects to the Requests to the extent that they impose obligations that go beyond, or that are otherwise inconsistent with, the Federal Rules of Civil Procedure, the Local Rules of the Court, any Order of the Court, or any other applicable law, rule, or order (collectively "Discovery Rules").

3.      WPATH objects to the Requests because the subpoena violates Federal Rule of Civil Procedure 45, as it commands WPATH, an Illinois-based organization, to provide testimony and produce documents in Washington, D.C., more than 100 miles from where WPATH resides.

4.      WPATH objects to the Requests to the extent they seek discovery beyond any relevant, responsive, non-privileged, and non-duplicative information and/or documents in its possession, custody, or control that would be located after a reasonable search proportional to the needs of the case.  WPATH will respond to these Requests in good faith, but observes that the Requests on their face appear to seek information that is not relevant to any party's claims or defenses.  *See, e.g., Boe v. Marshall*, No. 2022 WL 14049505, at *2 (M.D. Ala. Oct. 24, 2022) (finding materials sought from a third party were irrelevant to a similar lawsuit challenging

restrictions on gender-affirming care in the State of Alabama, reasoning that the "materials are unlikely to reveal or lead to any information that would help resolve the fundamental issue in this case," the constitutionality of the challenged statute); *see also North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51–52 (D.D.C. 2005) (holding that "[t]he mere filing of an amicus brief … does not open oneself to broad discovery demands, nor does it make one's bias, if any, relevant to the underlying action" and that "imposing such a burden on amici would undoubtedly discourage entities from making amicus filings at all, so as to avoid subjecting themselves to severe scrutiny and onerous discovery requests.").

5.    WPATH objects to the Requests as overly broad and unduly burdensome, particularly the burden of requiring a non-party to respond to multiple deposition topics and multiple requests for documents, many with multiple sub-parts, which demand "*[a]ny* Documents" and "*[a]ny* Communications" (emphasis added) and are unbounded by time or any other limiting criteria.  The cumulative burden of responding to these Requests is not proportional to the needs of the case, particularly because WPATH is not a party to the case.  Indeed, "concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs" under Rule 45 of the Federal Rules of Civil Procedure.  *See, e.g.*, *Va. Dep't of Corrs. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) (holding that "a more demanding variant of the proportionality analysis"

3

applies, and that courts "must give the recipient's nonparty status special weight, leading to an even more demanding and sensitive inquiry than the one governing discovery generally.").

6.      WPATH objects to the Requests, and to the definitions and instructions included in the Requests, to the extent that they assume facts and events, include characterizations that are assumed to be accurate, or contain legal conclusions.  By responding to the Requests, WPATH does not admit or concede that any fact, event, characterization, or legal conclusion is correct or accurate, and WPATH reserves the right to contest all assumed facts, events, characterizations, and legal conclusions.

7.      WPATH objects to the Requests, and to the definitions and instructions included in this set of Requests, to the extent that they purport to require that WPATH identify and provide discovery with regard to "any" or similar all-encompassing wording on the grounds that the Requests are individually and collectively overly broad and unduly burdensome and seek discovery not relevant to the parties' claims and defenses nor proportional to the needs of the case.  To the extent that the Requests seek information and/or documents that are not reasonably accessible because they cannot be retrieved or produced without undue burden or cost, WPATH objects because the Requests are overly broad and unduly burdensome.

4

8.    WPATH objects to the Requests to the extent that they seek information that can be obtained from the parties to this case, publicly available sources, or other third parties, including from the parties' experts.

9.    WPATH objects to the Requests to the extent they seek information and/or documents that are no longer reasonably obtainable by WPATH due to the passage of time, employee turnover, or because the information is not stored on active systems.

10.   WPATH objects to the Requests to the extent that they seek production of confidential or other sensitive information, and to the extent they seek discovery of sensitive non-public information or disclosure of information protected by any confidentiality obligation owed a third party.

11.   WPATH objects to the Requests to the extent that they seek the production of information and/or documents that are protected by the attorney-client privilege, the work product doctrine, the joint-defense or common interest privilege, privacy laws (including patient and healthcare privacy laws), any other applicable privilege, protection, or immunity, or that are otherwise exempted from discovery.  WPATH hereby asserts all applicable privileges and protections to the extent implicated by each Request, whether based on statute or regulation or recognized at common law.  In the event that any privileged information and/or

5

document is produced by WPATH, its production is inadvertent and does not constitute waiver of any privilege, protection, or immunity.

12.    WPATH objects to the Requests to the extent that they seek the production of information and/or documents that are protected by the First Amendment privilege, including but not limited to associational information. *See, e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1152 (9th Cir. 2010) (recognizing that where "discovery would have the practical effect of discouraging the exercise of First Amendment associational rights, the party seeking such discovery must demonstrate a need for the information sufficient to outweigh the impact on those rights").

13.    WPATH's objections are made to the best of its knowledge, information, and belief.  WPATH reserves the right to revise, correct, clarify, supplement, and/or amend the objections set forth herein, and reserves its right to assert any and all other defenses or objections, including those permitted by the Discovery Rules and the case law.

## OBJECTIONS TO DEFINITIONS

14.    WPATH objects to the definitions of "You" and "Your" on the grounds that they are overly broad, vague, ambiguous, and unduly burdensome to the extent they seek production of information from entities other than WPATH.

6

In responding to these Requests, WPATH will construe "You" and "Your" to refer to WPATH.

15.     WPATH objects to the definitions of "Document" and "documents" to the extent that they seek to impose obligations on WPATH beyond those imposed by the Discovery Rules and/or seek information or documents not in WPATH's possession, custody, or control.

16.     WPATH objects to the definition of "Communication" to the extent that it seeks to impose obligations on WPATH beyond those imposed by the Discovery Rules and/or seek information or documents not in WPATH's possession, custody, or control.

17.     WPATH objects to the definitions of "Gender Affirming Care" as argumentative and/or inaccurate.  However, solely for purposes of responding to the subpoena, WPATH will interpret the Requests consistent with the provided Definitions, to the extent that they can be understood.

18.     WPATH objects to the definitions of "Members" and "membership" on the grounds that they are overly broad, vague, ambiguous, and unduly burdensome.

App_0774

## OBJECTIONS TO INSTRUCTIONS

19.    WPATH objects to Instruction Nos. 1, 2, 3, and 4 to the extent that they impose obligations that go beyond, or that are otherwise inconsistent with the Discovery Rules.

8

## SPECIFIC OBJECTIONS TO DEPOSITION TOPICS

**TOPIC NO. 1:**

[T]he Entity's policy position on gender-affirming care for gender dysphoria[.]

**RESPONSE TO TOPIC NO. 1:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein.  WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party.  *See Leake*, 231 F.R.D. at 51–52.  WPATH further objects to this Request to the extent that it fails to state with particularity the requested information for testimony.  WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "policy position" and because it is unbounded by time.  WPATH further objects to this Request to the extent that "the Entity's policy position on gender-affirming care for gender dysphoria" speaks for itself.  WPATH further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.

Subject to and without waiving the foregoing objections, WPATH is willing to meet and confer about this Topic.

9

**TOPIC NO. 2:**

[A]ny guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria[.]

**RESPONSE TO TOPIC NO. 2:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. WPATH further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "any guidelines, standards, best-practices, or policy positions" and "considered or adopted," and because it is unbounded by time. WPATH further objects to this Request to the extent that "any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria" speak for themselves. WPATH further objects to this Request to the extent that it is duplicative of Topic No. 1.

Subject to and without waiving the foregoing objections, WPATH is willing to meet and confer about this Topic.

10

**TOPIC NO. 3:**

[A]ny side effects and risks associated with the treatments recommended by through a guideline, standard, best-practice, or policy[.]

**RESPONSE TO TOPIC NO. 3:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. WPATH further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "any side effects and risks," "associated with the treatments," and "guideline, standard, best-practice, or policy," and because it is unbounded by time. WPATH further objects to this Request to the extent that it seeks information that is publicly available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, WPATH is willing to meet and confer about this Topic.

App_0778

**TOPIC NO. 4:**

[H]ow the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria[.][1]

**RESPONSE TO TOPIC NO. 4:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein.  WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party.  *See Leake*, 231 F.R.D. at 51–52.  WPATH further objects to this Request to the extent that it fails to state with particularity the requested information for testimony.  WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "how the entity is organized" and "so that Defendants may determine the process," and because it is unbounded by time. WPATH further objects to this Request to the extent that it seeks information that is publicly available and therefore equally available to all parties.

---

[1] The numbering in the original notice of deposition had two topics labeled "(3)." The second of those two topics, and all subsequent topics, have been renumbered.

Subject to and without waiving the foregoing objections, WPATH is willing to meet and confer about this Topic.

**TOPIC NO. 5:**

[H]ow many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions[.]

**RESPONSE TO TOPIC NO. 5:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. WPATH further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "voted to support any guidelines, standards, best-practices, or policy positions," and because it is unbounded by time. WPATH further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

13

Subject to and without waiving the foregoing objections, WPATH is willing to meet and confer about this Topic.

## TOPIC NO. 6:

[W]hy the Entity sought to file an amicus brief in this case.

## RESPONSE TO TOPIC NO. 6:

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein.  WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party.  *See Leake*, 231 F.R.D. at 51–52.  WPATH further objects to this Request to the extent that it fails to state with particularity the requested information for testimony.  WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "why [WPATH] sought to file."  WPATH further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.   WPATH further objects to this Request because it calls for documents protected by at least the attorney-client privilege and/or the attorney work product doctrine.

14

Subject to and without waiving the foregoing objections, WPATH is willing to meet and confer about this Topic.

## SPECIFIC OBJECTIONS TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1**:

Any documents that state the total number of your membership.

**RESPONSE TO REQUEST NO. 1:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. WPATH further objects that this is an interrogatory disguised as a document request. WPATH further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties. WPATH further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.

Subject to and without waiving the foregoing objections, WPATH directs Defendants to information available online, including on its website. *See, e.g.*, https://www.wpath.org/member/search/results?showAll=1.

16

**REQUEST NO. 2:**

Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

**RESPONSE TO REQUEST NO. 2:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "how you establish" and "guidelines, standards, best-practices, or policy positions," and because it is unbounded by time. WPATH further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, WPATH directs Plaintiffs to the information available online, including on its website. *See, e.g.*, https://www.wpath.org/soc8/Methodology. WPATH is willing to meet and confer about what additional responsive documents, if any, WPATH may agree to produce.

17

**REQUEST NO. 3:**

Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 3:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. WPATH further objects to this Request as compound, as it appears to encompass two separate document requests. WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care" and "showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care," and because it is unbounded by time. WPATH further objects to this Request to

18

the extent that it seeks documents that are publicly available and therefore equally available to all parties.  WPATH further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.  WPATH further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.  WPATH further objects to this Request to the extent that it is duplicative of Request No. 2.

Subject to and without waiving the foregoing objections, WPATH directs Defendants to information available online, including on its website.  *See, e.g.*, https://www.wpath.org/media/cms/Documents/SOC%20v8/SOC8%20Full%20Contributor%20List%20-%20FINAL%20UPDATED%202022.pdf; see also https://www.wpath.org/soc8/Chairs-Evidence-Leads.  WPATH is willing to meet and confer about what additional responsive documents, if any, WPATH may agree to produce.

**REQUEST NO. 4:**

Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 4:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein.  WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party.  *See Leake*, 231 F.R.D. at 51–52.  WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time.  WPATH further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.  WPATH further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

Subject to and without waiving the foregoing objections, WPATH is willing to meet and confer about this Request and to discuss what, if any, responsive documents WPATH may agree to produce.

20

**REQUEST NO. 5:**

Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

**RESPONSE TO REQUEST NO. 5:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "detailing your intention to file." WPATH further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege. WPATH further objects to this Request because it calls for documents protected by at least the attorney-client privilege and/or the attorney work product doctrine.

WPATH will not produce documents in response to this improper Request.

21

**REQUEST NO. 6:**

Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 6:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein.  WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party.  *See Leake*, 231 F.R.D. at 51–52.  WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "or any other person" and "relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time.   WPATH further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.  WPATH further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

App_0789

Subject to and without waiving the foregoing objections, WPATH is willing to meet and confer about this Request and to discuss what, if any, responsive documents WPATH may agree to produce.

**REQUEST NO. 7:**

Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 7:**

WPATH incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. WPATH further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of WPATH's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. WPATH further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "showing any side effects and risks," "associated with the treatments," and "your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time. WPATH further objects to this

23

Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, WPATH is willing to meet and confer about this Request and to discuss what, if any, responsive documents WPATH may agree to produce.

24

Dated:  December 2, 2022

Respectfully submitted,

*/s/ Cortlin H. Lannin*
Cortlin H. Lannin

Covington & Burling LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

*Counsel for Non-Party World
Professional Association for
Transgender Health*

25

## CERTIFICATE OF SERVICE

I, the undersigned, certify that copies of the foregoing **World Professional Association for Transgender Health's Responses and Objections to Rule 45 Subpoena to Testify at a Deposition in a Civil Action and to Produce Documents** were delivered to the following parties by electronic mail:

Mohammad O. Jazil
mjazil@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938


Dated:  December 2, 2022

  /s/ Dylan M. Silva
Dylan M. Silva
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-7007
dsilva@cov.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

|  |  |
|---|---|
| AUGUST DEKKER, et al., | No. 4:22-cv-00325-RH-MAF |
| Plaintiffs, | |
| v. | |
| SIMONE MARSTILLER, et al., | |
| Defendants. | |

## ENDOCRINE SOCIETY'S RESPONSES AND OBJECTIONS TO RULE 45 SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION AND TO PRODUCE DOCUMENTS

Pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, non-party Endocrine Society ("Endocrine Society"), through its undersigned counsel, hereby responds and objects to the subpoena for deposition testimony and the production of documents ("Requests") served by Defendants Simone Marstiller and the Agency for Health Care Administration, ("Defendants") in the above-captioned proceeding.

### GENERAL OBJECTIONS

The following General Objections are incorporated in full into all Specific Objections set forth below:

1.     These responses are made solely for the purpose of this action.  By responding to the Requests, Endocrine Society does not waive any objections that it may have to admission into evidence of these responses or any information and/or documents produced in response to the Requests on any applicable grounds.

2.     Endocrine Society objects to the Requests to the extent that they impose obligations that go beyond, or that are otherwise inconsistent with, the Federal Rules of Civil Procedure, the Local Rules of the Court, any Order of the Court, or any other applicable law, rule, or order (collectively "Discovery Rules").

3.     Endocrine Society objects to the Requests to the extent they seek discovery beyond any relevant, responsive, non-privileged, and non-duplicative information and/or documents in its possession, custody, or control that would be located after a reasonable search proportional to the needs of the case.  Endocrine Society will respond to these Requests in good faith, but observes that the Requests on their face appear to seek information that is not relevant to any party's claims or defenses.  *See, e.g., Boe v. Marshall*, No. 2022 WL 14049505, at *2 (M.D. Ala. Oct. 24, 2022) (finding materials sought from a third party were irrelevant to a similar lawsuit challenging restrictions on gender-affirming care in the State of Alabama, reasoning that the "materials are unlikely to reveal or lead to any information that would help resolve the fundamental issue in this case," the constitutionality of the challenged statute); *see also North Carolina Right to Life,*

App_0795

*Inc. v. Leake*, 231 F.R.D. 49, 51–52 (D.D.C. 2005) (holding that "[t]he mere filing of an amicus brief … does not open oneself to broad discovery demands, nor does it make one's bias, if any, relevant to the underlying action" and that "imposing such a burden on amici would undoubtedly discourage entities from making amicus filings at all, so as to avoid subjecting themselves to severe scrutiny and onerous discovery requests.").

4.   Endocrine Society objects to the Requests as overly broad and unduly burdensome, particularly the burden of requiring a non-party to respond to multiple deposition topics and multiple requests for documents, many with multiple sub-parts, which demand "*[a]ny* Documents" and "*[a]ny* Communications" (emphasis added) and are unbounded by time or any other limiting criteria. The cumulative burden of responding to these Requests is not proportional to the needs of the case, particularly because Endocrine Society is not a party to the case. Indeed, "concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs" under Rule 45 of the Federal Rules of Civil Procedure. *See, e.g.*, *Va. Dep't of Corrs. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) (holding that "a more demanding variant of the proportionality analysis" applies, and that courts "must give the recipient's nonparty status special weight, leading to an even more demanding and sensitive inquiry than the one governing discovery generally.").

5.      Endocrine Society objects to the Requests, and to the definitions and instructions included in the Requests, to the extent that they assume facts and events, include characterizations that are assumed to be accurate, or contain legal conclusions.  By responding to the Requests, Endocrine Society does not admit or concede that any fact, event, characterization, or legal conclusion is correct or accurate, and Endocrine Society reserves the right to contest all assumed facts, events, characterizations, and legal conclusions.

6.      Endocrine Society objects to the Requests, and to the definitions and instructions included in this set of Requests, to the extent that they purport to require that Endocrine Society identify and provide discovery with regard to "any" or similar all-encompassing wording on the grounds that the Requests are individually and collectively overly broad and unduly burdensome and seek discovery not relevant to the parties' claims and defenses nor proportional to the needs of the case.  To the extent that the Requests seek information and/or documents that are not reasonably accessible because they cannot be retrieved or produced without undue burden or cost, Endocrine Society objects because the Requests are overly broad and unduly burdensome.

7.      Endocrine Society objects to the Requests to the extent that they seek information that can be obtained from the parties to this case, publicly available sources, or other third parties, including from the parties' experts.

4

8.      Endocrine Society objects to the Requests to the extent they seek information and/or documents that are no longer reasonably obtainable by Endocrine Society due to the passage of time, employee turnover, or because the information is not stored on active systems.

9.      Endocrine Society objects to the Requests to the extent that they seek production of confidential or other sensitive information, and to the extent they seek discovery of sensitive non-public information or disclosure of information protected by any confidentiality obligation owed a third party.

10.      Endocrine Society objects to the Requests to the extent that they seek the production of information and/or documents that are protected by the attorney-client privilege, the work product doctrine, the joint-defense or common interest privilege, privacy laws (including patient and healthcare privacy laws), any other applicable privilege, protection, or immunity, or that are otherwise exempted from discovery.  Endocrine Society hereby asserts all applicable privileges and protections to the extent implicated by each Request, whether based on statute or regulation or recognized at common law.  In the event that any privileged information and/or document is produced by Endocrine Society, its production is inadvertent and does not constitute waiver of any privilege, protection, or immunity.

5

11.     Endocrine Society objects to the Requests to the extent that they seek the production of information and/or documents that are protected by the First Amendment privilege, including but not limited to associational information. *See, e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1152 (9th Cir. 2010) (recognizing that where "discovery would have the practical effect of discouraging the exercise of First Amendment associational rights, the party seeking such discovery must demonstrate a need for the information sufficient to outweigh the impact on those rights").

12.     Endocrine Society's objections are made to the best of its knowledge, information, and belief.  Endocrine Society reserves the right to revise, correct, clarify, supplement, and/or amend the objections set forth herein, and reserves its right to assert any and all other defenses or objections, including those permitted by the Discovery Rules and the case law.

## OBJECTIONS TO DEFINITIONS

13.     Endocrine Society objects to the definitions of "You" and "Your" on the grounds that they are overly broad, vague, ambiguous, and unduly burdensome to the extent they seek production of information from entities other than Endocrine Society.  In responding to these Requests, Endocrine Society will construe "You" and "Your" to refer to Endocrine Society.

6

14.     Endocrine Society objects to the definitions of "Document" and "documents" to the extent that they seek to impose obligations on Endocrine Society beyond those imposed by the Discovery Rules and/or seek information or documents not in Endocrine Society's possession, custody, or control.

15.     Endocrine Society objects to the definition of "Communication" to the extent that it seeks to impose obligations on Endocrine Society beyond those imposed by the Discovery Rules and/or seek information or documents not in Endocrine Society's possession, custody, or control.

16.     Endocrine Society objects to the definitions of "Gender Affirming Care" as argumentative and/or inaccurate.  However, solely for purposes of responding to the subpoena, Endocrine Society will interpret the Requests consistent with the provided Definitions, to the extent that they can be understood.

17.     Endocrine Society objects to the definitions of "Members" and "membership" on the grounds that they are overly broad, vague, ambiguous, and unduly burdensome.

**OBJECTIONS TO INSTRUCTIONS**

18.     Endocrine Society objects to Instruction Nos. 1, 2, 3, and 4 to the extent that they impose obligations that go beyond, or that are otherwise inconsistent with the Discovery Rules.

App_0800

## SPECIFIC OBJECTIONS TO DEPOSITION TOPICS

**TOPIC NO. 1:**

[T]he Entity's policy position on gender-affirming care for gender dysphoria[.]

**RESPONSE TO TOPIC NO. 1:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "policy position" and because it is unbounded by time. Endocrine Society further objects to this Request to the extent that "the Entity's policy position on gender-affirming care for gender dysphoria" speaks for itself. Endocrine Society further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.

Subject to and without waiving the foregoing objections, Endocrine Society is willing to meet and confer about this Topic.

**TOPIC NO. 2:**

[A]ny guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria[.]

**RESPONSE TO TOPIC NO. 2:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "any guidelines, standards, best-practices, or policy positions" and "considered or adopted," and because it is unbounded by time. Endocrine Society further objects to this Request to the extent that "any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria" speak for themselves. Endocrine Society further objects to this Request to the extent that it is duplicative of Topic No. 1.

9

Subject to and without waiving the foregoing objections, Endocrine Society is willing to meet and confer about this Topic.


## TOPIC NO. 3:

[A]ny side effects and risks associated with the treatments recommended by through a guideline, standard, best-practice, or policy[.]

## RESPONSE TO TOPIC NO. 3:

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "any side effects and risks," "associated with the treatments," and "guideline, standard, best-practice, or policy," and because it is unbounded by time. Endocrine Society further objects to this Request to the extent that it seeks information that is publicly available and therefore equally available to all parties.

10

Subject to and without waiving the foregoing objections, Endocrine Society is willing to meet and confer about this Topic.

## TOPIC NO. 4:

[H]ow the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria[.][1]

## RESPONSE TO TOPIC NO. 4:

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "how the entity is organized" and "so that Defendants may

---

[1] The numbering in the original notice of deposition had two topics labeled "(3)." The second of those two topics, and all subsequent topics, have been renumbered.

determine the process," and because it is unbounded by time.  Endocrine Society

further objects to this Request to the extent that it seeks information that is publicly

available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, Endocrine Society

is willing to meet and confer about this Topic.


**TOPIC NO. 5:**

[H]ow many of the Entity's members, if any, voted to support any

guidelines, standards, best-practices, or policy positions[.]

**RESPONSE TO TOPIC NO. 5:**

Endocrine Society incorporates the foregoing General Objections,

Objections to Definitions, and Objections to Instructions as if fully set forth herein.

Endocrine Society further objects to this Request on the ground that it seeks

information that is neither relevant to any claim or defense in this case nor

proportional to the needs of the case, particularly in light of Endocrine Society's

status as a non-party.  *See Leake*, 231 F.R.D. at 51–52.  Endocrine Society further

objects to this Request to the extent that it fails to state with particularity the

requested information for testimony.  Endocrine Society further objects to this

Request as vague, ambiguous, overly broad, and unduly burdensome, particularly

as to the phrase "voted to support any guidelines, standards, best-practices, or

policy positions," and because it is unbounded by time.  Endocrine Society further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

Subject to and without waiving the foregoing objections, Endocrine Society is willing to meet and confer about this Topic.

**TOPIC NO. 6:**

[W]hy the Entity sought to file an amicus brief in this case.

**RESPONSE TO TOPIC NO. 6:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party.  *See Leake*, 231 F.R.D. at 51–52.  Endocrine Society further objects to this Request to the extent that it fails to state with particularity the requested information for testimony.  Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "why [Endocrine Society] sought to file."  Endocrine Society further objects to this Request to the extent it seeks information that is protected by

13

the First Amendment privilege.   Endocrine Society further objects to this Request because it calls for documents protected by at least the attorney-client privilege and/or the attorney work product doctrine.

Subject to and without waiving the foregoing objections, Endocrine Society is willing to meet and confer about this Topic.

14

## SPECIFIC OBJECTIONS TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1**:

Any documents that state the total number of your membership.

**RESPONSE TO REQUEST NO. 1:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects that this is an interrogatory disguised as a document request. Endocrine Society further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties. Endocrine Society further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.

Subject to and without waiving the foregoing objections, Endocrine Society directs Defendants to information available online, including on its website. *See, e.g.*, https://www.endocrine.org/membership.

**REQUEST NO. 2:**

Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

**RESPONSE TO REQUEST NO. 2:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "how you establish" and "guidelines, standards, best-practices, or policy positions," and because it is unbounded by time. Endocrine Society further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, Endocrine Society directs Plaintiffs to the information available online, including on its website. *See, e.g.*, https://www.endocrine.org/clinical-practice-guidelines/methodology. Endocrine Society is willing to meet and confer about what additional responsive documents, if any, Endocrine Society may agree to produce.

**REQUEST NO. 3:**

Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 3:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request as compound, as it appears to encompass two separate document requests. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care" and "showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care," and because it is unbounded by time.

App_0810

Endocrine Society further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties. Endocrine Society further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.  Endocrine Society further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.   Endocrine Society further objects to this Request to the extent that it is duplicative of Request No. 2.

Subject to and without waiving the foregoing objections, Endocrine Society directs Defendants to information available online, including on its website.  *See, e.g.*, https://academic.oup.com/jcem/article/102/11/3869/4157558 ("Method of Development of Evidence-Based Clinical Practice Guidelines" and "Commissioned Systematic Review" sections); *see also* https://www.endocrine.org/-/media/endocrine/files/advocacy/society-letters/2022/july-2022/response-to-fl-medicaid-nprm.pdf.  Endocrine Society is willing to meet and confer about what additional responsive documents, if any, Endocrine Society may agree to produce.

18

**REQUEST NO. 4:**

Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 4:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time. Endocrine Society further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection. Endocrine Society further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

19

Subject to and without waiving the foregoing objections, Endocrine Society is willing to meet and confer about this Request and to discuss what, if any, responsive documents Endocrine Society may agree to produce.


**REQUEST NO. 5:**

Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

**RESPONSE TO REQUEST NO. 5:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "detailing your intention to file." Endocrine Society further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege. Endocrine Society further objects to this Request because it calls for documents protected by at least the attorney-client privilege and/or the attorney work product doctrine.

App_0813

Endocrine Society will not produce documents in response to this improper Request.

**REQUEST NO. 6:**

Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 6:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "or any other person" and "relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time. Endocrine Society further objects to the Request to the extent it seeks

information subject to a third-party's right of privacy or protection. Endocrine Society further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

Subject to and without waiving the foregoing objections, Endocrine Society is willing to meet and confer about this Request and to discuss what, if any, responsive documents Endocrine Society may agree to produce.


**REQUEST NO. 7:**

Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 7:**

Endocrine Society incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Endocrine Society further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of Endocrine Society's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Endocrine Society further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "showing any side effects and risks,"

22

"associated with the treatments," and "your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time.  Endocrine Society further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, Endocrine Society is willing to meet and confer about this Request and to discuss what, if any, responsive documents Endocrine Society may agree to produce.

App_0816

Dated:  December 2, 2022

Respectfully submitted,

*/s/ Cortlin H. Lannin*
Cortlin H. Lannin

Covington & Burling LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

*Counsel for Non-Party Endocrine Society*

24

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify that copies of the foregoing **Endocrine Society's Responses and Objections to Rule 45 Subpoena to Testify at a Deposition in a Civil Action and to Produce Documents** were delivered to the following parties by electronic mail:

Mohammad O. Jazil
mjazil@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

Dated:  December 2, 2022

_/s/ Dylan M. Silva_
Dylan M. Silva
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-7007
dsilva@cov.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

        Plaintiffs,

        v.

SIMONE MARSTILLER, et al.,

        Defendants.

No. 4:22-cv-00325-RH-MAF

---

## AMERICAN ACADEMY OF PEDIATRICS' RESPONSES AND OBJECTIONS TO RULE 45 SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION AND TO PRODUCE DOCUMENTS

Pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, non-party American Academy of Pediatrics ("AAP"), through its undersigned counsel, hereby responds and objects to the subpoena for deposition testimony and the production of documents ("Requests") served by Defendants Simone Marstiller and the Agency for Health Care Administration, ("Defendants") in the above-captioned proceeding.

### GENERAL OBJECTIONS

The following General Objections are incorporated in full into all Specific Objections set forth below:

1.      These responses are made solely for the purpose of this action.  By responding to the Requests, AAP does not waive any objections that it may have to admission into evidence of these responses or any information and/or documents produced in response to the Requests on any applicable grounds.

2.      AAP objects to the Requests to the extent that they impose obligations that go beyond, or that are otherwise inconsistent with, the Federal Rules of Civil Procedure, the Local Rules of the Court, any Order of the Court, or any other applicable law, rule, or order (collectively "Discovery Rules").

3.      AAP objects to the Requests to the extent they seek discovery beyond any relevant, responsive, non-privileged, and non-duplicative information and/or documents in its possession, custody, or control that would be located after a reasonable search proportional to the needs of the case.  AAP will respond to these Requests in good faith, but observes that the Requests on their face appear to seek information that is not relevant to any party's claims or defenses.  *See, e.g., Boe v. Marshall*, No. 2022 WL 14049505, at *2 (M.D. Ala. Oct. 24, 2022) (finding materials sought from a third party were irrelevant to a similar lawsuit challenging restrictions on gender-affirming care in the State of Alabama, reasoning that the "materials are unlikely to reveal or lead to any information that would help resolve the fundamental issue in this case," the constitutionality of the challenged statute); *see also North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51–52 (D.D.C.

2

2005) (holding that "[t]he mere filing of an amicus brief … does not open oneself to broad discovery demands, nor does it make one's bias, if any, relevant to the underlying action" and that "imposing such a burden on amici would undoubtedly discourage entities from making amicus filings at all, so as to avoid subjecting themselves to severe scrutiny and onerous discovery requests.").

4.      AAP objects to the Requests as overly broad and unduly burdensome, particularly the burden of requiring a non-party to respond to multiple deposition topics and multiple requests for documents, many with multiple sub-parts, which demand "*[a]ny* Documents" and "*[a]ny* Communications" (emphasis added) and are unbounded by time or any other limiting criteria.  The cumulative burden of responding to these Requests is not proportional to the needs of the case, particularly because AAP is not a party to the case.  Indeed, "concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs" under Rule 45 of the Federal Rules of Civil Procedure. *See, e.g.*, *Va. Dep't of Corrs. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) (holding that "a more demanding variant of the proportionality analysis" applies, and that courts "must give the recipient's nonparty status special weight, leading to an even more demanding and sensitive inquiry than the one governing discovery generally.").

5.      AAP objects to the Requests, and to the definitions and instructions included in the Requests, to the extent that they assume facts and events, include characterizations that are assumed to be accurate, or contain legal conclusions.  By responding to the Requests, AAP does not admit or concede that any fact, event, characterization, or legal conclusion is correct or accurate, and AAP reserves the right to contest all assumed facts, events, characterizations, and legal conclusions.

6.      AAP objects to the Requests, and to the definitions and instructions included in this set of Requests, to the extent that they purport to require that AAP identify and provide discovery with regard to "any" or similar all-encompassing wording on the grounds that the Requests are individually and collectively overly broad and unduly burdensome and seek discovery not relevant to the parties' claims and defenses nor proportional to the needs of the case.  To the extent that the Requests seek information and/or documents that are not reasonably accessible because they cannot be retrieved or produced without undue burden or cost, AAP objects because the Requests are overly broad and unduly burdensome.

7.      AAP objects to the Requests to the extent that they seek information that can be obtained from the parties to this case, publicly available sources, or other third parties, including from the parties' experts.

8.      AAP objects to the Requests to the extent they seek information and/or documents that are no longer reasonably obtainable by AAP due to the

4

passage of time, employee turnover, or because the information is not stored on active systems.

9.     AAP objects to the Requests to the extent that they seek production of confidential or other sensitive information, and to the extent they seek discovery of sensitive non-public information or disclosure of information protected by any confidentiality obligation owed a third party.

10.     AAP objects to the Requests to the extent that they seek the production of information and/or documents that are protected by the attorney-client privilege, the work product doctrine, the joint-defense or common interest privilege, privacy laws (including patient and healthcare privacy laws), any other applicable privilege, protection, or immunity, or that are otherwise exempted from discovery. AAP hereby asserts all applicable privileges and protections to the extent implicated by each Request, whether based on statute or regulation or recognized at common law. In the event that any privileged information and/or document is produced by AAP, its production is inadvertent and does not constitute waiver of any privilege, protection, or immunity.

11.     AAP objects to the Requests to the extent that they seek the production of information and/or documents that are protected by the First Amendment privilege, including but not limited to associational information. *See, e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1152 (9th Cir. 2010) (recognizing

App_0823

that where "discovery would have the practical effect of discouraging the exercise of First Amendment associational rights, the party seeking such discovery must demonstrate a need for the information sufficient to outweigh the impact on those rights").

12.     AAP's objections are made to the best of its knowledge, information, and belief.  AAP reserves the right to revise, correct, clarify, supplement, and/or amend the objections set forth herein, and reserves its right to assert any and all other defenses or objections, including those permitted by the Discovery Rules and the case law.

## OBJECTIONS TO DEFINITIONS

13.     AAP objects to the definitions of "You" and "Your" on the grounds that they are overly broad, vague, ambiguous, and unduly burdensome to the extent they seek production of information from entities other than AAP.  In responding to these Requests, AAP will construe "You" and "Your" to refer to AAP.

14.     AAP objects to the definitions of "Document" and "documents" to the extent that they seek to impose obligations on AAP beyond those imposed by the Discovery Rules and/or seek information or documents not in AAP's possession, custody, or control.

15.     AAP objects to the definition of "Communication" to the extent that it seeks to impose obligations on AAP beyond those imposed by the Discovery Rules

6

and/or seek information or documents not in AAP's possession, custody, or control.

16.     AAP objects to the definitions of "Gender Affirming Care" as argumentative and/or inaccurate.  However, solely for purposes of responding to the subpoena, AAP will interpret the Requests consistent with the provided Definitions, to the extent that they can be understood.

17.     AAP objects to the definitions of "Members" and "membership" on the grounds that they are overly broad, vague, ambiguous, and unduly burdensome.

## OBJECTIONS TO INSTRUCTIONS

18.     AAP objects to Instruction Nos. 1, 2, 3, and 4 to the extent that they impose obligations that go beyond, or that are otherwise inconsistent with the Discovery Rules.

7

## SPECIFIC OBJECTIONS TO DEPOSITION TOPICS

**TOPIC NO. 1:**

[T]he Entity's policy position on gender-affirming care for gender dysphoria[.]

**RESPONSE TO TOPIC NO. 1:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "policy position" and because it is unbounded by time. AAP further objects to this Request to the extent that "the Entity's policy position on gender-affirming care for gender dysphoria" speaks for itself. AAP further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.

Subject to and without waiving the foregoing objections, AAP is willing to meet and confer about this Topic.

8

**TOPIC NO. 2:**

[A]ny guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria[.]

**RESPONSE TO TOPIC NO. 2:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "any guidelines, standards, best-practices, or policy positions" and "considered or adopted," and because it is unbounded by time. AAP further objects to this Request to the extent that "any guidelines, standards, best-practices, or policy positions considered or adopted by the Entity for the treatment of gender dysphoria" speak for themselves. AAP further objects to this Request to the extent that it is duplicative of Topic No. 1.

Subject to and without waiving the foregoing objections, AAP is willing to meet and confer about this Topic.

**TOPIC NO. 3:**

[A]ny side effects and risks associated with the treatments recommended by through a guideline, standard, best-practice, or policy[.]

**RESPONSE TO TOPIC NO. 3:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "any side effects and risks," "associated with the treatments," and "guideline, standard, best-practice, or policy," and because it is unbounded by time. AAP further objects to this Request to the extent that it seeks information that is publicly available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, AAP is willing to meet and confer about this Topic.

10

**TOPIC NO. 4:**

[H]ow the Entity is organized so that Defendants may determine the process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions concerning the treatment of gender dysphoria[.][1]

**RESPONSE TO TOPIC NO. 4:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "how the entity is organized" and "so that Defendants may determine the process," and because it is unbounded by time. AAP further objects to this Request to the extent that it seeks information that is publicly available and therefore equally available to all parties.

---

[1] The numbering in the original notice of deposition had two topics labeled "(3)." The second of those two topics, and all subsequent topics, have been renumbered.

App_0829

Subject to and without waiving the foregoing objections, AAP is willing to meet and confer about this Topic.

## TOPIC NO. 5:

[H]ow many of the Entity's members, if any, voted to support any guidelines, standards, best-practices, or policy positions[.]

## RESPONSE TO TOPIC NO. 5:

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "voted to support any guidelines, standards, best-practices, or policy positions," and because it is unbounded by time. AAP further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

12

Subject to and without waiving the foregoing objections, AAP is willing to meet and confer about this Topic.

**TOPIC NO. 6:**

[W]hy the Entity sought to file an amicus brief in this case.

**RESPONSE TO TOPIC NO. 6:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request to the extent that it fails to state with particularity the requested information for testimony. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "why [AAP] sought to file." AAP further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege. AAP further objects to this Request because it calls for documents protected by at least the attorney-client privilege and/or the attorney work product doctrine.

13

Subject to and without waiving the foregoing objections, AAP is willing to meet and confer about this Topic.

14

## SPECIFIC OBJECTIONS TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1**:

Any documents that state the total number of your membership.

**RESPONSE TO REQUEST NO. 1:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects that this is an interrogatory disguised as a document request. AAP further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties. AAP further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.

Subject to and without waiving the foregoing objections, AAP directs Defendants to information available online, including on its website. *See, e.g.*, https://www.aap.org/en/about-the-aap/.

15

**REQUEST NO. 2:**

Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

**RESPONSE TO REQUEST NO. 2:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "how you establish" and "guidelines, standards, best-practices, or policy positions," and because it is unbounded by time. AAP further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, AAP directs Plaintiffs to the information available online, including on its website. *See, e.g.*, https://downloads.aap.org/AAP/PDF/Const-and-Bylaws-2020.pdf?_ga=2.62103468.1650656677.1669829336-1025446989.1661864354. AAP is willing to meet and confer about what additional responsive documents, if any, AAP may agree to produce.

App_0834

**REQUEST NO. 3:**

Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 3:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request as compound, as it appears to encompass two separate document requests. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care" and "showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care," and because it is unbounded by time. AAP further objects to this Request to the extent

17

that it seeks documents that are publicly available and therefore equally available to all parties. AAP further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection. AAP further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege. AAP further objects to this Request to the extent that it is duplicative of Request No. 2.

Subject to and without waiving the foregoing objections, AAP directs Defendants to information available online, including on its website. *See, e.g.*, https://downloads.aap.org/AAP/PDF/Const-and-Bylaws-2020.pdf?_ga=2.62103468.1650656677.1669829336-1025446989.1661864354. AAP is willing to meet and confer about what additional responsive documents, if any, AAP may agree to produce.

**REQUEST NO. 4:**

Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 4:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further

App_0836

objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time. AAP further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection. AAP further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

Subject to and without waiving the foregoing objections, AAP is willing to meet and confer about this Request and to discuss what, if any, responsive documents AAP may agree to produce.

**REQUEST NO. 5:**

Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

**RESPONSE TO REQUEST NO. 5:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further

19

objects to this Request on the ground that it seeks information that is neither

relevant to any claim or defense in this case nor proportional to the needs of the

case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at

51–52. AAP further objects to this Request as vague, ambiguous, overly broad,

and unduly burdensome, particularly as to the phrase "detailing your intention to

file." AAP further objects to this Request to the extent it seeks information that is

protected by the First Amendment privilege. AAP further objects to this Request

because it calls for documents protected by at least the attorney-client privilege

and/or the attorney work product doctrine.

AAP will not produce documents in response to this improper Request.


**REQUEST NO. 6:**

Any documents and communications with consultants, federal or Florida

government officials, lobbyists, researchers, scholars, members of the public, or

any other person relating to gender dysphoria or your guidelines, standards, best-

practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 6:**

AAP incorporates the foregoing General Objections, Objections to Definitions,

and Objections to Instructions as if fully set forth herein. AAP further

objects to this Request on the ground that it seeks information that is neither

relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "or any other person" and "relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time. AAP further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection. AAP further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

Subject to and without waiving the foregoing objections, AAP is willing to meet and confer about this Request and to discuss what, if any, responsive documents AAP may agree to produce.

21

**REQUEST NO. 7:**

Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 7:**

AAP incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. AAP further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of AAP's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. AAP further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "showing any side effects and risks," "associated with the treatments," and "your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time. AAP further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, AAP is willing to meet and confer about this Request and to discuss what, if any, responsive documents AAP may agree to produce.

App_0840

Dated:  December 2, 2022          Respectfully submitted,

*/s/ Cortlin H. Lannin*
Cortlin H. Lannin

Covington & Burling LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

*Counsel for Non-Party American
Academy of Pediatrics*

23

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify that copies of the foregoing **American Academy of Pediatrics' Responses and Objections to Rule 45 Subpoena to Testify at a Deposition in a Civil Action and to Produce Documents** were delivered to the following parties by electronic mail:

Mohammad O. Jazil
mjazil@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938

Dated:  December 2, 2022

＿＿_/s/ Dylan M. Silva_＿＿＿＿＿＿＿
Dylan M. Silva
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-7007
dsilva@cov.com

Tab L

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

AUGUST DEKKER, et al.,

        Plaintiffs,

    v.

SIMONE MARSTILLER, et al.,

        Defendants.

No. 4:22-cv-00325-RH-MAF

## NON-PARTY GROUPS' RESPONSES AND OBJECTIONS TO RULE 45 SUBPOENA TO PRODUCE DOCUMENTS

Pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure,

non-party groups Academic Pediatric Association, American Academy of Child &

Adolescent Psychiatry, American Academy of Family Physicians, American

Academy of Nursing, American College of Obstetricians and Gynecologists,

American College of Osteopathic Pediatricians, American College of Physicians,

American Medical Association, American Pediatric Society, American Psychiatric

Association, Association of American Medical Colleges, Florida Chapter of the

American Academy of Pediatrics, National Association of Pediatric Nurse

Practitioners, North Central Florida Council of Child & Adolescent Psychiatry,

Pediatric Endocrine Society, Societies for Pediatric Urology, Society for

Adolescent Health and Medicine, Society for Pediatric Research, and Society of

Pediatric Nurses (individually, "Non-Party Group"; together, "Non-Party Groups"), through each of their undersigned counsel, hereby respond and object to the subpoena for the production of documents ("Requests") served by Defendants Simone Marstiller and the Agency for Health Care Administration ("Defendants"), in the above-captioned proceeding.

## GENERAL OBJECTIONS

The following General Objections are incorporated in full into all Specific Objections set forth below:

1.     These responses are made solely for the purpose of this action.  By responding to the Requests, each Non-Party Group does not waive any objections that it may have to admission into evidence of these responses or any information and/or documents produced in response to the Requests on any applicable grounds.

2.     Each Non-Party Group objects to the Requests to the extent that they impose obligations that go beyond, or that are otherwise inconsistent with, the Federal Rules of Civil Procedure, the Local Rules of the Court, any Order of the Court, or any other applicable law, rule, or order (collectively "Discovery Rules").

3.     Each Non-Party Group objects to the Requests to the extent that the subpoena would violate Federal Rule of Civil Procedure 45 by commanding it to produce documents more than 100 miles from where it resides.

4.      Each Non-Party Group objects to the Requests to the extent they seek discovery beyond any relevant, responsive, non-privileged, and non-duplicative information and/or documents in their possession, custody, or control that would be located after a reasonable search proportional to the needs of the case.  Each Non-Party Group will respond to these Requests in good faith, but observes that the Requests on their face appear to seek information that is not relevant to any party's claims or defenses.  *See, e.g., Boe v. Marshall*, No. 2022 WL 14049505, at *2 (M.D. Ala. Oct. 24, 2022) (finding materials sought from a third party were irrelevant to a similar lawsuit challenging restrictions on gender-affirming care in the State of Alabama, reasoning that the "materials are unlikely to reveal or lead to any information that would help resolve the fundamental issue in this case," the constitutionality of the challenged statute); *see also North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51–52 (D.D.C. 2005) (holding that "[t]he mere filing of an amicus brief … does not open oneself to broad discovery demands, nor does it make one's bias, if any, relevant to the underlying action" and that "imposing such a burden on amici would undoubtedly discourage entities from making amicus filings at all, so as to avoid subjecting themselves to severe scrutiny and onerous discovery requests.").

5.      Each Non-Party Group objects to the Requests as overly broad and unduly burdensome, particularly the burden of requiring a non-party to respond to

3

multiple requests for documents, many with multiple sub-parts, which demand "*[a]ny* Documents" and "*[a]ny* Communications" (emphasis added) and are unbounded by time or any other limiting criteria. The cumulative burden of responding to these Requests is not proportional to the needs of the case, particularly because each Non-Party Group is not a party to the case. Indeed, "concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs" under Rule 45 of the Federal Rules of Civil Procedure. *See, e.g.*, *Va. Dep't of Corrs. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) (holding that "a more demanding variant of the proportionality analysis" applies, and that courts "must give the recipient's nonparty status special weight, leading to an even more demanding and sensitive inquiry than the one governing discovery generally.").

6.    Each Non-Party Group objects to the Requests, and to the definitions and instructions included in the Requests, to the extent that they assume facts and events, include characterizations that are assumed to be accurate, or contain legal conclusions. By responding to the Requests, each Non-Party Group does not admit or concede that any fact, event, characterization, or legal conclusion is correct or accurate, and each Non-Party Group reserves the right to contest all assumed facts, events, characterizations, and legal conclusions.

7.      Each Non-Party Group objects to the Requests, and to the definitions and instructions included in this set of Requests, to the extent that they purport to require that each Non-Party Group identify and provide discovery with regard to "any" or similar all-encompassing wording on the grounds that the Requests are individually and collectively overly broad and unduly burdensome and seek discovery not relevant to the parties' claims and defenses nor proportional to the needs of the case.  To the extent that the Requests seek information and/or documents that are not reasonably accessible because they cannot be retrieved or produced without undue burden or cost, each Non-Party Group objects because the Requests are overly broad and unduly burdensome.

8.      Each Non-Party Group objects to the Requests to the extent that they seek information that can be obtained from the parties to this case, publicly available sources, or other third parties, including from the parties' experts.

9.      Each Non-Party Group objects to the Requests to the extent they seek information and/or documents that are no longer reasonably obtainable by each Non-Party Group due to the passage of time, employee turnover, or because the information is not stored on active systems.

10.      Each Non-Party Group objects to the Requests to the extent that they seek production of confidential or other sensitive information, and to the extent

5

they seek discovery of sensitive non-public information or disclosure of
information protected by any confidentiality obligation owed a third party.

11.     Each Non-Party Group objects to the Requests to the extent that they
seek the production of information and/or documents that are protected by the
attorney-client privilege, the work product doctrine, the joint-defense or common
interest privilege, privacy laws (including patient and healthcare privacy laws), any
other applicable privilege, protection, or immunity, or that are otherwise exempted
from discovery. Each Non-Party Group hereby asserts all applicable privileges
and protections to the extent implicated by each Request, whether based on statute
or regulation or recognized at common law. In the event that any privileged
information and/or document is produced by a Non-Party Group, its production is
inadvertent and does not constitute waiver of any privilege, protection, or
immunity.

12.     Each Non-Party Group objects to the Requests to the extent that they
seek the production of information and/or documents that are protected by the First
Amendment privilege, including but not limited to associational information. *See,
e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1152 (9th Cir. 2010) (recognizing
that where "discovery would have the practical effect of discouraging the exercise
of First Amendment associational rights, the party seeking such discovery must

6

demonstrate a need for the information sufficient to outweigh the impact on those rights").

13.     Each Non-Party Group's objections are made to the best of its knowledge, information, and belief.  Each Non-Party Group reserves the right to revise, correct, clarify, supplement, and/or amend the objections set forth herein, and reserves its right to assert any and all other defenses or objections, including those permitted by the Discovery Rules and the case law.

## OBJECTIONS TO DEFINITIONS

14.     Each Non-Party Group objects to the definitions of "You" and "Your" on the grounds that they are overly broad, vague, ambiguous, and unduly burdensome to the extent they seek production of information from entities other than the Non-Party Group.  In responding to these Requests, each Non-Party Group will construe "You" and "Your" to refer to Non-Party Groups.

15.     Each Non-Party Group objects to the definitions of "Document" and "documents" to the extent that they seek to impose obligations on each Non-Party Group beyond those imposed by the Discovery Rules and/or seek information or documents not in each Non-Party Group's possession, custody, or control.

16.     Each Non-Party Group objects to the definition of "Communication" to the extent that it seeks to impose obligations on each Non-Party Group beyond

those imposed by the Discovery Rules and/or seek information or documents not in each Non-Party Group's possession, custody, or control.

17.    Each Non-Party Group objects to the definitions of "Gender Affirming Care" as argumentative and/or inaccurate.  However, solely for purposes of responding to the subpoena, each Non-Party Group will interpret the Requests consistent with the provided Definitions, to the extent that they can be understood.

18.    Each Non-Party Group objects to the definitions of "Members" and "membership" on the grounds that they are overly broad, vague, ambiguous, and unduly burdensome.

## OBJECTIONS TO INSTRUCTIONS

19.    Each Non-Party Group objects to Instruction Nos. 1, 2, 3, and 4 to the extent that they impose obligations that go beyond, or that are otherwise inconsistent with the Discovery Rules.

## SPECIFIC OBJECTIONS TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1**:

Any documents that state the total number of your membership.

**RESPONSE TO REQUEST NO. 1:**

Each Non-Party Group incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Each Non-Party Group further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of each Non-Party Group's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Each Non-Party Group further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "total number of your membership," and because it is unbounded by time. Each Non-Party Group further objects that this is an interrogatory disguised as a document request. Each Non-Party Group further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties. Each Non-Party Group further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.

Subject to and without waiving the foregoing objections, each Non-Party Group is willing to meet and confer about this Request and to discuss what, if any, responsive documents each Non-Party Group may agree to produce.

**REQUEST NO. 2:**

Any documents that describe how you establish guidelines, standards, best-practices, or policy positions.

**RESPONSE TO REQUEST NO. 2:**

Each Non-Party Group incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Each Non-Party Group further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of each Non-Party Group's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Each Non-Party Group further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "how you establish" and "guidelines, standards, best-practices, or policy positions," and because it is unbounded by time. Each Non-Party Group further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties.

10

Subject to and without waiving the foregoing objections, each Non-Party Group is willing to meet and confer about this Request and to discuss what, if any, responsive documents each Non-Party Group may agree to produce.

**REQUEST NO. 3:**

Any documents describing how you established guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. Any documents and communications showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 3:**

Each Non-Party Group incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Each Non-Party Group further objects to this Request as compound, as it appears to encompass two separate document requests. Each Non-Party Group further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of each Non-Party Group's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Each Non-Party Group further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "describing how you established guidelines, standards, best-practices, or

11

policy positions on gender-affirming care" and "showing the individuals or committees that proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care," and because it is unbounded by time.  Each Non-Party Group further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties.  Each Non-Party Group further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection.  Each Non-Party Group further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege. Each Non-Party Group further objects to this Request to the extent that it is duplicative of Request No. 2.

Subject to and without waiving the foregoing objections, each Non-Party Group is willing to meet and confer about this Request and to discuss what, if any, responsive documents each Non-Party Group may agree to produce.

12

**REQUEST NO. 4:**

Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 4:**

Each Non-Party Group incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Each Non-Party Group further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of each Non-Party Group's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Each Non-Party Group further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time. Each Non-Party Group further objects to the Request to the extent it seeks information subject to a third-party's right of privacy or protection. Each Non-Party Group further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

13

Subject to and without waiving the foregoing objections, each Non-Party Group is willing to meet and confer about this Request and to discuss what, if any, responsive documents each Non-Party Group may agree to produce.

**REQUEST NO. 5:**

Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

**RESPONSE TO REQUEST NO. 5:**

Each Non-Party Group incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Each Non-Party Group further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of each Non-Party Group's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Each Non-Party Group further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrase "detailing your intention to file." Each Non-Party Group further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege. Each Non-Party Group further objects to this Request because it calls for documents protected by at least the attorney-client privilege and/or the attorney work product doctrine.

The Non-Party Groups will not produce documents in response to this improper Request.

**REQUEST NO. 6:**

Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 6:**

Each Non-Party Group incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Each Non-Party Group further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of each Non-Party Group's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Each Non-Party Group further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "or any other person" and "relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time. Each Non-Party Group further objects to the Request to the

15

extent it seeks information subject to a third-party's right of privacy or protection. Each Non-Party Group further objects to this Request to the extent it seeks information that is protected by the First Amendment privilege.

Subject to and without waiving the foregoing objections, each Non-Party Group is willing to meet and confer about this Request and to discuss what, if any, responsive documents each Non-Party Group may agree to produce.

**REQUEST NO. 7:**

Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

**RESPONSE TO REQUEST NO. 7:**

Each Non-Party Group incorporates the foregoing General Objections, Objections to Definitions, and Objections to Instructions as if fully set forth herein. Each Non-Party Group further objects to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this case nor proportional to the needs of the case, particularly in light of each Non-Party Group's status as a non-party. *See Leake*, 231 F.R.D. at 51–52. Each Non-Party Group further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome, particularly as to the phrases "showing any side effects and

16

risks," "associated with the treatments," and "your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria," and because it is unbounded by time. Each Non-Party Group further objects to this Request to the extent that it seeks documents that are publicly available and therefore equally available to all parties.

Subject to and without waiving the foregoing objections, each Non-Party Group is willing to meet and confer about this Request and to discuss what, if any, responsive documents each Non-Party Group may agree to produce.

Dated:  December 19, 2022

Respectfully submitted,

*/s/ Cortlin H. Lannin*
Cortlin H. Lannin

Covington & Burling LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

*Counsel for Non-Party Groups Academic Pediatric Association, American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, Florida Chapter of the American Academy of Pediatrics, National Association of Pediatric Nurse Practitioners, North Central Florida Council of Child & Adolescent Psychiatry, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, and Society of Pediatric Nurses*

18

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify that copies of the foregoing **Non-Party Groups'**

**Responses and Objections to Rule 45 Subpoena to Produce Documents** were

delivered to the following parties by electronic mail:


Mohammad O. Jazil
mjazil@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938



Dated:  December 19, 2022

_ /s/ Dylan M. Silva_____
Dylan M. Silva
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-7007
dsilva@cov.com

Tab M

| | |
|---|---|
| **From:** | Michael Beato |
| **To:** | Joshua Pratt |
| **Subject:** | FW: Dekker v. Marstiller Notice of Non-Party Subpoenas |
| **Date:** | Thursday, January 5, 2023 8:01:00 PM |

Follow up to the meet and confer.

**Michael Beato**
**Office:** **(850)** 354-5645
mbeato@HoltzmanVogel.com // www.HoltzmanVogel.com



PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged.  They are intended for the sole use of the addressee.  If you receive this transmission in error, you are
advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  Moreover, any such disclosure shall not compromise
or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise.  If you have received this communication in error, please contact me at the above
email address.  Thank you.

DISCLAIMER
Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a
substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties.  If desired, Holtzman Vogel, PLLC would be pleased to perform the requisite research and provide you with a
detailed written analysis.  Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

---

**From:** Michael Beato
**Sent:** Tuesday, December 13, 2022 4:23 PM
**To:** Lannin, Cortlin <clannin@cov.com>; Silva, Dylan <DSilva@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>; Zack Bennington
<zbennington@HoltzmanVogel.com>
**Subject:** Dekker v. Marstiller Notice of Non-Party Subpoenas

Counsel,

Thank you for the good-faith discovery conversation yesterday. During our discussion, we addressed the three subpoenas duces tecum for depositions of WPATH, ES, and AAP.

Specifically, we discussed the relevancy of our requests: in our case, the district court stated that the main issue is "whether, based on current medical knowledge," it was "reasonable" for Florida to "determine[e] that" certain treatments for gender dysphoria—puberty blockers, cross-sex hormones, surgeries, treatments that change primary and secondary sex characteristics—are "experimental." ECF No. 64 at 4. Thus, our discovery requests to these organizations are directly relevant to the main issue in the case.

App_0864

We also discussed the specific discovery requests themselves.

- For Request 1, we are satisfied with your responses.
- For Request 2, we will take another look at the links you have provided in response to this request.
- For Request 3, we will take another look at the links you have provided in response to this request.
- For Request 4, you will consider the production of any communications with the organizations' membership concerning their guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria. As we discussed during our conversation, we are looking for how the organizations communicated its guidelines, standards, best-practices, or policy positions on gender-affirming care to its members.
- For Request 5, we understand your position on this request.
- For Request 6, we will limit the request to any documents and communications with federal or Florida government officials relating to gender dysphoria or the organizations' guidelines, standards, best-practices, or policy positions on gender-affirming care.
- For Request 7, we stated that we are looking for whether the organizations know of the side effects and risks of their guidelines, standards, best-practices, or policy positions on gender-affirming care.

We also asked for deposition dates and times for representatives from WPATH, ES, and AAP.

And, as a final note, we mentioned that fact discovery ends on **Feb. 14, 2023**.

Again, we appreciate the efforts to resolve this discovery matter.

**Michael Beato**
**Office: (850) 354-5645**
mbeato@HoltzmanVogel.com // www.HoltzmanVogel.com



PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged.  They are intended for the sole use of the addressee.  If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  Moreover, any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise.  If you have received this communication in error, please contact me at the above email address.  Thank you.

DISCLAIMER
Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties.  If desired, Holtzman Vogel, PLLC would be pleased to perform the requisite research and provide you with a detailed written analysis.  Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

App_0866

Tab N

| | |
|---|---|
| **From:** | Michael Beato |
| **To:** | Pratt, Joshua |
| **Subject:** | FW: Dekker v. Marstiller: Notice of Non-Party Subpoenas |
| **Date:** | Thursday, January 5, 2023 8:03:00 PM |

**Michael Beato**

**Office: (850) 354-5645**

mbeato@HoltzmanVogel.com // www.HoltzmanVogel.com



PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged.  They are intended for the sole use of the addressee.  If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  Moreover, any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise.  If you have received this communication in error, please contact me at the above email address.  Thank you.

DISCLAIMER
Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties.  If desired, Holtzman Vogel, PLLC would be pleased to perform the requisite research and provide you with a detailed written analysis.  Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

**From:** Michael Beato
**Sent:** Friday, December 30, 2022 1:20 PM
**To:** Silva, Dylan <DSilva@cov.com>; Mohammad O. Jazil <mjazil@holtzmanvogel.com>; Lannin, Cortlin <clannin@cov.com>; Zack Bennington <zbennington@HoltzmanVogel.com>; MedicalAmici <MedicalAmici@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

Good afternoon, counsel,

To provide you with an update, we spoke with Plaintiffs today about our proposal. They stated that they are not in a position to accept it.

That said, we look forward to hearing back from you regarding your conversations with your clients.

**Michael Beato**
**Office: (850) 354-5645**
mbeato@HoltzmanVogel.com // www.HoltzmanVogel.com



PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged.  They are intended for the sole use of the addressee.  If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  Moreover, any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise.  If you have received this communication in error, please contact me at the above email address.  Thank you.

DISCLAIMER
Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties.  If desired, Holtzman Vogel, PLLC would be pleased to perform the requisite research and provide you with a detailed written analysis.  Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

**From:** Michael Beato
**Sent:** Friday, December 23, 2022 12:55 PM
**To:** 'Silva, Dylan' <DSilva@cov.com>; Mohammad O. Jazil <mjazil@holtzmanvogel.com>; 'Lannin, Cortlin' <clannin@cov.com>; Zack Bennington <zbennington@HoltzmanVogel.com>; 'MedicalAmici' <MedicalAmici@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

Counsel,

Thank you for meeting and conferring yesterday. We discussed the subpoenas for WPATH, ES, and AAP, as well as the subpoenas for the other medical organizations.

Regarding WPATH, ES, and AAP:

- We stated that we were seeking additional documents in response to Request 2 and Request 3
- For WPATH, we questioned whether WPATH regularly transacts business in the District of Columbia
- We reiterated that we are not seeking "all documents" and "all communications"; instead, we are merely seeking substantive documents—for example, meeting minutes—that respond to our requests

For the remaining medical organizations:

- We stated that the requests for production for these organizations were materially similar to the requests for production to WPATH, ES, and AAP. the limitations and compromises we established for the WPATH, ES, and AAP requests would apply to the requests for the other organizations.

We also floated the following proposal:

- For WPATH, ES, and AAP, we would still seek responsive documents. But in lieu of seeking a deposition, we would seek a declaration or affidavit from a representative from their organizations that answers the following questions:

  1. How many members are in their organizations
  2. What subset of the membership sets their policies, guidelines, and standards of care and how
  3. What subset of the membership set their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria
  4. Of the individuals responsible for setting their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria, how many of those individuals dissented from the policies, guidelines, and standards of care on gender-affirming care for gender dysphoria and why
  5. How many members in the organizations as a whole dissented from the organizations' policies, guidelines, and standards of care on gender-affirming care for gender dysphoria and did these members suggest any alternatives (and if so what were they)
  6. What side effects of gender-affirming care for gender dysphoria were these organizations aware of when they developed their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria

- For the remaining organizations, in lieu of seeking documents, we would seek a declaration or affidavit from a representative from their organizations that answers the above questions.

We agreed that we would ask Plaintiffs about the proposal; you stated that you would talk to your clients about it. You stated that you will get back to us next week or shortly after the new year.

As a final matter, we clarified that the end of fact discovery for us is **February 7, 2023**, not February 14.

Have a happy holiday,


**Michael Beato**
**Office: (850) 354-5645**
mbeato@HoltzmanVogel.com // www.HoltzmanVogel.com



PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged.  They are intended for the sole use of the addressee.  If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  Moreover, any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise.  If you have received this communication in error, please contact me at the above email address.  Thank you.

DISCLAIMER
Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties.  If desired, Holtzman Vogel, PLLC would be pleased to perform the requisite research and provide you with a detailed written analysis.  Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

**From:** Michael Beato
**Sent:** Monday, December 19, 2022 7:42 PM

**To:** Silva, Dylan <DSilva@cov.com>; Mohammad O. Jazil <mjazil@holtzmanvogel.com>; Lannin, Cortlin <clannin@cov.com>; Zack Bennington <zbennington@HoltzmanVogel.com>; MedicalAmici <MedicalAmici@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

4:00 works. I can circulate call-in information.

**Michael Beato**
**Office: (850) 354-5645**
mbeato@HoltzmanVogel.com // www.HoltzmanVogel.com



PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited. Moreover, any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise. If you have received this communication in error, please contact me at the above email address. Thank you.

DISCLAIMER
Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Holtzman Vogel, PLLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

---

**From:** Silva, Dylan <DSilva@cov.com>
**Sent:** Monday, December 19, 2022 7:31 PM
**To:** Michael Beato <mbeato@HoltzmanVogel.com>; Mohammad O. Jazil <mjazil@holtzmanvogel.com>; Lannin, Cortlin <clannin@cov.com>; Zack Bennington <zbennington@HoltzmanVogel.com>; MedicalAmici <MedicalAmici@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

How about Thursday between 4pm ET and 6pm ET?

---

**From:** Michael Beato <mbeato@HoltzmanVogel.com>
**Sent:** Monday, December 19, 2022 4:27 PM
**To:** Silva, Dylan <DSilva@cov.com>; Mohammad O. Jazil <mjazil@holtzmanvogel.com>; Lannin, Cortlin <clannin@cov.com>; Zack Bennington <zbennington@HoltzmanVogel.com>; MedicalAmici <MedicalAmici@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

<mark>[EXTERNAL]</mark>
Understood. Friday could work, but Thursday or tomorrow works better for us. Would any of those days be possible?

**Michael Beato**
**Office: (850) 354-5645**
mbeato@HoltzmanVogel.com // www.HoltzmanVogel.com



PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged.  They are intended for the sole use of the addressee.  If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  Moreover, any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise.  If you have received this communication in error, please contact me at the above email address.  Thank you.

DISCLAIMER
Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties.  If desired, Holtzman Vogel, PLLC would be pleased to perform the requisite research and provide you with a detailed written analysis.  Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

---

**From:** Silva, Dylan <DSilva@cov.com>
**Sent:** Monday, December 19, 2022 7:25 PM
**To:** Michael Beato <mbeato@HoltzmanVogel.com>; Mohammad O. Jazil <mjazil@holtzmanvogel.com>; Lannin, Cortlin <clannin@cov.com>; Zack Bennington <zbennington@HoltzmanVogel.com>; MedicalAmici <MedicalAmici@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

Wednesday is unfortunately difficult for me.  How about any time on Friday?

---

**From:** Michael Beato <mbeato@HoltzmanVogel.com>
**Sent:** Monday, December 19, 2022 4:20 PM
**To:** Silva, Dylan <DSilva@cov.com>; Mohammad O. Jazil <mjazil@holtzmanvogel.com>; Lannin, Cortlin <clannin@cov.com>; Zack Bennington <zbennington@HoltzmanVogel.com>; MedicalAmici <MedicalAmici@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

<mark>[EXTERNAL]</mark>
Thank you, counsel. Would you be free to confer on Wednesday—about these subpoenas and the

ones we sent to WPATH, ES, and AAP?

**Michael Beato**
**Office: (850) 354-5645**
mbeato@HoltzmanVogel.com // www.HoltzmanVogel.com



PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged.  They are intended for the sole use of the addressee.  If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  Moreover, any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise.  If you have received this communication in error, please contact me at the above email address.  Thank you.

DISCLAIMER
Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties.  If desired, Holtzman Vogel, PLLC would be pleased to perform the requisite research and provide you with a detailed written analysis.  Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

**From:** Silva, Dylan <DSilva@cov.com>
**Sent:** Monday, December 19, 2022 7:17 PM
**To:** Mohammad O. Jazil <mjazil@holtzmanvogel.com>; Lannin, Cortlin <clannin@cov.com>; Zack Bennington <zbennington@HoltzmanVogel.com>; MedicalAmici <MedicalAmici@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>; Michael Beato <mbeato@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

> Some people who received this message don't often get email from dsilva@cov.com. Learn why this is important

Counsel,

Please see attached the responses and objections to the subpoenas.  As noted in the attached, we are available to meet and confer about the requests.

Thanks,
Dylan

**From:** Mohammad O. Jazil <mjazil@holtzmanvogel.com>
**Sent:** Monday, November 28, 2022 11:44 AM
**To:** Lannin, Cortlin <clannin@cov.com>; Zack Bennington <zbennington@HoltzmanVogel.com>; MedicalAmici <MedicalAmici@cov.com>
**Cc:** Gary V. Perko <gperko@HoltzmanVogel.com>; Michael Beato <mbeato@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

[EXTERNAL]
That works for us. Thanks, Mo.

---

**From:** Lannin, Cortlin <clannin@cov.com>
**Sent:** Monday, November 28, 2022 2:26 PM
**To:** Zack Bennington <zbennington@HoltzmanVogel.com>; MedicalAmici <MedicalAmici@cov.com>
**Cc:** Mohammad O. Jazil <mjazil@holtzmanvogel.com>; Gary V. Perko <gperko@HoltzmanVogel.com>; Michael Beato <mbeato@HoltzmanVogel.com>
**Subject:** RE: Dekker v. Marstiller: Notice of Non-Party Subpoenas

> Some people who received this message don't often get email from clannin@cov.com. Learn why this is important

Zack,

Hope you had a nice holiday.  I can confirm that we will represent these organizations and are authorized to accept service of the subpoenas on their behalf.  In exchange, we'd appreciate a short one-week extension of the organizations' deadline to serve responses to the subpoenas, to December 19, 2022.  Does that work?

Regards,

Cort

---

**From:** Zack Bennington <zbennington@HoltzmanVogel.com>
**Sent:** Tuesday, November 15, 2022 11:42 AM
**To:** Veta, Jean <jveta@cov.com>; Isasi, William <WIsasi@cov.com>; Mondry, Emily <EMondry@cov.com>; Lannin, Cortlin <clannin@cov.com>
**Cc:** Mohammad O. Jazil <mjazil@holtzmanvogel.com>; Gary V. Perko <gperko@HoltzmanVogel.com>; Michael Beato <mbeato@HoltzmanVogel.com>
**Subject:** Dekker v. Marstiller: Notice of Non-Party Subpoenas

[EXTERNAL]
Good afternoon, Counsel,

I've attached non-party subpoenas and notices in the subject case for the following:

Academic Pediatric Association
American Academy of Child and Adolescent Psychiatry
American Academy of Family Physicians
American Academy of Nursing
American College of Obstetricians and Gynecologists
American College of Osteopathic Pediatricians
American College of Physicians
American Medical Association
American Pediatric Society

American Psychiatric Association
Association of American Medical Colleges
Florida Chapter—American Academy of Pediatrics
National Association of Pediatric Nurse Practitioners
North Central Florida Council Child & Adolescent Psychiatry
Pediatric Endocrine Society
Societies for Pediatric Urology
Society for Adolescent Health and Medicine
Society for Pediatric Research
Society of Pediatric Nurses

Please inform us if you accept service of the subpoenas.  If not, we can serve them through a process server.  Thank you and please let us know if you have any questions or require additional information.

Sincerely,
Zack Bennington


**Zack Bennington**
**Holtzman Vogel Baran Torchinsky & Josefiak PLLC**
**Mobile: (762) 585-0490**
zbennington@HoltzmanVogel.com // www.HoltzmanVogel.com

**Tallahassee Office**
119 S. Monroe St, Ste 500
Tallahassee, FL 32301
**(850) 270-5938**

**Virginia Office**
15405 John Marshall Highway
Haymarket, VA 20169
**(540) 341-8808**

**Washington DC Office**
2300 N Street, NW, Ste 643-A
Washington, DC  20037
**(202) 737-8808**



PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged.  They are intended for the sole use of the addressee.  If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  Moreover, any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise.  If you have received this communication in error, please contact me at the above email address.  Thank you.

DISCLAIMER

Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties.  If desired, Holtzman Vogel, PLLC would be pleased to perform the requisite research and provide you with a detailed written analysis.  Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.

Tab O

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
AUGUST DEKKER, et al.,          )
                                )
              Plaintiffs,       ) Case No: 4:22cv325
                                )
        v.                      ) Tallahassee, Florida
                                ) October 12, 2022
SIMONE MARSTILLER, et al.,      )
                                ) 9:33 AM
              Defendants.       )
_____  )
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE ROBERT L. HINKLE**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 120)**

```
Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com
```

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

APPEARANCES:

For Plaintiffs:              Lambda Legal
                            By:  OMAR GONZALEZ-PAGAN
                                 Attorney at Law
                                 ogonzalez-pagan@lambdalegal.com
                            120 Wall Street
                            19th Floor
                            New York, New York 10005

                            Pillsbury, Winthrop, Shaw, Pittman, LLP
                            By:  JENNIFER ALTMAN
                                 Attorney at Law
                                 jennifer.altman@pillsburylaw.com
                            600 Brickell Avenue
                            Suite 3100
                            Miami, Florida 33131

                            Lambda Legal
                            By:  CARL S. CHARLES
                                 Attorney at Law
                                 ccharles@lambdalegal.org
                            1 West Court Square
                            Suite 105
                            Decatur, Georgia 30030

                            Southern Legal Counsel Inc
                            By:  SIMONE M. CHRISS
                                 CHELSEA LEE DUNN
                                 Attorney at Law
                                 simone.chriss@southernlegal.org
                                 chelsea.dunn@southernlegal.org
                            1229 NW 12th Avenue
                            Gainesville, Florida 32601

                            Florida Health Justice Project
                            By:  KATHERINE JEAN ANN DEBRIERE
                                 Attorney at Law
                                 debriere@floridahealthjustice.org
                            3900 Richmond Street
                            Jacksonville, Florida 32205

                            National Health Law Program
                            By:  CATHERINE ANNE MCKEE
                                 Attorney at Law
                                 mckee@healthlaw.org
                            1512 East Franklin Street
                            Chapel Hill, North Carolina 27514

APPEARANCES (continued):

For Defendants:          Holtzman Vogel Baren, et al.
                         By:  MOHAMMAD OMAR JAZIL
                              GARY VERGIL PERKO
                              MICHAEL BEATO
                              Attorneys at Law
                              mjazil@holtzmanvogel.com
                              garyp@holtzmanvogel.com
                              michaelb@holtzmanvogel.com
                         119 South Monroe Street
                         Suite 500
                         Tallahassee, Florida 32301

```
 1                    P R O C E E D I N G S

 2         (Call to Order of the Court at 9:33 AM on Wednesday,

 3    October 12, 2022.)

 4              THE COURT:  Good morning.  Please be seated.

 5              We're here on the plaintiffs' motion for a preliminary

 6    injunction.  I've read all of the papers.  I've read the record.

 7    I think I'm up to speed.

 8              The plaintiffs submitted evidence but did not indicate

 9    they wish to call any live witnesses.  Defense has indicated it

10    wishes to call live witnesses.  Unless either side has something

11    you want to tell me first, we can go straight to the witnesses.

12              Is there anything on the plaintiffs' side you want to

13    tell me before we do that?

14              MR. GONZALEZ-PAGAN:  No, Your Honor.  We're ready to

15    proceed with the witnesses if defendants are.

16              THE COURT:  All right.  And for the defense?

17              MR. GONZALEZ-PAGAN:  Your Honor, we would just note

18    that we would have a standing objection regarding the relevance

19    regarding the lay witnesses, and we filed a motion to that

20    effect as well.

21              THE COURT:  And I read the motion and the response.

22    I'm not going to exclude the witnesses wholesale.  The -- if the

23    testimony is relevant, it's not a very high standard.

24              Yes.

25              MR. PERKO:  May it please the Court, the defense would
```

Direct Examination - Dr. Laidlaw

 1  like to call Dr. Michael K. Laidlaw --

 2          THE COURT:  All right.

 3          MR. PERKO:  -- by remote -- or video.

 4          THE COURT:  All right.  And for what it's worth, I've

 5  read Dr. Laidlaw's declaration, so I've seen some of what he has

 6  to say.

 7          MR. PERKO:  Good morning, Dr. Laidlaw.  Can you hear

 8  me?

 9          THE WITNESS:  I can hear you okay.

10          THE COURT:  I need to speak with him first.

11          Dr. Laidlaw, are you there in a room by yourself?

12          THE WITNESS:  I am.

13          THE COURT:  All right.  You should be by yourself

14  while you're testifying.  If anyone else comes into the room

15  where you are, if you'd stop and let me know, we'll address it.

16          If you would, please, raise your right hand.

17  **DR. MICHAEL K. LAIDLAW, DEFENSE WITNESS, DULY SWORN**

18          THE COURT:  Please tell us your full name, and spell

19  your last name for the record for our record.

20          THE WITNESS:  Michael K. Laidlaw.  That's spelled

21  L-a-i-d, as in David, L-a-w.

22          THE COURT:  All right.  And the lawyers will have some

23  questions for you.

24          MR. PERKO:  Thank you, Your Honor.

25                      DIRECT EXAMINATION

6

Direct Examination – Dr. Laidlaw

1    BY MR. PERKO:

2    Q.   Dr. Laidlaw, could you please briefly describe your

3    educational background?

4    A.   Sure.  I got a bachelor's degree of science in biology,

5    concentration in molecular cell biology, at San José State

6    University.  I received a medical doctor degree from University

7    of Southern California in 2001.  I went on to train in an

8    internal medical residency at the same location and did a -- for

9    three years and did a two-year fellowship afterwards in

10   endocrinology, diabetes and metabolism, and took and passed

11   board certifications in both of those areas.

12   Q.   Could you briefly describe your professional experiences in

13   obtaining your degrees?

14   A.   Yes.  Since that time, since 2006, I've been in private

15   practice in endocrinology, primarily outpatient but some

16   inpatient work, in Rocklin, California.

17   Q.   Can you describe us -- or tell us what endocrinology

18   entails?

19   A.   Yeah.  Endocrinology involves the study of disorders of

20   glands and hormones, structural gland disorders such as cancer

21   or tumors, and then hormonal imbalances such as high hormone

22   levels of, say, the thyroid or testosterone or estrogen or low

23   levels of these hormones and the consequences -- physical and

24   mental consequences that occur from these hormones.  And so I

25   diagnosis and treat these conditions.

Voir dire Examination – Dr. Laidlaw

```
 1   Q.   Are you a member of any professional associations?

 2   A.   I am a member of the Endocrine Society.

 3        MR. PERKO:  Your Honor, at this time we'd proffer

 4   Dr. Laidlaw as an expert in endocrinology.

 5        MR. CHARLES:  Objection, Your Honor.  I'd like to voir

 6   dire the witness.

 7        THE COURT:  You may certainly voir dire the witness.

 8        MR. CHARLES:  May it please the Court, Your Honor.  My

 9   name is Carl Charles for the plaintiffs.

10                    VOIR DIRE EXAMINATION

11   BY MR. CHARLES:

12   Q.   Dr. Laidlaw, can you hear me?

13   A.   Yes.

14   Q.   Okay.  Dr. Laidlaw, you wrote a declaration that was filed

15   in this case; correct?

16   A.   Correct.

17   Q.   And as a part of that declaration, you submitted a CV

18   entitled "Exhibit A"?

19   A.   Yes.

20   Q.   And you're not a practicing psychiatrist; is that correct,

21   Dr. Laidlaw?

22   A.   That is correct.

23   Q.   You are not a licensed mental health care provider; is that

24   correct?

25   A.   That's correct.
```

Voir dire Examination – Dr. Laidlaw

1    Q.   And you're not a psychologist; is that correct?

2    A.   That is correct.

3    Q.   And, Dr. Laidlaw, you're not an obstetrician; is that

4    correct?

5    A.   That is correct.

6    Q.   And, Dr. Laidlaw, you're not a gynecologist; is that

7    correct?

8    A.   That is correct.

9    Q.   And you're not a surgeon, Dr. Laidlaw; is that correct?

10   A.   That's correct.

11   Q.   And you're not a pediatric endocrinologist; is that

12   correct?

13   A.   That is correct.

14   Q.   Less than 5 percent of your patients are under the age of

15   18; is that correct?

16   A.   Yes.

17   Q.   And you're not a bioethicist; is that correct?

18   A.   I have no formal training other than an IRB certification

19   many years ago.

20   Q.   Okay.  So you don't practice as a bioethicist; is that

21   correct?

22   A.   That's correct.

23   Q.   And you haven't done any primary research on fertility; is

24   that correct?

25   A.   No primary research on fertility; that's correct.

Voir dire Examination – Dr. Laidlaw

1  Q.    And you haven't done any primary research on sterility; is

2  that correct?

3  A.    That is correct.

4  Q.    And you haven't written any articles which have been

5  subjected to a confirmed peer-review process about fertility; is

6  that correct?

7  A.    I -- specifically about fertility -- I don't know what the

8  peer review -- I had a paper in *The American Journal of*

9  *Bioethics.*  I don't know what the peer-review process was.

10  Q.    Okay.  So you -- again, you have not written any articles

11  which have been subjected to a peer review for process which you

12  can confirm about fertility; is that correct?

13  A.    Not that I can confirm.

14  Q.    And you haven't written any articles that have been

15  subjected to a confirmed peer-review process about sterility; is

16  that correct?

17  A.    Correct.

18  Q.    And you haven't performed any primary research about

19  medical ethics; is that correct?

20  A.    That's correct.

21  Q.    And you haven't written any confirmed peer-reviewed

22  publications about medical ethics; is that correct?

23  A.    I have not independent -- there is the article that I

24  mentioned.  I have not independently confirmed the peer-review

25  process.

Voir dire Examination – Dr. Laidlaw

1    Q.    Okay.  You cannot confirm that that article has been peer

2    reviewed?

3    A.    I cannot confirm.

4    Q.    And you have not performed any primary research about

5    informed consent; is that correct?

6    A.    That's correct.

7    Q.    And you have not written any articles confirmed to be peer

8    reviewed regarding parents' ability to consent for treatment for

9    their minor children; is that correct?

10   A.    I have not written a peer reviewed article on that topic.

11   Q.    And none of the publications listed in your CV attached to

12   your declaration are based on original primary research; is that

13   correct?

14   A.    That's correct.

15   Q.    And you haven't done any primary research about transgender

16   people; is that correct?

17   A.    Just to clarify, when you say "primary research," you're

18   talking about using human subjects in the research -- as part of

19   the research rather than a review of the literature; is that

20   correct?

21   Q.    You haven't done any original primary research about

22   transgender people; is that correct?

23   A.    In the context of working with human subjects, that is

24   correct.

25   Q.    And that includes any research about children and

Voir dire Examination – Dr. Laidlaw

1   adolescents; isn't that correct?

2   A.   Yes.  With regard to human subjects, that is correct.

3   Q.   And you haven't received any grants to support research

4   into endocrine treatments for gender dysphoria; is that correct?

5   A.   That is correct.

6   Q.   And you have not done any original primary research about

7   the treatment of gender dysphoria; is that correct?

8   A.   Not with human subjects; that's correct.

9   Q.   And you haven't performed any original primary research

10  into the frequency of gender -- into how frequently gender

11  dysphoria occurs; is that correct?

12  A.   I have not done primary research involving which -- human

13  subjects on that matter.

14  Q.   And you haven't -- and you have not done any original

15  primary research about the phenomenon of desistance; is that

16  correct?

17  A.   I have not done primary research with human subjects on

18  that condition -- for that condition.

19  Q.   And you've never diagnosed anyone with gender dysphoria; is

20  that correct?

21  A.   That is correct.

22  Q.   And you've previously testified under oath that you've only

23  provided care to one transgender patient related to the

24  treatment of gender dysphoria; is that correct?

25  A.   I have worked with patients with gender incongruence in the

Voir dire Examination – Dr. Laidlaw

 1   context of my practice, but as far as providing hormones, there

 2   was -- someone with gender dysphoria, there was one.

 3   Q.   And it was only to provide that patient with a refill of

 4   estrogen; is that correct?

 5   A.   There was an evaluation.  There was an office visit, and

 6   there was necessity for a refill of estrogen in that case.

 7   Q.   Okay.  And so you did not deny the patient the refill of

 8   the estrogen?

 9   A.   That's correct.

10   Q.   So you have utilized the Endocrine Society guidelines for

11   the treatment of gender dysphoria once; is that correct?

12   A.   This was -- this preceded the Endocrine Society guidelines.

13   Q.   What year was the treatment of that patient?

14   A.   It was in the early 2000s.  It was prior to -- it was prior

15   to 2009, which is when the first Endocrine Society guidelines

16   were published.

17   Q.   In your private practice, Dr. Laidlaw, you do not contract

18   with California Medicaid insurance; is that correct?

19   A.   That's correct.

20   Q.   And you have not spoken with any transgender Florida

21   Medicaid beneficiaries; is that correct?

22   A.   Yeah, not that I'm aware of.

23   Q.   And that would include the plaintiffs in this matter; is

24   that correct?

25   A.   That's correct.

Voir dire Examination – Dr. Laidlaw

1   Q.   And that would also include the parents of the minor

2   plaintiffs in this case; is that correct?

3   A.   Yeah, I have not spoken directly with them.  That is

4   correct.

5   Q.   And you have not evaluated any transgender Florida Medicaid

6   beneficiaries for any endocrine issues; is that correct?

7   A.   That's correct.

8   Q.   And you have not evaluated any of the plaintiffs for issues

9   related to the endocrine treatment they are receiving for their

10  gender dysphoria; is that correct?

11  A.   I have evaluated medical records that were provided to me.

12  Q.   Right.  But you have not evaluated those individuals for

13  the purposes of the endocrine treatment they are receiving as

14  treatment for their gender dysphoria?

15  A.   When you say "evaluate," I presume you mean a direct

16  history and physical evaluation.  I have not done that.

17  Q.   And you have not spoken with any of the plaintiffs' current

18  treating medical providers; is that correct?

19  A.   That's correct.

20  Q.   So you have not spoken with their qualified mental health

21  care professionals; is that correct?

22  A.   That's correct.

23  Q.   And you have not spoken with any of their primary care

24  physicians; is that correct?

25  A.   That's correct.

14

Voir dire Examination – Dr. Laidlaw

1   Q.   And you have not spoken with any of the plaintiffs' current

2   treating endocrinologists; is that correct?

3   A.   That's correct.

4   Q.   And you have not reviewed the entirety of these

5   individuals' medical records; is that correct?

6   A.   That is correct.

7           MR. CHARLES:  Your Honor, if I may have just one

8   moment to confer with counsel?

9           THE COURT:  You may.

10       (Discussion was held.)

11          MR. CHARLES:  Your Honor, I would make a proffer at

12  this time that due to Dr. Laidlaw's lack of experience treating

13  gender dysphoria or writing or publishing in this area, due to

14  his lack of evaluation of the plaintiffs or the complete review

15  of their medical records, that he not be able to testify further

16  as to the contents of his declaration at this time.

17          THE COURT:  The objection is overruled.  There are

18  subjects on which he may be able to testify.  If you have

19  objections to individual questions, you may object as they

20  arise.

21          MR. CHARLES:  Thank you, Your Honor.

22          THE COURT:  Mr. Perko, you may proceed.

23          MR. PERKO:  Thank you, Your Honor.

24

25

Direct Examination – Dr. Laidlaw

1          CONTINUED DIRECT EXAMINATION

2    BY MR. PERKO:

3    Q.   Dr. Laidlaw, you submitted a declaration in this matter,

4    didn't you?

5    A.   I did.

6    Q.   And have you reviewed the declarations -- rebuttal

7    declarations that the plaintiffs submitted in response to your

8    declaration?

9    A.   Yes.

10   Q.   And do you stand by the opinions in your declaration,

11   notwithstanding those rebuttal reports?

12   A.   Yes, I do stand by those opinions.

13   Q.   What were your opinions expressed in your declaration based

14   on?

15   A.   My opinions are based on my education and clinical

16   experience in endocrinology, my work with gender incongruent

17   patients in the context of my practice, including a

18   detransitioner, my extensive evaluation of the scientific

19   literature regarding the treatment of gender dysphoria, gender

20   incongruence for adults and minors, and also my review of all

21   the plaintiffs' declarations and the medical records provided to

22   me.

23   Q.   Dr. Laidlaw, you stated that you had limited experience

24   with gender dysphoria.  But have you reviewed the literature

25   with regard to gender dysphoria in the gender-affirming care?

Direct Examination – Dr. Laidlaw

1  A.   I have reviewed the literature extensively over the last at

2  least four years.

3  Q.   And why is that?

4  A.   Well, for a few reasons.  One is that these treatments that

5  they advocate for involve hormones and raising hormone levels to

6  sometimes very high levels or very low levels.  So I've taken an

7  interest in the risk-and-benefit ratio of these types of

8  treatments, and this is something I do every day in

9  endocrinology.

10      Furthermore, before my colleagues and I are to follow any

11  sort of treatment protocol, I think it's essential that these

12  studies and so forth are evaluated to determine the risk-benefit

13  profile before any of us use these treatments.

14  Q.   And, Dr. Laidlaw, what exactly is gender dysphoria?

15  A.   Gender dysphoria is –– well, there's a couple of terms that

16  would be helpful.  Gender identity is a person's internal or

17  mental sense of being male or female or perhaps some other

18  designation, and there's an incongruence or mismatch in these

19  cases with their physical body.  For example, a person may

20  identify as a female but have been born with a male body, and so

21  there is resulting distress and impairment of function.  There's

22  different definitions from there on as to how long it lasts and

23  slight differences for adults versus children and adolescents.

24  Q.   And is gender dysphoria an endocrine disorder?

25  A.   It's not an endocrine disorder.  It's a disorder found in

Direct Examination – Dr. Laidlaw

1    the DSM-V, *Diagnostic and Statistical Manual of Mental*
2    *Disorders.*
3    Q.   Are there any objective tests for diagnosing gender
4    dysphoria?
5    A.   There are no objective tests insofar as you can't do a
6    scan or -- a brain scan, for example, or a blood test, a genetic
7    test, or other biomarkers cannot test and confirm gender
8    dysphoria.
9    Q.   Dr. Laidlaw, what is desistance?
10   A.   Desistance is a condition where someone had -- once had
11   gender dysphoria or gender incongruence and then over time lost
12   or changed that condition such that some go on to fully identify
13   their internal sense of gender identity that is equivalent with
14   their physical body that they were born with.
15   Q.   And what is detransition?
16   A.   Detransition is a further step that one may take who has
17   desisted or is in the process of desisting such that they are --
18   you might think of it as reserving the process that they went
19   through in transition.  So they may stop the hormones that they
20   were taking.  They may dress in a manner more typical of the sex
21   of their nation.  They may opt to reverse surgeries and so forth
22   to align their identity with their physical body and their
23   perception in society.
24   Q.   So, Dr. Laidlaw, would you consider gender identity to be
25   immutable?

Direct Examination – Dr. Laidlaw

1    A.    No.

2    Q.    And why is that?

3    A.    Well, I think that it's proved by the desistance,

4    particularly with young people.  Children have high desistance

5    rates.  There are many detransitioners who are adults, including

6    one patient of mine, which proves that this gender identity is

7    not immutable.

8    Q.    Doctor, switching gears a little bit, you say in your

9    declaration that hormone treatment for gender dysphoria can lead

10   to infertility.

11        Is that always the case?

12            MR. CHARLES:  Objection, Your Honor.

13            The witness has already stated he's not qualified to

14   opine about this subject.

15            MR. PERKO:  I don't believe that's the case,

16   Your Honor.  He's talking about hormone therapy, and he's an

17   endocrinologist.

18            THE COURT:  I'll overrule the objection.  I'm going to

19   be the finder of fact.

20            When Dr. Laidlaw has knowledge because of his actual

21   medical practice, as opposed to having read some stuff over the

22   last four years, you might want to point it out, because he's

23   not going to persuade me very much -- he may persuade me, but

24   he's less likely to persuade me when all he is telling me is

25   what he has read and not what he has applied in his practice.

Direct Examination – Dr. Laidlaw

1          MR. PERKO:  Yes, Your Honor.

2    BY MR. PERKO:

3    Q.    Can you answer the question, Dr. Laidlaw?

4    A.    Could you repeat the question, please?

5    Q.    You state in your declaration that hormone treatment for

6    gender dysphoria can lead to infertility.  Is that always the

7    case?

8    A.    That is not always the case.  It depends at what stage of

9    puberty the gender dysphoria treatment was initiated.  For

10   example, in late stages of puberty or adulthood, a person may

11   take hormones of the opposite sex, for example, and then

12   withdraw those hormones and then later regain fertility, where

13   they were once infertile while taking those hormones.  But if

14   puberty is stopped in a very early stage, say before ovulation

15   takes place for a female or sperm production takes place for a

16   male, then while they're taking these hormones they will remain

17   in an infertile state.

18   Q.    Dr. Laidlaw --

19          THE COURT:  That -- for example, how does he know

20   that?

21   BY MR. PERKO:

22   Q.    How do you know that, Doctor?

23   A.    Well, that's based on -- I mean, part of endocrinology is

24   sexual development.  We deal with gonads -- male/female gonads,

25   reproductive issues, infertility issues.  For example, I see

Direct Examination - Dr. Laidlaw

1   woman with polycystic ovarian syndrome who have high

2   testosterone levels which leads to infertility that in some

3   cases I treat with Metformin.  So infertility is part of our,

4   you know, daily workup.

5        And understanding what happens to children, as they get

6   older, they could develop infertility as children and present as

7   adults, for example, because of their endocrine disorders.  The

8   thing with the treatment that they're advising is that they're

9   inducing the infertility through their hormones that they're

10  prescribing rather than it developing natally in the body, but

11  the situation is the same.

12  Q.   Dr. Laidlaw, are you familiar with the standards of care

13  for gender dysphoria developed by the World Professional

14  Association for Transgender Health, or WPATH?

15  A.   Yes.

16  Q.   And why are you familiar with those?

17  A.   For a couple of reasons.  This is -- there's a recently

18  published "Standards of Care 8" by WPATH.  These relate to our

19  Endocrine Society guidelines last published in 2017 that were

20  created with mainly WPATH authors.  So I've studied these

21  documents in order to understand what the effects of these

22  treatments would be on any of my patients before I were to

23  endeavor to follow their recommendations.

24  Q.   And do you follow the WPATH standards of care?

25  A.   I do not.

Direct Examination - Dr. Laidlaw

1    Q.    Why not?

2    A.    Could you repeat?

3    Q.    Why not?

4    A.    Why not was the question?

5          Well, for -- one thing is that they're not standards of

6    care.  They're standards of care that exist within their own

7    organization, but they're not widely accepted standards of care.

8    In fact, the Endocrine Society, which worked with WPATH on their

9    own set of guidelines, says explicitly that they're not

10   standards of care.  So these -- I see these as an opinion on

11   what should be done with these patients but not the exclusive

12   rule.

13   Q.    And you mentioned the Endocrine Society's guidelines.  Do

14   you follow the Endocrine Society guidelines?

15   A.    I have read the guidelines extensively.  They have ratings

16   for the quality of evidence which you can read, which are low,

17   very low quality, or absent evidence.  There are some useful

18   facts in those guidelines, but again, I think their

19   determination to use high doses of hormones and block normal

20   puberty has more risks than benefits.  So I do not follow the

21   recommendations of those guidelines.

22   Q.    Dr. Laidlaw, switching gears again, in your report, you

23   talked about your review of medical records for the plaintiffs.

24         What specifically did you review?

25   A.    I was provided case notes for two patients.  There was an

Direct Examination – Dr. Laidlaw

1   Excel spreadsheet with dates of service, diagnostic and

2   procedure codes.  And then for two other patients there were

3   medical records provided in association with authorizations for

4   medications and, I think, procedures.

5   Q.   Dr. Laidlaw, the plaintiffs' expert rebuttal reports

6   criticize you for making conclusions based on your review of the

7   medical records.

8        Could you please respond to those criticisms?

9   A.   Well, as I said, I've spent quite a bit of time evaluating

10  guidelines and papers on gender dysphoria to make a

11  determination if the risks exceed the benefits for these

12  patients.  So going into it, I believe already that the risks

13  exceed the benefits.

14       However, when reviewing the records, I can also see

15  medications, whether it be contraindications or concerns.  I can

16  see diagnoses where the application of high doses of hormones

17  are blocking puberty could compound the patient's problems.  So

18  the risk level I determined was heightened for these plaintiffs

19  based on that limited review.

20  Q.   And did you rely on your professional experience in making

21  those conclusions?

22  A.   Yes, I relied on my professional experience in

23  endocrinology to make those decisions.

24  Q.   Without getting into specifics, Dr. Laidlaw, what did you

25  conclude based on your review of the medical records?

Cross-Examination – Dr. Laidlaw

```
 1    A.   I concluded that the risks outweighed the benefits for

 2    hormone social transition and surgery for the plaintiffs or

 3    minors.

 4              MR. PERKO:  May I confer with Counsel, Your Honor?

 5              THE COURT:  You may.

 6         (Discussion was held.)

 7              MR. PERKO:  We have no further questions, Your Honor.

 8              THE COURT:  Cross-examine.

 9              MR. CHARLES:  Yes, Your Honor.

10              If I may just have a moment.

11         (Pause in proceedings.)

12                        CROSS-EXAMINATION

13    BY MR. CHARLES:

14    Q.   Okay.  Dr. Laidlaw, can you hear me?

15    A.   Yes.

16    Q.   You testified that you have determined that based on a

17    review of incomplete medical records that gender-affirming care

18    for the plaintiffs could compound their problems; is that right?

19    A.   Yes.

20    Q.   You're not referring to endocrine problems, are you?

21    A.   Endocrine problems are a part of it, yes.

22    Q.   Okay.  So what is the endocrine problem you're referring

23    to?

24    A.   Issues of hypogonadotropic hypogonadism, hyperandrogenism,

25    hyperestrogenemia, and consequential infertility growth
```

Cross-Examination – Dr. Laidlaw

1    abnormalities that occur from those.

2    Q.   You said that was part of it; is that correct?

3    A.   Yes.

4    Q.   And the other part of it is nonendocrine problems.  What

5    are you referring to?

6    A.   Referring to issues with patients' underlying psychological

7    conditions that could be worsened by hormone manipulation.

8    Q.   But you not a psychiatrist; is that correct?

9    A.   No, but I have to make these evaluations every day to

10   determine if my hormone prescription --

11   Q.   Dr. Laidlaw, I understand --

12        THE COURT:  Wait.  Wait.  Wait.  When he's answering,

13   you have to let him answer the question.

14        MR. CHARLES:  Yes, Your Honor.

15        THE WITNESS:  I have to assess if the hormones that

16   I'm providing are going to exacerbate or cause psychological

17   conditions.

18   BY MR. CHARLES:

19   Q.   But as a nonpsychiatrist, you don't know if those hormones

20   are going to exacerbate any psychiatric conditions?

21   A.   They can affect -- I mean, there's warnings on the

22   medications themselves that they can affect psychiatric

23   conditions.

24   Q.   And you're not a psychologist, right, Dr. Laidlaw?

25   A.   That's correct.

Cross-Examination - Dr. Laidlaw

1   Q.   Psychological conditions?

2   A.   I do not make diagnoses, but we're trained in psychology

3   and psychiatry.  It's part of our medical licensing.

4   Q.   Okay.  But you are not a practicing psychologist?

5   A.   That's correct.

6   Q.   And you're not a practicing psychiatrist?

7   A.   That's correct.

8   Q.   And you have not met with any of the plaintiffs in this

9   matter --

10          THE COURT:  Mr. Charles, I sat through the voir dire.

11  I'm not going to sit through it again on cross.  You get one

12  chance to ask some questions.  You've asked those.  Let's ask

13  some new ones.

14          MR. CHARLES:  Thank you, Your Honor.

15  BY MR. CHARLES:

16  Q.   Dr. Laidlaw, you stated you don't follow the WPATH

17  standards of care; is that right?

18  A.   Yes.

19  Q.   But you testified earlier you don't treat gender dysphoria;

20  is that correct?

21  A.   I don't treat gender dysphoria with hormones and surgeries.

22  Q.   Dr. Laidlaw, are you aware that your opposition to

23  gender-affirming care for the treatment of gender dysphoria in

24  youth and adults is contrary to the vast majority of medical

25  associations' recommendations?

Cross-Examination – Dr. Laidlaw

```
 1   A.    Yes.

 2   Q.    Dr. Laidlaw, can you see the screen share that I've just

 3   enabled?

 4   A.    Yes, I can.

 5            MR. CHARLES:  Your Honor, can you see that as well?

 6            THE COURT:  I can.  It's hiding under the table up

 7   here, but I've got it.

 8            MR. CHARLES:  Okay.

 9   BY MR. CHARLES:

10   Q.    Dr. Laidlaw, are you aware that the American Academy of

11   Child and Adolescent Psychiatry supports gender-affirming care

12   for youth?

13   A.    I haven't looked at that specifically.

14   Q.    Okay.  And looking at the document here, I'll --

15            MR. CHARLES:  Let me ensure -- Defense Counsel, can

16   you view this document?

17            MR. PERKO:  Yes.

18            MR. CHARLES:  Okay.  So I'd like to enter this as

19   Exhibit P1.

20   BY MR. CHARLES:

21   Q.    This is the -- Dr. Laidlaw, this is the "American Academy

22   of Child and Adolescent Psychiatry Statement Responding to

23   Efforts to Ban Evidence-Based Care for Transgender and

24   Gender-Diverse Youth."

25            Do you see that?
```

Cross-Examination – Dr. Laidlaw

1    A.    Yes.

2    Q.    And it's dated November 8, 2019?

3    A.    Yes.

4    Q.    And if you could, just read aloud for me that highlighted

5    portion, please.

6    A.    Sure.

7         *Many reputable professional organizations, including the*

8    *American Psychological Association, the American Psychiatric*

9    *Association, the American Academy of Pediatrics, and the*

10   *Endocrine Society, which represent tens of thousands of*

11   *professionals across the United States, recognize natural*

12   *variations in gender identity and expression and have published*

13   *clinical guidance that promotes nondiscriminatory, supportive*

14   *interventions for gender-diverse youth based on the current*

15   *evidence base.  These interventions may include, and are not*

16   *limited to, social gender transition, hormone-blocking agents,*

17   *hormone treatment, and affirmative psychotherapeutic modalities.*

18        *The American Academy of Child and Adolescent Psychiatry*

19   *supports the use of current evidence-based clinical care with*

20   *minors.  AACAP strongly opposes any efforts -- legal,*

21   *legislative, and otherwise -- to block access to these*

22   *recognized interventions.*

23   Q.    Thank you.

24             THE COURT:  You apparently asked to have this admitted

25   into evidence.  I don't think I've seen this, so this may not

 1   have been in the record previously.

 2          MR. CHARLES:  Just one moment, Your Honor.

 3          It wasn't, Your Honor, but I do have copies I can

 4   provide to the Court to so enter.

 5          THE COURT:  Didn't I require disclosures before today?

 6   If I didn't, it would certainly depart from the standard of care

 7   for judges.

 8          MR. CHARLES:  I apologize, Your Honor.  I wasn't -- I

 9   didn't see that designation so -- in your order.

10          THE COURT:  I may not have.

11          Do you object to the admission of this?

12          MR. PERKO:  Yes, Your Honor, for the reasons you just

13   stated.

14          Also, I would suggest that it's really irrelevant to

15   this witness's testimony because it talks about the American

16   Psychological Association.  He's already testified he's not a

17   psychologist.

18          THE COURT:  You can't have it both ways.

19          I'll admit it subject to going back and looking at the

20   scheduling orders and --

21      (Discussion was held.)

22   BY MR. CHARLES:

23   Q.   Dr. Laidlaw, is what you just read consistent with your

24   understanding of the position of these organizations?

25   A.   Are you talking about the AACAP?

Cross-Examination – Dr. Laidlaw

1   Q.   Yes, let's start with that one.

2   A.   Well, I'm just reading it now for the first time, so it

3   must be -- it was 2019 -- unless they have changed their

4   opinion.

5   Q.   Okay.  But you don't have any --

6            THE COURT:  Let me just back up.  I'm going to exclude

7   the exhibit.  I did require things to be disclosed, and you

8   can't come up to the hearing and bring up a new exhibit that you

9   didn't timely disclose.

10            MR. CHARLES:  Okay.

11            THE COURT:  So Plaintiffs' 1 is excluded.

12            The scheduling order is ECF No. 32.

13            MR. CHARLES:  Okay.  Thank you, Your Honor.

14            Ms. Markley, you can unpublish, please.  Thank you.

15   BY MR. CHARLES:

16   Q.   Dr. Laidlaw, are you aware that the American Academy of

17   Family Physicians supports gender-affirming care for youth and

18   adults?

19   A.   Supports gender-affirming care for youth and adults?

20   Q.   Yes.  Do you need to me to repeat?  Did you hear that?

21   A.   They probably do.  I don't know their exact statement.

22   Q.   Okay.  Are you aware that the American Academy of Family

23   Physicians published a policy statement in July of 2022,

24   approved by their board of directors, entitled "Care for the

25   Transgender and Gender Nonbinary Patient"?

1   A.   I have not read that particular document -- Family Practice

2   Document.

3   Q.   Okay.  Are you aware that the American Academy of Family

4   Physicians supports gender-affirming care as an

5   evidence-informed intervention that can promote permanent health

6   equity for gender-diverse individuals?

7          MR. PERKO:  Your Honor, I would object for the same

8   reasons.  He's essentially reading from an exhibit that was not

9   disclosed.

10          THE COURT:  He's now exploring the witness's knowledge

11   of the situation in the field.  The objection is overruled.

12   BY MR. CHARLES:

13   Q.   Dr. Laidlaw --

14   A.   I'm not a family practice physician, so I don't keep up

15   with --

16   Q.   Just a moment.  Sorry.  Let me start over.

17   A.   -- the literature of that organization.

18   Q.   I'm sorry.  Can you please repeat that?

19   A.   I said I'm not a family practice physician; I'm an

20   endocrinologist, so I don't keep up with whatever they're

21   publishing.

22   Q.   Okay.  So I -- let me just ask you one more question about

23   that brief -- or policy statement.  Excuse me.

24          Are you aware that the American Academy of Family

25   Physicians asserts the full spectrum of gender-affirming health

Cross-Examination – Dr. Laidlaw

```
 1   care should be legal and should remain a treatment decision
 2   between a physician and their patient?
 3   A.   I'm not surprised.
 4   Q.   Can -- so does that mean you are or are not aware?
 5   A.   I don't read the Family Practice documents, unless they are
 6   provided to me.
 7   Q.   Dr. Laidlaw, are you aware the American Academy of
 8   Pediatrics supports gender-affirming care for youth?
 9   A.   Yes.
10   Q.   Dr. Laidlaw, are you aware that the American College of
11   Obstetricians and Gynecologists has recommendations and
12   conclusions that support gender-affirming care for youth and
13   adults?
14   A.   I'm not -- again, I'm not surprised, but I don't read their
15   literature regularly for that purpose.
16   Q.   Okay.  Are you aware that the American College of
17   Obstetricians and Gynecologists has conclusions that
18   gender-affirming hormone therapy is not effective contraception?
19   A.   That gender-affirming therapy is not effective
20   contraception?
21   Q.   Correct.
22   A.   I have read that.  I'm not sure if it was theirs or someone
23   else who is publishing that.  I'm aware of that concept.
24   Q.   Can you repeat your answer?  I didn't understand you.
25   A.   I said I haven't read their statements specifically, but
```

Cross-Examination – Dr. Laidlaw

1    I'm aware of the concept or proposition that gender-affirming

2    hormones are not effective contraception.

3    Q.   Okay.  So you're not aware of the American College of

4    Obstetricians and Gynecologists conclusion that it is not

5    effective contraception?

6    A.   I have not read their particular conclusion.

7    Q.   Are you aware that the American College of Physicians, the

8    largest medical specialty society in the world with 160,000

9    internal medicine and subspecialty members, supports public and

10   private health care coverage of gender-affirming care?

11   A.   I'm not aware that all 160,000 members voted to approve

12   such a thing, but I'm aware that they have issued a statement

13   like that.

14   Q.   You are aware they issued such a statement?

15   A.   Yes.

16   Q.   Are you aware that in 2022, the American College of

17   Physicians issued a brief supporting access to gender-affirming

18   care and opposing discriminatory policies enforced against LGBTQ

19   people and objected, in particular, to the interference with the

20   physician-patient relationship and the penalization of

21   evidence-based care?

22   A.   I may have read that particular statement from that

23   organization.

24   Q.   Are you aware that the American Medical Association

25   supports gender-affirming medical care for youth and adults?

Cross-Examination – Dr. Laidlaw

1    A.    Yes.

2    Q.    Are you aware that in April of 2021, the American Medical

3    Association wrote a letter to the National Governors Association

4    objecting to the interference with health care of transgender

5    children?

6    A.    I believe I had come across that headline.

7    Q.    Are you aware that the American Medical Association, in

8    conjunction with GLMA, has issued a brief in support of public

9    and private insurance coverage of gender-affirming care?

10   A.    I'm not a member of the American Medical Association.  I

11   think only 20 percent of physicians in the nation are even a

12   member.  So I don't follow everything they say, but I do believe

13   I read that document.

14   Q.    Do you have evidence to support your assertion that only 20

15   percent of medical practitioners in the United States are

16   members of the AMA?

17   A.    I don't have a piece of paper with evidence, but that's my

18   general understanding.  I'm not a member.

19   Q.    But you don't have any evidence today to point to to

20   support that assertion?

21   A.    No.

22   Q.    Are you aware that in 2022, the American Medical

23   Association reaffirmed it's resolution in support of private and

24   public health care coverage for the treatment of gender

25   dysphoria as recommended by a patient's physician in Resolution

Cross-Examination – Dr. Laidlaw

1    Number 158.950?

2    A.    I have not read that resolution.

3    Q.    Are you aware, Dr. Laidlaw, that the American Psychological

4    Association has guidelines that support access to

5    gender-affirming care for youth and adults?

6    A.    Yes.

7    Q.    Are you aware that the American Psychological Association

8    opposes gender-identity change efforts as a broad practice

9    described as a range of techniques used by mental health

10   professionals and nonprofessionals with the goal of changing

11   gender identity, gender expression, or associated components of

12   these, to be in alignment with gender role behaviors

13   stereotypically associated with their sex assigned at birth?

14   A.    Yes, I am aware.

15   Q.    Are you aware that the American Psychiatric Association

16   supports gender-affirming medical care for youth specifically?

17   A.    Yes.

18   Q.    Are you aware that the American Psychiatric Association has

19   a position statement from 2018, supporting access to care for

20   transgender and gender-variant individuals broadly?

21   A.    Yes, I believe so.

22   Q.    Are you aware that the Endocrine Society and the Pediatric

23   Endocrine Society take the position that there is a durable

24   biological underpinning to gender identity that should be

25   considered in policy determinations?

Cross-Examination – Dr. Laidlaw

1    A.    I would have to read -- I have not read that particular

2    statement from the Endocrine Society.  I would like to see that

3    before I make a -- conclude anything.

4    Q.    Okay.  Are you aware this determination was included in a

5    position statement published in December of 2020?

6    A.    I have read that position statement.

7    Q.    And are you aware that the Endocrine Society and the

8    Pediatric Endocrine Society take the position that medical

9    intervention for transgender youth and adults is effective,

10   relatively safe when appropriately monitored, and has been

11   established as the standard of care?

12   A.    Well, they wrote that it was not the standard of care in

13   2017, so they're contradicting themselves.

14   Q.    Dr. Laidlaw, are you aware that that statement is contained

15   in the transgender health position statement issued

16   December 2020?

17   A.    I believe I read that.

18   Q.    And are you aware that the Endocrine Society and the

19   Pediatric Endocrine Society take the position that federal and

20   private insurers should cover such interventions as prescribed

21   by a physician, as well as the appropriate medical screenings

22   that are recommended for all body tissues that a person may

23   have?

24   A.    I believe I read something along those lines.

25   Q.    Are you aware that the Pediatric Endocrine Society supports

Cross-Examination – Dr. Laidlaw

1    gender-affirming care for youth?

2    A.   Yes.

3    Q.   Are you aware they published a position statement to that

4    effect in April of 2021?

5    A.   Yes.  I wrote an article describing why their conclusions

6    are false or incorrect.

7    Q.   Are you aware the Pediatric Endocrine Society recommends an

8    affirmative model of care that supports one's gender identity

9    and follows a multidisciplinary approach that includes

10   involvement of mental health professionals, patients and their

11   families.  Puberty suppression and/or gender-affirming hormone

12   therapy is recommended within this evidence-based approach on a

13   case-by-case basis as medically necessary and potentially

14   lifesaving.

15       Are you aware that was contained in the Pediatric Endocrine

16   Society statement?

17   A.   I am aware that it's contained.  I don't agree with it,

18   but, yes, I'm aware.

19             THE COURT:  If we're leading up to something, you can

20   go ahead with all of this.  If all you're doing is publishing

21   stuff I've already read --

22             MR. CHARLES:  No, Your Honor.

23             THE COURT:  You're welcome to make a closing argument

24   later and to go through all of this, but if -- this is an

25   incredibly inefficient way to publish material.

Cross-Examination - Dr. Laidlaw

```
 1              MR. CHARLES:  Your Honor --
 2              THE COURT:  So if that's all we are doing, let's move
 3  on.
 4              MR. CHARLES:  Thank you, Your Honor.  I'm -- I do have
 5  a final comment for Dr. Laidlaw related to --
 6              THE COURT:  I've been patient through all that, and if
 7  you're setting up another question, that's fine.
 8              MR. CHARLES:  Okay.  Thank you, Your Honor.
 9              Just two more documents.  I appreciate your patience.
10  BY MR. CHARLES:
11  Q.   Dr. Laidlaw, are you aware the Society for Adolescent
12  Health and Medicine supports gender-affirming care for youth?
13  A.   No.
14  Q.   Are you aware the Society for Adolescent Health and
15  Medicine issued a statement in opposition to state legislation
16  barring evidence-based treatment?
17  A.   No.
18  Q.   And, Dr. Laidlaw, are you aware that the World Medical
19  Association, which includes 115 national medical associations,
20  supports gender-affirming care?
21  A.   No.
22  Q.   So, Dr. Laidlaw, you're aware that your opinions related to
23  gender-affirming care are in contrast to all of those medical
24  associations' statements that we just reviewed?
25              MR. PERKO:  Objection, Your Honor.
```

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Yeah.  Sorry.  Could you repeat the

 3    question?

 4    BY MR. CHARLES:

 5    Q.   You are aware that your opinions against gender-affirming

 6    care for the treatment of gender dysphoria are contrary to the

 7    positions of the medical associations' statements we just

 8    reviewed?

 9    A.   Yes.

10              MR. CHARLES:  Just one moment, Your Honor.

11          (Discussion was held.)

12              MR. CHARLES:  No further questions, Your Honor.

13              THE COURT:  Redirect?

14              MR. PERKO:  Very briefly, Your Honor.

15              May it please the Court.

16                      REDIRECT EXAMINATION

17    BY MR. PERKO:

18    Q.   Dr. Laidlaw, you testified that you consider mental health

19    effects of hormone therapy in your practice; is that correct?

20    A.   That is correct.

21    Q.   Okay.  And why do you consider the potential mental health

22    effects of hormone therapy in your practice?

23              MR. CHARLES:  Objection, Your Honor.

24              THE COURT:  Overruled.

25              THE WITNESS:  To give you maybe a more concrete
```

1  example, the thyroid is a gland that makes thyroid hormone.

2  When people have very high levels of thyroid hormone, we call

3  that hyperthyroidism.  They can have physical effects like fast

4  heart rates, heart palpitations, tremors, but they can also have

5  mental effects like anxiety and even psychosis.  This can occur

6  because their body develops too much thyroid hormone, or they

7  may be taking too high of a dose of thyroid hormone.

8        So I have to distinguish if a mental health condition

9  is related to a hormone imbalance versus a native psychological

10 condition, or both sometimes.

11 BY MR. PERKO:

12 Q.   Dr. Laidlaw, one final question.

13      How many patients a year do you treat with hormone

14 treatments?

15 A.   For hormone treatments?

16 Q.   Yes.

17 A.   Well, all of them, for the most part.  I'd have to make an

18 estimate.  I see about 50 patient visits a week 50 weeks or so

19 out of the year.

20      MR. PERKO:  Thank you, Your Honor.  No further

21 questions.

22      THE COURT:  Dr. Laidlaw, I want to ask you a question,

23 and to do it, I need to define a couple of terms.  These may not

24 be the best definitions.  They are my definition for purposes of

25 my question.

1      I'm going to refer to natal identity as the identity

2  at birth, and then I'm going to refer to gender identity as a

3  person's perceived identity, the identity the person believes is

4  the correct identity for the person.

5      Here's my question.  In your opinion, is it ever

6  appropriate for any medical professional in any specialty to

7  support a person's decision to live in the person's gender

8  identity instead of in the person's natal identity?

9      THE WITNESS:  Ever under any circumstances, is that

10  what you are saying?

11      I think my determination is that, in general, the

12  risks of the hormones that are required and surgeries outweigh

13  the benefits for the majority of people.  I recognize there's

14  some small degree of adults, perhaps, who are living this way.

15  There are risks to mental health and things like that.  So I'm

16  not opposed to personal autonomy, but I am concerned about risks

17  versus benefits, particularly for minors and youth.

18      THE COURT:  So is the answer no?

19      THE WITNESS:  I guess no.

20      THE COURT:  Questions to follow up on mine?

21      MR. PERKO:  No, Your Honor.

22      MR. CHARLES:  No, Your Honor.

23      THE COURT:  Thank you, Dr. Laidlaw.  That concludes

24  your testimony.

25      THE WITNESS:  Thank you.

```
 1          (Dr. Laidlaw exited the Zoom video conference.)

 2               THE COURT:  Please call your next witness.

 3               MR. BEATO:  Your Honor, we call Zoe Hawes as our next

 4     witness.

 5               MR. PERKO:  Your Honor, we don't have any additional

 6     witnesses remotely.

 7               THE COURT:  We are trying to turn it off.

 8          (Ms. Hawes entered the courtroom.)

 9               THE COURTROOM DEPUTY:  Please remain standing and

10     raise your right hand.

11               ZOE HAWES, DEFENSE WITNESS, DULY SWORN

12               THE COURTROOM DEPUTY:  Please be seated.

13               Please state your full name, and spell your last name

14     for the record.

15               THE WITNESS:  Zoe Hawes, H-a-w-e-s.

16                         DIRECT EXAMINATION

17     BY MR. BEATO:

18     Q.   Good morning, Ms. Hawes.  Michael Beato on behalf of the

19     defendants.

20          Did you submit a declaration in this case?

21     A.   Yes.

22          (Pause in proceedings.)

23               MR. BEATO:  Your Honor, may I approach the witness to

24     give her her declaration?

25               THE COURT:  No.  Just ask her a question before you
```

Direct Examination – Ms. Hawes

 1  show her her declaration.

 2              MR. BEATO:  Of course, Your Honor.

 3  BY MR. BEATO:

 4  Q.   Ms. Hawes, your declaration states that you suffered from

 5  many mental health issues as a teenager.  What were those

 6  issues?

 7  A.   Yes.  So by the age of 15, I was diagnosed with anxiety and

 8  major depressive disorder.  I was later diagnosed with gender

 9  dysphoria, PTSD, and OCD.

10  Q.   You state in your declaration that you met with people.

11              THE COURT:  Look, if a general statement and –– we'll

12  have a trial later in the case, and so here's my statement to

13  both sides –– and some of the lawyers have heard me say this

14  before –– I'm the finder of fact.  If you want me to believe

15  what a witness says, your chances are much better if you ask a

16  nonleading question and the witness testifies.  If you tell the

17  witness what to say and the witness says yes, it's rarely

18  persuasive.

19              So you can do it any way you want, but let me just

20  tell you that to the extent that you're just going to read her

21  what she said before –– first, I'll sustain an objection to that

22  question, if there is one, and if there's not, it's not very

23  likely to persuade me.

24              MR. BEATO:  Yes, Your Honor.

25

Direct Examination – Ms. Hawes

1    BY MR. BEATO:

2    Q.   Ms. Hawes, what gender-affirming treatments did you

3    receive?

4    A.   I started testosterone at the age of 16.

5    Q.   For how long did you receive this treatment?

6    A.   About four years.

7    Q.   What are the physical effects of receiving this treatment?

8    A.   I -- first my menstrual cycle stopped, and then gradually

9    my body started to change, facial hair growth, my voice lowered.

10   Q.   How was your mental health at this time?

11   A.   Not great.  I -- anxiety became debilitating to where I

12   dropped out of school.  I was unable to keep a job, and I was

13   very -- still very suicidal and was in and out of the hospital

14   six times.

15   Q.   Did you seek any other treatments for gender dysphoria at

16   this time?

17   A.   I was planning and hoping to get a double mastectomy and

18   hysterectomy.

19   Q.   When did you stop taking testosterone?

20   A.   At the age of 20.

21   Q.   And why did you stop taking testosterone?

22   A.   I -- after a suicide attempt, I realized that my peace was

23   not going to come from changing my body, and I began to work on

24   my inner self and not trying to fix the physical.

25   Q.   What happened after you stopped taking testosterone?

Direct Examination - Ms. Hawes

```
 1   A.   Gradually my body started to refeminize.  I started to have
 2   more peace.
 3   Q.   And can you describe your mental and physical health now?
 4   A.   Much, much better.  I've been able to keep a job and --
 5   yeah.
 6   Q.   Have you experienced any significant life incidents
 7   stopping taking testosterone?
 8   A.   Can you repeat the question?
 9   Q.   Sure.  Or let me rephrase.
10        Your declaration says that you're married and are expecting
11   a son?
12             MR. GONZALEZ-PAGAN:  Objection.  Leading.
13             THE WITNESS:  Yes.
14             THE COURT:  That much is okay.  Overruled.
15   BY MR. BEATO:
16   Q.   How long have you been married?
17   A.   Almost two years.
18   Q.   And when are you expecting a son?
19   A.   At the end of January.
20   Q.   Congratulations.
21   A.   Thank you.
22   Q.   My final question is why did you not receive the gender
23   transition surgeries?
24   A.   I -- at the time we could not afford it.  I really, really
25   wanted it and thought it would bring lasting peace.  But I
```

Cross-Examination – Ms. Hawes

```
 1   couldn't afford it, and my insurance would not pay for it.
 2           MS. CHRISS:  Objection.  Calls for speculation.
 3           THE COURT:  Overruled.
 4           MR. BEATO:  One moment, Your Honor.
 5           No further questions.
 6           THE COURT:  Cross-examine.
 7                     CROSS-EXAMINATION
 8   BY MS. CHRISS:
 9   Q.   Good afternoon, Ms. Hawes.
10           THE COURT:  Introduce yourself to me.  I didn't take
11   appearances to begin with, and so I apologize.  But tell me --
12           MS. CHRISS:  I apologize, Your Honor.  Thank you.
13           My name is Simone Chriss, and I represent the
14   plaintiffs in this matter.
15   BY MS. CHRISS:
16   Q.   Thank you for being here, Ms. Hawes.
17       In order to keep this succinct and sufficient for the
18   Court, most of the questions that I'm going to ask you are
19   being -- will be in yes or -- can be answered by yes or no;
20   okay?
21   A.   Okay.
22   Q.   Great.  Ms. Hawes, you don't live in the state of Florida;
23   correct?
24   A.   Correct.
25   Q.   And you don't receive health insurance through Florida's
```

Cross-Examination – Ms. Hawes

1    Medicaid program; correct?

2    A.   Correct.

3    Q.   You've never received health insurance through Florida

4    Medicaid?

5    A.   Correct.

6    Q.   And you've never received any treatment in the state of

7    Florida?

8    A.   Correct.

9    Q.   Are you aware that this case concerns a rule related to

10   Florida's Medicaid program?

11   A.   Yes.

12   Q.   Were you contacted by anyone, Ms. Hawes, to provide

13   testimony in this case?

14   A.   Yes.

15   Q.   And who were you contacted by?

16   A.   Vernadette (phonetic).  I don't know the last name.  I'm

17   sorry.

18   Q.   Who is that person?

19   A.   I know she's an attorney.

20   Q.   And what were you asked to do in this case?

21   A.   I was invited to share my story.

22   Q.   And you filed a declaration in this case; correct?

23   A.   Yes, ma'am.

24   Q.   Who prepared the initial draft of that declaration?

25   A.   I am not sure.  I think Vernadette, but I'm not positive.

Cross-Examination – Ms. Hawes

1    Q.   Were you compensated for your time in this case?

2    A.   No.

3    Q.   Ms. Hawes, you stated that you were on testosterone for

4    almost four years; is that correct?

5    A.   Yes.

6    Q.   And you're now an expectant mother?

7    A.   Yes.

8    Q.   You're are not a mental health provider; is that correct?

9    A.   Correct.

10   Q.   And you're not a health care provider?

11   A.   Correct.

12   Q.   And you don't have a medical degree?

13   A.   Correct.

14   Q.   And you don't know any of the plaintiffs in this case?

15   A.   Correct.

16   Q.   So you can only speak to your personal experience with

17   accessing medical care outside of Florida; correct?

18   A.   Yes.

19   Q.   You don't know whether the plaintiffs in this case have

20   benefited from the treatment that they received; is that

21   correct?

22   A.   I don't know them, so correct.

23            MS. CHRISS:  Your Honor, may I have a moment to

24   confer?

25            THE COURT:  You may.

1          (Discussion held.)

2               MS. CHRISS:  No further questions, Your Honor.

3          Thank you.

4          THE COURT:  Redirect?

5          MR. BEATO:  No further questions, Your Honor.

6          THE COURT:  Ms. Hawes, before you started testosterone

7    treatment, tell me what kind of medical care you got for the

8    gender dysphoria issues or gender-related issues.  What kind of

9    doctor?  Where?  How much time?

10         THE WITNESS:  I saw a therapist in Norman, Oklahoma,

11   and she was some kind of certified gender therapist.  I'm not

12   sure of the precise title on that.  But she was qualified to do

13   what she was doing, and I saw her about three, four months.  We

14   went over childhood history, everything that led me to believe

15   that I was male, and she was agreeing with what I was saying and

16   feeling, and so after three or four months she signed off on

17   starting testosterone.

18         THE COURT:  The therapist, do you know if it was a

19   medical doctor?

20         THE WITNESS:  The one who signed the document saying I

21   was ready to start testosterone was a therapist, but I was

22   referred to an endocrinologist that had handled that before.

23         THE COURT:  And the therapist is a licensed social

24   worker?  Do you know what education level --

25         THE WITNESS:  She was licensed.  I'm not sure what

 1  degree or anything like that.

 2          THE COURT:  You don't know if she was a medical

 3  doctor?

 4          THE WITNESS:  Correct.  I don't think she was, like, a

 5  doctor.

 6          THE COURT:  How much time did you spend with the

 7  endocrinologist?

 8          THE WITNESS:  I had one consultation visit before

 9  starting testosterone.

10          THE COURT:  And did you talk to the endocrinologist

11  about the gender-identity issues --

12          THE WITNESS:  Yes.

13          THE COURT:  -- or just about the drug and the

14  treatment?

15          THE WITNESS:  She knew what I was coming in with and

16  asked me brief questions about if I'm sure, and I had to sign a

17  paper saying I understood, like, what I was getting into.

18          THE COURT:  So brief questions.  What?  15 minutes?

19  30 minutes?  Two hours?  How long?

20          THE WITNESS:  Maybe, like, 45 minutes of just sharing.

21          THE COURT:  Some of that included what testosterone

22  does?

23          THE WITNESS:  Yeah.

24          THE COURT:  I take it some discussion of risks --

25          THE WITNESS:  Yeah.

1          THE COURT:  -- and so forth?

2          Questions just to follow up on mine?

3          MR. BEATO:  No, Your Honor.

4          MS. CHRISS:  No, Your Honor.  Thank you.

5          THE COURT:  All right.  Thank you, Ms. Hawes.  You may

6   step down.

7       (Ms. Hawes exited the courtroom.)

8          THE COURT:  Please call your next witness.

9          MR. JAZIL:  Your Honor, Yaacov Sheinfeld is the final

10  witness.

11      (Mr. Sheinfeld entered the witness stand.)

12          THE COURT:  Right up here, sir.

13          THE COURTROOM DEPUTY:  Please remain standing and

14  raise your right hand.

15          **YAACOV SHEINFELD, DEFENSE WITNESS, DULY SWORN**

16          THE COURTROOM DEPUTY:  Please be seated.

17          Please state and spell your full name for the record.

18          THE WITNESS:  Yaacov Sheinfeld.

19          THE COURTROOM DEPUTY:  Could you spell it, please?

20          THE WITNESS:  Y-a-a-c-o-v S-h-e-i-n-f-e-l-d.

21                    DIRECT EXAMINATION

22  BY MR. JAZIL:

23  Q.   Good morning, Mr. Sheinfeld.

24       You submitted a declaration in this case --

25  A.   Yes.

Direct Examination – Mr. Sheinfeld

1   Q.   -- is that correct?

2        And your declaration talks about the experience of you and

3   your daughter dealing with transition; is that correct?

4   A.   Yes, I did.

5   Q.   Did your daughter see a therapist?

6   A.   Yes, about since the age of 14, 15.

7   Q.   Why did she start seeking therapy at the age of 14, 15?

8   A.   It was evident that she had issues relating to anxiety and

9   depression.

10  Q.   When did she tell you that she wanted to transition?

11  A.   She was about 17 and a half, 17 and 10 months.  I'm sorry

12  about the exact time because it's been about ten years ago.

13  Q.   Was she still suffering with the depression, anxiety that

14  you mentioned at that time?

15  A.   Absolutely.

16  Q.   Did your daughter take any testosterone hormones?

17  A.   Yes.  After seeing a therapist in North Hampton where she

18  went to college, she was put on a regimen of testosterone and

19  medication.

20  Q.   What was her age when she started taking the testosterone?

21  A.   I submitted your firm a printout from CVS which contains

22  hundreds of -- hundreds of drugs.

23           MS. ALTMAN:  Your Honor, I would object.  It's hearsay

24  at this point.

25           THE COURT:  Well, it probably is.  If he doesn't

Direct Examination - Mr. Sheinfeld

```
 1   remember, he doesn't remember.
 2              THE WITNESS:  Thank you.
 3              As a father --
 4              THE COURT:  Wait.  He's going to ask you another
 5   question.
 6              THE WITNESS:  Okay.
 7              Go ahead.
 8   BY MR. JAZIL:
 9   Q.   So the question was do you just remember the age she was?
10   A.   Yes.
11   Q.   What was her age when she started taking the testosterone?
12   A.   Probably 18, 18 and a half.
13   Q.   Now, in your declaration, you also discuss a meeting with a
14   social worker.
15        Can you briefly tell us what happened at that meeting?
16   A.   Okay.  This is in North Hampton.  And in a 45-minute time
17   span it was clear to me that the social worker would not
18   consider my total objection to this journey.  She dismissed my
19   concerns.  She disregarded them, told me to join this journey
20   and just accept my daughter and love her, and everything would
21   be okay.
22   Q.   What happened after that meeting?
23   A.   I was very angry.  Could you specify the question, please?
24   Q.   Did she -- did your daughter get any other gender-affirming
25   treatments after that meeting?
```

Direct Examination – Mr. Sheinfeld

```
 1   A.   I'm sure she did.

 2            MS. ALTMAN:  Your Honor, objection.  I believe it's

 3   hearsay.

 4            THE COURT:  It probably is.

 5            Sustained.

 6   BY MR. JAZIL:

 7   Q.   Do you know whether your daughter got any surgeries after

 8   that?

 9   A.   Of course she did.  The exact date is unknown to me, but

10   she did.  She had a double mastectomy.  I think it was around

11   the age of 18 and a half.  And the reason why I think is because

12   all her medical treatment was kept away from me.  Nobody told me

13   anything.

14   Q.   So after the surgery, from your perspective, was there --

15   what was your daughter's mental health from your perspective

16   after the surgery?

17            MS. ALTMAN:  Your Honor, objection.  He just testified

18   that all of the mental health was kept away from him.

19            THE COURT:  Overruled.

20   BY MR. JAZIL:

21   Q.   So after the surgery, from your perspective, what effect

22   did the surgery and the other treatments have on your daughter's

23   mental health?

24            THE COURT:  Well, I'll sustain an objection to that

25   question.  You can ask what he observed, what he saw, what he
```

Direct Examination - Mr. Sheinfeld

1    heard her say about her mental situation.  But he's not going to

2    give a diagnosis.

3              MR. JAZIL:  Yes, Your Honor.

4    BY MR. JAZIL:

5    Q.   What did you observe?

6    A.   I observed a -- my daughter -- rest her soul -- I saw no

7    improvement.  I saw deterioration of her soul and body, her

8    mental health.  Her body went through all these changes.  They

9    were very difficult for me to accept.  And her depression was

10   still evident.  All the drugs she took, hundreds of them, had

11   side effects of -- all kinds of effects on her body, her voice,

12   her demeanor, and she wasn't any happier.  I can tell you that.

13   There was no improvement in her accepting who she is.

14   Q.   Mr. Yaacov, reading your declaration, it announced your

15   daughter passed away.  When did she pass away?

16   A.   October 6, 2021.

17   Q.   Briefly tell us the circumstances of her death.

18   A.   She was found dead in a hotel room alone at the Best

19   Western in West Orange with fentanyl in her system.

20             THE COURT:  He has some.

21   A.   She committed suicide.

22   BY MR. JAZIL:

23   Q.   Mr. Sheinfeld, I'm sorry for your loss.

24             MR. JAZIL:  I have no further questions.  Thank you.

25             THE COURT:  Cross-examine.

Cross-Examination – Mr. Sheinfeld

1          MS. ALTMAN:  Good morning, Your Honor.  May it please

2  the Court, my name is Jennifer Altman.

3                      CROSS-EXAMINATION

4  BY MS. ALTMAN:

5  Q.   Sir, whenever you're ready.

6  A.   I'm ready.

7  Q.   First of all, on behalf of the plaintiffs, we all certainly

8  do apologize for your loss.  It is certainly unfathomable.

9          I'm going to ask you some questions, and I apologize if

10  they are indelicate under the circumstances, but you have

11  submitted a declaration here.

12          Virtually all, if not all of them, are yes-or-no questions,

13  and for efficiency, I would ask that you try and answer in that

14  manner.

15          Are you transgender?

16  A.   No.

17  Q.   Have you ever been diagnosed with gender dysphoria?

18  A.   No.

19  Q.   Have you ever been treated for gender dysphoria?

20  A.   No.

21  Q.   Is it fair to assume you've never been denied treatment for

22  gender dysphoria?

23  A.   No.

24  Q.   Have you ever spoken with any of the treating physicians

25  for the transgender plaintiffs in this action?

Cross-Examination - Mr. Sheinfeld

```
 1    A.    No.
 2    Q.    Do you have a medical degree?
 3    A.    No.
 4    Q.    Do you have a master's degree in behavioral health?
 5    A.    No.
 6    Q.    Do you have a doctorate in any specialty relating to
 7    psychology?
 8    A.    No.
 9    Q.    Do you have a bachelor of science or any other degree in
10    psychology?
11    A.    No, but I do have another degree.  I have a degree in
12    architectural -- in architecture.
13    Q.    Have you ever treated an individual with gender dysphoria?
14    A.    No.
15    Q.    Would you agree with me, sir, that you have no clinical,
16    educational, or academic training on the treatment of gender
17    dysphoria?
18              THE WITNESS:  Your Honor, can I elaborate on that?
19              THE COURT:  Well, just answer the question she asked.
20              THE WITNESS:  Well, it can't be just yes or no.  I
21    have to elaborate on that.
22    BY MS. ALTMAN:
23    Q.    Do you need me to repeat the question?
24    A.    Yes, please.
25    Q.    You would agree with me, sir, that you have no clinical,
```

Cross-Examination - Mr. Sheinfeld

 1  educational, or academic training on the treatment of gender

 2  dysphoria?

 3  A.   Yes, but it doesn't render me as somebody who is

 4  incompetent or somebody without logic to render my decision.

 5  Q.   Do you understand my question?

 6       THE COURT:  Well, look, you asked an argumentive

 7  question; he gets to give an argumentive answer.

 8  BY MS. ALTMAN:

 9  Q.   Do you understand the question, sir?

10  A.   I do understand the question.

11  Q.   Do you have any clinical, educational, or academic

12  experience?

13  A.   Educational, yes.

14  Q.   Okay.  Can you describe for the Court what your educational

15  experience is in the treatment of gender dysphoria?

16  A.   I think that we are dealing with a genuine feeling of

17  certain individuals who do not agree with their assigned birth

18  assignment, quote/unquote, but I think there is huge underlying

19  issues of these individuals that --

20  Q.   Sir, did you understand the question?

21       THE COURT:  Wait, wait.  Let him finish his answer.

22       When you ask an argumentive question for no reason

23  other than to make your argument, he gets to make his argument

24  in response.  If you want to just ask factual questions, I'll

25  make him give you the factual answer, but it has to be something

Cross-Examination – Mr. Sheinfeld

1    that has some factual purpose in the case.

2            MS. ALTMAN:  Understood, Your Honor, but my question

3    was his educational experience.

4            THE COURT:  And you asked that solely for the reason

5    of making an argument.  He has a degree in architecture.  He has

6    no degree in any mental health area.  When the only reason to

7    ask a question is to make an argument, you have to listen to the

8    argument that comes back.

9            MS. ALTMAN:  Fair enough, Your Honor.

10           THE COURT:  You may finish your answer, Mr. Sheinfeld.

11           THE WITNESS:  Thank you, Your Honor.

12           So I'm not here to render any decisions about other

13    individuals who may have genuine feelings of discomfort with

14    their body.  All I know is -- what's your name, please?

15    BY MS. ALTMAN:

16    Q.   Ms. Altman.

17    A.   Ms. Altman.

18    Q.   Yes, sir.

19    A.   All I know is that the system -- and I call the system, you

20    know, the world, the Internet, her friends -- influenced her

21    into a journey that killed her.  She's dead.  I buried her a

22    year ago, and I'm very angry, because they all failed her.  My

23    daughter did not deserve this.  So that's my educational,

24    quote/unquote, answer to you.

25    Q.   Understood.

Cross-Examination - Mr. Sheinfeld

1          Your daughter died of an overdose of fentanyl and alcohol;

2    correct?

3    A.    Yes, yes.

4    Q.    Sir, were you involved in any of the meetings, discussions,

5    or analysis performed by AHCA that led to the drafting and

6    implementation of Rule 59G-1.050?

7    A.    I don't even know what that is.

8    Q.    Have you reviewed Florida's rule banning gender-affirming

9    care?

10   A.    No, I've not.

11   Q.    Do you believe someone can be transgender?

12   A.    I think that in rare medical cases of maybe biological

13   organs of some individual who may have both organs -- in some

14   rare cases I could see the need for medical intervention that is

15   basically taking care of that issue.

16         But for the most part, I see it as a contagion of -- of --

17   it's hard to explain, and I don't have enough time to explain

18   myself.  But I feel like this is a social -- why do we have

19   7,000 percent increase in the last ten years of transgender

20   population to feel discomfort with their body?  7,000 percent.

21   We need to ask ourself why this is happening.

22   Q.    Do you believe someone can have gender dysphoria?

23   A.    I believe in rare cases maybe, yes.

24   Q.    Were you contacted by anyone to prepare or, rather, to

25   provide testimony in this case?

Cross-Examination – Mr. Sheinfeld

1    A.    Yes.

2    Q.    Who were you contacted by?

3    A.    I was contacted by the firm that is representing the State

4    of Florida.

5    Q.    And who prepared your draft declaration that you submitted

6    in this case?

7    A.    Well, I submitted my verbal, through the phone, testimony,

8    and I was just told about the proceeding, what's going to happen

9    here in this courtroom, today.  I am not indoctrinized or was

10   told what to do, if this is what you're after.

11   Q.    Sir, if I understood your testimony correctly, you said

12   your daughter was 18 and a half when she was put on

13   testosterone; is that correct?

14   A.    Yes.

15   Q.    So she was an adult?

16   A.    Yes.  By legal term, yes.

17   Q.    And she was also an adult when she made the decision --

18   when your child made the decision to transition; is that

19   correct?

20   A.    When you call someone an adult, you assume that they are.

21   You think that they are, but she was not an adult.

22   Q.    Was your child --

23   A.    Of legal age?

24   Q.    -- of legal age?

25   A.    Yes.

Cross-Examination - Mr. Sheinfeld

1   Q.   And how often did you see your child from, let's say, 18 to

2   the point at which she died, annually?

3   A.   My dear child did not speak to me for two years because I

4   had a very hard time accepting her decision and what happened.

5   It was of his choice not to talk to me.  So this is part of the

6   whole journey.  So it wasn't my choice not to talk to Sophia.

7   It was her choice.

8   Q.   Understood.

9        When was that period of time, from what year to what year?

10  A.   I would say --

11  Q.   18 to 20?

12  A.   18 to 20, yeah.

13  Q.   After that, from age 20 going forward, did you see your

14  daughter?

15  A.   Oh, yeah.  We reconciled, thank God.  My other daughter was

16  instrumental in that.  And we had a loving relationship, and I

17  accepted Sophia to the degree that I could call her Sam, and to

18  the best of my ability, I conformed to what she wanted me to do

19  because my choice was either have no relationship with her or

20  have the relationship according to what Sam wanted.  So as a

21  parent, I had no choice in the matter.

22  Q.   And if my question wasn't clear -- I'm trying to understand

23  how frequently you saw your child once you reconciled.

24  A.   I would say it was random because she was in college on and

25  off between Rutgers University and her own life.  She moved

Cross-Examination - Mr. Sheinfeld

 1    quite a bit.  At that point she was Sam.  So when I say "she," I
 2    mean Sam.
 3         I would say every two weeks she would come to my house.  In
 4    the whole COVID time of 2020, she was in my house for three or
 5    four months.
 6    Q.   Did you know your child was using fentanyl?
 7    A.   I had no idea.  That was at the very end, I assume.
 8         If I may elaborate?
 9         Go ahead.
10    Q.   Sir, do you recall -- in paragraph 3 of your declaration,
11    you state:  *Florida's Rule will prevent manipulation and*
12    *coercion on the part of health care providers and from that*
13    *their own distressed and confused children to comply with*
14    *demands for medical and surgical intervention aimed at*
15    *'affirming' a young person's professed discordant gender*
16    *identity under threats of alienation or loss of a child to*
17    *suicide.*
18         Did I read that portion of your declaration correctly?
19    A.   Say it again and slower.  Excuse me.  I can't hear you very
20    well.
21    Q.   Yeah.
22         In paragraph 3 of your declaration, you state:  *Florida's*
23    *Rule will prevent manipulation and coercion on the part of*
24    *health care providers and from that of their own distressed and*
25    *confused children to comply with demands for medical and*

Cross-Examination – Mr. Sheinfeld

1    *surgical intervention aimed at 'affirming' a young person's*

2    *professed discordant gender identity under threats of alienation*

3    *or loss of a child to suicide.*

4        Do you recall making that statement in your declaration?

5    A.   No, I don't recall making that declaration.  I'm not aware

6    of all the Florida law regarding this sublaw or declaration.

7    Q.   Did you review your declaration before you signed it?

8    A.   Yes.

9    Q.   Sir, your child never stopped identifying as male; correct?

10   A.   I don't know how to answer that.

11   Q.   You don't know how to answer the question?

12   A.   No.

13   Q.   At the time of your child's death, was your child going by

14   the name Sam?

15   A.   Yes.

16          MS. ALTMAN:  I have no further questions, Your Honor.

17          THE COURT:  Redirect?

18          MR. JAZIL:  No, Your Honor.  Thank you.

19          THE COURT:  Thank you, Mr. Sheinfeld.  You may step

20   down.  You are free to go about your business.  Thank you, sir.

21          THE WITNESS:  Thank you.

22       (Mr. Sheinfeld exited the courtroom.)

23          THE COURT:  Further evidence for the defense?

24          MR. JAZIL:  No, Your Honor.  Thank you.

25          THE COURT:  Rebuttal evidence for the plaintiffs?

64

```
 1                MR. GONZALEZ-PAGAN:  Nothing beyond what's in the

 2    record, Your Honor.

 3                THE COURT:  All right.  We can probably take a break

 4    before we have argument.  Let's take 15.

 5                How long do you want for argument?

 6                MR. GONZALEZ-PAGAN:  Your Honor, I think -- I leave it

 7    to the Court, depending on the Court's questions, but I think I

 8    can present in less than 30 minutes, I'm sure.

 9                MR. JAZIL:  Your Honor, 30 minutes is fine for the

10    defense as well.

11                THE COURT:  Let's shoot for 30 minutes a side.

12                Let's take a 15-minute break.  We'll start back at

13    11:25 by that clock.

14         (Recess taken at 11:11 AM.)

15         (Resumed at 11:27 AM.)

16                THE COURT:  Please be seated.

17                I'll hear from the plaintiffs.

18                MR. GONZALEZ-PAGAN:  Good morning.

19                THE COURT:  Tell me how you want to split up your

20    time.

21                MR. GONZALEZ-PAGAN:  Your Honor, if I could reserve,

22    like, five minutes for rebuttal.

23                THE COURT:  All right.  So we'll set the timer at 25

24    minutes.

25                MR. GONZALEZ-PAGAN:  Thank you, your Honor.
```

1       Good morning, Your Honor.  Omar Gonzalez-Pagan for the

2   plaintiffs, and may it please the Court.

3       Central both to the idea of the rule of law and to our

4   own Constitution's guarantee of equal protection is the

5   principle that government and each of its parts remain open on

6   impartial terms to all who seek its assistance.  Your Honor,

7   that is *Romer v. Evans.*

8       We are in court today representing four transgender

9   Medicaid beneficiaries, two of them through their parents,

10  seeking to stop the limitation of a rule that denies Medicaid

11  coverage to a population simply because of who they are.  The

12  rule with an incredibly broad brush, categorically excludes from

13  coverage medical care for the treatment of gender dysphoria

14  which only transgender people suffer, and any care that purports

15  to be for, quote, "sex reassignment," close quote, or, quote,

16  alters sexual characteristics," close quote.  This rule does not

17  target or specify any particular medication or procedure as

18  experimental, because they are not, but, rather, it deems all

19  gender-affirming care when used to treat gender dysphoria to be

20  experimental because the State does not like the outcome of that

21  care, that being the alignment between a transgender person's

22  body characteristics and their identity.

23      The reason the rule does not target any particular

24  procedure or treatment as experimental is because these are

25  common services and procedures used to treat other conditions.

1   Their side effects and risks are well known, and the physical

2   changes that the State complaint of are, in most instances, the

3   desired outcome of the treatment, the masculinization of the

4   body for a transgender male and the feminization of the body for

5   a transgender female.

6         The exclusion, Your Honor, is unlawful, and

7   unconstitutional.  We're asking that it be preliminarily

8   enjoined on the basis that it violates the Equal Protection

9   Clause of the Fourteenth Amendment and Section 1557 of the

10  Affordable Care Act.  It facially discriminates on the basis of

11  sex.  On its face it speaks purely in sex terms.  This is one of

12  the many reasons why *Geduldig* is not applicable here,

13  Your Honor.

14        The regulation speaks of gender dysphoria, which is

15  charactered by the distress arising from an encumbrance between

16  one's sex assigned at birth and one's gender identity.  It

17  targets procedures that lead to sex reassignment or alter sexual

18  characteristics.  It seeks to impose sex stereotypes.  The

19  exclusion is based on the notion that only those assigned male

20  at birth can and should have access to masculinizing hormones or

21  procedures and only those assigned female at birth can and

22  should have access to feminizing hormones and procedures.

23        THE COURT:  Let me back up and put this in a framework

24  here.

25        You start by saying this is not experimental, and I

```
 1   understand the vast majority of medical associations certainly

 2   take your side of the equation.  There are some doctors who take

 3   the opposite view.

 4          But let's try to frame the issue.  If this is

 5   experimental -- and we can talk about what that means in more

 6   detail, but some things are experimental.  If this is

 7   experimental, you lose; right?

 8          MR. GONZALEZ-PAGAN:  Not necessarily, Your Honor.

 9          THE COURT:  Well, explain to me how you get around

10   Rush versus Parham, a binding circuit decision.  Didn't it say

11   in just so many terms -- I mean, it deals with gender surgery in

12   that case, but gender-affirming care, and it says, Vacate the

13   district court's decision in favor of the plaintiff.  Remand.

14   The question on remand:  Is this experimental and is it

15   medically necessary for this plaintiff?

16          MR. GONZALEZ-PAGAN:  Correct, Your Honor.

17          THE COURT:  So -- and there was an equal protection

18   claim in that case.  So plainly the circuit said, If it's

19   experimental, the plaintiffs lose.  Now, why isn't that

20   controlling here; if this is experimental, you lose?

21          MR. GONZALEZ-PAGAN:  For a couple of reasons,

22   Your Honor.

23          Rush v. Parham specifically stands for the

24   unremarkable proposition that a state Medicaid program can,

25   according -- following the criteria of the statute and their own
```

1    regulations, not cover experimental services or procedures.

2          Why *Rush v. Parham* doesn't apply here, there's a few

3    reasons.  A, this doesn't target specific services or

4    procedures, Your Honor.  This actually allows those services and

5    procedures to be provided for and be covered under the state's

6    Medicaid program in other circumstances, and that was --

7          THE COURT:  The same is true in *Rush versus Parham*.

8    It was a mastectomy, for God's sake.  It was plainly covered --

9    I think it was Georgia.  It was plainly covered under the

10   Medicaid statute in Georgia, and the only question was is it

11   covered for a transgender person.

12         MR. GONZALEZ-PAGAN:  Yes, Your Honor.  But at that

13   point in time, also *Rush* -- what *Rush v. Parham* stands for is

14   the actual -- it's the guiding -- the guiding -- the guidance

15   necessary for the Court to adjudicate whether it's experimental,

16   that being on Footnote 11 of *Rush v. Parham,* Your Honor, where

17   that Fifth Circuit at the time specifically noted that the

18   clearest articulation of the considerations that go into

19   determining whether a particular service is experimental is

20   whether the service has come to be generally accepted by the

21   professional medical community as an effective, proven treatment

22   for the condition for which it is being used.

23         THE COURT:  Absolutely.  But I started off by saying

24   there's a question in the case whether it's experimental, and as

25   *Rush* says, that's a factual question.  So today, or in due

 1    course, I'll make a determination whether it is reasonable for

 2    the State to decide this is experimental.

 3              MR. GONZALEZ-PAGAN:  Correct.

 4              THE COURT:  That's what that case says.

 5              But my question is something else.  My question is not

 6    did the State reasonably decide this was experimental.  My

 7    question is this:  If the State reasonably decided it was

 8    experimental, don't you lose?  And it seems to me this is a very

 9    easy question, and the answer is yes.  But if you've got an

10    argument to the contrary, I need you to tell me it, but don't

11    jump back and say it's not experimental.

12              MR. GONZALEZ-PAGAN:  Absolutely, your Honor.

13              THE COURT:  You've got to come to grips with this

14    question.

15              MR. GONZALEZ-PAGAN:  Yes.  And the answer is no.

16              *Rush v.* -- the Affordable Care Act, which this Court

17    needs to give both enforcement and implementation to all of the

18    statutory provisions both of the Social Security Act as it

19    pertains to the Medicaid Act and the Affordable Care Act -- the

20    Affordable Care Act specifically prohibits the design -- the

21    benefit design of coverage plans, health plans in a manner that

22    is discriminatory on the basis of sex.

23              So even if it were to be experimental, it cannot be

24    done with --

25              THE COURT:  Wait.

1          MR. GONZALEZ-PAGAN:  -- reference to sex.

2          THE COURT:  You think the Affordable Care Act says a

3    state must cover an experimental procedure for transgenders even

4    though it does not have to cover experimental treatments for

5    anyone else?

6          MR. GONZALEZ-PAGAN:  No, Your Honor, I won't go that

7    far.  What I would say is that the Affordable Care Act says that

8    in the design of the health plan, and here the regulation, the

9    plan is not allowed to use sex as a criteria that has a

10    discriminatory effect.

11          And here their regulation at issue is -- which is,

12    again, categorically with a broad brush, as to all care --

13    medical care for a condition.  This is not a particular

14    treatment or procedure that is being deemed to be experimental;

15    it's all care for a condition.  It is designed exclusively on

16    the basis of sex.  If they were to say and have gone through the

17    analysis of, like, X procedure doesn't apply, X medication

18    doesn't apply, that's a different question, Your Honor.

19          THE COURT:  I thought --

20          MR. GONZALEZ-PAGAN:  That would fit within *Rush v.*

21    *Parham,* but not --

22          THE COURT:  Maybe I don't understand it, but I thought

23    that's exactly what they did do.

24          MR. GONZALEZ-PAGAN:  No, Your Honor.

25          THE COURT:  Well, let me ask you this.  If someone

1   presents to a mental health professional, a psychiatrist, for

2   treatment of gender dysphoria, is that covered?

3          MR. GONZALEZ-PAGAN:  The mental health care is

4   covered, Your Honor.

5          THE COURT:  Okay.  So the State hasn't said you can't

6   get treatment for gender dysphoria.  What the statement has said

7   is you can't get hormone treatment, puberty blockers, or sex

8   reassignment surgery, particular kinds of surgery.

9          So, what, they didn't list them carefully enough?

10  Instead of listing a few things, they needed to make it a longer

11  list?

12         MR. GONZALEZ-PAGAN:  Well, Your Honor, I think because

13  it goes to the question of how it was drafted and the outcome

14  that was already preordained, there is a conflation of risk and

15  side effects of all of these treatments, and it painted with a

16  broad brush all of this care.  And I think if you were to parse

17  them all out, it is a house of cards that falls.  Right?  They

18  speak of infertility and sterility as a side effect, but that

19  doesn't apply to hormones or puberty blockers and most

20  surgeries.

21         THE COURT:  We're back to the factual question of

22  whether this decision is reasonable.

23         MR. GONZALEZ-PAGAN:  Yes.

24         THE COURT:  But here's what I want to get to for

25  today.  And I tell both sides, I'm a

1   follow-the-circuit-decisions guy.  I mean, the circuit has a

2   prior panel rule.  When the prior panel makes a decision, a

3   later panel has to follow it.  And that's even more true for

4   district judges.

5           So when there is a binding Eleventh Circuit decision

6   or a Fifth Circuit pre-*Bonner* decision dealing with an issue and

7   it's right on the issue, I'm going to follow it, maybe more than

8   the subsequent panel does.

9           MR. GONZALEZ-PAGAN:  Understood, Your Honor.

10          THE COURT:  So I'm going to follow *Rush v. Parham*.

11          But here's the question as it applies to today.  So if

12  the law of the circuit is the State doesn't have to cover

13  experimental treatments, if the State refuses to pay for a

14  treatment and it's not experimental, then under *Rush*, I can

15  enter an injunction and say, Pay for the treatment.  But if the

16  State reasonably concludes that the treatment is experimental,

17  then I can't.  And it's not an equal protection violation,

18  because it wasn't an equal protection violation in *Rush v.*

19  *Parham.*

20          MR. GONZALEZ-PAGAN:  Well, your Honor, I would quibble

21  with that in that the Fifth Circuit in no point actually dealt

22  with the equal protection claim in *Rush v. Parham.*

23          THE COURT:  Well, let's push on that a little bit.

24  There was an equal protection claim.  It says so right in the

25  decision.

1          MR. GONZALEZ-PAGAN:  Correct.

2          THE COURT:  They reversed the decision in the

3    plaintiff's favor and remanded for a determination of whether

4    the State reasonably decided this was experimental.

5          MR. GONZALEZ-PAGAN:  Correct.

6          THE COURT:  How can that not be a holding that if it's

7    experimental, the plaintiff loses?  Basically that's what the

8    circuit told the district court:  You make a fact-finding

9    whether this is a reasonable determination that it's

10   experimental, and if it was a reasonable determination, the

11   plaintiff loses.

12         MR. GONZALEZ-PAGAN:  Your Honor, I would go to

13   page 1153 of *Rush v. Parham* -- just before 1154, so at the end

14   of 1153 -- and note the issues that were decided on summary

15   judgment and which were dealt with with the -- by the circuit

16   court on appeal.

17         Those were, first, whether the state Medicaid program

18   could categorically deny funding of a medically necessary

19   service because it was decided purely on the statutory grounds

20   at that point in time; and, B, whether the Department of Medical

21   Assistance abused its discretion in finding that the surgery was

22   not indicated for *Rush.*

23         Those were the issues that were decided by the

24   district court that went up on appeal, because it was decided

25   purely on statutory grounds.

1    The Fifth Circuit did not weigh in on the protection

2  claim that was in the complaint because it wasn't decided at

3  that point in time.  And once the circuit court said, Under the

4  Medicaid Act, the State is allowed to not provide coverage for

5  experimental care, then that is a factual question that goes

6  down to the district court.

7    That is separate and apart from the confines of the

8  Constitution that was not decided by the Fifth Circuit in *Rush*

9  *v. Parham.*  And it was touched on by the district court

10  thereafter because it not only had guidance on how to deal with

11  the statutory claim, but the Constitution has limits as to --

12  that supplant and are supreme over these federal statutes.

13    And here the way that the regulation was drafted, the

14  way that it classifies it is purely a sex-based classification,

15  and the question of whether the care is experimental then goes

16  to the justifications of tailoring, but not as to whether it is

17  presumptively unconstitutional under the Equal Protection

18  Clause.  And I would argue the same under the ACA.

19    THE COURT:  Well, here's where -- I take your

20  answer -- and I'll go back and read *Rush* yet again.  I've read

21  it a number of times already.

22    Here's where I'm going.  I told you I'm a

23  follow-the-prior-panel guy.  I also believe in *Ashwander*, the

24  Brandeis concurrence, I guess it is.  When I don't need to get

25  to a constitutional question, I don't get to the constitutional

1    question; I just apply the statute.

2           So here's the premise -- and I get it from what you

3    tell me that you disagree with part of this.  But here's the

4    premise.  If it's constitutional for a state to exclude

5    experimental treatments under Medicaid -- and I know you say

6    it's not, but assume for me for a minute that I rule that

7    it's -- that I would think it's constitutional to exclude

8    experimental treatments.  Then it seems to me that if you win

9    this case under the Medicaid statute because this is not

10   experimental, then you win this case, and there's no reason to

11   get to the constitutional question.

12          On the other hand, if you lose this case under the

13   Medicaid statute because the treatment is experimental, then you

14   also lose under the Constitution.

15          So the Medicaid decision is going to control the

16   outcome every time.  And if that's so, there's no reason for me

17   to get to the constitutional question and I've just got a

18   Medicaid question, my difficulty today is you didn't ask for a

19   preliminary injunction under the statute.

20          So I guess what's wrong with that analysis and why

21   not?  And if the answer is -- and this is the only answer I can

22   imagine -- you don't want an answer today under the Medicaid

23   statute, you're going for the home run.  You don't want the

24   single.  You want the home run.  And the home run is to tell the

25   legislature, Don't go banning this because it's

1    unconstitutional.

2            But that's not my question.  I've got these four

3    people and payment under Medicaid.  And so are you just trying

4    to make me get to the constitutional issue, or why else would

5    you not have moved under the Medicaid statute?

6            MR. GONZALEZ-PAGAN:  Your Honor, I believe some of the

7    Medicaid claims that we brought -- and I'll be honest, in *Rush*

8    *v. Parham* and the subsequent caption of *Rush v. Johnson* is

9    somewhat unclear as to what were -- the claims under Medicaid

10   that were being brought, but the comparability and EPSDT claims

11   that we brought we believe probably would benefit from some more

12   factual development.

13           But that is separate and apart from the question of

14   whether an injunction can be entered today, because Your Honor's

15   question, just assuming for the sake of this conversation that

16   we are having, the premise about experimental or not under the

17   Medicaid Act because there is no -- the question then becomes

18   one of tailoring; right.  We know here -- and that can be done

19   also with regards to the ACA claim and not have to reach the

20   constitutional claim; right.  We have a statutory claim that

21   permits the Court to reach there.

22           But there is sex discrimination here, and then the

23   question is in that interaction was this permitted or not?  And

24   what -- not only was it permitted, but was it tailored in a way

25   that is permissible within the confines of benefit assignments

1    articulated by the ACA and the constitutional claim.

2        And here we can posit a number of ways in which the

3    deeming of experimental all gender-affirming medical treatment

4    is not reasonable.  It's not rational.  It's not, let alone, an

5    exceedingly persuasive justification that is being furthered

6    substantially by the regulation because it actually paints with

7    such a broad brush.  It runs counter to the very guidance,

8    binding guidance, from the Fifth Circuit in *Rush v. Parham* about

9    how do they find something to be experimental.

10        And it also, as noted in the expert -- our expert

11    declarations, ignores the reality that this is care that's being

12    provided by Florida Medicaid, undisputedly has been provided

13    before, has been provided in this -- has a history that goes --

14    and I can point to paragraph 22 of Dr. Antommaria's declaration

15    in docket No. 11-5 noting that gender-affirming care has a long

16    history.  The provision of hormone therapy goes as far back as

17    90 years, and gender-affirming surgery goes as far back as 70

18    years.

19        I will also note that *Rush v. Parham*, the facts of

20    that case all predate even the first iteration of the WPATH

21    standards of care, clinical guidelines that are widely accepted

22    by the medical community that were first published in 1979.

23        And I would add that, as noted with the colloquy with

24    defendant's designated expert, most medical organizations

25    support a provision of this care.  And, in fact, if one were to

 1   look at the defendant Agency for Health Care Administration's

 2   GAPMS memo, Your Honor, one can see that a plurality -- sorry;

 3   having a problem with that word -- of state Medicaid programs

 4   explicitly cover this care, and 80 percent of them either

 5   explicitly cover it or treat it on a case-by-case basis.

 6       The reality is that this rule as it stands here today

 7   stands in stark contrast to not only the medical establishment

 8   but how care is provided in the United States and the world.  No

 9   country has banned or prohibited this care.

10       THE COURT:  Let's move on to the -- a different part

11   of this, and that's these individual plaintiffs.

12       You would agree, would you not, that sometimes this

13   care gets botched -- not for these plaintiffs, but sometimes

14   this care gets botched?

15       MR. GONZALEZ-PAGAN:  Your Honor, I would agree with

16   the commonsensical supposition that sometimes medical care, as

17   in all medical care, is not provided up to the clinical

18   guidelines standard of care.

19       THE COURT:  Sometimes the surgeon cuts off the wrong

20   arm.  I got it.

21       They've presented some declarations, and it's not a

22   large number compared to the universe, certainly, of people who

23   have gotten gender-affirming care, but they've presented some.

24   It seems pretty clear that there are some providers who haven't

25   followed the guidelines and have jumped to puberty blockers and

1  hormone therapy without going through the kinds of careful

2  attention that the guidelines call for.

3          You would agree with that, wouldn't you?

4          MR. GONZALEZ-PAGAN:  Your Honor, I would agree for the

5  sake of argument.  I would not agree with that as a factual

6  basis.  I would argue that many of these declarants actually

7  have other reasons for why they stopped identifying as

8  transgender, if they ever did, and why they stopped the care.

9  For example, I will note the testimony earlier today about

10  Ms. Hawes wanting to work on her inner self.  And I will note

11  that several other people, like Ms. Chloe Coe noted, for

12  example, that it was her religion that led her to the path that

13  she's on now.

14          So I will not argue that all of -- that these

15  declarations in toto show that this care has not been provided.

16  I will agree, Your Honor, that there are instances in which it

17  hasn't been provided according to standard of care, as with all

18  medical care in the United States.

19          THE COURT:  It's okay for the state Medicaid folks to

20  evaluate any given request for payment to determine whether the

21  provider deviated from the standard of care?

22          MR. GONZALEZ-PAGAN:  Absolutely, Your Honor.

23          THE COURT:  True?

24          MR. GONZALEZ-PAGAN:  And that is what was the case

25  until this rule.  This rule eliminates that.

1          Whether or not --

2          THE COURT:  Got it.  No, I understand.

3          So here we are in a preliminary injunction hearing.

4   You're asking me to order the State to pay for the care the

5   plaintiffs wish to have; true?  That's what you've asked for.

6   You want an injunction that says, Pay for it?

7          MR. GONZALEZ-PAGAN:  What we're saying, Your Honor, is

8   an injunction that says, Do not implement the rule that was

9   rushed through the summer that actually disrupts the care, not

10  only of our plaintiffs but of thousands of transgender Medicaid

11  beneficiaries.

12         THE COURT:  What --

13         MR. GONZALEZ-PAGAN:  They clearly dispute a status

14  quo.

15         THE COURT:  What do you want the injunction to say?

16         MR. GONZALEZ-PAGAN:  That the rule is left without --

17  cannot be enforced and is left without effect while the case is

18  pending and that the State goes back to its existing policy of

19  evaluating medical necessity on a case-by-case basis.

20         THE COURT:  So what does that do for the plaintiffs?

21         MR. GONZALEZ-PAGAN:  Well, as we know from the history

22  from their care and the fact that Medicaid indisputably has

23  covered their care that in their instances some of them are

24  already preauthorized for that care.  And I would point to

25  Mr. Rothstein having a surgery that has been preauthorized by

1    the agency that's scheduled for December but now will not be

2    covered.

3            THE COURT:  But you're not asking for an injunction

4    that says, Provide the care to these plaintiffs?

5            MR. GONZALEZ-PAGAN:  I would ask for an injunction

6    that is a prohibitory injunction that stops the enforcement of

7    the rule and, therefore, permits a case-by-case analysis of

8    medical necessity claims as they come in, as has always been the

9    case in the Agency for Health Care Administration.

10           Your Honor, what happened in those instances is that

11   plans which AHCA contracts with would apply their own medical

12   criteria, which support and allow this care.

13           THE COURT:  What makes you think that if I enter an

14   injunction that says, You can't enforce this rule, then the

15   responsible state authority won't say to one of these

16   plaintiffs, Your care is not medically necessary, and we're not

17   going to provide it?

18           MR. GONZALEZ-PAGAN:  Your Honor, what I would argue is

19   that the injunctions say that the State cannot implement or

20   enforce this rule and it reverts back to its existing practice

21   prior to August 21, 2022.

22           And in those circumstances, if, and only if, the plan

23   with which they contract, which apply the medical necessity

24   criteria, were to determine that it wasn't medically necessary,

25   there will be an appeal internally within the Medicaid system

1     over that.

2              THE COURT:  All right.  We've run you out of time.

3     I'll let you keep the rest for your rebuttal, and I'll hear from

4     the other side.

5              MR. GONZALEZ-PAGAN:  Thank you, Your Honor.

6              MR. JAZIL:  Thank you, Your Honor.  May it please the

7     Court.

8              I'd like to start with the *Rush* case, Your Honor.  I

9     note that the Court said*:  We hold that a State may adopt a*

10    *definition of medical necessity that places reasonable limits on*

11    *a physician's discretion,* so that was the holding in the case.

12             As the Court is discussing the holding and what needs

13    to be done on remand, the district court on remand needed to

14    determine whether its determination -- whether the State's

15    determination that transsexual surgery is experimental is

16    reasonable as one of the questions that the district court had

17    to ask and --

18             THE COURT:  So that question's for me?

19             MR. JAZIL:  Yeah.

20             THE COURT:  Whether today or at the final trial, my

21    mandate under *Rush versus Parham* is to decide whether the

22    State's rule refusing to pay for these treatments is reasonable.

23             MR. JAZIL:  Your Honor, there is additional gloss in

24    the case.  The Eleventh Circuit goes on -- pardon me.  The

25    former Fifth Circuit goes on to say that*:  To show such*

*reasons* -- this is discussing what the plaintiff needs to do on

remand -- *we think Rush was required to present convincing*

*evidence that no other form of treatment would improve her*

*condition.*

And, Your Honor, my point is this:  That was on --

THE COURT:  Fair enough.  That's what makes it

necessary.

MR. JAZIL:  -- Section B.

And, Your Honor, my further point is this*:  Rush*

doesn't exist in isolation*.  Rush* should be read together with

*Dobbs*, and *Dobbs* talked about how where you have classifications

based on medical treatment or medical conditions, rational basis

applies.  In *Dobbs* there was a section -- the bulk of the case

deals with the substantive due process issues, but the Supreme

Court did address what it called another home for the argument

that there is a constitutional right, and it was equal

protection, and then they went with the rational basis.

THE COURT:  Look, everybody likes dealing with the

big, sexy issues, *Dobbs* and equal protection.  I'm right, aren't

I, that this case just turns on the Medicaid statute?  If it's

experimental, then you win, and if it's not experimental, you

lose under the Medicaid statute and we never get to the

constitutional issue.

MR. JAZIL:  You are correct about that.  The doctrine

of constitutional avoidance would dictate the result there.

1          THE COURT:  I do want to ask about -- while I'm

2    thinking about it -- and we're probably jumping ahead here --

3          MR. JAZIL:  Yes, Your Honor.

4          THE COURT:  -- but partly they say, Strike down the

5    whole rule, and part of what you said is, Oh, you can only give

6    relief to these four plaintiffs because there's no class.  So

7    here's my question:

8          I get a lot of these cases -- or a good number of

9    these cases.  You're in a number of them.

10          MR. JAZIL:  Yes, Your Honor.

11          THE COURT:  So when I get a case like this challenging

12    State action, and the plaintiffs move to certify a class, what

13    the State says, I think, every time is, Don't certify a class.

14    We're going to abide by whatever rule you make for these

15    plaintiffs.  There's no reason to certify a class.  And then

16    when they file an individual action, the State comes in and

17    says, No, there's no class action.

18          So, look, you can't have it both ways.  I guess you

19    can say that was then and this is now, but it's the position you

20    took, for example, in prior cases.  I can cite them for you.

21    Which is it?

22          MR. JAZIL:  Fair enough, Your Honor.  And the position

23    we've taken here is that a universal injunction would be

24    inappropriate to provide the relief to the four named plaintiffs

25    And, Your Honor, there's a recent Eleventh Circuit case.  It's

1    called *Georgia versus President of the U.S.*, 46 F.4th 1283,

2    where the Court talks about nationwide injunctions, and it talks

3    about --

4              THE COURT:  I got it and read it the day it came out,

5    but -- but my question is which is it?  Because if you're -- if

6    you're telling me the State of Florida's position henceforth is

7    just an injunction for the individual plaintiffs, we're never

8    again going to say in response to the motion to certify a class

9    that you don't need to certify a class because we're going to

10   follow what you said -- if that's what you're telling me, fine;

11   you get to change your position, but you don't get to change it

12   every time depending on what position the plaintiffs take.

13             MR. JAZIL:  Fair enough, Your Honor.  And I can't

14   standing here take a categorical position for the State in all

15   future cases.  I don't have the authority to do that,

16   Your Honor.  I apologize, but --

17             THE COURT:  I get it.  That's fair enough.  They

18   probably -- probably not be pleased if you came back and told

19   them, By the way, I made a promise for the next case.

20             MR. JAZIL:  Yes, Your Honor.

21             THE COURT:  I just finished one, and I think I've got

22   another one pending where the same issue comes up, and I got the

23   State on both sides.

24             MR. JAZIL:  Fair enough, Your Honor.  But at its core,

25   the point that Judge Grand, Judge Edmondson and I think

1    Judge Anderson all agreed on in the *Georgia* case that I

2    referenced was, Hey, at the very least, you have to provide only

3    the relief that would give the plaintiffs what it is they're

4    seeking, because anything beyond that runs into potential

5    Article 3 issues on case in controversy.

6            THE COURT:  I got it, and that's what I've always

7    done, so you can go back and check my decisions.

8            MR. JAZIL:  Yes, Your Honor.  So that's -- that's on

9    the universal nationwide injunction side.  And my friend also

10   brought up, I guess, a distinction between prohibitory and

11   mandatory injunctions, as I understood it, and I thought them to

12   be seeking both prohibitory and mandatory relief where they're

13   seeking to prohibit the State from implementing its categorical

14   exclusions and mandating that the State approve these

15   treatments, despite the fact that the State has now gone through

16   the GAPMS process which lays out what state policy is on, you

17   know, whether or not these treatments ought to be approved.

18           Whether that state policy is applied categorically or

19   on an individual-by-individual basis, GAPMS itself would still

20   be there.  It would still be a guiding principle to these

21   determinations, Your Honor.  So I think what they're asking for

22   is both prohibitory and mandatory, so I just wanted to at least

23   get my understanding of the relief before the Court.

24           Your Honor, I'd also like to focus on the broader

25   question of irreparable harm.  It's their burden to establish

1    irreparable harm.  It's their burden to establish irreparable

2    harm for the four individual plaintiffs.  We've got declarations

3    from the four individual plaintiffs, but we don't have any of

4    the treating physicians for any of the four individual

5    plaintiffs providing any opinions to this Court.

6           We have Dr. Laidlaw who is an endocrinologist who

7    prescribes hormones and puberty blockers.

8           THE COURT:  And has an opinion about sex reassignment

9    surgery.  What is his expertise to talk about these surgeries?

10          MR. JAZIL:  Your Honor, he's someone who's tracking

11   the literature.  He is advising people who go into his clinic.

12   And I take Your Honor's point that if it's something that he's

13   not experienced with as a clinician, you're going to give it

14   little weight.

15          THE COURT:  And he's a doctor who says a person with

16   gender dysphoria should not be treated in a way affirmative of

17   the person's perceived gender by any medical professional.  So a

18   psychiatrist, psychologist, therapist should never say to a

19   natal male, for example, that it's okay to live as a female.

20          Now, how far off the standard, the general view in the

21   medical profession, is that?

22          MR. JAZIL:  Your Honor, two points on that:  One, his

23   answer there was a little confusing.  He -- and Your Honor asked

24   a follow-up question to him.  When he initially gave an answer,

25   he said, I could think of possibly some instances where it would

1    be appropriate, and when there was a follow-up question, he said

2    no.

3           So, Your Honor, I note that the testimony wasn't the

4    clearest.  Further, I note, Your Honor, that in our rule we are

5    not excluding all gender-affirming care.  We have a long list.

6           THE COURT:  I got it.  But the best doctor you could

7    find to call into court -- and, look, I asked him the question

8    because I thought that would be his answer based on his

9    declaration and his testimony.

10          Here's the guy who couldn't use the pronoun that

11   somebody preferred, who couldn't refer to somebody by their

12   preferred gender.  I mean, I respect his -- he's a well-trained

13   endocrinologist, but here's a person that's that far off from

14   the accepted view, even by the State, even the State.  Like you

15   just said, even your rule does not suggest that it would be

16   improper for a mental health professional to work with somebody

17   in an affirmative way.

18          So, I mean, you do scratch your head when that's the

19   best you can do.

20          MR. JAZIL:  And, Your Honor, his testimony related

21   to -- the use and effects of certain of these hormones is

22   crucial to why he was up there.  In addition, Your Honor, I

23   would note that Attachment E to the GAPMS report has another

24   expert report from Quentin Van Meter who is a pediatric

25   endocrinologist who is on the clinical faculty of both Morehouse

1    and Emory University, and his perspective is also there for the

2    Court.  So this is not the only endocrinologist whose

3    perspective we're providing, and we do also have Dr. Cantor.  We

4    have Dr. Nagia, who's a psychiatrist, and others, so he is not

5    the only one.

6              THE COURT:  I read every one of them.

7              I do want to ask you some questions about the process

8    that you went through.

9              MR. JAZIL:  Yes, Your Honor.

10             THE COURT:  First, the background question about the

11   State-administered process, been a long time since I've been

12   involved in a rule challenge in state court, so I really don't

13   know the procedure, and I haven't gone back and looked it up.

14             In the federal system, if an agency adopts a rule, but

15   the procedure is fatally flawed, then the Court vacates the rule

16   and remands it to the agency, and the agency then goes forward

17   and tries to fix the problem.

18             That -- is that how it works in the state court?

19             MR. JAZIL:  From the perspective of the challenger

20   it's even better.  As soon as a challenge is filed to the rule,

21   the rule does not go into effect.

22             THE COURT:  And when -- and I take it it gets a DOAH

23   officer initially?

24             MR. JAZIL:  Yes, Your Honor.

25             THE COURT:  A DOAH administrative law judge.

1          And so then does the judge evaluate the process or

2     just the substance?  So if the procedure is just biased, if it's

3     clear when you look at it that there was a preordained result

4     and not an honest effort to go through the process, does the

5     judge then invalidate the rule or can the judge say, Well, you

6     know, it's a bad process, but the rule is okay, substantively,

7     and uphold the rule, or do you vacate the rule?

8          MR. JAZIL:  Your Honor, the DOAH judge does get to

9     take a look at the process, and I believe the DOAH judge gets to

10    undo the entire rule if the process is flawed.

11         THE COURT:  So tell me, how do you support a process

12    that goes out and finds five experts -- I think it's five.

13    Clearly, the minority view could be right.  I mean, I get it.

14    And they are certainly entitled to express their views, and the

15    agency is certainly entitled to take it into account.  But they

16    go out and get five people who are decidedly out of the

17    mainstream, nobody in the mainstream.  They have a hearing and

18    they line up all the lay speakers who are opposed, one after the

19    next.  So somebody has organized this.  And that's how they do

20    it.

21         And when anybody speaks with some expertise on the

22    other side of the issue, they've got somebody there at the

23    hearing to rebut it instantly.  So if you speak on the

24    preordained side, you get to just speak, but if you speak

25    against the preordained view -- or the allegedly preordained

```
 1   view, you've got somebody right there harking back at you
 2   immediately.
 3            How does that work?
 4            MR. JAZIL:  So, Your Honor, two points there.
 5            One, not everyone who was instrumental to the GAPMS
 6   report is someone who is active in this field.  I note that
 7   Dr. Rumina Brignardello-Peterson is not someone who has taken a
 8   side on either end of this debate.
 9        Second, Your Honor, the hearing was public.  Whoever came,
10   came.  There was a panel of experts there to respond to issues
11   as they came up, but written testimony was also considered, and
12   it was provided.  So you have the -- I'll call it the Yale
13   letter by lawyers and physicians was submitted as well.  For
14   example, the various medical associations provided their written
15   comments through that process as well.
16            THE COURT:  But I'm right that the State recruited
17   five?
18            MR. JAZIL:  Yes, Your Honor, the State recruited five.
19            THE COURT:  All -- all well out of the mainstream, all
20   on the same side of the issue?
21            MR. JAZIL:  Your Honor, I'd say four on the same side
22   of the issue.  I disagree with the notion that they are out of
23   the mainstream.  If we are defining the mainstream as the
24   American medical groups, that's one thing, but we do cite in our
25   paper the Europeans who have gone the other way.
```

1          THE COURT:  And I have to say, you cite it, and the

2     report cites it.  Every one of those allows this treatment,

3     every one of them.  So you keep saying these are people on the

4     other side, but they are on the plaintiffs' side in terms of the

5     final result if every one of those countries will pay for this

6     medical care if it's appropriate in the individual circumstance

7     on a case-by-case basis.  That's right, isn't it?

8          MR. JAZIL:  Well, I believe, Your Honor, there's a

9     tilt towards exceptional circumstances in some of those

10    countries.

11         THE COURT:  It's gotten harder, and they've slowed it

12    down, and you heard my comments earlier.  It seems pretty clear

13    to me from reading some of your declarations that there are

14    people that are not doing this very well.  There are

15    professionals that are not doing this very well.  So I get it.

16         But every one of those states will pay for this in an

17    appropriate circumstance; isn't that right?

18         MR. JAZIL:  In an exceptional circumstance,

19    Your Honor.

20         THE COURT:  But in the GAPMS report, it makes it

21    sound -- and in your briefs it makes it sound like these states

22    have decided not -- these countries have decided not to pay for

23    it.  That's just not so.

24         MR. JAZIL:  And, Your Honor, the Florida APA also has

25    out clauses that's for exceptional circumstances.  This is not

1   something where we're suspending the general law in the state.

2   120.542 is the APA provision that deals with variances and

3   waivers from generally applicable rules, for example.

4          THE COURT:  Well, can one of these plaintiffs -- for

5   example, we've got a 28-year-old plaintiff -- I may mess up the

6   details off the top of my head.  I think we have got a

7   28-year-old plaintiff who was approved for surgery by the State,

8   had it scheduled -- has it scheduled, I think, and -- so is that

9   an exceptional circumstance?  You already approved it.  Can that

10  28-year-old get the surgery?

11         MR. JAZIL:  Your Honor, if that 28-year-old -- so, for

12  example, under 120.542, if that 28-year-old shows that there

13  is -- I believe the standard is undue hardship and the purposes

14  of the rules will be furthered through this variance and waiver

15  process, they can submit that.  There's a time clock under the

16  120.542 process by which the agency has to act or else the

17  variance is granted as a matter of course.

18         It's possible that that person could qualify.  That

19  person would need to submit the requisite paperwork that -- for

20  example, there would have to be something from their treating

21  physician, which isn't present here.  If that something from the

22  treating physician says, I've looked at this person.  I believe

23  that this is the only way to go about doing this, that could be

24  something that's attached to that variance and waiver as a

25  consideration that could get this person the treatment they

1    think they need based on a case-by-case basis.

2              But that doesn't foreclose the State from having a

3    categorical rule that's generally applicable that says, We

4    believe that in most instances the puberty blockers, the

5    cross-sex hormones, and the surgeries are inappropriate.  I

6    think the two can coexist, which is what I think the European

7    experience has taught us.

8              THE COURT:  So what you're telling me is the

9    plaintiffs misunderstand it, and frankly, when I walked into the

10   room, I misunderstood it?  This is not a flat ban?  There is a

11   route by which they can get their care permitted and paid for?

12             MR. JAZIL:  Yes, Your Honor.  As with all rules --

13             THE COURT:  One of their lawyers is going to be in

14   touch with you before you walk out of this room today to try to

15   get you to help facilitate that process, I'm confident.

16             MR. JAZIL:  And, Your Honor, I make that point --

17             THE COURT:  And that may be.  If there can be an

18   exceptional circumstance, you've got a 28-year-old who had

19   already been approved and has it scheduled, scheduled it after

20   the State approved it.  So they may want to talk to you about

21   that, and you know --

22             MR. JAZIL:  Fair enough, Your Honor.

23             THE COURT:  That's not my bailiwick, but I heard what

24   you said.

25             MR. JAZIL:  And the issue before this Court is -- you

1    know, the crux of the issue for irreparable harm before this

2    Court is will these four plaintiffs suffer irreparable harm, and

3    the question is what evidence does the Court have to provide

4    this unusual and drastic remedy.  The evidence before the Court

5    specific to these four plaintiffs showing that they have

6    suffered irreparable harm is just their declarations.  It's not

7    the declarations of their treating physicians.  It's not the

8    declarations -- it's not the live testimony from these folks

9    talking about why it is they need it and why it is --

10            THE COURT:  Yeah.  In fairness, I'm going to treat

11   their declarations the same as the live testimony.

12            MR. JAZIL:  Fair enough, your Honor.

13            THE COURT:  That's the procedure we all agreed to.

14            MR. JAZIL:  So the Ninth Circuit case *Doe,* which

15   affirmed the district court's denial of irreparable harm,

16   disagreed with the district court on all the legal issues but at

17   its core agreed with the district court that, Look, if you're

18   going to try to show irreparable harm for the folks that are

19   seeking this extraordinary remedy, you need to have someone

20   that's treating them in front of you.  Otherwise, you don't

21   carry that burden.  So I just underscore on that point,

22   Your Honor, irreparable harm.

23            And, Your Honor, I know we've talked about the

24   European experience.  We've talked about Florida's experts.

25   There is also a comment in our papers from the acting director

1    of the NIH when he was recently testifying in front of the

2    Senate.  He did not say that this is -- he was talking about

3    puberty blockers and cross-sex hormones, not the surgeries.  He

4    did not say these things are the medical go-to's in the area.

5    He said that the NIH has only funded observational studies, and

6    the long-term effects of puberty blockers on gender transition

7    are unclear.  So, Your Honor, I highlight that just to round out

8    the discussion of experts.

9            Your Honor, I would also note the Swedish study that

10   went 30 years, looked at 324 folks, and came to the conclusion

11   that if the idea is to prevent suicides and to prevent early

12   deaths in these folks, that simply doesn't happen.

13           THE COURT:  Let me ask about that.  And I've read

14   every declaration in the case and the report and the comments.

15   I've been through all that.  If the -- I don't think the studies

16   themselves are in the record and -- because I don't think I

17   would have missed them if they had been, but I can tell you I

18   have not read the studies.

19           And, for whatever reason, we've got people on both

20   sides who have an agenda, and they spin it their way, and I

21   don't think I've had any doctor that gives a really good

22   impartial analysis of the studies.  But I haven't read the

23   studies, so I'm not sure of that.

24           But here's what I -- here is the question that jumped

25   off the page to me that I don't know that anybody has asked.  So

1   that study, I think, is the one that said you look down the

2   road, and the suicides are higher among the people that got this

3   treatment than in the control group.  And I take it the control

4   group is the population.  And so these are people who often had

5   other mental health diagnoses but certainly encountered gender

6   dysphoria and probably the reaction that -- sometimes the

7   bigotry, the discrimination that that leads to.  So I would not

8   be surprised if the suicide rate among those people was higher,

9   even if the treatment was enormously successful.

10          And, look, if -- if a doctor replaces a heart valve

11  and then you look ten years later how are those people doing and

12  you compare it to the general population, I can tell you more of

13  them are going to have died from heart problems because they had

14  a bad heart valve and they had the surgery.

15          So that's my question.  Is the -- are you just

16  comparing people to the general population?  If so, that doesn't

17  tell me much.  Or is the control group something else?

18          MR. JAZIL:  Your Honor, I believe the control group

19  was the general population and -- fair point, Your Honor.

20          THE COURT:  I don't know -- if the life expectancy is

21  a little lower, I don't know how that plugged in.  That's a

22  little different than the mental health issue.

23          But, you know, the -- here's my take on it -- and I'll

24  get you to tell me whether this is right or wrong.  My take on

25  it is, no, there are not great studies.  It's an enormously

1   difficult thing to study.  There are certainly no randomized

2   clinical trials.  That's just makeweight stuff on your side of

3   the case.  Of course there are no randomized clinical studies,

4   can't be one.  So, yeah, the studies aren't great.  It's a hard

5   thing to study.  And it's -- with any change in medication or

6   change in circumstances, it takes awhile.

7          We have no long-term studies of COVID.  Nobody has had

8   the disease for more than two or three years.  So how are people

9   doing after ten years with COVID?  We don't have a study.  Of

10  course not.

11         So my take on it is the studies aren't great.  They

12  are what they are.  Clinicians' views matter.  If you get honest

13  clinicians, they know something.

14         MR. JAZIL:  Fair point, your Honor.

15         And I think what Your Honor is echoing are some of the

16  comments the federal government made in the HHS 2020 rule where

17  it said the medical community is on either end of the spectrum

18  on this, and we don't have a clear answer about whether or not

19  gender-affirming care is something that we can mandate at this

20  time.  That's what the federal government said.

21         THE COURT:  You do know it -- that some people who

22  have gotten gender-affirming care have done well with it and

23  have been happy with it.

24         You know that, don't you?

25         MR. JAZIL:  Yes, Your Honor.

1          THE COURT:  And so -- I mean, some of your experts

2     seem to say, Well, they say they are happy.  Well, if they say

3     they are happy, they are probably happy.

4          MR. JAZIL:  It -- And, Your Honor, again, that goes to

5     the point I made earlier.  We're not imposing a categorical bar

6     on gender-affirming care.  We've concluded that this is a mental

7     health condition, and for this mental health condition, mental

8     health treatment works.  We don't think the puberty blockers,

9     cross-sex hormones or the surgeries do.

10          And with the medical community being divided, as the

11     HHS pointed out and as Your Honor pointed out, the tie should go

12     to the State.  The State gets to chose in that instance, I would

13     submit, which way to pivot and which way to create the

14     categorical rule, which is what we're doing through the

15     exclusion.  And that categorical rule is not inconsistent with

16     the European experience, which is now trending towards an

17     exceptional circumstance model.  That categorical rule is not

18     inconsistent with the NIH acting director's statements saying

19     that we have no long-term studies on this.  We've just started

20     funding observational studies on this.

21          So even if Florida is the outlier, as they paint us to

22     be, which I think is incorrect, what Your Honor has pointed out

23     is the doctors are on both sides of this issue.  And in that

24     instance, Your Honor, I would submit that both under *Dobbs* and

25     *Rush v. Parham*, it's reasonable for the State to pick one of

1    those two alternates to go with and make policy with.  And that

2    is what the State is doing here.

3            So on the substantial likelihood for success prong, we

4    should prevail and --

5            THE COURT:  Why wouldn't the better rule be what

6    you've essentially described here today, maybe with a little --

7    a little less insistence, but essentially why shouldn't the rule

8    be for puberty blockers, hormone therapy, or surgery, there has

9    to be good medical care and opinion and comply with the

10   conditions and show a real need and evaluate each case to make

11   sure you don't have cases like the ones that you've got in your

12   declarations?  Why wouldn't that -- if there's already an

13   exception built in, why not put it in this rule so these people

14   would know it?

15           MR. JAZIL:  Well -- so Your Honor's suggestion is to

16   build an exception into the rule itself and not rely on the

17   broader APA exception under 125.14?

18           THE COURT:  Well, and more than just the exceptional

19   reasons that -- I don't know if anybody knows what those

20   exceptional reasons are going to be.  But if it is true that

21   sometimes puberty blockers can be approved, then why not say

22   that in the rule?

23           MR. JAZIL:  Well, Your Honor, I don't think it needs

24   to be spelled out in the rule.  If the rule is a categorical

25   rule and you're justifying that based on this broad study that's

1    looking to see what the categorical rule should be, then I don't

2    think you need a specific exception in the rule when you have

3    the 120 exception available.

4           Also, Your Honor, Your Honor said something that, so

5    long as someone is providing the appropriate care consistent

6    with the appropriate standards of care -- in that part,

7    Your Honor, the appropriate standards of care, that's also in

8    flux.

9           We've been provided and we've talked about, my friends

10   for the plaintiffs, the standards provided by WPATH, for

11   example.  WPATH has standards.  The Endocrine Society has

12   guidelines.  We don't have a set of standards that necessarily

13   apply, the standards of care that necessarily apply in this

14   instance.  And there's another agency, the Department of Health,

15   that is in the process of hearing from folks and coming up with

16   appropriate standards of care for gender dysphoria.

17          So -- pardon me, Your Honor -- on the standards of

18   care side, that is a separate process, and I would just note

19   that for the Court.

20          THE COURT:  All right.  I've run you out of time.

21          What else do you need to tell me?

22          MR. JAZIL:  Well, Your Honor, I would simply ask that

23   the preliminary injunction be denied.

24          Thank you.

25          THE COURT:  All right.  Rebuttal?

1            MR. GONZALEZ-PAGAN:  Thank you, Your Honor.

2            Just briefly, I would like to start with the reference

3    to the waiver variance regulation, Your Honor.  I will note that

4    everybody has been proceeding because it is, but this is a

5    categorical ban on coverage.

6            THE COURT:  Don't -- let me just tell you, you are

7    representing four plaintiffs who have just had the State tell me

8    that there is a possible exception.  You really don't want to

9    argue that the State is wrong, do you?

10           MR. GONZALEZ-PAGAN:  Your Honor, I -- I will -- I -- I

11   will confer with my co-counsel that's experienced with state APA

12   claims.  And, Your Honor, I just don't think this is an accurate

13   statement by the State, and so it's a representation here by

14   counsel here in court; but if they want to stipulate that they

15   will move case by case for people moving forward, that's

16   different than a statement here in court saying that a

17   categorical ban on coverage has some waiver invariance based on

18   this completely separate rule that, as I understand it, has

19   never been applied in this context when the State deems that it

20   is experimental.  Because the waiver of variance has to go --

21   has to still be consistent with the purpose of the rule.

22           THE COURT:  I hear ya.  I just wonder why you wouldn't

23   say --

24           MR. GONZALEZ-PAGAN:  I'm happy to enter into a

25   stipulation --

1          THE COURT:  -- thank you very much.  I'm happy to find

2    out there's an exception.  Please put it in the ruling so that

3    my later judicial estoppel claim will be squarely established.

4          MR. GONZALEZ-PAGAN:  I'm happy for that to be built

5    into a ruling, Your Honor, and I'm happy for that to be entered

6    as a stipulation.  But I think it is farfetched for us to accept

7    that based on counsel's representation today when it has never

8    been argued in any of the papers anywhere at all that this is

9    something that applies and that somehow this is not a ban on

10   coverage.

11         But I think, you know, if the State wants to proceed

12   that way and lead with that effect, the provision, and actually

13   move on a case-by-case basis via a stipulation, that is a

14   completely different matter, and we're willing to entertain it,

15   Your Honor.

16         I will also note that Your Honor kept asking and

17   expressing the concern about, well, if the State deemed this to

18   be experimental, would it affect the other claims.  And I would

19   posit that there is still a valid equal protection and/or 1557

20   claims because it depends on how is it applied and also the

21   provenance of the rule.

22         If the State excludes some experimental services but

23   not others -- and that is part of *Rush v. Parham*, Your Honor,

24   where it noted that if the State provided for the experimental

25   care in some circumstances versus others, they couldn't do a

1   categorical ban --

2           THE COURT:  Look, I think I understand what you just

3   said, and I think I agree with you.  If there were comparable

4   services, comparably experimental -- so here's surgery for

5   transgender individuals and here's surgery for something having

6   nothing to do with gender dysphoria and you can say these are

7   comparable in all relevant respects, they are equally

8   experimental, and the State paid for the one and didn't pay for

9   the other, then you've got a viable equal protection claim.

10          MR. GONZALEZ-PAGAN:  Yes, Your Honor.  And I would

11  posit --

12          THE COURT:  Point me to the experimental services not

13  for transgender individuals or not for gender dysphoria that the

14  State pays for.

15          MR. GONZALEZ-PAGAN:  Your Honor, the basis for them

16  deeming this experimental in large part relies on the quality of

17  the evidence, which I will note, Your Honor, that low quality --

18  the terminology "low quality," as many of our experts have

19  explained, is a term of art within the context of scientific

20  literature.

21          THE COURT:  I got it.

22          MR. GONZALEZ-PAGAN:  But based on the fact that

23  there's no randomized control trials or what they would deem

24  high quality, there's a number of other care that is provided

25  coverage for that doesn't meet that bar.  I will note --

1          THE COURT:  Absolutely, absolutely.  There are a lot

2   of things that you can't get that high quality evidence for.  I

3   get that, but that wasn't my question.

4          MR. GONZALEZ-PAGAN:  Yes.  The question was comparable

5   treatments that don't meet that bar that are comparable to the

6   ones here, and I will note, for example --

7          THE COURT:  That are experimental in the same way as

8   this one is.

9          MR. GONZALEZ-PAGAN:  Yes.  And the reason they are

10  claimed as experimental is because of the quality of the

11  evidence.

12          I will note, for example, the use of hormone --

13  post-menopausal hormone therapy which is -- note the use of

14  surgery for cranial facial injuries.  They use statins to treat

15  high cholesterol, gallbladder surgery, and the use of surgery

16  for cleft palates are all examples of similar procedures in many

17  instances, like facial feminization surgery, for example, or the

18  use of hormone therapy that are similar and have similar quality

19  bases of the evidence.

20          THE COURT:  All right.

21          MR. GONZALEZ-PAGAN:  And I will point to --

22          THE COURT:  Here's where you don't persuade me.

23          First, for statins, I would have guessed that there

24  are randomized trials, but maybe not.

25          But to say that the analysis of statins to treat high

1    cholesterol is comparable and so it has to be treated by the

2    State the same as the use of puberty blockers for gender

3    dysphoria, you just don't get off the dime with me.  They are

4    markedly different treatments for markedly different conditions

5    with markedly different analyses.  And nobody would say, Well,

6    because you do this with statins, you have to do the same thing

7    with puberty blockers.  It's just a completely different medical

8    analysis.

9            MR. GONZALEZ-PAGAN:  But under the equal protection

10   principle it is the same, Your Honor.  And I would point to

11   several of the cases, including *Brandt* from the Eighth Circuit;

12   including *Fain* from West Virginia, a Medicaid case; *Flack* in

13   Wisconsin; and even *Eknes-Tucker* in Alabama, all of which engage

14   in that analysis, because the reality is that even here the

15   competitor -- you don't have to go even that far, Your Honor.

16   These are services that are provided to achieve the same outcome

17   but to non-transgender people.  Hormones are provided in order

18   to achieve an outcome that is consistent with the person's

19   identity.

20           THE COURT:  Look, you're right.  Medicaid will pay for

21   statins to treat high cholesterol.  Medicaid will not pay for

22   statins to treat gender dysphoria, or lots of other things,

23   because statins don't treat all those other things.

24           There's nothing wrong with the State saying, I will

25   approve a treatment for this, but not for that.

```
 1              MR. GONZALEZ-PAGAN:  Actually, Your Honor, there is.

 2              And there's a comparability argument to be made there

 3    which we did not move on the preliminary injunction under

 4    Medicaid.  But that same analysis can be portended into the

 5    equal protection and sexual orientation and Section 1557 claims.

 6              But I think what state Medicaid here is covering and

 7    has been covering requires an individualized medical

 8    determination.  That has always been the rule under the Medicaid

 9    program.  And the rule as adopted here prohibits that,

10    short-circuits that, and disrupts that.  I would note that at

11    the end of the day --

12              THE COURT:  Are there no other procedures that the

13    State flatly prohibits -- or not prohibits -- refuses to pay

14    for?

15              MR. GONZALEZ-PAGAN:  Your Honor, I could give an

16    example of the case of KG, which had to do with a particular

17    form of therapy for the autism population, and in that case that

18    was found to be both unlawful -- and the State deemed it to be

19    experimental and it was found unlawful, and it was enjoined

20    statewide.

21              THE COURT:  I got it.  And, look, I told you if I

22    decide as a matter of fact that the State's characterization of

23    this treatment as experimental is not reasonable, you're going

24    to win the case.

25              MR. GONZALEZ-PAGAN:  Your Honor, I would just like
```

1  to --

2         THE COURT:  So the fact that some other judge decided

3  some other treatment was not experimental, that -- you don't

4  need to cite that to me because I'm already on your side on that

5  issue.

6         MR. GONZALEZ-PAGAN:  Understood, Your Honor.

7         I would just briefly correct the record and note a

8  particular part of the argument here, which has to do with both

9  equal protection and to *Romer* but also the pretextual nature of

10  the rule here.

11        Your Honor already pointed out what seemed to be not

12  an unbiased assessment by the State as to the quality of the

13  evidence or effectiveness of the treatment in this case, but to

14  have a preordained outcome in mind and seeking only a particular

15  view.  That is only but one indicia of what we consider to be

16  pretextual animus here, as that term of art is known within the

17  constitutional context.

18        I would also note that Dr. Brignardello, who counsel

19  pointed out as an exception that doesn't have a view on this --

20  that's not true.  And we pointed to that in our papers, that as

21  a member of SEGM, a particular organization that opposes this

22  care, she's an active member of that.

23        I will note -- but I will note here that it's not

24  only --

25        THE COURT:  I think she also limited her analysis to

1    people under 25, but --

2            MR. GONZALEZ-PAGAN:  Correct, Your Honor.

3            But I will note that that is only but one indicia.

4    Another indicia here of that is that all of the concerns, if

5    we're to read the GAPMS memo, if we were to read all of their

6    so-called expert reports, Your Honor, all of them keep a focus

7    on, well, the ability to consent and whether this is effective

8    or whether this has been proven effective with regards to

9    minors.

10           But the rule is not drafted that way.  The rule is

11   seeking to prohibit care for all transgender people in the

12   state, because the outcome of having transgender people having

13   their body be aligned with their identity, having that be

14   covered by Medicaid is something that they do not want.

15           THE COURT:  Yeah, they don't prohibit the treatment;

16   they refuse to pay for the treatment.

17           MR. GONZALEZ-PAGAN:  Correct, Your Honor.

18           But for many of our plaintiffs and most transgender

19   Medicaid beneficiaries, they are one and the same.  These are

20   people who don't have the medical -- the financial resources.

21   By definition for them to be on Medicaid, most of them need to

22   be extremely medium/low income.  They wouldn't be able to access

23   the care otherwise.  It constitutes an absolute bar on access to

24   the care.

25           Your Honor, for those and other reasons stated --

1          THE COURT:  I did mess up my questions earlier, as I
2   look at my note.  I was talking about a 28-year-old person.
3   That person has had top surgery.  It's just talking about
4   testosterone.
5          MR. GONZALEZ-PAGAN:  Yes.  I think Your Honor was
6   referring to Brit Rothstein, Your Honor, who is 20 years old.
7          THE COURT:  The -- so for the 28-year-old, the -- he
8   needs testosterone at a cost of 60 to $65 a month.  That's a lot
9   for a person that doesn't have much money.  I'm not sure that's
10  irreparable harm.
11         MR. GONZALEZ-PAGAN:  Well, Your Honor, we've
12  established and cited to a number of cases that the loss of
13  coverage does constitute irreparable harm and --
14         THE COURT:  Well, it certainly can, sure, if you can't
15  pay it.
16         MR. GONZALEZ-PAGAN:  Well -- and I believe Mr. Dekker
17  has testified that he can't.  He lives on a monthly income of
18  about $841, Your Honor.
19         THE COURT:  I got it.  $60 is hard.
20         MR. GONZALEZ-PAGAN:  It's an incredibly high
21  percentage of that and impossible for him to afford.
22         The same holds true in regards to the surgery with
23  regards to --
24         THE COURT:  Before you mention other names -- by the
25  way, I don't know how many of these names are public.

```
 1              MR. GONZALEZ-PAGAN:  The names I'm mentioning are
 2    public, Your Honor.
 3              THE COURT:  All right.  Good.
 4              MR. GONZALEZ-PAGAN:  And, Your Honor, I can point to
 5    K.F., one of the minor plaintiffs.  His family lives under the
 6    poverty line, and they cannot afford this care.  They've
 7    testified in their declaration that the cost for the puberty
 8    blocker could be between 3,000 to $3,600 every three months.
 9    They don't have that kind of money, and it would mean the
10    absolute loss of access to this care.
11              THE COURT:  All right.  Anything else?
12              MR. GONZALEZ-PAGAN:  No, Your Honor.
13              For the reasons already -- well, Your Honor, if I may,
14    one brief moment to confer.
15              THE COURT:  All right.
16          (Discussion was held.)
17              MR. GONZALEZ-PAGAN:  Again, no, Your Honor.  We thank
18    the Court for its time, and we'll rest on our papers and the
19    arguments here today.
20              THE COURT:  All right.  Thank you.
21              Give me just a minute.
22          (Pause in proceedings.)
23              THE COURT:  Let me tell you what the ruling is going
24    to be and give you a very brief summary.  The ruling is not
25    going to reach the fundamental issue in the case.  The
```

1   fundamental issue that eventually will determine the outcome in

2   the case is whether the State has reasonably determined that the

3   treatments at issue are experimental.

4           Under Florida Statute, Section 409.905:  *The agency*

5   *shall not pay for services that are clinically unproven,*

6   *experimental, or for purely cosmetic purposes.*

7           Under *Rush v. Parham* the question is whether the State

8   has reasonably determined that these services are clinically

9   unproven or experimental.  There is evidence on both sides of

10  that question.

11          I deny the motion for a preliminary injunction for a

12  different reason.  The controlling law, as I just summarized it,

13  is statutory.  If this treatment is clinically unproven or

14  experimental within the meaning of the statute, or if the State

15  has reasonably determined that, then excluding payment is not

16  unconstitutional unless the State doesn't follow the statute as

17  a custom or practice.  There are other instances when the State

18  does pay for clinically unproven or experimental treatments.

19  And if that's the case, then the fact there's a statute that's

20  only applied against these plaintiffs and not against others

21  would give rise to an equal protection claim and a whole new

22  layer of analysis.  There's no evidence of that in this record.

23          Discrimination under the Affordable Care Act is

24  essentially the same.  The analysis tracks what I just gave you.

25          So, basically, this comes down to a Medicaid statute.

1    The plaintiffs didn't move for a preliminary injunction based on

2    a Medicaid statute under the *Ashwander* principle, the

3    constitutional avoidance principle.  I'm not going to reach out

4    to decide the constitutional case in a case that's actually

5    going to be controlled by the statute, and this case is an

6    illustration of why that rule is there.  A constitutional ruling

7    probably would apply not just to the payment question but to the

8    question whether a State can prohibit the practice.  The State

9    of Florida has not tried to do that.  That constitutional

10   question is not presented here, and there's no reason for me to

11   address it.

12        The other reason for denying a preliminary injunction

13   is that the record does not include medical records for these

14   plaintiffs.  Before I entered an injunction that would lead to a

15   requirement or it might lead to a requirement to provide service

16   to these plaintiffs, the record would need to include medical

17   opinions that this treatment is indeed necessary, that these

18   plaintiffs are going to suffer irreparable harm from the denial

19   of care.  Perhaps I could make that finding based just on their

20   declarations alone, but my finding is that those declarations

21   are not sufficient to establish irreparable harm for these

22   plaintiffs at this time based on this record.

23        You've noticed from all of that that I haven't

24   decided, as I said earlier, the critical question in the case.

25   That will await further proceedings.  This should not take long.

1    This is not quite an administrative review, but it's not that

2    far off from it.

3            Tell me how long do you think -- I probably should

4    have asked before I told you I was going to deny the preliminary

5    injunction because answers change depending on which side thinks

6    they won the preliminary injunction motion.

7            How long do you think you need to present this case

8    fully?  And if the answer is "I don't know," I guess I can just

9    tell you to go talk to each other.  But if you can give me a

10   rough ballpark at this point, it will help.

11           MR. JAZIL:  Your Honor, I'm happy to confer with my

12   colleagues for the other side and get back to the Court.

13           THE COURT:  It seems to me that you want to find out

14   about the plaintiffs and their doctors and that's about it;

15   right?  I mean, you had all you had when you adopted the rule.

16           MR. JAZIL:  Yes, Your Honor.  I suppose -- there's a

17   footnote in *Rush v. Parham* that discusses -- well, in my mind it

18   opens up the possibility of additional evidence to provide to

19   the Court on whether or not this is or isn't experimental,

20   but --

21           THE COURT:  At least tentatively I think that's right.

22   I think the question is for me to decide based on the federal

23   trial whether the State's determination is reasonable or not,

24   and I think *Rush* says that's not an administrative review of

25   what the State knew at the time.  It's the question at the --

1    based on the evidence presented at the trial.  So, yes, I think

2    that's right.

3              MR. JAZIL:  That's right.

4              THE COURT:  And that goes back to my questions about

5    the Florida administrative procedure.  In a rule challenge in

6    state court, they might be stuck with the record they put

7    together to adopt the rule, but I don't think that's the case

8    here.

9              MR. GONZALEZ-PAGAN:  Your Honor, if I may, I just have

10   a question on the Court's ruling.

11             Will the Court include in its order for representation

12   as to what counsel has stated here today that there is a waiver

13   procedure?

14             THE COURT:  Yes, I will.

15             MR. GONZALEZ-PAGAN:  Thank you, Your Honor.

16             THE COURT:  I hope I express it accurately.  I'll try

17   to have it in -- an accurately narrow statement of the

18   availability of an exception.

19             MR. JAZIL:  Thank you, Your Honor.

20             THE COURT:  You gave me a cite, and I didn't --

21             MR. JAZIL:  Yes, Your Honor.  It's 120.542.

22             THE COURT:  120.54(2)?

23             MR. JAZIL:  No, Your Honor.  It's, I think, 120.542.

24             Your Honor, with the Court's indulgence, I have one

25   other issue.  The trial date is set for August 7th.  I'm in a

1    trial in the Southern District of Florida that week.

2              MR. GONZALEZ-PAGAN:  Sorry, Your Honor.  If we can

3    confer just briefly on the time?

4         (Pause in proceedings.)

5              THE COURT:  While you were talking, Mr. Jazil said

6    that he wanted to raise a question about the time of the trial.

7    The initial scheduling order apparently set it for August 7th.

8    Let me tell you how that got done, and surely we can change it,

9    and we probably ought to move it earlier.

10             The way that gets done is when the defense appears in

11   a case, I issue an initial scheduling order.  It generally sets

12   the discovery deadline.  It sets the deadline for the 26(f)

13   attorney conference.  Then it sets a discovery deadline, and it

14   sets a trial.  Those are just routinely set for the same

15   distance out, unless there is something very unusual about the

16   case.

17             So August 7th would have been -- the same time would

18   have been set for trial for any case that got filed, and in this

19   case it probably ought to be sooner than that.  I mean, this one

20   is -- it doesn't seem to me that there's much to be -- much to

21   be done.

22             MR. GONZALEZ-PAGAN:  Your Honor, if I may, we are

23   happy to confer with counsel.  I think there's a 26(f)

24   conference that's coming up in 12 days, but we are happy to

25   confer much earlier than that to come up with a proposed

 1    schedule.  I agree with the Court, I don't believe we need a

 2    year to do this, and certainly we are talking between a couple

 3    to four months for a schedule.

 4             THE COURT:  Yeah, that's on the right track.  I mean,

 5    the -- unless the defense is looking for more experts or the

 6    plaintiff is looking for more experts -- if you've already got

 7    them -- I assume the defense is going to want to get the medical

 8    records and the information about the plaintiffs, and then -- I

 9    don't know if you want to depose each other's experts.  You

10    probably do, although you might want to save it for cross, but

11    that's up to you.  So you need time to do those things, get the

12    26(a)(2) reports.

13             But it's -- this is -- nobody is trying to figure out

14    some complicated factual issue other than the complicated

15    factual issue that's the core of the case and that you've

16    already looked at in detail.

17             So, yeah, let's just leave it this way.  Talk to each

18    other.  Twelve days off -- and, again, that would have been the

19    standard time.  You're all in the same city today.  It might be

20    great to talk to each other right now.  The room is available.

21    I don't -- I'm not using this room the rest of the day.  You're

22    welcome to it and -- or go to lunch and meet at somebody's

23    office and talk about -- if you can get through those things,

24    good -- and talk about it.  I'll be available as soon as you

25    are.  Sooner is probably better.  It's better for everybody to

 1    get the issue resolved sooner and especially for the four

 2    plaintiffs.

 3            And talk about the class question.  There's not a

 4    class allegation in the complaint.  I assume there's no

 5    interest -- that you don't plan --

 6            And, Mr. Jazil, I think the answer is that if they try

 7    this case and I rule that the rule is invalid, then you can

 8    appeal that, but in the meantime, I would probably just comply

 9    with it.  But talk to your client and decide what you want to

10    do.  If you can goad them into a class action, we're just going

11    to have a whole lot more work for the lawyers and the judge and

12    probably not much of a different outcome.  So talk about all of

13    those things at your 26(f) meeting.

14            MR. JAZIL:  Sure.

15            THE COURT:  I'll try to get you a written order.  I

16    would like to say more than I have and address a couple of these

17    things.  It's -- as somebody said, I've got a preliminary

18    injunction docket working at the moment.  I've had three or four

19    of these.  I've got several other things going, so it's going to

20    be a little hard for me to spend the time I need to sit and

21    write something down, but I may try to get something.  Don't

22    hold your breath.

23            I will at least get you a prompt order that confirms

24    the ruling so that you've got a written order if you wish to

25    appeal, which certainly it's an appealable order.  Perhaps the

1   Supreme Court will tell us otherwise here in the next day or

2   two -- in the next few days.  It seems to me this certainly

3   would be an appealable order, and I'll get you a written order

4   so that if you wish to appeal, you can.

5               What else, if anything, do we need to address today?

6               Thank you all.  We are adjourned.

7       (Proceedings concluded at 12:57 PM on Wednesday, October

8   12, 2022.)

9                           * * * * * * * *

10              I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
11  Any redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy is noted within the
12  transcript.

13

14  /s/ Megan A. Hague                      10/12/2022

15  Megan A. Hague, RPR, FCRR, CSR          Date
    Official U.S. Court Reporter
16                          I N D E X

17  DEFENDANT'S WITNESSES                              PAGE

18  DR. MICHAEL K. LAIDLAW
    Direct Examination By Mr. Perko                     6
19  Voir Dire Examination By Mr. Charles                7
    Cont. Direct Examination By Mr. Perko              15
20  Cross-Examination By Mr. Charles                   23
    Redirect Examination By Mr. Perko                  38
21
    ZOE HAWES
22  Direct Examination By Mr. Beato                    41
    Cross-Examination                                  45
23
    YAACOV SHEINFELD
24  Direct Examination By Mr. Jazil                    50
    Cross-Examination By Ms. Altman                    55

25

1                         **E X H I B I T S**

2

  PLAINTIFFS' EXHIBITS                    OFFERED   RECEIVED

3
  P1      American Academy of Child          26
4         and Adolescent Psychiatry
          Statement Responding to
5         Efforts to ban
          Evidence-Based Care for
6         Transgender and Gender
          Diverse Youth
7

8  OTHER RECORD MADE                                  PAGE

9  Closing Argument By Mr. Gonzalez-Pagan              64
   Closing Argument By Mr. Jazil                       82
10 Rebuttal Closing Argument By  Mr. Gonzalez-Pagan   102

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tab P

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE SUBPOENAS SERVED ON:


AMERICAN ACADEMY OF PEDIATRICS,
345 Park Boulevard
Itasca, IL 60143

ENDOCRINE SOCIETY,
2055 L Street NW, Suite 600
Washington, DC 20036

WORLD PROFESSIONAL ASSOCIATION
FOR TRANSGENDER HEALTH,
1300 S. 2nd Street, Suite 180
Minneapolis, MN 55454

AMERICAN ACADEMY OF CHILD &
ADOLESCENT PSYCHIATRY,
3615 Wisconsin Avenue NW
Washington, DC 20016

AMERICAN ACADEMY OF FAMILY          Misc. Case No. _____
PHYSICIANS,
11400 Tomahawk Creek Parkway
Leawood, KS 66211

AMERICAN ACADEMY OF NURSING,
1000 Vermont Avenue NW, Suite 910
Washington, DC 20005

AMERICAN COLLEGE OF
OBSTETRICIANS AND GYNECOLOGISTS,
409 12th Street SW
Washington, DC 20024

AMERICAN COLLEGE OF PHYSICIANS,
190 N. Independence Mall West
Philadelphia, PA 19106

AMERICAN MEDICAL ASSOCIATION,
330 N. Wabash Avenue, Suite 39300
Chicago, IL 60611

1

AMERICAN PEDIATRIC SOCIETY,
9303 New Trails Drive, Suite 350
The Woodlands, TX 77381

AMERICAN PSYCHIATRIC ASSOCIATION,
800 Maine Avenue SW, Suite 900
Washington, DC 20024

ASSOCIATION OF AMERICAN MEDICAL
COLLEGES,
655 K Street NW, Suite 100
Washington, DC 20001

NATIONAL ASSOCIATION OF PEDIATRIC
NURSE PRACTITIONERS,
5 Hanover Square, Suite 1401
New York, NY 10004

NORTH CENTRAL FLORIDA COUNCIL OF
CHILD & ADOLESCENT PSYCHIATRY,
3615 Wisconsin Avenue NW
Washington, DC 20016

SOCIETIES FOR PEDIATRIC UROLOGY,
500 Cummings Center, Suite 4400
Beverly, MA 01915

SOCIETY FOR ADOLESCENT HEALTH
AND MEDICINE,
111 West Jackson Boulevard, Suite 1412
Chicago, IL 60604

SOCIETY FOR PEDIATRIC RESEARCH, and
9303 New Trails Drive, Suite 350
The Woodlands, TX 77381

SOCIETY OF PEDIATRIC NURSES
330 N. Wabash Avenue, Suite 2000
Chicago, IL 60611

2

| | |
|---|---|
| AUGUST DEKKER, et al., | |
|        Plaintiffs, | Northern District of Florida |
| v. | Case No. 4:22cv325-RH-MAF |
| JASON WEIDA, et al., | |
|        Defendants. | |

**JOINT MOTION OF NONPARTY GROUPS TO
QUASH RULE 45 SUBPOENAS AND FOR FEES**

3

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, nonparties American Academy of Pediatrics ("AAP"), Endocrine Society, World Professional Association for Transgender Health ("WPATH"), American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American College of Obstetricians and Gynecologists,  American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, National Association of Pediatric Nurse Practitioners, North Central Florida Council of Child & Adolescent Psychiatry, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, and Society for Pediatric Research, and Society of Pediatric Nurses (collectively, "Nonparty Groups") jointly move to quash the subpoenas served on each of them by Defendants the Florida Agency for Health Care Administration and its Secretary, Jason Weida ("Defendants" or the "State"), in the related case of *Dekker v. Weida*, No. 4:22-cv-325-RH-MAF (N.D. Fla. filed Sept. 7, 2022).[1]  Each of the subpoenas at issue purports to command compliance in the District of Columbia.

A Statement of Points and Authorities, and Declarations of Cortlin H. Lannin ("Lannin Declaration"), AAP, Endocrine Society, and WPATH are also submitted in support of this Motion.[2]  A proposed order is also submitted herewith.  The subpoenas are attached as Exhibits A-R to the Statement of Points and Authorities.

As described in the accompanying Statement of Points and Authorities, the subpoenas should be quashed in their entirety because:

---

[1] On January 12, 2023, pursuant to Federal Rule of Civil Procedure 25(d), Jason Weida was substituted for Simone Marstiller as a defendant.

[2] The AAP, Endocrine Society, and WPATH declarations have been redacted to remove the names and other personal identifying information of the declarants.  Copies of the declarations without redactions were prospectively filed under seal.

4

1. The subpoenas do not seek relevant information;

2. Complying with the subpoenas would impose an undue burden on the Nonparty Groups; and

3. The subpoenas would infringe on the Nonparty Groups' associational rights under the First Amendment.

In addition, the State should be required to reimburse Nonparty Groups for the attorneys' fees they incurred in responding to the State's subpoenas, including their fees incurred in bringing this Motion.  *See* Fed. R. Civ. P. 45(d)(1).

The Nonparty Groups respectfully request oral argument on this Motion.

Dated: January 13, 2023

Respectfully submitted,

*/s D. Jean Veta*
D. Jean Veta

Cortlin H. Lannin (CA Bar No. 266488)
(*pro hac vice* motion to be submitted)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

Michael J. Lanosa (CA Bar No. 30124)
(*pro hac vice* motion to be submitted)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (424) 332-4800
mlanosa@cov.com

D. Jean Veta (D.C. Bar No. 358980)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com

*Counsel for Nonparty Groups*

## **LOCAL RULE 7(m) STATEMENT**

As described in the attached Statement of Points and Authorities and Lannin Declaration, counsel for the Nonparty Groups and Defendants have engaged in repeated discussions in an attempt to resolve this matter without the assistance of the Court, but counsel have been unable to reach agreement.  Counsel for Defendants confirmed they will oppose this motion.

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2023 I electronically filed the foregoing document with the Clerk of the Court via email, and that I also caused copies of the documents to be sent to the Clerk via FedEx.  I also certify that on that same day, with their consent I caused the foregoing documents to be served on counsel for Defendants Jason Weida and the Agency for Health Care Administration via email at the following addresses:

Mohammad O. Jazil (via email only)
Gary V. Perko (via email only)
Michael Beato (via email only)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
Phone:  (850) 270-5938
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com

*/s Michael J. Lanosa*
Michael J. Lanosa

6

Tab Q

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON AMERICAN ACADEMY OF PEDIATRICS, et al., | Misc. Case No. _____ |
| AUGUST DEKKER, et al., <br><br> Plaintiffs, <br> v. <br><br> JASON WEIDA, et al., <br><br> Defendants. | Northern District of Florida Case No. 4:22-cv-325-RH-MAF |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF**
**JOINT MOTION OF NONPARTY GROUPS TO**
**QUASH RULE 45 SUBPOENAS AND FOR FEES**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 4

A.    The Nonparty Groups ............................................................................... 4

B.    The Subpoenas ......................................................................................... 5

C.    Scope of Discovery in the Underlying Litigation .................................... 7

D.    Meet-and-Confer Efforts .......................................................................... 8

III.  ARGUMENT ..................................................................................................... 10

A.    The Subpoenas Seek Discovery Irrelevant to the Issue in Dispute in This
      Litigation. ............................................................................................... 10

B.    Complying With the Subpoenas Would Impose Undue Burdens on the
      Nonparty Groups. ................................................................................... 13

C.    The Subpoenas Infringe on Free Speech and Associational Rights. ...... 16

D.    The State Should be Required to Pay the Nonparty Groups' Fees. ......... 19

IV.   CONCLUSION .................................................................................................. 21

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AFL-CIO v. FEC*,
    333 F.3d 168 (D.C. Cir. 2003) ................................................................17

*Apple Inc. v. Match Grp., Inc.*,
    2021 WL 3727067 (N.D. Cal. Aug. 19, 2021) ...........................................17

*Black Panther Party v. Smith*,
    661 F.2d 1243 (D.C. Cir. 1981) .................................................................17

*Boe v. Marshall*,
    2022 WL 14049505 (M.D. Ala. Oct. 24, 2022).....................................13, 14

*Builders Ass'n of Greater Chicago v. City of Chicago*,
    2002 WL 1008455 (N.D. Ill. May 13, 2002) ...........................................20

*Coleman v. District of Columbia*,
    275 F.R.D. 33 (D.D.C. 2011).................................................................10, 13

*Dekker v. Weida*,
    No. 4:22-cv-325-RH-MAF (N.D. Fla. filed Sept. 7, 2022) ........................ *passim*

*Int'l Action Ctr. v. United States*,
    207 F.R.D. 1 (D.D.C. 2002)........................................................................17

*N.C. Right to Life v. Leake*,
    231 F.R.D. 49 (D.D.C. 2005)................................................................12, 14

*NAACP v. Ala. ex rel. Patterson*,
    357 U.S. 449 (1958)...............................................................................16, 19

*Night Hawk Ltd. v. Briarpatch Ltd., L.P.*,
    2003 WL 23018833 (S.D.N.Y. Dec. 23, 2003) .....................................21

*In re Schaefer*,
    331 F.R.D. 603 (W.D. Pa. 2019) ..............................................................12

*Ted Cruz for Senate v. FEC*,
    451 F. Supp. 3d 92, 99 (D.D.C. 2020)......................................................17

*United States v. Kellogg Brown & Root Servs., Inc.*,
    284 F.R.D. 22 (D.D.C. 2012)...................................................................10

ii

*United States v. Miller*,
    799 F.3d 1097 (D.C. Cir. 2015) ........................................................................10

*Updateme Inc. v. Axel Springer SE*,
    2018 WL 5734670 (N.D. Cal. Oct. 31, 2018) .....................................................14

*Watts v. S.E.C.*,
    482 F.3d 501 (D.C. Cir. 2007) ..........................................................................14

*Whole Woman's Health v. Texas Catholic Conference*,
    896 F.3d 362 (5th Cir. 2018) ............................................................................18

*Wyoming v. U.S. Dep't of Agriculture*,
    208 F.R.D. 449 (D.D.C. 2002) ..........................................................................14

**Statutes**

Fla. Stat. § 409.905(9) ............................................................................................7

**Other Authorities**

Fed. R. Civ. P. 25(d) ..............................................................................................1

Fed. R. Civ. P. 26 ..............................................................................................1, 10

Fed. R. Civ. P. 45 ........................................................................................ *passim*

Fla. Admin. Code R. 59G-1.050(7) ........................................................................4

Dylan Housman, *EXCLUSIVE: Florida Subpoenas Organizations Pushing
    Transgender Care on Children in Lawsuit*, Daily Caller (Dec. 14, 2022),
    https://dailycaller.com/2022/12/14/florida-transgender-care-lawsuit-medicaid-
    subpoena/ ......................................................................................................19

## I.    INTRODUCTION

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, nonparties American Academy of Pediatrics ("AAP"), Endocrine Society, World Professional Association for Transgender Health ("WPATH"), American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, National Association of Pediatric Nurse Practitioners, North Central Florida Council of Child & Adolescent Psychiatry, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, and Society of Pediatric Nurses (collectively, the "Nonparty Groups") jointly and respectfully move to quash the subpoenas served on each of them by Defendants Jason Weida and the Florida Agency for Health Care Administration ("Defendants" or the "State") in the case styled *Dekker v. Weida*, No. 4:22-cv-325-RH-MAF (N.D. Fla. filed Sept. 7, 2022) ("*Dekker*" or the "Underlying Litigation").[1] Nonparty Groups also seek reimbursement of their attorneys' fees incurred in responding to the subpoenas, including their fees incurred in bringing this motion.

In the Underlying Litigation, several individual plaintiffs have asserted Constitutional and statutory challenges to the adoption by the Florida Agency for Healthcare Administration of an administrative rule prohibiting Medicaid coverage for medical treatments that are indicated for the clinical condition known as gender dysphoria.  Lannin Decl., Ex. 1 (*Dekker*, Complaint, Doc. 1).  Gender dysphoria is a clinical condition that is marked by distress due to an

---

[1] The subpoenas at issue, which are noticed for compliance in this judicial district, are attached hereto as Exhibits A-R.  On January 12, 2023, pursuant to Federal Rule of Civil Procedure 25(d), Jason Weida was substituted for Simone Marstiller as a defendant.

incongruence between a patient's gender identity (*i.e.*, the innate sense of oneself as being a particular gender) and sex assigned at birth.

The Nonparty Groups are 18 professional medical and mental health organizations. They are not, and have never been, parties to the Underlying Litigation. Rather, they moved to submit an *amicus* brief in support of the *Dekker* Plaintiffs' motion for a preliminary injunction. Lannin Decl., Ex. 2 (*Dekker*, Motion for Leave to File Amicus Brief, Doc. 34). The proposed *amicus* brief described the widely accepted view of the medical community that "gender-affirming care," which includes the treatments prohibited by the Florida rule, is the appropriate treatment for gender dysphoria, as reflected in publicly-available clinical guidelines published by two of the 18 groups that bring this motion: WPATH and Endocrine Society. Pursuant to those clinical guidelines, the medical treatments at issue in *Dekker* may be indicated to treat gender dysphoria in adolescents and adults who meet specified eligibility criteria. The remaining 16 groups do not publish clinical guidelines.

The State opposed the submission of the Nonparty Groups' *amicus* brief, arguing it lacked adequate time to respond, that "counsel for the parties are more than able to present arguments and scientific information," and that " [o]utside assistance is not necessary." Lannin Decl., Ex. 4 (*Dekker*, Opp. to. Mot. for Leave to File Amicus Brief ("Opp. to Mot. for Leave"), Doc. 35 at 2). The *Dekker* court subsequently denied the Nonparty Groups leave to file their proposed *amicus* brief and denied plaintiffs' motion for a preliminary injunction. Lannin Decl., Ex. 5 (*Dekker*, Order Denying Leave to File Amicus Br., Doc. 43).

Although it succeeded in excluding the Nonparty Groups' *amicus* brief, the State proceeded to serve substantively identical subpoenas on all of the Nonparty Groups. Those subpoenas seek documents from every organization and, from three of the organizations (AAP,

2

Endocrine Society, and WPATH), deposition testimony.  The State has identified two principal

areas of inquiry: (i) any "policy positions" each organization has regarding gender-affirming

care; and (ii) any "guidelines" (or "standards" and "best-practices") each organization publishes

for gender-affirming care.  As to both categories, the State is seeking voluminous internal

information, including how such materials were created, who voted for them and why, and

communications between and among members about them.  All of this material is irrelevant to

the Underlying Litigation.

 The *Dekker* court has observed that the "controlling" question in that litigation is

"whether, based on current medical knowledge, the state's determination that these treatments

are experimental is reasonable."  Lannin Decl., Ex. 6 (*Dekker*, Order Denying a Prelim. Injunct.

("PI Order"), Doc. 64 at 4-5).  There is no plausible argument that statements pertaining to

policy matters, much less internal documents about them, are relevant to the state of "current

medical knowledge."  *Id.*  Furthermore, even assuming that the clinical guidelines published by

exactly *two* of the subpoenaed organizations are relevant to "current medical knowledge," those

guidelines speak for themselves.  The State presumably will challenge those guidelines with

whatever contrary scientific evidence it credited when it first determined the treatments

described in those guidelines is "experimental."  But the State does not need WPATH's and

Endocrine Society's sensitive internal communications to mount that challenge to the scientific

basis of the guidelines they publish.  Rather, the State has sought these internal materials for a

very different reason: to hunt for evidence of supposed internal dissent and biased procedures in

service of an attack on the guidelines (and the credibility of the other 16 organizations that

merely support them) from the inside-out.  This Court should not countenance this inappropriate

and highly invasive discovery.

3

For the reasons described more fully below, the State's subpoenas to the Nonparty Groups should be quashed in their entirety. The subpoenas seek information that is irrelevant to the issue in dispute in the Underlying Litigation, and complying with them would impose significant, undue burdens and expenses on these nonparty, non-profit organizations. The subpoenas also infringe upon the Nonparty Groups' associational rights under the First Amendment by discouraging membership and candid, uninhibited dialogue within the organizations, which is integral to the scientific process and the organizations' missions. Indeed, permitting invasive internal discovery of organizations that merely sought (unsuccessfully) to file an *amicus* brief would have far-reaching and chilling implications for friends of the court everywhere. Finally, given the charged nature of the Underlying Litigation and the publicity it has attracted, permitting this discovery could subject the Nonparty Groups and their employees and members—many of whom are identified with specificity in the materials sought by the State—to harassment, threats, and even the risk of physical violence, which would further chill membership.[2]

## II.   BACKGROUND

### A.   The Nonparty Groups

On August 21, 2022, Defendant Florida Agency for Healthcare Administration adopted Florida Administrative Code Rule 59G-1.050(7), which prohibits Medicaid coverage for certain treatments for gender dysphoria. Plaintiffs in the Underlying Litigation thereafter filed a complaint for declaratory, injunctive, and other relief and a motion for a preliminary injunction barring enforcement of the rule. Lannin Decl., Ex. 1 (*Dekker*, Complaint, Doc. 1).

---

[2] The Nonparty Groups also request an order requiring the State to reimburse them and their *pro bono* counsel for the fees incurred responding to these subpoenas, including their fees incurred in bringing this Motion.

The 18 Nonparty Groups bringing this motion are among the 22 national and state professional medical and mental health organizations that sought leave to file an *amicus* brief in support of Plaintiffs' motion.[3]  Lannin Decl., Ex. 2 (*Dekker*, Mot. for Leave., Doc. 34).  The proposed *amicus* brief explained that gender-affirming care, as described in publicly-available clinical guidelines issued by WPATH and Endocrine Society, is the widely-accepted standard of care for gender dysphoria.[4]  Lannin Decl., Ex. 3 (*Dekker*, Proposed *Amicus* Brief, Doc. 34-1 at 8–27).  The State opposed the submission of Nonparty Groups' proposed *amicus* brief, arguing "counsel for the parties are more than able to present arguments and scientific information" and that "[o]utside assistance is not necessary."  Lannin Decl., Ex. 4 (*Dekker*, Opp. to Mot. for Leave, Doc. 35 at 2).  On October 3, 2022, the *Dekker* court denied the Nonparty Groups leave to file the *amicus* brief and, a few weeks later, denied Plaintiffs' motion for preliminary injunction.  Lannin Decl., Exs. 5, 6.  In short, the Nonparty Groups' proposed *amicus* brief is *not* in the record in the Underlying Litigation.

**B.      The Subpoenas**

On November 8, 2022, the State issued to AAP, Endocrine Society, and WPATH subpoenas seeking depositions from each of these organizations and also the production of documents, as specified in seven requests for production.[5]  *See* Ex. A  at 11-12 (AAP Subpoena);

---

[3] Four of the 22 proposed *amici* are not parties to this Motion because the subpoenas that they received from the State, which are otherwise identical to those at issue in this motion, were noticed for compliance in other jurisdictions.

[4] None of the other proposed *amici curiae*, aside from WPATH and Endocrine Society, have published clinical guidelines related to gender-affirming care.

[5] AAP, founded in 1930, is a 501(c)(3) non-profit organization of 67,000 pediatricians whose mission is to attain the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults.  *See* Declaration of AAP (January 10, 2023) ("AAP Decl."), filed under seal, ¶ 4.  WPATH, founded in 1979, is a 501(c)(3) non-profit

5

Ex. B  at 11-12 (Endocrine Soc'y Subpoena);  Ex. C  at 11-12 (WPATH Subpoena)).  The

subpoenas seek information about each organization's policies and guidelines, internal

communications, and associational activities related to gender-affirming care.  Specifically, the

subpoenas specify the following deposition topics: "(1) the Entity's policy position on gender-

affirming care for gender dysphoria; (2) any guidelines, standards, best-practices, or policy

positions considered or adopted by the Entity for the treatment of gender dysphoria; (3) any side

effects and risks associated with the treatments recommended by through a guideline, standard,

best-practice, or policy; (3) how the Entity is organized so that Defendants may determine the

process used to adopt (or approve) any guidelines, standards, best-practices, or policy positions

concerning the treatment of gender dysphoria; (4) how many of the Entity's members, if any,

voted to support any guidelines, standards, best-practices, or policy positions; and (5) why the

Entity sought to file an amicus brief in this case." *See, e.g.*, Exs. A-C at 2.

The document requests are similar and call for:

> Request No. 1:  Any documents that state the total number of your
> membership.
>
> Request No. 2: Any documents that describe how you establish
> guidelines, standards, best-practices, or policy positions.
>
> Request No. 3: Any documents describing how you established
> guidelines, standards, best-practices, or policy positions on gender-
> affirming care for gender dysphoria.  Any documents and
> communications showing the individuals or committees that

---

interdisciplinary professional and educational organization whose mission is to promote
evidence-based care, education, research, public policy, and respect in transgender health. *See*
Declaration of WPATH (January 10, 2023) ("WPATH Decl."), filed under seal, ¶ 4.  Endocrine
Society, founded in 1916, is a 501(c)(3) non-profit organization of physicians and scientists
whose mission includes uniting, leading, and growing the endocrine community to accelerate
scientific breakthroughs and improve health worldwide. *See* Declaration of Endocrine Society
(January 10, 2023) ("Endocrine Society Decl."), filed under seal, ¶ 3. Public versions of the
foregoing declarations, which have been lightly redacted to protect the privacy of the individual
declarants, have also been filed concurrently with this Motion.

proposed, reviewed, modified, or voted on your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 4:  Any communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 5:  Any documents and communications detailing your intention to file an amicus brief in *Dekker v. Marstiller*, 4:22-cv-00325-RH-MAF (N.D. Fla.).

Request No. 6:   Any documents and communications with consultants, federal or Florida government officials, lobbyists, researchers, scholars, members of the public, or any other person relating to gender dysphoria or your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

Request No. 7:  Any documents and communications showing any side effects and risks associated with the treatments recommended through your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria.

*See* Exs. A, B, C at 11-12 (subpoenas to AAP, Endocrine Society, and WPATH).  On November 15, 2022, the State issued subpoenas to the remaining 15 Nonparty Groups containing identical requests for production, but without deposition requests.  Exs. D-R.

## C.    Scope of Discovery in the Underlying Litigation

According to the State, it adopted the challenged rule prohibiting coverage for certain treatments consistent with gender-affirming care "because [it] found those treatments to not be 'consistent with generally accepted professional medical standards,' and to otherwise be 'experimental or investigational.'"  Lannin Decl., Ex. 12 (*Dekker,* Opp. to PI Mot., Doc. 49 at 2; *see also* Fla. Stat. § 409.905(9) (barring Florida Medicaid coverage for services that are "clinically unproven [or] experimental.")).  Consequently, the *Dekker* court has determined that "[t]he fundamental issue that eventually will determine the outcome in the case is whether the State has reasonably determined that the treatments at issue are experimental."  Lannin Decl., Ex.

7

7 (*Dekker*, 10/12/2022 Hr'g on Prelim. Inj. Tr., at 111:25-112:3).  The *Dekker* court explained that whether the treatments are experimental is a "factual question," *id.* at 68:23-25, and found that the reasonableness of the State's determination depends on whether it comports with "current medical knowledge."  Lannin Decl., Ex. 6 (*Dekker*, PI Order, Doc. 64 at 4-5 (emphasis added)).  In light of the purely scientific nature of the "fundamental issue" in dispute, the *Dekker* court set an accelerated fact discovery schedule and noted that "nobody is trying to figure out some complicated factual issue other than the complicated factual issue that's the core of the case *and that you've already looked at in detail*."  *See* Lannin Decl., Ex. 7 (*Dekker*, 10/12/2022 Hr'g on Prelim. Inj. Tr. at 117:13-16 (emphasis added)).

The State echoed the district court's view of the "fundamental issue" in dispute when it opposed the Nonparty Groups' motion for leave to file their *amicus* brief.  Specifically, the State observed that "counsel for the parties are more than able to present arguments *and scientific information* to this Court," and as such "[o]utside assistance is not necessary."  Lannin Decl., Ex. 4 (*Dekker*, Opp. to Mot. for Leave, Doc. 35 at 2 (emphasis added)).

### D.   Meet-and-Confer Efforts

Following service of the subpoenas, the Nonparty Groups served the State with timely written responses and objections.  *See*  Exs. S–V.  Counsel for the Nonparty Groups thereafter conferred with the State's counsel on December 12, 2022 and December 22, 2022 in an attempt to narrow the requests, lessen the burden on the Nonparty Groups, and address First Amendment concerns.  *See* Lannin Decl., ¶¶ 11–19.  As a result of those discussions, the State offered to accept the identification of publicly-available information in response to Request No. 1; to withdraw Request No. 5; and to narrow Request No. 6 to communications with federal and

8

Florida officials.  *See id.* ¶ 16, Ex. 9 (Dec. 13 email).  As to the remaining requests, the State has stated that it is looking for "more substantive" documents.  *See id.* ¶ 17, Ex. 10 (Dec. 23 email).

During the December 22 teleconference, the State "floated" a "proposal" to withdraw the deposition (but *not* document requests) as to AAP, Endocrine Society, and WPATH, and to withdraw the document requests as to the remaining Nonparty Groups, if each organization submitted a sworn declaration answering the following questions identified by the State:

> 1. How many members are in their organizations;
>
> 2. What subset of the membership sets their policies, guidelines, and standards of care and how;
>
> 3. What subset of the membership set their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria;
>
> 4. Of the individuals responsible for setting their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria, how many of those individuals dissented from the policies, guidelines, and standards of care on gender-affirming care for gender dysphoria and why;
>
> 5. How many members in the organizations as a whole dissented from the organizations' policies, guidelines, and standards of care on gender-affirming care for gender dysphoria and did these members suggest any alternatives (and if so what were they); and
>
> 6. What side effects of gender-affirming care for gender dysphoria were these organizations aware of when they developed their policies, guidelines, and standards of care on gender-affirming care for gender dysphoria.

*See* Lannin Decl., ¶ 17, Ex. 10 (Dec. 23 email).

During the parties' final meet-and-confer on January 10, 2023, counsel for the Nonparty Groups explained that the document requests as narrowed, as well as the declaration topics proposed by the State, were still problematic to the extent they sought irrelevant discovery into the internal processes and communications of each organization.  *See id.* ¶ 18.  In an effort to avoid motion practice, the Nonparty Groups offered to produce the sources cited in the

9

Endocrine Society and WPATH clinical guidelines, which are analogous to materials that a district court in Alabama recently concluded were appropriate subjects of third-party discovery in a case similar to this one.  *Id.*; *see also infra* III.A (discussing Alabama case).  The State rejected that compromise and, with the parties at impasse, this motion followed.  *Id.*.

**III.**   **ARGUMENT**

This Court should quash the subpoenas directed at the Nonparty Groups because the subpoenas seek discovery irrelevant to the issue in dispute in the Underlying Litigation, would impose significant and undue burdens on these nonparties, and infringe upon associational rights under the First Amendment.

### A.    The Subpoenas Seek Discovery Irrelevant to the Issue in Dispute in This Litigation.

Subpoenas issued pursuant to Federal Rule of Civil Procedure 45 must satisfy the relevance requirements of Rule 26.  *See Coleman v. District of Columbia*, 275 F.R.D. 33, 36 (D.D.C. 2011) ("[I]t is settled that a subpoena is limited in scope by Rule 26(b)(1) of the Federal Rules of Civil Procedure.").  "Courts test relevance by looking at the law and facts of the case, not simply the expressed desires of a party to see certain information."  *United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 36 (D.D.C. 2012).  "Evidence is relevant if it 'has any tendency to make a fact more or less probable than it would be without the evidence' and if the 'fact is of consequence in determining the action.'"  *United States v. Miller*, 799 F.3d 1097, 1105 (D.C. Cir. 2015) (quoting Fed. R. Evid. 401).

In this case, the *Dekker* court has already offered guidance on the scope of relevant discovery: evidence bearing on whether, based on current medical knowledge, the State reasonably determined that the treatments excluded from Medicaid coverage are "experimental." The discovery sought by the State fails that standard.

10

These subpoenas seek information about two general topics.  The first is any "policy positions" each organization maintains regarding gender-affirming care.  But positions on questions of policy, to the extent they even exist, are irrelevant to whether "current medical knowledge" supports the State's conclusion that the prohibited treatments are experimental.  For example, the Nonparty Groups typically oppose legislative and administrative efforts to criminalize or ban gender-affirming care, and often issue position statements to that effect when such efforts are underway.  Such statements of organizational policy are not relevant to the fundamental scientific question identified by the *Dekker* court.  Compounding this problem, the State is seeking *internal information* about those irrelevant policy positions, including how they were developed and who supported them, all of which is even further afield from the scientific issue in dispute.

The second category relates to any "guidelines" (or "standards" and "best-practices") published by each organization for gender-affirming care—again, not copies of such guidelines, but rather information internal to each organization about how they were created, who supported them, and why.  In fact, only two of the Nonparty Groups even publish clinical guidelines for gender-affirming care.[6]  Even assuming that the guidelines published by WPATH and Endocrine Society are relevant to "current medical knowledge," they are publicly available, cite every study and piece of evidence on which they rely, and reflect the consensus view of the organizations that publish them.[7]  Those guidelines speak for themselves.  Presumably the State will present its

---

[6] As noted above, none of the other 16 Nonparty Groups that are party to this motion publish clinical guidelines for gender-affirming care.

[7] *See* https://www.wpath.org/soc8 (information about and link to WPATH's Standards of Care Version 8); https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence (information about and link to Endocrine Society's Gender Dysphoria/Gender Incongruence Guideline).

11

own scientific evidence and studies that allegedly are contrary to those guidelines—indeed, evidence the State must have *already had* when it determined in the first place that the treatments described in the WPATH and Endocrine Society guidelines are "experimental."  But information about, *inter alia*, the WPATH and Endocrine Society committees and members that developed those guidelines, and disclosure of their internal communications with each other, is not relevant to that exercise.  *See In re Schaefer*, 331 F.R.D. 603, 612 (W.D. Pa. 2019) (quashing subpoena seeking the deposition of the lead author of a publicly available report on transgender persons in the military, because the respondent had access to the report and "the same studies and data that [the petitioner] did in formulating her opinions and conclusions in the [] Report[,]" which "foreclose[d] any argument that the [respondent] ha[d] a 'substantial need" (or anything close to it) for [the petitioner's] testimony").

To the contrary, the face of the subpoena requests and the declaration topics the State proposed as a "compromise" leave no real doubt about the purpose of this discovery.  It is not about the science.  Rather, it is a fishing expedition for evidence of supposed dissent within each organization and an attempt to seed doubts about the internal processes, credibility, and purported bias of each organization.  This discovery is irrelevant.  As this court has recognized, "[t]he mere filing of an *amicus* brief … does not open oneself to broad discovery demands, nor does it make one's bias, if any, relevant to the underlying action."  *N.C. Right to Life v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005).  Instead, "[c]redibility of *amici* is a determination to be made by the trial judge, not a question that the parties should pursue in discovery."  *Id.*  "[W]ere the bias or credibility of *amici* presumptively relevant in every case, litigation and discovery of the issue would threaten the efficacy of the federal courts."  *Id.*

12

In an ongoing case challenging an Alabama law barring certain gender-affirming care, the district court quashed nonparty subpoenas similar to those at issue here.  There, the United States (as an intervener plaintiff) sought nonparty discovery from two organizations that had helped draft the Alabama law.  There, as here, the requested discovery included internal communications evidencing the organizations' decision-making processes and supposed motivations.  The district court quashed those subpoenas, concluding the discovery had "little— if any—relevance" and was "unlikely to reveal or lead to any information that would help resolve the fundamental issue in this case"—whether the Alabama law was constitutional.  *Boe v. Marshall*, 2022 WL 14049505, at *2 (M.D. Ala. Oct. 24, 2022).  The court concluded that the only documents in the nonparties' possession that were potentially relevant and not unduly burdensome to produce were "medical studies [and] literature" referenced in the challenged Alabama statute, "such as they exist."  Lannin Decl., Ex. 8 (*Eknes-Tucker*, Hr'g on Mot. to Quash Tr. at 40:13, 20-21).  Relying on that principle, the Nonparty Groups offered the same compromise to the State here—the production of materials cited in the WPATH and Endocrine Society clinical guidelines—which it rejected.  *See id.* ¶ 18.

Because the State cannot articulate any plausible theory of relevance that would justify the expansive discovery sought, the subpoenas should be quashed.

### B.    Complying With the Subpoenas Would Impose Undue Burdens on the Nonparty Groups.

Under Rule 45, the Court must also quash a subpoena that "subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A)(iv).  An undue burden exists when complying with the subpoena would result in time, expense, or collection efforts that outweigh any relevance the requested documents may have.  *See Coleman*, 275 F.R.D. at 36–37 ("[C]ourts generally employ a balancing test, weighing the burdensomeness to the [party on which the subpoena was served]

13

against the [need of the party which served the subpoena] for, and the relevance of, the information being sought.") (modifications in original).  Additionally, courts consider the recipient's nonparty status "in weighing the burden of imposing discovery."  *Wyoming v. U.S. Dep't of Agriculture*, 208 F.R.D. 449, 452, 454 (D.D.C. 2002) ("[T]he discovery is 'unduly burdensome' considering the non-party status of the witnesses."); *Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2007) ("The Rule 45 'undue burden' standard requires district courts . . . to be generally sensitive to the costs imposed on third parties."); *see also Updateme Inc. v. Axel Springer SE*, 2018 WL 5734670, at *3 (N.D. Cal. Oct. 31, 2018) (observing that "[n]on-parties" that are unrelated to the litigants "should not be burdened in discovery to the same extent as litigants") (collecting cases).  Courts therefore quash subpoenas when compliance would require organizations like the Nonparty Groups to "sacrifice . . . a large proportion of [their] staff" and parse through voluminous records to identify responsive documents.  *See, e.g.*, *N.C. Right to Life*, 231 F.R.D. at 52 (quashing a subpoena that would require amici recipients to dedicate their limited staff to the weeks' long task of identifying and producing a "vast array" of documents). In accord, the *Marshall* court's quashing of similar nonparty subpoenas in Alabama was based in part on the undue burden of compliance, which would have required volunteer staff and *pro bono* counsel to sort through "thousands of documents" spanning multiple years.  *Marshall*, 2022 WL 14049505, at *2.

Complying with these expansive and scattershot subpoenas would require substantial efforts by each of the Nonparty Groups and their *pro bono* counsel.  The attached declarations of AAP, WPATH, and Endocrine Society detail the extent to which those organizations would be

14

unduly burdened by the subpoenas.[8]  These organizations do not have in-house e-discovery teams and could be forced to hire contract attorneys to review the requested documents, itself an undue burden and significant expense for a non-profit with limited resources.  *See* AAP Decl. ¶ 10; WPATH Decl. ¶ 9; Endocrine Society Decl. ¶ 9.  These organizations would need to dedicate staff members to this review, as their internal documents are highly contextual and contain esoteric medical terminology that staff will need to explain to hired counsel.  *See* AAP Decl. ¶ 11; WPATH Decl. ¶ 9; Endocrine Society Decl. ¶ 9.  These organizations would also need to identify and speak with a significant number of potential custodians across their organizations and membership, many of whom utilize the external e-mail accounts of their employers, including hospitals, medical groups, and educational institutions.  *See* AAP Decl. ¶ 9; WPATH Decl. ¶¶ 7-8; Endocrine Society Decl. ¶¶ 8, 11.  Endocrine Society, a 501(c)(3) organization with a limited legal budget, has already started identifying which programs, products, and services would need to be suspended to devote staff time to complying with the subpoena.  *See* Endocrine Society Decl. ¶¶ 8-11.

The State's offer to withdraw certain discovery requests in exchange for sworn declarations does not cure the defects in its subpoenas.  Under the State's proposal, it would withdraw its deposition requests (but not its requests for production) to AAP, WPATH, and Endocrine Society and its requests for production to the other Nonparty Groups.  In exchange, each Nonparty Group would need to provide a sworn declaration answering certain questions identified by the State.  *See* Lannin Decl., Ex. 10 at 1 (questions); Section II.D *supra* (listing questions).  However, the proposed declaration topics are substantively identical to the

---

[8] Movants have submitted representative declarations from AAP, WPATH, and Endocrine Society given the State's heightened focus on them, including through requests for deposition testimony that were not directed at the other 15 Nonparty Groups.

deposition topics and requests for production that the State has offered to withdraw.  *Compare* Lannin Decl., Ex. 10 at 1 (questions) *with, e.g.*, Exs. A-C at 2 (deposition topics) *and* Attachment to Exs. D-R at 10-11 (requests for production).[9]  Because the State's proposed questions seek essentially the same information as the discovery requests they would replace, developing answers to them would require each organization to identify, review, and then memorialize the same information requested now.  In short, the State's proposal would change the form of the discovery but not its substance, and would remediate neither the undue burden required to provide the discovery nor its lack of relevance.

### C.      The Subpoenas Infringe on Free Speech and Associational Rights.

The subpoenas should also be quashed because they would infringe on the Nonparty Groups' associational rights guaranteed by the First Amendment.  Complying with the subpoenas would discourage members from joining or participating in the organizations, and chill the robust and uninhibited internal exchange of ideas that these organizations rely on to do their work.  As discussed below, courts routinely quash subpoenas that would infringe upon these types of protected interests.

Under the First Amendment's associational privilege, organizations are protected from compelled disclosure that would "induce members to withdraw . . . and dissuade others from joining it because of fear of exposure."  *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 463 (1958).  In assessing a claim of privilege, courts in this Circuit balance the claimant's First Amendment interests against the requester's need for the information—"if the former outweighs

---

[9] The requests for production that the State served on all of the Nonparty Groups, and the deposition topics that it served on AAP, WPATH, and Endocrine Society, are also listed above in Sections II.B, and the State's proposed questions are also listed above in Section II.D (listing questions).

App_1025

the latter, then the claim of privilege should be upheld." *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 4 (D.D.C. 2002) (quoting *Black Panther Party v. Smith*, 661 F.2d 1243, 1266 (D.C. Cir. 1981) (citation and quotations omitted)).  In assessing First Amendment interests, this Court has recognized that materials bearing on an organization's internal discussions and operations may qualify for protection from disclosure.  *See Ted Cruz for Senate v. FEC*, 451 F. Supp. 3d 92, 99 (D.D.C. 2020); *see also AFL-CIO v. FEC*, 333 F.3d 168, 176–78 (D.C. Cir. 2003) (applying First Amendment privilege where compelled disclosure of "detailed descriptions of training programs, member mobilization campaigns . . . and state-by-state strategies" would "seriously interfere[] with internal group operations and effectiveness").  As to need, the D.C. Circuit has recognized that "[t]he interest in disclosure will be relatively weak unless the information goes to 'the heart of the matter'" and that "[m]ere speculation that information might be useful will not suffice."  *See also Black Panther Party,* 661 F.2d at 1268 (citation omitted)*.*

Here, the representative declarations attached to this motion explain in detail how disclosure of the information sought by the State would chill the organizations' associational rights, regardless of whether they publish clinical guidelines (WPATH and Endocrine Society) or not (AAP).  The mere issuance of the subpoenas (let alone enforcement of them) has already had a chilling effect on member participation due to fears of being embroiled in litigation and exposure of their private communications.  *See* AAP Decl. ¶¶ 15-20; WPATH Decl. ¶¶ 12-16; Endocrine Society Decl. ¶¶ 13-16; *see, e.g.*, *Apple Inc. v. Match Grp., Inc.*, 2021 WL 3727067, at *8 (N.D. Cal. Aug. 19, 2021) (refusing to enforce request for advocacy group's internal documents on First Amendment grounds and observing "[w]ho in their right mind would want to participate in a public advocacy organization, knowing that all their internal communications

17

about strategy, lobbying, planning, and so on, would be turned over to their principal

opponent?").

Additionally, the declarations detail how the subpoenas have already discouraged

dialogue in a field that requires robust scientific debate and candid exchanges. *See id.* For

example, the quality of the clinical guidelines published by WPATH and Endocrine Society will

suffer if their members and contributors, with the prospect of public disclosure looming over

them, feel inhibited in the views they may express or reluctant to voice critical opinions. Indeed,

as the Fifth Circuit recognized, the chilling effect of a subpoena that seeks internal

communications of a nonparty is "self-evident" because it would discourage "frank internal

dialogue and deliberations." *Whole Woman's Health v. Texas Catholic Conference*, 896 F.3d

362, 372-373 (5th Cir. 2018) (quashing subpoena that sought a nonparty religious organization's

internal communications about a Texas abortion regulation, and explaining that

"communications within such a group must be permitted to be broad, uninhibited, and fearless").

The Nonparty Groups are entitled to the same type of vigorous, "uninhibited, and fearless"

debate under the First Amendment. *See id.*

Moreover, the declarations detail the alarming threats of violence and intimidation that

these organizations have already received due to their work on issues related to gender-affirming

care. *See, e.g.*, AAP Decl. ¶ 19; WPATH Decl. ¶¶ 12-15; Endocrine Society Decl. ¶ 15. This

includes, for example, the receipt of emails characterizing individuals who provide gender-

affirming care as "child molesters" and warning that "[y]our attempt to hide the child molesters

will get you killed. If I see you or anyone who supports you. I will kill them." WPATH Decl.

¶ 15. Complying with these subpoenas—which would require, among other things, the

production of personally identifying information about the organizations, their employees, and

their members—risks amplifying these threats and jeopardizes the safety of the Nonparty

Groups' employees and members.  In turn, members of these organizations would be motivated

to end their participation and potential members would waver in their decisions to join out of

unease regarding their safety.  *See NAACP*, 357 U.S. at 463.

It is no answer that such information could be produced subject to a protective order,

given the possibility such information could nonetheless become public.  Indeed, detailed

information about *these very subpoenas* was recently leaked by unknown entities to an online

website that has previously characterized gender-affirming care as the "mutilation of children."[10]

In light of the heightened First Amendment interests at stake and the State's failure to

demonstrate any need for the irrelevant information it seeks, the instant subpoenas should be

quashed.

### D.      The State Should be Required to Pay the Nonparty Groups' Fees.

The State should be required to reimburse Nonparty Groups for the fees they were forced

to incur in responding to the State's subpoenas, including their fees incurred in bringing this

Motion.  Rule 45 provides:

> ***Avoiding Undue Burden or Expense; Sanctions.*** A party or
> attorney responsible for issuing and serving a subpoena must take
> reasonable steps to avoid imposing undue burden or expense on a
> person subject to the subpoena. The court for the district where
> compliance is required must enforce this duty and impose an
> appropriate sanction--which may include lost earnings and
> reasonable attorney's fees--on a party or attorney who fails to
> comply.

---

[10] *See* Dylan Housman, *EXCLUSIVE: Florida Subpoenas Organizations Pushing Transgender Care on Children in Lawsuit*, Daily Caller (Dec. 14, 2022), https://dailycaller.com/2022/12/14/florida-transgender-care-lawsuit-medicaid-subpoena/.

Fed. R. Civ. P. 45(d)(1).  Even if a party acted in good faith in issuing the subpoena, they may be subject to such sanctions.  *See Builders Ass'n of Greater Chicago v. City of Chicago*, 2002 WL 1008455, at *3 (N.D. Ill. May 13, 2002) ("[G]ood faith in issuing a subpoena is not sufficient to avoid sanctions . . . if a party has issued the subpoena in violation of [its] duty [to avoid imposing undue burden or expense on a subpoena recipient].").

Here, the fee request should be granted for at least two independent reasons.  *First*, the State served subpoenas containing the same boilerplate requests for production on 18 separate organizations that differ substantially in many material respects.  For example, and as discussed above, only two of the 18 groups even publish clinical guidelines.  The State made no effort to "tailor its subpoenas in any way to the nature of the recipients, the types of documents they would be likely to produce, or their resources to respond," in violation of its duty under Rule 45 to "take reasonable steps to avoid imposing undue burden or expense."  Fed. R. Civ. P. 45(d)(1); *Builders Ass'n of Greater Chicago*, 2002 WL 1008455, at *4 (granting fee request under Rule 45 where the party had served "subpoenas with identical 49–category boilerplate Riders" on numerous nonparties and failed to "tailor its subpoenas in any way to the nature of the recipients, the types of documents they would be likely to produce, or their resources to respond." (emphasis omitted)).  Nor did the State investigate which of the materials it sought through subpoena might be publicly available, as evidenced by its request for "documents that state the total number of your membership"—information that is readily available online for many of the organizations.  *See* Ex. S (AAP Objs. & Resps. to Subpoena) at 15; Ex. T at 15 (Endocrine Soc'y Objs. & Resps. to Subpoena); Ex. U at 16 (WPATH Objs. & Resps. to Subpoena).

*Second*, and as set forth above, the subpoenas seek facially irrelevant discovery.  Further, the State declined to withdraw the improper subpoenas even after the Nonparty Groups identified

this issue, forcing them bring the instant motion to quash.  This also constitutes a breach of the State's duty imposed by Rule 45(d)(2).  *See Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, 2003 WL 23018833, at *9 (S.D.N.Y. Dec. 23, 2003) ("Sanctions are properly imposed and attorney's fees are awarded where . . . the party improperly issuing the subpoena refused to withdraw it, requiring the non-party to institute a motion to quash.").  For each of the foregoing reasons, the State should be required to reimburse Nonparty Groups for the fees they were forced to incur in responding to its improper subpoenas.[11]

## IV.    CONCLUSION

For the reasons set forth above, the Nonparty Groups respectfully request that the Court quash the State's subpoenas in their entirety.

---

[11] If the Court grants Nonparty Groups' request for fees, counsel for Nonparty Groups is prepared to submit to the Court a declaration stating and describing the fees incurred within 14 days of the Court's order or as otherwise directed by the Court.

21

Dated: January 13, 2023

Respectfully submitted,

*/s D. Jean Veta*
_____
D. Jean Veta

Cortlin H. Lannin (CA Bar No. 266488)
(*pro hac vice* motion to be submitted)
Covington & Burling LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

D. Jean Veta (D.C. Bar No. 358980)
Covington & Burling, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com

Michael J. Lanosa (CA Bar No. 30124)
(*pro hac vice* motion to be submitted)
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (424) 332-4800
mlanosa@cov.com

*Counsel for Nonparty Groups*

22

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, I electronically filed the foregoing document and its attachments with the Clerk of the Court via email, and that I also caused copies of the documents to be sent to the Clerk via FedEx.  I also certify that on that same day, with their consent I caused the foregoing documents to be served on counsel for Defendants Jason Weida and the Agency for Health Care Administration via email at the following addresses:

Mohammad O. Jazil (via email only)
Gary V. Perko (via email only)
Michael Beato (via email only)
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
Phone:  (850) 270-5938
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com

/s Michael J. Lanosa
Michael J. Lanosa

23

Tab R

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON AMERICAN ACADEMY OF PEDIATRICS, et al. | Misc. Case No. _____ |
| AUGUST DEKKER et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>SIMONE MARSTILLER et al.,<br><br>      Defendants. | Northern District of Florida<br>Case No. 4:22-cv-325-RH-MAF |

**REDACTED DECLARATION OF WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH IN SUPPORT OF JOINT MOTION OF NONPARTY GROUPS TO QUASH RULE 45 SUBPOENAS AND FOR FEES**

I, ███████████, declare as follows:

1.      I am the ███████████ of the World Professional Association for Transgender Health ("WPATH").  If called upon to testify as to the facts set forth herein, I could and would testify competently thereto.

2.      I have been the ███████████ of WPATH since ███████████ and was an ███████████ from ███████████ to ███████.  As ███████████, my work involves, among other things, developing board policies and systems to ensure the efficiency and effectiveness of the organization; ensuring ongoing measurement of deliverables for projects and initiatives; supporting the organization's mission and strategies; continuously improving processes for the organization to meet both long- and short-term objectives; setting standards and expectations for governing the organization; understanding and overseeing the current and future financial resources and expenditures of the organization; and guiding revenue-generating activities to ensure adequate income to the organization.

3.      I have spent nearly seven years working with hundreds of members and dozens of partner organizations on issues in transgender health, and I have extensive knowledge of, and oversee WPATH's internal operations.

Background

4.      WPATH, founded in 1979, is a 501(c)(3) non-profit interdisciplinary professional and educational organization devoted to transgender health.  WPATH's mission is to promote evidence-based care, education, research, public policy, and respect in transgender health.  To that end, WPATH is internationally recognized for establishing Standards of Care for the treatment of individuals with gender dysphoria.  These standards articulate our organizational consensus about the psychiatric, psychological, medical, and surgical management of gender

1

dysphoria.  Many WPATH members engage in clinical and academic research to develop evidence-based medicine.

5.      WPATH is an international membership organization, and it has regional affiliated organizations in Europe, Asia, and the United States.  These organizations work collaboratively to help ensure safe, competent, and available healthcare for transgender and gender diverse ("TGD") people around the world.  The voting membership of WPATH consists of professionals working across a wide range of disciplines that encompass total care for TGD individuals, such as medicine, psychology, law, social work, counseling, psychotherapy, nursing, family studies, sociology, speech and voice therapy, sexology, and more.  WPATH members work together to increase access to competent care and address the needs and concerns of TGD people through collaboration of their expertise in education, advocacy, clinical medicine, research, and communication.

6.      WPATH engages in a number of activities, including the publishing of its official journal, the International Journal of Transgender Health, a peer-reviewed medical journal. WPATH also hosts book clubs and journal clubs, which provide members and others working in TGD health the opportunity to interact, collaborate, and learn from their colleagues who are leading authors, clinicians, and expert researchers in transgender health.  WPATH holds educational symposia, courses, and workshops to improve access to accurate and up-to-date information and research in the field of transgender health.

The Subpoena

7.      I have reviewed the non-party subpoena issued to WPATH by Secretary Marstiller and the Florida Agency for Health Care Administration, which covers a broad range of issues that relate to many different aspects of WPATH's work.  Responding to the subpoena

would require WPATH to identify and speak with multiple potential document custodians from across the organization, including at least the following groups within WPATH: the board of directors, executive committee, SOC8 co-chairs, SOC8 chapter leads, SOC8 chapter members, IT department, and consultants.  Then, we would need to collect potentially responsive documents from those individuals.  These documents would then need to be reviewed by me.  The scope of these requests, in their current state, would mean that I could no longer dedicate my time to completing the daily tasks necessary to manage the association.  The scope of this search would also unduly burden my staff, in that it would require the assistance of other team members, who would then be unable to function in their roles at WPATH.

8.    Given the breadth of the requests as drafted, it is possible WPATH would need to collect Electronically Stored Information ("ESI"), such as custodial email files, from some or all of those individuals.  Moreover, a number of our members utilize their own personal and business e-mail addresses to communicate with other members.  These members come from a wide range of disciplines and employers, including hospitals, medical groups, and educational institutions.  Any ESI search and production of these e-mail addresses would require notice to their employers, as well as additional review to ensure that protected or confidential information was properly redacted.

9.    Because WPATH does not have an in-house e-discovery function, we would likely need to retain a third-party vendor to collect and process those documents.  Any collected documents would also need to be reviewed by attorneys for responsiveness, privilege, and other issues.  While our pro bono counsel may assist with that, depending on the volume of documents, WPATH could need to retain additional contract attorneys to review the materials.  I would also need to closely review the responsiveness and privilege determinations.  Screening

3

for this information would require additional time from my team.  We would also likely need a vendor to process the responsive documents for production.  I have reviewed a number of quotes from associations that needed to retain these services and I understand that discovery costs of this type can often run into the tens of thousands of dollars.

10.     The subpoena also requests that we identify one or more witnesses to testify on behalf of WPATH as to a number of very broad topics.  Identifying such individuals and preparing them to testify in a deposition—which will require that we locate and review supporting documents, identify and speak with knowledgeable individuals from across the organization, and spend many hours educating our witness(es)—will require a substantial amount of time and resources.

11.     In my view, the work I have described that would be required to respond to the subpoena as drafted would distract my team from the critically important, time-sensitive work we do advancing and improving healthcare for transgender individuals.

12.     I also view this subpoena, which requests our private, confidential internal communications, as exceedingly intrusive.  It requests the production of internal communications with our members and partners, including internal chats, emails, notes, drafts, and social media posts.  Our members use all of these channels to communicate with each other and engage in open discussions of WPATH's work product.

13.     Based on my nearly seven years of experience working WPATH members, I believe that our staff and members will communicate less if the subpoena is enforced.  Our staff is already more cautious about sending written communications for fear that they will be produced and taken out-of-context in an attempt to misuse and harm the persons we are trying help.  I am also concerned that new members will fear joining if they know their private emails

4

and comments shared with us could subject them to harassment arising from this litigation.  Over

the last several years, as TGD health has become the subject of charged rhetoric, our members

have been increasingly harassed, intimidated, and subjected to threats of harm.  For example, our

members have been illegally videotaped during educational presentations and had their

intellectual property misused and edited to fit an agenda that has led to threats of violence.

Members experience weekly attacks via email, phone calls and threatening voicemails, and

social media messages and posts threatening and harassing them by name.

14.     My staff and I receive weekly emails that include threats of violence and shaming.

Some excerpts from these include: "*It is unconscionable that you have lowered the age for

hormone treatment from an age that was already TOO LOW.  What you are doing amounts to

child abuse and I will do everything in my power to 1) spread the word that you are abusing and

mutilating children and 2) undermine and destroy your organization before you can do any more

harm to children.  Mark my words: this is a war.*"  Not only is this statement false, but it was

sent to us almost immediately following false news reports regarding age limits.

15.     Another example reads, "*I am filing with the international criminal court against

you.  Transgender people are scientifically proven molestation and sexual abuse victims.  Your

attempt to hide the child molesters will get you killed.  If I see you or anyone who supports you.

I will kill them.*"  These examples are only two of many examples of attempts to harass,

intimidate, and ultimately chill the work of members and staff of WPATH.

16.     This subpoena has also created a notable chill on our educational efforts.  As a

result of this subpoena, whenever WPATH prepares to submit a new amicus filing, send a letter

to the government, or issue a new policy statement, our board now considers whether this will

open us to more subpoenas.  In addition, due to the recent breaches that have occurred involving

snippets of presentations being taken out of context, digitally manipulated, and used against the

care we are seeking to provide, WPATH has had to cancel its planned educational courses and

workshops in November and December to investigate stronger security measures to protect the

faculty and staff.  Faculty that has participated in many past projects are tenuous, and must now

seek approval from their employers (hospitals, universities, etc.) to participate, as they must now

consider whether risking the safety of their facilities is worth getting the research and data out to

those in the field.  I believe enforcement of this subpoena would only heighten those members'

concerns.

17.     Open, honest dialogue is also essential to the accuracy of our work and practice

recommendations, which medical professionals across many specialties use to inform their

medical decision-making.  We work with dozens of medical experts every year to understand the

latest science, and to review and edit our publications, educational materials, curriculum, and

public statements.  These experts are volunteers and do this work out of a need to help improve

care for transgender individuals.  Having personally worked with many of them for years, I know

that many would think twice before volunteering their expertise if their confidential feedback

could be shared with the world.  Our ability to receive candid feedback depends on the

confidence that peer reviews and communications within WPATH will not be publicly disclosed.

Based on my experience, I believe enforcement of this subpoena will greatly hinder the quality

and accuracy of our work product, which in turn will worsen the care that our members provide

to their patients across all health domains.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Roanoke, VA, on January 10, 2023.



WPATH

7

Tab S

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE SUBPOENAS SERVED ON
AMERICAN ACADEMY OF PEDIATRICS,
et al.,

Misc. Case No. _____

AUGUST DEKKER et al.,

      Plaintiffs,

v.

SIMONE MARSTILLER et al.,

      Defendants.

Northern District of Florida

Case No. 4:22-cv-325-RH-MAF

**REDACTED DECLARATION OF ENDOCRINE SOCIETY IN SUPPORT OF JOINT MOTION OF NONPARTY GROUPS TO QUASH RULE 45 SUBPOENAS AND FOR FEES**

I, ████████████, declare as follows:

1.        I am the ███████████████████ at the Endocrine Society.  If called upon to testify as to the facts set forth herein, I could and would testify competently thereto.

2.        I have served as the ██████ since █████████.  In my role, I oversee the Endocrine Society's Government and Public Affairs Department, which manages the Society's public policy agenda and advocacy efforts.  I develop strategies to create and improve policies that affect access to and quality of care, and I engage in advocacy related to endocrine-disrupting chemicals.  I also serve as liaison to the Endocrine Society's Clinical Affairs, Research Affairs, and Advocacy & Public Outreach Core Committees.  These committees play an integral role in implementing the Society's mission, sharing the latest clinical and research information, and making policy recommendations.  Over the past nine  years, I have had the opportunity to work closely with our staff, our members, our partner organizations, and others in the medical society, scientific organization, and policy communities.  As a result, I have developed a broad and deep knowledge of Endocrine Society's operations and of the clinicians, scientists, and groups with which we collaborate.

Background

3.        The Endocrine Society, founded in 1916, is a 501(c)(3) charitable, non-profit organization of physicians and scientists dedicated to accelerating scientific breakthroughs and improving patient health and wellbeing.  The Endocrine Society is one of the largest and most active organizations devoted to the study of hormones and clinical practice in endocrinology.  Its mission is to advance excellence in endocrinology and promote endocrinology's role in scientific discovery, medical practice, and human health.  To accomplish this, the Endocrine Society publishes multiple peer-reviewed journals and publications, hosts forums for the exchange of

App_1044

clinical and scientific knowledge in the field, and supports over 18,000 clinicians and scientists through every stage of their careers.

4.      The Endocrine Society has a top-ranked peer-reviewed journal publishing program that addresses dozens of endocrine issues.  The Endocrine Society also publishes policy statements, scientific statements, and clinical practice guidelines.  In addition, the Endocrine Society hosts meetings and conferences to provide opportunities to share the latest information and updates in endocrinology and to facilitate professional development and networking for members and all professionals involved in the specialized field of hormone research and clinical endocrinology.

5.      The Endocrine Society also offers educational and training opportunities that cover all areas of endocrinology, diabetes, and metabolism.  The Endocrine Society's Center for Learning provides a wealth of activities that offer our members opportunities to obtain and maintain specialty certification.  The Endocrine Society's Special Interest Groups and online platforms allow our members to share information with their peers, learn best practices, and find research collaborations.  The Endocrine Society also works with its members to develop policy positions and educate policy makers about them.

6.      As a 501(c)(3) organization, the majority of the Society's policy work involves education; however, as part of its civic responsibility and to represent the interests of its members and the patients they care for, the Society also engages in advocacy to support or oppose specific legislation as necessary and well within the limits of 501(c)(3) requirements. The Society is viewed as a trusted and credible policy advisor by policymakers around the globe and has also had the opportunity as an *amicus* to provide information to courts considering scientific or clinical information related to endocrinology and endocrine-related science.

App_1045

7.      While the Endocrine Society directs its members to potential endocrine-related research opportunities, the Endocrine Society does not itself conduct clinical research.  In other words, the Endocrine Society's work related to clinical practice guidelines involves working with our members who are experts in the field to analyze the publicly available evidence.  The Endocrine Society determines the topics for guidelines, selects an expert writing committee, and provides the infrastructure for the development and publication by using a robust and rigorous process that adheres to the highest standards of trustworthiness and transparency as defined by the Institute of Medicine.  The Endocrine Society also follows the Grading of Recommendations, Assessment, Development and Evaluation (GRADE) methodology to develop its recommendations.  GRADE is a transparent framework for summarizing evidence and provides a systematic approach for making clinical practice recommendations.  Additionally, Endocrine Society guidelines are not developed in a vacuum.  Guidelines take an average of 2-3 years to develop through a multi-step drafting, comment, review, and approval process.  This includes a public comment period and expert review period, and all comments are addressed by the guideline development panel prior to publication.  There is ample opportunity for feedback and debate through this years-long development process.  Consequently, the Endocrine Society's guidelines represent a high-quality resource to be used for patient care based on medical evidence, author expertise, rigorous scientific review, and a transparent process.

The Subpoena

8.      I have reviewed the nonparty subpoena issued to Endocrine Society by Secretary Marstiller and the Florida Agency for Health Care Administration.  There are multiple requests that implicate many different elements of Endocrine Society's work.  Based on my experience, responding to the requests as drafted would require us to undertake a substantial and burdensome

process of identifying and speaking with a number of individuals across our organization who may have been involved with our work in these areas, including at least the Clinical Practice Guideline team, the Publications Department, the Communications and Media Relations teams, the Executive Office, the Membership Department, and the IT team as well as the Government & Public Affairs team.  In addition to Endocrine Society staff, responding to the requests as drafted would also require us to interrupt the work of several Endocrine Society members, including the expert writing panel of the guidelines, the authors of our position statement and policy documents, the Board of Directors, and other member experts in transgender medicine who have participated in the Endocrine Society's work.  Then, we would need to collect potentially responsive documents from those individuals.  Given the breadth of the requests, Endocrine Society may need to collect Electronically Stored Information ("ESI") from some or all of those individuals, and we would likely need to retain a third-party vendor to collect and process those documents.

9.     Any collected documents would also need to be reviewed by attorneys for responsiveness and privilege.  Our pro bono counsel would be involved in that work, but I understand that depending on the volume of documents, Endocrine Society could need to retain additional contract attorneys to review the materials.  Moreover, my team would need to closely review the responsiveness and privilege determinations, because many of our documents may be highly technical (including use of acronyms and medical information) or require familiarity or expertise to properly categorize.  Further, many of our documents may involve third parties with their own privacy interests, or sensitive patient or health data.  Screening for this information would require a substantial commitment of time and resources from Endocrine Society.

10.     I understand that discovery costs of this type can often run into the hundreds of thousands of dollars, which has significant budget implications for a 501(c)(3) organization like our medical society.  Approximately eight years ago, the Endocrine Society was involved in discovery related to a different matter.  At that time, our costs were close to $100,000 plus significant staff time.  Consequently, based on the breadth of the subpoena in this case, we estimate that our costs would be well over that amount plus weeks of IT and other relevant staff time.  For a medical society like ours, this cost and staff burden is not easily absorbed and would have significant effect on our budget.  Our Finance Department is already considering the budget impact of compliance to the subpoena and identifying what programs, products, and services will be affected, moved, delayed, or stopped.  Our IT Department also must consider what the budgetary impact of compliance will be on technology infrastructure plans as well as its staff capacity and what additional help would be needed.

11.     The work I have described that would be required to respond to the subpoena as drafted would divert our staff from the vital, urgent work Endocrine Society does to advance endocrine practice for patients and endocrine research.  It would compromise our ability to deliver on other critical programs and services of the Society, including the preparation for our annual meeting; development of educational products and programs such as other guidelines; and hinder our ability to do core functions of the Society.  In addition, the subpoena requests would create new burdens on not only Society member leaders but also rank-and-file members who volunteered to lend their expertise.  Our members, like other physicians and researchers across the country, are busy with patient and administrative activities.  Responding to these broad requests would reduce their time for caring for patients and for research.

12.     The subpoena also requests that one or more witnesses testify on a number of topics on behalf of our organization.  Identifying those individuals and preparing them to give testimony about these broad and deep topics will require a substantial amount of time and resources.  I expect we would need to locate and review supporting documents, identify and speak with knowledgeable individuals from across the organization, and spend many hours educating our witness to ensure they are sufficiently prepared to give testimony for even a relatively short deposition.

13.     I am also seriously concerned about the effect this subpoena will have on our ability to freely communicate as an organization.  As drafted, the subpoena requests production of internal communications with our members and partners, internal chats, notes, drafts, social media posts, and private emails.  Our staff and members use these tools to communicate with each other and engage in robust, frank, and healthy discussion of the Society's work product.

14.     Based on my experience working with Endocrine Society members, I believe that our staff and members will communicate less, and less freely, if the subpoena were enforced. Already, our staff are more cautious about sending written communications.  In addition to disrupting communications between staff, the subpoena has already created an environment in which departments and teams affected are pausing some new activities or reducing current activities out of concern that if required to comply with the subpoena they will be unable to perform other duties and responsibilities of their jobs.  For example, the guidelines team has delayed an update of the gender dysphoria guideline; the media relations team is hesitant to respond to reporter inquiries; and the Government and Public Affairs Department has paused certain activities related to work on other issues, such as engagement in coalitions.

6

15.     I am also concerned that if this subpoena is enforced our staff and members will avoid communicating with each other to complete work on Endocrine Society projects and programs; that our members will step back from volunteering to work on future clinical practice guidelines, educational sessions and materials, and participating in Endocrine Society committees and work groups; and that new members will fear joining.  While Endocrine Society members are committed to ensuring access to care for individuals suffering from gender dysphoria, we are hearing that our members do not feel comfortable using our platforms to discuss the issue.  Currently, our members who treat people with gender dysphoria or who are transgender are working in often hostile environments in which their clinics are subject to threats and in some cases actual violence.  Consequently, some members have requested that we remove their contact information from our online directory.  While this keeps their name out of public attention, it also has the effect of making it harder for patients to find a physician with this expertise.  If these members learn that their communications with their professional society are now discoverable, I am concerned that it will cause some to walk away from the Society just when they need it the most and when their contributions will be helpful to others.

16.     This subpoena has also created a notable strain on our activities to help educate policy makers and the courts about transgender medicine so that they have medical evidence and scientific information to inform their decisions.  As a result of this subpoena, whenever Endocrine Society prepares to submit a new amicus filing, send a letter to the government, meet with a legislator or government official, or issue a new policy statement, our board now must consider whether this will result in future subpoenas.  This is truly chilling to the Endocrine Society's ability to participate in the policy, legislative, and regulatory process and share our views as well as clinical and scientific information with policy makers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C., on January 10, 2023.



Endocrine Society

Tab T

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON AMERICAN ACADEMY OF PEDIATRICS, et al. | Misc. Case No. _____ |
| AUGUST DEKKER et al.,<br><br>Plaintiffs,<br>v.<br><br>SIMONE MARSTILLER et al.,<br><br>Defendants. | Northern District of Florida<br>Case No. 4:22-cv-325-RH-MAF |

**REDACTED DECLARATION OF AMERICAN ACADEMY OF
PEDIATRICS  IN SUPPORT OF JOINT MOTION OF
NONPARTY GROUPS  TO QUASH RULE 45 SUBPOENAS
AND FOR FEES**

I, ███████████, declare as follows:

1.      I am the ██████████████████████ at the American Academy of Pediatrics ("AAP").  If called upon to testify as to the facts set forth herein, I could and would testify competently thereto.

2.      Before becoming AAP's ████████████████ on ██████ ██, I was a member of AAP's ████████████████████ team since ████████ ██.  In that role, my responsibilities included legislative research and analysis on pediatric health care issues; strategic consultation and technical assistance to AAP chapters, AAP committees, AAP councils, AAP sections, and other AAP entities on pediatric health care issues; developing and disseminating state advocacy resources; providing advocacy education and training; and partner engagement.

3.      I have spent nearly 15 years working with hundreds of AAP physician-members and hundreds of our partner organizations in the medical community to advance the cause of children's health and wellbeing.  Through this work, I have developed extensive knowledge of pediatric health care issues and AAP's internal operations and procedures.

Background

4.      AAP is a 501(c)(3) organization founded in 1930 by a group of 35 pediatricians who wanted to address pediatric healthcare standards.  AAP's mission is to attain optimal physical, mental, and social health and well-being for all infants, children, adolescents and young adults.  To accomplish this mission, AAP supports the professional needs of our more than 67,000 pediatrician members.

5.      AAP engages in a number of charitable activities, including our large pediatric publishing program, with more than 300 titles for consumers and over 500 titles for physicians and other healthcare professionals.  AAP also publishes hundreds of policy statements, clinical reports, and technical reports, ranging from advocacy issues to practice recommendations, all of which are available on AAP's website.

6.      AAP does not conduct clinical studies.  We work with experts in the field to review and analyze publicly available evidence.  We then publish those analyses freely online, citing all of the evidence we reviewed, the methodology we used to evaluate the evidence, the basis of our conclusions, and all potential conflicts of interest.

7.      We have published numerous policy statements examining pediatric health care issues and providing recommendations.  Most recently, AAP published policy statements on the prevention and control of influenza, patient safety in emergency care settings, ATV injuries and deaths, and immunization information systems.

8.      Related specifically to gender-affirming care, we published a Policy Statement that examined the medical literature and provided recommendations for the care of transgender and gender-diverse youth.  AAP does not generate or publish clinical guidelines regarding gender-affirming care.  Our Policy Statement recommends that "TGD (transgender and gender-diverse) youth have access to comprehensive, gender-affirming, and developmentally appropriate health care that is provided in a safe and inclusive clinical space," among other recommendations.  The Policy Statement is not clinical guidance for the care of transgender and gender-diverse youth.

2

The Subpoena

9.      I have reviewed the nonparty subpoena issued to AAP by Secretary Marstiller and

the Florida Agency for Health Care Administration.  The subpoena contains multiple requests

that relate to many different aspects of AAP's work.  In my judgment, responding to the requests

as drafted would require AAP to identify and speak with multiple potential document custodians

from across the organization, including at least the following teams within AAP: Advocacy

Communications; Chapter, District, & Member Engagement; News, Media, and Public

Relations; Information Technology; Medical & Surgical Subspecialties; State Advocacy; and

Systems of Services for Children with Special Health Care Needs.  We would then need to

collect potentially responsive documents from those individuals.  Given the breadth of the

requests as drafted, it is possible AAP would need to collect Electronically Stored Information

("ESI"), such as custodial email files, from some or all of those individuals.

10.     AAP does not have an in-house e-discovery team.  To the extent AAP needed to

collect more than a *de minimus* number of documents, and certainly if any ESI collections were

required, we would likely need to retain a third-party vendor to collect and process those

documents.  Any collected documents would also need to be reviewed by attorneys for

responsiveness to the subpoena requests and for privilege, among other issues.  Our pro bono

counsel would be involved in that work, but I understand that depending on the volume of

documents, AAP could need to retain additional contract attorneys to review the materials.

11.     AAP has only one in-house counsel, who currently has a full plate with wide

ranging legal matters to attend to and hundreds of contracts to review in a short timeframe.

Moreover, my team would need to closely review the responsiveness and privilege

determinations, especially because many of our organizational and internal documents are highly

context-specific.  For example, we extensively use acronyms or medical terminology.  Further, many of our internal documents may involve third parties who have their own privacy rights, or sensitive patient or health data.  Screening for this information would require additional time from my team.  Finally, I understand that we would likely need a vendor to process the responsive documents for production.

12.     While we have not obtained quotes from discovery vendors for the work I described above, I understand that discovery costs of this type can often run into the tens of thousands of dollars.  AAP is a non-profit organization with limited resources, and this effort would quickly supplant and exceed AAP's existing legal budget.

13.     In my view, the work I have described that would be required to respond to the subpoena as drafted would also distract our team from the critically important, time-sensitive work we do advancing children's health and wellbeing.

14.     The subpoena also requests that AAP put forward one or more witnesses to speak on behalf of our organization in a deposition.  Given the scope of the topics identified in the subpoena, I believe it would require a substantial investment of time and resources to prepare such individuals to testify.  At a minimum, we would need to locate and review supporting documents (which would impose much of the same burden described above), identify and speak with knowledgeable individuals from across the organization, and spend many hours educating our witness(es).

15.     We also view this subpoena—which is broad, and which requests our private, confidential internal communications—as highly invasive.  As drafted, the subpoena requests production of various internal communications with our members and partners, internal chats, notes, drafts, social media posts, and private email.  Our members use all of these channels to

communicate with each other and engage in robust, frank, and healthy discussion of AAP's work product.

16.     Based on my nearly 15 years of experience working with AAP members, I believe that our staff and members will communicate less, and less freely, if the subpoena were enforced. Already, just the service of this subpoena, and the prospect that we may be required to produce internal messages and communications, has chilled our internal communications.  My previous work in AAP State Advocacy required the ability to have honest, open discussions about policy issues and then strategize with colleagues and partners on how best to approach issues and provide guidance to AAP chapters, AAP committee, AAP councils, AAP sections, and other AAP entities.  The subpoena has greatly hampered our ability to engage in those discussions.  I am anxious of updating my colleagues on the current state of affairs around gender-affirming care in Florida for concern of those open discussions being pulled into court.  I am reluctant to seek guidance from colleagues or my previous supervisor on this issue for concern of bringing them under the umbrella of the subpoena.  The answer has been to not update colleagues out of trepidation and not to seek guidance.

17.     During discussions on the State of Florida's efforts regarding gender-affirming care, we were required to be very cautious about communications between us and the Florida Chapter of the AAP out of concern that those discussions could be pulled into court as well.  We have since had to take a more cautious approach in other states as well on this issue, thereby greatly diminishing our ability to engage in open discussions with state AAP chapters on how best to advocate against efforts to ban gender-affirming care.  State AAP chapters are small, with very limited budgets and staff.  They rely on us to be able to provide guidance and have open

discussions on advocacy strategies.  Since the subpoena was issued, that ability has greatly diminished.

18.    The subpoena is not just an issue for myself and other AAP staff; it also directly effects the ability of our physician-member experts to volunteer and provide their expertise.  The AAP is an evidence-based, policy-driven organization and we rely on our physician-member experts to develop our policy statements, clinical reports, and technical reports.  Physician members with expertise in gender-affirming care have to be very cautious in the political environment surrounding gender-affirming care and the subpoena has added to that burden.  The subpoena has made it extremely difficult to seek out our physician-member expertise on gender-affirming care because we risk putting those physician-members under the umbrella of the subpoena.  Our physician-members have been harassed and threatened for providing this care and many are unwilling to engage in public support or serve as spokespersons on the issue for the AAP.

19.    I am also concerned that our staff and members will avoid communicating with each other, and that new members will fear joining, if they know their private emails and comments shared with us will become public fodder in contentious policy debates and potentially subject them to harassment.

20.    This subpoena has also created a notable chill on our educational efforts, which aim to benefit all pediatricians and their patients.  As a result of this subpoena, whenever AAP prepares to submit a new amicus filing, send a letter to the government, or issue a new policy statement, our board now considers whether this will open us up to a similarly invasive subpoena from those who oppose our policy positions.

21.     Open, honest dialogue is also essential to the accuracy of our work product and practice recommendations, which pediatricians use every day to inform their medical decision-making.  We work with dozens of pediatric care experts every year to understand the latest science, and to review and edit our publications materials.  These experts are volunteers, and do this work out of a desire to help improve pediatric care.  Having personally worked with many of them for years, I know that many would think twice before volunteering their expertise if their confidential feedback could be shared with the world.  Our ability to receive candid feedback depends on the confidence that peer reviews and communications with AAP will not be publicly disclosed.  Based on my experience, I believe enforcement of this subpoena will reduce the quality and accuracy of our work product, which in turn will worsen the care that our pediatrician members provide to their patients across all health domains.

App_1060

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Itasca, IL, on January 10, 2023.



American Academy of Pediatrics

8

Tab U

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                                  Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## DECLARATION OF JOSEPH ZANGA, M.D.

     I, Joseph Zanga, M.D., hereby declare and state as follows:

     1.     I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this declaration and would testify completely to those facts if called to do so.

     2.     While my curriculum vitae (attached) outlines my background and expertise, I here provide a few details as amplification.

     3.     After graduating from college with a major in Biology and a minor in Philosophy and Theology (Ethics), I matriculated to Medical School where I quickly determined that my career path would be to care for children in the context of their families.

     4.     After Medical School my Internship and Residency led me to an academic career beginning with a further year of education as a Fellow in Community Pediatrics. Though active in the direct care of children in the context of their families, my work in academic centers teaching premedical (college), medical, nursing and other students, pediatric and family medicine residents, as well as post-graduate physicians and others, made me a lifelong student of medicine in all its varied iterations. This is how I came to work with adolescents, work in and direct programs in Child

Abuse/Child Protective Services, build a Community Coalition to end human trafficking, and in all of these areas studied the physical, mental, and emotional development of children to young adulthood.

5.      I continue, even in retirement, to do so, serving for a time as Health and Safety Chair for a 3 county Boys and Girls Club and as a member of my County Community Resilience Collaborative, among other activities where my education and experience might be useful.

6.      I have been retained by the Defendants in the case to describe my experience with the American Academy of Pediatrics (AAP), to express my opinion regarding the AAP's decision-making process for positions taken by the AAP regarding gender dysphoria treatments, and to express my opinions about current, non-science-based approaches, to gender dysphoria in children and adolescents.  If called to testify in this matter, I would testify truthfully based on my almost 50 years of pediatric study about, experience with, and knowledge of, the health and being of children and adolescents.

7.      I am being compensated at an hourly rate of $400 per hour for my time preparing this declaration. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

8.      I have been a Fellow of the AAP for about 50 years having joined because of their role as a defender of the health and well-being of children. I joined because of the high regard in which it was held by my professors and colleagues. I joined to receive quality continuing education and become involved in the work it was doing on behalf of children. Over the years I've encouraged many pediatricians, and pediatricians-in-training to join. While still an AAP Fellow, and participant in AAP activities, I have become concerned about its direction in recent years.

9.      During these 50 years the AAP has grown from 30,000 or so members to about 67,000 members. (Please note that **Fellows** are Board Certified Pediatricians while **members** include students, Residents, pediatric dentists, and others working with children. Members also include

pediatricians and others in Canada, Mexico, and other nations. There are more Board Certified Pediatricians in the USA than Fellows of the AAP. So the 67,000 members aren't all the US pediatricians.

10.     The AAP has also grown from a small office in Evanston, to a new, quite large, building in Itasca, and a smaller office in Washington, DC, with a combined staff compliment in the hundreds. Member dues are the bedrock of support but there is increasing funding from government, foundations, and the pharmaceutical industry.

11.     Distressing to me and other members is a bent towards what was termed "political correctness" in issues such as gender dysphoria.

12.     When an issue of concern impacting children is brought to its attention, the AAP considers the development of Policy to address it. The process usually begins with the Board of Directors (BOD) which refers the issue to a standing Committee (usually), Council, or Section Executive Committee to develop a Statement for publication. Committees have 10 to 15 members, the majority of whom are Fellows chosen by the BOD from AAP Chapter recommendations. There are also non-Fellow members who may or may not be Pediatricians. When completed, the Statement is referred back to the BOD for discussion, perhaps review by other relevant Committees, etc. for their opinion, and then a BOD vote. If a majority approves, the Policy is published as a product of the AAP, referencing the Committee, etc. and the principal author.

13.     The process is therefore internal and involves none of the other AAP Fellows/Members who are not Committee, etc. members. The voting Board is composed of **17** members with one elected by Fellows in each of the 10 AAP geographic Districts. There are 3 at-large members elected nationally and a 5 member Executive Committee, 4 elected nationally, and the employed CEO. There is no review or vote by the remainder of the AAP membership.

14.     From the above (#12 &-#13) AAP Policy cannot be said to reflect opinions/beliefs of all, or even a large cross-section of, even AAP members. There is one potential exception to this and that is the Annual Leadership Forum (ALF). Occurring in the late Summer to early Autumn of each year, the ALF brings together Chapter officers, Committee (etc. Chairs, the BOD, and others to review Resolutions, submitted by AAP Fellows, Chapters, etc., requesting that the AAP take action on an issue. The Resolutions, if approved, are only advisory to the BOD but do call BOD attention to issues.

15.     With respect to the Gender Dysphoria issue, Resolutions were submitted to the ALF in 2021 and 2022. In 2021, Resolution 33 asked the AAP to study further the science of this children's issue currently presented as AAP policy. It was written with abundant referenced science and an extensive bibliography. In the Reference Committee (B) to which this resolution was assigned, it received 50 yes votes, 12 no votes, and perhaps 10 abstentions. At 80.65% it had about the highest support of any resolution in Reference B, yet the Committee "Had No Recommendation" (neither for nor against it being presented to the entire ALF) and the resolution then disappeared, never apparently brought to the main voting session. A similar resolution in 2022, simply again asking the AAP to study the issue, was rejected on procedural grounds and never presented at the ALF.

16.     Many wonder why this potential objection to the AAP position of transgender affirmation was treated so unscientifically and undemocratically. This is quite opposite my past experience with the AAP and the ALF (then called the ACF), as in the past there was always vigorous discussion of controversial issues. For the proposal on this issue, at least in 2021, there seemed to be little controversy. The Reference Committee members overwhelmingly wanted it presented to the ALF.

17.     So why is the AAP so set in their defense of children/adolescents being allowed to begin transitioning at almost any age. Is this in the best interest of children? The simple answer is "no".

18.     My first written statement on the issue, after much research, *First Do No Harm* (attached), was published in my local medical society newsletter in July of 2018 and was updated and republished in the Spring 2020 AAP Senior Bulletin. What was written then is still true today. In outline form here are the continuing/expanded reasons for my concern:

a)  As I noted in #4 & #8 above, Pediatricians, guided by the AAP, have always provided care for children in the context of their families. Why is the AAP now not discouraging, or perhaps even encouraging, schools and others working with children to keep parents uninformed about transitioning ideation and actions?

b)  From the start of my pediatric education, I was taught that parents are the decisions makers for their children as children/adolescents are too immature and inexperienced to make potentially life altering decisions.

c)  In the 1990s, science verified what was long ago known and taught to pediatric trainees in the 1960s – 1980s, that the brains of children are incapable of making long term, life changing, decisions until their early to mid-20s.

d)  The AAP as always held firmly to this position from its origins as an organization. We expected that it would do so even more with science documenting the rightness of this approach.

e)  For the most part the AAP does teach that children need parental, and often pediatrician, guidance in important matters. We also articulate many "thou shalt nots" directly to youth. We tell them that they should not drink (alcohol), use tobacco products or other drugs, to avoid tanning beds, not operate or ride with

another on an ATV, and refrain from excessive media use, among other activities. We make clear that if a child, usually an adolescent, comes to us seeking diet advice or medication for a perceived body image problem (anorexia) our approach is to seek out the underlying problem and counsel, or refer for counseling, to correct the unreasonable thinking and "cure" the child. We do not "affirm" their body image problem and assist them in losing weight. We do not provide diet pills or weigh loss surgical procedures. There are other things we would not recommend no matter the request of the child or parents (growth hormone to improve sports performance, weight loss to wrestle in a lower weight category, are among these).

f) It is at least puzzling then that we do precisely that when a youth, incapable of making such a decision, requests to transition to the opposite sex. This is especially concerning when good studies have shown that the desire to do this disappears in most $(80 - 90\%)$ after passing through puberty or by late adolescence.

g) As this is our standard for care for almost all other issues it is distressing to me that the AAP recommends that we affirm a child's desire to transition, provide help to do so, and works to prohibit counseling to cure the desire at its root even to the extent of supporting the legal punishing of counselors who might provide that service. This despite knowing that appropriate counseling can work to dissipate gender dysphoria

h) In addition, the AAP seems to ignore the potential harms which might accrue, some of which may be impossible to know at present. We do know however:

   i. That puberty-delaying or gender-affirming hormone therapy, diminishes bone mineral density, at least in the short term.

ii.   That many of the drugs used increase blood pressure, risk of obesity, cardiac disease, blood clots, strokes, diabetes, and cancers. They also have deleteriously effects on the (presently immature and malleable) brain. Unfortunately, for none of these do we have long term studies, though short term studies and projections from adult are not favorable. It is inappropriate medical care to experiment on youth in this fashion, waiting for years or decades to learn if we were right or wrong.

iii.   That even the easily observable immediate ill effects seem to be irreversible.

iv.   That the basic premise is scientifically impossible and dangerous. We are born with every cell of our body unmistakably male or female. That cannot be changed by drug or surgical manipulation, so no boy can ever be a girl or girl be a boy. Since we know that males and females respond to medications differently and present with illnesses in different ways (a heart attack, or Type 1 Diabetes where girls are more likely to have higher A1C levels than boys when first diagnosed and continued to have higher levels after treatment begins. Girls also need higher basal insulin and total insulin doses than boys, for instance), imitating the opposite sex can lead to improper treatment or a missed diagnosis

v.   That increasing numbers of those who have transitioned are attempting to retransition.

vi.   That rates of suicide are twenty times greater among adults who've used cross-sex hormones and/or have undergone sex reassignment surgery, even in Sweden which is among the most transgender

affirming countries.

vii:    That several "developed" nations, including the United Kingdom, Sweden,

Finland, and France have all taken steps to pull back on transgender

medical treatments for seemingly gender-dysphoric children.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day

of September, 2022.

Respectfully submitted,

Joseph Zanga, M.D.

8

CURRICULUM VITAE

1      Joseph Robert Zanga, MD, FAAP
2      Chief of Pediatrics – Columbus Regional Health (Retired - July 2015)
3      President, 1997–1998, American Academy of Pediatrics
4      President, 2002 - 2007, American College of Pediatricians

1. PERSONAL INFORMATION:

   1.1 Business Address: 2031 Long Point Trail
                        Sanford, NC 27332
                        919 343 2003

   1.2 Married to:      Christine E. Zanga (1969)
       Children:      Catherine A. Zanga, JD (Deceased 2014)
                        Joseph R. Zanga, Jr., MD

2. LICENSURE:

   2.1 Licensed in the State of Georgia #062014 (Inactive)
   2.2 Licensed in the State of North Carolina #2003–00108

   2.3 Licensed in the State of Illinois #036–101427 (Inactive)
   2.4 Licensed in the State of Louisiana #12064R (Inactive)
   2.5 Licensed in the Commonwealth of Virginia #2282 (Inactive)
   2.6 Licensed in the State of New York #119949 (Inactive)

   2.7 Diplomat of the National Board of Medical Examiners
   2.8 American Board of Pediatrics, Certification #20986
   2.9 Pediatric Advanced Life Support (PALS) Provider and
       Instructor Credentialed, 1989, Re-credentialed, 1992, 1995

3. EDUCATION:
   3.1 Loyola University – Stritch School of Medicine, MD degree conferred June 1971
   3.2 Fordham University – New York City B.S. Biology awarded June 1966

4. POSTDOCTORAL TRAINING:

   4.1   Certificate in Health Care Management, Loyola University Chicago, June 20, 2001

   4.2   MCH/APA National Faculty Scholars Development Program, 1999–2001

   4.3   Ambulatory Pediatric Fellowship, 1974–75, Robert Haggerty, MD, Chair, and Evan
       Charney, MD, Program Director, at Strong Memorial Hospital of the University of
       Rochester, Rochester, New York

   4.4   Chief Residency in Pediatrics, 1973–74, William Laupus, MD, Chair, at the Medical
       College of Virginia, Richmond, Virginia (Now VCU School of Medicine)

   4.5   Pediatric Residency, 1972–73, William Laupus, MD, Chair, at the Medical College of
       Virginia, Richmond, Virginia (Now VCU School of Medicine)

   4.6   Pediatric Internship, 1971–72, David Yi–Yung Hsia, MD, Chair, at the Loyola
       University Medical Center, Maywood, Illinois

5. PAST ACADEMIC APPOINTMENTS:

5    Chief of Pediatrics – Columbus Regional Health (Retired - July 2015)
6            Clinical Professor of Pediatrics – Medical College of Georgia
7             Clinical Professor of Pediatrics – Philadelphia College of Osteopathic Medicine
             Clinical Professor of Pediatrics – Mercer University School of Medicine

5.1   Assistant Dean for Primary Care and Director, Office of Generalist Programs, East Carolina Brody School Of Medicine, Max and Catherine Joyner Endowed Professor in Primary Care, 2003(January)– Retired 2009 (December)

5.2   Chair, Department of Pediatrics, M. C. Clark Endowed Professor of Pediatrics, Loyola University, Stritch School of Medicine, 2000(January) –2002(December)

5.3   Vice Chair, Department of Pediatrics, Louisiana State University Medical Center 1997(January)–1999(December)

5.4   Professor of Pediatrics and Emergency Medicine with Tenure, LSUMC (Associate Appointment, Tulane Medical School) 1997–1999

5.5   Professor of Pediatrics and Emergency Medicine with Tenure, Virginia Commonwealth University/Medical College of Virginia, 1996

5.6   Professor of Pediatrics with Tenure, Medical College of Virginia, 1987–1996

5.7   Chair, Division General Pediatrics and Emergency Care, Medical College of Virginia, 1987–1996

5.8   Director, Virginia Injury Prevention Center, Medical College of Virginia, 1987–1996

5.9   Director, Developmental/Behavioral Fellowship, Medical College of Virginia, 1986–1993

5.10  Director, Community Pediatric Fellowship, Medical College of Virginia, 1979–1993

5.11  Associate Professor of Pediatrics, Medical College of Virginia, 1978–1987 (Tenure granted 1981)

5.12  Director, Section of Ambulatory and Emergency Care, Department of Pediatrics, Children's Medical Center, Medical College of Virginia, 1978–1987

5.13  Project Director, Health Underserved Rural Areas Program, Department of Pediatrics, University of Virginia Medical Center, 1976–1978

5.14  Assistant Professor of Pediatrics, University of Virginia, 1975–1978

5.15  Project Director, Children and Youth Project, Department of Pediatrics, University of Virginia Medical Center, 1975–1978

5.16  Coordinator, Ambulatory Pediatric Fellowship Program, University of Virginia School of Medicine, 1975–1978

5.17  Instructor in Pediatrics, University of Rochester, 1974–1975

6. MEMBERSHIPS:
6.1 Georgia Chapter of the American Academy of Pediatrics, 2009 - 2019
        Board of Directors – Permanent Adviser
        Fall CME Program Committee, 2009 – 2019
             Chair – 2011, 2014

Honorary President (Elected by the Board) June 2016 – June 2017
Georgia Pediatric Health Improvement Coalition Board, 2011 – 2017
Co-Chair IT/Telemedicine Committee, 2012 - 2017

6,2   Medical Association of Georgia, 2009 – Present (Life Member)
Task Force on Health Insurance and Medicare (2018)
Muscogee County Medical Society
Executive Committee and Chair Program Committee, 2010 - 2013
Elected Delegate to Medical Association of Georgia, 2011 – 2019

6.3   Georgia Alliance of Community Hospitals 2010 - 2014

6.4   American College of Pediatricians (Board of Director – 2002 – 2014)
Member Founding Board (2002)
President 2002–2007 (Re Elected 2005)

6.5   North Carolina Pediatric Society/NC Chapter of the American Academy of Pediatrics,
2003–2010, 2019-Present

6.6   American Medical Association, 1995-Present

Section on Medical Schools – BSOM elected faculty representative, 2004-2009

At-Large member, 2009 - 2011

Region 4 (Southeast) Medical Student Section – Elected Faculty Advisor, 2008 - 2010

6.7   North Carolina Medical Society, 2003–2010, 2019 - Present
Pitt County Medical Society Delegate, 2004-2009

Family and Public Health Committee, 2005-2009

6.8   Medical Institute for Sexual Health, Board of Directors, 2001–2005

Advisory Board – 2019 - Present

6.9   Ambulatory Pediatric Association, 1978–2013

6.10   American Academy of Pediatrics (Life Fellow)

Past Presidents' Advisory Committee (Founding Chair), 1998 - Present
Chair, Committee on Board Compensation 2000–2001
Chair, Executive Committee, Section on Bioethics, 1999–2003,
Section on Bioethics Nominating Committee, 2003–2005
**President  1997–1998**
Vice President/President Elect 1996–1997
Board of Directors, 1989–1998
Advisory Committees to the Board on Membership and 5 others, 1989 - 1995
Chair, Advisory Committee on Research, 1992
Chair, Advisory Committee on Membership, 1993
Chair, Advisory Committee on Development, 1994
Advisory Committee to the Board on Strategic Planning, 1992–1994, 1997–1998
Chair, District IV (Southeast), 1989–1995
Alternate District Chair, District IV, 1988–1989
Chair, Founding Chair, Section on School Health, 1987–1989
Council on Sections, 1987–1989
Committee on School Health, 1981–1987; Chair, 1983–1987
Council on Child and Adolescent Health, 1983–1987

Sections on: Bioethics, School Health

6.11 Virginia Pediatric Society/Virginia Chapter of the American Academy of Pediatrics
Honorary Life Member – Voted 1997
Chair, Council on Child and Adolescent Health 1988–1990
Chapter President – 1985–1988
Chapter Vice President – 1982–1985, Secretary–Treasurer: 1979–1982

## 7. AWARDS/HONORS:

7.0   *Master of the College* - American College of Pediatricians – October, 2017

7.1   Honorary President (2016 – 2917) – Georgia Chapter AAP – June 10, 2016

7.2   The Outstanding Clerkship Director – Mercer University School of Medicine Class of 2016, March 18, 2016

7.3   Columbus Regional Health Physician Recognition Award 2015 – Nominee for Physician of the Year in Teaching

7.4   Certificate of Appreciation – Columbus State University Competitive Premedical Studies Program. March 19, 2015

7.5   The Outstanding Pediatric Faculty Award – Mercer University School of Medicine Class of 2014, May 1, 2014 and Mercer Class of 2015, March 20, 2015

7.6   Excellence in Medical Education Award – Georgia Campus - Philadelphia College of Osteopathic Medicine, April 9, 2010

7.7   Outstanding Contribution Award (Teaching) – Georgia Campus - Philadelphia College of Osteopathic Medicine, 2009, 2010/2011

7.8   Elected to Rotary International, Rotary Club of Columbus (GA), 2009

7.9   New Student Organization of the Year Award, ECU Student Leadership Awards Banquet, April 27, 2008, for the Rural Health Care Volunteer Society (Faculty Adviser)

7.10   Guest of Honor and Keynote Speaker, Alpha Epsilon Delta Pre-Health Honor Society, Induction Ceremony, April 19, 2008

7.11   Keynote Speaker, The Schweitzer Fellows Celebration of Service (Induction Luncheon), 2007 and 2008

7.12   Dedication Award (Highest Honor), BSOM M2 Class, April 10, 2008

7.13   Best Doctors in America 2000-2012, North Carolina Top Doctors (Pediatrician) 2021

7.14   AMA Physician's Recognition Award with Commendations in CME. 2004 – 2008.

7.15   National Health Services Corps "Spirit of the Corps" Award presented at the 2007 Ambassador's Conference: Training to Serve, July 27-28, 2007, Memphis, Tennessee.

7.16   Guide to America's Top Pediatricians, 2004 – 2008, 2014 Editions.
Consumers' Research Council of America.

7.17   Title of Professor of Honour, Senate of the University of Medicine and Pharmacy of Targu Mures, Romania, September 12, 2005

7.18   Business North Carolina Magazine, Top Doctors, 2004, 2005

7.19   Award in Recognition – Brody (ECU) Rural Health Interest Group, April 7, 2003

7.20   Who's Who Among America's Teachers, 2002. 7th Edition

7.21   Visiting Professor, University of Hawaii Post Graduate
Program at Chubu Hospital, Okinawa, Japan, January, 2002

7.22   Visiting Professor, University of Medicine and Pharmacy, Targu Mures, Romania
Diploma of Honour, Awarded May 18, 2001

7.23   American Academy of Pediatrics, Section on School Health,
Milton J.E. Senn Award, October, 2000

7.24   National Center for Missing and Exploited Children,
Rainbow Award, February 27, 1999

7.25   APA National Pediatric Faculty Development Scholar Awards, 1999–2001

7.26   Community Service Award, School of Medicine, VCU/MCV, May 18, 1996

7.27   Virginia Governors School, Commonwealth of Virginia,
Certificate of Commendation, August 4, 1995

7.28   Alpha Omega Alpha – Epsilon Chapter, 1991

7.29   Distinguished Service Award, Virginia Commonwealth University, 1988

7.30   Award for "Excellence in Medicine and Community Service,"
National Italian–American Foundation, October 11, 1987

7.31   Award in Appreciation – Human Growth Foundation, October, 1986

7.32   Annual Award for Outstanding Service to the Brain Injured,
MCV–VCU, Williamsburg, VA, June, 1985

7.33   American Academy of Pediatrics, Outstanding Service Citation, 1985

7.34   American Academy of Family Practice Teaching Recognition Certificate, 1980

7.35   Outstanding Pediatric Resident Award, 1973–74, Medical College of Virginia

7.36   Senior Award for Scholastic Excellence, June, 1971, Stritch School of Medicine


8. COMMITTEES - Columbus Regional Health

8.1 Columbus Regional Medical Group AOC, 2014 - 2015

8.2 Family Advisory Council (Founding Chair), 2013 - 2015

8.3 Continuing Medical Education Committee, 2009 – 2015

8.4 Pediatric Executive Committee, 2009 – 2015

8.5 Pediatric Strategic Planning Committee, 2009 – 2015

8.6 Family Medicine Internal Review Committee, 2011- 2015

Chair – Transitional Year Internal Review Committee, 2012


9. COMMITTEES – ECU/BRODY/PCMH:

9.1 Academic Affairs, 2002–2007

9.2 Faculty Sponsor, Rural Health Interest Group, 2002–2008

9.3 Faculty Sponsor, American Medical Student Association, 2002–2009

9.4 Brody Council Committee, 2003-2008

9.5 M1, M2, M3, M4 Curriculum Committees, 2003–2008

9.6 Executive Curriculum Committee, 2003–2008

9.7 MD/7 Advisory Committee, 2004–2008

9.8 Chair, Family Medicine Chair Search Committee, 2004–2005

9.9 Delegate to Section on Medical Schools, AMA, Elected by BSOM Faculty, 2004–2009

9.10    Medical Ethics Committee, University Health Systems of Eastern North Carolina, PCMH, 2006–2008

   9.10.1   Chair, Pediatrics Ethics Consultation Subcommittee, 2008

9.11    Board of Governor's Distinguished Professor for Teaching Awards Review Committee, 2007–2008

9.12    Promoting Healthful Eating to Prevent Weight Gain in Young Adults Advisory Board, 2007–2008

9.13    Search Committee for the Associate Vice Chancellor for International Affairs, 2008

10.  COMMITTEES – LUMC:

10.1 Ronald McDonald Children's Hospital Committee of the Board, 1999; Chair, 2000–2002

10.2 Ronald McDonald House Board, 2000–2002

10.3 Medical Center Ethics Committee, 2000–2002

10.4 Medical Executive Committee, 1999–2002

10.5 Clinical Leadership Committee, 1999–2002

10.6 Marfan Syndrome Program Committee, Chair, 2000–2002

10.7 Committee on Academic Rank and Tenure, 2001–2002

11.  COMMITTEES – MCV/VCU:

11.1  University Council, 1993–1996

11.2  Executive Committee, Virginia Center for the Advancement of Generalist Medicine (RWJ Generalist Grant), 1992–1996

11.3  Medical Director, Child Protection Committee, 1980–1992; Member, 1992–1996

11.4  University Tenure and Promotion Appeals Committee, 1990–1993

12.  COMMITTEES – COMMUNITY:

12   Boys & Girls Clubs - Central Carolina – Board & Chair Safety Comm – 2020- 2022

12.1 Sanford, NC *Resilience Committee* – 7/2019 - Present

12.2 Sanford, NC, Crime Prevention and Youth Committee, 2019

12.2 Columbus Court Appointed Special Advocate (CASA) for Children, 2016 – 2019

12.3 Columbus Rotary *End Human Trafficking Now Coalition* 2015 - 2019

      Chair - November 2016 - 2019

12.4 Right from the Start – Building Strong Marriages and Families, Pastoral Institute, 2015 -2017

12.5 Columbus State University Leadership Council, 2015 - 2019

      College of Letters and Science – Strategic Planning Committee, 2017 - 2018

12.6 Columbus State University Competitive Pre-Med Advisory Group, 2015- 2019

      Community Director (Founder) Primary Care Shadowing Program

12.7 Project Launch Committee, Georgia State and Local Health Dept, 2015 - 2019

12.8 Columbus Symphony Orchestra Board, 2015- 2019

      Finance Committee – 2017 – 2019

12.9 Columbus Child Fatality Review Team, 2012 - 2013

12.10 Live Healthy Columbus/Strong 4 Life Obesity Project Convener. Founding Chair. Elected Chair, May 2011. Reelected, May 2012, Executive Committee 2013 – 2018

12.11 Georgia Pediatric Health Improvement Coalition Board (PHIC), Co-Chair IT/Telemedicine Committee 2011 - 2017

12.12 Georgia Children's Health Alliance – Executive Committee – Appointed by Lt. Governor Casey Cagle, 2010 - 2011

12.13 Family and Public Health Committee, North Carolina Medical Society, 2006–2009.

12.14 Member of the Board, Medical Institute, Austin, Texas, 2001-2006

12.15 Academic Advisory Board, Pfizer Scholars Grants for Faculty Development in Pediatric Health, 2000–2003

12.16 Chicago Rotary (Rotary One), Advisory Group on International Pediatric Health Services, 2000-2002

12.17 Reviewer, Center for Pediatric Emergency Medicine, National Child Protection Education Project, 2000–2003

12.18 Board of Directors, Vice President, Commonwealth Care of Virginia, Inc., 1995–1996

12.19 Board of Directors and Executive Committee, St. Joseph's Villa, 1993–1996 Chair–Medical Advisory Committee, 1995–1996

12.20 Managed Care (Medallion) Medicaid Advisory Board, State Department Medical Assistance Services, 1992–1996

12.21 Virginia Bar Association Commission on the Needs of Children, Founding Member, 1986–1992

12.22 State Emergency Medical Services Advisory Council, Appointed by Governor Robb, 1982–1986 Reappointed by Governor Baliles, 1986–1988

13. ADMINISTRATIVE EXPERIENCE:

13.1  Pediatric Clerkship Program Director, Mercer University School of Medicine, Columbus Campus, 2014 - 2015

13.2  Chief of Pediatrics, Columbus Regional Healthcare System, 2009 – 2015 (Retired)

13.3  Adjunct Professor in the Office of Interdisciplinary Health Sciences Education, Division of Health Sciences, Brody SOM, 2004–2008.

13.4  Director, Office of Generalist Programs, Brody SOM, 2002–2008

13.5  Faculty Mentor for Junior Faculty BSOM from: Pediatrics, IM, FM, 2003–2008

13.6  Medical Director, Ronald McDonald Children's Hospital, 1999–2002

13.7 Chair, Ambulatory Pediatric Division, LSUMC, and Director Pediatric Emergency Medicine at Charity Hospital for LSU and Tulane, New Orleans, LA, 1997–1999

13.8 Chair, Division of General Pediatrics and Emergency Care, Medical College of Virginia, 1987–1996

13.9  Director, Section of Ambulatory and Emergency Care, Children's Medical Center, Medical College of Virginia, 1978–1987

13.10  Medical Director – PruCare (MCO) of Richmond, 1987–1990
Chair, Physicians Advisory Committee
Chair, Quality Assurance Committee

Chair, Utilization Management Committee
Member, Executive Committee
Member, Pharmacy and Therapeutics Committee

13.11  Medical Coordinator, Richmond Juvenile Detention Home, 1986–1996

14. CONSULTANCIES:

14.1  Medical Advisory Board for the DiscoveryHealth.com Disease and Conditions Encyclopedia, DiscoveryHospital.com and HealthTeacher.com, 2007– 2009

14.2  National Advisory Child Health and Human Development Council, NIH/NICHD, 2006–2011

14.3  Chair, Lysosomal Storage Disorders (LSD) Education Initiative, 2004–2006
Chair, LSD Pediatric Education Development Project, 2004

14.4  National Advisory Council of the National Center for Primary Care, David Satcher, MD, PhD, Director, 2003–2010 (reappointed 3 times)

14.5  Johnson & Johnson Consumer Products Co. Pediatric  Advisory Board, 2002–2005

14.6  Human Growth Foundation Medical Advisory Council, June, 1986–1991

15. BIBLIOGRAPHY:
### 15.1  *Articles*

Zanga, J.R.  "First Do No Harm" AAP Section on Seniors Bulletin. Spring 2020
Vol 29 (2); 20-21

Zanga, J. R. "First Do No Harm" Muscogee County Medical Society *Bulletin* June 2018

Vol. 63 (4); 18-19

Zanga, J. R. "The Medical Home" Muscogee County Medical Society *Bulletin* April 2014 Vol.59 (4);14-15

Zanga, J. R. "The 'Affordable' Care Act (ACA)" Muscogee County Medical Society *Bulletin* May 2013 Vol. 58(5); 6-7

" June, P.L., Trumbull, D.A., Zanga, J.R. "Regarding 'The Partial Death of Abortion Rights' *Linacre Quarterly,* August 2010. Vol. 77(3); 245-246

Zanga, J. R. "The HPV Vaccine: Deciding for our Children." *Family North Carolina*, May/June 2007

Zanga, J,R., "The Adolescent Brain: Implications of Sexuality Education." *Linacre Quarterly*, February 2007. Vol. 74 (1);  68-75

Bissonette-Pitre, L., et al (...Zanga, J.R). "Executive Summary: To Prevent and Protect: Report of the Task Force of the Catholic Medical Association on the sexual abuse of children and its prevention." *Linacre Quarterly*, November 2006; 293-296

Zanga, JR, Moskop, JC. Obesity in kids: when appeals to vanity fail. *Virtual Mentor*. October 2006. 8:659-662. Available at: http://www.ama-assn.org/ama/pub/category/16855.html

Collier DN, Zanga JR. Teaching residents and students to help patients and their families with obesity. *Virtual Mentor*. October 2006. 8:663-666. Available at: http://www.ama-assn.org/ama/pub/category/16856.html

Bissonette-Pitre, L., et al (...Zanga, J.R). "To Prevent and Protect: The Sexual Abuse of Children and its Prevention." CMA, 2006

Collier D, Perkin RM, Zanga JR. "Clinical Case 3: Obesity as Medical Neglect: Should Doctors Report?" *Virtual Mentor*, August,2003. http://www.ama–assn.org/ama/pub/category/10832.html

Savage R, Perkin RM, Zanga JR. Clinical case 4: Palliative Care for an Infant with Short Bowel Syndrome and Advanced Liver Disease. *Virtual Mentor*. August 2003 http://www.ama–assn.org/ama/pub/category/10830.html

Zanga, J.R., "One Must Get Involved." (Invited Article) *AAPI Journal*, 2:5, 1998

Bar-on, M. and Zanga, J.R.: "Bronchiolitis." *Primary Care*, 23:4, 1996

Bar-on, M. and Zanga, J.R: "Child Abuse: A Model for the Use of Structured Clinical Forms" *Pediatrics*, 98:1996

Zanga, J.R., "Case in Point." *Bioethically Speaking*, 4:9, 1996

Zanga, J.R.: "The New Plague – An Epidemic of Violence." *Pediatric Rounds: Growth Nutrition Development*, 3:8, 1994

Kroner, B.A.: Scott, R.B., Zanga, J.R.: "Poisoning in the Elderly: Characterization of Exposures Reported to a Poison Control Center." *J. Am. Ger. Soc.*  41:842, 1993

Zanga, J.R.: "Should There Be Universal Childhood Vaccination Against Hepatitis B?  Part 2: A Rebuttal." *Pediatric Nursing*, 19:5, 1993

Zanga, J.R.: "Child Abuse:  The Real Numbers." *Virginia Medical*, 119: 110–112, 1992

Zanga, J.R.: "Hepatitis B:  A Controversial Vaccine (or a Vaccine Controversy?)." *Pediatric Rounds: Growth Nutrition Development*, 1:6–8, 1992

Zanga, J.R. and Butts, F.M.: "Tympanometry in The Schools – Is It Worth the Effort?" *School Nurse* 7, 36–38, 1991

Hoekelman, R.A., Napolitano, L.V., Zanga, J.R.: "Getting More from Preadolescent Exams." *Patient Care* 15, 91–108, 1991

Zanga, J.R. and Oda, D.S.: "School Health Services." *Journal of School Health*, 57:413–416, 1987

Zanga, J.R.: "A Perspective from the Private Sector on the Health Care of the School Age Child." Conference Proceedings. *Health of School Age Children: Expectations for the Future*. University of Colorado, School of Nursing, 1984

Ogren, J.M. and Zanga, J.R.: "Sexual Abuse: Incidence, Complications, Evaluation and Therapy." *Virginia Medical*, 110:488, 1983

Zanga, J.R.: "What is the Risk of a Second Child Having Seizures?" "Is There Any Medication to Prevent Convulsions?" "Is Surgery Needed for an Umbilical Hernia?." in *500 Questions New Parents Ask*, Dell, New York, 1982

Zanga, J.R. and Becker, M.: "Dying on the Highways: Virginia's Children." *Virginia Medical*, 108:34,1981

Zanga, J.R.: "Importance of Immunization and Periodic Health Screening." Conference 14. Proceedings. December, 1980

Zanga, J.R.: "Tick Paralysis, Another Lethal Tick–Borne Disease." *Virginia Medical*, 106:443, 1979

Zanga, J.R.: "Immunizations: A Critical Problem in Preventive Health Care." *Virginia Medical,* 105: 436, 1978

Cunningham, D. and Zanga, J. R.: "Myiasis of the External Auditory Meatus." *J. Peds.*, 84:857, 1974

### 15.2  Letters

Zanga, J.R.: "Shots Are Not Abusive," *Peds* 60:384,1977

Zanga, J.R.: "Alternatives to the Intermountain Regional Poison Control Center," *Veterinary and Human Toxicology*, 22:394,1980

Zanga, J.R.: "Incentives for Technology – Intensive Medicine," *NEJM* 304:1307–C,1981

Zanga, J.R. and Bar–on, M.: "Don't Compromise the Medical Home," *Arch Pediatr Adolesc Med*,152:714,1998

Zanga, J.R.: "Removing Financial Barriers to Pediatric Care," *The New England Journal of Medicine*, 339:1,1998

Zanga, J.R.: "Sexual Abuse and Adolescent Pregnancy," *JAMA*, 281:6,1999

Zanga, J.R.: "Children and Adolescents should not Have Unrestricted Access to Morning– After Pill," *AM News*, 2/9/04

Zanga, J.R.: "Increasing Awareness of Genetic Disorders," *Contemporary Pediatrics*, 3/9/04

McConnell M., et all, Zanga J.R.: "The Effects of Marriage, Civil Union, and Domestic Partnership Laws on the Health and Well-being of Children," Pediatrics, November 2006, Vol. 118(5): p 2259

### 15.3    American Academy of Pediatrics Publications:

Zanga, J.R.: "Ethics Code Inconsistent Concerning Executions and Abortions." (Letter), *AMNews*, 2/28/05

Zanga, J.R.: "The Hospitality Counterpoint." Invited Commentary, AAP News, 1/1999

Zanga, J.R.: "Are There Moral Absolutes?" *Bioethics Newsletter*, Invited Commentary, January, 1999

Zanga, J.R.: "Preventive Health Care: Why it Needs to Be Studied." Child Health Care – *AAP Research Update*, 8:1, 1992

Zanga, J.R., et al: AAP Committee on School Health: "School–Based Health Clinics." *AAP News*, May, 1987

Dement, P.G., and Zanga, J.R., et al: AAP Committees on Sports Medicine and School Health "Physical Fitness and the Schools." *Pediatrics*, 80:449–450, 1987

Zanga, J.R., et al: AAP Committee on School Health: "Qualification and Utilization of Nursing Personnel Delivering Health Services in Schools." *Pediatrics*, 79:647–648, 1987

Zanga, J.R (Chair): Committee on School Health, AAP: "School Health: A Guide For Health Professionals." 2nd Edition, 1987

Zanga, J.R., et al: AAP Committee on School Health: "CPR Training in the School." *AAP News*, February, 1986

Zanga, J.R., et al: AAP Committee on School Health: "School Health Examinations." *AAP News*, February, 1986

Zanga, J.R., et al: AAP Committee on School Health and Burrell, P.A., et al: AAP Committee on Infectious Disease: "School Attendance of Children and Adolescents with HTLV III/LAV Infection." *Pediatrics*, 77:430–432,1986

Zanga, J.R., et al: AAP Committee on School Health: "Concepts of School Health Programs." *AAP News*, December, 1985

Zanga, J.R., et al: AAP Committee on School Health: "Home Instruction." *AAP News*, December, 1985

Zanga, J.R., et al: AAP Committee on School Health: "School Bus Safety." *AAP News*, February, 1985

Zanga, J.R., et al: AAP Committee on School Health: "Education to Strengthen the Family." *AAP News*, January, 1985

Zanga, J.R., et al: AAP Committee on School Health: "Health Education and Schools." *Pediatrics*, 75: 1160, 1985

Zanga, J.R., et al: AAP School Health Committee: "Guidelines for Urgent Care in School." *Pediatrics*, 74:148,1984

Zanga, J.R., et al: AAP School Health Committee: "Heat Stress and School Closings." *Pediatrics*, 74:313,1984

Zanga, J.R., et al: AAP Committee on School Health: "Alcohol Abuse Education in School." *AAP News*

Zanga, J.R., et al: AAP Committee on School Health: "Administration of Medication in School." *Pediatrics* 74:433, 1984

### 15.4   Books, Chapters, Monographs:

Zanga, J.R. Disorders of Temperature:  Hyper-and Hypothermia in:  Pediatric Hospital Medicine, 2nd Edition, 2008.  Perkin, R., Swift, J, Newton, D, and Anas, N. (eds Lippincott, Philadelphia), 2008, P101-104

Fitch, J.T., McIlhaney, J., Adam, M. Hagar, MD, and Zanga, J.R. (Contributors): "Sex, Condoms and STDs: What We Now Know." The Medical Institute for Sexual Health, 2002

Sanders, J. and Zanga, J.R., "Child and Adolescent Drownings in Virginia." *Potter and Perry's Fundamentals of Nursing*, Levin, M.A., Mosby–Year Book, Inc., Zanga, J.R.: "School Violence." *School Health Newsletter, AAP*, Fall, 1994

Bar–on, M., Foster, R., and Zanga, J.R.: "Hospital Protocol for The Recognition and Treatment of Child Abuse." *Virginia Department of Social Services*, 1993

Zanga, J.R. and Oda, D.S.: "School Health Services." *Readings in Community Health Nursing*, B.W. Spradley (MD) J.B. Lippincott Co., Philadelphia, 1991, P 435–443

Zanga, J.R., Blizzard, R, Falkner, F, and Muncie, H: "Monitoring and Evaluation of Growth and Growth Disorders in Primary Care Practice." *Clinical Courier*. SynerMed, NJ, August, 1990

Zanga, J.R.: "The School Age Child". *Ambulatory Pediatrics*, M. Greene and R. Haggerty (eds), W.B. Saunders Co., New York, 1990

Zanga, J.R. (ed): *Emergencies Pediatrics*. Interlivros Edicoes Ltda; Rio de Janeiro, 1988, Portuguese edition

Zanga, J.R. (ed): *Manual of Pediatric Emergencies*. Churchill Livingstone, Inc., New York, 1987 (Authored five chapters)

Spencer, C., Walker, D., and Zanga, J.R.: "School and the Handicapped Child." *Pediatric Clinics of North America*, October, 1986, p. 1251–1264

Zanga, J.R.: "Primary Care and Community Health Resources". *Pediatrics*, H. Maurer (ed), Churchill Livingstone, Inc., New York, 1983, p.155–167

### 15.5  Abstracts:

Bissonnette-Pitre, L., et al (…Zanga, J.R.). To Protect and Prevent: The Sexual Abuse of Children and its Prevention. The Catholic Medical Association, 2006.

Zanga, J.R.: "Mobile Health Care: Bringing Medical Care Home." The 23rd International Congress of Pediatrics, September 10, 2001

Gautier, K.B., Peck, G.Q., Ferrand, C., Collier, E.A., Sgritto, J., Kaye R.E., Zanga, J.R.: "Aerobic/Cross Training Program Improves Baseline Asthma and Fitness in Children."

*Southern Society for Pediatric Research*, 1997

Zanga, J.R.: "Cervical Spine Injury: A Rational Approach to Diagnosis." *Arch Pediatric Adolesc Med*, 150: p111, 1996

Sanders, J.K. and Zanga, J.R.: "Child and Adolescent Drownings in Virginia: A Population Based Study." APHA Annual Meeting, November 1,1994

Sanders, J.K. and Zanga, J.R.: "Injuries to Children: A Statewide System for Injury Surveillance in the Pediatric Office Setting." Second World Conference on Injury Control, Atlanta, GA., May 23, 1993

Sanders, J.K. and Zanga, J.R.: "Playground Safety Workshop." Second World Conference on Injury Control, Atlanta, GA, May 20, 1993

Sanders, J.K., Waring, E., and Zanga, J.R.: "Finding The Missing Data – A Statewide System For Injury Surveillance in The Pediatric Office." *American Journal of Diseases of Children*, 145: 416, 1991

Zanga, J.R.: "The Short Statured Child." Assoc. for the Care of Children's Health, Cleveland, Ohio, June 12–15, 1988

Henderson, E.L., Zanga, J.R., et al. "Physician Bias and The Interpretation of Rapid Tests For Group A Streptococcal Pharyngitis." *Am Jour Diseases of Children*, 142:405–406, 1988.

### 15.6    Posters and Media:

 Zanga, J.R. Champions for Children. Muscogee County Medical Society Bulletin, 55, 6, May, 2010

Forrow, L., O'Donnell, J., Irons, T., Zanga, J.R.: "Ideas in Action: The Schweitzer Fellows Program." Poster Presentation at AAMC, November 7-9, 2004

Zanga. J.R. (Work Group Chair): "Identifying Lysosomal Storage Disorders in Pediatric Practice – The Importance of Early Diagnosis." Speaker Slide Kit, Genzyme, Inc. 2004

 Sy, B. and Zanga, J.R.: "Subarachnoid Hemorrhage Secondary to Bleeding Carotid Aneurysm."  NC Pediatric Society Resident Poster Session, August 17-20, 2006

Cuellar, J.G., Zanga,J.R.: "Hearts-N-Parks: Salud para su Corazon." NHMA, Washington, DC, 2006

Kaplan SA, Merritt KB, Zanga JR, et al: "Healthy Smile, Healthy Child: A Pilot Study." North Carolina Pediatric Society, August 17-19, 2007

Fischer H, Zargham S, and Zanga JR: "Effects of Media Education on Children's Perceptions of Health Issues." BSOM/ECU Summer Scholars Research Day, August 18, 2008

Fischer H, Zargham S, and Zanga JR: "Effects of Media Education on Children's Perceptions of Health Issues."  AMA Medical Student Section Research Poster Session, AMA Interim Meeting, Orlando, Florida, November 8, 2008

### 15.7

Journal Reviewer, 2014 - Present. *Linacre Quarterly*

Journal Reviewer, 2007– 2013   *American Journal of Medical Genetics*

Journal Reviewer, 2006– 2014   *Journal of Palliative Care*

Journal Reviewer, 2005– 2013  *Journal of Medical Ethics (BMJ)*

Reviewer. *Ambulatory Pediatric Association's Educational Guidelines for Pediatric Residency*. (Revision), 2003

Editorial Advisory Board: *Children's Health and Safety Magazine*, 2000–2002

Journal Reviewer, 2000–2011. *Ambulatory Pediatrics*

Editor–in–Chief: *Pediatric Rounds: Growth Nutrition Development*, SynerMed, 1991-1995

Journal Reviewer, 1984–2011. *Pediatrics*

### 15.8   Lectures: *(Invited – Selected Topics)*

"The New Sexual Revolution: Protecting Children from the Dangers of Comprehensive Sex Education" Mathew Bulfin Educational Conference. Nashville, TN. February 26. 2022

"ACEs & Resilience: Biology of Stress & The Science of Hope" US HHS ACYF & FYSB Conference. *Creating a 2020 Vision*. June 4, 2020

"Telemedicine and School Based Health Centers" Muscogee County Schools SBHC Advisory Committee, June 21, 2018

"Is this the Face of Human Trafficking: Modern Slavery". Resident/Medical Student Noon Conference. Midtown Medical Center. Columbus Ga. Ga, February 20, 2018

"Human Trafficking – How We Can End It". Pediatric Grand Rounds – Bon Secours (St. Mary's Hospital) – Richmond, VA, October 31, 2017

"End Human Trafficking Now – Rotary's Role". Grand Rounds, Columbus Children's Hospital, Columbus, Ga, May 18, 2017

"The Future of Pediatrics". Columbus Children's Hospital, Columbus, Ga, Grand Rounds, June 23, 2016

"The Newborn Examination". Philadelphia College of Osteopathic Medicine, Atlanta, Ga, (4 hours for M2 Class), June 7, 2016

"Pediatric Emergencies". Philadelphia College of Osteopathic Medicine, Atlanta, Ga, (2 hours each for M1 & M2 Classes), April 5, 2016

"Community Roundtable Training on Domestic Minor Sex Trafficking - The Medical Issues". Columbus State University, April 19, 2016

"Evidence Based Medicine". Medical Society/Mercer Preceptor Conference, Columbus Regional/MMC, August 22, 2015

"Columbus – A Live Healthy City: Addressing Obesity as a Community." Carl Patrick Multidisciplinary Symposium, St Francis Hospital. Columbus, Ga, February 2, 2013

"Childhood Obesity and Diabetes." Columbus Diabetes University 2011, Columbus, Ga,

October 29, 2011

"The Obesity Conundrum." Georgia Perianesthesia Nurses Association, Peachtree City, Ga, September 17, 2011

"Live Healthy Columbus – Obesity." Partners in Education Conference, Columbus, Ga, September 7, 2011

"Special Populations: Caring for Chronically Ill Children." Columbus Metro Medical Response System, Fundamental Disaster Management, Columbus, Ga, September 29, 2010

"Five Things Children Would Change about Emergency Medicine." Pediatric Grand Rounds, Columbus Regional Healthcare System, Columbus, Ga, September 9, 2010

"Adolescent Brain Development: Legal and Societal Issues." Catholic Medical Association, Baltimore, Md, October 10, 2008

"Making the Case for Primary Care." 4th Annual NHSC Ambassadors Conference, Keynote Address,  Phoenix, Az,  July 26, 2008

"The Role of the Ambassador." 4th Annual NHSC Ambassadors Conference, Phoenix, Az, July 25, 2008

"Legal and Societal Issues in Adolescent Health." 7th National Meeting of the Medical Institute, Austin, Texas, July 9, 2008

"Freedom of Conscience in Clinical Practice." 7th National Meeting of the Medical Institute, Austin, Texas, July 8, 2008

"The NIH/NICHD:  An Overview." Critical Care Pediatric Research Network Committee, Bethesda, Md, March 26, 2008

"How you Gonna Keep 'em Down on the Farm?: Promoting Primary Care. AMA Section on Medical Schools, November 17, 2007

"Child Prostitution." National Advisory Council on Sexual Health, Sept 17, 2007

"Religion, Science, and Sexual Health." National Advisory Council on Sexual Health, Sept 17, 2007

"Internationalism in Medical Education." BSOM Medical Education Grand Rounds, January 11, 2007

"International Child Health: It's Not So Healthy." World Affairs Council of Eastern, NC. Great Decisions Program, 1/27/2007

"Encouraging Students to Primary Care Residencies: Bridging Supply to Meet Demand." SGSA, April 4, 2007, Little Rock, Arkansas

"Earth Day & 50th Anniversary Albert Schweitzer 'Declaration of Conscience.'" Town Commons Park, Greenville, NC. Sunday, April, 23, 2007

"Encouraging Students to Primary Care." National Health Services Corp Ambassador Conference, July 26-29, 2007, Memphis, Tennessee

"Vaccines and Sexual Health." National Advisory Council, National Center for Primary Care, Morehouse School of Medicine, May 8, 2007

"Five Things that Children Would Change about Emergency Medicine." BSOM, Peds

Emergency Grand Rounds. PCMH Auditorium, August 28, 2007

"Bringing International Health to Eastern North Carolina: Why Should Our Trainees Study Abroad?" World Affairs Councils of Eastern North Carolina, October 2006

"Sexuality and the Media." – National Advisory Council, National Center for Primary Care, Morehouse SOM, May 23, 2005

"Abstinence Education Programs." – Medical Institute Annual Conference, Moderator  and Commentator, Washington, DC, May 27, 2005

"Why is This Child Coughing?" – 27th Annual MCU/VCU Pediatric Primary Care Conference, Virginia Beach, VA. July 23, 2005

"Evaluation of Chronic Abdominal Pain." Workshop – 27th Annual MCU/VCU Pediatric Primary Care Conference, Virginia Beach, VA, July 23, 2005

 "Condom Integrity: Research Needs." – National Advisory Council, National Center for Primary Care, Morehouse SOM, July 26, 2005

"Why is this Child Coughing?" PRO BONO Course – Romania, American College of Chest Physicians and the University of Medicine and Pharmacy, Targu Mures, Romania, September 13, 2005

"Common Pediatric Illnesses Presenting as Rashes." PRO BONO Course – Romania, American College of Chest Physicians and the University of Medicine and Pharmacy, Targu Mures, Romania, September 13, 2005

"Evaluations of Fever in the Infant." PRO BONO Course – Romania, American    College of Chest Physicians and the University of Medicine and Pharmacy, Targu Mures, Romania, September 13, 2005

"The Role of the General Physician in Child Care." PRO BONO Course – Romania, American College of Chest Physicians and the University of Medicine and Pharmacy,   Targu Mures, Romania, September 13, 2005

"PICU Organization in the United States." PRO BONO Course – Romania, American College of Chest Physicians and the University of Medicine and Pharmacy, Targu Mures, Romania, September 13, 2005

 "Adolescent Brain: Implications of Sexuality Education." – Catholic Medical Association, 74th Annual Conference, Portland, OR, October 21, 2005

"The Declining Number of Generalists – Challenges in Medical Education." (with Bruce Johnson, MD), Workshop – Generalists in Medical Education Meeting, Washington, DC, November 5–6, 2005

"Health Disparities and the Uninsured." – AMSA Region 5 Conference,  Durham, NC, March 6, 2004

"The Diagnosis of ADHD Pediatrician's Role." – International Pediatric Congress, Cancun, Mexico, August 17, 2004

"Primary Care of Infants." – International Pediatric Congress, Cancun, Mexico, 8/20/2004

"The Developing World is Close to Home." – UNCC AMSA Chapter, Charlotte, NC,  September 10, 2004

"A Medical Practice Initiative." – National Advisory Council, National Center for

Primary Care, Morehouse SOM, September 21, 2004

"Lysosomal Storage Disorders." – The LSD Education Initiative, San Francisco, CA, October 9, 2004

"Sexuality Education in the Schools." – Section on School Health Symposium, AAP NCE, San Francisco, CA, October 10, 2004

"It Takes a Village: The Importance of Family in the Rearing of Children." – Annual Conference, Virginia Chapter, American Academy of Pediatrics, and the Children's Hospital of the King's Daughters, Williamsburg, VA, October 3–5, 2003

"The Telephone in Pediatric Practice." – Pediatric Grand Rounds, University of Illinois Medical School at Rockford, Rockford, IL, February 15, 2002

"Child Abuse." – Pediatric Grand Rounds, Alexian Brothers Medical Center, March 16, 2001

"The Future of Pediatrics." – Slovenian Pediatric Association, via Teleconference, March, 2001

"Child Abuse." – Annual Convocation, University of Medicine and Pharmacy, Targu–Mures, Romania, May 18–21, 2001

"The Role of the Department Chair." – International Pediatric Chairs Association Meeting, Beijing, China, September 8–9, 2001

"Pediatrics in the New Millennium." – Pediatric Grand Rounds, Jersey Shore Medical Center, Neptune, NJ, October 5, 2001

"Problems in the Practice of Pediatrics." – Department of Pediatrics Meeting, Elmhurst Hospital, Elmhurst, Illinois, March 28, 2000

"Child Abuse." – Pediatric Grand Rounds, Rush Medical School, 8/13, 2000

"Child Abuse." – Pediatric Grand Rounds, Lutheran General Children's Hospital, 8/22/2000

"Children of the World – An Underrepresented Minority" – The Shantilal C. Sheth Oration, 35th National Conference of The Indian Academy of Pediatrics, Kochi, India, January 8–11, 1998

"Development of Emergency Services in Pediatrics." – 35th National Conference of Indian Academy of Pediatrics, Kochi, India, January 8–11, 1998

"Child Abuse: The Pediatrician Role.", "Telephone in Pediatric Practice." and "Cervical Spine Trauma – A Rational Approach to Diagnosis." – 45th Annual Meeting of the Pediatric Section, Puerto Rico Medical Association, San Juan, Puerto Rico, February 13–16, 1998

"The Plight of Children and the Role of National Pediatric Organizations." – 18th Pan American Pediatric Congress, Santiago, Chile, April 27,1998

"Title XXI – What is the AAP Doing." – Pediatric Academic Societies' Annual Meeting, New Orleans, LA, May 4, 1998

"Presentation on the 10th Anniversary of the CHIP Program." Keynote Speaker. – Child Health Investment Partnership (CHIP) 10th Anniversary, Roanoke, Virginia, June

4,1998

"Child Abuse." – Louisiana Association of Nationally Registered Emergency Medical Technicians Educational Conference, Kenner, Louisiana, June 12–14, 1998.

"Minorities, Media and the AAP." – National Medical Association, Annual Meeting, New Orleans, Louisiana, August 1–5, 1998

"Pediatric AIDS, The Role of Pediatric Societies in Policy Making." – XX Congress of        the Federation of Pediatric Associations of Central America and the Caribbean, Panama City, Panama, November 16-18, 1998

"The Interconnectedness of Risky Behaviors." – Right Choices for Youth Conference, sponsored by Gov. George Bush, Austin, Texas – March 31, 1998

"Pediatrics Now and in the 21st Century." Visiting Professor – University of South Florida, February 6, 1997

"Pediatric Emergency Medicine in the USA." and "The Changing World of Academic Pediatrics." – Italian Pediatric Society, Bologna, Italy, June 13–16,1997

"AAP Update.", "Telephone in Pediatric Practice.", "Child Abuse." and "Guns and Children." – Seventh Annual Pediatric Symposium, Joe DiMaggio Children's Hospital, Fort Lauderdale, Florida, November 8–9, 1997

"Guns and Children: A Pediatric Epidemic." – Grand Rounds, All Children's Hospital,  St. Petersburg, Florida, December 12, 1997

"Health Care Reform." "Violence and Children – The Gun Epidemic." "Child Abuse – The Physician's Role." – Medical College of Georgia Annual Pediatric CME Conference, St. Simon Island, GA, July 18–20, 1994

"Adolescent Health: Strategies for Improving Health Status." speaker and panel moderator – Children's Defense Fund National Conference, Washington, DC, March 11, 1988

 "Meeting the Health Care Needs of Children in Schools." Keynote Address – National Association of School Nurses, Anaheim, CA, June 28, 1988

"School Based Clinics, Another View." – American Academy of Pediatrics Annual Meeting, New Orleans, LA, November 1–3, 1987

"Tort Reform." – American Academy of Pediatrics Annual Meeting, New Orleans, LA,  November 1–3, 1987

"School Based Health Clinics – Problems For the Future" and Panel Commentator for Research Papers on School Health Clinics – American Public Health Association Annual Meeting – Las Vegas, NV, September 29–30, 1986

"School Health" – Keynote address, Annual Conference on School Health, Yale University School of Medicine, New Haven, CT, March 20,1985

"Health Care for the School–Aged Child in the Next Decade." – National Conference on Health of the School Aged Child, April 12–14, 1984, Denver, CO

"Health Care of the School Aged Child" – National Maternal and Child Health Conference, Tyson's Corner, Virginia, March 17, 1982

"Health Education Process and Methodology: What It Is and How It's Done." – First National Conference on Rural Health Education, May 2–4, 1978, St. Louis, Missouri

 Zanga, J.R. and Martinez, J.: "Pathologic Analysis on Werdnig–Hoffman Disease Presenting as Diaphragmatic Paralysis: Report of a Case." – Cuban Medical Association Congress, Miami, Florida, 1975

***15.9  Other:  (Selected Items)***

*CBS This Morning*, August 23, 1994 Video Parenting Magazine, Nationally syndicated, 15 segments, 2001–2003

"House Call" – Monthly segment of *Noon News*, WWBT–TV Channel 12, 1991–1996

Volunteer Medical Director, Camp Easter Seal East, 1985–1996

Consultant – Pediatric Program Organization, St. Joseph's Hospital, Phoenix, AZ, March 23–25,1994

*Good Morning America,* September, 1990

Consultant – National Institutes for Mental Health – To develop AIDS Publication for Primary Care Physician, 1986–1987

"A Visit With the Pediatrician" – Weekly segment of *Good Morning Virginia*, WXEX–TV, Channel 8. 1980–1985

Regular Pediatric Columnist – *Woman's World Magazine*, 1980–1984

## 16.  GRANTS AS PRINCIPAL INVESTIGATOR

"Caring for the Elderly: House Calls." Pitt Memorial Hospital Foundation, 2008-2009
 $15,770

"Office of Generalist Programs." PCMH, Pitt County Memorial Hospital, 2002– 2008, $78,000 per year

"Childhood Injury Prevention for Family Daycare." DHHS, Maternal and Child Health Bureau, 1992–1993, $19,872

"Residency Training in General Internal Medicine and/or General Pediatrics." DHHS, U.S.

"Injury Prevention Grant." Virginia Department of Health, DMCH, 1987–1996, $185,000 per year

"Child Development Services." Virginia Department of Health, DMCH, 1988–1993, $165,000 per year

"Behavioral Pediatric Training Program." DHHS, Maternal and Child Health Services, 1986–1992, $630,000

"Virginia Auto Safety Alliance. Traffic Safety Now." 1986 and 1987, $300,000,

 "Community Grant" US Public Health Service, 1985–1988, $475,000 plus indirect costs)

Updated: 9/12/2022