**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON AMERICAN ACADEMY OF PEDIATRICS, et al., | Misc. Case No. 23-mc-00004-CJN |
| AUGUST DEKKER, et al.,<br><br>           Plaintiffs,<br>v.<br><br>JASON WEIDA, et al.,<br><br>           Defendants. | Northern District of Florida<br>Case No. 4:22-cv-325-RH-MAF |

**REPLY OF NONPARTY GROUPS IN SUPPORT OF JOINT
MOTION TO QUASH RULE 45 SUBPOENAS AND FOR FEES**

The Nonparty Groups' Motion to Quash (Doc. 1-26) ("Mot.") explained in detail how the subpoenas served on those 18 organizations[1] by Defendants Jason Weida and the Florida Agency for Health Care Administration ("Defendants" or the "State") do not seek information relevant to the underlying litigation,[2] impose substantial and undue burdens on the recipients, and infringe the Nonparty Groups' free speech and associational rights under the First Amendment.  The State's responses to these fundamental problems are unavailing.  Its argument as to relevance mischaracterizes the controlling issue in dispute as articulated by the district court overseeing the underlying litigation.  As to undue burden, the State repeatedly characterizes its service of identical and expansive discovery on 18 different organizations as "targeted" and "limited" when the discovery is plainly anything but.  Finally, the State has no response at all to the Nonparty Groups' showing that these subpoenas infringe on their associational rights and would chill their members' participation in these organizations.  For all these reasons, the subpoenas should be quashed.

I.   **ARGUMENT**

A.   **The State Has Failed To Show That the Subpoenas Seek Any Relevant Discovery.**

In their opening motion, the Nonparty Groups explained how the requested discovery

---

[1] The Nonparty Groups are American Academy of Pediatrics ("AAP"), Endocrine Society, World Professional Association for Transgender Health ("WPATH"), American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, National Association of Pediatric Nurse Practitioners, North Central Florida Council of Child & Adolescent Psychiatry, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, and Society of Pediatric Nurses.

[2] *Dekker v. Weida*, No. 4:22-cv-325-RH-MAF (N.D. Fla. filed Sept. 7, 2022).

went beyond the scope of the underlying litigation and was thus irrelevant.  *See* Nonparty

Groups' Statement of Points & Authorities in Support of Motion to Quash (Doc. 1-26) ("Mot.")

at 10-13.  The State's argument to the contrary fails on multiple levels.

To start, the State's theory of relevance mischaracterizes the core dispute in the

underlying litigation.  The State repeatedly asserts that Plaintiffs' theory of the underlying case

hinges entirely on the premise that the State's "determination that certain treatments for gender

dysphoria are 'experimental' is unreasonable because the entire medical establishment—

including each of the non-parties—adheres to gender-affirming-care guidelines that approve of

the excluded treatments."  State's Opposition to Motion to Quash (Doc. 11) ("Opp.") at 17; *see

also id.* at 19 (asserting "Plaintiffs' theory of the case hinges upon the non-parties' gender

dysphoria guidelines supposedly representing the established medical consensus regarding the

treatment of gender dysphoria"); *id.* at 22 (same), 28 ("…principle thrust of Plaintiffs' cause of

action is that the non-parties' gender dysphoria guidelines represent the established medical

consensus"), 31 ("…the medical community's supposed prevailing accepted standard of care for

the treatment of gender dysphoria are the linchpin of Plaintiffs' case").  In other words, the State

insists the requested discovery is relevant because Plaintiffs' case supposedly rises or falls on

whether the "entire medical establishment" adheres to the guidelines published by WPATH and

Endocrine Society—not what the guidelines actually say, and whether they are scientifically

valid.

That, however, is not how the *Dekker* court has framed the relevant inquiry.  As that

court has repeatedly confirmed and the State itself concedes elsewhere in its brief, the

"controlling" question is "whether, based on current medical knowledge, the state's

determination that these treatments are experimental is reasonable."  *See* Mot. at 3; Opp. at 15.  It

2

is for exactly that reason that the Nonparty Groups have acknowledged that, to the extent the WPATH and Endocrine Society guidelines and the studies on which they rely (which are cited in the guidelines) reflect "current medical knowledge," they are facially relevant to the case. Indeed, WPATH and Endocrine Society offered to produce those materials in response to the subpoenas—an offer the State rejected.  But that is also why everything else sought by the State, including internal information about any "policy positions" maintained by the 16 other subpoenaed organizations, is not relevant.  *See* Mot. at 11.

