**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON AMERICAN ACADEMY OF PEDIATRICS, et al., | Misc. Case No. 23-mc-00004-CJN |
| AUGUST DEKKER, et al.,<br><br>              Plaintiffs,<br>v.<br><br>JASON WEIDA, et al.,<br><br>              Defendants. | Northern District of Florida<br>Case No. 4:22-cv-325-RH-MAF |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
JOINT EMERGENCY MOTION OF NONPARTY GROUPS
FOR STAY PENDING APPEAL**

1

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND .................................................................................................. 2

III.  ARGUMENT ....................................................................................................... 4

     A.   The Nonparty Groups Are Likely to Succeed on the Merits Because Their
        First Amendment Interest in Protecting Internal Deliberations Outweighs
        Any Need the State Might Have for the Requested Information. ........................... 4

     B.   The Nonparty Groups Will Be Irreparably Injured Absent a Stay Because
        the Harm to Their First Amendment Rights Cannot Be Remedied. ....................... 8

     C.   The Public Interest In Protecting First Amendment Values and
        Encouraging Robust Scientific Debate Favors a Stay. ........................................ 10

     D.   Issuance of a Stay Will Not Substantially Injure the State Because the
        Requested Information Has Little or No Relevance to Their Defense in the
        Underlying Litigation. ......................................................................................... 12

IV.   CONCLUSION .................................................................................................. 13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abah v. Bush*,
    2005 WL 711814 (D.D.C. Mar. 29, 2005)..............................................................................10

*AFL-CIO v. FEC*,
    333 F.3d 168 (D.C. Cir. 2003) ..............................................................................................5

*Awad v. Ziriax*,
    670 F.3d 111 (10th Cir. 2012) .............................................................................................10

*Beck v. Test Masters Educ. Servs., Inc.*,
    937 F. Supp. 2d 85 (D.D.C. 2013).........................................................................................4

*Black Panther Party v. Smith*,
    661 F.2d 1243 (D.C. Cir. 1981), *vacated as moot sub nom. Smith v. Black
    Panther Party*, 458 U.S. 1118 (1982) .............................................................................5, 6, 7, 8

*Buckley v. Valeo*,
    424 U.S. 1 (1976)....................................................................................................................6

*Cate v. Oldham*,
    707 F.2d 1176 (11th Cir. 1983) ...........................................................................................10

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006)...............................................................................................9

*Cuomo v. U.S. Nuclear Regulatory Comm.*,
    772 F.2d 972 (D.C. Cir. 1985)..............................................................................................12

*Elrod v. Burns*,
    427 U.S. 347 (1976).............................................................................................................8, 9

*Eu v. San Francisco County Democratic Cent. Comm.*,
    489 U.S. 214 (1989)................................................................................................................5

*In re Fosamax Prods. Liab. Litig.*,
    2009 WL 2395899 (S.D.N.Y. Aug. 4, 2009)........................................................................11

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.*,
    263 F. Supp. 3d 144 (D.D.C. 2017).......................................................................................4

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*,
    23 F.3d 1071 (6th Cir. 1994) ...............................................................................................10

*Int'l Action Ctr. v. United States*,
   207 F.R.D. 1 (D.D.C. 2002)..................................................................................5

*Jubilant DraxImage Inc. v. ITC*,
   396 F. Supp. 3d 113, 125 (D.D.C. 2019) ...............................................................9

*Nken v. Holder*,
   556 U.S. 418 (2009)..............................................................................................4

*Plough Inc. v. Nat'l Acad. of Scis.*,
   530 A.2d 1152 (D.C. 1987) ........................................................................8, 11, 13

*Rosa v. City of Seaside*,
   2009 WL 2382760 (N.D. Cal. July 29, 2009)........................................................7

*Simms v. District of Columbia*,
   872 F. Supp. 2d 90 (D.D.C. 2012) ......................................................................10

*St. Marks Place Housing Co. v. HUD*,
   610 F.3d 75 (D.C. Cir. 2010) ................................................................................4

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) (Frankfurter, J., concurring) ...............................................11

*Whole Woman's Health v. Smith*,
   896 F.3d 362 (2018)...........................................................................................5, 6

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)...........................................................................8, 12

*WMATA v. Holiday Tours, Inc.*,
   559 F.2d 841 (D.C. Cir. 1977)...............................................................................4

**Statutes**

28 U.S.C. § 1291.........................................................................................................4

## I.      INTRODUCTION

The Nonparty Groups[1] jointly move to stay this Court's orders dated January 26, 2023 (Doc. 18) and February 28, 2023 (Doc. 26) (collectively, "Orders") requiring all the Nonparty Groups to produce certain categories of documents and requiring AAP, Endocrine Society, and WPATH to submit to depositions regarding, among other things, matters protected by the Nonparty Groups' First Amendment rights.  This motion for stay is submitted pending the Nonparty Groups' appeal of the Orders.

