# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON AMERICAN ACADEMY OF PEDIATRICS, *et al.*, | Misc. Case No. 23-MC-00004 (CJN) |
| AUGUST DEKKER, *et al.*,<br><br>      Plaintiffs,<br>v.<br><br>JASON WEIDA, *et al.*,<br><br>      Defendants. | Northern District of Florida<br>Case No. 4:22-cv-325-RH-MAF |

**STATEMENT OF POINTS AND AUTHORITIES IN**
**<u>OPPOSITION TO EMERGENCY MOTION FOR STAY</u>**

1

# **TABLE OF CONTENTS**

Table of Contents .................................................................................................................. i

Table of Authorities ............................................................................................................ ii

I.   Introduction ............................................................................................................. 1

II.  Legal Standard ........................................................................................................ 1

III. Argument ................................................................................................................ 2

   A. Factor One: The Nonparty Groups Are Unlikely to Succeed on the Merits. ........... 2

   B. Factor Two: Absent a Stay, the Nonparty Groups Would Not Be Harmed. ............ 7

   C. Factor Three: With a Stay, the State Would Be Substantially Injured. ................... 8

   D. Factor Four: Public Interest Weighs Against the Nonparty Groups. ...................... 9

IV.  Conclusion ............................................................................................................. 10

V.   Certificate of Service ............................................................................................. 11

# **TABLE OF AUTHORITIES**

**Case Law**

*Black Panther Party v. Smith*,
    661 F.2d 1243 (D.C. Cir. 1981) ......................................................................... 2-4

*Carey v. Hume*,
    492 F.2d 631 (D.C. Cir. 1974) ................................................................................2

*Cuomo v. U.S. Nuclear Reg. Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985) ................................................................................1

*In re Subpoena Duces Tecum*,
    439 F.3d 740 (D.C. Cir. 2006) ................................................................................4

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................................................10

*NAACP v. Ala. ex rel. Patterson*,
    357 U.S. 449 (1958) ................................................................................................2

*Nken v. Holder*,
    556 U.S. 418 (2009) ..........................................................................................1, 10

*Rush v. Parham*,
    625 F.2d 1150 (5th Cir. 1980) ................................................................................5

*United States v. Philip Morris USA, Inc.*,
    449 F. Supp. 2d 988, 990 (D.D.C. 2006) ................................................................1

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) ................................................................................2

**Statutes**

§ 409.905, Fla. Stat. ..........................................................................................................9

**I.      INTRODUCTION**

Stays pending appeal are "an intrusion into the ordinary processes of administration and judicial review." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (cleaned up). They are the rare exception, not the rule. Here, the Nonparty Groups are not entitled to a stay because the most critical stay factor—likelihood of success on the merits—weighs in the State of Florida's favor. The other stay factors similarly weigh against granting a stay because this Court has already struck a balance between the State's needs and the Nonparty Groups' rights. For these reasons, and those that follow, this Court should deny the Nonparty Groups' motion for stay pending appeal.

**II.     LEGAL STANDARD**

The stay applicant bears the heavy burden to show that the "exercise of the court's extraordinary injunctive powers is warranted." *Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam). Or as this Court has previously said: "it must be remembered that granting a stay pending appeal is always an extraordinary remedy and that the moving party carries a heavy burden to demonstrate that the stay is warranted." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 988, 990 (D.D.C. 2006) (cleaned up). To carry that heavy burden, the stay applicant must (1) make a strong showing that it is likely to succeed on the merits; (2) that the applicant will be irreparably injured absent a stay; (3) that issuance of a stay will not substantially injure the other parties; and (4) that the stay will further the public interest. *Nken*, 556 U.S. at 434. The first two factors are the most crucial. *Id.* The Nonparty Groups fail to meet *any* of the four stay factors.

