IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON AMERICAN ACADEMY OF PEDIATRICS, *et al.*, | Misc. Case No. 23-MC-00004 (CJN) |
| AUGUST DEKKER, *et al.*,<br><br>    Plaintiffs,<br>v.<br><br>JASON WEIDA, *et al.*,<br><br>    Defendants. | Northern District of Florida<br>Case No. 4:22-cv-325-RH-MAF |

## ORDER

This matter is before the Court on the Nonparty Groups' Emergency Motion for a Stay Pending Appeal, ECF No. 27. The Nonparty Groups seek a stay of the Court's orders requiring each of them to produce certain documents and three of them to submit to depositions on certain topics, citing their rights under the First Amendment.

To determine whether to grant a stay pending appeal, the Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Beck v. Test Masters Educ. Servs., Inc.*, 937 F. Supp. 2d 85, 86 (D.D.C. 2013) (quotations omitted). The most important factors are the likelihood of success on the merits and the risk of irreparable harm. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

The Nonparty Groups have not made a strong showing that they are likely to succeed on the merits. As the Court previously explained, evaluating a First Amendment defense in the discovery context requires a careful balancing of First Amendment interests against the need for the requested information. *See Ted Cruz for Senate v. FEC*, 451 F. Supp. 3d 92, 99 (D.D.C. 2020). Courts must consider (1) whether the requested information goes to the "heart of the lawsuit" and (2) whether the party seeking the discovery sought the information through alternative sources or otherwise made reasonable attempts to obtain the information elsewhere. *See Wyoming v. Dep't of Argic.*, 208 F.R.D. 449, 455 (D.D.C. 2002) (citing *Int'l Union v. Nat'l Right to Work Legal Defense and Ed. Found., Inc.*, 590 F.2d 1139, 1147 (D.C. Cir. 1978)). First Amendment interests "ordinarily grow stronger as the danger to rights of expression and association increases," such as when the fear of harassment is substantial. *Black Panther Party v. Smith*, 661 F.2d 1243, 1267–69 (D.C. Cir. 1981), *vacated as moot sub nom. Moore v. Black Panther Party*, 458 U.S. 1118 (1982). The First Amendment accordingly affords strong protection against disclosure of an organization's membership lists, *see NAACP v. Alabama*, 357 U.S. 449, 466 (1958), but protection also extends to internal communications that, if disclosed, may chill the exercise of First Amendment rights, *see Wyoming*, 208 F.R.D. at 454.

The Court concludes, as it did before, that the Nonparty Groups' First Amendment interests are outweighed by the State's substantial need for the requested discovery, especially given the State's agreement to a protective order and to the redaction of names and other personal identifiers in any documents that are produced or testimony that is obtained.

To begin, the State's interest in disclosure here is particularly strong because the requested information, as limited by the Court's orders, goes to the heart of the lawsuit. The District Court for the Northern District of Florida helpfully identified the controlling question in the underlying litigation: "whether, based on current medical knowledge, the state's determination that [certain]

treatments [for gender dysphoria] are experimental is reasonable." *See* App'x to Opp'n to Mtn. to Quash at 12, ECF No. 11-1 ("App'x"). Both sides agree that the outcome of the case turns on the answer to this question. *See* Mtn. for Stay at 7. But the Nonparty Groups contend that the requested discovery has no bearing on the inquiry.

The Court disagrees, for the reasons discussed during the hearing on January 26, 2023, and as follows. In challenging the reasonableness of the State's determination that certain treatments for gender dysphoria are experimental, the plaintiffs in the underlying litigation lean heavily on the views of the Nonparty Groups. For example, the plaintiffs allege in their complaint that "[g]ender-affirming care is neither experimental nor investigational; it is the prevailing standard of care, accepted and supported by every major medical organization in the United States." App'x at 368–69. They also allege that two of the Nonparty Groups—the World Professional Association for Transgender Health and the Endocrine Society—have "published widely accepted guidelines for treating gender dysphoria" that are "based on the best available science and expert professional consensus," are "widely accepted as best practices guidelines for the treatment of adolescents and adults diagnosed with gender dysphoria," and are "recognized as authoritative by the leading medical organizations." *Id.* at 379–80.