Furthermore, even if the question of whether the "entire medical establishment" supported the WPATH and Endocrine Society guidelines *was* relevant to the case, that does not mean the discovery the State has actually sought is relevant to that question either.  That is because the State is not seeking evidence of consensus *among* the medical establishment. Rather, as the State candidly acknowledges, it is looking for evidence of a lack of consensus *within* organizations—or, as it summarizes, for evidence that "the non-parties' gender dysphoria guidelines do not represent the prevailing medical consensus, that their guidelines were driven by political correctness rather than science, that they were willfully (or ignorantly) blind to the irreversible harms that the treatments they advocate for cause in children, adolescents, and adults, and that their views do not fairly represent the majority of medical practitioners (much less the views of the majority of their own members)."  Opp. at 28.

The State's argument fails on its own terms.  First, the State's repeated references to "the non-parties' gender dysphoria guidelines" only highlight why the discovery it directed at the 16 organizations that *do not publish* "gender dysphoria guidelines" is irrelevant and misguided. Notably, the State never responds to the Nonparty Group's argument as to why discovery into

3

those organizations "policy statements," to the extent they even exist, is relevant here.  *See* Mot. at 11.

In addition, WPATH's and Endocrine Society's internal deliberations and communications regarding their guidelines cannot possibly be relevant to whether or not those guidelines "represent the prevailing medical consensus" beyond WPATH and Endocrine Society, even assuming the "consensus" is relevant.  The former is not connected to the latter.  In other words, the "entire medical establishment" is not privy to the inner workings of WPATH and Endocrine Society, and there is no reason to think (and certainly the State offers no evidence to suggest) that other medical organizations' support for those guidelines is conditioned on access to the same materials the State seeks here.

Conspicuously, the State fails to cite a single case authorizing the type of invasive organizational discovery it is seeking.  In fact, as discussed in the Nonparty Groups' opening brief (at p. 12), courts have observed that "[t]he reliance of the opposing party on a study does not entitle the moving party to a fishing expedition in order to attack a report that it dislikes." *Rosa v. City of Seaside*, 2009 WL 2382760, at *2 (N.D. Cal. July 29, 2009) (holding that there was no substantial need to depose the author of a report where, as here, the report disclosed the relied-upon sources and methodology); *see also In re Bextra & Celebrex Mktg. Sales Pracs. & Prods. Liab. Litig.*, 249 F.R.D. 8, 12 (D. Mass. 2008) ("The Plaintiffs' claims focus on what Pfizer knew, or should have known, via published articles in the scholarly literature.  The peer reviewers' confidential comments—which Pfizer even now has yet to discover—hardly speak to that issue.  Moreover, Pfizer's own experts are equally able to review and analyze the articles for flaws in methodology or otherwise.").

Notably, the State does not argue that it needs this discovery to challenge the guidelines on the terms that actually *were* set by the district court—in other words, to marshal a challenge to whether those guidelines reflect "current medical knowledge."  Nor could it, because the State concedes it relied on its own scientific evidence (including at least five experts) when it first concluded the targeted treatments are "experimental," and has since retained at least one expert to explain why the science supports the State's position in this litigation.  *See* Opp. at 7, 17.  That the State did not need WPATH's and Endocrine Society's internal documents when it first concluded that their guidelines endorsed "experimental" treatments, but now claims it urgently does to defend that conclusion, only betrays how far this discovery strays from the guardrails set by the district court.

A related case in Arkansas is instructive on this front.  There, plaintiffs challenged that State's enactment of a law banning the use of the treatments also at issue in *Dekker* to treat adolescents with gender dysphoria.  The scientific basis and validity of the WPATH and Endocrine Society guidelines were vigorously litigated, with both sides presenting expert testimony on that front.  But as the parties' Proposed Findings of Fact confirm, neither plaintiffs nor Arkansas sought or needed internal discovery from WPATH or Endocrine Society (much less other organizations that are alleged to publish "policy statements") to make their case.  Lannin Reply Decl. ¶¶ 2, 3.  There is no good reason Florida needs what Arkansas did not.