Courts consider four factors in the context of such a motion, and all four favor issuance of a stay here.  The Nonparty Groups are likely to succeed on the merits of their appeal because the Nonparty Groups' First Amendment interests in protecting their internal deliberations from disclosure substantially outweigh the State's alleged need for this discovery.  In addition, disclosure of the ordered material and information would irreparably harm the Nonparty Groups, and would substantially harm the public interest by, *inter alia*, impeding dialogue in a field that requires uninhibited scientific debate.  Finally, any harm the State claims from a stay could be readily mitigated.  Accordingly, the Court should stay enforcement of the Orders pending appeal.

The Nonparty Groups have styled this as an emergency motion because, pursuant to the Court's most recent order, all the Nonparty Groups are due to produce documents in short order, and the depositions of AAP, Endocrine Society, and WPATH must be complete by Wednesday,

---

[1] The Nonparty Groups are American Academy of Pediatrics ("AAP"), Endocrine Society, World Professional Association for Transgender Health ("WPATH"), American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, National Association of Pediatric Nurse Practitioners, North Central Florida Council of Child & Adolescent Psychiatry, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, and Society of Pediatric Nurses.

March 8, 2023.  Absent relief from this Court, those organizations are confronted with the

imminent prospect of providing compelled information and testimony that, in their good faith

view, infringes their First Amendment rights.  AAP, Endocrine Society, and WPATH remain

willing, however, to sit for depositions on the timeframe ordered by this Court if those

depositions do not implicate the information that is the subject of their pending appeal.

## II.      BACKGROUND

This proceeding involves subpoenas served on the Nonparty Groups by Defendants Jason

Weida and the Florida Agency for Health Care Administration ("Defendants" or the "State") in

the case styled *Dekker v. Weida*, No. 4:22-cv-325-RH-MAF (N.D. Fla. filed Sept. 7, 2022)

("*Dekker*" or the "Underlying Litigation").[2]  In *Dekker*, several plaintiffs have asserted

Constitutional and statutory challenges to the Florida Agency for Healthcare Administration's

adoption of an administrative ruling prohibiting Medicaid coverage for medical treatments that

are indicated for the clinical condition known as gender dysphoria.

The Nonparty Groups are 18 professional medical and mental health organizations.  They

moved to submit an *amicus* brief in support of the *Dekker* plaintiffs, but the State successfully

opposed the submission of the brief.  The State subsequently issued subpoenas to these groups

requesting documents that would reveal their internal deliberations, as well as corresponding

deposition subpoenas to AAP, Endocrine Society, and WPATH.

Following unsuccessful meet-and-confer efforts, on January 13, 2023, the Nonparty

Groups moved to quash the subpoenas.  On January 26, this Court denied in part the motion.

The order expressly required the Nonparty Groups to produce a variety of documents, including

---

[2] The Nonparty Groups described this proceeding's background in detail in their Motion to Quash (Doc. 1-26).

"[d]ocuments sufficient to show how [each of the Nonparty Groups] established guidelines or, if it has not established guidelines, its policy position (if any) on gender-affirming care for gender dysphoria."  (Doc. 18 at 1.)

The Nonparty Groups subsequently produced documents in response to the Court's order that were sufficient to show the *process* those organizations used to establish their policy positions or guidelines regarding gender-affirming care.  The State deemed this production deficient insofar as the documents did not reveal the *substance* of any such process, and sought the Court's assistance in resolving that dispute.  On February 28, 2023, this Court confirmed that:

> In producing documents sufficient to show "how" the Nonparty Groups established guidelines or policy positions on gender-affirming care for the treatment of gender dysphoria, the Nonparty Groups shall produce documents sufficient to show both (a) the process by which any such guidelines were adopted, and (b) the substantive materials and opinions that were considered and relied upon, as well as the materials and opinions that were considered and rejected in adopting the guidelines or policy positions.  This includes, but is not limited to, documents that would be sufficient to show what studies were considered in adopting the guidelines or policy positions and why a particular study was relied upon or rejected.  It also includes documents that would be sufficient to show whether any dissenting views were otherwise acknowledged, whether such views were considered in adopting guidelines or policy positions, and why such views were rejected.