### III.   ARGUMENT

#### A.   FACTOR ONE: THE NONPARTY GROUPS ARE UNLIKELY TO SUCCEED ON THE MERITS.

The first stay factor—strong showing of success on the merits—requires more than a negligible chance of success. *Id.* at 434. The chance of success must be "substantial," with "questions going to the merits so serious," "difficult[,] and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (cleaned up). Given the outsized importance of this factor, failing to satisfy it is likely "fatal." *CREW v. Fed. Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam). And it is fatal here.

The Nonparty Groups contend that, if they are subject to depositions and required to produce additional documents, then such measures would violate their First Amendment rights, namely "their ability to organize, entertain uninhibited and candid internal dialogues, make well-reasoned decisions, and generate useful work product," as well as having "robust, candid discussions necessary for them to do their work." Doc. 27-1 at 9-10. Not so.

**1.** As an initial matter, First Amendment rights are not absolute. When invoked in discovery disputes, these qualified constitutional rights are subject to a balancing test. That test requires that courts balance one party's "First Amendment claim[s]" with an opposing party's "need for the information sought." *Black Panther Party v. Smith*, 661 F.2d 1243, 1266 (D.C. Cir. 1981). If the latter outweighs the former, then disclosure is required. *See Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1974) (holding that the First Amendment is not an absolute bar to discovery).

True, disclosing member lists and member names does encroach upon First Amendment rights, and usually tilts the balance against disclosure. *See NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958). In this case, however, the State has already agreed that member lists and

2

member names should be redacted, as the Nonparty Groups have already done so in their limited production. The State has also repeatedly explained that it does not care about the *whos*—the names of members who created guidelines or policies. The State's focus remains on the *hows* and *whats*—how the Nonparty Groups created their guidelines and policy positions on gender-affirming care, what evidence they disregarded, and what dissent, if any, was expressed. The chilling effect that comes with naming names is thus absent, and has been further minimized by this Court's orders narrowing the scope of the State's discovery.

**2.** In addition, the Nonparty Groups must substantiate their First Amendment fears. The only substantive evidence that they rely on here are declarations from an American Academy of Pediatrics ("AAP") member, an Endocrine Society ("ES") member, and a World Professional Association for Transgender Health ("WPATH") member. Doc. 27-1 at 10. Yet these declarations are not enough for three independent reasons.

First, these declarations address concerns over the original subpoenas.[1] Again, this Court has already modified the original subpoenas and narrowed them to the Nonparty Groups' benefit. Therefore, the concerns expressed in the declarations are outdated and do not express the concerns with the now-modified, narrowed subpoenas or the State's representations to this Court.

Second, the AAP, ES, and WPATH declarations themselves do not demonstrate "substantial" First Amendment harms; the declarations do not even demonstrate that the harms are even "probab[le]." *Black Panther Party*, 661 F.2d at 1267-68. The declarations mostly illustrate

---

[1] *E.g.*, AAP, Doc. 1-1, ¶ 16 ("I am reluctant to seek guidance from colleagues or my previous supervisor on this issue for concern of bringing them under the umbrella of the [original] subpoena."); ES, Doc. 1-2, ¶ 15 ("I am also concerned that if this [original] subpoena is enforced . . . ."); WPATH, Doc. 1-3, ¶ 13 ("I believe that our staff and members will communicate less if the [original] subpoena is enforced.").

3

speculative, future First Amendment concerns.[2] There is also no explanation for why the speculative beliefs of one member of AAP, ES, and WPATH should apply to the organizations as a whole.[3]

Third, to the extent that they demonstrate First Amendment concerns, the declarations concern only three of eighteen Nonparty Groups. The First Amendment concerns for the remaining fifteen Nonparty Groups are unsupported by any declarations and are thus purely speculative. Their concerns cannot be weighed in a vacuum without any supporting facts. "It is well established that the proponent of a privilege bears the burden of demonstrating *facts* sufficient to establish a privilege's applicability." *In re Subpoena Duces Tecum*, 439 F.3d 740, 750 (D.C. Cir. 2006) (emphasis added). None of the Nonparty Groups have done so here.