The plaintiffs' reliance on the Nonparty Groups extends beyond their complaint. During cross-examination at a preliminary injunction hearing, the plaintiffs' counsel asked the State's expert whether he was "aware that [his] opposition to gender-affirming care for the treatment of gender dysphoria in youth and adults is contrary to the vast majority of medical associations' recommendations[.]" *Id.* at 902. The same counsel also explained that many of the Nonparty Groups have adopted policy statements in support of the plaintiffs' position. *Id.* at 903–15. Finally, each of the Nonparty Groups signed a proposed amicus brief challenging the State's position and arguing that

3

"[t]he widely accepted recommendation of the medical community, including that of the respected professional organizations participating here as *amici*, is that the standard of care for treating gender dysphoria is 'gender-affirming care.'" *Id.* at 456.

The upshot is that the plaintiffs, in challenging the reasonableness of the State's position, have relied (and presumably will continue to rely) substantially on the guidelines and policy positions of the Nonparty Groups. This reliance is understandable—the Nonparty Groups and the plaintiffs all claim that the Nonparty Groups represent the medical community, so their views provide a powerful retort to the reasonableness of the State's position. At the same time, however, it is also understandable that the State would try to defend the reasonableness of its position by seeking information that goes to the rigor of the process by which the guidelines and policy positions were adopted.[1] Again, the reasonableness of the State's position is not just *an* issue in the case—it is *the* issue in the case, at least as the court there has framed it.[2]

Next, the Court must consider whether the State has sought the information through alternative sources. As the Court previously explained, however, there are no plausible alternative sources—the Nonparty Groups, and the Nonparty Groups alone, possess the requested information. To be sure, the State can present its own scientific evidence and expert testimony to support its position on the proper treatment for gender dysphoria. But it cannot fully respond to the plaintiffs' reliance on the views of

---

[1] The Nonparty Groups seek to produce documents that show only the high-level *procedures* by which they establish guidelines and policy positions. But such information would not enable the State to adequately probe *how* the Nonparty Groups arrived at their guidelines or policy positions on "gender-affirming care," which are the only relevant guidelines in the underlying litigation. Indeed, the State has already put forward some evidence that the guidelines for the American Academy of Pediatrics may not reflect the consensus of its members—and that the organization may have ignored dissenting views in adopting its guidelines. *See* App'x at 1063–1070 (Declaration of Dr. Joseph Zanga).

[2] Contrary to the Nonparty Groups' assertion, the State is not merely speculating that the requested information is relevant; the information *is* relevant because the guidelines and policy positions are relevant.

4

the Nonparty Groups—who again the plaintiffs and the Nonparty Groups assert represent the prevailing view in the medical community—without obtaining the requested information.

To repeat what the Court said during the January 26, 2023 hearing, it recognizes the First Amendment interests at stake here. But importantly, the State is not seeking the identities of the Nonparty Groups' members. Indeed, the State has represented that it does not object to the redaction of names and other personal identifiers from any documents or testimony. *See* Opp'n to Mtn. to Quash at 29. Nor does the State object to the entry of a protective order safeguarding this same information. *See id.* These concessions substantially mitigate the Nonparty Groups' fear of harassment and interference with First Amendment rights. And although the Nonparty Groups still have a First Amendment interest in their internal communications, the Court concludes that this interest is outweighed by the State's substantial need for the requested discovery, given the controlling question in the case and how the plaintiffs have tried to answer that question.

It is accordingly

**ORDERED** that the Nonparty Groups' Emergency Motion for a Stay Pending Appeal, ECF No. 27, is **DENIED**; and it is further

**ORDERED** that the document production and deposition deadlines are **EXTENDED** to March 10, 2023, so that the Nonparty Groups may have additional time to seek a stay pending appeal from the Court of Appeals.

Date: March 3, 2023

_____
CARL J. NICHOLS
United States District Judge