In short, there is no dispute that the WPATH and Endocrine Society guidelines are relevant to this case.  That is precisely why both organizations offered to produce those guidelines and every piece of evidence cited therein—a compromise the State rejected.  But the State has no plausible argument for why discovery into how those guidelines were created, much

less discovery into any "policy statements" published by the other 16 organizations, is at all relevant to the underlying case.

**B.    The State Dismisses Without Reason the Undue Burdens the Subpoena Would Impose on the Nonparty Groups.**

The State and the Nonparty Groups agree that where a subpoena imposes an undue burden that outweighs the need of the requesting party, it should be quashed.  The State, however, both disregards the undue burden imposed by its subpoenas and overstates its (non-existent) need for this discovery.

In response to the Nonparty Groups' specific showing of undue burden, the State repeatedly asserts that the discovery requests are "limited," "narrowly targeted," "clearly delineated," and not "overly expansive."  *See* Opp. at 15, 24.  But even a cursory review of the deposition topics and document requests belies the State's argument.[3]  The State served identical requests for production on each of the 18 Nonparty Groups (and served identical deposition notices on three of those groups) seeking wide-ranging information, unbounded by time, concerning their internal communications and decision-making processes related to gender-affirming care.  *See also* Mot. at 3, 14-16.  For example, the State seeks "[a]ny communications with your membership concerning your guidelines, standards, best-practices, or policy positions on gender-affirming care for gender dysphoria."  On their face, these requests are anything but "limited."  And while the State now claims that it is not seeking "any" or "all" documents but only "substantive" ones, Opp. at 24, that is a distinction without a difference.  Besides a fleeting

---

[3] The State also asserts that it attempted to "further narrow" the scope of the subpoenas in its proposed order denying the motion to quash.  Opp. at 25.  In fact, little has been "narrowed." The State chiefly proposes to withdraw one document request (No. 6) and change No. 5 to request "[a]ny documents and communications detailing your communications with Plaintiffs in [the underlying litigation]."  State's Proposed Order, Doc. 11-2 at 2.

reference to "meeting minutes," *see id.*, the State has offered no guidance on how to distinguish substantive documents from non-substantive ones, and, in any event, making that determination would still require the type of burdensome collection and review detailed in the declarations attached to the motion.

 Similarly unavailing is the State's breezy assurance that the information it seeks is "readily accessible" to the Nonparty Groups.  *Id.*  The representative declarations of AAP, WPATH, and Endocrine Society establish otherwise.  *See* AAP Decl. (Doc. 6-2), ¶¶ 9-14; Endocrine Soc'y Decl. (Doc. 6-3), ¶¶ 8-14; WPATH Decl. (Doc 6-4), ¶¶ 7-11 (detailing work required to collect, review, and produce requested documents).[4]  Furthermore, while the State claims that those burdens are "at best run-of-the-mill," Opp. at 24, there is nothing "run-of-the-mill" about subpoenas that as drafted would require these non-party, non-profit organizations to expend substantial resources and time to provide the requested information.  *See Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2007) ("'[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs' in [the] Rule 45 inquiry[.]").

### C.    The State Has No Response to the Chilling Effect of the Subpoenas.

In their motion, the Nonparty Groups articulated how these subpoenas infringe on their associational and free speech rights under the First Amendment.  Neither of the State's responses has merit.

---

[4] The State complains that the Nonparty Groups only submitted declarations from three of the 18 organizations that received a subpoena.  *See* Opp. at 23.  This argument is ironic indeed given that the State served 18 *identical* subpoenas on each organization, with no effort made to tailor each subpoena to each organization or account for publicly-available information.  *See* Mot. at 20.  The Nonparty Groups should not be faulted for forgoing the burdensome process of creating 18 particularized declarations when the State made no effort to create 18 particularized subpoenas.

*First*, the State asserts that it "has a substantial need to obtain the requested testimony and documents from the non-parties," and that this need "outweigh[s] any First Amendment privilege the non-parties have attempted to muster."  Opp. at 27-28.  As is discussed above, however, the requested information is irrelevant, and the State does not "need" it at all.  With no "need" to weigh against the infringement of a constitutional right, that should be the end of the First Amendment inquiry.