(Doc. 28 at 1.)  The Court also ordered AAP, the Endocrine Society, and WPATH to submit to depositions covering the topics on which they were ordered to produce documents, including the substantive information described above.  (Doc. 28 at 2.)  Those depositions are to be "held no later than three days prior to the discovery deadline" in the Underlying Case, or Wednesday, March 8, 2023.  *Id.*

3

### III.     ARGUMENT

"In assessing whether to grant a stay pending appeal, the Court looks to four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Beck v. Test Masters Educ. Servs., Inc.*, 937 F. Supp. 2d 85, 86 (D.D.C. 2013) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *see also WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). While the Court considers each factor, the risk of irreparable harm and the likelihood of success on appeal are most critical. *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 263 F. Supp. 3d 144, 147 (D.D.C. 2017). In this case, all four factors favor issuance of a stay.

> **A.     The Nonparty Groups Are Likely to Succeed on the Merits Because Their First Amendment Interest in Protecting Internal Deliberations Outweighs Any Need the State Might Have for the Requested Information.**

Courts have quashed subpoenas that would infringe on associational rights guaranteed by the First Amendment by, for example, discouraging members from joining or participating in organizations, chilling the robust and uninhibited exchange of ideas that organizations require to do their work, or otherwise damaging their effectiveness. In this case, disclosure of the Nonparty Groups' internal deliberations would substantially infringe their First Amendment right of association and speech, while the State's interest in disclosure is nonexistent or weak at best. As such, the Nonparty Groups are likely to prevail on the merits of their appeal challenging the Orders.[3]

---

[3] The Orders are appealable for multiple reasons. First, they are appealable under the collateral order doctrine, because the Court's Orders are conclusive, resolve important questions separate from the merits of the Underlying Litigation, and are effectively unreviewable on appeal from

In this Circuit, courts addressing First Amendment challenges to discovery requests must perform a balancing test: "the plaintiff's First Amendment claim should be measured against the defendant's need for the information sought.  If the former outweighs the latter, then the claim of privilege should be upheld."  *See Black Panther Party v. Smith*, 661 F.2d 1243, 1266 (D.C. Cir. 1981), *vacated as moot sub nom. Smith v. Black Panther Party*, 458 U.S. 1118 (1982); *see also Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 4 (D.D.C. 2002).

Here, the Nonparty Groups' First Amendment interests are substantial.  Indeed, the State did not argue otherwise, but rather suggested the Nonparty Groups could protect their members from harassment by redacting their names from any materials they produce.  (Doc. 11 at 29.) But that argument misapprehends the problem.  The fundamental issue here is that enforcement of the subpoenas would impede the Nonparty Groups' freedom of association and speech and thus their effectiveness, including by frustrating their ability to organize, entertain uninhibited and candid internal dialogues, make well-reasoned decisions, and generate useful work product. Indeed, courts routinely protect First Amendment rights from harm caused by compelled disclosures that threaten to undermine an organization's effectiveness.

For example, the D.C. Circuit concluded that the AFL-CIO and Democratic National Committee asserted "substantial First Amendment interests in the disclosure of their own internal materials" by showing that "compelled disclosure of internal planning material" would "frustrate

---

the final judgment.  *See, e.g.*, *Whole Woman's Health v. Smith*, 896 F.3d 362, 368 (2018) (holding on analogous facts that "interlocutory court orders bearing on First Amendment rights remain subject to appeal pursuant to the collateral order doctrine").  In addition, and in the alternative, this Court's February 28 order is a final decision that provides the Court of Appeals with jurisdiction under 28 U.S.C. § 1291.  See *St. Marks Place Housing Co. v. HUD*, 610 F.3d 75, 79 (D.C. Cir. 2010) (concluding a "'final decision' is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment").  Finally, mandamus relief is available in the alternative.

those groups' decisions as to 'how to organize . . . [themselves], conduct . . .[their] affairs, and select . . . [their] leaders.'" *AFL-CIO v. FEC*, 333 F.3d 168, 177–78 (D.C. Cir. 2003) (quoting *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 230–21 & n.21 (1989)). The court explained that "disclosure of an association's confidential internal materials . . . intrudes on the 'privacy of association and belief guaranteed by the First Amendment,' as well as seriously interferes with internal group operations and effectiveness." *Id*. at 177–78 (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)). As the Fifth Circuit concluded in vacating an order permitting discovery similar to the discovery at issue here, communications within associations "must be permitted to be broad, uninhibited, and fearless, and [] protecting such deliberations is a seminal aspect of the freedom to associate." *Whole Woman's Health v. Tex. Catholic Conf.*, 896 F.3d 362, 372 (5th Cir. 2018).