**3.** Even if the Nonparty Groups had substantiated their First Amendment fears, the State's need for depositions and documents outweighs those fears. The information being sought goes to "the heart of" the underlying case against the State currently pending before the Northern District of Florida. *Black Panther Party*, 661 F.2d at 1268. There, in *Dekker v. Weida*, the court has said that the central issue is "whether, based on current medical knowledge," the State's "determination

---

[2] *E.g.*, AAP, Doc.1-1, ¶ 19 ("I am also *concerned* that our staff and members *will avoid* communicating with each other, and that new members *will fear* joining." (emphasis added)); ¶ 21 ("*I believe* enforcement of this subpoena *will reduce* the quality and accuracy of our work product." (emphasis added)); ES, Doc. 1-2, ¶ 14 ("*I believe* that our staff and members *will communicate less*, and less freely, if the subpoena were enforced." (emphasis added)); ¶ 15 ("I am also *concerned* that if this subpoena is enforced our staff and members *will avoid communicating* with each other to complete work on Endocrine Society projects and programs; that our members *will step back* from volunteering to work on future clinical practice guidelines, educational sessions and materials, and participating in Endocrine Society committees and work groups; and that new members *will fear* joining." (emphasis added)); WPATH, Doc. 1-3, ¶ 13 ("*I believe* that our staff and members *will communicate less if* the subpoena is enforced." (emphasis added)).

[3] *E.g.*, AAP, Doc. 1-1, ¶ 16 ("*I am reluctant* to seek guidance from colleagues." (emphasis added)); ES, Doc. 1-2, ¶ 13 ("*I am seriously concerned* about the effect this subpoena will have on our ability to freely communicate as an organization." (emphasis added)).

4

that" the at-issue treatments for gender dysphoria "are experimental is reasonable." Doc. 64 at 4, 4:22-cv-00325 (N.D. Fla. 2022) (citing *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980)).

Unsurprisingly, the *Dekker* Plaintiffs maintain that the Nonparty Groups represent that consensus on current medical knowledge. The operative complaint is replete with references to the Nonparty Groups' guidelines and policy positions. *E.g.*, Doc. 1, ¶¶ 37-40, 47, 56, 89, 91, 4:22-cv-00325 (N.D. Fla. 2022). And consider the *Dekker* preliminary injunction hearing. On cross examination of the State's expert witness, Dr. Laidlaw, the *Dekker* Plaintiffs sought to discredit Dr. Laidlaw by comparing his opinions with the guidelines and policy positions of the Nonparty Groups. They asked: "Dr. Laidlaw, are you aware that your opposition to gender-affirming care for the treatment of gender dysphoria in youth and adults is contrary to the vast majority of medical associations' recommendations?" Doc. 11-1 at 902-15. They pursued this line of questioning for approximately fifteen transcript pages, marching through different medical organizations' guidelines and policy statements. *Id.*

The Nonparty Groups also maintain that they represent the current medical consensus. They said so expressly in their motion for leave to file an amicus brief in *Dekker*. Doc. 34-1 at 22, 4:22-cv-00325 (N.D. Fla. 2022). When discussing the medical consensus on the "treatment protocols for gender dysphoria," the Nonparty Groups expressly relied on guidelines and standards from ES and WPATH, among other Nonparty Group members. *Id.*

Given the *Dekker* district court's focus on the current medical knowledge, the *Dekker* Plaintiffs' reliance on the Nonparty Groups to establish the medical consensus on this issue, and the Nonparty Groups' position that they do represent the medical consensus on this issue, the State must be allowed to test the proposition. Obtaining "substantive materials and opinions that were

5

considered and relied upon, as well as the materials and opinions that were considered and rejected in adopting the guidelines or policy positions" is how the State can do just that. Doc. 28 at 1.