*Second*, the State cursorily asserts that the articulated First Amendment harms are not "substantial," in part because the State claims not to be seeking the names and addresses of group members.  Regardless of whether the State has specifically requested member names and other personally-identifying information, however, such details will necessarily appear throughout the requested materials, including on internal communications and the "meeting minutes" the State holds up as representative of the "substantive" documents it wants.  The State's suggestion that it would permit the Nonparty Groups to redact such information is a cure worse than the disease, as it would only exacerbate the undue burden on these groups if, in addition to collecting and reviewing potentially responsive documents, they were *also* required to review and redact any personally-identifying information from those documents.

More fundamentally, the State misses the point.  The risk is not simply that a member's name or address could be disclosed.  The core First Amendment concern is that the State's invasive discovery requests will inhibit the "broad, uninhibited, and fearless . . . deliberation [that] is a seminal aspect of the freedom to associate."  *Whole Woman's Health v. Tex. Catholic Conf.*, 896 F.3d 362, 372 (5th Cir. 2018) (holding that order compelling nonparty group to produce its internal communications in light of its support for the law being challenged in the case was an abuse of discretion); *see also id.* at 375 (nonparty group was given "the 'Hobson's

8

choice' of retreating from the public square or defending its position while creating a precedent (for the first time) that may open its internal deliberations to public scrutiny").  The representative declarations from AAP, WPATH, and Endocrine Society describe in detail how even the *receipt* of these subpoenas, to say nothing of their potential enforcement, has chilled participation in their organizations and inhibited the type of robust, candid discussions that are necessary to do their work.  *See, e.g.*, AAP Decl. (Doc. 6-2), ¶¶ 15-20; Endocrine Soc'y Decl. (Doc. 6-3), ¶¶ 13-16; WPATH Decl. (Doc 6-4), ¶¶ 12-16; *see also In re Fosamax Prods. Liab. Litig.*, 2009 WL 2395899, at *4 (S.D.N.Y. Aug. 4, 2009) (quashing a subpoena on the grounds that "[c]ompelling testimony from a third party researcher risks chilling participation in beneficial public research" and that "permitting discovery in these situations 'inevitably tend[s] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor'").  Conspicuously, the State has no answer to this issue at all.

### D.     The State Should Be Required To Pay the Nonparty Groups' Fees.

The Nonparty Groups' opening motion identified good cause for the Court to award fees incurred in responding to these subpoenas.  The State's responses are not persuasive.

*First*, the State asserts that it declined to withdraw its subpoenas because "it is legally entitled to the relevant information and documents it seeks."  Opp. at 30.  But for the reasons discussed above and in the opening motion, almost all the requested information is irrelevant (and WPATH and Endocrine Society offered to produce the information that *is* relevant—their guidelines and the studies cited therein).  The State's failure to withdraw the subpoenas in light of that showing supports the requested award.

Second, the State concedes it served identical discovery to all 18 organizations, but claims that they are "similar" organizations that each signed on to a proposed *amicus* brief, and

that it thus "made sense" for the State to send the same discovery to them.  *See* Opp. at 30.  This is an unsatisfying explanation at best for why the State failed to conduct a bare minimum of diligence about each organization before serving identical subpoenas seeking information that is, in many cases, readily available from a simple Google search.  *See* Mot. at 20.[5]  At bottom, that the State put little thought into these subpoenas has not spared the Nonparty Groups from the burdens of responding to them, and that justifies an award of fees.

## II.      CONCLUSION

For the reasons set forth above, the Nonparty Groups respectfully request that the Court quash the State's subpoenas in their entirety and award their fees incurred in responding to the subpoenas.

---

[5] The State's reliance on *Goldberg v. Amgen*, *see* Opp. at 31, is misplaced.  In that case, the requesting party sought the information from at least *five* other sources, had already deposed three individuals, and reviewed "analyst reports and other public source information" to no avail before serving its subpoena.  123 F. Supp. 3d 9, 23 (D.D.C. 2015).  Here, the State has not shown that it did anything even remotely similar in advance of serving these 18 subpoenas.

Dated: January 25, 2023

Respectfully submitted,

/s D. Jean Veta
D. Jean Veta

Cortlin H. Lannin (CA Bar No. 266488)
(admitted *pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

D. Jean Veta (D.C. Bar No. 358980)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com

Michael J. Lanosa (CA Bar No. 30124)
(admitted *pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (424) 332-4800
mlanosa@cov.com

*Counsel for Nonparty Groups*

11

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 25, 2023, I electronically filed the foregoing document and its attachment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

*/s D. Jean Veta*
D. Jean Veta