In this case, the Nonparty Groups have shown that compelled disclosure of their internal deliberations would chill their exercise of associational and free speech rights under the First Amendment. Undisputed declarations submitted by AAP, Endocrine Society, and WPATH describe how the receipt of the subpoenas at issue, to say nothing of their potential enforcement, has chilled participation in their organizations and inhibited the type of robust, candid discussions necessary for them to do their work. *See* AAP Decl. (Doc. 6-2, ¶¶ 15–21); Endocrine Soc'y Decl. (Doc. 6-3 ¶¶ 13–16); WPATH Decl. (Doc. 6-4, ¶¶ 12–16).

On the other side of the scale, the State's purported "need for the information sought" is non-existent. Courts consider the interest in disclosure in this context to be "relatively weak unless the information goes to 'the heart of the matter,' that is, unless it is crucial to the party's case." *Black Panther Party*, 661 F.2d at 1268. "Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe the information they

hope to obtain and its importance to their case with a reasonable degree of specificity." *Id*. In addition, courts "must determine whether the litigants seeking disclosure have pursued alternative sources." *Id*. "Even when the information sought is crucial to a litigant's case, disclosure should be compelled only after the litigant has shown that he has exhausted every reasonable alternative source of information." *Id*. "Because of the preferred position of First Amendment rights," any "[i]nfringement of First Amendment interests must be kept to a minimum." *Id.*

In this case, the State failed to show that the information it seeks goes to "the heart of the matter" and that they have pursued alternative sources. The court in the Underlying Litigation has explained that, in the underlying case, the heart of the matter is "whether, based on current medical knowledge, the state's determination that [the banned] treatments are experimental is reasonable." *See* Nonparty Groups' Statement of Points & Authorities in Support of Motion to Quash (Doc. 1-26) ("Mot.") at 3. As is explained at length in the Nonparty Groups' motion to quash, information about the Nonparty Groups' internal deliberations, including deliberations about the policy positions adopted by 16 of the Nonparty Groups, is not relevant to that inquiry. *Id.* at 10–13. In addition, the State's argument that it is seeking evidence about whether the "medical establishment" supports the WPATH and Endocrine Society guidelines does not justify this discovery either. That is because the State is not seeking evidence of consensus *among* the medical establishment, but rather evidence of a lack of consensus *within* individual organizations.

Even if such information was at all relevant to the Underlying Litigation—and it is not—the State has shown no likelihood that the Nonparty Groups' internal deliberations contain the information it seeks, and "mere speculation" does not justify the infringement of First

Amendment interests.  *See Black Panther Party*, 661 F.2d at 1268; *see also Rosa v. City of Seaside*, 2009 WL 2382760, at \*2 (N.D. Cal. July 29, 2009) ("The reliance of the opposing party on a study does not entitle the moving part to a fishing expedition in order to attack a report it dislikes.").

Finally, the State has not shown that it "exhausted every reasonable alternative source of information." *Black Panther Party*, 661 F.2d at 1268.  To assess whether "current medical knowledge" supports its position, the State could examine medical literature and seek out the opinions of experts—just as it did when it first determined the banned treatments are supposedly experimental.  Similarly, the State does not need this discovery to contest the merits of the WPATH and Endocrine Society guidelines.  The guidelines themselves exhaustively cite the underlying studies and information on which they rely.  If the State wants to impeach the guidelines, "it may use means other than securing the requested documents and attacking the deliberative process by which the [Nonparty Groups] reached [their] evaluation."  *Plough Inc. v. Nat'l Acad. of Scis.*, 530 A.2d 1152, 1159 (D.C. 1987).

Because the Nonparty Groups have shown that their First Amendment interests in the requested material substantially outweigh the State's purported need for that information, the Nonparty Groups have demonstrated a strong likelihood of success on the merits of their appeal. This factor weighs in favor of a stay.