To be sure, documents from the Nonparty Groups' webpages, whitepapers, or even internal policies, alone, cannot fully explain *how* these organizations created their guidelines and policy positions on gender-affirming care. *See* Doc. 27-1 at 12. Nor do the documents produced to date. The production to date simply makes clear that the organizations have detailed, thorough, and multi-level drafting, editing, and review procedures for guidelines and policy positions. *E.g.*, Nonparty Groups' Production Bates No. AAP_159; ES_147, ES_148, ES_225; ACOG_60; AACAP_54.[4] The WPATH, ES, and AAP declarations confirm a robust drafting and review process. *See* Doc. 27-1 at 14-16 (citing declarations). Obtaining substantive communications, documents, and opinions throughout that process is precisely what the State seeks. Moreover, in the *Dekker* case, the State produced evidence that the Nonparty Groups' positions on gender dysphoria might not even represent their own members' viewpoints: Dr. Zanga, a member of the AAP, wrote a declaration and stated that the organization likely suppressed member-led resolutions that questioned the organization's stance on gender dysphoria. Doc. 11-1 at 1065. If the Nonparty Groups do not even represent the viewpoints of their members, they cannot represent the medical consensus, either.

The State tried different avenues to obtain discovery from the Nonparty Groups. During several meet and confers, the State proposed—to both the Nonparty Groups and to the *Dekker* Plaintiffs—that instead of deposing WPATH, ES, and AAP, those groups could provide written responses to the State's questions. The only issue was whether the *Dekker* Plaintiffs would allow

---

[4] The State notes that the Nonparty Groups have designated these documents as confidential. The State remains able and ready to provide these documents to this Court under seal or in any other manner this Court deems fit.

6

the responses to be introduced as evidence at trial and would not make hearsay objections; unfortunately, the *Dekker* Plaintiffs stated that they would not. Contrary to the Nonparty Groups' suggestion, there is no reasonable alternative source of information from which the State can gain an understanding of the Nonparty Groups' guidelines and policy positions—information that is critically important to the State's defense of the GAPMS Rule. They and they alone have the information relevant to the formation of their own guidelines and policy positions.

In sum, even if the Nonparty Groups have a fact-specific First Amendment concern, the State's interests in deposition and document discovery outweigh those concerns. The Nonparty Groups thus have no likelihood of success on the merits. The Nonparty Groups' failure to satisfy this factor is "fatal." *CREW*, 904 F.3d at 1019.

### B. FACTOR TWO: ABSENT A STAY, THE NONPARTY GROUPS WOULD NOT BE HARMED.

The Nonparty Groups' failure to satisfy the irreparable harm factor is equally fatal. Irreparable harm must be "both certain and great," "likely" "and actual," and not merely "theoretical." *Id.* at 1019 (cleaned up). The Nonparty Groups cannot show such harm. As noted above, this Court has already allowed redactions of member names and member lists after modifying the State's original subpoena. The Nonparty Groups' declarations do not demonstrate facts that show certain, great, likely, or actual First Amendment injuries. This is so because the declarations express concern for the original subpoena, not the Court-modified subpoena; they focus on future, speculative, and individual First Amendment concerns; and at best, they suggest First Amendment concerns for three out of eighteen organizations.

The Nonparty Groups' recent actions seemingly contradict the declarations as well. Consider ES's declaration where an ES member states that "[a]s a result of [the original] subpoena, whenever the Endocrine Society prepares to submit a new amicus filing, send a letter to the

7

government, meet with a legislator or governmental official, or issue a new policy statement, our board now must consider whether this will result in future subpoenas," which "is truly chilling to the Endocrine Society's ability to participate in the policy, legislative, and regulatory process and share our views as well as clinical and scientific information with policy makers." ES, Doc. 1-2, ¶ 16. Yet just last week, that same organization announced on its website that it is now emboldened and has taken new advocacy actions, including lobbying Congress. *See* Advocacy in Action, Endocrine Society (Feb. 24, 2023), https://www.endocrine.org/advocacy/advocacy-in-action.

All told, the Nonparty Groups have not carried their burden on the second factor. Their harms are not "certain" or "great," not "likely" or "actual"; at best, they are "theoretical." *CREW*, 904 F.3d at 1019.