**B.      The Nonparty Groups Will Be Irreparably Injured Absent a Stay Because the Harm to Their First Amendment Rights Cannot Be Remedied.**

A party moving for a stay must show injury "both certain and great" that is "actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Supreme Court precedent establishes that infringement of a First Amendment right constitutes irreparable harm in and of itself, and that temporary relief is warranted when "First Amendment interests [are]

8

being threatened or in fact being impaired at the time relief [is] sought." *Elrod v. Burns*, 427

U.S. 347, 373 (1976); *see also id.* ("The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.").  In this case, the Nonparty

Groups have submitted unrefuted evidence that the compelled disclosure of their internal

deliberations in compliance with the Orders is having and would have a chilling effect on their

exercise of their free speech and associational rights under the First Amendment.  *See* AAP Decl.

(Doc. 6-2, ¶¶ 15–21); Endocrine Soc'y Decl. (Doc. 6-3 ¶¶ 13–16); WPATH Decl. (Doc. 6-4,

¶¶ 12–16).  The irreparable injury factor is thus satisfied in this case.  *See Chaplaincy of Full*

*Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) ("Within the irreparable harm

analysis itself . . . we examine only whether [the alleged infringement of First Amendment

rights] if true, inflicts irremediable injury.").

Even apart from the special First Amendment concerns the Supreme Court recognized in

*Elrod v. Burns*, this case is different from many others in which a party seeks to stay discovery of

contested material pending an appeal.  In other cases, a party might have a post-trial remedy if a

trial court improperly admits evidence that is later found to be improper.  For example, the

appellate court might order a new trial that excludes the contested material.  By contrast, the

Nonparty Groups' only interest in this case is in preventing the harm to First Amendment rights

that they will suffer if they are required to produce their internal deliberations.  *See Jubilant*

*DraxImage Inc. v. ITC*, 396 F. Supp. 3d 113, 125 (D.D.C. 2019) (finding irreparable injury with

"little trouble" where a movant sought injunction to prevent disclosure of confidential material

because "once . . . putatively protected material is disclosed, the very right sought to be protected

has been destroyed").  In this case, absent a stay, no remedy could undo those harms—the

Nonparty Groups' injuries would be irreparable.

### C.      The Public Interest In Protecting First Amendment Values and Encouraging Robust Scientific Debate Favors a Stay.

The public interest strongly favors granting a stay to protect the Nonparty Group's First Amendment rights. "'It is always in the public interest to prevent the violation of a party's constitutional rights.'" *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting *Abah v. Bush*, 2005 WL 711814, at *6 (D.D.C. Mar. 29, 2005)); *accord Awad v. Ziriax*, 670 F.3d 111, 1132 (10th Cir. 2012); *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see also Cate v. Oldham*, 707 F.2d 1176, 1190 (11th Cir. 1983) (noting the "strong public interest in protecting First Amendment values").

The public interest also strongly favors granting a stay in this case because the prospect of compelled disclosure is already chilling the educational and scientific efforts of the Nonparty Groups, and disclosure would have a still greater destructive effect. For example, AAP engages in education efforts aimed to benefit all pediatricians and their patients by working with experts to review and analyze publicly available evidence and publish those analyses on line. *See* AAP Decl. (Doc. 6-2, ¶ 6). "Open, honest dialogue is . . . essential to the accuracy of [AAP's] work practice recommendations, which pediatricians use every day to inform their medical decision-making." *Id.*, ¶ 21. However, the prospect that its internal deliberations might be disclosed has already "created a notable chill on [AAP's] educational efforts," *Id.*, ¶ 20. In addition, AAP relies on experts who volunteer their time to work with the organization. However, "many would think twice before volunteering their expertise if their confidential feedback could be shared with the world," and that would "reduce the quality and accuracy of [AAP's] work product, which in turn will worsen the care that [its] pediatrician members provide to their patients across all health domains." *Id.*, ¶ 21.

10

Similarly, the potential disclosure of the Endocrine Society's internal deliberations "has already created an environment in which departments and teams affected are pausing some new activities or reducing current activities," Endocrine Soc'y Decl. (Doc. 6-3, ¶ 14), and is "chilling . . . the Endocrine Society's ability to participate in the policy, legislative, and regulatory process." *Id.*, ¶ 16.  If the subpoena is enforced, it is likely that "members will step back from volunteering to work on future clinical practice guidelines, educational sessions and materials, and participating in Endocrine Society committees and work groups; and . . . new members will fear joining." *Id.*, ¶ 15.