### C. FACTOR THREE: WITH A STAY, THE STATE WOULD BE SUBSTANTIALLY INJURED.

Again, in the *Dekker* district court's framing of the issue, the State must be allowed to determine *how* the Nonparty Groups—the self-professed guardians of medical expertise—created their guidelines and policy positions on gender-affirming care. Absent this substantive information, the State will remain at a disadvantage in the underlying litigation. Should this disadvantage result in the State's at-issue rule on gender-affirming care being stricken, the State would be irreparably harmed. *See generally Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (a state suffers irreparable harm when it is not allowed to enforce its laws).

The motion for stay only increases the potential harm to the State. Fact discovery ends March 10. The Nonparty Groups speculate that the *Dekker* district court might extend the discovery deadline, but it is unknown whether or not the *Dekker* court would extend fact discovery for a third time. The *Dekker* court, at the *Dekker* Plaintiffs' request, fast-tracked this case. *See* Doc.

8

67 at 2, 4:22-cv-00325 (N.D. Fla. 2022) ("This [scheduling] order sets an aggressive schedule because the claims are of a kind that should be resolved as promptly as feasible."). The State is bound to complete discovery by the current deadline set by the *Dekker* court. The time to conduct nonparty discovery is now, and the State is harmed in its absence.

### D. FACTOR FOUR: PUBLIC INTEREST WEIGHS AGAINST THE NONPARTY GROUPS.

Finally, the public interest weighs in the State's favor, not the Nonparty Groups'. As explained previously, the Nonparty Groups' asserted First Amendment privilege is outweighed by the State's need for the sought after discovery. This information will go toward proving (or disproving) the experimental nature of the excluded treatments for gender-dysphoria. Having this information furthers the State's goal in ensuring that its Medicaid program reimburses for only non-experimental services, which may pose significant (and unknown) medical risks or otherwise do more harm than good. *See* Fla. Stat. § 409.905(9) (stating the State' Medicaid agency "shall not pay for [Medicaid] services that are . . . experimental").

The Nonparty Groups present an additional argument: they favor an open, robust, scientific dialogue on treatments for gender-affirming care, but say that such a debate can only take place behind closed doors. Doc. 27-1 at 14-16. This is not a national security issue where the public would benefit from secret science. An open and robust debate requires transparency.

Indeed, if the Nonparty Groups truly "seek[] to ensure all individuals, including those with gender dysphoria, receive the optimal medical and mental healthcare they need and deserve," Doc. 34 at 3, 4:22-cv-00325 (N.D. Fla. 2022), then the public would benefit from transparency. Transparency in how these organizations seek to steer the medical community on an important medical issue is important. So too is transparency in what these organizations relied on when creating their guidelines and policy positions. Surely then the public interest tilts toward

9

transparency. *See generally Nken*, 556 U.S. at 436 (public interest in enforcing laws); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *CREW*, 904 F.3d at 1019-20 (citing cases for the proposition that transparency is beneficial, albeit in the election-campaign-disclosure context).

## IV. CONCLUSION

None of the four stay factors favors the Nonparty Groups. Their motion should be denied.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | /s/ Mohammad O. Jazil |
|  | Mohammad O. Jazil (FBN 72556) |
|  | Gary V. Perko (FBN 855898) |
|  | Joshua E. Pratt* (FBN 119347) |
|  | mjazil@holtzmanvogel.com |
|  | gperko@holtzmanvogel.com |
|  | jpratt@holtzmanvogel.com |
|  | HOLTZMAN VOGEL BARAN |
|  | TORCHINSKY & JOSEFIAK PLLC |
|  | 119 S. Monroe St., Suite 500 |
|  | Tallahassee, FL 32301 |
| Dated: March 3, 2023 | (850) 270-5938 |
|  | *admitted pro hac vice |
|  | *Counsel for Secretary Weida and the* |
|  | *Agency for Health Care Administration* |

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2023, a true and correct copy of the foregoing was served on counsel for the non-parties by electronic mail and counsel of record for the parties who have appeared in *Dekker, et al. v. Weida, et al.*, No. 4:22-cv-325-RH-MAF by electronic mail.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

11