As a final example, the subpoena has already "created a notable chill on [WPATH's] educational efforts." WPATH Decl. (Doc. 6-4, ¶ 16).  The prospect that internal deliberations might be disclosed threatens to disrupt WPATH's work with the dozens of medical experts who volunteer their expertise to help WPATH "to understand the latest science, and to review and edit [its] publications, educational materials, curriculum, and public statements." *Id.*, ¶ 17. WPATH further states that its ability to receive "candid feedback" from those experts "depends on the confidence that peer reviews and communications within WPATH will not be publicly disclosed." *Id*.

In similar contexts, courts have recognized the public interest in protecting third-party experts from discovery.  "Compelling testimony from a third party researcher risks chilling participation in beneficial public research." *In re Fosamax Prods. Liab. Litig.*, 2009 WL 2395899, at *4 (S.D.N.Y. Aug. 4, 2009).  Permitting such discovery "'inevitably tend[s] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.'" *Id.* (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring)); *see also Plough*, 530 A.2d at 1156–57 (crediting organization's

claim that its "ability to convince volunteers to serve on its committees would be impaired [if the court allowed discovery], since individuals would be reluctant to serve if they knew their comments were subject to disclosure").

The State may argue the public interest lies in allowing discovery to support its efforts in the Underlying Litigation.  But the public has no interest in unbounded discovery or discovery that infringes on First Amendment rights.  And, as discussed above, the State can challenge the Nonparty Groups' guidelines using material developed by its own experts.  In short, the public interest in protecting the Nonparty Groups' First Amendment rights and the public interest in promoting rather than chilling educational and scientific efforts weigh strongly in favor of a stay.

**D.      Issuance of a Stay Will Not Substantially Injure the State Because the Requested Information Has Little or No Relevance to Their Defense in the Underlying Litigation.**

When the party opposing a stay claims that issuance of a stay will cause them substantial injury, a court tests the claimed harms for substantiality, likelihood of occurrence, and adequacy of proof.  *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Cuomo v. U.S. Nuclear Regulatory Comm.*, 772 F.2d 972, 977 (D.C. Cir. 1985).  In this case, any harm to the State from issuance of a stay will be insubstantial because the State will obtain the information it is seeking if it prevails on appeal.  The State may claim that a stay could effectively moot the issue by preventing it from obtaining the information it seeks before the discovery deadline in the Underlying Litigation, but the existence of such harm is wholly speculative.  Neither the State nor this Court knows whether the *Dekker* court would extend the discovery deadline or find other ways to accommodate the State's asserted interest in this discovery.  Additionally, this Court would be justified in deferring to the docket management decision of the *Dekker* court. That court is well positioned to evaluate the State's arguments that the discovery at issue is sufficiently relevant to the Underlying Litigation to justify a scheduling adjustment to

accommodate a stay pending appeal in this proceeding.  If the court handling the Underlying

Litigation agrees with the State, it can adjust the schedule accordingly.

Any harm to the State would also be insubstantial because the requested information has

little or no relevance to the Underlying Litigation.  As discussed above, the Underlying

Litigation will turn on whether the State reasonably determined that treatments at issue are

experimental, and the discovery in dispute is not relevant to that inquiry.  Rather, the State is

seeking to litigate the internal processes and deliberations of these organizations.  Although the

State might consider this approach tactically desirable, it is far removed from the issue at the

core of the Underlying Litigation.  *See, e.g.*, *Plough*, 530 A.2d at 1160 (claimed necessity of

discovery aimed at using deliberative materials to attack prestige of organization that reviewed

study was "an attenuated kind of 'necessity,' if that term may be applied at all").

Finally, the State has not offered and could not offer any proof that its inability to obtain

timely access to the requested information would cause it any harm.  Consequently, this factor

weighs in favor of granting a stay.

## IV.     CONCLUSION

For the reasons set forth above, the Nonparty Groups respectfully request that the Court

stay the Orders pending appeal.

Dated: March 2, 2023

Respectfully submitted,

/s D. Jean Veta
D. Jean Veta

Cortlin H. Lannin (CA Bar No. 266488)
(admitted *pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

D. Jean Veta (D.C. Bar No. 358980)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com

Michael J. Lanosa (CA Bar No. 30124)
(admitted *pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (424) 332-4800
mlanosa@cov.com

*Counsel for Nonparty Groups*

14

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2023, I electronically filed the foregoing document and its attachment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.


*/s D. Jean Veta*
D. Jean Veta